1  Mark D. Kemple (State Bar No. 145219)
   Erik K. Swanholt (State Bar No. 198042)
2  JONES DAY
   555 South Flower Street
3  Fiftieth Floor
   Los Angeles, CA 90071-2300
4  Telephone: (213) 489-3939
   Facsimile: (213) 243-2539
5  Email: mkemple@jonesday.com
   Email: ekswanholt@jonesday.com
6
7  Attorneys for Defendants
   Greystone Servicing Corporation, Inc., and
8  Greystone CDE, LLC

COPY

E-filing

ORIGINAL FILED
OCT 2 5 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

JCS

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                   (OAKLAND DIVISION)

12

13  SANTA FE POINTE, LP, an            CASE NO. C07-05454
    Oklahoma limited partnership; SANTA
14  FE MANAGEMENT, LLC, an             NOTICE OF REMOVAL OF
    Oklahoma limited liability company;  ACTION UNDER 28 U.S.C.
15  RANT, LLC, a Delaware limited      §1441(A)
    liability company; and THEOTIS F.
16  OLIPHANT, an individual,           (DIVERSITY)

17                Plaintiffs,

18       v.

19  GREYSTONE SERVICING
    CORPORATION, INC., a Georgia
20  corporation; GREYSTONE CDE,
    LLC, a Delaware limited liability
21  company, and DOES 1 through 100,
    inclusive,
22
23                Defendants.

24

25

26

27

28

LAI-2909459

Notice of Removal of Action Under 28 U.S.C. §1441(a)

**TO THE CLERK AND HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA:**

**PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 1332 and 1441(a), Defendants Greystone Servicing Corporation, Inc. and Greystone CDE, LLC (collectively, "Defendants" or "Greystone") hereby remove the above-entitled action from the Superior Court of California for the County of Alameda to the United States District Court for the Northern District of California. The grounds for removal are as follows:

## INTRODUCTION

1. On September 7, 2007, an action was commenced against Defendants in the Superior Court of California for the County of Alameda, Case Number RG 07-345170, entitled *Santa Fe Pointe, LP, et al. v. Greystone Servicing Corporation, Inc., et al.*. On September 25, 2007, Plaintiffs filed and served a First Amended and Supplemental Complaint for Damages and Declaratory Relief ("FAC"). Copies of the summonses and complaints in that action are attached hereto as Exhibits "A1" and "A2."

2. Defendants first received a copy of the FAC on September 25, 2005, when their designated service agents were personally served. Defendants filed their Answer to Plaintiffs' FAC in the Superior Court of California for the County of Alameda on October 25, 2007. No other proceedings have occurred in the state court action.

## DIVERSITY JURISDICTION EXISTS

3. This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one that may be removed to this Court by Defendants under 28 U.S.C. § 1441(a). This is an action between citizens of different states, and the amount in controversy as to each of the Plaintiffs exceeds the sum of $75,000, exclusive of interest and costs.

A.    **The Amount In Controversy Requirement Is Satisfied**.

4.    Plaintiffs' FAC alleges seven separate causes of action including claims for monetary recovery under theories of tort and contract. The substance of these claims is that Plaintiffs failed to realize the financial incentives that they had hoped to attain through the development of a multi-million dollar Low Income Housing Tax Credit project in conjunction with a mortgage loan insured by the Federal Housing Authority's ("FHA") Office of Housing and Urban Development ("HUD"), and incurred additional expenses in their pursuit of the project. *See* Ex. A2 (FAC) ¶¶ 1, 15, 17, 28, 33, 65, 81, 94. Specifically, Plaintiffs allege that "[t]he tax credit developer [for such projects] gets paid a fee equal to 14% of the total allowable project costs," and have further alleged that this particular project was to be financed through the issuance of "$7,095,000 of tax exempt bonds." *Id.* ¶¶ 1, 17. Plaintiffs further allege the incurrence of approximately $215,000 in costs related to the issuance of those bonds. *Id.* ¶ 28. Based on these allegations, Plaintiffs seek general damages, compensatory damages, punitive damages, exemplary damages, and attorneys' fees. *Id.* at p. 22.[1] Therefore, it is "facially apparent from the complaint that the jurisdictional amount [in excess of $75,000] is in controversy." *See Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373 (9th Cir. 1997) (internal quotations and citation omitted). The amount in controversy as to each of the Plaintiffs exceeds $75,000. Accordingly, this action meets the jurisdictional amount in controversy requirement of this Court.

B.    **The Parties Have Complete Diversity of Citizenship**.

5.    Plaintiffs allege that Plaintiff Theotis F. Oliphant ("Oliphant") "maintain[s] his principal place of residence in the State of California." Ex. A2

---

[1] The amount in controversy includes: (i) claims for general and special damages excluding costs and interest; (ii) a reasonable projection of attorneys' fees through resolution of the controversy if fees are recoverable by statute or contract; and (iii) punitive damages if recoverable. *See Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238, 240 (1943); *Brady v. Mercedes-Benz USA, Inc.*, 243 F.Supp.2d 1004, 1010-11 (N.D. Cal. 2002).

1   (FAC) ¶ 5. Defendants are informed and believe that Oliphant was, at the time of

2   the filing of this action, and still is, residing and domiciled in, and therefore a

3   citizen of, the State of California.

4        6.     Plaintiffs allege that Plaintiff Santa Fe Management, LLC is a limited

5   liability company organized under the laws of the State of Oklahoma. Ex. A2

6   (FAC) ¶ 3. Defendants are informed and believe that Santa Fe Management, LLC's

7   sole member, Oliphant, was, at the time of the filing of this action, and still is, a

8   citizen of the State of California.[2]

9        7.     Plaintiffs allege that Plaintiff Santa Fe Pointe, LP is a limited

10   partnership organized under the laws of the State of Oklahoma. Ex. A2 (FAC) ¶ 2.

11   Defendants are informed and believe that Plaintiff Santa Fe Pointe, LP's sole

12   general partner, Santa Fe Management, LLC, and sole limited partner, Oliphant,

13   were, at the time of the filing of this action, and still are, citizens of the State of

14   California.[3]

15        8.     Plaintiffs allege that Plaintiff Rant, LLC is a limited liability company

16   organized under the laws of the State of Delaware. Ex. A2 (FAC) ¶ 4. Defendants

17   are informed and believe that Rant, LLC consists of two members, Oliphant and

18   Robin van der Vegt, both of whom were, at the time of the filing of this action, and

19   still are, residing and domiciled in, and therefore citizens of, the State of California.

20        9.     Plaintiffs erroneously allege that Defendant Greystone Servicing

21   Corporation, Inc. has "its principal place of business in New York, New York."

22   Ex. A2 (FAC) ¶ 6. Defendant Greystone Servicing Corporation, Inc. was, at the

23   time of the filing of this action, and still is, a corporation formed under the laws of

---

24        [2] Unlike a corporation, for purposes of diversity jurisdiction, an LLC is not a

25   citizen of the state in which it is organized. Rather, like a partnership, "an LLC is a citizen of every state of which its owners/members are citizens." *Johnson v.*

26   *Columbia Props. Anchorage, Ltd. P'ship*, 437 F.3d 894, 899 (9th Cir. 2006).

27        [3] It has been long established by the Supreme Court that, for purposes of diversity jurisdiction, an artificial entity such as a limited partnership is treated as

28   having the citizenship of all its members. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990)).

1   the State of Georgia, with its principal place of business in the Commonwealth of

2   Virginia.

3         10.    Plaintiffs erroneously allege that Defendant Greystone CDE, LLC "is a

4   Delaware *corporation* having its principal place of business in New York,

5   New York," and that it "was not qualified to do business as a foreign corporation in

6   the State of California but in fact did business in said state." Ex. A2 (FAC) ¶ 7

7   (emphasis added). Defendant Greystone CDE, LLC is a *limited liability company*

8   organized under the laws of the State of Delaware, consisting of two members,

9   Greystone Development Corporation and Greystone Funding Corporation, both of

10  which were, at the time of the filing of this action, and still are, corporations formed

11  under the laws of the Commonwealth of Virginia, with their principal places of

12  business in the State of New York.

13        11.    For diversity purposes, "a corporation shall be deemed to be a citizen

14  of any State by which it has been incorporated and of the State where it has its

15  principal place of business[.]" 28 U.S.C. § 1332(c)(1).

16        12.    Unless it is shown that a corporation's "activities do not substantially

17  predominate in any one state," the Ninth Circuit applies a "place of operations"

18  analysis to determine the principal place of business of a corporation. *Tosco Corp.*

19  *v. Cmtys. for a Better Env't*, 236 F.3d 495, 500 (9th Cir. 2001); *see also Indus.*

20  *Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1094 (9th Cir. 1990). Under this

21  approach, the court may look to factors such as "the location of employees, tangible

22  property, production activities, sources of income, and where sales take place."

23  *Tosco Corp.*, 236 F.3d at 500. Thus, to establish a principal place of business in a

24  state, the amount of business activity in that state must be "significantly larger than

25  any other state in which the corporation does business." *Id.*; *see also United*

26  *Computer Sys., Inc. v. AT&T*, 298 F.3d 756, 763 (9th Cir. 2002); *Indus. Tectonics,*

27  *Inc.*, 912 F.2d at 1093-94.

28

13.     Alternatively, "when no state contains a substantial predominance of the corporation's business activities," courts may apply the "nerve center" test. Under this approach, a corporation's principal place of business is located "in the state where the majority of its executive and administrative functions are performed." *Tosco Corp.*, 236 F.3d at 500.  Thus, even in the face of significant California operations, courts have declined to hold that California is a corporation's principal place of business, where those operations do not clearly dominate operations in other states.  For example, in *Ho v. Ikon Office Solutions, Inc.*, 143 F. Supp. 2d 1163, 1165-67 (N.D. Cal. 2001), a court in this district concluded that the defendant's principal place of business was not California— even though it had the greatest number of employees in California— because no single state had more than 10% of its workforce, no single state generated more than 10% of its annual revenue, and its administrative and executive functions took place elsewhere.

14.     Defendant Greystone Servicing Corporation, Inc.'s executive functions are located outside the State of California.  Its business operations in California do not substantially predominate or outweigh its business operations in other states.  Rather, the substantial predominance of Greystone Servicing Corporation, Inc.'s business activities takes place in the Commonwealth of Virginia, as most of its employees, and significant operational and administrative functions are located in Warrenton, Virginia.

15.     The executive functions of Greystone Development Corporation, which is one of two members of Defendant Greystone CDE, LLC, are located outside the State of California.  Its business operations in California do not substantially predominate or outweigh its business operations in other states.  Rather, the substantial predominance of Greystone Development Corporation's business activities takes place in the State of New York, as most of its employees, and significant operational and administrative functions are located in New York, New York.

16.    The executive functions of Greystone Funding Corporation, which is one of two members of Defendant Greystone CDE, LLC, are located outside the State of California.  Its business operations in California do not substantially predominate or outweigh its business operations in other states.  Rather, the substantial predominance of Greystone Funding Corporation's business activities takes place in the State of New York, as most of its significant operational and administrative functions are located in New York, New York.

17.    Applying the above facts to the place of operations test, California is not the principal place of business for either Greystone Servicing Corporation, Inc. or Greystone CDE, LLC.  The facts demonstrate that the substantial predominance of Defendants' business activities does not take place in the State of California.  Rather, the substantial predominance of Defendants' business activities takes place in the Commonwealth of Virginia for Greystone Servicing Corporation, Inc., and in the State of New York for the constituent members of Defendant Greystone CDE, LLC.

18.    This action is therefore brought between citizens of different states under the definition of 28 U.S.C. § 1332.

## **COMPLIANCE WITH STATUTORY REQUIREMENTS**

**A.    This Notice of Removal Is Timely.**

19.    This Notice of Removal is being filed within thirty (30) days after Defendants were served with the Summons and FAC in this action.  Therefore, this Notice of Removal is timely filed under 28 U.S.C. § 1446(b).

20.    The removal statute also provides that a case may not be removed on the basis of diversity jurisdiction more than one year after commencement of such action.  28 U.S.C. § 1446(b).  This action was commenced less than one year ago.

**B.    <u>All Properly Joined and Served Defendants Join In this Notice</u>.**

21.    This Notice of Removal is being filed jointly by Defendants Greystone Servicing Corporation, Inc. and Greystone CDE, LLC, which are the only named defendants that have been served in the state court action.

**C.    <u>Copies of All Specified Documents Served Upon Defendants Have Been Filed With This Court</u>.**

22.    Pursuant to 28 U.S.C. § 1446(a), Defendants hereby attach collectively as Exhibits "A1" and "A2" a copy of "all process, pleadings, and orders" served upon Defendants in the state court action.  Defendants will provide the complete state court file upon request by the district court pursuant to 28 U.S.C. § 1447(b).

**D.    <u>Defendants Will Promptly Give Notice</u>.**

23.    As required by 28 U.S.C. § 1446(d), Counsel for Defendants will promptly file a copy of this Notice of Removal with the Clerk of the Superior Court of California for the County of Alameda, and will give notice of such filing to counsel for Plaintiffs.

* * *

WHEREFORE, Defendants respectfully remove the above-entitled action from the Superior Court of California for the County of Alameda to this Court pursuant to 28 U.S.C. §§ 1332 and 1441(a).

Dated:    October 25, 2007

JONES DAY

By: _____
Mark D. Kemple
Erik K. Swanholt

Attorneys for Defendants Greystone Servicing Corporation, Inc. and Greystone CDE, LLC

EXHIBIT A-1

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:
Eric J. Farber, SBN 169472 / Ann McFarland Draper, SBN 065669
Farber & Company Attorneys, LLP
847 Sansome Street, Suite LL / San Francisco, CA 94111

TELEPHONE NO.: 415-434-5320    FAX NO.: 415-434-5380
ATTORNEY FOR *(Name)*: Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Northern Division

FOR COURT USE ONLY

ENDORSED
FILED
ALAMEDA COUNTY

SEP 07 2007

CLERK OF THE SUPERIOR COURT
By KMEL DRILLON, Deputy

CASE NAME:
Santa Fe Point, LP, et al. v. Greystone Servicing Corporation, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: RG 07345170 |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☑ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. ☑ monetary    b. ☐ nonmonetary; declaratory or injunctive relief    c. ☐ punitive
4. Number of causes of action *(specify)*: 2
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 7, 2007
Eric J. Farber
_____
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov
American LegalNet, Inc.



1   Eric J. Farber, SBN 169472
    Ann McFarland Draper, SBN 065669
2   FARBER & COMPANY ATTORNEYS, LLP
    847 Sansome Street, Ste. LL
3   San Francisco, California 94111
    Telephone 415.434.5320
4   Facsimile 415.434.5380

5   Attorneys for Plaintiff

6

7

**F I L E D**
ALAMEDA COUNTY

SEP 0 7 2007

CLERK OF THE SUPERIOR COURT
By_____
                        Deputy

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                 **IN AND FOR THE COUNTY OF ALAMEDA**
                         **UNLIMITED JURISDICTION**
10

11   SANTA FE POINTE, LP, an Oklahoma limited        **Case No.:** RG **07345170**
     partnership; RANT, LLC, a Delaware limited liability
12   company; and THEOTIS F. OLIPHANT, an            **COMPLAINT FOR DAMAGES**
     individual,
13                                                    **JURY TRIAL DEMANDED**
                     Plaintiffs,
14          vs.

15   GREYSTONE SERVICING CORPORATION,
     INC., a Georgia corporation; GREYSTONE CDE,
16   LLC, a Delaware limited liability company; and
     DOES 1 through 100, inclusive,
17
                     Defendants.
18

19

20       Plaintiffs SANTA FE POINTE, LP, an Oklahoma limited partnership ("SFP"), THEOTIS F.

21   OLIPHANT ("Oliphant"), an individual, and RANT, LLC, a Delaware limited liability company

22   ("Rant"), allege as follows:

23                          **DEMAND FOR JURY TRIAL**

24       Plaintiffs here demand a jury trial to the fullest extent available under the law, the United

25   States Constitution, and Section 16 of Article I of the California Constitution..

26                        **INTRODUCTORY ALLEGATIONS**

27       1.     This is an action for damages, declaratory relief and accounting arising out of the

28   conduct of defendants with respect to Plaintiffs' efforts to acquire and rehabilitate a 224-unit

_____
*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                    - 1
Complaint for Damages
Farber & Company Attorneys, LLP

1    apartment building in Oklahoma City (the "Project") as a tax-credit developer of a Low Income

2    Housing Tax Credit project offered through the FHA's Office of Housing and Urban Development

3    ("HUD"). The Federal Government subsidizes tax credit projects to encourage private developers to

4    acquire, construct, renovate, housing stock that will be income restricted for tenants, and maintained

5    by the private developer. The tax-credit developer gets paid a fee equal to 14% of the total allowable

6    project costs, and the project financing is non-recourse.

