Borrower. Upon receipt by Borrower of each Disbursement, Borrower shall promptly apply such portion of the proceeds thereof which were drawn for previously incurred expenses to the payment thereof. Any proceeds drawn by Borrower in anticipation of a Future Project Expense shall be held by Borrower in trust and applied to the payment of such expenses. Evidence of the application of Disbursement proceeds to the payment of approved expenses shall be sent to Lender along with the next Disbursement Request Form, or otherwise as may reasonably be requested by Lender.

Section 6.3    **Disbursements to Pay Interest.**

(a)    Unless and until the Loan Amount shall have been fully disbursed in accordance with the terms hereof, on each interest payment date and without submission by Borrower of any Disbursement Request Form or any further authorization by Borrower, Lender shall make a disbursement to itself in an amount equal to the difference between (i) the amount of interest due hereunder and under the Note and (ii) an amount equal to investment earnings received by or credited to the account of Lender, if any, since the preceding interest payment date on an amount equal to the undisbursed portion of the Loan Amount at such interest rate as may be determined from time to time by Lender upon notice to Borrower. Borrower acknowledges and agrees that Lender may determine the interest rate in its sole and absolute discretion.

(b)    Notwithstanding any provisions of this Article VI to the contrary, and without further notice to or authorization by Borrower, Lender may, at its option, make a Disbursement to pay such other sums as may be owing from time to time by Borrower in connection with the Loan, upon the failure by Borrower to pay such other sums when and as due, whether or not the proceeds of the Loan were contemplated as the source of payment of interest or such other sums.

(c)    To the extent any interest or other sum due to Lender is not fully paid by a disbursement of the remaining undisbursed Loan Amount under this Article VI, Borrower shall immediately pay to Lender the balance then due and owing.

(d)    Any Disbursement pursuant to this Section 6.3 shall be made by Lender to itself, shall be evidenced by the Note and shall be secured by the Collateral as fully as if made to or at the request of Borrower.

Section 6.4    **General Conditions Governing All Disbursements.**

(a)    No Disbursement shall be made after the end of the Origination Period.

(b)    No Disbursement shall be made pursuant to Section 6.2 hereof which would cause the total of all Disbursements made pursuant to Section 6.2 to exceed the Loan Amount.

(c)    No Disbursement shall be made during the continuance of an Event of Default, during the continuance of any event which, with the giving of notice or the passage of time or both, would constitute an Event of Default, or during the continuance of any default

11

under any other financing now or in the future provided by Lender to Borrower or any other Obligor.

(d)    All representations and warranties made by Borrower in this Agreement and in the other Loan Documents, shall be true and correct in all material respects on the date of the Disbursement with the same effect as though such representations and warranties had been made on and as of such date.

(e)    Lender reserves the right to withhold any Disbursement if, in Lender's reasonable judgment, (i) a material adverse change has occurred in the financial condition, operations or prospects of Borrower or (ii) a material adverse change has occurred in the feasibility or development progress of the Project (including, without limitation, the events described in Section 7.5(d)) and/or the fair market value of the Collateral securing the Loan.

Section 6.5    No Waiver. In the event Lender fails to require, or Borrower fails to fulfill, any condition to a Disbursement, such failure shall not constitute a waiver of such condition by Lender, nor shall such failure preclude Lender from requiring fulfillment of such condition by Borrower in order for Borrower to receive a future Disbursement.

Section 6.6    Continuing Representations and Warranties. Each request for a Disbursement shall constitute, without the necessity of a written statement to such effect, a confirmation by Borrower to Lender that all representations and warranties made by Borrower in this Agreement and the other Loan Documents are true and correct in all material respects as of the date of such request.

## ARTICLE VII
## AFFIRMATIVE COVENANTS

As long as any portion of the Loan is outstanding or any amounts under the Note remain unpaid, Borrower covenants and agrees that, unless Lender otherwise consents in writing:

Section 7.1    Reports. Borrower shall furnish or cause to be furnished to Lender the following financial information and other reports:

(a)    Within one hundred (120) days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender annual financial statements of Borrower certified by an independent certified public accountant as fairly presenting Borrower's financial position at the end of the fiscal year and the results of Borrower's operations for the fiscal year, and as being prepared in accordance with generally accepted accounting principles, consistently applied.

(b)    On the forty-fifth (45th) day after the end of each calendar quarter, commencing March 1, 2007, Borrower shall furnish to Lender: (i) quarterly financial statements of Borrower fairly presenting Borrower's financial position at the end of the quarter and the results of Borrower's operations for the quarter, prepared internally, in accordance with generally accepted accounting principles, consistently applied.

(c)    As promptly and as reasonable practicable after request, Borrower shall furnish to Lender such additional information, reports, statements, and certificates with respect to

12

Exhibit A-2, Page 74

the Loan, and/or the operations, prospects or financial condition of Borrower, and/or the development of the Project, as Lender may from time to time reasonably request.

Section 7.2    Existence. Borrower shall maintain its existence and good standing under the laws of the State of Oklahoma, and shall comply with all applicable federal, state and local laws and regulations to the extent necessary and required for the continuation of its operations.

Section 7.3    Taxes and Charges. Borrower shall promptly pay and discharge all taxes, assessments, and governmental charges, on its income and properties (including, without limitation, the Collateral) prior to the date on which penalties attach thereto, except to the extent such taxes shall be contested in good faith and by appropriate proceedings and as to which adequate reserves in the judgment of Lender shall have been provided.

Section 7.4    Records. Borrower shall (i) maintain books and records adequate to enable independent certified public accountants to certify the financial statements referred to in Section 7.1, (ii) retain such books and records and copies of the reports and statements referred to in Section 7.1 for a period of at least four (4) years after payment in full of the Note, and (iii) make such books and records available for inspection by Lender and its agents and representatives at all reasonable times.

Section 7.5    Notices to Lender. Borrower shall promptly notify Lender of the following:

(a)    The commencement of any action, suit or proceeding before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that seeks recovery from such party in an amount equal to or greater than ten percent (10%) of the Loan Amount;

(b)    Any change in the end of Borrower's fiscal year, which currently is December 31;

(c)    The occurrence of any material adverse change in the financial condition, operations or prospects of Borrower or any other Obligor from the date of the most recent financial statements of the Borrower delivered to Lender;

(d)    Any material adverse change in anticipated course of development of the Project (including, without limitation, the occurrence of any default under the contract for the purchase and sale of the Project, failure to receive any necessary HUD approval, the occurrence of a default under any of the Bond Documents, failure to satisfy any of the conditions to break of escrow under the Bond Documents within the time period specified therein, redemption of the Bonds, failure to satisfy the conditions to the equity investment in the Project or termination of the commitment to provide an equity investment in the Project); and

(e)    The occurrence of any Event of Default or event which, with the giving of notice or the passage of time or both, would constitute an Event of Default.

Section 7.6    Insurance. Borrower shall maintain property and general liability insurance in such amounts, on such terms, and covering such risks as is reasonably acceptable to

13

Lender, with Lender to be notified, by the terms thereof, prior to the cancellation or non-renewal of any such policy.

**Section 7.7    Anti-Discrimination Laws.** Borrower, in its use of proceeds of the Loan and in its conduct of the Project, shall comply fully with all applicable federal, state, local, and any other governmental anti-discrimination laws, executive orders, and rules and regulations.

**Section 7.8    Inspections.** Borrower shall allow Lender to inspect Borrower's books and records, and books, records, and contracts relating to the Project, and make copies and extracts therefrom, at all reasonable times. Borrower shall grant Lender and its agents and representatives full rights of entry and free access to the Project.

## ARTICLE VIII
## NEGATIVE COVENANTS

As long as any portion of the Loan is outstanding or any amounts under the Note remain unpaid, Borrower covenants and agrees that, unless Lender otherwise consents in writing:

**Section 8.1    Assignment.** Borrower shall not assign any rights or delegate performance of any duties or obligations of Borrower provided in this Agreement or the other Loan Documents.

**Section 8.2    Material Changes.** Borrower shall not:

(a)    Permit or make any material change in or to the Project; or

(b)    Dissolve, liquidate, consolidate with, merge into, or form a partnership or joint venture with, any corporation or other organization, or otherwise acquire all or substantially all of the assets, capital stock, or properties of any corporation or other organization.

**Section 8.3    Disposal of Assets.** Borrower shall not sell, lease, transfer or otherwise dispose of its properties, assets, rights, licenses to any person or entity, except (i) in the ordinary course of its operations and (ii) in the case of the Collateral, with the prior written approval of Lender.

**Section 8.4    Liens.** Except as otherwise provided in this Agreement, Borrower shall not create, incur, assume or suffer to exist any pledge, lien, charge or other encumbrance of any nature on the Collateral or any portion thereof.

**Section 8.5    Guaranties.** Borrower shall not and shall not permit any Borrower Affiliate to guaranty, become surety for, endorse or otherwise in any way be or become responsible for the liabilities or obligations of any person or entity other than any guaranties in favor of the Lender and the guaranties related to the acquisition or construction of affordable housing developments in which Borrower or any Borrower Affiliate is participating.

**Section 8.6    Indebtedness.** Borrower shall not incur, create, assume or suffer to exist on the part of Borrower, any indebtedness for borrowed money other than (i) the Loan, (ii) the

Exhibit A-2, Page 76

existing debt due and owing to the Senior Secured Lender and (iii) indebtedness incurred by a Borrower to finance affordable housing projects in which the Borrower is participating.

Section 8.7    Conduct of Business. Borrower shall not cease to engage in its business as currently conducted and shall not engage in any other business.

## ARTICLE IX
## EVENTS OF DEFAULT

Section 9.1    Events of Default. The occurrence of any or more of the following events shall constitute an "Event of Default" under this Agreement:

(a)    Borrower or any other Obligor fails to make any payment of principal of or interest when due hereunder and under the Note; or

(b)    Borrower fails to observe or perform any other term, covenant, undertaking or agreement contained in this Agreement or any other Loan Document, and such failure continues unremedied for a period of thirty (30) days after written notice has been given to Borrower by Lender, or, if such failure is not reasonably capable of being remedied within such period of thirty (30) days, Borrower or another Obligor has not commenced remedial action within such thirty-day period and is not proceeding with diligent efforts to remedy such failure; provided, however, that no notice or remedial period shall apply to any event specifically described elsewhere in this Section 9.1, or to a default under Section 8.3 or Section 8.4;

(c)    Any representation or warranty made by Borrower or any other Obligor in this Agreement or the other Loan Documents, or any statement or representation made in any certificate, report or opinion delivered pursuant to this Agreement or the other Loan Documents, proves to have been false, misleading or incorrect when made or deemed made; or

(d)    Any Obligor becomes insolvent, or fails or ceases to pay its debts as they mature or makes an assignment for the benefit of creditors or files a petition in bankruptcy or is adjudicated insolvent or bankrupt or petitions or applies to any tribunal for the appointment of any receiver or any trustee, or commences any proceeding under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or any such proceeding is commenced against any Obligor that is not dismissed within a period of sixty (60) days, or any Obligor, by any act indicates its consent, approval of, or acquiescence in any such proceeding or the appointment of any receiver of or any trustee for it or any substantial part of its property, or suffers any such receivership or trusteeship to continue undischarged for a period of sixty (60) days; or

(e)    One or more judgments or decrees are entered against any Obligor involving in the aggregate a liability of an Obligor (not paid or fully covered by insurance) which in the judgment of Lender is determined to materially and adversely affect the financial condition of such Obligor, and all such judgments or decrees are not vacated, discharged, stayed or bonded pending appeal within sixty (60) days after receiving notice from Lender of its determination under this Section 9.1(e); or

(f)    The organizational documents of Borrower are amended without the prior written consent of Lender; or

(g)    The contract for the purchase and sale of the Project expires without having been extended or a default occurs thereunder which extends beyond any applicable notice, grace or cure period;

(h)    There occurs and is continuing beyond any applicable notice, grace or cure period, an event of default under the Bond Documents or the Bonds are redeemed; or

(i)    There occurs and is continuing beyond any applicable notice, grace or cure period, an event of default in respect of the indebtedness secured by the Senior Pledge (as defined in the Certificate of Deposit); or

(j)    The commitment to provide the equity investment in the Project expires without having been extended or is terminated; or

(k)    Any change occurs in the operation, prospects or financial condition of Borrower which Lender in its reasonable judgment believes may materially adversely affect the ability of Borrower to repay the Note or the ability of Borrower or any Obligor to perform its respective obligations under this Agreement or the other Loan Documents; or

(l)    A default occurs under any other loans or financing now or in the future provided to Borrower or any Obligor by Lender or under the terms of any instrument or document evidencing or securing, or otherwise executed or delivered in connection with, any other loans or financing now or in the future provided by Lender to Borrower or any Obligor.

**Section 9.2    Remedies Upon Event of Default**. Upon the occurrence of any one or more Events of Default, Lender may exercise all or any of the following rights and remedies:

(a)    Lender may, by written notice to Borrower, declare the indebtedness evidenced by the Note, any and all other amounts payable hereunder and under the other Loan Documents and any and all other indebtedness of Borrower or any Obligor to Lender forthwith to be due and payable, whereupon the indebtedness evidenced by the Note and such other indebtedness shall become immediately due and payable, as to principal, interest and any other amounts payable to Lender.

(b)    Lender may exercise any and all rights and remedies provided in this Agreement and in the other Loan Documents and/or as available at law or in equity.

(c)    Lender may protect and enforce its rights and remedies by appropriate judicial proceedings, including, but not limited to, foreclosure of the Collateral, an award of specific performance, or other legal or equitable remedy in aid of the exercise of the powers granted in or pursuant to this Agreement or the other Loan Documents.

**Section 9.3    Automatic Acceleration**. Upon the occurrence of any Event of Default described in Section 9.1(d), all amounts due under the Note, this Agreement and the other Loan Documents shall immediately be due and payable without presentment, demand, protest or notice

of any kind, all of which are expressly waived by Borrower to the fullest extent permitted by law.

Section 9.4    Cumulative Rights. Each right, remedy and power granted to Lender under this Agreement and the other Loan Documents shall be cumulative and in addition to any other right, remedy or power not specifically granted in this Agreement or now or hereafter existing in equity, at law, by virtue of statute or otherwise, may be exercised by Lender from time to time concurrently or independently and as often and in such order as Lender may deem expedient.

## ARTICLE X
## MISCELLANEOUS

Section 10.1    Indemnification.

(a)    Borrower shall indemnify and hold Lender harmless against and in respect of:

(i)    Any and all losses, damages or deficiencies of Lender, its employees or its agents, resulting from any material misrepresentation or willful nonfulfillment or breach of any agreement on the part of Borrower under this Agreement or from any material misrepresentation or willful omission from any instrument, agreement or other document furnished or to be furnished to Lender under this Agreement, other than losses, damages or deficiencies in connection with the nonpayment of the Loan, the provisions for which are separately provided for in this Agreement; and

(ii)    Any and all actions, suits, proceedings, demands, assessments, judgments, costs and reasonable legal and other expenses incident to any of the provisions of Section 10.1(a)(i).

(b)    The obligations of this Section 10.1 shall survive the repayment of the Loan.

Section 10.2    Notices. All notices, requests, demands, consents, waivers and other communications given under any of the provisions of this Agreement shall be in writing (or by fax, e-mail, or similar electronic transmission confirmed in writing) and shall be deemed to have been duly given or made (i) when delivered by hand, or (ii) if given by mail, three (3) days after deposited in the mails by certified mail, return receipt requested, sufficient postage prepaid, or (iii) if given by fax, e-mail, or similar electronic transmission, when sent and receipt has been confirmed, addressed as stated below, or to such other address as the addressee may have specified in a notice duly given to the other addressees.

To Lender:              Greystone CDE, LLC
                        419 Belle Air Lane
                        Warrenton, Virginia 20186
                        Attention:   Andrew J. Shedlock, III
                        Phone:       540-428-7208

17

|  | Fax: | 540-341-2192 |
|  | Email: | AShedlock@GreystoneUSA.com |

To Borrower:

Santa Fe Pointe, L.P.
c/o Santa Fe Pointe Management, LLC
16416 Oconee Creek Drive
Edmond, Oklahoma 73013
Attention:
Phone:
Fax:
Email:

**Section 10.3    Entire Agreement.** This Agreement and the other Loan Documents contain the entire agreement of the parties with respect to the transactions contemplated in this Agreement, and supersedes all prior proposals, negotiations, agreements, and understandings relating to such transactions. Borrower acknowledges that, in entering into this Agreement, it is not relying on any statement, representation, warranty, covenant, or undertaking of any kind made by Lender or any employee or agent of Lender, other than the agreements of Lender set forth in this Agreement.