## PARTIES

7

8    2.    Plaintiff SANTA FE POINTE, LP ("SFP"), is an Oklahoma limited partnership

9    formed for the purpose of acquiring the Project, and having its principal place of business in

10    Oklahoma City, Oklahoma.

11    3.    Plaintiff RANT, LLC ("Rant") is a Delaware limited liability company having its

12    principal place of business in the County of Alameda, State of California. Plaintiff Rant is now, and at

13    all times material hereto was, qualified to do business as a foreign corporation in the State of

14    California.

15    4.    Plaintiff THEOTIS F. OLIPHANT is an individual who does now, and at all times

16    material hereto did, maintain his principal residence in the State of California, County of Alameda.

17    OLIPHANT is now, and at all times material hereto was, the general partner of Plaintiff SFP and the

18    managing member of Plaintiff RANT.

19    5.    Defendant GREYSTONE SERVICING CORPORATION, INC. ("Greystone

20    Servicing") is a Georgia corporation having its principal place of business in New York City, New

21    York. Defendant Greystone Servicing is now, and at all times material hereto was, qualified to do

22    business as a foreign corporation in the State of California. Plaintiffs are informed and believe and on

23    that basis allege that Defendant Greystone Servicing in fact does business in said state. Defendant

24    Greystone Servicing has failed to designate any principal place of business in the State of California;

25    the only California address identified by Defendant Greystone Servicing on its California filings is the

26    address of its agent for service of process, which is 818 West Seventh St., Los Angeles, CA 90017.

27    Venue for Defendant Greystone Servicing is therefore proper in the County of Alameda and in any

28    other county in the State of California.

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                                    - 2
Complaint for Damages
Farber & Company Attorneys, LLP                    Exhibit A-1, Page 10

6.    GREYSTONE CDE, LLC ("Greystone CDE") is a Delaware corporation having its principal place of business in New York City, New York.   Plaintiffs are informed and believe and on that basis allege that at all times material hereto, defendant Greystone CDE was not qualified to do business as a foreign corporation in the State of California but in fact did business in said state. Defendant Greystone CDE has failed to designate any principal place of business in the State of California.  Venue for Defendant Greystone CDE is therefore proper in any county in the State of California.

7.    Defendants Greystone Servicing and Greystone CDE are hereinafter collectively referred to as the "Greystone Defendants." Plaintiffs are informed and believe and on that basis allege that the Greystone Defendants are owned and operated in such a way that each benefited financially from the conduct of the others alleged hereinbelow.

8.    The Defendants sued herein as DOES 1 through 100, inclusive, are either natural persons or business entities, whose true names, capacities and (in the case of business entities) exact form of entity, are currently unknown to Plaintiffs, who therefore sue said defendants by such fictitious names.   Plaintiffs are informed and believe and on that basis allege:

A.    that each of these fictitiously-named defendants is (either alone or in concert with named Defendants) responsible in some manner for the occurrences, injuries and damages herein alleged, has participated or is participating in some manner in the actionable conduct herein alleged, and is liable to Plaintiffs together with Defendants named herein for damages and/or other relief prayed for herein;

B.    that Plaintiffs' injuries as herein alleged were legally caused by the acts or omissions of said fictitiously-named defendants;

C.    that at all times mentioned herein, each of the named and fictitiously named Defendants was the officer, director, employee, partner, joint venturer, servant, agent, subsidiary, division and/or alter ego of each of his, her or its co-Defendants, was acting within the course and scope of said employment, partnership, joint venture, joint enterprise, service or agency relationship, with the full knowledge and consent of each of the other defendants and within the authority granted to said defendants, and

1    each of them, and/or that each of the acts of each of the Defendants was ratified by

2    each of the other said Defendants.

3    9.    Plaintiffs are informed and believe and on that basis allege:

4    A.    that at all times mentioned herein, each of the named and fictitiously

5    named Defendants was the co-conspirator of the others and was acting in concert of

6    action and within the course and scope of a conspiracy formed amongst them;

7    B.    that each defendant sued herein received money or property as a result

8    of the conduct described herein without consideration therefor and/or with

9    knowledge that the money or property was obtained as a result of the fraud, deception

10   or other wrongful conduct described herein;

11   C.    that each of the defendants knowingly and intentionally aided, abetted,

12   encouraged and cooperated with, or turned a blind eye to, the other defendants in the

13   wrongful conduct alleged herein and accordingly are liable as aiders and abettors

14   and/or co-conspirators of each other; and/or

15   D.    that each defendant sued herein aided and abetted the others with the

16   intent that each would be successful in their mutual endeavors.

17   10.    Pursuant to California Code of Civil Procedure §474, Plaintiffs will seek to amend this

18   Complaint to substitute the true names, capacities and (in the case of business entities) exact form of

19   entity, of each of the said fictitiously-named defendants, as well as the particulars of the conduct,

20   participation and basis for liability for each of said fictitiously-named defendants, as and when such

21   information is ascertained by Plaintiff.

22   **VENUE**

23   11.    This case is properly venued in the County of Alameda because defendants

24   GREYSTONE SERVICING CORPORATION, INC., a Georgia corporation ("Greystone

25   Servicing"), and GREYSTONE CDE, LLC, a Delaware corporation ("Greystone CDE"), have failed

26   to designate any current California principal place of business and may therefore be properly sued in

27   any county of this state.

28

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
Complaint for Damages                                                          - 4 -
Farber & Company Attorneys, LLP

1

2 **COMMON ALLEGATIONS**

3     12.    Plaintiffs are informed and believe and on that basis allege: that the Greystone

4 Defendants are one of the nation's leading originators of Federal Housing Administration (FHA)

5 multifamily loans; that the FHA financing originated by the Greystone Defendants provides long-

6 term, fully amortizing, fixed rate, non-recourse loans for acquisition and rehabilitation of low-income

7 housing projects such as the Project; that the Greystone Defendants have regional origination offices

8 in California and throughout the United States; and that the Greystone Defendants provide loan

9 officers, underwriters, analysts and consultants to facilitate successful acquisition, rehabilitation and

10 financing of projects such as the Project.

11     13.    Plaintiffs are informed and believe and on that basis allege that the Greystone

12 Defendants are a HUD-approved underwriter for the FHA's Multifamily Accelerated Processing

13 (MAP) program.  This program establishes national standards for approved lenders to prepare,

14 process and submit their own loan applications.  In this process, the Greystone Defendants serve as

15 an intermediary between their developer-clients and FHA offices to facilitate approval of applications

16 and to obtain financing within required timeframes.

17     14.    On or about September 7, 2006, Plaintiffs and Greystone Servicing entered into a

18 written agreement wherein Plaintiffs appointed Greystone Servicing to serve as their exclusive agent

19 to process the HUD application for financing the acquisition and rehabilitation of the Project.  On

20 the same date, Plaintiffs paid fees to Greystone Servicing as required by the agreement.

21     15.    Under the agreement and FHA procedures, the HUD application materials were to be

22 completed by the tax-credit developer (Plaintiffs) and the underwriter (the Greystone Defendants).

23 However, as underwriter, the role of the Greystone Defendants was (A) to underwrite the financing

24 of the acquisition and rehabilitation of the Project; and (B) to submit the application on behalf of the

25 tax credit developer to HUD.   In connection with this role, it was the responsibility of the Greystone

26 Defendants to commission third party reports and submit them as support for the underwriting

27 analysis along with the HUD application materials; Plaintiffs were neither authorized nor permitted to

28 communicate directly with HUD with respect to the application.

16.    Also on or about September 7, 2006, Plaintiffs also engaged Seibert Branford Shank & Company, LLC ("SBS") to serve as investment bank underwriter to sell the $7,095,000 of tax-exempt bonds through which the Project was to be financed. The bond financing was required to close by December 20, 2006 or the bond issue would expire. In order to accomplish timely sale of the tax-exempt bonds, SBS had to coordinate the sale of the tax-exempt bonds with the filing of the HUD application by the Greystone Defendants. Toward this end, SBS impressed upon the Greystone Defendants the importance of completing the HUD application by November 2006.

17.    On or about September 22, 2006, SBS distributed a financing timetable and responsible parties list for the Project. The timetable provided that the Greystone Defendants were to submit the HUD loan application on November 6, 2006. Miriam Simon ("Simon"), who was Greystone's senior underwriter for the Project, received the SBS document and participated in Project meetings and telephone conferences on behalf of the Greystone Defendants. Plaintiffs informed Simon that they were willing to pay incremental costs to accelerate the filing of the HUD application.

18.    On or about October 5, 2006, Oliphant, Simon, SBS representatives and others met with HUD officials in Oklahoma City regarding the Project. At that meeting HUD officials emphasized that the application needed to be in by the first week of December 2006. Shortly thereafter, Plaintiffs paid additional fees to Greystone's HUD architect review firm to expedite the review process so that the architectural review component would not delay filing of the HUD application.

19.    On or about October 5, 2006, Oliphant, Simon, SBS representatives and others met with HUD officials in Oklahoma City regarding the Project. At that meeting HUD officials emphasized that the application needed to be in by the first week of December 2006.

20.    At the time of this meeting, the Greystone Defendants were aware that Plaintiffs wanted to complete the purchase of the property by December 20, 2006. The Greystone Defendants were also aware that Plaintiffs would lose the $7,095,000 of tax-exempt bond financing if the bond financing was not closed by December 20, 2006.

21.    On or about October 16, 2006, Oliphant filed the paperwork and expended the funds to form Plaintiff Santa Fe Pointe, LP as an Oklahoma limited partnership and Santa Fe Management,

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
Complaint for Damages
Farber & Company Attorneys, LLP

- 6

Exhibit A-1, Page 14

1    LLC as an Oklahoma limited liability company.  Santa Fe Pointe** was the official, single purpose

2    entity formed to execute the acquisition and rehabilitation of the Project and be the borrower on the

3    HUD non-recourse loan.

4        22.    On or about October 27, 2006, Simon sent an email stating that the HUD application

5    process was behind schedule.  Plaintiffs were troubled by this email because of the December 20,

6    2006 deadlines, and Oliphant communicated his concerns to Matt James (the business development

7    person at Greystone who initially sold Oliphant on using Greystone's services).  To address

8    Oliphant's concerns, James told Oliphant that Greystone would provide  a non-recourse bridge loan

9    to fund the purchase of the Project and fund the cost of issuance for the bonds to be sold by SBS.

10        23.    On or about November 13, 2006, Plaintiffs caused the final set of architectural plans

11   and specifications to be delivered to Greystone's architectural review firm.  On or about November

12   14, 2006, Plaintiffs delivered by FedEx a complete set of financial certifications and list of business

13   entities for all participants in the Project.  These items, which were the final items required from

14   Plaintiffs and the development team, were delivered a full two weeks before Greystone's scheduled

15   delivery of the HUD application.  All other aspects of the HUD application were within Greystone's

16   ability to perform and execute timely.

17        24.    On November 14, 2006, after Plaintiffs had transmitted all items required to be

18   provided by them, Greystone for the first time informed Plaintiffs that the HUD application would

19   not be submitted in 2006.  Again, to address the concerns of Plaintiff and the development team and

20   reassure them that the Project would ultimately be a success, James again stated that Greystone was

21   committed to funding the acquisition of the Project and issuance of the tax-exempt bonds, and stated

22   that Greystone would issue a non-recourse bridge loan to fund the acquisition of the Project and the

23   cost of issuing the bonds.

24        25.    On November 16, 2006, bond counsel for SBS sent an email to confirm that

25   Greystone would fund a bridge loan for the purchase of the Project and the cost of issuing the tax-

26   exempt bonds.  That same day, Greystone provided a bridge loan term sheet on behalf of Defendant

27   Greystone CDE which provided for a non-recourse bridge loan to Oliphant in the amount of

28

1    $4,348,400. The term sheet stated that the bridge loan would be for the full purchase price of the

2    Project and that it would be non-recourse.

3        26.    On November 21, 2006, SBS representatives provided the final financing timetable,

4    again confirming that Greystone had agreed to fund all costs of selling the tax-exempt bonds through

5    bridge financing. Thereafter, the parties proceeded to complete arrangements for issuance of the tax-

6    exempt bonds and acquisition of the Project, and Oliphant made arrangements to travel to Oklahoma

7    City on December 18 through 20 for the closing of the Project acquisition.

8        27.    The tax-exempt bonds were priced on December 13 and 14, and were sold by SBS to

9    institutional investors. As a result, Plaintiffs incurred approximately $251,000 in bond issuance costs.

10        28.    On December 17, 2006, the literal eve of Oliphant's departure to Oklahoma City, the

11    Greystone Defendants' counsel delivered the first drafts of the bridge loan documents. The provided

12    loan documents did not provide the financing promised by Greystone. Instead, these documents

13    provided for a bridge loan of only $500,000 rather than the promised $$4,348,400. This reduced

14    amount would cover the cost of the bond issuance but not acquisition of the Project. In addition,

15    instead of the promised non-recourse financing, the provided loan documents included a personal

16    guaranty by Oliphant and a spousal guaranty, neither of which had been mentioned previously.

17        29.    When Oliphant received the bridge loan documents on December 17, 2006, the

18    $251,000 bond issuance costs had already been incurred because the tax-exempt bonds had been sold.

19    Moreover, if the Project acquisition was not closed by December 20, 2006, Plaintiffs faced losing the

20    tax-exempt bond funding because the bonds would expire. Oliphant signed the voluminous

21    documents as presented.

22        30.    On or about March 14, 2007, Greystone submitted the final HUD application on

23    behalf of Oliphant and Plaintiffs.

24        31.    Part of the financial structure of the Project included sale of the tax credits to a

25    purchaser/syndicator. Under the original HUD application, the tax credit purchaser/syndicator was

26    the Richman Group. On or about April 15, 2007, the Richman Group backed out of the deal.

27    Thereafter, with the knowledge and consent of the Greystone Defendants, Plaintiffs pursued other

28    syndicators and co-developers to complete the financial aspects of the Project. On or about June 14,

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
Complaint for Damages                                                           - 8
Fatber & Company Attorneys, LLP

1   2007, Plaintiffs were introduced to David Henry, an experienced Arkansas tax credit developer who

2   would serve as general contractor, property manager, and co-developer, and thereafter Plaintiffs and

3   David Henry worked out terms for their relationship.

4          32.    On or about June 29, 2007, the seller of the Project agreed to extend the closing date

5   to July 31, 2007 in order to accommodate additional bridge loan financing arranged by David Henry.

6   As a part of this agreement, Plaintiffs paid an additional $25,000 earnest money deposit to the seller,

7   which Oliphant funded through an additional $25,000 advance on the Greystone bridge loan.

8          33.    On or about July 5, 2007, Oliphant met with HUD personnel in Oklahoma City and

9   learned that the HUD application had been rejected by letter sent out earlier that day.  At this

10  meeting, the HUD representative informed Oliphant that at a HUD conference in St. Louis on June

11  19, Greystone's representative had gone out of her way to make unsolicited disparaging remarks about

12  the Project to the HUD representative from Oklahoma City.

13         34.    On or about July 10, 2007, Matt James acknowledged to Oliphant that Greystone had

14  received the HUD rejection letter, and stated that Betsy Vartanian, who was "one of the top HUD

15  loan executives at Greystone," was going to step in.

16         35.    On or about July 11, 2007, Betsy Vartanian informed Oliphant that she had spoken

17  with HUD personnel in Oklahoma City and that HUD had agreed to reconsider the application

18  without starting over from the beginning, and that Greystone would submit written materials

19  responsive to HUD's concerns.  On or about July 13, 2007, Greystone sent a letter to HUD

20  confirming that supplemental materials would follow to address HUD's concerns raised in the July 5

21  letter.

22         36.    In the meantime, Oliphant and David Henry continued to proceed with the closing of

23  the acquisition of the Project.  Oliphant and David Henry reached an agreement with the seller

24  whereby the seller would carry back a second mortage in the amount of $500,000.  On July 25, 2007,

25  the attorneys for the first mortgage lender sent out drafts of the closing documents.  On July 27,

26  2007, Greystone threatened to disrupt the acquisition deal unless the seller agreed to subordinate his

27  carry-back loan to Greystone's pre-development bridge loan.  That same day, Oliphant and David

28

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
Complaint for Damages                                                                                    - 9 -
Farber & Company Attorneys, LLP

Exhibit A-1, Page 17

1  Henry made arrangements to meet in Oklahoma on July 30th and 31st to make plans for signing the
2  closing documents, taking control of the Project, and getting the keys.

3        37.    On July 29, 2007, the eve of travel, David Henry emailed that he was having second
4  thoughts about the deal and had concerns about the cost of the bond issuance in December 2006.
5  However, Henry was unavailable to discuss his concerns that entire day.