**Section 10.4    Amendments.** No modification or waiver of any provision of this Agreement shall be valid unless in writing, and signed by Lender and Borrower.

**Section 10.5    No Waiver.** No delay or failure on the part of Lender in exercising any rights under this Agreement or the other Loan Documents and no partial or single exercise of any such rights, shall constitute a waiver of such rights or of any other rights under this Agreement or the other Loan Documents.

**Section 10.6    Liability of Lender.** Borrower agrees that Lender shall have no liability (in contract, in tort, or otherwise) for any lost profits or other consequential damages sustained by Borrower or any Borrower Affiliate as a result of any act or omission to act by Lender or any of its directors, officers, agents, or employees, in connection with the Loan or the Loan Documents, unless caused by the gross negligence or willful misconduct of Lender.

**Section 10.7    No Joint Venture.** Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, Lender, by making the Loan or by any action pursuant to this Agreement or the other Loan Documents, is not and shall not be deemed to be a partner or joint venturer with Borrower.

**Section 10.8    Other Parties.** Nothing in this Agreement shall be construed as giving any person or entity, other than the parties to this Agreement, any right, remedy or claim under or in respect of this Agreement.

**Section 10.9    Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of _____ (without regard to the principles of conflicts of law).

Exhibit A-2, Page 80

**Section 10.10  Survival.** All representations, warranties and agreements in this Agreement shall survive the expiration or termination of this Agreement.

**Section 10.11  Severability.** If any provision of this Agreement should, for any reason, be held to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such illegal, invalid or unenforceable provision had never been contained in this Agreement.

**Section 10.12  Successors and Assigns.** This Agreement shall be binding upon and operate for the benefit of the respective successors and assigns of the parties; provided, however, that Borrower shall not have the right to assign any of its rights or delegate the performance of any of its obligations under this Agreement without the prior written consent of Lender.

**Section 10.13  Duplicate Originals.** Two or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument.

**Section 10.14  Titles and Captions.** The titles and captions in this Agreement are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

**Section 10.15  Records.** The outstanding principal balance of the Loan and the unpaid interest accrued thereon shall at all times be ascertained from the records of Lender, which shall be conclusive evidence thereof, absent manifest error.

**Section 10.16  Further Assurances.** At any time upon, and from time to time upon request by Lender, Borrower shall do any acts and execute and deliver any documents as may be reasonably requested by Lender to accomplish the purposes of this Agreement.

**Section 10.17  Assignment of Loan Documents.** The Lender may assign or otherwise transfer its rights under this Agreement at any time or times, in its sole and absolute discretion, without any notice to or approval or consent from Borrower; and any holder or holders of the Note or other Loan Documents shall be deemed an assignee of such rights.

**Section 10.18  Waiver of Jury Trial.** BORROWER AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THE LOAN OR OUT OF THIS AGREEMENT AND/OR THE OTHER LOAN DOCUMENTS THAT IS TRIABLE OF RIGHT BY JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, INTENTIONALLY, KNOWINGLY, AND VOLUNTARILY.

**Section 10.19  Contingency.** The obligations of Lender under this Agreement are contingent upon the execution and delivery by Borrower, the General Partner, the Developer and the Guarantor of the respective Loan Documents to which each is a party and such other documents, instruments, certifications and opinions of counsel as Lender may require.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

GREYSTONE CDE, LLC

By: _____
Name:
Title:

SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:    SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company, its general partner

By: _____
Name:
Title:

## EXHIBIT A

### FORM OF DISBURSEMENT REQUEST FORM

**BORROWER:**     Santa Fe Pointe, L.P.

**REQUISITION NO.:** _____

**IN THE AMOUNT OF $** _____

TO:   Greystone CDE, LLC
      419 Belle Air Lane
      Warrenton, Virginia 20186

The borrower hereby requests payments in the following amounts, from the following sources and to be made to the following parties, all as set forth on the Invoices attached to this Requisition:

Amount                              Payable to:

                                    [Borrower's account #] [third party
                                    payment/wire instructions must be
                                    attached]

**Requisition – Contents and Attachments**

☐     Borrower's Representations and Warranties

☐     Invoices for Payments

A-1          Exhibit A-2, Page 83

## Representations and Warranties

1.  Funding of this Disbursement shall be in accordance with the terms and provisions of the Bridge Loan Agreement, dated as of December __, 2006 (the "Loan Agreement"), and amounts for which disbursement is sought are for payments of predevelopment costs of Borrower described on the attachments hereto which have not been the subject of any previous Requisition.

2.  All moneys requisitioned by Borrower and disbursed by Lender under previously approved Disbursement Request Forms have been expended for the purpose for which they were requisitioned. Attached hereto are invoices (or other evidence, as applicable) of the incurrence of the expenses under previous Disbursement Request Forms, to the extent not previously provided to Lender.

3.  All of the information submitted to Lender in connection with this Disbursement Request Form is true and accurate as of the date of submission.

4.  The representations and warranties set forth in the Loan Agreement and the other Loan Documents are true and correct as of the date hereof with the same effect as if made on this date.

5.  The Borrower represents and warrants that this Disbursement Request Form is in the form of requisition required by Lender and the conditions to Disbursement set forth in Article VI of the Loan Agreement have been satisfied.

6.  The Borrower represents and warrants that (i) all invoices attached hereto and to be paid by this Disbursement have either already been paid by the Borrower or will be paid by the Borrower or directly by Lender on the date this Disbursement is funded and (ii) all anticipated expenses listed on the Schedule attached hereto and intended to be paid by this Disbursement are expected to be incurred in the next 30 (thirty) days and shall be paid as incurred by the Borrower and evidence of such payment shall be supplied by Borrower to Lender in connection with Borrower's next Disbursement Request Form after such payment is made (or otherwise as reasonably requested by Lender).

All capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto under the Loan Agreement.

Executed this __ day of _____, 200_.

        SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:    SANTA FE POINTE MANAGEMENT, LLC an Oklahoma limited liability company, its general partner

        By:   _____
        Name:
        Title:

<u>Borrower's Invoices for Prior Disbursement Requests</u>

[Attach Invoices]

Borrower's Invoices for Current Disbursement Request

**<u>Borrower's Schedule of Anticipated Expenses</u>**
**<u>to be paid from Current Disbursement Request</u>**

# EXHIBIT C

#155241v1
GT Draft 12/17/06

## BRIDGE PROMISSORY NOTE

$500,000.00                                                    December ___, 2006

FOR VALUE RECEIVED, **SANTA FE POINTE, L.P.**, a limited partnership duly organized, validly existing and in good standing under the laws of the State of Oklahoma (together with its successors and assigns, the "**Borrower**"), hereby promises to pay to the order of **GREYSTONE CDE, LLC**, a limited liability company organized and existing under the laws of the State of Delaware (together with its successors and assigns, the "**Lender**"), or its successors and assigns, at its principal office at 419 Belle Air Lane, Warrenton, Virginia 20186, or at such other address designated in writing by the Lender, the principal sum of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "**Loan Amount**"), or so much thereof as shall have been disbursed in accordance with and as shall be then outstanding under the Loan Agreement (as hereinafter defined), in lawful money of the United States of America, payable on the dates and in the amounts set forth in the Bridge Loan Agreement dated December ___, 2006 between the Borrower and the Lender (the same may be further amended, modified or supplemented from time to time, the "**Loan Agreement**"), and to pay interest on the full Loan Amount (whether or not disbursed) at such office in like money, as set forth below and in the Loan Agreement. Capitalized terms used herein shall have the respective meanings assigned to them in the Loan Agreement.

This Bridge Loan Promissory Note is the "Note" referred to in the Loan Agreement and evidences a Loan made by the Lender thereunder. This Note is subject to the terms of the Loan Agreement and is secured by the Loan Documents, as more fully set forth in the Loan Agreement, which terms are incorporated herein by reference and made a part hereof.

This Note shall bear interest on the Loan Amount (whether or not disbursed) at a variable rate equal to LIBOR plus two and three-quarters percent (2.75%) per annum, accruing on the full Loan Amount (whether or not disbursed) from the Closing Date; provided, however, if this Note is not paid in full on or prior to the end of the Loan Term or when due pursuant to the Loan Agreement or if an Event of Default shall occur hereunder or under any Loan Documents, this Note shall bear interest on the Loan Amount and all other amounts due and owing under the Loan Documents at an annual rate equal to the lesser of twelve percent (12%) per annum or the highest rate permitted by law from and after the date of the Event of Default, the date of mandatory prepayment or the end of the Loan Term, whichever is earlier, until this Note and all other amounts due and owing under the Loan Documents are paid in full or the Event of Default shall have been cured to the satisfaction of the Lender, if sooner. Accrued interest on this Note shall be due and payable on each March 1, June 1, September 1 and December 1, commencing March 1, 2007, until payment in full at the end of the Loan Term or the date of prepayment in full hereof prior to the end of the Loan Term. Interest hereon shall be calculated on the basis of a 360-day year for the actual number of days elapsed. The entire unpaid principal balance and accrued but unpaid interest and any other unpaid sums or fees due under this Note and/or the Loan Documents, if not sooner paid, shall be due and payable on July 1, 2007, unless extended in accordance with the terms of Section 2.4 of the Loan Agreement (the "**Maturity Date**").

The Loan Agreement provides for the mandatory repayment hereof in accordance with Section 2.6 thereof.

Except as expressly provided in the Loan Agreement or this Note, the undersigned hereby waives presentment, demand for payment, notice of dishonor, notice of protest, and protest, and all other notices or demands in connection with the delivery, acceptance, performance, default, endorsement or guaranty of this instrument.

The obligation to make payments hereunder to the Lender hereunder is absolute and unconditional and the rights of any subsequent holder of this Note shall not be subject to any defense, set-off, counterclaim or recoupment which the undersigned may have against the Lender or by reason of any indebtedness or liability at any time owing by the Lender to the undersigned.

Nothing herein is intended to result in interest being charged which would exceed the maximum rate permitted by law.

Should this Note, or any part of the Loan or any other amounts due and owing under the Loan Documents be collected by law or through an attorney-at-law, the Lender shall be entitled to collect all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees.

No delay or omission on the part of the Lender in exercising any remedy, right or option under this Note or the Loan Documents shall operate as a waiver of such remedy, right or option. In any event a waiver on any one occasion shall not be construed as a waiver or bar to any such remedy, right or option on a future occasion. The rights, remedies and options of the Lender under this Note and the Loan Documents are and shall be cumulative and are in addition to all of the rights, remedies and options of the Lender at law or in equity or under any other agreement.

This Note may not be changed orally. The acceptance by the Lender of any amount after the same is due shall not constitute a waiver of the right to require prompt payment, when due, of all other amounts due hereunder. The acceptance by the Lender of any sum in an amount less than the amount due shall be deemed an acceptance on account only and upon condition that such acceptance shall not constitute a waiver of the obligation of the Borrower to pay the entire sum then due, and the Borrower's failure to pay such amount then due shall be and continue to be a default notwithstanding such acceptance of such amount on account, as aforesaid. Consent by the Lender to any action of the Borrower which is subject to consent or approval of the Lender hereunder shall not be deemed a waiver of the right to require such consent or approval to future or successive actions.

All notices hereunder are to be given in the same manner set forth in the Loan Agreement.

Exhibit A-2, Page 91

This Note is governed by, and is to be construed in accordance with the laws of the State of _____, without regard to _____'s choice of law rules. The Borrower hereby submits to personal jurisdiction in the State of _____ for the enforcement of the Borrower's obligations hereunder and under the Loan Documents, and waives any and all personal rights under the law of any other state to object to jurisdiction within the State of _____ for the purposes of litigation to enforce such obligations of the Borrower. In the event such litigation is commenced, the Borrower agrees that service of process may be made and personal jurisdiction over the Borrower obtained, by service of a copy of the summons, complaint and other pleadings required by applicable law to commence such litigation upon the Borrower's appointed Agent for Service of Process in the State of _____, which the Borrower hereby designates to be:

_____
_____
_____
_____

The Lender may accept additional or substitute security for this Note, or release any security or any party liable for this Note, or extend or renew this Note, all without notice to the Borrower and without affecting the liability of the Borrower.

This Note inures to and binds the heirs, legal representatives, successors and assigns of the Borrower and the Lender; provided, however, that the Borrower may not assign this Note, or assign or delegate any of its rights or obligations hereunder, without the prior written consent of the Lender in each instance. The Lender in its sole discretion may transfer this Note, and may sell or assign participations or other interests in all or part of the Loan, on the terms and subject to the conditions of the Loan Documents, all without notice to or the consent of the Borrower. Also, without notice to or the consent of the Borrower, the Lender may disclose to any actual or prospective purchaser of any securities issued or to be issued by the Lender, and to any actual or prospective purchaser or assignee of any participation or other interest in this Note, the Loan or any other loans made by the Lender to the Borrower (whether evidenced by this Note or otherwise), any financial or other information, data, or material in the Lender's possession relating to the Borrower, any other Obligors, the Loan, and/or the Collateral; provided, however, that the Lender shall use commercially reasonable efforts to obtain an undertaking of confidentiality (on customary commercial lending terms) from any prospective purchaser or assignee prior to disclosure of such information. If the Lender so requests, the Borrower will sign and deliver a new note to be issued in exchange for this Note on the same terms and conditions as this Note. Unless and until the Borrower receives written notice from the Lender of the transfer or assignment of this Note, the Borrower may continue to make payments hereunder to the Lender without any liability to the Lender's assignee or transferee.

If any payment made in connection with this Note is, in whole or in part, subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid or paid over to a trustee, receiver, or any other entity, whether under any bankruptcy act or otherwise

(any payment of this type being referred to as a "**Preferential Payment**"), then the indebtedness intended to be satisfied by the Preferential Payment will be revived and continued in full force and effect as if the Preferential Payment had not been made.

The Borrower warrants that the Loan is being made solely to acquire or carry on a business or commercial enterprise, and/or the Borrower is a business or commercial organization. The Borrower further warrants that all of the proceeds of this Note shall be used for commercial purposes and stipulates that the Loan shall be construed for all purposes as a commercial loan, and is made for other than personal, family, household or agricultural purposes.

THE BORROWER WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH THE BORROWER AND THE LENDER MAY BE PARTIES, ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY PERTAINING TO, THIS NOTE OR THE LOAN. THIS WAIVER APPLIES TO ALL CLAIMS AGAINST ALL PARTIES, WHETHER OR NOT PARTIES TO THIS NOTE. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY THE BORROWER, AND THE BORROWER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

Time is of the essence with regard to each provision of this Note as to which time is a factor, including payment obligations.

If any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any of the remaining provisions of this Note.

4

WITNESS the execution hereof under seal this _____ day of December, 2006.

**SANTA FE POINTE, L.P,** an Oklahoma limited partnership

By:   SANTA FE POINTE MANAGEMENT, LLC,
      an Oklahoma limited liability company, its
      general partner

      By:_____
      Name:
      Title:

# EXHIBIT D

#155250v2
GT Draft 12/17/06

---

PARTNER GUARANTY, PLEDGE AND SECURITY AGREEMENT

from

SANTA FE POINTE, L.P.,

and

THEOTIS F. OLIPHANT

to

GREYSTONE CDE, LLC

Dated as of December 1, 2006

---

**PARTNER GUARANTY,**
**PLEDGE AND SECURITY AGREEMENT**

This PARTNER GUARANTY, PLEDGE AND SECURITY AGREEMENT (as amended, modified or supplemented from time to time, this **"Agreement"**), dated as of December __, 2006, is made by SANTA FE POINTE MANAGEMENT, LLC, a limited liability company organized and existing under the laws of the State of Oklahoma (together with its permitted successors and assigns, the **"General Partner"**) and THEOTIS F. OLIPHANT, an individual and a resident of the State of California (together with his heirs, executors, personal representatives and permitted successors and assigns, the **"Limited Partner"** and, together with the General Partner, the **"Pledgors"**) with an address at _____, _____, in favor of GREYSTONE CDE, LLC, a limited liability company duly organized and existing under the laws of the State of Delaware (together with its successors and assigns, **"Pledgee"**) with an address at 419 Belle Air, Warrenton, Virginia 20186,

**W I T N E S S E T H :**

**WHEREAS,** Pledgors is the general partner and limited partner of Santa Fe Pointe, L.P., a limited partnership duly organized and validly existing under the laws of the State of Oklahoma (together with its permitted successors and assigns, the **"Partnership"**), owner of certain land located at 125 SW 74th Street in Oklahoma City, Oklahoma, and the site improvements located thereon, known as Santa Fe Pointe Apartments (the **"Project"**);

**WHEREAS,** pursuant to a Bridge Loan Agreement dated as of December __, 2006 between Pledgee and the Partnership (as the same may be amended, modified or supplemented from time to time, the **"Loan Agreement"**), Pledgee has agreed to make a $500,000.00 loan (the **"Loan"**) to the Partnership to fund certain expenses associated with the financing of the Project;

**WHEREAS,** Pledgors will derive substantial economic benefit from the Loan and the financing of the Project; and

**WHEREAS,** the execution and delivery of this Agreement is a condition to Pledgee's making the Loan.

**NOW, THEREFORE,** in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.**    **Defined Terms.**  The following terms, which are defined in the Uniform Commercial Code in effect in the State of _____ on the date hereof, are used herein as so defined: Accounts, Chattel Paper, General Intangibles, Instruments and Proceeds; and the following terms shall have the following meanings:

"**Collateral**" has the meaning assigned to it in Section 3 of this Agreement.