6        38.    On July 30, 2007, Oliphant and Henry arrived in Oklahoma City.  In a telephone
7  conference call, Greystone rescinded its demand that the seller subordinate his carry-back loan.
8  Instead, Greystone requested that Henry's bank allow Greystone to purchase its loan after closing, so
9  that Greystone could improve its collateral position.

10       39.    On July 31, 2007, Oliphant and Henry met for approximately six hours to discuss
11 Henry's concerns.  During this meeting, David Henry proposed taking over the entire Project in
12 exchange for assuming the Greystone loan.  The parties did not reach agreement for modifying their
13 prior arrangement, and David Henry left town without signing the escrow documents.  Oliphant,
14 however, signed the closing documents at the title company that day before leaving Oklahoma City.

15       40.    In early August 2007, Greystone began negotiating with David Henry on ways to get
16 the deal done without Oliphant and Plaintiffs, and also began threatening to declare the bridge loan in
17 default.

18       41.    On August 9, 2007, Greystone unilaterally withdrew the HUD loan application
19 without any prior notice or warning to Oliphant or Plaintiffs.  The withdrawal of the HUD
20 application placed at risk the $7,095,000 in tax exempt bond proceeds.  It also caused the seller to
21 terminate negotiations with Oliphant because the withdrawal of the HUD application made it appear
22 that Plaintiffs could not close the deal and that it would take another 10-12 months if the HUD
23 process were started over.

24       42.    On or about August 21, 2007, Greystone CDE declared the bridge loan in default and
25 threatened legal enforcement.  At the same time, the Greystone Defendants began pressuring
26 Oliphant and Plaintiffs to allow David Henry to take over the entire Project (keeping all the profits).
27 As a part of this proposal, Henry would assume $275,000 of the bridge loan but Greystone required
28 that Oliphant accept responsibility for paying $215,000, release Greystone of all liability, and agree not

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
Complaint for Damages                                                      - 10
Farber & Company Attorneys, LLP

1   to sue.  On August 30, 2007, Greystone's counsel delivered an "assignment agreement and covenant

2   not to sue" to this effect and demanded that Oliphant provide written confirmation of acceptance by

3   August 31.

4

### FIRST CAUSE OF ACTION
5   (For Breach of Fiduciary Duty / Constructive Fraud)

6       43.    Plaintiffs refer to and hereby incorporate herein the foregoing Paragraphs 1 through

7   42, inclusive, as though the same were fully set forth at this place.

8       44.    Each of the Greystone Defendants owned Plaintiffs and each of them a fiduciary duty

9   by virtue of the trust and confidence Plaintiffs and each of them reposed in said defendants by virtue

10   of the agreement and business relationship.

11       45.    The Greystone and each of them were negligent in the performance of the duties

12   insofar as the Project and HUD financing was concerned.  The Greystone Defendants further

13   breached their respective fiduciary duties to Plaintiffs and each of them by changing the terms of the

14   bridge financing, by withdrawing the HUD application without prior notice to or consent by Plaintiffs

15   or any of them, by demanding priority for the bridge loan to which they were not entitled, and by

16   negotiating directly with David Henry under terms that cut out Oliphant and Plaintiffs from the deal.

17       46.    The Greystone Defendants and each of them have gained an advantage over Plaintiffs

18   by virtue of the foregoing breaches.

19       47.    Plaintiffs and each of them were prejudiced by the foregoing breaches of duty in that

20   they advanced funds and expended time and energy and incurred obligations in connection with the

21   Project.

22       48.    Plaintiffs' reliance, as set forth above, was reasonable under the circumstances.

23   Plaintiffs could not, in the exercise of reasonable diligence, have anticipated or discovered the

24   misconduct of the Greystone Defendants in the circumstances in a way that Plaintiffs could have

25   protected themselves or their financial interests.

26       49.    As a direct and legal result of the conduct of the Greystone Defendants as alleged

27   hereinabove, Plaintiffs, and each of them, have been damaged and injured in an amount to be proven

28   at trial.

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
Complaint for Damages                               - 11
Farber & Company Attorneys, LLP

50.     As a direct and legal result of the conduct of the Greystone Defendants, Plaintiffs, and each of them, have been forced to retain attorneys, accountants, investigators, agents and other consultants, and to expend time and money, to discover and remedy the fraud, all according to proof. Plaintiffs reserve the right to amend this complaint at such time as the amounts of damage become known.

51.     Plaintiffs should recover punitive damages, in addition to their actual damages, to make an example of and to punish Defendants and each of them.

52.     The conduct of the Greystone Defendants, and each of them, as described hereinabove was fraudulent, malicious and oppressive, and done for the specific purpose of getting control over Plaintiff's monies for Defendants' own use and benefit. The Greystone Defendants, and each of them, also displayed reckless indifference to Plaintiffs and each of them with regard to the conduct alleged in this complaint. Plaintiffs should recover punitive damages, in addition to their actual damages, to make an example of and to punish Defendants and each of them.

53.     The conduct of the Greystone Defendants was, in and of itself, fraudulent, malicious and oppressive in that said Defendants were guilty of reckless indifference towards Plaintiffs, acted willfully and knowingly in the manner in which they torpedoed the Project and Plaintiffs' HUD application and the tax-exempt bond issue, and undertook separate negotiations with David Henry to cut out Oliphant and Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SECOND CAUSE OF ACTION
### (Intentional Interference with Prospective Economic Advantage)

54.     Plaintiffs refer to and hereby incorporate herein the foregoing Paragraphs 1 through 53, inclusive, as though the same were fully set forth at this place.

55.     Plaintiffs had an existing business relationship with the seller of the Project and with the HUD office in Oklahoma City.

56.     Plaintiffs had a probability of future economic benefit from successful completion of the financing, rehabilitation and development of the Project.

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
Complaint for Damages
Farber & Company Attorneys, LLP

- 12

Exhibit A-1, Page 20

57.    The Greystone Defendants interfered with Plaintiffs' prospective economic advantage, as set forth above.

58.    The conduct of the Greystone Defendants in interfering with Plaintiffs' opportunity to complete the Project was wrongful in that said defendants, and each of them, made false statements, changed terms of the deal at the last minute, and breached their fiduciary duties to Plaintiffs and each of them.

59.    The Greystone Defendants knew of Plaintiffs' business relationship and prospective business advantage.

60.    The Greystone Defendants intended to interfere with Plaintiffs' business relationship and prospective injurious interference and profits from the Project.

61.    As a direct and legal result of the conduct of the Greystone Defendants as alleged hereinabove, Plaintiffs, and each of them, have been damaged and injured in an amount to be proven at trial.

62.    As a direct and legal result of the conduct of the Greystone Defendants, Plaintiffs, and each of them, have been forced to retain attorneys, accountants, investigators, agents and other consultants, and to expend time and money, to discover and remedy the fraud, all according to proof. Plaintiffs reserve the right to amend this complaint at such time as the amounts of damage become known.

63.    Plaintiffs should recover punitive damages, in addition to their actual damages, to make an example of and to punish Defendants and each of them.

64.    The conduct of the Greystone Defendants, and each of them, as described hereinabove was fraudulent, malicious and oppressive, and done for the specific purpose of getting control over Plaintiff's monies for Defendants' own use and benefit. The Greystone Defendants, and each of them, also displayed reckless indifference to Plaintiffs and each of them with regard to the conduct alleged in this complaint. Plaintiffs should recover punitive damages, in addition to their actual damages, to make an example of and to punish Defendants and each of them.

65.    The conduct of the Greystone Defendants was, in and of itself, fraudulent, malicious and oppressive in that said Defendants were guilty of reckless indifference towards Plaintiffs, acted

1   willfully and knowingly in the manner in which they torpedoed the Project and Plaintiffs' HUD

2   application and the tax-exempt bond issue, and undertook separate negotiations with David Henry to

3   cut out Oliphant and Plaintiffs.

4          WHEREFORE, Plaintiffs pray for judgment as set forth below.

5

6                              **PRAYER FOR RELIEF**

7          WHEREFORE, Plaintiffs SANTA FE POINTE, LP, an Oklahoma limited partnership

8   ("SFP"), THEOTIS F. OLIPHANT ("Oliphant"), an individual, and RANT, LLC, a Delaware limited

9   liability company ("Rant"), pray for judgment against defendants and each of them as follows:

10         A.    For general damages, according to proof;

11         B.    For compensatory damages, according to proof;

12         C.    For punitive and exemplary damages;

13         D.    For any statutory damages or penalties available under statute;

14         E.    For reasonable attorney's fees;

15         F.    For costs of suit herein incurred; and

16         G.    For such other and further relief as the Court deems just or proper.

17

18   DATED:  September 7, 2006            FARBER & COMPANY ATTORNEYS, LLP
                                          Attorneys for Plaintiff
19

20

21                                       By _____
                                            Eric J. Farber, SBN 169472
22                                          Ann McFarland Draper, SBN 065669

23

24

25

26

27

28

_Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al._                    - 14
Complaint for Damages
Farber & Company Attorneys, LLP

**EXHIBIT A-2**

FARBER & COMPANY
ATTORNEYS, LLP
Attn: Farber, Eric J.
847 Sansome Street
Suite LL
San Francisco, CA  94111

## Superior Court of California, County of Alameda

| Santa Fe Pointe | No. RG07345170 |
|---|---|
| Plaintiff/Petitioner(s) | |
| VS. | **NOTICE OF CASE MANAGEMENT CONFERENCE AND ORDER** |
| Greystone Servicing Corporation, Inc. | Unlimited Jurisdiction |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD.**
Notice is given that a Case Management Conference has been scheduled as follows:

| Date: 01/22/2008 Time: 09:00 AM | Department: 301 Location: George E. McDonald Hall of Justice First Floor 2233 Shoreline Drive, Alameda  CA  94501 Internet: http://www.alameda.courts.ca.gov | Judge: Ronni MacLaren Clerk: Irene Crowell Clerk telephone: (510) 263-4301 E-mail: Dept.301@alameda.courts.ca.gov Fax: (510) 267-5713 |
|---|---|---|

### ORDERS

1. You must:
   a. Serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (CRC 3.110(b));
   b. Give notice of this conference to any party not included in this notice and file proof of service;
   c. Meet and confer, in person or by telephone, to consider each of the issues identified in CRC 3.724 no later than 30 calendar days before the date set for the Case Management Conference;
   d. File and serve a completed Case Management Conference Statement (use of Judicial Council Form CM 110 is mandatory) at least 15 days before the Case Management Conference (CRC 3.725)

2. If you do not follow the orders above, you are hereby ordered to show cause why you should not be sanctioned under CRC 2.30. The hearing on the Order to Show Cause re: Sanctions will be at the same time as the Case Management Conference. Sanctions may include monetary sanctions and any other sanction permitted by law, including striking pleadings or dismissing the action.

3. You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.

4. The Direct Calendar Judge will issue orders at the conclusion of the conference that should include:
   a. Referring to ADR and setting an ADR completion date
   b. Dismissing or severing claims or parties
   c. Setting a trial date.

*Telephonic appearances at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties may make arrangements by calling 1-888-882-6878, or faxing a service request to 1-888-882-2946. This service is subject to charges by the vendor.

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice of Hearing by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 09/12/2007.

By

Deputy Clerk

Exhibit A-2, Page 23

## Superior Court of California, County of Alameda



## Notice of Judicial Assignment for All Purposes

Case Number: RG07345170
Case Title:    Santa Fe Pointe VS Greystone Servicing Corporation, Inc.
Date of Filing: 09/07/2007

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

This case is hereby assigned for all purposes to:

| | |
|---|---|
| Judge: | Ronni MacLaren |
| Department: | 301 |
| Address: | George E. McDonald Hall of Justice |
| | 2233 Shoreline Drive |
| | Alameda CA  94501 |
| Phone Number: | (510) 263-4301 |
| Fax Number: | (510) 267-5713 |
| Email Address: | Dept.301@alameda.courts.ca.gov |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

**Please note: In this case, any challenge pursuant to Code of Civil Procedure §170.6 must be exercised within the time period provided by law.  (See Govt. Code 68616(i); Motion Picture and Television Fund Hosp. v. Superior Court (2001) 88 Cal.App.4th 488, 494; and Code Civ. Proc. §1013.)**

IT IS THE DUTY OF EACH PLAINTIFF AND CROSS COMPLAINANT TO SERVE A COPY OF THIS NOTICE IN ACCORDANCE WITH LOCAL RULES.

<u>General Procedures</u>

All pleadings and other documents must be filed in the clerk's office at any court location except when the Court permits the lodging of material directly in the assigned department. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

ASSIGNED FOR ALL PURPOSES TO
JUDGE Ronni MacLaren
DEPARTMENT 301

Counsel are expected to know and comply with the Local Rules of this Court, which are available on the Court's website at: http://www.alameda.courts.ca.gov/courts/rules/index.shtml and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

The parties are always encouraged to consider using various alternatives to litigation, including mediation and arbitration, prior to the Initial Case Management Conference. The Court may refer parties to alternative dispute resolution resources.

Self-represented litigants must also comply with the rules cited above. All references to "counsel" in this Order apply equally to self-represented litigants. The Court maintains a Self-Help Center at the Wiley W. Manuel Courthouse, 2nd Floor, 661 Washington St., Oakland.

Please submit a courtesy copy of all filed documents directly to Dept. 301.

## Schedule for Department 301

The following scheduling information is subject to change at any time, without notice. Please contact the department at the phone number or email address noted above if you have questions.

- Trials generally are held: Mondays and Wednesdays 9:30 a.m. to 4:30 p.m.; Tuesdays and Thursdays at 10:30 a.m. to 4:30 p.m. Trial readiness: Fridays at 9:00 a.m. A pretrial conference may be set two to three weeks before the trial.

- Case Management Conferences are held: Mondays through Thursdays at 9:00 a.m. Timely filed and complete case management statements may eliminate the need for an in-person conference by allowing the Court to issue a Tentative Case Management Order.

- Law and Motion matters are heard: Tuesdays and Thursdays at 9:00 a.m.

- Settlement Conferences are heard: Fridays at 1:30 p.m. and such other times as may be available.

- Ex Parte matters are heard: Tuesdays and Thursdays at 9:00 a.m. Counsel must comply with Local Rule 4.14

- (1) Counsel should consider and recommend creative, efficient approaches to valuing and resolving their case (CRC §3.724). (2) Potential discovery and other problems should be anticipated and discussed. (3) No discovery motion shall be filed without prior serious efforts to resolve it. If those efforts are unsuccessful, moving party may then email the Court attaching a letter (maximum of 3 pages) outlining the dispute. Opposing party may email a brief response within 24 hours. The Court will advise the parties how the issue will be resolved or whether further proceedings are necessary.

## Law and Motion Procedures

To obtain a hearing date for a Law and Motion or ex parte matter, parties must contact the department as follows:

- Motion Reservations
      Email:         Dept.301@alameda.courts.ca.gov

Exhibit A-2, Page 25

Phone:        (510) 263-4301

The Court prefers that reservations for the Law and Motion calendar be made by email. Limited hearings are available for summary judgments, preliminary injunction and other time intensive motions.

- Ex Parte Matters
  Email:        Dept.301@alameda.courts.ca.gov
  Phone:        (510) 263-4301

  The Court prefers that reservations for the Ex Parte calendar be made by email.