"**Event of Default**" means any "Event of Default" as defined in the Loan Agreement or any of the Loan Documents.

"**Obligations**" has the meaning assigned to it in Section 2 of this Agreement.

"**Partnership Agreement**" means the Agreement of Limited Partnership of Santa Fe Pointe, L.P., dated as of October 16, 2006, as the same may be further amended, modified or supplemented from time to time.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of _____.

All other capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Loan Agreement.

**Section 2.    Guaranty.**  The General Partner hereby absolutely, irrevocably and unconditionally guarantees and is surety to Pledgee for, and this Agreement is expressly limited to, the full and punctual payment and performance by the Partnership of any and all payment obligations and other covenants and obligations of the Partnership to Pledgee contained in the Loan Documents and the Limited Partner hereby reaffirms his obligations under the Guaranty (all such obligations hereinafter collectively referred to as the "**Obligations**").

(a)      **Guaranty Absolute.**  The guaranty of General Partner under this Agreement is a guaranty of payment and performance and not merely of collection or enforceability and shall remain in full force and effect until all of the Obligations are indefeasibly paid or performed in full.  The obligations and liabilities of General Partner under this Agreement are the primary, direct and immediate obligations of General Partner and shall in no way be affected, limited, impaired, modified or released by, subject to or conditioned upon, and may be enforced against General Partner irrespective of (i) any attempt, pursuit, enforcement or exhaustion of any rights and remedies Pledgee may at any time have to collect, any or all of the Obligations (whether pursuant to any of the Loan Documents or otherwise) from the Partnership, from any other Obligor, from any other maker, endorser, surety or guarantor of, or pledgor of collateral and security for, all or any part of the Obligations, and/or by any resort or recourse to or against any collateral and security for all or any part of the Obligations, (ii) the invalidity, irregularity, lack of priority or unenforceability in whole or in part of any or all of the Loan Documents, (iii) any counter-claim, recoupment, setoff, reduction or defense based on any claim the Partnership or any other Obligor may now or hereafter have against Pledgee (other than the defense that payment in full of all amounts claimed to be due by Pledgee actually has been made), (iv) the voluntary or involuntary liquidation, dissolution, termination, merger, sale or other disposition of the Partnership or any other Obligor or any of the assets and properties of the Partnership or any other Obligor, (v) any bankruptcy, reorganization, insolvency or similar proceedings for the relief of debtors under any federal or state law by or against the Partnership or any other Obligor, or any discharge, limitation, modification or release of liability of the Partnership or any other Obligor by virtue of any such proceedings, (vi) any event, circumstance or matter to which Pledgor has consented pursuant to the provisions of paragraph 3 hereof, and (vii) any other event or circumstance which might otherwise constitute a legal or equitable discharge, release or defense of guarantor or surety, whether similar or dissimilar to the foregoing (other than the defense that payment in full of all amounts claimed to be due by Pledgee actually has been made).

(b)    **Consents.** Without notice to, or further consent of, the General Partner, the General Partner hereby agrees that Pledgee may at any time and from time to time on one or more occasions (i) renew, extend, accelerate, subordinate, change the time or manner of payment or performance of, or otherwise deal with, in any manner satisfactory to Pledgee and in accordance with the applicable Loan Documents, any of the terms and provisions of, all or any part of the Obligations, (ii) waive, excuse, release, change, amend, modify or otherwise deal with in any manner satisfactory to Pledgee any of the provisions of any of, the Loan Documents, (iii) release the Partnership or any or all of the other Obligors, (iv) waive, omit or delay the exercise of any of its powers, rights and remedies against the Partnership or any other Obligors or all or any of the collateral and security for all or any part of the Obligations, (v) release, substitute, subordinate, add, fail to maintain, preserve or perfect any of its liens on, security interests in or rights to, or otherwise deal with in any manner satisfactory to Pledgee, any collateral and security for all or any part of the Obligations, (vi) apply any payments of all or any of the Obligations received from the Partnership or any other Obligors or any other party or source whatsoever first to late charges or other sums due and owing to Pledgee, next to accrued and unpaid interest, and then to amounts due under the Loan Agreement and the other Loan Documents and any excess, after payment of the Obligations and performance of all other Obligations of the Partnership and/or any other obligors to Pledgee, shall be returned to the Partnership, or (vii) take or omit to take any other action, whether similar or dissimilar to the foregoing which may or might in any manner or to any extent vary the risk of the General Partner or otherwise operate as a legal or equitable discharge, release or defense of the General Partner under applicable laws.

(c)    **Waivers.** The General Partner hereby waives (i) notice of the execution and delivery of any of the Loan Documents, (ii) notice of the creation of any of the Obligations, (iii) notice of Pledgee's acceptance of and reliance on this Agreement, (iv) presentment and demand for payment of the Obligations and notice of non-payment and protest of non-payment of the Obligations, (v) any notice from Pledgee of the financial condition of the Partnership regardless of Pledgee's knowledge thereof, (vi) demand for observance, performance or enforcement of, or notice of default under, any of the provisions of this Agreement or any of the Loan Documents (other than such as are expressly provided for therein), and all other demands and notices otherwise required by law which the General Partner may lawfully waive, (vii) any right or claim to cause a marshalling of the assets of the Partnership, and (viii) any defense at law or in equity based on the adequacy or value of the consideration for this Agreement. The General Partner agrees not to institute any action or proceeding based on any rights of subrogation and reimbursement against the Partnership or against any collateral or security for any of the Obligations until the Obligations have been indefeasibly paid and satisfied in full. The foregoing sentence is not intended to limit Pledgor's right to accept payments from the Partnership that are otherwise permitted under the Loan Documents. The General Partner waives any and all other rights and defenses available to Pledgor by reason of any statutory provisions now or hereafter in effect in any other jurisdiction, including, without limitation, any and all rights or defenses the General Partner may have by reason of protection afforded to the Partnership or any other Obligor with respect to the Obligations pursuant to antideficiency or other laws of any state limiting or discharging the Partnership's or any other obligor's indebtedness (other than the defense that payment in full of all amounts claimed to be due from such parties actually has been made). The General Partner waives all rights and defenses arising out of an election of remedies by Pledgee, even if that election of remedies, such as a nonjudicial

3

foreclosure with respect to security for a guaranteed obligation, has destroyed the General Partner's rights of subrogation and reimbursement against the Partnership or any other Obligor.

**Section 3.     Grant of Security Interest by Pledgers.**  Each of Pledgers hereby pledge to Pledgee, and grant to Pledgee, a lien on, and continuing priority security interest in, all of the following property now owned or at any time hereafter acquired by Pledgors or in which Pledgors now have or at any time in the future may acquire any right, title or interest (collectively, the "**Collateral**") as security for the prompt and complete payment and performance by the Partnership of the Obligations and by Pledgors of the Obligations:

(a)     its partnership interest in the Partnership and all of its rights as a partner under the Partnership Agreement (including, without limitation, all of its right, title and interest to participate in the operation and management of the Partnership and all of its right, title and interest to property, assets, partnership interest and distributions under the Partnership Agreement);

(b)     all Accounts arising out of its partnership interest in the Partnership and the Partnership Agreement;

(c)     all General Intangibles arising out of its general partnership interest in the Partnership and the Partnership Agreement;

(d)     all present and future rights of Pledgor to receive any payment of money or other distribution or payment arising out of or in connection with its partnership interest in the Partnership and its rights as a partner under the Partnership Agreement;

(e)     any other property of the Partnership to which Pledgor now or in the future may be entitled in its capacity as a partner of the Partnership by way of distribution, return of capital or otherwise;

(f)     any other claim which Pledgor now has or may in the future acquire in its capacity as a partner of the Partnership against the Partnership and its property and of the other partners thereof; and

(g)     to the extent not otherwise included above, all Proceeds of any and all of the foregoing, including, without limitation, whatever is received upon any collection, exchange, sale or other disposition of any of the Collateral, and any property into which any of the Collateral is converted, whether cash or noncash proceeds, and any and all other amounts paid or payable under or in connection with any of the Collateral.

This Agreement constitutes a continuing security interest in the Collateral and shall remain in full force and effect until the satisfaction, release or termination of all of the Obligations.

**Section 4.     Rights of Pledgee; Limitations on Pledgee's Obligations.**

(a)     **Pledgors Remain Liable.**  Anything herein to the contrary notwithstanding, Pledgors shall remain liable under the Partnership Agreement to observe and perform all the conditions and obligations to be observed and performed by them thereunder, all

in accordance with and pursuant to the terms and provisions thereof. Unless Pledgee shall become a general partner and/or a limited partner of the Partnership as a result of its exercise of remedies pursuant to the terms hereof and except as set forth in Section 18 hereof, Pledgee shall not have any obligation or liability by reason of or arising out of this Agreement or the receipt by Pledgee of any payment relating to any Collateral pursuant hereto, nor shall Pledgee be obligated in any manner to perform any of the obligations of Pledgors under or pursuant to the Partnership Agreement or any Account or General Intangible to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any thereof, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been pledged to it or to which it may be entitled at any time or times. Nothing contained in this Agreement shall be construed or interpreted (a) to transfer to Pledgee any of the obligations of a partner of the Partnership or (b) to constitute Pledgee a partner of the Partnership.

(b)      **Proceeds.** Pledgee hereby authorizes Pledgors to collect all Accounts arising out of the Partnership Agreement in respect of their respective partnership interests in the Partnership. If required by Pledgee at any time after the occurrence and during the continuation of an Event of Default, such Accounts and any Proceeds, when collected by Pledgors, shall be forthwith deposited by Pledgors in the exact form received, duly endorsed (without recourse) by Pledgors to Pledgee, in a special bank account maintained by Pledgee, subject to withdrawal by Pledgee as hereinafter provided, and, until so turned over, shall be held by Pledgors in trust for Pledgee, segregated from other funds of Pledgor.

**Section 5.      Representations and Warranties.** Each Pledgor hereby represents and warrants, with respect to himself or itself, as applicable, as follows:

(a)      **Entity Status.** The General Partner is duly formed and validly existing as a limited liability company under the laws of the State of Oklahoma.

(b)      **Loan Documents.** Such Pledgor has or has had an opportunity to examine the Loan Documents.

(c)      **Enforceability.** This Agreement has been duly executed and constitutes a valid and binding obligation of such Pledgor, enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally.

(d)      **Ownership of Collateral; Liens.** Such Pledgor is the legal and beneficial owner of its Collateral, free and clear of all liens, except for the liens created by this Agreement. Such Pledgor has all requisite power and authority and the legal right to pledge to Pledgee, and to grant to Pledgee, a lien on and continuing security interest in its Collateral. The execution, delivery and performance by such Pledgor of this Agreement is within such Pledgor's powers, has been duly authorized by all necessary legal action, and does not contravene any agreement applicable to the Partnership or such Pledgor or restriction binding on or affecting the Partnership, such Pledgor or any of their respective assets. No security agreement, financing statement or other public notice with respect to all or any part of its Collateral is on file or of

5          Exhibit A-2, Page 101

record in any public office, except such as may have been filed in favor of Pledgee pursuant to this Agreement.

(e)    **Security Interest.** The security interests granted and continued pursuant to this Agreement will, upon filing of UCC financing statements in the appropriate filing offices, constitute perfected security interests in the Collateral in favor of Pledgee, and are enforceable as such against all creditors of and purchasers from such Pledgor. All action on the part of such Pledgor necessary or desirable to perfect such security interests in each item of the Collateral requested by Pledgee, including the execution of financing statements for filing in the appropriate filing offices, has been or will be duly taken upon such filing.

(f)    **Legal Name.** Such Pledgor's exact legal name is set forth at the beginning of this Agreement and such Pledgor does not conduct business under any other name.

(g)    **Power and Authority.** Such Pledger has and has duly exercised all requisite power and authority to enter into this Agreement, to pledge its interest in the Collateral and to carry out the transactions contemplated by this Agreement.

(h)    **Place of Business; Jurisdiction of Organization; Organizational Identification Number.** Such Pledgor's chief executive offices and chief place of business, in the case of the General Partner, or principal residence, in the case of the Limited Partner, and the place where such Pledgor keeps its records concerning the Collateral, is located at such Pledgor's address set forth on page 1 hereof. The General Partner's jurisdiction of organization is as set forth on page 1 hereof and the General Partner's organizational identification number is

_____.

Section 6.    **Covenants.** Each Pledgor covenants and agrees that, so long as this Agreement remains in effect:

(a)    **Further Documentation; Pledge of Instruments.** At any time and from time to time, upon the written request of Pledgee, and at the sole expense of such Pledgor, such Pledgor will promptly and duly execute and deliver such further instruments and documents and take such further action as Pledgee may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted. Without limiting the generality of the foregoing, such Pledgor will execute and file such financing or continuation statements, or amendments thereto, and such other instruments, endorsements or notices, as Pledgee may deem necessary or desirable in order to perfect and preserve the liens created or continued or intended to be created or continued hereby. Such Pledgor hereby authorizes Pledgee to file any such financing or continuation statement without the signature of such Pledgor to the extent permitted by applicable Legal Requirements. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, other Instrument or Chattel Paper, such note, Instrument or Chattel Paper shall be immediately delivered to Pledgee, duly endorsed (without recourse) in a manner satisfactory to Pledgee, to be held as Collateral pursuant to this Agreement.

(b)    **Maintenance of Records.** Such Pledgor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral.

(c)     **Limitation on Liens on Collateral**.  Such Pledgor will not create, incur or permit to exist, will defend the Collateral and the right, title and interest of Pledgee therein against, and will take such other action as is necessary to remove, any lien, claim, security interest or other encumbrances on or to the Collateral other than the lien created and continued pursuant to this Agreement.

(d)     **Further Identification of Collateral**.  Such Pledgor will furnish to Pledgee from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Pledgee may reasonably request, all in reasonable detail.

(e)     **Changes in Locations, Name, Etc**.  Such Pledgor will not, unless it shall give sixty (60) days' prior written notice to such effect to Pledgee, (i) change the location of its chief executive office or chief place of business from that specified on page 1 hereof, or remove its books and records from such location or (ii) change its name, identity, structure or jurisdiction of organization to such an extent that any financing statements filed by Pledgee in connection with this Agreement would become misleading or ineffective to perfect the security interests granted hereunder (to the extent the same can be perfected by filing of financing statements).

(f)     **Amendments of Partnership Agreement**.  Such Pledgor shall not, without the prior written consent of Pledgee, consent to, vote in favor of or otherwise permit any amendment to or modification of the Partnership Agreement.

(g)     **No Transfer of Interests**.  Such Pledgor shall not sell, assign, transfer, pledge or encumber or permit to be sold, assigned, transferred, pledged or encumbered any of its general partnership interest in the Partnership or the other Collateral, nor, in the case of the General Partner, permit the sale, assignment, transfer, pledge or encumbrance any membership interest in the General Partner.  Any such sale, assignment, transfer, pledge or encumbrance of Pledgor's partnership interest in the Partnership or of membership interests in the General Partner in violation of the foregoing provisions of this Section 6(g) shall be null and void.

(h)     **Bankruptcy of the Partnership**.  Such Pledgor shall not authorize, seek to cause or permit the Partnership to commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property or to consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or to make a general assignment for the benefit of the creditors.

(i)     **Maintenance of Existence, Etc**.  Such Pledgor shall at all times preserve and maintain in full force and effect its existence under the laws of the state of its organization and its qualification to do business in each jurisdiction where the ownership or leasing of property or the nature of business transacted makes such qualifications necessary.

7

(j) **Claims against Collateral.** Such Pledgor shall, within five (5) days of receipt of knowledge by such Pledgor, notify Pledgee in reasonable detail of any lien or claim made or asserted against the Collateral.

(k) **Notice of Dissolution.** Such Pledgor will forthwith upon learning of the occurrence of any event which would cause termination and/or dissolution of the Partnership, notify Pledgee in writing thereof.