**Tentative Rulings**

The court will issue tentative rulings in accordance with the Local Rules. Tentative rulings will become the Court's order unless contested in accordance with the Local Rules. Tentative rulings will be available at:

- Website: www.alameda.courts.ca.gov/domainweb, Calendar Information for Dept. 301
- Phone: 1-866-223-2244

Dated: 09/11/2007                    Executive Officer / Clerk of the Superior Court

                            By

                                    _____
                                             Deputy Clerk

---

**CLERK'S CERTIFICATE OF MAILING**

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown on the attached Notice of Initial Case Management Conference and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 09/12/2007

                            By

                                    _____

Deputy Clerk

Exhibit A-2, Page 27

-100

# SUMMONS ON FIRST AMENDED &
# (CITACION JUDICIAL) SUPPLEMENTAL
COMPLAINT

*5876325*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

GREYSTONE SERVICING CORPORATION, INC., a Georgia
corporation; GREYSTONE CDE, LLC, a Delaware limited liability
company; and DOES 1 through 100, inclusive

ENDORSED
FILED
ALAMEDA COUNTY

SEP 2 5 2007

CLERK OF THE SUPERIOR COURT
By Tasha Perry, Deputy
Deputy

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

SANTA FE POINTE, LP, an Oklahoma limited partnership; SANTA FE
MANAGEMENT, LLC, an Oklahoma limited liability company; RANT,
LLC, a Delaware limited liability company; THEOTIS F. OLIPHANT,
an individual

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

Alameda County Superior Court
1225 Fallon Street
Oakland, CA 94612

CASE NUMBER:
*(Número del Caso):*  RG 07-345170

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Eric J. Farber / Farber & Company Attorneys, LLP
847 Sansome Street, Suite LL / San Francisco, CA 94111 / Tel: 415-434-5320

DATE:        SEP 2 5 2007        Pat S. Sweeten        Clerk, by _____ Tasha Perry, Deputy
*(Fecha)*                                        *(Secretario)*                    *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
[SEAL]
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)        [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

SUMMONS     Exhibit A-2, Page 28

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc.    www.USCourtForms.com

1  Eric J. Farber, SBN 169472
   Ann McFarland Draper, SBN 065669
2  FARBER & COMPANY ATTORNEYS, LLP
   847 Sansome Street, Ste. LL
3  San Francisco, California 94111
   Telephone 415.434.5320
4  Facsimile 415.434.5380

5  Attorneys for Plaintiff

                                              ENDORSED
                                                FILED
                                            ALAMEDA COUNTY

                                             SEP 2 6 2007

                                        CLERK OF THE SUPERIOR COURT
                                          By Tasha Perry, Deputy

6

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               IN AND FOR THE COUNTY OF ALAMEDA
                      UNLIMITED JURISDICTION
10

11  SANTA FE POINTE, LP, an Oklahoma limited        Case No.: RG 07-345170
    partnership; SANTA FE MANAGEMENT, LLC,
12  an Oklahoma limited liability company; RANT,    FIRST AMENDED AND
    LLC, a Delaware limited liability company; and  SUPPLEMENTAL COMPLAINT
13  THEOTIS F. OLIPHANT, an individual,             FOR DAMAGES AND
                                                    DECLARATORY RELIEF
14            Plaintiffs,
                                                    JURY TRIAL DEMANDED
15        vs.

16  GREYSTONE SERVICING CORPORATION,
    INC., a Georgia corporation; GREYSTONE CDE,
17  LLC, a Delaware limited liability company; and
    DOES 1 through 100, inclusive,
18
              Defendants.
19

20       Plaintiffs SANTA FE POINTE, LP, an Oklahoma limited partnership ("SFP"), THEOTIS F.

21  OLIPHANT ("Oliphant"), an individual, and RANT, LLC, a Delaware limited liability company

22  ("Rant"), allege as follows:

23                          DEMAND FOR JURY TRIAL

24       Plaintiffs here demand a jury trial to the fullest extent available under the law, the United

25  States Constitution, and Section 16 of Article I of the California Constitution:

26                        INTRODUCTORY ALLEGATIONS

27       1.     This is an action for damages, declaratory relief and accounting arising out of the

28  conduct of defendants with respect to Plaintiffs' efforts to acquire and rehabilitate a 224-unit

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                    - 1
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP

1    apartment building in Oklahoma City (the "Project") as a tax-credit developer of a Low Income

2    Housing Tax Credit project offered through the FHA's Office of Housing and Urban Development

3    ("HUD"). The Federal Government subsidizes tax credit projects to encourage private developers to

4    acquire, construct, renovate, and maintain housing stock that will be income restricted for tenants,

5    and maintained by the private developer. The tax-credit developer gets paid a fee equal to 14% of the

6    total allowable project costs, and the project financing is non-recourse.

**PARTIES**

8        2.      Plaintiff SANTA FE POINTE, LP ("SFP"), is an Oklahoma limited partnership

9    formed for the purpose of acquiring the Project, and having its principal place of business in

10    Edmond, Oklahoma.

11        3.      Plaintiff SANTA FE MANAGEMENT, LLC, is an Oklahoma limited liability

12    company formed for the purpose of managing the Project, and having its principal place of business

13    in Edmond, Oklahoma.

14        4.      Plaintiff RANT, LLC ("Rant") is a Delaware limited liability company having its

15    principal place of business in the County of Alameda, State of California. Plaintiff Rant is now, and at

16    all times material hereto was, qualified to do business as a foreign corporation in the State of

17    California.

18        5.      Plaintiff THEOTIS F. OLIPHANT is an individual who does now, and at all times

19    material hereto did, maintain his principal residence in the State of California, Contra Costa County.

20    OLIPHANT is now, and at all times material hereto was, the managing member of Santa Fe

21    Management, LLC (the general partner of Plaintiff SFP) and the managing member of Plaintiff

22    RANT.

23        6.      Defendant GREYSTONE SERVICING CORPORATION, INC. ("Greystone

24    Servicing") is a Georgia corporation having its principal place of business in New York, New York.

25    Defendant Greystone Servicing is now, and at all times material hereto was, qualified to do business

26    as a foreign corporation in the State of California. Plaintiffs are informed and believe and on that

27    basis allege that Defendant Greystone Servicing in fact does business in the State of California.

28    Defendant Greystone Servicing has failed to designate any principal place of business in the State of

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                    - 2
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP

Exhibit A-2, Page 30

1   California; the only California address identified by Defendant Greystone Servicing on its California

2   filings is the address of its agent for service of process, which is 818 West Seventh St., Los Angeles,

3   CA 90017.  Venue for Defendant Greystone Servicing is therefore proper in the County of Alameda

4   and in any other county in the State of California.

5         7.        GREYSTONE CDE, LLC ("Greystone CDE") is a Delaware corporation having its

6   principal place of business in New York, New York.    Plaintiffs are informed and believe and on that

7   basis allege that at all times material hereto, defendant Greystone CDE was not qualified to do

8   business as a foreign corporation in the State of California but in fact did business in said state.

9   Defendant Greystone CDE has failed to designate any principal place of business in the State of

10  California.  Venue for Defendant Greystone CDE is therefore proper in any county in the State of

11  California.

12        8.        Defendants Greystone Servicing and Greystone CDE are hereinafter collectively

13  referred to as the "Greystone Defendants."  Plaintiffs are informed and believe and on that basis

14  allege that the Greystone Defendants are owned and operated in such a way that each benefited

15  financially from the conduct of the others alleged hereinbelow.

16        9.        The Defendants sued herein as DOES 1 through 100, inclusive, are either natural

17  persons or business entities, whose true names, capacities and (in the case of business entities) exact

18  form of entity, are currently unknown to Plaintiffs, who therefore sue said defendants by such

19  fictitious names.   Plaintiffs are informed and believe and on that basis allege:

20              A.        that each of these fictitiously-named defendants is (either alone or in

21        concert with named Defendants) responsible in some manner for the occurrences,

22        injuries and damages herein alleged, has participated or is participating in some

23        manner in the actionable conduct herein alleged, and is liable to Plaintiffs together

24        with Defendants named herein for damages and/or other relief prayed for herein;

25              B.        that Plaintiffs' injuries as herein alleged were legally caused by the acts

26        or omissions of said fictitiously-named defendants;

27              C.        that at all times mentioned herein, each of the named and fictitiously

28        named Defendants was the officer, director, employee, partner, joint venturer, servant,

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                                    - 3

First Amended and Supplemental Complaint for Damages and Declaratory Relief

Farber & Company Attorneys, LLP

1   agent, subsidiary, division and/or alter ego of each of his, her or its co-Defendants,

2   was acting within the course and scope of said employment, partnership, joint venture,

3   joint enterprise, service or agency relationship, with the full knowledge and consent of

4   each of the other defendants and within the authority granted to said defendants, and

5   each of them, and/or that each of the acts of each of the Defendants was ratified by

6   each of the other said Defendants.

7   10.    Plaintiffs are informed and believe and on that basis allege:

8          A.    that at all times mentioned herein, each of the named and fictitiously

9   named Defendants was the co-conspirator of the others and was acting in concert of

10  action and within the course and scope of a conspiracy formed amongst them;

11         B.    that each defendant sued herein received money or property as a result

12  of the conduct described herein without consideration therefor and/or with

13  knowledge that the money or property was obtained as a result of the fraud, deception

14  or other wrongful conduct described herein;

15         C.    that each of the defendants knowingly and intentionally aided, abetted,

16  encouraged and cooperated with, or turned a blind eye to, the other defendants in the

17  wrongful conduct alleged herein and accordingly are liable as aiders and abettors

18  and/or co-conspirators of each other; and/or

19         D.    that each defendant sued herein aided and abetted the others with the

20  intent that each would be successful in their mutual endeavors.

21  11.    Pursuant to California Code of Civil Procedure §474, Plaintiffs will seek to amend this

22  Complaint to substitute the true names, capacities and (in the case of business entities) exact form of

23  entity, of each of the said fictitiously-named defendants, as well as the particulars of the conduct,

24  participation and basis for liability for each of said fictitiously-named defendants, as and when such

25  information is ascertained by Plaintiff.

### VENUE

27  12.    This case is properly venued in the County of Alameda because each of defendants

28  GREYSTONE SERVICING CORPORATION, INC., a Georgia corporation ("Greystone

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                − 4
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP                Exhibit A-2, Page 32

1   Servicing"), and GREYSTONE CDE, LLC, a Delaware corporation ("Greystone CDE"), has failed

2   to designate any current California principal place of business and therefore may be properly sued in

3   any county of this state.

### COMMON ALLEGATIONS

4

5   13.    Plaintiffs are informed and believe and on that basis allege: that the Greystone

6   Defendants are one of the nation's leading originators of Federal Housing Administration (FHA)

7   multifamily loans; that the FHA financing originated by the Greystone Defendants provides long-

8   term, fully amortizing, fixed rate, non-recourse loans for acquisition and rehabilitation of low-income

9   housing projects such as the Project; that the Greystone Defendants have regional origination offices

10  in California and throughout the United States; and that the Greystone Defendants provide loan

11  officers, underwriters, analysts and consultants to facilitate successful acquisition, rehabilitation and

12  financing of projects such as the Project.

13      14.    Plaintiffs are informed and believe and on that basis allege that the Greystone

14  Defendants are a HUD-approved underwriter for the FHA's Multifamily Accelerated Processing

15  (MAP) program. This program establishes national standards for approved lenders to prepare,

16  process and submit their own loan applications. In this process, the Greystone Defendants serve as

17  an intermediary between their developer-clients and FHA offices to facilitate approval of applications

18  and to obtain financing within required timeframes.

19      15.    On or about September 7, 2006, Plaintiffs and Greystone Servicing entered into a

20  written agreement wherein Plaintiffs appointed Greystone Servicing to serve as their exclusive agent

21  to process the HUD application for financing the acquisition and rehabilitation of the Project (the

22  "Engagement Agreement"). A copy of the Engagement Agreement is attached as Exhibit "A" hereto

23  and incorporated herein by this reference. On the same date, Plaintiffs paid $14,000 in fees to

24  Greystone Servicing as required by the Engagement Agreement.

25      16.    Under the agreement and FHA procedures, the HUD application materials were to be

26  completed by the tax-credit developer (Plaintiffs) and the underwriter (the Greystone Defendants).

27  However, as underwriter, the role of the Greystone Defendants was (A) to underwrite the financing

28  of the acquisition and rehabilitation of the Project; and (B) to submit the application on behalf of the

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                              - 5
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP

1  tax credit developer to HUD.   In connection with this role, it was the responsibility of the Greystone

2  Defendants to commission third party reports and submit them as support for the underwriting

3  analysis along with the HUD application materials; Plaintiffs were neither authorized nor permitted to

4  communicate directly with HUD with respect to the HUD application.

5          17.     Also on or about September 7, 2006, Plaintiffs also engaged Seibert Branford Shank &

6  Company, LLC ("SBS") to serve as investment bank underwriter to sell the $7,095,000 of tax-exempt

7  bonds through which the Project was to be financed.  The bond financing was required to close by

8  December 20, 2006 or the bond issue would expire.  In order to accomplish timely sale of the tax-

9  exempt bonds, SBS had to coordinate the sale of the tax-exempt bonds with the filing of the HUD

10  application by the Greystone Defendants.  Toward this end, SBS impressed upon the Greystone

11  Defendants the importance of completing the HUD application by November 2006.

12          18.     On or about September 22, 2006, SBS distributed a financing timetable and

13  responsible parties list for the Project.  The timetable provided that the Greystone Defendants were

14  to submit the HUD application on November 6, 2006.   Miriam Simon ("Simon"), who was

15  Greystone's senior underwriter for the Project, received the SBS document and participated in Project

16  meetings and telephone conferences on behalf of the Greystone Defendants.  Plaintiffs informed

17  Simon that they were willing to pay incremental costs to accelerate the filing of the HUD application.

18          19.     On or about October 5, 2006, Oliphant, Simon, SBS representatives and others met

19  with HUD officials in Oklahoma City regarding the Project.  At that meeting HUD officials

20  emphasized that the HUD application needed to be submitted by the first week of December 2006 or

21  HUD's review of the application would be delayed.

22          20.     One of the supporting documents required for the HUD application is architectural

23  review by a firm designated by the HUD-approved lender. Shortly after the October 5 meeting,

24  Plaintiffs agreed to and did pay additional fees to Greystone's HUD architect review firm to expedite

25  its review process so that the architectural review component would not delay filing of the HUD

26  application.

27          21.     At the time of this meeting, the Greystone Defendants were aware that Plaintiffs

28  wanted to complete the purchase of the property by December 20, 2006. The Greystone Defendants

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                    - 6 -
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP                    Exhibit A-2, Page 34

1  were also aware that Plaintiffs would lose the $7,095,000 of tax-exempt bond financing if the bond

2  financing was not closed by December 20, 2006.

3      22.    On or about October 16, 2006, Oliphant filed the paperwork and expended the funds

4  to form Plaintiff SFP (Santa Fe Pointe, LP) as an Oklahoma limited partnership and Santa Fe

5  Management, LLC as an Oklahoma limited liability company. Plaintiff SFP was the official, single

6  purpose entity formed to execute the acquisition and rehabilitation of the Project and be the borrower

7  on the HUD non-recourse loan. Plaintiff Santa Fe Management, LLC was the official, single purpose

8  entity formed to be the general partner of Plaintiff SFP and manage the Project.

9      23.    On or about October 27, 2006, Simon sent an email stating that the HUD application

10  process was behind schedule. In light of the December 20, 2006 deadlines, Plaintiffs were troubled by

11  this email, and Oliphant communicated his concerns to Matt James (the business development person

12  at Greystone who initially sold Oliphant on using Greystone's services). To address Oliphant's

13  concerns, James told Oliphant that Greystone would provide a non-recourse bridge loan to fund the

14  purchase of the Project and the cost of issuance for the bonds to be sold by SBS.

15      24.    On or about November 13, 2006, Plaintiffs caused the final set of architectural plans

16  and specifications to be delivered to Greystone's architectural review firm. On or about November

17  14, 2006, Plaintiffs delivered by FedEx a complete set of financial certifications and list of business

18  entities for all participants in the Project. These items, which were the final items required from

19  Plaintiffs and the development team, were delivered a full two weeks before Greystone's scheduled

20  delivery of the HUD application. All other aspects of the HUD application were within Greystone's

21  ability to perform and execute timely.

22      25.    On November 14, 2006, after Plaintiffs had transmitted all items required to be

23  provided by them, Greystone for the first time informed Plaintiffs that the HUD application would

24  not be submitted in 2006. To address the concerns of Plaintiff and the development team and

25  reassure them that the Project would ultimately be a success, James again stated that Greystone was

26  committed to funding the acquisition of the Project and issuance of the tax-exempt bonds, and stated

27  that Greystone would issue a non-recourse bridge loan to fund the acquisition of the Project and the

28  cost of issuing the bonds.

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP    Exhibit A-2, Page 35

- 7

1    26.    On November 16, 2006, bond counsel for SBS sent an email to confirm that

2    Greystone would fund a bridge loan for the purchase of the Project and the cost of issuing the tax-

3    exempt bonds.   That same day, Defendant Greystone Servicing provided a bridge loan term sheet on

4    behalf of Defendant Greystone CDE which provided for a non-recourse bridge loan to Oliphant in

5    the amount of $4,348,400.  The November 16 Term Sheet stated that the bridge loan would be for

6    the full purchase price of the Project and that it would be non-recourse.

7    27.    On November 21, 2006, SBS representatives provided the final financing timetable,

8    again confirming that Greystone had agreed to fund all costs of selling the tax-exempt bonds through

9    bridge financing.   Thereafter, the parties proceeded to complete arrangements for issuance of the tax-

10   exempt bonds and acquisition of the Project, and Oliphant made arrangements to travel to Oklahoma

11   City on December 18 through 20 for the closing of the Project acquisition.  .

12   28.    The tax-exempt bonds were priced on December 13 and 14, and were sold by SBS to

13   institutional investors.  As a result, Plaintiffs incurred approximately $251,000 in bond issuance costs.