### Section 7.    Pledgee's Appointment as Attorney-in-Fact.

(a) **Powers.** Effective immediately, without limiting any rights or powers granted herein to Pledgee while no Event of Default has occurred and is continuing, Pledgors hereby irrevocably constitute and appoint Pledgee and any officer or agent thereof, with full power of substitution, as their true and lawful attorney-in-fact with full irrevocable power and authority, in the place and stead of Pledgors and in the names of Pledgors or in its own name, for the purpose of carrying out the terms of this Agreement, with notice to, but without prior assent by Pledgor, to do the following:

(i) upon the occurrence of any Event of Default, to exercise all partnership rights and powers to the same extent as a partner of the Partnership;

(ii) upon the occurrence of any Event of Default, in the name of Pledgors or its own name, or otherwise, to take possession of and endorse (without recourse) and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under the Partnership Agreement or any Account, Instrument or General Intangible arising thereunder or out of Pledgors' partnership interests in the Partnership and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Pledgee for the purpose of collecting any and all such moneys due under the Partnership Agreement or any Account, Instrument or General Intangible arising thereunder or out of Pledgors' partnership interests in the Partnership whenever payable;

(iii) upon the occurrence of any Event of Default, to pay or discharge taxes and liens levied or placed on the Collateral and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of Section 6(a) hereof; and

(iv) upon the occurrence of any Event of Default, (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to Pledgee or as Pledgee shall direct, (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral, (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral, (D) to commence and prosecute any suits,

actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral, (E) to defend any suit, action or proceeding brought against Pledgors with respect to any Collateral, (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as Pledgee may deem appropriate and (G) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Pledgee were the absolute owner thereof for all purposes, and to do, at Pledgee's option and Pledgors' expense, at any time, or from time to time, all acts and things that Pledgee deems necessary to protect, preserve or realize upon the Collateral and the liens thereon created and continued hereby and to effect the intent of this Agreement, all as fully and effectively as Pledgors might do.

Pledgors hereby ratify all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

(b)    **Other Powers.** Pledgors also authorize Pledgee, at any time and from time to time, to execute, in connection with any sale provided for in Section 9 hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

**Section 8.    Performance by Pledgee of Pledgors' Obligations; Rights of Pledgors Prior to Event of Default.** Immediately upon the occurrence of an Event of Default, and without limiting any rights or powers granted herein to Pledgee while no Event of Default has occurred and is continuing, Pledgee, without releasing Pledgors from any obligation, covenant or condition hereof, itself may make any payment or perform, or cause the performance of, any such obligation, covenant or condition or take any other action in such manner and to such extent as Pledgee may deem necessary to protect, perfect or continue the perfection of the liens created or continued or intended to be created or continued pursuant to this Agreement. Unless an Event of Default shall have occurred, Pledgors shall be entitled to receive and retain, dividend or otherwise utilize all distributions made pursuant to the Partnership Agreement or otherwise arising out of the Collateral and exercise all voting, partnership and other rights pertaining to the Collateral and take all action it is authorized to take thereunder; provided that no vote or other action taken shall otherwise result in an Event of Default. All such rights of Pledgors with respect to dividends, distributions and voting shall cease upon the occurrence and during the continuation of an Event of Default.

**Section 9.    Rights and Remedies.**

(a)    **Collateral.** If an Event of Default shall have occurred, (i) all payments made in respect of the Collateral and received by or on behalf of Pledgee in accordance with the provisions of this Agreement or the Loan Agreement or otherwise, may, in the discretion of Pledgee, (A) be held by or on behalf of Pledgee as Collateral, and/or (B) then or at any time thereafter be applied to the Obligations in such order as Pledgee shall determine, and (ii) all shares or certificates of or evidencing the Collateral shall be registered in the name of Pledgee or its nominee, and (whether or not so registered) Pledgee or its nominee may thereafter exercise

9

(A) all voting, partnership and other rights pertaining to the Collateral and (B) any and all rights of conversion, exchange, subscription and any other rights, privileges or options pertaining to the Collateral as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Collateral upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the partnership structure of the Partnership or upon the exercise by Pledgors or Pledgee of any right, privilege or option pertaining to such shares or certificates of or evidencing the Collateral, and in connection therewith, the right to deposit and deliver any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine), all without liability except to account for property actually received by it, but Pledgee shall have no duty to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(b)    **UCC.** If an Event of Default shall have occurred, then, in addition to any other rights and remedies provided for herein and in any other instrument or agreement securing, evidencing or relating to the Obligations, or that may otherwise be available, Pledgee may, without any demand, advertisement or notice (except as expressly provided for below in this Section 9(b) or by applicable legal requirements), exercise all the rights and remedies of a secured party under the UCC, and in addition may sell, lease, assign, give option or options to purchase, or otherwise dispose of the Collateral, or any part thereof, as hereinafter provided. The Collateral may be sold or otherwise disposed of in one or more sales, at public or private sale, conducted by any officer or agent of, or auctioneer or attorney for, Pledgee, at any exchange or broker's board or at Pledgee's place of business or elsewhere, for cash, upon credit or for other property, for immediate or future delivery, and at such price or prices and on such terms as Pledgee shall, in its sole discretion, deem appropriate. Pledgee may be the purchaser of any or all of the Collateral so sold at a sale and thereafter may hold the same, and the Obligations may be applied as a credit against the purchase price. Pledgee may, in its sole discretion, at any such sale restrict the prospective bidders or purchasers as to their number, nature of business and investment intention. Upon any such sale, Pledgee shall have the right to deliver, assign and transfer to the purchaser thereof (including Pledgee) the Collateral so sold. Each purchaser (including Pledgee) at any such sale shall hold the Collateral so sold, absolutely free from any claim or right of whatsoever kind, including any equity or right of redemption, of Pledgors, and Pledgors hereby specifically waive, to the fullest extent they may lawfully do so, all rights of redemption, stay or appraisal that they have or may have under any rule of law or statute now existing or hereafter adopted. Pledgors agree that Pledgee need not give more than 10 days prior notice of the time and place of any public sale or of the time after which a private sale or other intended disposition is to take place and that such notice is reasonable notification of such matters. No notification need be given to Pledgors if they have signed after the occurrence of an Event of Default a statement renouncing or modifying any right to notification of sale or other intended disposition. Any such public sale shall be held at such time or times within ordinary business hours as Pledgee shall fix in the notice of such sale. At any such sale, the Collateral may be sold in one lot as an entirety or in separate parcels. Pledgee shall not be obligated to make any sale pursuant to any such notice. Pledgee may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be so adjourned without further notice or publication. In case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be

10

retained by Pledgee until the full selling price is paid by the purchaser thereof, but Pledgee shall not incur any liability in case of the failure of such purchaser to take up and pay for the Collateral so sold, and, in case of any such failure, such Collateral may again be sold pursuant to the provisions hereof.

(c)    **Proceedings.**  If an Event of Default shall have occurred, instead of exercising the power of sale provided in Section 9(b) hereof, Pledgee may proceed by a suit or suits at law or in equity to foreclose the pledge and security interest under this Agreement and sell the Collateral or any portion thereof under a judgment or decree of a court or courts of competent jurisdiction.

(d)    **Attorney-in-Fact.**  Pledgee, as attorney-in-fact pursuant to Section 7 hereof, may, in the name and stead of Pledgors, make and execute all conveyances, assignments and transfers of the Collateral sold pursuant to Section 9(b) or Section 9(c) hereof, and Pledgors hereby ratify and confirm all that Pledgee, as said attorney-in-fact, shall lawfully do by virtue hereof.  Nevertheless, Pledgors shall, if so requested by Pledgee, ratify and confirm any sale or sales by executing and delivering to Pledgee, or to such purchaser or purchasers, all such instruments as may, in the judgment of Pledgee, be advisable for the purpose.

(e)    **Collateral Sold Free and Clear.**  The receipt of Pledgee for the purchase money paid at any such sale made by it pursuant to Section 9(b) or 9(c) hereof shall be a sufficient discharge therefor to any purchaser of the Collateral, or any portion thereof, sold as aforesaid; and no such purchaser (or the representatives or assigns of such purchaser), after paying such purchase money and receiving such receipt, shall be bound to see to the application of such purchase money or any part thereof or in any manner whatsoever be answerable for any loss, misapplication or non-application of any such purchase money, or any part thereof, or be bound to inquire as to the authorization, necessity, expediency or regularity of any such sale.

(f)    **No Pledgee Liability.**  Pledgee shall not incur any liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to Section 9(b) hereof conducted in a commercially reasonable manner and in accordance with applicable legal requirements. Pledgors hereby waive, to the fullest extent permitted by legal requirements, all claims, damages and demands against Pledgee arising out of the repossession or retention of the Collateral or the sale of the Collateral pursuant to Section 9(b) or Section 9(c) hereof, including, without limitation, any claims against Pledgee arising by reason of the fact that the price at which the Collateral, or any part thereof, may have been sold at a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if Pledgee accepts the first offer received that Pledgee in good faith deems to be commercially reasonable under the circumstances and does not offer the Collateral to more than one offeree.  To the fullest extent permitted by law, Pledgors shall have the burden of proving that any such sale of the Collateral was conducted in a commercially unreasonable manner.

(g)    **Availability of Collateral.**  If Pledgee shall demand possession of the Collateral or any part thereof in connection with its rights pursuant to Section 9(b) or Section 9(c) hereof, Pledgors will, at their own expense, forthwith cause such Collateral or any part

thereof designated by Pledgee to be assembled and made available and/or delivered to Pledgee at any place reasonably designated by Pledgee.

(h)     **No Release**.  No sale or other disposition of all or any part of the Collateral by Pledgee pursuant to this Section 9 shall be deemed to relieve the Partnership or Pledgors of their obligations in respect of the Obligations, except to the extent the proceeds thereof are received by Pledgee.

(i)     **Voting and other Rights**.  If an Event of Default shall have occurred and be continuing, Pledgee (i) may (but need not), upon notice to Pledgors, exercise all voting and other rights of Pledgors as partners of the Partnership and exercise all other rights provided under the Partnership Agreement and (ii) shall receive all permitted distributions, if any, made for the account of Pledgor under the Partnership Agreement.

**Section 10.     Waiver**.  Pledgors agree that they will not at any time insist upon, claim, plead, or take any benefit or advantage of any appraisement, valuation, stay, extension, moratorium, redemption, or similar law now or hereinafter in force in order to prevent, delay, or hinder the enforcement hereof or the absolute sale of any part of the Collateral. Pledgors, for themselves and all who claim through them, so far as they now or hereafter lawfully may do so, hereby waive the benefit of all such laws, and all right to have the Collateral marshaled upon any foreclosure hereof, and agrees that any court having jurisdiction to foreclose this Agreement may order the sale of the Collateral as an entirety.  Without limiting the generality of the foregoing, Pledgors hereby: (a) authorize Pledgee, in its sole discretion and without notice to or demand upon Pledgor and without otherwise affecting the obligations of Pledgors hereunder or in respect of the Obligations, from time to time to take and hold other collateral (in addition to the Collateral) for payment of Obligations or any part thereof and to exchange, enforce or release such other collateral or any part thereof and to accept and hold any endorsement or guarantee of payment of the Obligations or any part thereof and to release or substitute any endorser or pledgor or any other person or entity granting security for or in any other way obligated upon the Obligations or any part thereof; and (b) waives and releases any and all right to require Pledgee to collect any of the Obligations from any specific item or items of the Collateral or from any other party liable as Pledgors or in any other manner in respect of any of the Obligations or from any collateral (other than such Collateral) for any of the Obligations.

**Section 11.     Indemnity**.  Pledgors shall indemnify Pledgee from and against any and all claims, losses and liabilities growing out of or resulting from (i) this Agreement (including, without limitation, enforcement of this Agreement), (ii) any refund or adjustment (including any interest thereon) of any amount paid or payable in accordance with the terms hereof to Pledgee, in respect of any Collateral after the occurrence of an Event of Default, or any interest therein, that may be ordered or otherwise required by any Governmental Authority, (iii) any delay in paying any and all excise, sales or other similar taxes which may be payable or determined to be payable with respect to any of the Collateral, (iv) any delay in complying with any Legal Requirements applicable to any of the Collateral and (v) the transactions contemplated solely by this Agreement, but, in the case of each of clauses (i) through (v), excluding any such claims, losses or liabilities found by a final order of a court of competent jurisdiction to result from Pledgee's gross negligence or willful misconduct.

**Section 12.    Amendments; Etc.**  No amendment or waiver of any provision of this Agreement or consent to any departure by Pledgors from the terms of this Agreement shall in any event be effective unless the same shall be in writing and signed by Pledgors and Pledgee and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**Section 13.    Notices.**  All notices, demands and other communications hereunder shall be in writing and sent by United States certified or registered mail, postage prepaid, return receipt requested, or by telecopier or private delivery service, addressed to the parties at the addresses specified on page 1 of this Agreement. Each party may change the address to which notices to it are to be sent by written notice given to the other in accordance with this paragraph. All notices shall, when mailed as aforesaid, be effective on the date indicated on the return receipt, and all notices given by other means shall be effective when received.

**Section 14.    Continuing Pledge and Security Interest.**  This Agreement shall be a continuing one, and all representations, warranties, covenants, undertakings, obligations, consents, waivers and agreements of Pledgors herein shall survive the date of this Agreement and shall continue in full force and effect until final payment in full of all amounts owed under the Loan Documents, at which time, provided there exists no Default or Event of Default under the Loan Documents, Pledgee shall terminate this Agreement and release the security interests granted hereunder. Notwithstanding the foregoing the indemnities contained herein, including the indemnity set forth in Section 11 hereof, shall survive such termination. Promptly after termination, Pledgee shall release this Agreement and make any appropriate filings to reflect such release.

**Section 15.    Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF _____, WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAWS PRINCIPLES, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT THE UCC PROVIDES THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTERESTS HEREUNDER, OR REMEDIES HEREUNDER IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF _____.**

**Section 16.    Headings.**  Headings used in this Agreement are for convenience of reference only and do not constitute part of this Agreement for any purpose.

**Section 17.    No Waiver; Cumulative Remedies; Integration.**  Pledgee shall not by any act (except by a written instrument pursuant to this Section), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof.  No failure to exercise, nor any delay in exercising, on the part of Pledgee, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by Pledgee of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Pledgee would

otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law.

**Section 18.    Pledgee's Duties.** The powers conferred on Pledgee hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except as provided in the next sentence, Pledgee shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. Pledgee's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Pledgee deals with similar securities and property for its own account. Neither Pledgee nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Pledgors or otherwise.

**Section 19.    Severability.** Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Where provisions of any law or regulation resulting in such prohibition or unenforceability may be waived, they are hereby waived by Pledgors and Pledgee to the full extent permitted by law so that this Agreement shall be deemed a valid and binding agreement, and the liens and security interests created and continued hereby shall constitute continuing liens on and perfected security interests in the Collateral, in each case enforceable in accordance with its terms.

**Section 20.    Specific Performance.** Pledgor hereby irrevocably waive any defense based on the adequacy of a remedy at law that may be asserted as a bar to the remedy of specific performance in any action brought against Pledgors for specific performance of this Agreement by Pledgee or in respect of all or a substantial part of Pledgors' assets under the bankruptcy or insolvency laws of any jurisdiction to which Pledgors or their respective assets are subject.

**Section 21.    Security Interest Absolute.** All rights of Pledgee hereunder, the liens created and continued hereby and all obligations of Pledgors hereunder shall be absolute and unconditional irrespective of: (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any documents delivered in connection with the transactions contemplated by the Loan Agreement including, without limitation, the Partnership Agreement; or (b) any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to or departure from any guaranty, for all or any of the Obligations.

**Section 22.    Private Sales.** Pledgors recognize that Pledgee may be unable to effect a public sale of any or all the Collateral, by reason of certain prohibitions contained in any federal or state law governing the issuance or sale of securities and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted

14

group of purchasers which will be obliged to agree, among other things, to acquire the Collateral for their own account for investment and not with a view to the distribution thereof. Pledgors acknowledge and agree that any such private sale may result in prices and other terms less favorable to Pledgee than if such sale were a public sale and agree that such circumstances shall not, in and of themselves, result in a determination that such sale was not made in a commercially reasonable manner. Pledgee shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit the Partnership to register for public sale under any federal or state law governing the issuance or sale of securities, even if the Partnership would agree to do so.

     **Section 23.**    **Registration of Pledge.**  Concurrently with the execution of this Agreement, Pledgors have given to the Partnership written instructions, and has caused the Partnership to deliver, and the Partnership has, delivered to Pledgee a statement confirming that the Partnership has registered on its books the pledge effected by this Agreement.