14   29.    On December 17, 2006, the literal eve of Oliphant's departure to Oklahoma City, the

15   Greystone Defendants' counsel delivered the first drafts of the bridge loan documents.   The provided

16   loan documents did not provide the financing promised by Greystone.  Instead, these documents

17   provided for a bridge loan of only $500,000 rather than the promised $4,348,400.  This reduced

18   amount would cover the cost of the bond issuance but not acquisition of the Project.   In addition,

19   instead of the promised non-recourse financing, the provided loan documents included a personal

20   guaranty by Oliphant and a spousal guaranty, neither of which had been mentioned previously.

21   30.    When Oliphant received the bridge loan documents on December 17, 2006, the

22   $251,000 bond issuance costs had already been incurred because the tax-exempt bonds had been sold.

23   Moreover, if the Project acquisition was not closed by December 20, 2006, Plaintiffs faced losing the

24   tax-exempt bond funding because the bonds would expire.  Oliphant signed the voluminous bridge

25   loan documents as presented.  Copies of the following are attached as Exhibits "B," "C," "D," "E,"

26   and "F," respectively, hereto and incorporated herein by this reference: Bridge Loan Agreement; the

27   Bridge Loan Promissory Note; the Partner Guaranty, Pledge and Security Agreement; the Developer

28   Limited Guaranty, Pledge and Security Agreement; and the Guaranty and Suretyship Agreement.

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*    - 8 -
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP    Exhibit A-2, Page 36

1    31.    On or about March 14, 2007, Greystone submitted the final HUD application on

2    behalf of Oliphant and Plaintiffs.

3    32.    Part of the financial structure of the Project included sale of the tax credits to a

4    purchaser/syndicator.  Under the original HUD application, the tax credit purchaser/syndicator was

5    the Richman Group.  On or about April 17, 2007, the Richman Group backed out of the deal.

6    Thereafter, with the knowledge and consent of the Greystone Defendants, Plaintiffs pursued other

7    syndicators and co-developers to complete the financial aspects of the Project.  On or about June 14,

8    2007, Plaintiffs were introduced to David Henry, an experienced Arkansas tax credit developer who

9    would serve as general contractor, property manager, and co-developer, and thereafter Plaintiffs and

10   David Henry worked out terms for their relationship.

11   33.    On or about June 29, 2007, the seller of the Project agreed to extend the closing date

12   to July 31, 2007 in order to accommodate additional bridge loan financing arranged by David Henry.

13   As a part of this agreement, Plaintiffs paid an additional $25,000 earnest money deposit to the seller,

14   which Oliphant funded through an additional $25,000 advance on the Greystone bridge loan.

15   34.    On or about July 5, 2007, Oliphant met with HUD personnel in Oklahoma City and

16   learned that the HUD application had been rejected by letter sent out earlier that day.  At this

17   meeting, the HUD representative informed Oliphant that at a HUD conference in St. Louis on June

18   19, Greystone's representative had gone out of her way to make unsolicited disparaging remarks about

19   the Project to the HUD representative from Oklahoma City.

20   35.    On or about July 10, 2007, Matt James acknowledged to Oliphant that Greystone had

21   received the HUD rejection letter, and reassured Oliphant that Betsy Vartanian, who was "one of the

22   top HUD loan executives at Greystone," was going to step in.

23   36.    On or about July 11, 2007, Betsy Vartanian informed Oliphant that she had spoken

24   with HUD personnel in Oklahoma City and that HUD had agreed to reconsider the application

25   without starting over from the beginning, and that Greystone would submit written materials

26   responsive to HUD's concerns.  On or about July 13, 2007, Greystone sent a letter to HUD

27   confirming that supplemental materials would follow to address HUD's concerns raised in the July 5

28   letter.

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP

-9

37.     In the meantime, Oliphant and David Henry continued to proceed with the closing of the acquisition of the Project. Oliphant and David Henry reached an agreement with the seller whereby the seller would carry back a second mortage in the amount of $500,000. On July 25, 2007, the attorneys for the first mortgage lender sent out drafts of the closing documents. On July 27, 2007, Greystone threatened to disrupt the acquisition deal unless the seller agreed to subordinate his carry-back loan to Greystone's pre-development bridge loan. That same day, Oliphant and David Henry made arrangements to meet in Oklahoma on July 30th and 31st to make plans for signing the closing documents, taking control of the Project, and getting the keys.

38.     On July 29, 2007, the eve of travel, David Henry emailed that he was having second thoughts about the deal and had concerns about the cost of the bond issuance in December 2006. However, Henry was unavailable to discuss his concerns that entire day.

39.     On July 30, 2007, Oliphant and Henry arrived in Oklahoma City. In a telephone conference call, Greystone rescinded its demand that the seller subordinate his carry-back loan. Instead, Greystone requested that Henry's bank allow Greystone to purchase its loan after closing, so that Greystone could improve its collateral position.

40.     On July 31, 2007, Oliphant and Henry met for approximately six hours to discuss Henry's concerns. During this meeting, David Henry proposed taking over the entire Project in exchange for assuming the Greystone loan. The parties did not reach agreement for modifying their prior arrangement, and David Henry left town without signing the escrow documents. Oliphant, however, signed the closing documents at the title company that day before leaving Oklahoma City.

41.     In early August 2007, Greystone began negotiating with David Henry on ways to get the deal done without Oliphant and Plaintiffs, and also began threatening to declare the bridge loan in default.

42.     On August 9, 2007, Greystone unilaterally withdrew the HUD loan application without any prior notice or warning to Oliphant or Plaintiffs. The withdrawal of the HUD application placed at risk the $7,095,000 in tax exempt bond proceeds. It also caused the seller to terminate negotiations with Oliphant because the withdrawal of the HUD application made it appear

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                                    - 10 -
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP                    Exhibit A-2, Page 38

1  that Plaintiffs could not close the deal and that it would take another 10-12 months if the HUD

2  process were started over.

3      43.    By email dated August 21, 2007, Greystone representatives requested additional

4  documentation from Plaintiffs for submission to the loan committee, thus indicating that Greystone

5  intended to go forward with the deal.  On the same date, however, Greystone CDE was apparently

6  preparing a letter declaring the bridge loan in default.

7      44.    On or about August 22, 2007, Thom Ruffin of Greystone telephoned Oliphant and

8  asked if he had received "the letter."  When Oliphant responded in the negative, Ruffin informed

9  Oliphant that Plaintiffs were going to receive a letter that had gone out by FedEx declaring the bridge

10  loan in default.  Ruffin then proceeded to tell Oliphant that Greystone had been talking to David

11  Henry regarding terms upon which Henry would take over Plaintiffs' deal and assume some of the

12  liability of the Greystone bridge loan.

13      45.    After the telephone call, Oliphant received the letter dated August 21, 2007 wherein

14  Greystone CDE declared the bridge loan in default and threatened legal enforcement.  The August 21

15  default letter was transmitted by FedEx to Oliphant at his address in California.  The first alleged

16  default specified in the August 21 default letter was "expiration of the contract for purchase and sale

17  of the Project without the same having been extended."  The August 21 default letter also specified

18  other alleged defaults that were inaccurate, not defaults, and/or had been waived.

19      46.    Over the next several days, the Greystone Defendants continued to pressure Oliphant

20  and Plaintiffs to allow David Henry to take over the entire Project (keeping all the profits).  As a part

21  of this proposal, Henry would assume $275,000 of the bridge loan but Greystone required that

22  Oliphant accept responsibility for paying $215,000, release Greystone of all liability, and agree not to

23  sue.  By letter dated August 27, 2007, transmitted by email and FedEx, Greystone notified Oliphant

24  that it would pursue all collection remedies unless Plaintiffs agreed to the proposed transaction

25  wherein David Henry would take over the deal.  On August 30, 2007, Greystone's counsel delivered

26  an "assignment agreement and covenant not to sue" to this effect and demanded that Oliphant

27  provide written confirmation of acceptance by August 31.

28

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP

- 11 -

Exhibit A-2, Page 39

47.    The terms of the proposed "assignment agreement and covenant not to sue" were financially unacceptable to Plaintiffs and Oliphant did not sign the documents by the requested deadline. Instead, after the Labor Day weekend, Oliphant and Ruffin traded phone calls for several days.

48.    By email transmitted on September 11, 2007, Oliphant notified the Greystone Defendants that Plaintiffs had successfully documented extension of the time to close the deal with the Seller and provided copies of the fully executed Addendum effecting the extension. This cured the first-listed alleged default specified in Greystone's August 21 default letter ("expiration of the contract for purchase and sale of the Project without having been extended"). Thus, in this same email, Oliphant also demanded that Greystone rescind its Notice of Default issued August 21, 2007.

49.    The Greystone Defendants ignored Oliphant's email of September 11 and did not rescind the August 21 notice of default nor otherwise respond in writing. On September 13, 2007, Oliphant sent a further email to the Greystone Defendants asking for a written response to the September 11 email.

50.    In response to Oliphant's September 13 email, Thom Ruffin telephoned Oliphant on September 14, 2007, and set up a telephone conference call for later that day.   During that conference call, Oliphant again requested that the Greystone Defendants rescind the August 21 notice of default but the Greystone Defendants refused to do so. The Greystone Defendants claimed that the bridge loan was still in default because there was (they claimed) no tax credit syndicator. The Greystone Defendants further stated that Greystone was "out" unless Plaintiffs could prove that the Project was a viable deal.

51.    In fact, the bridge loan was not in default for the claimed lack of a tax credit syndicator. First of all, the Greystone Defendants waived this condition in April 2007 when the initial tax credit syndicator withdrew from the deal. Moreover, Plaintiffs had obtained a commitment from a successor tax credit syndicator in June 2007 which, at the time of the September 14 telephone conference, was still in effect and had not been withdrawn.

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                                    - 12
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP            Exhibit A-2, Page 40

1    52.    By letter dated September 21, 2007, Greystone CDE notified Plaintiffs that it was

2    accelerating the bridge loan and declaring all amounts due under the bridge loan note immediately due

3    and payable.

4
                            ### FIRST CAUSE OF ACTION
5                    (For Negligence, Including Professional Negligence)

6    53.    Plaintiffs refer to and hereby incorporate herein the foregoing Paragraphs 1 through

7    52, inclusive, and other material allegations set forth above, as though the same were fully set forth at

8    this place.

9    54.    Each of the Greystone Defendants owed Plaintiffs and each of them a duty of due

10   care by virtue of the business relationship established through the Engagement Agreement wherein

11   Plaintiffs appointed Greystone Servicing to serve as their exclusive agent to process the HUD

12   application for financing the acquisition and rehabilitation of the Project and Greystone Servicing's

13   and undertakings pursuant thereto.

14   55.    Each of the Greystone Defendants owed Plaintiffs and each of them a duty of due

15   care by virtue of Greystone Servicing's position as a HUD-approved underwriter for the FHA's

16   Multifamily Accelerated Processing (MAP) program and the respective roles and involvements of

17   Plaintiff in the Project.

18   56.    Each of the Greystone Defendants owed Plaintiffs and each of them a duty to use

19   such skill, prudence and diligence as other HUD-approved underwriters for the FHA's Multifamily

20   Accelerated Processing (MAP) program commonly possess and exercise.

21   57.    The Greystone Defendants and each of them breached their respective duties of due

22   care owed to Plaintiffs and each of them with respect to the Project and the HUD financing.  The

23   breaches of the Greystone Defendants include, but are not limited to, failing to expedite processing,

24   preparation and submission of the HUD application, causing delay in the processing, preparation and

25   submission of the HUD application, making unsolicited derogatory statements regarding Plaintiffs

26   and the Project to HUD representatives, and withdrawing the HUD application without prior notice

27   to or consent by Plaintiffs or any of them.

28

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP
                    Exhibit A-2, Page 41                                              - 13

58.    As a direct and legal result of the Greystone Defendants' respective breaches of the respective duties of due care owed to Plaintiffs and each of them with respect to the Project and the HUD financing, as alleged hereinabove, Plaintiffs, and each of them, have been damaged and injured in an amount to be proven at trial.

59.    As a direct and legal result of the Greystone Defendants' respective breaches of the respective duties of due care owed to Plaintiffs and each of them with respect to the Project and the HUD financing, as alleged hereinabove, Plaintiffs, and each of them, have been forced to retain attorneys, accountants, investigators, agents and other consultants, and to expend time and money, to discover and remedy the fraud, all according to proof.  Plaintiffs reserve the right to amend this complaint at such time as the amounts of damage become known.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SECOND CAUSE OF ACTION
### (For Breach of Fiduciary Duty / Constructive Fraud)

60.    Plaintiffs refer to and hereby incorporate herein the foregoing Paragraphs 1 through 52, inclusive, and other material allegations set forth above, as though the same were fully set forth at this place.

61.    Each of the Greystone Defendants stands in a confidential and fiduciary relationship with Plaintiffs and each of them by virtue of the trust and confidence Plaintiffs and each of them reposed in said defendants by virtue of the Engagement Agreement, the business relationship, and the Greystone Defendants' position as a HUD-approved underwriter for the FHA's Multifamily Accelerated Processing (MAP) program.

62.    Each of the Greystone Defendants owed Plaintiffs and each of them a fiduciary duty by virtue of the trust and confidence Plaintiffs and each of them reposed in said defendants by virtue of the Engagement Agreement, the business relationship, and the Greystone Defendants' position as a HUD-approved underwriter for the FHA's Multifamily Accelerated Processing (MAP) program.

63.    The Greystone Defendants and each of them were negligent in the performance of the duties owed to Plaintiffs and each of them with respect to the Project and the HUD financing, as alleged hereinabove.  The Greystone Defendants and each of them further breached their respective

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                - 14
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP
                                          Exhibit A-2, Page 42

1   fiduciary duties to Plaintiffs and each of them by failing to expedite processing, preparation and
2   submission of the HUD application, by causing delay in the processing, preparation and submission
3   of the HUD application, by making unsolicited derogatory statements regarding Plaintiffs and the
4   Project to HUD representatives, by changing the terms of the bridge financing, by withdrawing the
5   HUD application without prior notice to or consent by Plaintiffs or any of them, by demanding
6   priority for the bridge loan to which they were not entitled, by negotiating directly with David Henry
7   under terms that cut out Oliphant and Plaintiffs from the deal, and by attempting to force Plaintiffs to
8   transfer their prospective financial and non-economic gain in the Project to David Henry.

9       64.    The Greystone Defendants and each of them have gained an advantage over Plaintiffs
10  by virtue of the foregoing breaches.

11      65.    Plaintiffs and each of them were prejudiced by the foregoing breaches of duty in that
12  they advanced funds and expended time and energy and incurred obligations in connection with the
13  Project. Plaintiffs and each of them were further prejudiced by the foregoing breaches of duty in that
14  they now risk losing their prospective financial and non-economic gain from the Project.

15      66.    Plaintiffs' reliance, as set forth above, was reasonable under the circumstances.
16  Plaintiffs could not, in the exercise of reasonable diligence, have anticipated or discovered the
17  misconduct of the Greystone Defendants in the circumstances in a way that Plaintiffs could have
18  protected themselves or their financial interests.

19      67.    As a direct and legal result of the conduct of the Greystone Defendants as alleged
20  hereinabove, Plaintiffs, and each of them, have been damaged and injured in an amount to be proven
21  at trial.

22      68.    As a direct and legal result of the conduct of the Greystone Defendants, Plaintiffs, and
23  each of them, have been forced to retain attorneys, accountants, investigators, agents and other
24  consultants, and to expend time and money, to discover and remedy the fraud, all according to proof.
25  Plaintiffs reserve the right to amend this complaint at such time as the amounts of damage become
26  known.

27      69.    Plaintiffs should recover punitive damages, in addition to their actual damages, to
28  make an example of and to punish Defendants and each of them.

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP                    Exhibit A-2, Page 43                    - 15 -

70.    The conduct of the Greystone Defendants, and each of them, as described hereinabove was fraudulent, malicious and oppressive, and done for the specific purpose of getting control over Plaintiff's monies for Defendants' own use and benefit. The Greystone Defendants, and each of them, also displayed reckless indifference to Plaintiffs and each of them with regard to the conduct alleged in this complaint. Plaintiffs should recover punitive damages, in addition to their actual damages, to make an example of and to punish Defendants and each of them.

71.    The conduct of the Greystone Defendants was, in and of itself, fraudulent, malicious and oppressive in that said Defendants were guilty of reckless indifference towards Plaintiffs, acted willfully and knowingly in the manner in which they torpedoed the Project and Plaintiffs' HUD application and the tax-exempt bond issue, and undertook separate negotiations with David Henry to cut out Oliphant and Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

### THIRD CAUSE OF ACTION
#### (Intentional Interference with Prospective Economic Advantage)

72.    Plaintiffs refer to and hereby incorporate herein the foregoing Paragraphs 1 through 52, inclusive, and other material allegations set forth above, as though the same were fully set forth at this place.