     **Section 24.**    **Reinstatement.**  This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by Pledgee upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Pledgors or the Partnership or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Pledgors or the Partnership or any substantial part of their property, or otherwise, all as though such payments had not been made.

     **Section 25.**    **Powers Coupled with an Interest.**  All authorizations, agencies and powers herein contained with respect to the Collateral are irrevocable and are coupled with an interest.

     **Section 26.**    **Submission to Jurisdiction; Waivers.**

     (a)    PLEDGORS HEREBY IRREVOCABLY AND UNCONDITIONALLY:

     (i)    SUBMIT THEMSELVES AND THEIR RESPECTIVE PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THE LOAN AGREEMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT HEREOF OR THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF _____, THE COURTS OF THE UNITED STATES OF AMERICA FOR THE STATE OF _____, AND THE APPELLATE COURTS FROM ANY THEREOF;

     (ii)    CONSENT THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS, AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH

Exhibit A-2, Page 111

COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREE NOT TO PLEAD OR CLAIM THE SAME;

(iii)    AGREE THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO PLEDGORS AT THE ADDRESSES REFERRED TO ON PAGE 1 OF THIS AGREEMENT; AND

(iv)    AGREE THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT PLEDGEE'S RIGHT TO SUE IN ANY OTHER JURISDICTION.

(b)    PLEDGORS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT.

Section 27.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

16

**IN WITNESS WHEREOF,** Pledgor has caused this Partner Guaranty, Pledge and Security Agreement to be duly executed and delivered as of the date first above written.

SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company

By: _____
Name:
Title:

_____
THEOTIS F. OLIPHANT

## ACKNOWLEDGMENT AND CONSENT

Santa Fe Pointe, L.P., a limited partnership duly organized and validly existing under the laws of the State of Oklahoma (the **"Partnership"**), the Partnership referred to in the foregoing Partner Guaranty, Pledge and Security Agreement (the **"Pledge"**), hereby acknowledges receipt of a copy thereof and agrees to be bound thereby and to comply with the terms thereof insofar as such terms are applicable to it.

The Partnership also agrees that, if an Event of Default (as defined in the Pledge) shall occur, to pay to Pledgee all amounts then due and payable and thereafter as they become due and payable to the general partner of the Partnership, until the Pledge is no longer in force. The Partnership and its general partner hereby consent to the admission of Pledgee or its designee or successor or assign as general partner and/or a limited partner, if any such party, upon acquiring the Collateral in the form of partnership interests, desires to become a substitute general partner and/or limited partner, and agree to provide further written evidence of their consent at any later time if necessary or appropriate to allow or evidence the admission of a substitute general partner and/or limited partner pursuant to the applicable provisions of the Partnership Agreement. The Partnership further agrees that Pledgee will not have any of the obligations of a general partner and/or a limited partner of the Partnership unless Pledgee affirmatively elects to undertake such obligations by becoming a general partner in the Partnership in accordance with the terms of the Pledge.

December __, 2006

> SANTA FE POINTE, L.P., an Oklahoma limited partnership
>
> By:     SANTA FE POINTE MANAGEMENT,
>         LLC, an Oklahoma limited liability
>         company, its general partner
>
>         By:_____
>         Name:
>         Title:

General Partner Guaranty, Pledge and Security Agreement

(Instructions to Partnership)

December __, 2006

Santa Fe Pointe, L.P.
16416 Oconee Creek Drive
Edmond, Oklahoma 73013

Ladies and Gentlemen:

Santa Fe Pointe Management, LLC, and Theotis F. Oliphant hereby instructs you to register the pledge of their respective partnership interests in the above-captioned partnership in favor of Greystone CDE, LLC, pursuant to the Partner Guaranty, Pledge and Security Agreement dated as of December __, 2006.

Very truly yours,

SANTA FE POINT MANAGEMENT, LLC, an
Oklahoma limited liability company

By:_____
Name:
Title:

<u>**General Partner Guaranty, Pledge and Security Agreement**</u>

<u>(Confirmation of Pledge)</u>

December ___, 2006

Greystone CDE, LLC
418 Bell Air Lane
Warrenton, Virginia 20186

      This statement of Santa Fe Pointe, L.P. (the "Partnership") is to advise you that a pledge of the following uncertificated security has been registered in the name Greystone CDE, LLC, as follows:

      1.    Uncertificated Securities: The entire general partnership interest of Santa Fe Pointe Management, LLC, in the Partnership and the entire limited partnership interest of Theotis F. Oliphant in the Partnership.

      2.    There are no liens or restrictions on hypothecation of the partnership interests of the undersigned partnership and no adverse claims to which such uncertificated securities are or may be subject known to the undersigned partnership.

      3.    The pledge was registered on December ___, 2006.

      THIS STATEMENT IS MERELY A RECORD OF THE RIGHTS OF THE ADDRESSEE AS OF THE TIME OF ITS ISSUANCE, DELIVERY OF THIS STATEMENT, OF ITSELF, CONFERS NO RIGHTS ON THE RECIPIENT. THIS STATEMENT IS NEITHER A NEGOTIABLE INSTRUMENT NOR A SECURITY.

      SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:    SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company, its general partner

      By: _____
      Name:
      Title:

# EXHIBIT E

#155240v2
GT Draft 12/17/06

---

DEVELOPER LIMITED GUARANTY
PLEDGE AND SECURITY AGREEMENT

by

[NAME OF DEVELOPER]

in favor of

GREYSTONE CDE, LLC

Dated as of December ___, 2006

---

## DEVELOPER LIMITED GUARANTY,
## PLEDGE AND SECURITY AGREEMENT

This **DEVELOPER LIMITED GUARANTY, PLEDGE AND SECURITY AGREEMENT** (as amended, modified or supplemented from time to time, this **"Agreement"**), dated as of December ___, 2006, is made by [NAME OF DEVELOPER] a, _____, duly organized, validly existing and in good standing under the laws of the State of _____, with an address at _____ (together with its permitted successors and assigns, the **"Pledgor"**), in favor of GREYSTONE CDE, LLC, limited liability company organized and existing under the laws of the State of Delaware, with an address at 419 Belle Air Lane, Wanenton, Virginia 20186 (together with its successors and assigns, the **"Pledgee"**),

### W I T N E S S E T H:

WHEREAS, the Pledgor is an affiliate of Santa Fe Pointe, L.P., a limited partnership limited liability company duly organized, validly existing and in good standing under the laws of the State of Oklahoma (together with its permitted successors and assigns, the **"Borrower"**); and

WHEREAS, the Borrower has entered into an Bridge Loan Agreement dated as of December ___, 2006, (as the same may be amended, modified or supplemented from time to time, the **"Loan Agreement,"** and together with all documents evidencing or securing the Loan Agreement, collectively, the **"Loan Documents"**) with the Pledgee; and

WHEREAS, the Pledgor is or will be entitled to certain development fees under a development agreement to be entered into by and between the Pledgor and Borrower (as the same may be modified, amended or supplemented from time to time, the **"Development Agreement"**); and

WHEREAS, the Pledgor will derive substantial economic benefit from the transactions contemplated by the Loan Agreement; and

WHEREAS, the execution and delivery of this Agreement is a condition to the Pledgee's entering into the Loan Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby and in order to secure the Borrower' performance of its obligations to the Pledgee under the Loan Agreement, including payment of all amounts due or to become due to the Pledgee thereunder, and any extensions, renewals, replacements or modifications of any thereof, the Pledgor hereby agrees as follows:

**Section 1. Defined Terms.** The following terms which are defined in the Uniform Commercial Code in effect in the State of _____ on the date hereof are used herein as so defined: Accounts, Chattel Paper, General Intangibles, Instruments and Proceeds; and the following terms shall have the following meanings:

"Collateral" has the meaning assigned to it below in Section 3 of this Agreement.

"**Event of Default**" means any "Event of Default" as defined in the Loan Agreement.

"**Obligations**" has the meaning assigned to it in Section 2 of this Agreement.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of _____.

All other capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Loan Documents.

**Section 2. Guaranty.** The Pledgor hereby absolutely, irrevocably and unconditionally guarantees and is a surety to the Pledgee for the full and punctual payment and performance by the Borrower of its obligations to the Pledgee under the Loan Documents (collectively, the "**Obligations**").

(a)    **Guaranty Absolute.** The guaranty of the Pledgor under this Agreement is a guaranty of payment and performance and not merely of collection or enforceability and shall remain in full force and effect until all of the Obligations are indefeasibly paid in full. The obligations and liabilities of the Pledgor under this Agreement are the primary, direct and immediate obligations of the Pledgor and shall in no way be affected, limited, impaired, modified or released by, subject to or conditioned upon, and may be enforced against the Pledgor irrespective of (i) any attempt, pursuit, enforcement or exhaustion of any rights and remedies the Pledgee may at any time have to collect any or all of the Obligations (whether pursuant to any of the Loan Documents or otherwise) from the Borrower, from the other Obligors, from any other maker, endorser, surety or guarantor of, or pledgor of collateral and security for, all or any part of the Obligations, and/or by any resort or recourse to or against any collateral and security for all or any part of the Obligations; (ii) the invalidity, irregularity, lack of priority or unenforceability in whole or in part of any or all of the Loan Documents; (iii) any counter-claim, recoupment, setoff, reduction or defense based on any claim the Borrower, any other Obligor, or the Pledgor may now or hereafter have against the Pledgee (other than the defense that payment in full of all amounts claimed to be due by the Pledgee actually has been made); (iv) the voluntary or involuntary liquidation, dissolution, termination or merger of the Borrower or any other Obligor, or the sale or other disposition of the Collateral or any of the assets and properties of the Borrower or any other Obligor; (v) any bankruptcy, reorganization, insolvency or similar proceedings for the relief of debtors under any federal or state law by or against the Borrower or any other obligor, or any discharge, limitation, modification or release of liability of the Borrower or any other Obligor by virtue of any such proceedings; (vi) any event, circumstance or matter to which the Pledgor has consented pursuant to the provisions of clause (b) hereof; and (vii) any other event or circumstance which might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety, whether similar or dissimilar to the foregoing (other than the defense that payment in full of all amounts claimed to be due by the Pledgee actually has been made).

(b)    **Consents.** Without notice to, or further consent of the Pledgor, the Pledgor hereby agrees that the Pledgee may at any time and from time to time on one or more occasions (i) renew, extend, accelerate, subordinate, change the time or manner of payment or

2

performance of, or otherwise deal with, in any manner satisfactory to the Pledgee and in accordance with the applicable Loan Documents, any of the terms and provisions of, all or any part of the Obligations; (ii) waive, excuse, release, change, amend, modify or otherwise deal with in any manner satisfactory to the Pledgee any of the provisions of any of the Loan Documents; (iii) release the Borrower or any other Obligor; (iv) waive, omit or delay the exercise of any of its powers, rights and remedies against the Borrower or any other obligor all or any of the collateral and security for all or any part of the Obligations; (v) release, substitute, subordinate, add, fail to maintain, preserve or perfect any of its liens on, security interests in or rights to, or otherwise deal with in any manner satisfactory to the Pledgee, any collateral and security for all or any part of the Obligations; (vi) apply any payments in satisfaction of all or any of the Obligations due under the Loan Documents received from the Borrower or any other Obligor any other party or source whatsoever first to late charges or other sums due and owing to the Pledgee under the Loan Documents, next to accrued and unpaid interest then due and owing under the Loan Documents, and then to any other amounts due under the Loan Documents and any excess, after payment of the Obligations and performance of all other Obligations of the Borrower and any other Obligor to the Pledgee, shall be returned to the Borrower or (vii) take or omit to take any other action, whether similar or dissimilar to the foregoing which may or might in any manner or to any extent vary the risk of the Pledgor or otherwise operate as a legal or equitable discharge, release or defense of the Pledgor under applicable laws.

(c)    **Waivers.**  The Pledgor hereby waives (i) notice of the execution and delivery of any of the Loan Documents; (ii) notice of the creation of any of the Obligations; (iii) notice of the Pledgee's acceptance of and reliance on this Agreement; (iv) presentment and demand for payment of the Obligations and notice of non-payment and protest of non-payment of the Obligations; (v) any notice from the Pledgee of the financial condition of the Borrower or any other Obligor regardless of the Pledgee's knowledge thereof; (vi) demand for observance, performance or enforcement of, or notice of default under, any of the provisions of this Agreement or any of the other Loan Documents (other than such as are expressly provided for therein), and all other demands and notices otherwise required by law which the Pledgor may lawfully waive; (vii) any right or claim to cause a marshalling of the assets of the Borrower or any other Obligor; and (viii) any defense at law or in equity based on the adequacy or value of the consideration for this Agreement.  The Pledgor agrees not to institute any action or proceeding based on any rights of subrogation and reimbursement against the Borrower or any other Obligor against any collateral or security for any of the Obligations until the Obligations have been indefeasibly paid and satisfied in full.  The Pledgor waives any and all other rights and defenses available to the Pledgor by reason of any statutory provisions now or hereafter in effect in any other jurisdiction, including, without limitation, any and all rights or defenses the Pledgor may have by reason of protection afforded to the Borrower or any other Obligor with respect to the Obligations pursuant to antideficiency or other laws of any state limiting or discharging the Borrower's or any other Obligor's indebtedness (other than the defense that payment in full of all amounts claimed to be due from such parties actually has been made).  The Pledgor waives all rights and defenses arising out of an election of remedies by the Pledgee, even if that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Pledgor's rights of subrogation and reimbursement against the Borrower or any other Obligor.

3

(d)    **Non-Recourse**.   The obligations of the Pledgor hereunder shall be recoverable solely out of the Collateral pledged pursuant to this Agreement and shall otherwise be without recourse to the Pledgor or any of its other assets or any past, present or future, direct or indirect, partners, members or shareholders in the Pledgor, except that the Pledgee shall have recourse to the assets of any such person or entity if and only to the extent such person or entity has expressly assumed (other than by execution and delivery of this Agreement) or hereafter expressly assumes liability for, or has pledged (other than pursuant to this Agreement) or hereafter pledges any of its other assets as security for the performance of the Obligations or of the Pledgor's obligations hereunder.  Notwithstanding the preceding sentence, the Pledgor and its partners, members and shareholders shall be personally liable for and to the extent of any loss suffered by the Pledgee, as a direct result of (a) any act of fraud or willful misconduct by the Pledgor, (b) the application of any Collateral by the Pledgor other than as provided herein, or (c) the failure by the Pledgor to obtain the Pledgee's prior written consent to take any action otherwise proscribed by the terms hereof.  In addition, nothing herein contained shall be deemed to limit, vary, modify or amend any obligation owed to the Pledgee, under any other guaranty or indemnification agreement to which the Pledgor is a party.

**Section 3. Grant of Security Interest by Pledgor.**

(a)    **Grant of Security Interest**.  The Pledgor hereby pledges to the Pledgee, and grants to the Pledgee, a lien on, and continuing first priority security interest in, all of the following property (collectively, the "**Collateral**") as security for the prompt and complete payment and performance by the Borrower of the Obligations and by the Pledgor of its obligations hereunder:

(i)    the Pledgor's right to receive payment of the "developer's fee" under the Development Agreement or, if a Development Agreement is never finalized, executed and delivered, the Pledgor's right to receive any amounts in respect of a "developer's fee" or similar fee,, irrespective of the absence of any written agreement with respect thereto;

(ii)    all Accounts arising out of its rights to receive such payment under payment of "developer's fee" as aforesaid;

(iii)    all General Intangibles arising out of its rights to receive payment of "developer's fee" as aforesaid;

(iv)    any such "developer's fee" actually paid; and

(v)    to the extent not otherwise included above, all Proceeds of any and all of the foregoing, including, without limitation, whatever is received upon any collection, exchange, sale or other disposition of any of the Collateral, and any property into which any of the Collateral is converted, whether cash or noncash proceeds, and any and all other amounts paid or payable under or in connection with any of the Collateral.

Notwithstanding the foregoing, "collateral" shall not include any "developer fee" already paid in accordance with the terms of the Development Agreement.

4

(b)    **Continuing Interest.**  The security interest granted pursuant to this Agreement constitutes a continuing security interest in the Collateral and shall remain in full force and effect until termination of this Agreement in accordance with Section 15 hereof.

**Section 4. Payments in Respect of Collateral.**  During the continuation of any Event of Default, the Pledgor hereby directs that amounts the Pledgor is entitled to receive representing any portion of the Collateral shall be immediately transferred to the Pledgee.  The Pledgor hereby irrevocably authorizes the Borrower to make such payments directly to the Pledgee by wire transfer in accordance with the following wire transfer instructions, with the same effect as if the same had been paid to the Pledgor in accordance with the Development Agreement:

By execution hereof, the Pledgor acknowledges and agrees to such authorization and agrees to make any such payments to the Pledgee.  The Pledgee hereby agrees that, to the extent it receives any amounts on account of the Collateral during the continuance of an Event of Default, it shall immediately apply such funds as received, to the payment of the Obligations, in such order as the Pledgee may determine in its sole discretion.