73.    At all times material hereto, Plaintiffs had an existing business relationship with the seller of the Project and with the HUD office in Oklahoma City.

74.    At all times material hereto, Plaintiffs had a probability of future economic benefit from successful completion of the financing, rehabilitation and development of the Project.

75.    The Greystone Defendants disrupted, delayed and interfered with Plaintiffs' prospective economic advantage, as alleged hereinabove.

76.    The conduct of the Greystone Defendants in disrupting, delaying and interfering with Plaintiffs' opportunity to complete the Project was wrongful in that said defendants, and each of them, delayed and failed to expedite the HUD application, changed terms of the deal at the last minute, and breached their fiduciary duties to Plaintiffs and each of them.

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*    - 16
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP            Exhibit A-2, Page 44

77.     The conduct of the Greystone Defendants in disrupting, delaying and interfering with Plaintiffs' opportunity to complete the Project was substantially certain to result in interference with Plaintiffs' prospective economic advantage in the Project.  The Greystone Defendants knew of Plaintiffs' business relationship and prospective economic advantage.

78.     The Greystone Defendants intended to disrupt and interfere with Plaintiffs' business relationship and prospective economic advantage and profits from the Project.

79.     As a direct and legal result of the conduct of the Greystone Defendants as alleged hereinabove, Plaintiffs, and each of them, have been damaged and injured in an amount to be proven at trial.

80.     But for the disruption, delay and interference of the Greystone Defendants, it is reasonably probably that Plaintiffs would have realized the anticipated prospective economic advantage from the Project.

81.     Compelling public policy favors facilitating Low Income Housing Tax Credit projects (such as the Project) offered through the FHA's Office of Housing and Urban Development ("HUD").  This compelling public policy includes providing and facilitating the financial rewards available to tax-credit developers (such as Plaintiffs) so that the developers are incentivized to do such Low Income Housing Tax Credit projects (such as the Project).

82.     As a direct and legal result of the foregoing conduct of the Greystone Defendants, Plaintiffs, and each of them, have been forced to retain attorneys, accountants, investigators, agents and other consultants, and to expend time and money, to discover and remedy the fraud, all according to proof.  Plaintiffs reserve the right to amend this complaint at such time as the amounts of damage become known.

83.     Plaintiffs should recover punitive damages, in addition to their actual damages, to make an example of and to punish Defendants and each of them.

84.     The conduct of the Greystone Defendants, and each of them, as described hereinabove was fraudulent, malicious and oppressive, and done for the specific purpose of getting control over Plaintiff's monies for Defendants' own use and benefit.  The Greystone Defendants, and each of them, also displayed reckless indifference to Plaintiffs and each of them with regard to the

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP                    Exhibit A-2, Page 45                    - 17

1　conduct alleged in this complaint.  Plaintiffs should recover punitive damages, in addition to their

2　actual damages, to make an example of and to punish Defendants and each of them.

3　　　　85.　　The conduct of the Greystone Defendants was, in and of itself, fraudulent, malicious

4　and oppressive in that said Defendants were guilty of reckless indifference towards Plaintiffs, acted

5　willfully and knowingly in the manner in which they torpedoed the Project and Plaintiffs' HUD

6　application and the tax-exempt bond issue, and undertook separate negotiations with David Henry to

7　cut out Oliphant and Plaintiffs.

8　　　　WHEREFORE, Plaintiffs pray for judgment as set forth below.

9
10
### FOURTH CAUSE OF ACTION
**(Negligent Interference with Prospective Economic Advantage)**

11　　　　86.　　Plaintiffs refer to and hereby incorporate herein the foregoing Paragraphs 1 through

12　52, inclusive, and other material allegations set forth above, as though the same were fully set forth at

13　this place.

14　　　　87.　　At all times material hereto, Plaintiffs had an existing business relationship with the

15　seller of the Project and with the HUD office in Oklahoma City.

16　　　　88.　　At all times material hereto, the Greystone Defendants, and each of them, owed

17　Plaintiffs a duty of care as alleged hereinabove.

18　　　　89.　　At all times material hereto, Plaintiffs had a probability of future economic benefit

19　from successful completion of the financing, rehabilitation and development of the Project.

20　　　　90.　　The Greystone Defendants wrongfully disrupted, delayed and interfered with

21　Plaintiffs' prospective economic advantage, as alleged hereinabove, and in delaying and failing to

22　expedite the HUD application, changing terms of the deal at the last minute, and breaching their

23　fiduciary duties to Plaintiffs and each of them.

24　　　　91.　　The conduct of the Greystone Defendants in disrupting, delaying and interfering with

25　Plaintiffs' opportunity to complete the Project, as alleged hereinabove, foreseeably disrupted and

26　interfered with Plaintiffs' prospective economic advantage in the Project.

27
28

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*　　　　　　　　　　- 18 -
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP　　　　Exhibit A-2, Page 46

1    92.    As a direct and legal result of the conduct of the Greystone Defendants as alleged

2  hereinabove, Plaintiffs, and each of them, have been damaged and injured in an amount to be proven

3  at trial.

4    93.    But for the disruption, delay and interference of the Greystone Defendants, it is

5  reasonably probably that Plaintiffs would have realized the anticipated prospective economic

6  advantage from the Project.

7    94.    Compelling public policy favors facilitating Low Income Housing Tax Credit projects

8  (such as the Project) offered through the FHA's Office of Housing and Urban Development

9  ("HUD"). This compelling public policy includes providing and facilitating the financial rewards

10  available to tax-credit developers (such as Plaintiffs) so that the developers are incentivized to do such

11  Low Income Housing Tax Credit projects (such as the Project).

12    WHEREFORE, Plaintiffs pray for judgment as set forth below.

13

14    **FIFTH CAUSE OF ACTION**
       **(Anticipatory Breach)**

15    95.    Plaintiffs refer to and hereby incorporate herein the foregoing Paragraphs 1 through

16  52, inclusive, and other material allegations set forth above, as though the same were fully set forth at

17  this place.

18    96.    Plaintiffs and Defendants entered into a series of written agreements to accomplish

19  the financing for the acquisition and rehabilitation of the Project.

20    97.    The Greystone Defendants, and each of them, have expressly and unequivocally

21  repudiated those contracts by stating that they will not further perform, by stating that they are "out"

22  of the deal unless Plaintiffs provide proofs and assurances to which the Greystone Defendants are not

23  entitled, by refusing to rescind the August 21 notice of default, and by sending the September 18

24  notice of acceleration.

25    98.    Plaintiffs are ready, willing and able to perform under the agreements but for the

26  Greystone Defendants' repudiation and anticipatory breach.

27

28

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
First Amended and Supplemental Complaint for Damages and Declaratory Relief                    - 19
Farber & Company Attorneys, LLP

99.     As a direct and legal result of the breaches of the Greystone Defendants, as alleged hereinabove, Plaintiffs, and each of them, have been damaged and injured in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

### SIXTH CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

100.     Plaintiffs refer to and hereby incorporate herein the foregoing Paragraphs 1 through 52, inclusive, and other material allegations set forth above, as though the same were fully set forth at this place.

101.     Plaintiffs and Defendants entered into a series of written agreements (including but not limited to the Engagement Agreement) to accomplish the financing for the acquisition and rehabilitation of the Project.  Inherent in said agreements is an implied covenant of good faith and fair dealing by each party not to do anything which will deprive the other parties of the benefits of the contract.

102.     The Greystone Defendants, and each of them, breached the implied covenants of good faith and fair dealing by interfering as alleged hereinabove and by failing to cooperate with Plaintiffs in the performance of the agreements.

103.     As a direct and legal result of the breaches of the Greystone Defendants, as alleged hereinabove, Plaintiffs, and each of them, have been damaged and injured in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

### SEVENTH CAUSE OF ACTION
**(Declaratory Relief)**

104.     Plaintiffs refer to and hereby incorporate herein the foregoing Paragraphs 1 through 52, inclusive, and other material allegations set forth above, as though the same were fully set forth at this place.

105.     Plaintiffs and Defendants entered into a series of written agreements (including but not limited to the Engagement Agreement) to accomplish the financing for the acquisition and

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                                        - 20 -
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP                    Exhibit A-2, Page 48

1 | rehabilitation of the Project, as hereinabove alleged, including but not limited to the bridge loan for

2 | the Project, personal guarantees thereof, and written agreements concerning bridge loan for the

3 | Project.

4 |     106.    An actual controversy now exists between Plaintiffs and the Greystone Defendants

5 | concerning their respective legal rights, duties and obligations under the bridge loan, the guarantees

6 | and the other agreements relating thereto. The Greystone Defendants claim that the bridge loan is in

7 | default and that they have accelerated maturity of the bridge loan. Plaintiffs dispute that the bridge

8 | loan is in default or has been accelerated.

9 |     107.    Plaintiffs and each of them desire a judicial determination and declaration of the

10 | parties' respective rights, duties and obligations with respect to (1) whether or not the bridge loan is in

11 | default and (2) whether or not maturity of the bridge loan has been accelerated. In addition, Plaintiff

12 | Oliphant desires a judicial determination and declaration as to whether or not any payment is

13 | currently due and payable from Oliphant on the bridge loan, the guarantees and/or the related

14 | agreements and, if so, the amount thereof.

15 |     108.    Plaintiffs and each of them claim an offset against any amounts due any of the

16 | Greystone Defendants under the bridge loan, the guarantees and the related agreements by reason of

17 | Plaintiffs' respective claims for damages. Accordingly, Plaintiffs and each of them desire a judicial

18 | determination and declaration as to (1) whether or not Plaintiffs or any of them are entitled to offset

19 | any damages against any amounts due any of the Greystone Defendants under the bridge loan, the

20 | guarantees and the related agreements and, if so, the amount of offset, and (2) whether or not any

21 | sum is currently due and payable by any of them on the bridge loan, the guarantees and/or the related

22 | agreements and, if so, the amount thereof.

23 |     109.    Plaintiffs and each of them have standing to seek declaratory relief because Plaintiffs,

24 | and each of them, face imminent injury if the controversy is not promptly resolved.

25 |     110.    Under the circumstances, a declaration regarding the respective legal rights and duties

26 | of the parties is necessary so that the parties will know how to proceed with respect to the notices

27 | given by the Greystone Defendants and their respective rights, duties and obligations under the bridge

28 | loan, the guarantees and the related agreements.

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP
Exhibit A-2, Page 49

\- 21

1    WHEREFORE, Plaintiffs pray for judgment as set forth below.

2                    **PRAYER FOR RELIEF**

3    WHEREFORE, Plaintiffs SANTA FE POINTE, LP, an Oklahoma limited partnership

4    ("SFP"), THEOTIS F. OLIPHANT ("Oliphant"), an individual, and RANT, LLC, a Delaware limited

5    liability company ("Rant"), pray for judgment against defendants and each of them as follows:

6            A.      For general damages, according to proof;

7            B.      For compensatory damages, according to proof;

8            C.      For punitive and exemplary damages;

9            D.      For any statutory damages or penalties available under statute;

10           E.      For a judicial determination and declaration of the parties' respective rights,

11   duties and obligations with respect to (1) whether or not the bridge loan is in default, (2)

12   whether or not maturity of the bridge loan has been accelerated, (3) whether or not any

13   payment is currently due and payable from Oliphant on the bridge loan, the guarantees and/or

14   the related agreements and, if so, the amount thereof, (4) whether or not Plaintiffs or any of

15   them are entitled to offset any damages against any amounts due any of the Greystone

16   Defendants under the bridge loan, the guarantees and the related agreements and, if so, the

17   amount of offset, and (5) whether or not any sum is currently due and payable by any of them

18   on the bridge loan, the guarantees and/or the related agreements and, if so, the amount

19   thereof

20           F.      For reasonable attorney's fees;

21           G.      For costs of suit herein incurred; and

22           H.      For such other and further relief as the Court deems just or proper.

23

24   DATED:  September 24, 2006          FARBER & COMPANY ATTORNEYS, LLP
                                        Attorneys for Plaintiff
25

26

27                                      By
                                           Eric J. Farber, SBN 169472
28                                         Ann McFarland Draper, SBN 065669

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                    - 22
First Amended and Supplemental Complaint for Damages and Declaratory Relief
Farber & Company Attorneys, LLP

# EXHIBIT A

August 29, 2006

Mr. Theo Oliphant
113 Carmel Avenue
El Cerrito, CA  94530

GREYSTONE

RE:      *Santa Fe Pointe Apartments*
         *Oklahoma City, OK*
         *221(d)(4) Substantial Rehab*

Dear Mr. Oliphant:

Greystone Servicing Corporation, Inc. ("Greystone") is pleased to present this engagement letter to Theo Oliphant on behalf of an entity to be created ("Applicant"). This Engagement Letter will set forth the terms and conditions under which Greystone will process an application ("Application") for a mortgage loan ("Loan") on the above-referenced project ("Project") for submission to the Department of Housing and Urban Development acting through the Federal Housing Administration ("HUD") under its Multifamily Accelerated Processing ("MAP") for approval of HUD mortgage insurance under Section 221(d)(4) of the National Housing Act, as amended.

Please carefully review each of the following exhibits attached hereto and incorporated herein by reference:

          Exhibit A – Proposed Loan Terms
          Exhibit B – Notice & Disclosure of Transaction Fees and Costs
          Exhibit C – Summary of the Process
          Exhibit D – Required Documentation (all forms will be provided under separate cover)
          Exhibit E – Conflicts Questionnaire

Upon your acceptance of this Engagement Letter along with your payment of the Third Party Fees and Greystone's Processing Fee, Greystone will become the exclusive lender to underwrite and process a HUD-insured loan for the Project. The Loan will be processed in accordance with HUD's MAP procedures, regulations and guidelines.

If acceptable, please execute the original of this Engagement Letter, initial all Exhibits, and return it and a check made payable to Greystone Servicing Corporation, Inc., in the amount of $14,000 for payment of the estimated Third Party Fees and the Greystone Processing Fee to: Sharon R. Pollock, Assistant Vice President, Greystone Servicing Corporation, Inc., 419 Belle Air Lane, Warrenton, VA 20186. We will then work together to obtain all the items on Exhibit D. The terms of this Engagement Letter are subject to change if it is not accepted and returned by September 5, 2006.

Theo Oliphant on behalf of an entity to be created
August 29, 2006
Page 2

Greystone is dedicated to helping guide you through the process. We will assist you in completing the forms and will be available to provide instruction each step of the way. We look forward to working with you on the successful completion of this transaction.

Very truly yours,

GREYSTONE SERVICING CORPORATION, INC.

By: _Sharon R. Pollock_

Sharon R. Pollock
Assistant Vice President

## ACCEPTANCE:

The undersigned, as an authorized agent for the Applicant, hereby accepts the terms and conditions set forth in the foregoing Engagement Letter and agrees to perform or cause to be performed, in a timely manner, all of the obligations on the part of the Borrower contained herein; and to be bound by all of the terms, provisions and conditions thereof. You have the right for our account to order a title report and survey report.

## APPLICANT:

Theo Oliphant on behalf of an entity to be created

By:    _Theo P. Oliphant_

Name:  _Theotis Oliphant_

Title: _Managing Member_

Date:  _9/6/2006_

Theo Oliphant
August 29, 2006
Page A-1

## EXHIBIT A

### Proposed Loan Terms

The proposed loan terms, as detailed below, are based on preliminary information and are subject to change by Greystone and HUD.

| | |
|---|---|
| Proposed Transaction: | Substantial Rehab of Apartment Complex |
| Borrower: | TBD<br>c/o 113 Carmel Avenue<br>El Cerrito, CA 94530<br>(510) 222-5074<br>theo.oliphant@gmail.com |
| Contact Person: | Mr. Theo Oliphant |
| Project: | Santa Fe Pointe Apartments<br>125 SW 74th Street<br>Oklahoma City, OK 73139 |
| Type of Project: | 224-Unit Apartment Complex |
| Proposed Loan Amount: | $7,787,500 (subject to underwriting review and issuance of the HUD Commitment) |
| Loan Processing Interest Rate: | 5.40%. *[Note: This rate shall be used for the purpose of processing the Application and may not reflect the actual interest rate of the Loan (Refer to Exhibit C of this Engagement Letter, Section III - Rate Lock)]* |
| Loan Term: | 16-month construction loan term (Initial Endorsement to Final Endorsement) and 480-month permanent loan term (commencing from Final Endorsement to maturity) |
| Recourse: | Non-Recourse |

Exhibit A-2, Page 54

Applicant's Initials _____

Theo Oliphant
August 29, 2006
Page B-1

## EXHIBIT B

### Notice and Disclosure of Transaction Fees and Costs

The following describes the fees that will be incurred in this transaction. Unless otherwise defined herein, all capitalized terms used herein shall have the meaning set forth elsewhere in this Engagement Letter.