**Section 5. Limitations on Pledgee's Obligations.**  Anything herein to the contrary notwithstanding, the Pledgor shall remain liable under the Development Agreement to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof.  The Pledgee shall not have any obligation or liability under this Agreement by reason of or arising out of this Agreement or the receipt by the Pledgee of any payment relating to any Collateral pursuant hereto, nor shall the Pledgee be obligated in any manner to perform any of the obligations of the Pledgor under or pursuant to the Development Agreement or any Account or General Intangible to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any thereof, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been pledged to it or to which it may be entitled at any time or times.  Nothing contained in this Agreement shall be construed or interpreted to transfer to the Pledgee any of the obligations of the Pledgor under the Development Agreement.

**Section 6. Representations and Warranties.**  The Pledgor hereby represents and warrants as follows:

(a)    **Entity Status.**  The Pledgor is a _____ duly formed, validly existing and in good standing under the laws of the State of _____.

(b)    **Loan Documents.**  The Pledgor has examined or has had an opportunity to examine the Loan Agreement.

(c)    **Enforceability.**  This Agreement has been duly executed and constitutes the valid and binding obligation of the Pledgor, enforceable against the Pledgor in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally.

(d)    **Ownership of Collateral; Liens.**  The Pledgor is or will be the legal and beneficial owner of the Collateral, free and clear of all liens, except for the liens created by this

5

Agreement. The Pledgor has all requisite power and authority and the legal right to pledge to the Pledgee, and to grant to the Pledgee, a lien on and continuing security interest in the Collateral. The execution, delivery and performance by the Pledgor of this Agreement is within the Pledgor's powers, has been duly authorized by all necessary legal action, and does not contravene any agreement applicable to the Pledgor or restriction binding on or affecting the Pledgor or any of its assets. No security agreement, financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as may have been filed in favor of the Pledgee pursuant to this Agreement.

(e)    **Security Interest**. The security interests granted and continued pursuant to this Agreement will, upon filing of UCC financing statements in the appropriate filing offices, constitute first priority perfected security interests in the Collateral in favor of the Pledgee and are enforceable as such against all creditors of and purchasers from the Pledgor. All action on the part of the Pledgor necessary or desirable to perfect such security interests in each item of the Collateral requested by the Pledgee, including the execution of financing statements for filing in the appropriate filing offices, has been or will be duly taken upon such filing.

(f)    **Legal Name**. The Pledgor's exact legal name is set forth at the beginning of this Agreement and the Pledgor does not conduct business under any other names.

(g)    **Power and Authority**. The Pledgor has and has duly exercised all requisite power and authority to enter into this Agreement, to pledge its interest in the Collateral and to carry out the transactions contemplated by this Agreement.

(h)    **Place of Business; Organizational Identification Number**. The Pledgor's chief executive office and chief place of business, and the place where the Pledgor keeps its records concerning the Collateral, is located at the Pledgor's address set forth on page 1 hereof, and the Pledgor's jurisdiction of organization is as set forth on page 1 hereof. The Pledgor's organizational identification number is _____.

**Section 7. Covenants**. The Pledgor covenants and agrees that, so long as this Agreement remains in effect:

(a)    **Development Agreement**. The Development Agreement shall be in form and substance satisfactory to Pledgee in all respects. Pledgor shall afford Pledgee a reasonable opportunity to review a draft of the Development Agreement prior to execution and delivery thereof and will provide Pledgee a copy of the executed Development Agreement once it has been executed and delivered.

(b)    **Further Documentation; Pledge of Instruments**. At any time and from time to time, upon the written request of the Pledgee, and at the sole expense of the Pledgor, the Pledgor will promptly and duly execute and deliver such further instruments and documents and take such further action as the Pledgee, as applicable, may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted. Without limiting the generality of the foregoing, the Pledgor will execute and file such financing or continuation statements, or amendments thereto, and such other instruments, endorsements or notices, as the Pledgee may deem necessary or desirable in order to perfect and

preserve the liens created or continued or intended to be created or continued hereby. The Pledgor hereby authorizes the Pledgee to file any such financing or continuation statement without the signature of the Pledgor to the extent permitted by applicable legal requirements. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, other Instrument or Chattel Paper, such note, Instrument or Chattel Paper shall be immediately delivered to the Pledgee, duly endorsed (without recourse) in a manner satisfactory to the Pledgee, to be held as Collateral pursuant to this Agreement.

       (c)    **Maintenance of Records.** The Pledgor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral.

       (d)    **Limitation on Liens on Collateral.** The Pledgor will not create, incur or permit to exist, will defend the Collateral and the right, title and interest of the Pledgee therein against, and will take such other action as is necessary to remove, any lien, claim, security interest or other encumbrances on or to the Collateral other than the lien created and continued pursuant to this Agreement.

       (e)    **Further Identification of Collateral.** The Pledgor will furnish to the Pledgee from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Pledgee, as applicable, may reasonably request, all in reasonable detail.

       (f)    **Changes in Locations, Name, etc.** The Pledgor will not, without at least sixty (60) days' prior written notice to such effect to the Pledgee, as applicable (i) change the location of its chief executive offices or chief place of business from that specified on page 1 hereof, or remove its books and records from such location or (ii) change its names, identities, jurisdiction of organization or structure to such an extent that any financing statements filed by the Pledgee in connection with this Agreement would become misleading.

       (g)    **Amendments to Development Agreement.** The Pledgor shall not, without the prior written consent of the Pledgee, consent to, vote in favor of or otherwise permit any amendment to or modification of the Development Agreement.

       (h)    **No Transfer of Interests.** The Pledgor shall not sell, assign, transfer, pledge or encumber or permit to be sold, assigned, transferred, pledged or encumbered any of its interests in, to or under the Development Agreement or the other Collateral, nor permit the sale, assignment, transfer, pledge or encumbrance or any interests in, to or under the Development Agreement. Any sale, assignment, transfer, pledge or encumbrance of the Pledgor's interests under the Development Agreement in violation of the foregoing provisions of this Section 7(h) shall be null and void. Nothing in this Section 7(h) shall be construed to prohibit transfers of membership interests in the Pledgor.

       (i)    **Maintenance of Existence, Etc.** The Pledgor shall at all times preserve and maintain in full force and effect its existence under the laws of the state of its organization and its qualification to do business in each jurisdiction where the nature of business transacted makes such qualifications necessary.

7

(j)    **Claims against Collateral.**  The Pledgor shall, within five (5) days of receipt of knowledge by the Pledgor, notify the Pledgee, in reasonable detail of any lien or claim made or asserted against the Collateral.

(k)    **Notice of Default.**  The Pledgor will forthwith upon learning of the occurrence of any event which would cause a default under either of the Development Agreement, notify the Pledgee in writing thereof.

## Section 8. Pledgee's Appointment as Attorney-in-Fact.

(a)    **Powers.**  Effective immediately, without limiting any rights or powers granted herein to the Pledgee, the Pledgor hereby irrevocably constitutes and appoints the Pledgee and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority, in the place and stead of the Pledgor and in the name of the Pledgor or in its own name, for the purpose of carrying out the terms of this Agreement, without notice to or assent by the Pledgor, upon the occurrence and continuance of an Event of Default, (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Pledgee; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action or proceeding brought against the Pledgor with respect to any Collateral; (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as the Pledgee, may deem appropriate (provided that Pledgor shall have not less than ten (10) days prior written notice before any such settlement, compromise or adjustment shall become binding and Pledgee shall provide Pledgor with reasonable detail regarding the terms of any such settlement, compromise or adjustment prior to finalization); and (G) upon the occurrence of an Event of Default, generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Pledgee were the absolute owner thereof for all purposes, and to do, at the Pledgee's option, and the Pledgor's expense, at any time, or from time to time, all acts and things that the Pledgee deems necessary to protect, preserve or realize upon the Collateral and the liens thereon created and continued hereby and to effect the intent of this Agreement, all as fully and effectively as the Pledgor might do.  The Pledgor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

(b)    **Other Powers.**  The Pledgor also authorizes the Pledgee, at any time and from time to time, to execute, in connection with any sale provided for in Section 10 hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

8

**Section 9. Performance by Pledgee of Pledgor's Obligations.** Immediately upon the occurrence of an Event of Default, and without limiting any rights or powers granted herein to the Pledgee while no Event of Default has occurred and is continuing, the Pledgee, without releasing the Pledgor from any obligation, covenant or condition hereof, itself may make any payment or perform, or cause the performance of, any such obligation, covenant or condition or take any other action in such manner and to such extent as the Pledgee may deem necessary to protect, perfect or continue the perfection of the liens created or continued or intended to be created or continued pursuant to this Agreement.

**Section 10. Rights and Remedies.**

(a)     **Collateral.** If an Event of Default shall have occurred, all payments made in respect of the Collateral and received by or on behalf of the Pledgee in accordance with the provisions of this Agreement or the Loan Agreement or otherwise shall be applied in accordance with the Loan Agreement, which may result in the Collateral, in the discretion of the Pledgee, (A) being held by or on behalf of the Pledgee as Collateral, and/or (B) then or at any time thereafter being applied to the Obligations in such order as the Pledgee shall determine,

(b)     **UCC.** If an Event of Default shall have occurred, then, in addition to any other rights and remedies provided for herein and in any other instrument or agreement securing, evidencing or relating to the Obligations, or that may otherwise be available, the Pledgee may, without any demand, advertisement or notice (except as expressly provided for below in this Section 10(b) or by applicable legal requirements), exercise all the rights and remedies of a secured party under the UCC, and in addition may sell, lease, assign, give option or options to purchase, or otherwise dispose of the Collateral, or any part thereof, as hereinafter provided. The Collateral may be sold or otherwise disposed of in one or more sales, at public or private sale, conducted by any officer or agent of, or auctioneer or attorney for, the Pledgee, at any exchange or broker's board or at the Pledgee's place of business or elsewhere, for cash, upon credit or for other property, for immediate or future delivery, and at such price or prices and on such terms as the Pledgee shall, in its sole discretion, deem appropriate. The Pledgee may be the purchaser of any or all of the Collateral so sold at a sale and thereafter may hold the same, and the Obligations may be applied as a credit against the purchase price. The Pledgee may, in its commercially reasonable discretion, at any such sale restrict the prospective bidders or purchasers as to their number, nature of business, financial capability and investment intention, so long as prospective bidders or purchasers are not limited to the Pledgee and its affiliates (unless no commercially reasonable alternative is available). Upon any such sale, the Pledgee shall have the right to deliver, assign and transfer to the purchaser thereof (including the Pledgee) the Collateral so sold. Each purchaser (including the Pledgee) at any such sale shall hold the Collateral so sold, absolutely free from any claim or right of whatsoever kind, including any equity or right of redemption, of the Pledgor, and the Pledgor hereby specifically waives, to the fullest extent they may lawfully do so, all rights of redemption, stay or appraisal that they have or may have under any rule of law or statute now existing or hereafter adopted.  The Pledgor agrees that the Pledgee need not give more than ten (10) days prior notice of the time and place of any public sale or of the time after which a private sale or other intended disposition is to take place and that such notice is reasonable notification of such matters. No notification need be given to the Pledgor if it has signed after the occurrence of an Event of Default a statement renouncing or modifying any right to notification of sale or other intended disposition. Any such public sale shall be held

at such time or times within ordinary business hours as the Pledgee shall fix in the notice of such sale. At any such sale, the Collateral may be sold in one lot as an entirety or in separate parcels. The Pledgee shall not be obligated to make any sale pursuant to any such notice. The Pledgee may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be so adjourned without further notice or publication. In case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by the Pledgee until the full selling price is paid by the purchaser thereof, but the Pledgee shall not incur any liability in case of the failure of such purchaser to take up and pay for the provisions hereof.

(c)    **Proceedings.** If an Event of Default shall have occurred and is continuing, instead of exercising the power of sale provided in Section 10(b) hereof, the Pledgee may proceed by a suit or suits at law or in equity to foreclose the pledge and security interest under this Agreement and sell the Collateral or any portion thereof under a judgment or decree of a court or courts of competent jurisdiction.

(d)    **Attorney-in-Fact.** The Pledgee, as attorney-in-fact pursuant to Section 8 hereof, may, in the name and stead of the Pledgor, make and execute all conveyances, assignments and transfers of the Collateral sold pursuant to Section 10(b) or Section 10(c) hereof, and the Pledgor hereby ratifies and confirms all that the Pledgee, as said attorney-in-fact, shall lawfully do by virtue hereof. Nevertheless, the Pledgor shall, if so requested by the Pledgee, ratify and confirm any sale or sales by executing and delivering to the Pledgee, or to such purchaser or purchasers, all such instruments as may, in the judgment of the Pledgee, be advisable for the purpose.

(e)    **Collateral Sold Free and Clear.** The receipt of the Pledgee for the purchase money paid at any such sale made by it pursuant to Section 10(b) or 10(c) hereof shall be a sufficient discharge therefor to any purchaser of the Collateral, or any portion thereof, sold as aforesaid; and no such purchaser (or the representatives or assigns of such purchaser), after paying such purchase money and receiving such receipt, shall be bound to see to the application of such purchase money or any part thereof or in any manner whatsoever be answerable for any loss, misapplication or non-application of any such purchase money, or any part thereof, or be bound to inquire as to the authorization, necessity, expediency or regularity of any such sale.

(f)    **No Pledgee Liability.** The Pledgee shall not incur any liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to and in accordance with Section 10(b) hereof conducted in a commercially reasonable manner and in accordance with applicable legal requirements. The Pledgor hereby waives to the fullest extent permitted by legal requirements, all claims, damages and demands against the Pledgee arising out of the repossession or retention of the Collateral or the sale of the Collateral pursuant to and in accordance with Section 10(b) or Section 10(c) hereof, including, without limitation, any claims against the Pledgee arising by reason of the fact that the price at which the Collateral, or any part thereof, may have been sold at a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Pledgee accepts the first offer received that the Pledgee in good faith deems to be commercially reasonable under the circumstances and for commercially reasonable reasons does not offer the

10

Collateral to more than one offeree (so long as the offerees are not limited to the Pledgee and its affiliates, unless no commercially reasonable alternative was available). To the fullest extent permitted by law, the Pledgor shall have the burden of proving that any such sale of the Collateral was conducted in a commercially unreasonable manner.

(g)     **Availability of Collateral**. If the Pledgee shall demand possession of the Collateral or any part thereof in connection with its rights pursuant to Section 10(b) or Section 10(c) hereof, the Pledgor will, at its own expense, forthwith cause such Collateral or any part thereof designated by the Pledgee to be assembled and made available and/or delivered to the Pledgee at any place reasonably designated by the Pledgee.

(h)     **No Release**. No sale or other disposition of all or any part of the Collateral by the Pledgee pursuant to this Section 10 shall be deemed to relieve the Borrower or the Pledgor of their obligations in respect of the Obligations, except to the extent the proceeds thereof are received by the Pledgee.

**Section 11. Waiver**.  The Pledgor agrees that it will not at any time insist upon, claim, plead, or take any benefit or advantage of any appraisement, valuation, stay, extension, moratorium, redemption, or similar law now or hereinafter in force in order to prevent, delay, or hinder the enforcement hereof or the absolute sale of any part of the Collateral. The Pledgor, for itself and all who claim through it, so far as it now or hereafter lawfully may do so, hereby waives the benefit of all such laws, and all right to have the Collateral marshaled upon any foreclosure hereof, and agrees that any court having jurisdiction to foreclose this Agreement may order the sale of the Collateral as an entirety. Without limiting the generality of the foregoing, the Pledgor hereby: (a) authorizes the Pledgee, in its sole discretion and without notice to or demand upon the Pledgor and without otherwise affecting the obligations of the Pledgor hereunder or in respect of the Obligations, from time to time to take and hold other collateral (in addition to the Collateral) for payment of Obligations or any part thereof and to exchange, enforce or release such other collateral or any part thereof and to accept and hold any endorsement or guarantee of payment of the Obligations or any part thereof and to release or substitute any endorser or pledgor or any other person or entity granting security for or in any other way obligated upon the Obligations or any part thereof and (b) waives and releases any and all right to require the Pledgee to collect any of the Obligations from any specific item or items of the Collateral or from any other party liable as the Pledgor or in any other manner in respect of any of the Obligations or from any collateral (other than such Collateral) for any of the Obligations.