### The Following Fees Are Due and Payable at Execution of Engagement Letter:

Pre-ApplicationProcessing Fee:           $1,500 (Non-Refundable)

Pre-ApplicationThird Party Fees:         $2,500 - Phase I Environmental Report estimate
                                         $5,000 - Limited Scope Appraisal estimate
                                         $5,000 - Market Study estimate
                                         Lead Based Paint and Asbestos Report Costs may
                                         apply for properties built before 1978. Costs will be
                                         determined for these at a later date.

                                         The above Pre-Application Third Party Fees are
                                         estimates only. Any additional costs are the
                                         responsibility of Applicant and will be due and
                                         payable upon receipt of an invoice from Greystone.
                                         Some or all of these fees may be reimbursable from
                                         Loan proceeds.

### The Following Fees Are Due and Payable Following HUD's Invitation to Submit a Firm Commitment:

Firm Application Processing Fee:         $3,500 (~~Non-Refundable~~) Refundable. TPO

Firm Application Third Party Fees:       $4,500 - Cost Review estimate
                                         $4,500 - Architectural Review estimate
                                         $5,000 - Complete Appraisal estimate

                                         The above Firm Application Third Party Fees are
                                         estimates only. Any additional costs are the
                                         responsibility of Borrower and will be due and
                                         payable upon receipt of an invoice from Greystone.
                                         Some or all of these fees may be reimbursable from
                                         Loan proceeds.

### Payable Prior to Firm Application Submission:

HUD Application Fee:                     $23,363 (0.30% of Loan Amount)

Applicant's Initials TPO

Sep 07 2006 12:26PM  GIBBS & OLIPHANT LLP      5106348886              p.7

Theo Oliphant
August 29, 2006
Page B-2

## Payable Prior to Rate Lock:

Good Faith Deposit:

1.00% of the Loan Amount, collected prior to rate lock. The Deposit is required to assure closing occurs by the required closing date as determined at the time of rate lock and may be applied to Applicant's obligations at closing.

## Payable at Closing (generally payable from Loan proceeds):

HUD Inspection Fee:

0.50% of total improvements plus BSPRA, rounded up to the nearest $100. Fee is due and payable to HUD at closing.

Mortgage Insurance
Premium ("MIP"):

0.90% of the Loan Amount at closing. Thereafter, 0.45% will be due annually based on the then outstanding principal balance.

[1]Financing Fee:                    *TFO*    1.25 %
                                              1.50% of Loan Amount; due and payable to Greystone at closing.

[1]Placement Fee:

0.00% of Loan Amount; due and payable to Greystone at closing.

Closing Costs:

Paid at closing, and include, but are not limited to, recording fees, title insurance expenses, survey costs, architect costs, Borrower's legal fees, Borrower's organizational expenses and Greystone's legal fees.

---

[1] Deemed earned upon Applicant's acceptance of the Greystone Commitment.

Exhibit A-2, Page 56                            Applicant's Initials *TFO*

Theo Oliphant
August 29, 2006
Page C-1

## EXHIBIT C

### Summary of the Process

This summary is provided to assist you in tracking the status of the Loan throughout the process.

I. Pre-Application (NB: It is now possible to eliminate the pre-application and submit a firm application. In that case, the procedure described below would be modified. The cost of the initial appraisal would be increased by about $2,000 and the estimated cost of the architectural and cost review would be due on engagement. The cost of the final appraisal would be eliminated. The time frame for HUD to respond to the firm application would increase from 45 days to 60 days).

Upon Greystone's receipt of a fully executed original of this Engagement Letter, the Pre-Application Processing Fee, and the Pre-Application Third Party Fees as set forth in Exhibit B, Greystone will order the necessary third party reports and work with the Borrower to obtain the required documentation as identified in Exhibit D.

A. Preparation of Pre-Application. Upon completion of processing and underwriting (estimated at 4-6 weeks, depending on timing of third party reports), Greystone will prepare and deliver the pre-application to HUD (the "Pre-Application"); provided there are no conflict of interest issues which would prohibit Greystone from processing and submitting the Pre-application to HUD per HUD rules and regulatory requirements.

B. HUD Review. HUD guidelines indicate an initial review period of five (5) business days to determine completeness of submission, and once the Pre-Application is deemed complete, HUD's guidelines indicate HUD's review period should not exceed forty-five (45) days. Greystone will further obtain or assist Borrower in providing any additional clarifying information subsequently requested by HUD. Should HUD and/or Greystone decline to issue an invitation to submit a Firm Application, Greystone will refund any unexpended portion of the Pre-Application Third Party Fees.

II. Firm Application Processing

A. Date Firm Application Due to HUD. From the date of HUD's invitation, the firm application submission (the "Firm Application") is due to HUD within one-hundred twenty (120) days.

B. Preparation of Firm Application Submission. Greystone will advise Borrower of any issues received from HUD relating to Project acceptability and/or proposed Project underwriting parameters ("HUD Comments"). Borrower shall have fifteen (15) calendar days to provide Greystone with written acknowledgement and acceptance of the HUD Comments along with a check representing the Firm Application Processing Fee and the Firm Application Third Party Fees. Upon receipt of Borrower's acceptance of the HUD Comments and required fees, Greystone will then advise HUD of its intent to submit a Firm Application. Greystone will then commence its processing of the Firm Application and Borrower shall provide such additional documentation and Greystone shall order such additional third party reports as Greystone and/or

Applicant's Initials _____

Theo Oliphant
August 29, 2006
Page C-2

HUD requires to process such Firm Application as set forth in Exhibit D to the Engagement Letter. In the event Borrower declines to accept the HUD Comments, or fails to timely respond in writing, Greystone shall have no further obligation to the Borrower hereunder, other than to refund any unexpended portion of the Pre-Application Third Party Fees.

C. HUD Review. Upon completion of processing, receipt of underwriting approval, and receipt of the HUD Application Fee, Greystone will submit the Firm Application to HUD for review. HUD will again review the Firm Application for completeness. Once the Firm Application submission is deemed complete, HUD's review period should not exceed forty-five (45) days for the issuance of either (i) a HUD Commitment; or (ii) HUD's election not to issue a HUD Commitment.

III. Issuance of HUD and Greystone Commitment

Greystone will forward the HUD Commitment, when issued, to the Borrower for acceptance. Following Borrower's and Greystone's acceptance of the HUD Commitment, Greystone will issue its commitment ("Greystone Commitment") to the Borrower.

IV. Rate Lock

Once the Borrower and Responsible Party have individual acceptable to Greystone has guaranteed the Borrower's liability to Greystone for the period from rate lock through Loan closing, the Borrower may lock the Loan's interest rate, prepayment terms, and the closing date in accordance with the procedures set forth in the Greystone Commitment. The Responsible Party is a creditworthy individual acceptable to Greystone who will guarantee Borrower's liability to Greystone (i) for the period from rate lock through closing of the Loan (which includes any possible late closing fees) and/or (ii) resulting from Borrower's failure to close the Loan, all as more specifically outlined in the Greystone Loan Commitment.

It is important to note that rate lock should only occur once the Borrower and its counsel are confident that the Borrower is prepared to close the Loan by the required closing date, since locking the interest rate commits Greystone, and therefore the Borrower, to liability for damages should the Loan fail to close by the closing date established at the time of rate lock. The Greystone Commitment will provide for monthly extension periods that will be available to the Borrower upon payment of an extension fee of 0.375% per period, should the need arise to extend the closing date, subject to Greystone and HUD approval. However, because of the liability incurred during the period from rate lock through closing, a creditworthy individual acceptable to Greystone is required to guarantee the Borrower's liability incurred at rate lock.

V. Closing/Funding

Greystone will prepare the loan documents following rate lock. Closing and funding will be scheduled at the appropriate HUD Office and is to be attended by the Borrower and Greystone. Borrower must provide counsel capable of reviewing the loan documents and issuing any necessary opinions. The closing process typically takes 30-45 days following Borrower's execution of the Greystone Commitment.

Applicant's Initials ____

Theo Oliphant
August 29, 2006
Page C-3

VI. Brokerage

     Greystone shall be under no obligation for payment of any brokerage commission or fee of any kind with respect to the Loan or any subsequent HUD Commitment, and Borrower shall indemnify, defend and hold Greystone harmless for any claim for such, other than a specific brokerage commission or fee reflected in the Greystone Commitment, if any.

Applicant's Initials *TFO*

Theo Oliphant
August 29, 2006
Page D-1

## EXHIBIT D

### Required Documentation

SECTION 221(D)(4) SUBSTANTIAL REHAB

Brochure &/or resumes for:
    a. Mortgagor/sponsor entity
    b. Each principal of the mortgagor/sponsor
    c. General contractor and its principals

Organizational documents creating mortgagor entity:

    For Partnerships: Certificate of Partnership and Partnership Agreement reflecting current partners.

    For Corporations: Certificate of Incorporation; Articles of Incorporation or Charter, plus any amendments; By-Laws; any shareholder agreement; and Minutes reflecting current officers and directors

Site plan containing overall dimensions, major site elements (example: parking lots) location of utilities (example: water, sewer, electric, gas)

Typical unit and building layouts

Ground floor and typical floor plans

Wall section plan to include foundation, footing, wall and floor structure. Plan must indicate the basic materials in the structure, floor & exterior finish.

Site control evidence (deed, purchase agreement, option)

Ground lease, if applicable

As-is sketch plans.

Description of how existing residents will be moved and served during the work or any plans for relocation of existing residents because of sub-rehab work

Audited financial statements for the property for the past three years and year-to-date.

Evidence of availability of state or local grants or tax credits, if they are anticipated as part of the project financing.

Applicant's Initials _Teo_

# EXHIBIT B

#155243v2
GT Draft 12/17/06

# BRIDGE LOAN AGREEMENT

by and between

## GREYSTONE CDE, LLC,

and

## SANTA FE POINTE, L.P.

Dated as of December __, 2006

## BRIDGE LOAN AGREEMENT

This BRIDGE LOAN AGREEMENT (as amended, modified or supplemented from time to time, this "**Agreement**"), made as of December __, 2006, by and between **GREYSTONE CDE, LLC**, a limited liability company organized and existing under the laws of the State of Delaware, with its principal offices at 419 Belle Air Lane, Warrenton, Virginia 20186 (together with its successors and assigns, "**Lender**"), and **SANTA FE POINTE, L.P.**, a limited partnership organized and existing under the laws of the State of Oklahoma, with its principal offices at 16416 Oconee Creek Drive, Edmond, Oklahoma 73013 (together with its permitted successors and assigns, "**Borrower**"),

### W I T N E S S E T H:

**WHEREAS,** Borrower has requested that Lender make a bridge loan in the maximum principal amount outstanding at any time of $500,000.00 to finance predevelopment expenses of an affordable housing development to be known as the Santa Fe Pointe Apartments located at 125 SW 74th Street in Oklahoma City, Oklahoma, which will be developed and owned by the Borrower, and

**WHEREAS,** subject to the terms and conditions set forth below, and in reliance upon the representations and warranties and the covenants and undertakings of Borrower contained herein, Lender wishes to make such bridge loan to Borrower.

**NOW THEREFORE,** in consideration of the foregoing and of the mutual covenants and undertakings set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties, intending to be legally bound, hereby agree as follows:

### ARTICLE I
### DEFINITIONS AND RULES OF CONSTRUCTION

**Section 1.1    Definitions.**  In addition to terms defined elsewhere in this Agreement, the following terms as used in this Agreement shall have the meanings specified below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Agreement" means this Bridge Loan Agreement, as the same may be amended, modified, or supplemented from time to time.

"Assignment of Project Documents" has the meaning given to that term in Section 3.1(a).

"Assignment of Purchase Contract" has the meaning given to that term in Section 3.1(a).

"Bonds" means those certain $_____ in original aggregate principal amount of _____, the proceeds of which are to be loaned to Borrower to finance a portion of the costs of acquisition and rehabilitation of the Project.

"Bond Documents" means the documents evidencing or securing the Bonds and the loan of the proceeds thereof to Borrower.

"Borrower" means Santa Fe Pointe, L.P., a limited partnership duly organized, validly existing and in good standing under the laws of the State of Oklahoma, together with its successors and permitted assigns.

"Borrower Affiliates" means, collectively, an entity controlled by Borrower or under common control by any person or entity controlling Borrower, together with their respective successors and assigns.

"Business Day" means any day that is not a Saturday, Sunday or public holiday under the laws of the State of New York or the District of Columbia.

"Certificate of Deposit Pledge" has the meaning given to that term in Section 3.1(a).

"Closing" has the meaning given to that term in Section 2.1.

"Closing Date" means the date on which the Closing occurs.

"Collateral" means all property subject to the lien of the Partner Pledge, the Assignment of Project Documents, the Assignment of Purchase Contract, the Developer Fee Pledge and the Certificate of Deposit Pledge.

"Default" means any event which, with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

"Developer" means _____, a _____ duly organized and validly existing under the laws of the State of _____, together with its permitted successors and assigns.

"Developer Fee Pledge" has the meaning given to that term in Section 3.1(a).

"Disbursement" has the meaning given to that term in Section 6.1.

"Disbursement Request Form" shall be the form of request for Disbursements set forth on Exhibit A hereto.

"Event of Default" has the meaning given to that term in Section 9.1.

"Future Project Expenses" has the meaning given to that term in Section 6.2(a).

"General Partner" means Santa Fe Pointe Management, LLC, a limited liability company duly organized and validly existing under the laws of the State of Oklahoma, together with its permitted successors and assigns, in its capacity as a general partner of Borrower.

"Guarantor" means Theotis F. Oliphant, a [married] individual and a resident of the State of California, together with his heirs, executors, legal representatives, personal representatives and permitted successors and assigns.

"Guaranty" has the meaning given to that term in Section 3.1(a).

"LIBOR" means the rate per annum fixed by the British Bankers' Association at 11:00 a.m. (London time) on the last Business Day before the first day of each month, relating to quotations for London Interbank Offered Rates on U.S. dollar deposits for a three (3) month period and as published and reported by the Telerate Service by reference to the screen page currently designated as "Page [3750]" on that service (or such other screen page which may replace such screen page) or if no longer provided by Bloomberg LP or the Telerate Service, such rate as shall be determined in good faith by Lender from such sources as it shall determine to be materially comparable to the Telerate Service.

"Limited Partner" means Theotis F. Oliphant, an individual and a resident of the State of California, together with his heirs, executors, legal representatives, personal representatives, successors and assigns, in his capacity as a limited partner of Borrower.

"Loan" means, the bridge loan to be extended by Lender to Borrower pursuant to the terms of this Agreement.

"Loan Amount" has the meaning given to that term in Section 2.3.

"Loan Documents" means this Agreement, the Note, the Subordinate Mortgage and any other agreements or documents now or in the future executed or delivered to Lender by Borrower in connection with this Agreement and/or the making of the Loan.

"Loan Term" has the meaning given to that term in Section 2.4.

"Note" has the meaning given to that term in Section 2.2.

"Obligors" means, collectively, Borrower, the Guarantor, the Developer, the Limited Partner and the General Partner.

"Origination Period" means the period during which Disbursements may be made by Lender to Borrower, as described in Section 2.7.

"Partner Pledge" has the meaning given to that term in Section 3.1(a).

"Project" means the affordable multi-family housing development to be known as "Santa Fe Pointe Apartments" located at 125 SW 74th Street in Oklahoma City, Oklahoma.

"UCC Filings" has the meaning given to that term in Section 3.1(b).

Section 1.2    Accounting Terms.  All accounting terms not specifically defined in this Agreement shall be construed, and all calculations with respect to accounting or financial matters shall be computed, in accordance the generally accepted accounting principles, consistently applied.

Section 1.3    Incorporation by Reference. All provisions of the other Loan Documents, as may be amended, modified, or supplemented from time to time, are incorporated by reference in this Agreement with the same effect as though fully set forth in this Agreement. In the event of any inconsistency between the provisions of this Agreement and the provisions of

3

the other Loan Documents, the provisions of this Agreement or of such other Loan Documents as Lender shall designate in its discretion shall control.

## ARTICLE II
## THE LOAN

**Section 2.1    Agreement to Lend.** Subject to the terms and conditions in this Agreement and the other Loan Documents, Lender agrees to lend to Borrower such amounts as Borrower may request and Lender may approve, to be disbursed in accordance with the terms hereof, up to an aggregate amount at any time outstanding not in excess of the Loan Amount. The closing of the Loan will occur upon satisfaction of the conditions set forth in Sections 5.1 and Section 5.2 (the "**Closing**").