**Section 12. Indemnity**.  The Pledgor shall indemnify the Pledgee from and against any and all claims, losses and liabilities growing out of or resulting from (i) this Agreement (including, without limitation, enforcement of this Agreement), (ii) any refund or adjustment (including any interest thereon) of any amount paid or payable in accordance with the terms hereof to the Pledgee in respect of any Collateral after the occurrence of an Event of Default, that may be ordered or otherwise required by any governmental authority, (iii) any delay in paying any and all excise, sales or other similar taxes which may be payable or determined to be payable with respect to any of the Collateral, (iv) any delay in complying with any legal requirements applicable to any of the Collateral and (v) the transactions contemplated solely by this Agreement, but, in the case of each of clauses (i) through (v), excluding any such claims, losses

11

or liabilities found by a final order of a court of competent jurisdiction to result from the gross negligence or willful misconduct of the Pledgee.

**Section 13. Amendments; Etc.** No amendment or waiver of any provision of this Agreement or consent to any departure by the Pledgor from the terms of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Pledgor and the Pledgee, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**Section 14. Notices.** All notices, demands and other communications hereunder shall be in writing and sent by United States certified or registered mail, postage prepaid, return receipt requested, or by telecopier or private delivery service, addressed to the parties at the addresses specified in Section 10.2 of the Loan Agreement. Each party may change the address to which notices to it are to be sent by written notice given to the other in accordance with this paragraph. All notices shall, when mailed as aforesaid, be effective on the date indicated on the return receipt, and all notices given by other means shall be effective when received.

**Section 15. Termination.** This Agreement shall be a continuing one, and all representations, warranties, covenants, undertakings, obligations, consents, waivers and agreements of Pledgor herein shall survive the date of this Agreement and shall continue in full force and effect until the payment and performance in full of all obligations of the Borrower under the Loan Agreement. Notwithstanding the foregoing the indemnities contained herein, including the indemnity set forth in Section 12 hereof, shall survive such termination. Promptly after termination, Pledgee shall release this Agreement and make any appropriate filings to reflect such release.

**Section 16. GOVERNING LAW.** THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF _____, WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAWS PRINCIPLES, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT THE UCC PROVIDES THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTERESTS HEREUNDER, OR REMEDIES HEREUNDER IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF _____.

**Section 17. Headings.** Headings used in this Agreement are for convenience of reference only and do not constitute part of this Agreement for any purpose.

**Section 18. No Waiver; Cumulative Remedies; Integration.** The Pledgee shall not by any act (except by a written instrument pursuant to this Section), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of the Pledgee, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Pledgee of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which would otherwise have

12

on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law.

Section 19. Pledgee's Duties.  The powers conferred on the Pledgee hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except as provided in the next sentence, the Pledgee shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.  The Pledgee's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Pledgee deals with similar securities and property for its own account. Neither the Pledgee nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Pledgor or otherwise.

Section 20. Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Where provisions of any law or regulation resulting in such prohibition or unenforceability may be waived, they are hereby waived by the Pledgor and the Pledgee to the full extent permitted by law so that this Agreement shall be deemed a valid and binding agreement, and the liens and security interests created and continued hereby shall constitute continuing liens on and perfected security interests in the Collateral, in each case enforceable in accordance with its terms.

Section 21. Specific Performance.  The Pledgor hereby irrevocably waives any defense based on the adequacy of a remedy at law that may be asserted as a bar to the remedy of specific performance in any action brought against the Pledgor for specific performance of this Agreement by the Pledgee or in respect of all or a substantial part of the Pledgor's assets under the bankruptcy or insolvency laws of any jurisdiction to which the Pledgor or its respective assets are subject.

Section 22. Security Interest Absolute.  All rights of the Pledgee hereunder, the liens created and continued hereby and all obligations of the Pledgor hereunder shall be absolute and unconditional irrespective of: (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any documents delivered in connection with the transactions contemplated by the Loan Agreement; or (b) any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to or departure from any guaranty, for all or any of the Obligations.

Section 23. Private Sales.  The Pledgor recognizes that the Pledgee may be unable to effect a public sale of any or all the Collateral, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire the Collateral for their own account for investment and not with a view to the distribution thereof. The Pledgor acknowledges and agrees that, subject to compliance with

13

Section 10(b) hereof, any such private sale may result in prices and other terms less favorable to the Pledgee than if such sale were a public sale and agrees that such circumstances shall not, in and of themselves, result in a determination that such sale was not made in a commercially reasonable manner.

**Section 24. Reinstatement.**   This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations paid prior to the termination hereof in accordance with Section 15 is rescinded or must otherwise be restored or returned by the Pledgee upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Pledgor or the Borrower or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Pledgor or the Borrower or any substantial part of their property, or otherwise, all as though such payments had not been made.

**Section 25. Powers Coupled with an Interest.**  All authorizations, agencies and powers herein contained with respect to the Collateral are irrevocable and are coupled with an interest.

**Section 26. SUBMISSION TO JURISDICTION; WAIVERS.**

(a)     PLEDGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(i)     SUBMITS ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THE LOAN AGREEMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT HEREOF OR THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF _____, THE COURTS OF THE UNITED STATES OF AMERICA FOR THE STATE OF _____, AND THE APPELLATE COURTS FROM ANY THEREOF;

(ii)     CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS, AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREE NOT TO PLEAD OR CLAIM THE SAME;

(iii)     AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO THE PLEDGOR AT THE ADDRESS REFERRED TO ON PAGE 1 OF THIS AGREEMENT; AND

14

AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT PLEDGEE'S RIGHT TO SUE IN ANY OTHER JURISDICTION.

(b)     PLEDGOR HEREBY SUBMITS AND CONSENTS TO VENUE IN ANY COURT IN THE COUNTY WHERE THE PROJECT TO WHICH THE COLLATERAL RELATES IS LOCATED WITH RESPECT TO ANY ACTIONS ARISING OUT OF THIS AGREEMENT.

(c)     PLEDGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT.

Section 27. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

Section 28. Successors and Assigns; Beneficiaries. This Agreement shall be binding upon the Pledgor, the Borrower and their respective successors and assigns and shall inure to the benefit of the Pledgee and its respective successors and assigns. The Pledgor shall not assign its obligations hereunder without the prior written consent of the Pledgee. This Agreement is for the purpose of defining the respective rights and obligations of the Pledgor, the Borrower and the Pledgee and is not for the benefit of any creditor or other third party.

**IN WITNESS WHEREOF,** the Pledgor has caused this Developer Limited Guaranty, Pledge and Security Agreement to be duly executed and delivered as of the date first above written.

[NAME OF DEVELOPER], a _____

By: _____
Name:
Title:

Acknowledged and Agreed to by:

SANTA FE POINTE, L.P., an Oklahoma
limited partnership

By:     SANTA FE POINTE
        MANAGEMENT, LLC, an Oklahoma
        limited liability company, its general
        partner

        By: _____
        Name:
        Title:

# EXHIBIT F

#155253v2
GT Draft 12/17/06

# GUARANTY AND SURETYSHIP AGREEMENT

by

## THEOTIS F. OLIPHANT

to

## GREYSTONE CDE, LLC

Dated as of December __, 2006

## GUARANTY AND SURETYSHIP AGREEMENT

This GUARANTY AND SURETYSHIP AGREEMENT dated as of December __, 2006 (as amended, modified or supplemented from time to time, this "**Guaranty**"), made by THEOTIS F. OLIPHANT, an individual and a resident of the State of California (together with his heirs, executors, legal representatives, personal representatives and permitted successors and assigns, "**Guarantor**") to GREYSTONE CDE, LLC, a limited liability company duly organized and validly existing under the laws of the State of Delaware (together with its successors and assigns, the "**Lender**"),

## W I T N E S S E T H :

WHEREAS, the Lender has made a $500,000.00 loan (the "**Loan**") to the Borrower pursuant to that certain Bridge Loan Agreement dated as of the date hereof (as amended, modified or supplemented from time to time, the "**Loan Agreement**") between the Lender, and Santa Fe Pointe, L.P., a limited partnership duly organized and validly existing under the laws of the State of Oklahoma (together with its permitted successors and assigns, the "**Borrower**") (capitalized terms used herein and not otherwise defined herein having the meanings assigned to them in the Loan Agreement);

WHEREAS, the proceeds of the Loan will be applied to pay certain costs of acquiring that certain 224-unit multifamily housing facility and related site improvements and amenities located at 125 SW 74th Street in Oklahoma City, Oklahoma, and known as Santa Fe Pointe Apartments (the "**Project**");

WHEREAS, the Guarantor expects to derive financial benefit from the making of the Loan and the acquisition and rehabilitation of the Project; and

WHEREAS, the execution and delivery by the Guarantor of this Guaranty is a condition to the Lender's agreement to make the Loan.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Guarantor, and intending to be legally bound, the Guarantor hereby agrees as follows:

## ARTICLE I

## GUARANTY

Section 1.01  **Guaranteed Obligations**.  The Guarantor hereby unconditionally and irrevocably guarantees to the Lender and becomes surety to the Lender for the due, punctual and full payment and performance of, and covenant with the Lender duly, punctually and fully to pay and perform, the following (collectively, the "**Guaranteed Obligations**"):

(a)      all indebtedness of the Borrower to the Lender evidenced by the Loan Agreement and/or incurred under the Loan Documents, both principal and interest, and any refinancing or refunding of any thereof, and all other amounts due or to become due under the

Loan Agreement and the other Loan Documents, and any refinancing of any thereof, whether now existing or hereafter arising, contracted or incurred; and

> (b)    all covenants, agreements, obligations and liabilities of the Borrower under the Loan Agreement and the other Loan Documents, whether now existing or hereafter arising, contracted or incurred, as and when such payment or performance shall become due (whether by acceleration or otherwise) in accordance with the terms of the Loan Documents.

Section 1.02    Guarantee Unconditional.  This agreement is a direct and primary obligation of each Guarantor, and each Guarantor's obligations hereunder are not as a surety. This is a guarantee of payment and performance and not of collection.  The obligations of the Guarantor hereunder are continuing, absolute and unconditional, irrespective of any circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.  Without limiting the generality of the foregoing, the obligations of the Guarantor hereunder shall remain in full force and effect without regard to, and shall not be released, discharged or in any way affected by:

> (a)    any amendment, modification or supplement to the Loan Agreement or any other Loan Document;

> (b)    any exercise or nonexercise of or delay in exercising any right, remedy, power or privilege under or in respect of this Guaranty or any other Loan Document (even if any such right, remedy, power or privilege shall be lost thereby), or any waiver, consent, indulgence or other action or inaction in respect thereof;

> (c)    any bankruptcy, insolvency, arrangement, composition, assignment for the benefit of creditors or similar proceeding commenced by or against  the Borrower or its partners;

> (d)    any failure to perfect or continue perfection of, or any release or waiver of, any rights given to the Lender in any property as security for the performance of any of the Borrower's obligations under the Loan Agreement or any other Loan Document;

> (e)    any extension of time for payment or performance of any of the Guaranteed Obligations;

> (f)    the genuineness, validity or enforceability of any of the Loan Documents;

> (g)    any limitation of liability of the Borrower or its partners contained in any Loan Document;

> (h)    any defense that may arise by reason of the failure of the Lender to file or enforce a claim against the estate of the Borrower or its partners in any bankruptcy or other proceeding;

> (i)    any voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property of the Borrower or its partners, or any marshalling of assets and

2

Exhibit A-2, Page 138

liabilities, or other similar proceeding affecting, the Borrower or the General Partner or any of their respective assets;

(j)    the release of the Borrower or its partners from performance or observance of any of the agreements, covenants, terms or conditions contained in the Loan Documents by operation of law;

(k)    the failure of the Lender to keep Guarantors advised of the Borrower's or its partners' financial condition, regardless of the existence of any duty to do so;

(l)    the damage, destruction, condemnation, foreclosure or surrender of all or any part of the Project or the Improvements comprising the Project; any change in the plans and specifications, if any, relating to the rehabilitation of the Improvements; or any modification of the terms of any contract relating to the construction of the Improvements or the furnishing of any labor or materials therefor;

(m)    any sale or other transfer of the Property or any part thereof or any foreclosure by the Lender on the Property or any part thereof;

(n)    any statute of limitations applicable to any action hereunder or for the payment or performance of any Guaranteed Obligation;

(o)    failure to make or give notice of presentment and demand for payment of any of the indebtedness or performance of any of the Guaranteed Obligations;

(p)    the compromise, settlement, release or termination of any or all of the Guaranteed Obligations; or

(q)    any other circumstances which might otherwise constitute a legal or equitable discharge of a guarantor or surety.

No set-off, claim, reduction or diminution of any obligation, or any defense of any kind or nature (other than payment and performance in full of the Guaranteed Obligations) which the Borrower or any Guarantor now has or hereafter may have against the Lender shall be available hereunder to any Guarantor against the Lender.

Section 1.03  No Notice or Duty to Exhaust Remedies.  Each Guarantor hereby waives diligence, presentment, demand, protest and all notices of any kind, and waives any requirement that the Lender exhaust any right or remedy, or proceed first or at any time, against the Borrower or any other guarantor of, or any security for, any of the Guaranteed Obligations.  This Guaranty constitutes an agreement of suretyship as well as of guaranty, and the Lender may pursue its rights and remedies under this Guaranty and under the other Loan Documents in whatever order, or collectively, and shall be entitled to payment and performance hereunder notwithstanding such other Loan Documents and notwithstanding any action taken by the Lender or inaction by the Lender to enforce any of its rights or remedies against any other guarantor or any other Person or property whatsoever.

**Section 1.04   SUBORDINATION OF SUBROGATION, ETC.**
NOTWITHSTANDING ANY PAYMENTS MADE OR OBLIGATIONS PERFORMED BY
THE GUARANTOR BY REASON OF THIS GUARANTY (INCLUDING BUT NOT
LIMITED TO APPLICATION OF FUNDS ON ACCOUNT OF SUCH PAYMENTS OR
OBLIGATIONS), THE GUARANTOR HEREBY IRREVOCABLY (A) SUBORDINATES TO
THE PRIOR PAYMENT IN FULL OF THE GUARANTEED OBLIGATIONS ANY AND
ALL RIGHTS IT MAY HAVE AT ANY TIME (WHETHER ARISING DIRECTLY OR
INDIRECTLY, BY OPERATION OF LAW, CONTRACT OR OTHERWISE) TO ASSERT
ANY CLAIM AGAINST THE BORROWER OR ANY OTHER PERSON, OR AGAINST
ANY DIRECT OR INDIRECT SECURITY, ON ACCOUNT OF PAYMENTS MADE OR
OBLIGATIONS PERFORMED UNDER OR PURSUANT TO THIS GUARANTY,
INCLUDING WITHOUT LIMITATION ANY AND ALL RIGHTS OF SUBROGATION,
REIMBURSEMENT, EXONERATION, CONTRIBUTION OR INDEMNITY, AND (B)
WAIVES AND RELEASES ANY RIGHTS IT MAY HAVE AT ANY TIME TO REQUIRE
THE MARSHALING OF ANY ASSETS OF THE BORROWER, WHICH RIGHT OF
MARSHALING MIGHT OTHERWISE ARISE FROM PAYMENTS MADE OR
OBLIGATIONS PERFORMED UNDER OR PURSUANT TO THIS GUARANTY.

**Section 1.05   Termination.** The Lender shall terminate this Guaranty upon payment
and performance in full of the Guaranteed Obligations. Notwithstanding the foregoing, the
indemnities contained herein in Section 3.07 hereof shall survive such termination.

**Section 1.06   Security.** The Guarantor's obligations hereunder are secured as set forth
in that certain Assignment of Certificate of Deposit dated as of December ___, 2006 from the
Guarantor in favor of the Lender.

**Section 1.07   Waivers.**

(a)      The Guarantor hereby waives (i) any right or claim of right to
cause a marshalling of the Guarantor's assets or to cause the Lender to proceed against any of the
security for the Loans before proceeding under this Guaranty against the Guarantor; (ii) all rights
and remedies accorded by applicable law to the Guarantor, except any rights of subrogation
which the Guarantor may have, provided that the indemnity provided for hereunder shall neither
be contingent upon the existence of any such rights of subrogation nor subject to any claims or
defenses whatsoever which may be asserted in connection with the enforcement or attempted
enforcement of such subrogation rights including, without limitation, any claim that such
subrogation rights were abrogated by any acts of the Lender; (iii) the right to assert a
counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding
brought against or by the Lender; (iv) notice of acceptance hereof and of any action taken or
omitted in reliance hereon; (v) presentment for payment, demand of payment, protest or notice of
nonpayment or failure to perform or observe, or other proof, or notice or demand; and (vi) all
homestead exemption rights against the obligations hereunder and the benefits of any statutes of
limitations or repose.