**Section 2.2    Note.** The Loan is evidenced by a Bridge Loan Promissory Note dated December __, 2006 made by Borrower payable to the order of Lender in the principal amount of up to $500,000.00 (together with any extensions, modifications, renewals, replacements or refinancing thereof, the "**Note**").

**Section 2.3    Loan Amount.** The maximum principal amount of the loan at any time outstanding shall be Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "**Loan Amount**").

**Section 2.4    Loan Term.** The term of the Loan commenced on the Closing Date and shall end on June 15, 2007 (the "**Loan Term**"), which may be extended for an additional six (6) months with (i) prior written approval of both Lender and Borrower, and payment to Lender by Borrower of an extension fee equal to one quarter of one percent (0.25%) of the Loan Amount (the "**Extension Fee**") and (ii) execution and delivery by Borrower of an allonge to the Note and confirmation by the Guarantor, the Developer and the General Partner of their obligations under the Loan Documents to which they are parties, all in form and substance acceptable to Lender in its sole discretion.

**Section 2.5    Interest; Exit Fee.**

(a)    The Loan shall bear interest on the full Loan Amount (whether or not disbursed) at a variable rate equal to LIBOR plus two and three-quarters percent (2.75%) per annum, accruing on the full Loan Amount (whether or not disbursed) from the Closing Date. The Note provides for a default rate of interest of the lesser of (i) twelve percent (12.0%) per annum or (ii) the highest rate of interest permitted by applicable law. Interest on the Loan Amount (whether or not disbursed) shall be due and payable (i) on a quarterly basis, on each March 1, June 1, September 1 and December 1, commencing March 1, 2007 until all amounts due in respect of the Loan shall have been paid in full; (ii) contemporaneously with any payment of the Loan pursuant to Section 2.6 in an amount equal to the accrued and unpaid interest on the prepayment of the Loan; and (iii) in full, in the amount of all accrued and unpaid interest, at the end of the Loan Term.  Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  Borrower shall receive a credit against interest due hereunder and under the Note as set forth in Section 6.3 hereof.

(b)     In addition to and not in lieu of interest on the Loan, at the end of the Loan Term Borrower shall pay to Lender an exit fee equal to two percent (2%) of the Loan Amount (the "**Exit Fee**"). The Lender shall waive the Exit Fee if the Borrower closes its permanent financing through the Lender or an affiliate of the Lender upon terms and conditions satisfactory to Lender or its affiliate.

**Section 2.6    Mandatory Repayment Schedule.** A mandatory repayment of the outstanding principal amount of the Loan, plus all accrued and unpaid interest on the Loan Amount and other sums due and payable by Borrower under the Note and the other Loan Documents shall be due and payable on the earlier of: (A) the date on which the FHA-insured 221(d)(4) construction and permanent loan closing occurs in respect of the Project; or (B) the expiration of the Loan Term.

**Section 2.7    Origination Period.** Lender shall make proceeds of the Loan available to Borrower from time to time, up to a maximum amount equal to the Loan Amount, in separate Disbursements, as more fully provided in Article VI. Disbursements shall be made by Lender, if at all during a period commencing on the Closing Date ending on January 1, 2007, as such date may be extended in accordance with Section 2.4 hereof (the "**Origination Period**"), after which Lender shall no longer have any obligation to disburse funds to Borrower. Borrower shall have no right to or interest in any portion of the Loan Amount which has not been disbursed to Borrower in accordance with the provisions of Article VI on or before the end of the Origination Period. Amounts disbursed to Borrower and repaid may not be re-borrowed by Borrower.

**ARTICLE III**
**SECURITY**

**Section 3.1    Collateral.**

(a)     As security for the due and punctual payment of all liabilities of Borrower with respect to the Loan, including without limitation the payment of all amounts due or to become due under the Note, and as security for the prompt performance of all other obligations of Borrower under the Loan Documents, Borrower shall execute and deliver or cause to be executed and delivered to Lender (i) a guaranty and suretyship agreement dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Guaranty**"), from the Guarantor in favor of Lender, (ii) an assignment of certificate of deposit dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Certificate of Deposit Pledge**"), from the Guarantor in favor of Lender, with the consent of the senior pledgee, (iii) an assignment of project documents dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Assignment of Project Documents**"), from Borrower to Lender, (iv) an assignment of purchase contract dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Assignment of Purchase Contract**"), from Borrower to Lender, with the consent of the seller, (v) a partner limited guaranty, pledge and security agreement dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to time, "**Partner Pledge**") from the General Partner and the Limited Partner to Lender and (vi) a developer limited guaranty, pledge and security agreement dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to

5

time, the "**Developer Fee Pledge**") from the Developer to the Lender. All such documents shall be substantially in the form agreed upon by the parties, and shall create a valid second lien on the Project in favor of Lender. Upon request by Lender, Borrower shall record or file such instruments in the official public records of the State of Oklahoma and/or all state and/or local jurisdictions in which such recording or filing as shall be required to perfect Lender's security interest in the Collateral, and Borrower shall pay all recording costs and other fees in connection with such recording or filing.

(b)    Borrower hereby authorizes Lender to file UCC-1 financing statements or other documents as Lender may determine necessary to perfect, continue and/or reinstate the perfection of such security interest in the Collateral (the "**UCC Filings**"). Borrower shall pay all filing fees and other costs in connection with such UCC Filings.

**Section 3.2**    **Application of Collateral.** All amounts received by Lender on account of any other Collateral shall be applied in the following order of priority: (i) first, to the costs of preserving and protecting the Collateral and the costs of collection, if any, including without limitation reasonable attorneys' fees, incurred by Lender in connection with the collection of all or any portion of any amounts due under the Note; (ii) second, to the payment of any amounts other than principal, interest owing or Exit Fee under the Loan Documents; (iii) third, to the payment of accrued and unpaid interest due under the Note; (iv) fourth, to the payment of principal of the Note; (v) fifth, to the payment of unpaid Exit Fee; and (vi) sixth, to Borrower or as a court of competent jurisdiction may direct.

**Section 3.3**    **Power of Attorney.** Borrower authorizes, and makes, constitutes, and appoints Lender, and any officer or authorized agent of Lender, with full power of substitution, as Borrower's true and lawful attorney-in-fact, with power, in Lender's own name or in Borrower's name, (i) to execute and deliver on Borrower's behalf such documents as Lender may from time to time consider reasonably necessary to create, perfect, or preserve its security interest in the Collateral or to exercise its rights and remedies with respect to the Collateral, and (ii) to endorse any chattel paper, note, draft, instrument, or any other form or obligation relating to or constituting part of the Collateral or any right under the Collateral and, upon the occurrence of an Event of Default, to demand, collect, receipt for, compromise, settle, and sue for monies due in respect of the Collateral; and Borrower ratifies all that said attorney shall lawfully do or cause to be done by virtue thereof. This power of attorney is and shall be deemed coupled with an interest and shall be irrevocable so long as any amounts remain outstanding under the Note and/or the other Loan Documents.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to fund the Disbursements, Borrower represents and warrants to Lender, as of the Closing Date and as of the date of each Disbursement, as follows:

**Section 4.1**    **Organization.** Borrower is a limited partnership, duly organized, validly existing and in good standing under the laws of the State of Oklahoma, and has paid all taxes and filed all reports, if any, necessary to maintain its status and good standing as an Oklahoma

6

limited partnership. No proceeding or action is pending or, to the best of Borrower's knowledge, threatened, against Borrower which could affect its organization, existence or status and good standing under the laws of the State of Oklahoma.

   **Section 4.2    Power and Authority**. Borrower has the legal and other power and authority to conduct all of the activities which it now conducts or proposes to conduct as contemplated by the Loan Documents to which Borrower is a party, to enter into the Loan Documents to which Borrower is a party, and to make and perform the representations, warranties, covenants and undertakings provided in the Loan Documents to which Borrower is a party.

   **Section 4.3    Binding Agreement**. Borrower has taken all legal and other action necessary to authorize the execution and delivery of the Loan Documents to which Borrower is a party and the consummation of transactions contemplated by such Loan Documents, and such Loan Documents are valid and binding obligations of Borrower, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other law and equity principles applied for the relief of debtors generally. Neither the execution and delivery of the Loan Documents to which Borrower is a party nor the consummation of the transactions contemplated by such Loan Documents will constitute a violation or breach of the articles of organization or operating agreement of Borrower, or any provision of any contract or other instrument to which Borrower is a party or by which Borrower or its properties are bound or any order, writ, injunction, decree, statute, rule or regulation of any court or regulatory agency. No consent, order, authorization or other approval of any governmental body or agency is required in order for Borrower to execute or deliver, or perform its obligations under, the Loan Documents to which Borrower is a party.

   **Section 4.4    Financial Condition**. The financial statements of Borrower and the other Obligors previously furnished to Lender were prepared in accordance with generally accepted accounting principles, consistently applied, are substantially complete and correct, and present fairly the financial position, the results of operations and the contingent liabilities of Borrower and the other Obligors as of their dates and for the periods then ending. Since the date of the most recent financial statements of Borrower and the other Obligors furnished to Lender, no material adverse change has occurred in the financial condition, operations or prospects of Borrower or the other Obligors.

   **Section 4.5    Litigation**. No action, suit or proceeding or no investigation is pending or, to the best of Borrower's knowledge, threatened, against or affecting Borrower and/or the Collateral, at law or in equity, in any court or by any federal, state, municipal or other governmental authority, department, commission, board, agency or other governmental instrumentality which could have a material adverse effect on Borrower's ability to undertake the Project or on the financial condition or operations of Borrower, or which questions, or is likely to materially adversely affect, Borrower's undertakings under, or performance of, the Loan Documents to which Borrower is a party or its financial conditions, operations or prospects.

   **Section 4.6    No Defaults**. Borrower is not in default or alleged to be in default with respect to any judgment, order, writ, injunction or decree or in breach or, alleged to be in breach or default under any lease, contract, agreement, commitment, instrument or obligation to which it

is a party or by which it or its properties are bound (including, without limitation, the Collateral); and, no state of facts exists which is likely to create or cause a default or breach under any such lease, contract, agreement, commitment, instrument or obligation. There are no defaults or events which, with the giving or notice or the passage of time would constitute defaults on the part of Borrower.

Section 4.7     Compliance with Governmental Requirements. Borrower has complied with all federal, state and local laws, regulations and orders applicable to the conduct of its operations or the ownership of its properties (including, without limitation, the Collateral).

Section 4.8     Taxes. All tax returns (including, but not limited to, information returns) required to be filed by Borrower in any jurisdiction have in fact been filed, and all taxes, assessments, fees and other governmental charges upon Borrower, or upon any of its assets, income or franchises, which are due and payable, have been paid.

Section 4.9     Other Agreements. Borrower is not a party to any agreement or instrument, or subject to any restriction, which could materially adversely affect Borrower's properties or assets (including, without limitation, the Collateral), operations, prospects or condition, financial or otherwise.

Section 4.10     Disclosure. No representation, warranty or statement of Borrower in this Agreement or the other Loan Documents to which Borrower is a party, or in any document furnished to Lender pursuant to this Agreement or the other Loan Documents, or in connection with the transactions contemplated in this Agreement, contains any untrue statement of a material fact, or omits any material fact, the omission of which would be misleading. Borrower has disclosed to Lender in writing every fact that affects the financial condition or prospects or its ability to perform its obligations under this Agreement and the other Loan Documents.

Section 4.11     Judgments. No judgment, confession of judgment, decree, order, order to show cause, writ, lien, attachment, or injunction, including without limitation those on appeal, has been filed or entered against Borrower and/or the Collateral, in any court or in any arbitration proceeding.

Section 4.12     Security. The UCC Filings will be in proper recordable form and, upon recording in the official public records of the State of Oklahoma and all other state and local jurisdictions where required to be filed and will create a valid and binding liens upon the Collateral in favor of Lender, securing payment of the Loan.

## ARTICLE V
## CONDITIONS TO LENDER'S OBLIGATIONS

Section 5.1     General Conditions. The obligation of Lender under this Agreement fund the Loan is subject to the following conditions precedent, all of which shall be fulfilled to Lender's satisfaction on or prior to the Closing Date, which Closing Date shall occur on or before December ___, 2006, and shall be in effect on the Closing Date:

8

(a)    The representations and warranties made by Borrower in this Agreement and the other Loan Documents shall be true and correct with the same effect as though such representations and warranties had been made on and as of such time.

(b)    No Event of Default shall have occurred and be continuing or shall result from the funding of the Loan.

(c)    No material adverse change, as determined by Lender in its sole discretion, shall have occurred with respect to the Collateral and/or in the financial condition, operations or prospects of any of the Obligors since the dates of the Obligors' financial information most recently provided to Lender.

(d)    The Contract for Sale of Real Estate dated effective July 21, 2006 in respect of the Project shall have been assigned to Borrower and the deadline for closing under such contract shall have been extended to no later than March 31, 2007, with an opportunity to extend again to a date no later than June 30, 2007 for an additional escrow deposit of not more than $75,000.

(e)    Contemporaneously with the closing, Borrower shall have paid Lender's out-of-pocket expenses in connection with the Loan, including, without limitation, the fees and expenses of counsel to Lender.

**Section 5.2    Delivery of Documents**. As conditions precedent to the obligation of Lender to initially fund the Loan, Borrower shall deliver or cause to be delivered to Lender, at or prior to the Closing Date, the following documents, all of which shall be in form and substance acceptable to Lender:

(a)    The original Agreement, duly executed by Lender and Borrower.

(b)    The original Note, duly executed by Borrower.

(c)    The original Guaranty, Certificate of Deposit Pledge, Assignment of Project Documents, Assignment of Purchase Contract, Developer Fee Pledge and Partner Pledge, all duly executed by the parties thereto.

(d)    Closing certificates of Borrower, the General Partner, the Developer and the Guarantor, each substantially in the form provided by Lender to Borrower, with attached exhibits, certified by the Guarantor and the appropriate authorized representatives of Borrower, the General Partner and the Developer.

(e)    Such UCC-1 financing statements as may be requested by Lender.

(f)    Copies of the most recent annual compiled financial statements and quarterly unaudited financial statements of Borrower, the General Partner, the Developer and the Guarantor, each including a schedule of contingent liabilities.

(g)     An opinion of counsel for Borrower, the General Partner, the Developer and the Guarantor, in form and substance reasonably satisfactory to Lender and Lender's counsel.

(h)     Such additional documents and information and such additional certificates and assurances as reasonably requested by Lender under the terms of this Agreement, the other Loan Documents, or otherwise.

**ARTICLE VI**
**DISBURSEMENTS**

**Section 6.1     Loan Proceeds.** Lender shall disburse to Borrower proceeds of the Loan from time to time in the form of separate disbursements ("**Disbursements**"), in accordance with the procedures and subject to the conditions set forth in Sections 6.2, 6.3 and 6.4. Except for Disbursements to pay interest on the Loan Amount pursuant to Section 6.3 hereof, the proceeds of each Disbursement shall be made directly to Borrower (or as otherwise directed by Borrower) from time to time to pay development expenses of the Project incurred by Borrower, in each case as pre-approved by Lender. Prior to disbursement of the proceeds of the Loan in accordance with the terms hereof, neither Borrower nor any creditor of Borrower shall have any right to or interest in any undisbursed portion of the Loan Amount, notwithstanding anything herein to the contrary.

**Section 6.2     Specific Conditions and Procedures for Disbursements.**

(a)     As conditions precedent to the obligation of Lender to make a Disbursement (other than the Disbursement on the Closing Date or pursuant to Section 6.3 hereof), Lender shall have received from Borrower at least ten (10) Business Days before the requested date of the Disbursement, a Disbursement Request Form, substantially in the form attached hereto and made a part hereof as Exhibit A, properly completed and duly executed by Borrower, accompanied by (i) evidence reasonably satisfactory to Lender that the Project development expenses for which the Disbursement is sought are solely related to the Project and have been incurred by Borrower or are reasonably expected to be incurred by Borrower within the next thirty (30) days ("**Future Project Expenses**") and (ii) evidence as to the expenditure of funds for Future Project Expenses which were the subject of previous Disbursements, to the extent not already provided to Lender. Each Disbursement shall be subject to any other conditions reasonably required by Lender. Failure to provide Lender with satisfactory evidence of the expenditure of Future Project Expenses previously disbursed to Borrower shall be a condition precedent to any future request for Disbursement. Borrower may not request Disbursements more frequently then once every thirty (30) calendar days.

(b)     Lender will make good faith efforts to approve each Disbursement, or to advise Borrower of any deficiencies, within ten (10) Business Days of receipt by Lender of the materials described in Section 6.2(a).

(c)     After approval by Lender of the Disbursement Request Form and the accompanying documentation, and subject to all other conditions in this Section 6.2 and in Section 6.4, the Disbursement shall be made by wire transfer or otherwise as directed to

10