(b)      THE GUARANTOR HEREBY WAIVES, TO THE FULLEST
EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION,
PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR

OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOANS, THE COMMITMENT FOR THE LOAN, THE SECURITY INSTRUMENT, THIS GUARANTY OR ANY OF THE OTHER SECURITY DOCUMENTS OR ANY ACTS OR OMISSIONS OF THE LENDER IN CONNECTION THEREWITH.

(c)     The Guarantor absolutely, unconditionally, knowingly, and expressly waives any defense arising by reason of or deriving from any claim or defense based upon an election of remedies by the Lender including any defense based upon an election of remedies by the Lender under the provisions of the California Code of Civil Procedure Sections 580a, 580b, 580d, and 726 or any similar law of California or any other jurisdiction. Pursuant to California Civil Code Section 2856:

(i)     The Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed such the Guarantor's rights of subrogation and reimbursement against the Obligors by the operation of California Code of Civil Procedure Section 580(d) or otherwise.

(ii)     The Guarantor waives all rights and defenses that the Guarantor may have because the Obligations are secured by real property and personal property. This means, among other things:

(1)     The Lender may collect from the such Guarantor without first foreclosing on any real property or personal property collateral pledged by the Obligors for the Obligations; and

(2)     If the Lender forecloses on any real property or personal property collateral pledged by the Obligors for the Guaranteed Obligations: (A) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) the Lender may collect from the Guarantor even if the Lender, by foreclosing on the real property or personal property collateral pledged by the Obligors for the Guaranteed Obligations, has destroyed any right the Guarantor may have to collect from the Obligors.

(iii)     This is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have because the Guaranteed Obligations are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon California Code of Civil Procedure Sections 580b, 580d, or 726.

(iv)     If any of the Guaranteed Obligations at any time are secured by a mortgage or deed of trust upon real property, the Lender may

elect, in its sole discretion, upon a default with respect to the Guaranteed Obligations, to foreclose such mortgage or deed or trust judicially or nonjudicially in any manner permitted by law, before or after enforcing the said mortgage or deed of trust or any other instrument evidencing or securing any of the Guaranteed Obligations, without diminishing or affecting the liability of the Guarantor hereunder except to the extent the Guaranteed Obligations are repaid with the proceeds of such foreclosure. The Guarantor understands that (a) by virtue of the operation of California's antideficiency law applicable to nonjudicial foreclosures, an election by the Lender nonjudicially to foreclose such a mortgage or deed of trust probably would have the effect of impairing or destroying rights of subrogation, reimbursement, contribution, or indemnity of the Guarantor against the Obligors or other guarantors or sureties, and (b) absent the waiver given by the Guarantor, such an election would prevent the Lender from enforcing this Guaranty against the Guarantors. Understanding the foregoing, and understanding that the Guarantor is hereby relinquishing a defense to the enforceability of this Guaranty, the Guarantor hereby waivers any right to assert against the Lender any defense to the enforcement of this Guaranty, whether denominated "estoppel" or otherwise, based on or arising from an election by the Lender nonjudicially to foreclose any such mortgage or deed of trust. The Guarantor understands that the effect of the foregoing waiver may be that the Guarantor may have liability hereunder for amounts with respect to which the Guarantor may be left without rights or subrogation, reimbursement, contribution, or indemnity against the Obligors or other guarantors or sureties. The Guarantor also agrees that the "fair market value" provisions of California Code of Civil Procedure Section 280a shall have no applicability with respect to the determination of the Guarantor's liability hereunder.

(d)     Notwithstanding anything to the contrary contained herein, the Guarantor hereby agrees to postpone the exercise of any rights of subrogation with respect to any collateral securing any of the Loan until all of the Guaranteed Obligations shall have been paid in full. Until such time, the Guarantor hereby absolutely, unconditionally, knowingly, and expressly waives: (i) any right of subrogation the Guarantor have or may have as against any of the Obligors with respect to the Guaranteed Obligations; (ii) any right to proceed against any of the Obligors or any other person or entity, now or hereafter, for contribution, indemnity, reimbursement, or any other suretyship rights and claims, whether direct or indirect, liquidated or contingent, whether arising under express or implied contract or by operation of law, which the Guarantor may now or hereafter have as against the Obligors with respect to the Guaranteed Obligations; and (iii) any right to proceed or seek recourse against or with respect to any property or asset of the Obligors.

(e)     WITHOUT LIMITING THE GENERALITY OF ANY OTHER WAIVER OR OTHER PROVISION SET FORTH IN THIS GUARANTY, THE GUARANTOR HEREBY ABSOLUTELY, KNOWINGLY, UNCONDITIONALLY, AND EXPRESSLY WAIVES, ANY AND ALL BENEFITS OR DEFENSES ARISING DIRECTLY OR

INDIRECTLY UNDER ANY ONE OR MORE OF CALIFORNIA CIVIL CODE SECTIONS 2799, 2808, 2809, 2810, 2814, 2815, 2819, 2820, 2821, 2822, 2825, 2839, 2845, 2848, 2849, AND 2850, CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580c, 580d, AND 726, AND CHAPTER 2 OF TITLE 14 OF PART 4 OF DIVISION 3 OF THE CALIFORNIA CIVIL CODE.

      (f)     NOTWITHSTANDING ANY OF THE PROVISIONS CONTAINED IN THIS GUARANTY RELATING TO OR REFERENCING ANY OF THE CALIFORNIA CIVIL CODE AND THE CALIFORNIA CODE OF CIVIL PROCEDURE PROVISIONS, INCLUDING WITHOUT LIMITATION, ANY OF THE WAIVERS BY THE GUARANTOR OF ANY RIGHT, BENEFIT OR DEFENSE UNDER THE CALIFORNIA CIVIL CODE OR THE CALIFORNIA CODE OF CIVIL PROCEDURE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE _____ WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES, AND OTHERWISE IN ACCORDANCE WITH SECTION 3.11 HEREOF. NOTWITHSTANDING THE FOREGOING, IN THE EVENT THAT THIS AGREEMENT IS CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA (IN OPPOSITION TO THE INTENTION OF THE GUARANTOR AND THE LENDER AS EXPRESSED IN THE PREVIOUS SENTENCE), THEN ALL SUCH PROVISIONS AND WAIVERS SHALL BE GIVEN FULL FORCE AND EFFECT AS SET FORTH HEREIN.

      (g)     The Guarantor hereby expressly waives: (i) notice of acceptance of this Guaranty, (ii) notice of the existence or creation of all or any of the Guaranteed Obligations, (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever, (iv) all diligence in collection or protection of or realization upon the Guaranteed Obligations or any part thereof, any obligation hereunder, or any security for any of the foregoing, and (v) all rights of subrogation, indemnification, contribution and reimbursement from the Obligors, all rights to enforce any remedy which the Lender may have against the Obligors and any benefit of, or right to participate in, any collateral or security now or hereinafter held by the Lender in respect of the Guaranteed Obligations, until payment in full of the Guaranteed Obligations, except to the extent such waiver would be expressly prohibited by applicable law. If a claim is ever made upon the Lender for the repayment or recovery of any amount or amounts received by any person or entity in payment of any of the Guaranteed Obligations and the Lender repays all or part of such amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over such person or entity or any of its property, or (b) any settlement or compromise of any such claim effected by such person or entity with any such claimant, including the Obligors, then in such event the Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the Guarantor, notwithstanding any revocation hereof or the cancellation of any promissory note or other instrument evidencing any of the Guaranteed Obligations, and the Guarantor shall be and remain obligated to the Lender for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Lender.

Exhibit A-2, Page 143

## ARTICLE II

## REPRESENTATIONS , WARRANTIES AND COVENANTS

**Section 2.01    Representations and Warranties.**  The Guarantor hereby represents, warrants and certifies to the Lender as follows:

(a)    The execution, delivery and performance of this Guaranty and the other Loan Documents to which the Guarantor is or is to become a party and the transactions contemplated hereby and thereby (i) do not conflict with or result in any breach or contravention of any provision of law, statute, rule or regulation to which the Guarantor is subject or any judgment, order, writ, injunction, license or permit applicable to the Guarantor, and (ii) do not require the approval or consent of, or filing with, any governmental agency or authority.

(b)    The execution and delivery of this Guaranty and the other Loan Documents to which the Guarantor is a party or is to become a party will result in valid and legally binding obligations of the Guarantor enforceable against him in accordance with the respective terms and provisions hereof and thereof, except as enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting generally the enforcement of creditors' rights and except to the extent that availability of the remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding therefor may be brought.

(c)    There has been furnished to the Lender financial statements for the Guarantor, prepared by an independent certified public accountant.  Such balance sheets and statements of income fairly present the financial condition of the Guarantor as at the close of business on the date thereof.

(d)    Since the date of such financial statements, there has occurred no adverse change in the financial condition or business of the Guarantor as shown on or reflected in the respective financial statements, other than changes that have not had any adverse effect either individually or in the aggregate on the business or financial condition of the Guarantor.

(e)    There are no actions, suits, proceedings or investigations of any kind pending or threatened against the Guarantor before any court, tribunal or administrative agency or board or any mediator or arbitrator that, if adversely determined, might, either in any case or in the aggregate, adversely affect the business, assets or financial condition of the Guarantor, or result in any liability not adequately covered by insurance, or which will adversely affect the ability of the Guarantor to perform its obligations in the manner contemplated by this Guaranty and the other Loan Documents.

(f)    The Guarantor thereof (i) has made or filed, and will make or file in a timely fashion, all federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, and (ii) has paid, and will pay when due, all taxes and other governmental assessments and charges shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and by appropriate proceedings.

(g)     [The assets shown on the Guarantor's financial statements, whether or not such assets are part of any community estate, are, as of the date of execution and delivery hereof, available for the satisfaction of the Guaranteed Obligations without execution hereof by the Guarantor's spouse or any spousal consent or other spousal action whatsoever.] [The Guarantor's spouse has consented to the execution of this Guaranty and waived any community or similar property rights to the assets shown on the Guarantor's financial statements in a manner acceptable to the Lender, a copy of which consent is attached hereto.]

Section 2.02   Covenants. The Guarantor hereby covenants to the Lender that:

(a)     Such Guarantor shall furnish to the Lender the following, all in form and substance satisfactory to the Lender.

(i)     within twenty (20) days after the end of each calendar year, true, complete and correct copies of the Guarantor's annual financial statements, audited by an independent certified public accountant; and

(ii)    within ten (10) days after filing, copies of the Guarantor's federal income tax return, which return shall be timely filed (subject to lawful extensions of time).

(b)     Promptly upon becoming aware thereof, the Guarantor shall give the Lender, notice of (i) the commencement, existence or threat of any proceeding by or before any governmental authority against or affecting the Guarantor or any of its affiliates which, if adversely decided, would have a material adverse effect on the business, operations, condition (financial or otherwise) or prospects of the Guarantor or on its ability to perform its obligations hereunder or (ii) any material adverse change in the business, operations, condition (financial or otherwise) or prospects of the Guarantor.

(c)     The Guarantor shall permit such persons as the Lender may designate to examine the Guarantor's books and records relating to the Guarantor's financial condition and take copies and extracts therefrom and to discuss the affairs of the Guarantor with its officers, employees and independent accountants at such times and as often as the Lender may reasonably request. The Guarantor hereby authorizes such officers, employees and independent accountants to discuss with the Lender the affairs of the Guarantor.

## ARTICLE III

## MISCELLANEOUS

Section 3.01   Effect of Bankruptcy Proceedings. This Guaranty shall continue to be effective, or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Guaranteed Obligations is rescinded or must otherwise be restored or returned by the Lender as a preference, fraudulent conveyance or otherwise under any bankruptcy, insolvency or similar law, all as though such payment had not been made. If an Event of Default at any time shall have occurred and be continuing or exist and declaration of default or acceleration under or with respect to any of the Loan Documents shall at such time be prevented by reason of the pendency against the Borrower of a case or proceeding under any

bankruptcy or insolvency law, the Guarantor agrees that, for purposes of this Guaranty and its obligations hereunder, such Loan Documents shall be deemed to have been declared in default or accelerated with the same effect as if such Loan Documents had been declared in default and accelerated in accordance with the terms thereof, and the Guarantor shall forthwith pay the Guaranteed Obligations in full without further notice or demand.

Section 3.02    **Further Assurances.** From time to time upon the request of the Lender, the Guarantor shall promptly and duly execute, acknowledge and deliver any and all such further instruments and documents as the Lender may deem necessary or desirable to confirm this Guaranty, to carry out the purpose and intent hereof or to enable the Lender to enforce any of its rights hereunder.

Section 3.03    **Amendments and Waivers; Third Party Beneficiaries.** This Guaranty cannot be amended, modified, waived, changed, discharged or terminated except by an instrument in writing signed by the Guarantor and the Lender.

Section 3.04    **No Implied Waiver; Cumulative Remedies.** No course of dealing and no delay or failure of the Lender in exercising any right, power or privilege under this Guaranty or any Loan Document shall affect any other or future exercise thereof or exercise of any other right, power or privilege; nor shall any single or partial exercise of any such right, power or privilege or any abandonment or discontinuance of steps to enforce such a right, power or privilege preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies of the Lender under this Guaranty are cumulative and not exclusive of any rights or remedies which the Lender would otherwise have under the Loan Documents, at law or in equity.

Section 3.05    **Notices.** All notices requests, demands, directions and other communications under the provisions of this Guaranty shall be given in the manner and shall be effective at the times set forth in Section 10.2 of the Loan Agreement, addressed, if to the Lender, to its address as set forth in the Loan Agreement, and if to the Guarantor, at the address for the Guarantor as set forth under his signature hereto, or in accordance with the last unrevoked written direction from such party to the other parties hereto. The Lender may rely on any notice (including telephoned communication) purportedly made by or on behalf of the Guarantor, and shall have no duty to verify the identity or authority of the person giving such notice.

Section 3.06    **Default; Remedies.** Each of the following shall constitute an "**Event of Default**" hereunder.

(a)    The failure of the Guarantor to duly and promptly pay and perform any of the Guaranteed Obligations;

(b)    If any representation or warranty made by the Guarantor hereunder, or in any financial statement, certificate or other document delivered by the Guarantor to the Lender to induce such party to accept this Guaranty or to approve the advance of funds to the Borrower, shall be false in any material respect;

(c)    The breach or failure by the Guarantor to perform any other covenant or agreement contained herein; or

10          Exhibit A-2, Page 146

(d)     An event of default under any of the other Loan Documents not cured as provided therein.

Should an Event of Default occur, the Lender may enforce this Guaranty in any court of competent jurisdiction, an shall have all remedies available at law or equity including, without limitation, the right of recover any damages incurred by the Lender by reason of the Guarantor's failure or refusal to perform the Guarantor's obligations hereunder. An Event of Default under this Guaranty shall, at the continuing option of the Lender, be an Event of Default under the other Loan Documents.

Section 3.07    Expenses. The Guarantor agrees to pay or cause to be paid and to save the Lender harmless against liability for the payment of all reasonable out-of-pocket expenses, including fees and expenses of counsel for the Lender, incurred by the Lender from time to time arising in connection with the Lender's enforcement or preservation of rights under this Guaranty, including but not limited to such expenses as may be incurred by the Lender in connection with any default by the Guarantor of any of its obligations hereunder.

Section 3.08    Jurisdiction; Etc. The Guarantor irrevocably (a) agrees that the Lender may bring suit, action or other legal proceedings arising out of this Guaranty in the courts of the State of _____ or the courts of the United States located in _____; (b) consents to the jurisdiction of each such court in any such suit, action or proceeding; (c) waives any objection which the Guarantor may have to the laying of the venue of any such suit, action or proceeding in any of such courts; and **(d) waives any right the Guarantor may have to a jury trial in connection with any such suit, action or proceeding.**

Section 3.09    Severability. If any term or provision of this Guaranty or the application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Guaranty, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

Section 3.10    Counterparts. This Guaranty may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.

Section 3.11    Governing Law. This Guaranty shall be governed by, and construed in accordance with, the laws of the State of _____, without giving effect to conflict of laws principles.

Section 3.12    Successors and Assigns. The Guarantor shall not assign its obligations hereunder without the prior written consent of the Lender. This Guaranty shall bind the Guarantor and his heirs, executors, legal representatives, personal representatives, successors and assigns, and shall inure to the benefit of the Lender and its successors and assigns.

IN WITNESS WHEREOF, the Guarantor has duly executed and delivered this Guaranty as of the date first above written.

_____

THEOTIS F. OLIPHANT

Address:   _____

            _____

            _____