#155243v3

BRIDGE LOAN AGREEMENT

by and between

GREYSTONE CDE, LLC,

and

SANTA FE POINTE, L.P.

Dated as of December 20, 2006



# BRIDGE LOAN AGREEMENT

This BRIDGE LOAN AGREEMENT (as amended, modified or supplemented from time to time, this "**Agreement**"), made as of December 20, 2006, by and between **GREYSTONE CDE, LLC**, a limited liability company organized and existing under the laws of the State of Delaware, with its principal offices at 419 Belle Air Lane, Warrenton, Virginia 20186 (together with its successors and assigns, "**Lender**"), and **SANTA FE POINTE, L.P.**, a limited partnership organized and existing under the laws of the State of Oklahoma, with its principal offices at 16416 Oconee Creek Drive, Edmond, Oklahoma 73013 (together with its permitted successors and assigns, "**Borrower**"),

## W I T N E S S E T H:

**WHEREAS**, Borrower has requested that Lender make a bridge loan in the maximum principal amount outstanding at any time of $500,000.00 to finance predevelopment expenses of an affordable housing development to be known as the Santa Fe Pointe Apartments located at 125 SW 74th Street in Oklahoma City, Oklahoma, which will be developed and owned by the Borrower, and

**WHEREAS**, subject to the terms and conditions set forth below, and in reliance upon the representations and warranties and the covenants and undertakings of Borrower contained herein, Lender wishes to make such bridge loan to Borrower.

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants and undertakings set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

**Section 1.1    Definitions.** In addition to terms defined elsewhere in this Agreement, the following terms as used in this Agreement shall have the meanings specified below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Agreement" means this Bridge Loan Agreement, as the same may be amended, modified, or supplemented from time to time.

"Assignment of Project Documents" has the meaning given to that term in Section 3.1(a).

"Assignment of Purchase Contract" has the meaning given to that term in Section 3.1(a).

"Bonds" means those certain $7,095,000 in original aggregate principal amount of Oklahoma County Finance Authority Multifamily Housing Revenue Bonds (Santa Fe Pointe Apartments) Series 2006A, the proceeds of which are to be loaned to Borrower to finance a portion of the costs of acquisition and rehabilitation of the Project.

"Bond Documents" means the documents evidencing or securing the Bonds and the loan of the proceeds thereof to Borrower.

"Borrower" means Santa Fe Pointe, L.P., a limited partnership duly organized, validly existing and in good standing under the laws of the State of Oklahoma, together with its successors and permitted assigns.

"Borrower Affiliates" means, collectively, an entity controlled by Borrower or under common control by any person or entity controlling Borrower, together with their respective successors and assigns.

"Business Day" means any day that is not a Saturday, Sunday or public holiday under the laws of the State of New York or the District of Columbia.

"Certificate of Deposit Pledge" has the meaning given to that term in Section 3.1(a).

"Closing" has the meaning given to that term in Section 2.1.

"Closing Date" means the date on which the Closing occurs.

"Collateral" means all property subject to the lien of the Partner Pledge, the Assignment of Project Documents, the Assignment of Purchase Contract, the Developer Fee Pledge and the Certificate of Deposit Pledge.

"Default" means any event which, with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

"Developer" means RANT, LLC, a limited liability company duly organized and validly existing under the laws of the State of Delaware, with its principal place of business in California, together with its permitted successors and assigns.

"Developer Fee Pledge" has the meaning given to that term in Section 3.1(a).

"Disbursement" has the meaning given to that term in Section 6.1.

"Disbursement Request Form" shall be the form of request for Disbursements set forth on Exhibit A hereto.

"Event of Default" has the meaning given to that term in Section 9.1.

"Future Project Expenses" has the meaning given to that term in Section 6.2(a).

"General Partner" means Santa Fe Pointe Management, LLC, a limited liability company duly organized and validly existing under the laws of the State of Oklahoma, together with its permitted successors and assigns, in its capacity as a general partner of Borrower.

"Guarantor" means Theotis F. Oliphant, a married individual and a resident of the State of California, together with his heirs, executors, legal representatives, personal representatives and permitted successors and assigns.

"Guaranty" has the meaning given to that term in Section 3.1(a).

"LIBOR" means the rate per annum fixed by the British Bankers' Association at 11:00 a.m. (London time) on the last Business Day before the first day of each month, relating to quotations for London Interbank Offered Rates on U.S. dollar deposits for a three (3) month period and as published and reported by the Telerate Service by reference to the screen page currently designated as "Page [3750]" on that service (or such other screen page which may replace such screen page) or if no longer provided by Bloomberg LP or the Telerate Service, such rate as shall be determined in good faith by Lender from such sources as it shall determine to be materially comparable to the Telerate Service.

"Limited Partner" means Theotis F. Oliphant, an individual and a resident of the State of California, together with his heirs, executors, legal representatives, personal representatives, successors and assigns, in his capacity as a limited partner of Borrower.

"Loan" means, the bridge loan to be extended by Lender to Borrower pursuant to the terms of this Agreement.

"Loan Amount" has the meaning given to that term in Section 2.3.

"Loan Documents" means this Agreement, the Note, the Subordinate Mortgage and any other agreements or documents now or in the future executed or delivered to Lender by Borrower in connection with this Agreement and/or the making of the Loan.

"Loan Term" has the meaning given to that term in Section 2.4.

"Note" has the meaning given to that term in Section 2.2.

"Obligors" means, collectively, Borrower, the Guarantor, the Developer, the Limited Partner and the General Partner.

"Origination Period" means the period during which Disbursements may be made by Lender to Borrower, as described in Section 2.7.

"Partner Pledge" has the meaning given to that term in Section 3.1(a).

"Project" means the affordable multi-family housing development to be known as "Santa Fe Pointe Apartments" located at 125 SW 74th Street in Oklahoma City, Oklahoma.

"UCC Filings" has the meaning given to that term in Section 3.1(b).

Section 1.2    Accounting Terms.  All accounting terms not specifically defined in this Agreement shall be construed, and all calculations with respect to accounting or financial matters shall be computed, in accordance the generally accepted accounting principles, consistently applied.

Section 1.3    Incorporation by Reference.  All provisions of the other Loan Documents, as may be amended, modified, or supplemented from time to time, are incorporated

by reference in this Agreement with the same effect as though fully set forth in this Agreement. In the event of any inconsistency between the provisions of this Agreement and the provisions of the other Loan Documents, the provisions of this Agreement or of such other Loan Documents as Lender shall designate in its discretion shall control.

## ARTICLE II
## THE LOAN

**Section 2.1    Agreement to Lend.** Subject to the terms and conditions in this Agreement and the other Loan Documents, Lender agrees to lend to Borrower such amounts as Borrower may request and Lender may approve, to be disbursed in accordance with the terms hereof, up to an aggregate amount at any time outstanding not in excess of the Loan Amount. The closing of the Loan will occur upon satisfaction of the conditions set forth in Sections 5.1 and Section 5.2 (the "**Closing**").

**Section 2.2    Note.** The Loan is evidenced by a Bridge Loan Promissory Note dated December 20, 2006 made by Borrower payable to the order of Lender in the principal amount of up to $500,000.00 (together with any extensions, modifications, renewals, replacements or refinancing thereof, the "**Note**").

**Section 2.3    Loan Amount.** The maximum principal amount of the loan at any time outstanding shall be Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "**Loan Amount**").

**Section 2.4    Loan Term.** The term of the Loan commenced on the Closing Date and shall end on June 15, 2007 (the "**Loan Term**"), which may be extended for an additional six (6) months with (i) prior written approval of both Lender and Borrower, and payment to Lender by Borrower of an extension fee equal to one quarter of one percent (0.25%) of the Loan Amount (the "**Extension Fee**") and (ii) execution and delivery by Borrower of an allonge to the Note and confirmation by the Guarantor, the Developer and the General Partner of their obligations under the Loan Documents to which they are parties, all in form and substance acceptable to Lender in its sole discretion.

**Section 2.5    Interest; Exit Fee.**

(a)    The Loan shall bear interest on the full Loan Amount (whether or not disbursed) at a variable rate equal to LIBOR plus two and three-quarters percent (2.75%) per annum, accruing on the full Loan Amount (whether or not disbursed) from the Closing Date. The Note provides for a default rate of interest of the lesser of (i) twelve percent (12.0%) per annum or (ii) the highest rate of interest permitted by applicable law. Interest on the Loan Amount (whether or not disbursed) shall be due and payable (i) on a quarterly basis, on each March 1, June 1, September 1 and December 1, commencing March 1, 2007 until all amounts due in respect of the Loan shall have been paid in full; (ii) contemporaneously with any payment of the Loan pursuant to Section 2.6 in an amount equal to the accrued and unpaid interest on prepayment of the Loan; and (iii) in full, in the amount of all accrued and unpaid interest, at the end of the Loan Term. Interest shall be calculated on the basis of a 360-day year for the actual

number of days elapsed. Borrower shall receive a credit against interest due hereunder and under the Note as set forth in Section 6.3 hereof.

       (b)    In addition to and not in lieu of interest on the Loan, at the end of the Loan Term Borrower shall pay to Lender an exit fee equal to two percent (2%) of the Loan Amount (the "**Exit Fee**"). The Lender shall waive the Exit Fee if the Borrower closes its permanent financing through the Lender or an affiliate of the Lender upon terms and conditions satisfactory to Lender or its affiliate.

       **Section 2.6**    **Mandatory Repayment Schedule.** A mandatory repayment of the outstanding principal amount of the Loan, plus all accrued and unpaid interest on the Loan Amount and other sums due and payable by Borrower under the Note and the other Loan Documents shall be due and payable on the earlier of: (A) the date on which the FHA-insured 221(d)(4) construction and permanent loan closing occurs in respect of the Project; or (B) the expiration of the Loan Term.

       **Section 2.7**    **Origination Period.** Lender shall make proceeds of the Loan available to Borrower from time to time, up to a maximum amount equal to the Loan Amount, in separate Disbursements, as more fully provided in Article VI. Disbursements shall be made by Lender, if at all during a period commencing on the Closing Date ending on January 1, 2007, as such date may be extended in accordance with Section 2.4 hereof (the "**Origination Period**"), after which Lender shall no longer have any obligation to disburse funds to Borrower. Borrower shall have no right to or interest in any portion of the Loan Amount which has not been disbursed to Borrower in accordance with the provisions of Article VI on or before the end of the Origination Period. Amounts disbursed to Borrower and repaid may not be re-borrowed by Borrower.

**ARTICLE III**
**SECURITY**

      **Section 3.1**    **Collateral.**

       (a)    As security for the due and punctual payment of all liabilities of Borrower with respect to the Loan, including without limitation the payment of all amounts due or to become due under the Note, and as security for the prompt performance of all other obligations of Borrower under the Loan Documents, Borrower shall execute and deliver or cause to be executed and delivered to Lender (i) a guaranty and suretyship agreement dated as of December 20, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Guaranty**"), from the Guarantor in favor of Lender, (ii) an assignment of certificate of deposit dated as of December 20, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Certificate of Deposit Pledge**"), from the Guarantor in favor of Lender, with the consent of the senior pledgee, (iii) an assignment of project documents dated as of December 20, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Assignment of Project Documents**"), from Borrower to Lender, (iv) an assignment of purchase contract dated as of December 20, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Assignment of Purchase Contract**"), from Borrower to Lender, with the consent of the seller, (v) a partner limited guaranty, pledge and security agreement dated as of December 20, 2006 (as the same may be amended, modified or

supplemented from time to time, **"Partner Pledge"**) from the General Partner and the Limited Partner to Lender and (vi) a developer limited guaranty, pledge and security agreement dated as of December 20, 2006 (as the same may be amended, modified or supplemented from time to time, the **"Developer Fee Pledge"**) from the Developer to the Lender. All such documents shall be substantially in the form agreed upon by the parties, and shall create a valid second lien on the Project in favor of Lender. Upon request by Lender, Borrower shall record or file such instruments in the official public records of the State of Oklahoma and/or all state and/or local jurisdictions in which such recording or filing as shall be required to perfect Lender's security interest in the Collateral, and Borrower shall pay all recording costs and other fees in connection with such recording or filing.

(b)     Borrower hereby authorizes Lender to file UCC-1 financing statements or other documents as Lender may determine necessary to perfect, continue and/or reinstate the perfection of such security interest in the Collateral (the **"UCC Filings"**). Borrower shall pay all filing fees and other costs in connection with such UCC Filings.

**Section 3.2     Application of Collateral.** All amounts received by Lender on account of any other Collateral shall be applied in the following order of priority: (i) first, to the costs of preserving and protecting the Collateral and the costs of collection, if any, including without limitation reasonable attorneys' fees, incurred by Lender in connection with the collection of all or any portion of any amounts due under the Note; (ii) second, to the payment of any amounts other than principal, interest owing or Exit Fee under the Loan Documents; (iii) third, to the payment of accrued and unpaid interest due under the Note; (iv) fourth, to the payment of principal of the Note; (v) fifth, to the payment of unpaid Exit Fee; and (vi) sixth, to Borrower or as a court of competent jurisdiction may direct.

**Section 3.3     Power of Attorney.** Borrower authorizes, and makes, constitutes, and appoints Lender, and any officer or authorized agent of Lender, with full power of substitution, as Borrower's true and lawful attorney-in-fact, with power, in Lender's own name or in Borrower's name, (i) to execute and deliver on Borrower's behalf such documents as Lender may from time to time consider reasonably necessary to create, perfect, or preserve its security interest in the Collateral or to exercise its rights and remedies with respect to the Collateral, and (ii) to endorse any chattel paper, note, draft, instrument, or any other form or obligation relating to or constituting part of the Collateral or any right under the Collateral and, upon the occurrence of an Event of Default, to demand, collect, receipt for, compromise, settle, and sue for monies due in respect of the Collateral; and Borrower ratifies all that said attorney shall lawfully do or cause to be done by virtue thereof. This power of attorney is and shall be deemed coupled with an interest and shall be irrevocable so long as any amounts remain outstanding under the Note and/or the other Loan Documents.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to fund the Disbursements, Borrower represents and warrants to Lender, as of the Closing Date and as of the date of each Disbursement, as follows:

**Section 4.1    Organization**. Borrower is a limited partnership, duly organized, validly existing and in good standing under the laws of the State of Oklahoma, and has paid all taxes and filed all reports, if any, necessary to maintain its status and good standing as an Oklahoma limited partnership. No proceeding or action is pending or, to the best of Borrower's knowledge, threatened, against Borrower which could affect its organization, existence or status and good standing under the laws of the State of Oklahoma.

**Section 4.2    Power and Authority**. Borrower has the legal and other power and authority to conduct all of the activities which it now conducts or proposes to conduct as contemplated by the Loan Documents to which Borrower is a party, to enter into the Loan Documents to which Borrower is a party, and to make and perform the representations, warranties, covenants and undertakings provided in the Loan Documents to which Borrower is a party.

**Section 4.3    Binding Agreement**. Borrower has taken all legal and other action necessary to authorize the execution and delivery of the Loan Documents to which Borrower is a party and the consummation of transactions contemplated by such Loan Documents, and such Loan Documents are valid and binding obligations of Borrower, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other law and equity principles applied for the relief of debtors generally. Neither the execution and delivery of the Loan Documents to which Borrower is a party nor the consummation of the transactions contemplated by such Loan Documents will constitute a violation or breach of the articles of organization or operating agreement of Borrower, or any provision of any contract or other instrument to which Borrower is a party or by which Borrower or its properties are bound or any order, writ, injunction, decree, statute, rule or regulation of any court or regulatory agency. No consent, order, authorization or other approval of any governmental body or agency is required in order for Borrower to execute or deliver, or perform its obligations under, the Loan Documents to which Borrower is a party.

**Section 4.4    Financial Condition**. The financial statements of Borrower and the other Obligors previously furnished to Lender were prepared in accordance with generally accepted accounting principles, consistently applied, are substantially complete and correct, and present fairly the financial position, the results of operations and the contingent liabilities of Borrower and the other Obligors as of their dates and for the periods then ending. Since the date of the most recent financial statements of Borrower and the other Obligors furnished to Lender, no material adverse change has occurred in the financial condition, operations or prospects of Borrower or the other Obligors.

**Section 4.5    Litigation**. No action, suit or proceeding or no investigation is pending or, to the best of Borrower's knowledge, threatened, against or affecting Borrower and/or the Collateral, at law or in equity, in any court or by any federal, state, municipal or other governmental authority, department, commission, board, agency or other governmental instrumentality which could have a material adverse effect on Borrower's ability to undertake the Project or on the financial condition or operations of Borrower, or which questions, or is likely to materially adversely affect, Borrower's undertakings under, or performance of, the Loan Documents to which Borrower is a party or its financial conditions, operations or prospects.

Section 4.6    No Defaults.  Borrower is not in default or alleged to be in default with respect to any judgment, order, writ, injunction or decree or in breach or, alleged to be in breach or default under any lease, contract, agreement, commitment, instrument or obligation to which it is a party or by which it or its properties are bound (including, without limitation, the Collateral); and, no state of facts exists which is likely to create or cause a default or breach under any such lease, contract, agreement, commitment, instrument or obligation.  There are no defaults or events which, with the giving or notice or the passage of time would constitute defaults on the part of Borrower.

Section 4.7    Compliance with Governmental Requirements. Borrower has complied with all federal, state and local laws, regulations and orders applicable to the conduct of its operations or the ownership of its properties (including, without limitation, the Collateral).

Section 4.8    Taxes. All tax returns (including, but not limited to, information returns) required to be filed by Borrower in any jurisdiction have in fact been filed, and all taxes, assessments, fees and other governmental charges upon Borrower, or upon any of its assets, income or franchises, which are due and payable, have been paid.

Section 4.9    Other Agreements.  Borrower is not a party to any agreement or instrument, or subject to any restriction, which could materially adversely affect Borrower's properties or assets (including, without limitation, the Collateral), operations, prospects or condition, financial or otherwise.

Section 4.10    Disclosure. No representation, warranty or statement of Borrower in this Agreement or the other Loan Documents to which Borrower is a party, or in any document furnished to Lender pursuant to this Agreement or the other Loan Documents, or in connection with the transactions contemplated in this Agreement, contains any untrue statement of a material fact, or omits any material fact, the omission of which would be misleading.  Borrower has disclosed to Lender in writing every fact that affects the financial condition or prospects or its ability to perform its obligations under this Agreement and the other Loan Documents.

Section 4.11    Judgments. No judgment, confession of judgment, decree, order, order to show cause, writ, lien, attachment, or injunction, including without limitation those on appeal, has been filed or entered against Borrower and/or the Collateral, in any court or in any arbitration proceeding.

Section 4.12    Security. The UCC Filings will be in proper recordable form and, upon recording in the official public records of the State of Oklahoma and all other state and local jurisdictions where required to be filed and will create a valid and binding liens upon the Collateral in favor of Lender, securing payment of the Loan.

## ARTICLE V
## CONDITIONS TO LENDER'S OBLIGATIONS

Section 5.1    General Conditions. The obligation of Lender under this Agreement fund the Loan is subject to the following conditions precedent, all of which shall be fulfilled to Lender's satisfaction on or prior to the Closing Date, which Closing Date shall occur on or before December 20, 2006, and shall be in effect on the Closing Date:

8

(a)     The representations and warranties made by Borrower in this Agreement and the other Loan Documents shall be true and correct with the same effect as though such representations and warranties had been made on and as of such time.

(b)     No Event of Default shall have occurred and be continuing or shall result from the funding of the Loan.

(c)     No material adverse change, as determined by Lender in its sole discretion, shall have occurred with respect to the Collateral and/or in the financial condition, operations or prospects of any of the Obligors since the dates of the Obligors' financial information most recently provided to Lender.

(d)     The Contract for Sale of Real Estate dated effective July 21, 2006 in respect of the Project shall have been assigned to Borrower and the deadline for closing under such contract shall have been extended to no later than March 31, 2007, with an opportunity to extend again to a date no later than June 30, 2007 for an additional escrow deposit of not more than $75,000.

(e)     Contemporaneously with the closing, Borrower shall have paid Lender's out-of-pocket expenses in connection with the Loan, including, without limitation, the fees and expenses of counsel to Lender.

**Section 5.2    Delivery of Documents.** As conditions precedent to the obligation of Lender to initially fund the Loan, Borrower shall deliver or cause to be delivered to Lender, at or prior to the Closing Date, the following documents, all of which shall be in form and substance acceptable to Lender:

(a)     The original Agreement, duly executed by Lender and Borrower.

(b)     The original Note, duly executed by Borrower.

(c)     The original Guaranty, Certificate of Deposit Pledge, Assignment of Project Documents, Assignment of Purchase Contract, Developer Fee Pledge and Partner Pledge, all duly executed by the parties thereto.

(d)     Closing certificates of Borrower, the General Partner, the Developer and the Guarantor, each substantially in the form provided by Lender to Borrower, with attached exhibits, certified by the Guarantor and the appropriate authorized representatives of Borrower, the General Partner and the Developer.

(e)     Such UCC-1 financing statements as may be requested by Lender.

(f)     Copies of the most recent annual compiled financial statements and quarterly unaudited financial statements of Borrower, the General Partner, the Developer and the Guarantor, each including a schedule of contingent liabilities.

9

**Exh. _3 A_, Page 55**

(g)    An opinion of counsel for Borrower, the General Partner, the Developer and the Guarantor, in form and substance reasonably satisfactory to Lender and Lender's counsel.

(h)    Such additional documents and information and such additional certificates and assurances as reasonably requested by Lender under the terms of this Agreement, the other Loan Documents, or otherwise.

## ARTICLE VI
## DISBURSEMENTS

**Section 6.1    Loan Proceeds**. Lender shall disburse to Borrower proceeds of the Loan from time to time in the form of separate disbursements ("**Disbursements**"), in accordance with the procedures and subject to the conditions set forth in Sections 6.2, 6.3 and 6.4. Except for Disbursements to pay interest on the Loan Amount pursuant to Section 6.3 hereof, the proceeds of each Disbursement shall be made directly to Borrower (or as otherwise directed by Borrower) from time to time to pay development expenses of the Project incurred by Borrower, in each case as pre-approved by Lender. Prior to disbursement of the proceeds of the Loan in accordance with the terms hereof, neither Borrower nor any creditor of Borrower shall have any right to or interest in any undisbursed portion of the Loan Amount, notwithstanding anything herein to the contrary.

**Section 6.2    Specific Conditions and Procedures for Disbursements**.

(a)    As conditions precedent to the obligation of Lender to make a Disbursement (other than the Disbursement on the Closing Date or pursuant to Section 6.3 hereof), Lender shall have received from Borrower at least ten (10) Business Days before the requested date of the Disbursement, a Disbursement Request Form, substantially in the form attached hereto and made a part hereof as <u>Exhibit A</u>, properly completed and duly executed by Borrower (provided, however, that the initial Disbursement shall be funded on the basis of a settlement statement executed by Borrower and Lender in the form provided by Lender), accompanied by (i) evidence reasonably satisfactory to Lender that the Project development expenses for which the Disbursement is sought are solely related to the Project and have been incurred by Borrower or are reasonably expected to be incurred by Borrower within the next thirty (30) days ("**Future Project Expenses**") and (ii) evidence as to the expenditure of funds for Future Project Expenses which were the subject of previous Disbursements, to the extent not already provided to Lender. Each Disbursement shall be subject to any other conditions reasonably required by Lender. Failure to provide Lender with satisfactory evidence of the expenditure of Future Project Expenses previously disbursed to Borrower shall be a condition precedent to any future request for Disbursement. Borrower may not request Disbursements more frequently then once every thirty (30) calendar days.

(b)    Lender will make good faith efforts to approve each Disbursement, or to advise Borrower of any deficiencies, within ten (10) Business Days of receipt by Lender of the materials described in Section 6.2(a).

10

(c)    After approval by Lender of the Disbursement Request Form and the accompanying documentation, and subject to all other conditions in this Section 6.2 and in Section 6.4, the Disbursement shall be made by wire transfer or otherwise as directed to Borrower. Upon receipt by Borrower of each Disbursement, Borrower shall promptly apply such portion of the proceeds thereof which were drawn for previously incurred expenses to the payment thereof. Any proceeds drawn by Borrower in anticipation of a Future Project Expense shall be held by Borrower in trust and applied to the payment of such expenses. Evidence of the application of Disbursement proceeds to the payment of approved expenses shall be sent to Lender along with the next Disbursement Request Form, or otherwise as may reasonably be requested by Lender.

### Section 6.3    Disbursements to Pay Interest.

(a)    Unless and until the Loan Amount shall have been fully disbursed in accordance with the terms hereof, on each interest payment date and without submission by Borrower of any Disbursement Request Form or any further authorization by Borrower, Lender shall make a disbursement to itself in an amount equal to the difference between (i) the amount of interest due hereunder and under the Note and (ii) an amount equal to investment earnings received by or credited to the account of Lender, if any, since the preceding interest payment date on an amount equal to the undisbursed portion of the Loan Amount at such interest rate as may be determined from time to time by Lender upon notice to Borrower. Borrower acknowledges and agrees that Lender may determine the interest rate in its sole and absolute discretion.

(b)    Notwithstanding any provisions of this Article VI to the contrary, and without further notice to or authorization by Borrower, Lender may, at its option, make a Disbursement to pay such other sums as may be owing from time to time by Borrower in connection with the Loan, upon the failure by Borrower to pay such other sums when and as due, whether or not the proceeds of the Loan were contemplated as the source of payment of interest or such other sums.

(c)    To the extent any interest or other sum due to Lender is not fully paid by a disbursement of the remaining undisbursed Loan Amount under this Article VI, Borrower shall immediately pay to Lender the balance then due and owing.

(d)    Any Disbursement pursuant to this Section 6.3 shall be made by Lender to itself, shall be evidenced by the Note and shall be secured by the Collateral as fully as if made to or at the request of Borrower.

### Section 6.4    General Conditions Governing All Disbursements.

(a)    No Disbursement shall be made after the end of the Origination Period.

(b)    No Disbursement shall be made pursuant to Section 6.2 hereof which would cause the total of all Disbursements made pursuant to Section 6.2 to exceed the Loan Amount.

(c)     No Disbursement shall be made during the continuance of an Event of Default, during the continuance of any event which, with the giving of notice or the passage of time or both, would constitute an Event of Default, or during the continuance of any default under any other financing now or in the future provided by Lender to Borrower or any other Obligor.

(d)     All representations and warranties made by Borrower in this Agreement and in the other Loan Documents, shall be true and correct in all material respects on the date of the Disbursement with the same effect as though such representations and warranties had been made on and as of such date.

(e)     Lender reserves the right to withhold any Disbursement if, in Lender's reasonable judgment, (i) a material adverse change has occurred in the financial condition, operations or prospects of Borrower or (ii) a material adverse change has occurred in the feasibility or development progress of the Project (including, without limitation, the events described in Section 7.5(d)) and/or the fair market value of the Collateral securing the Loan.

**Section 6.5     No Waiver**. In the event Lender fails to require, or Borrower fails to fulfill, any condition to a Disbursement, such failure shall not constitute a waiver of such condition by Lender, nor shall such failure preclude Lender from requiring fulfillment of such condition by Borrower in order for Borrower to receive a future Disbursement.

**Section 6.6     Continuing Representations and Warranties**. Each request for a Disbursement shall constitute, without the necessity of a written statement to such effect, a confirmation by Borrower to Lender that all representations and warranties made by Borrower in this Agreement and the other Loan Documents are true and correct in all material respects as of the date of such request.

## ARTICLE VII
## AFFIRMATIVE COVENANTS

As long as any portion of the Loan is outstanding or any amounts under the Note remain unpaid, Borrower covenants and agrees that, unless Lender otherwise consents in writing:

**Section 7.1     Reports**. Borrower shall furnish or cause to be furnished to Lender the following financial information and other reports:

(a)     Within one hundred (120) days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender annual financial statements of Borrower certified by an independent certified public accountant as fairly presenting Borrower's financial position at the end of the fiscal year and the results of Borrower's operations for the fiscal year, and as being prepared in accordance with generally accepted accounting principles, consistently applied.

(b)     On the forty-fifth (45th) day after the end of each calendar quarter, commencing March 1, 2007, Borrower shall furnish to Lender: (i) quarterly financial statements of Borrower fairly presenting Borrower's financial position at the end of the quarter and the results of Borrower's operations for the quarter, prepared internally, in accordance with generally accepted accounting principles, consistently applied.

12

(c)    As promptly and as reasonable practicable after request, Borrower shall furnish to Lender such additional information, reports, statements, and certificates with respect to the Loan, and/or the operations, prospects or financial condition of Borrower, and/or the development of the Project, as Lender may from time to time reasonably request.

**Section 7.2    Existence.** Borrower shall maintain its existence and good standing under the laws of the State of Oklahoma, and shall comply with all applicable federal, state and local laws and regulations to the extent necessary and required for the continuation of its operations.

**Section 7.3    Taxes and Charges.** Borrower shall promptly pay and discharge all taxes, assessments, and governmental charges, on its income and properties (including, without limitation, the Collateral) prior to the date on which penalties attach thereto, except to the extent such taxes shall be contested in good faith and by appropriate proceedings and as to which adequate reserves in the judgment of Lender shall have been provided.

**Section 7.4    Records.** Borrower shall (i) maintain books and records adequate to enable independent certified public accountants to certify the financial statements referred to in Section 7.1, (ii) retain such books and records and copies of the reports and statements referred to in Section 7.1 for a period of at least four (4) years after payment in full of the Note, and (iii) make such books and records available for inspection by Lender and its agents and representatives at all reasonable times.

**Section 7.5    Notices to Lender.** Borrower shall promptly notify Lender of the following:

(a)    The commencement of any action, suit or proceeding before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that seeks recovery from such party in an amount equal to or greater than ten percent (10%) of the Loan Amount;

(b)    Any change in the end of Borrower's fiscal year, which currently is December 31;

(c)    The occurrence of any material adverse change in the financial condition, operations or prospects of Borrower or any other Obligor from the date of the most recent financial statements of the Borrower delivered to Lender;

(d)    Any material adverse change in anticipated course of development of the Project (including, without limitation, the occurrence of any default under the contract for the purchase and sale of the Project, failure to receive any necessary HUD approval, the occurrence of a default under any of the Bond Documents, failure to satisfy any of the conditions to break of escrow under the Bond Documents within the time period specified therein, redemption of the Bonds, failure to satisfy the conditions to the equity investment in the Project or termination of the commitment to provide an equity investment in the Project); and

(e)    The occurrence of any Event of Default or event which, with the giving of notice or the passage of time or both, would constitute an Event of Default.

13

**Section 7.6    Insurance.** Borrower shall maintain property and general liability insurance in such amounts, on such terms, and covering such risks as is reasonably acceptable to Lender, with Lender to be notified, by the terms thereof, prior to the cancellation or non-renewal of any such policy.

**Section 7.7    Anti-Discrimination Laws.** Borrower, in its use of proceeds of the Loan and in its conduct of the Project, shall comply fully with all applicable federal, state, local, and any other governmental anti-discrimination laws, executive orders, and rules and regulations.

**Section 7.8    Inspections.** Borrower shall allow Lender to inspect Borrower's books and records, and books, records, and contracts relating to the Project, and make copies and extracts therefrom, at all reasonable times. Borrower shall grant Lender and its agents and representatives full rights of entry and free access to the Project.

**ARTICLE VIII**
**NEGATIVE COVENANTS**

As long as any portion of the Loan is outstanding or any amounts under the Note remain unpaid, Borrower covenants and agrees that, unless Lender otherwise consents in writing:

**Section 8.1    Assignment.** Borrower shall not assign any rights or delegate performance of any duties or obligations of Borrower provided in this Agreement or the other Loan Documents.

**Section 8.2    Material Changes.** Borrower shall not:

(a)    Permit or make any material change in or to the Project; or

(b)    Dissolve, liquidate, consolidate with, merge into, or form a partnership or joint venture with, any corporation or other organization, or otherwise acquire all or substantially all of the assets, capital stock, or properties of any corporation or other organization.

**Section 8.3    Disposal of Assets.** Borrower shall not sell, lease, transfer or otherwise dispose of its properties, assets, rights, licenses to any person or entity, except (i) in the ordinary course of its operations and (ii) in the case of the Collateral, with the prior written approval of Lender.

**Section 8.4    Liens.** Except as otherwise provided in this Agreement, Borrower shall not create, incur, assume or suffer to exist any pledge, lien, charge or other encumbrance of any nature on the Collateral or any portion thereof.

**Section 8.5    Guaranties.** Borrower shall not and shall not permit any Borrower Affiliate to guaranty, become surety for, endorse or otherwise in any way be or become responsible for the liabilities or obligations of any person or entity other than any guaranties in favor of the Lender and the guaranties related to the acquisition or construction of affordable housing developments in which Borrower or any Borrower Affiliate is participating.

**Section 8.6    Indebtedness.** Borrower shall not incur, create, assume or suffer to exist on the part of Borrower, any indebtedness for borrowed money other than (i) the Loan, (ii) the existing debt due and owing to the Senior Secured Lender and (iii) indebtedness incurred by a Borrower to finance affordable housing projects in which the Borrower is participating.

**Section 8.7    Conduct of Business.** Borrower shall not cease to engage in its business as currently conducted and shall not engage in any other business.

## ARTICLE IX
## EVENTS OF DEFAULT

**Section 9.1    Events of Default.** The occurrence of any or more of the following events shall constitute an "Event of Default" under this Agreement:

(a)    Borrower or any other Obligor fails to make any payment of principal of or interest when due hereunder and under the Note; or

(b)    Borrower fails to observe or perform any other term, covenant, undertaking or agreement contained in this Agreement or any other Loan Document, and such failure continues unremedied for a period of thirty (30) days after written notice has been given to Borrower by Lender, or, if such failure is not reasonably capable of being remedied within such period of thirty (30) days, Borrower or another Obligor has not commenced remedial action within such thirty-day period and is not proceeding with diligent efforts to remedy such failure; provided, however, that no notice or remedial period shall apply to any event specifically described elsewhere in this Section 9.1, or to a default under Section 8.3 or Section 8.4;

(c)    Any representation or warranty made by Borrower or any other Obligor in this Agreement or the other Loan Documents, or any statement or representation made in any certificate, report or opinion delivered pursuant to this Agreement or the other Loan Documents, proves to have been false, misleading or incorrect when made or deemed made; or

(d)    Any Obligor becomes insolvent, or fails or ceases to pay its debts as they mature or makes an assignment for the benefit of creditors or files a petition in bankruptcy or is adjudicated insolvent or bankrupt or petitions or applies to any tribunal for the appointment of any receiver or any trustee, or commences any proceeding under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or any such proceeding is commenced against any Obligor that is not dismissed within a period of sixty (60) days, or any Obligor, by any act indicates its consent to, approval of, or acquiescence in any such proceeding or the appointment of any receiver of or any trustee for it or any substantial part of its property, or suffers any such receivership or trusteeship to continue undischarged for a period of sixty (60) days; or

(e)    One or more judgments or decrees are entered against any Obligor involving in the aggregate a liability of an Obligor (not paid or fully covered by insurance) which in the judgment of Lender is determined to materially and adversely affect the financial condition of such Obligor, and all such judgments or decrees are not vacated, discharged, stayed or bonded pending appeal within sixty (60) days after receiving notice from Lender of its determination under this Section 9.1(e); or

(f)     The organizational documents of Borrower are amended without the prior written consent of Lender; or

(g)     The contract for the purchase and sale of the Project expires without having been extended or a default occurs thereunder which extends beyond any applicable notice, grace or cure period;

(h)     There occurs and is continuing beyond any applicable notice, grace or cure period, an event of default under the Bond Documents or the Bonds are redeemed; or

(i)     There occurs and is continuing beyond any applicable notice, grace or cure period, an event of default in respect of the indebtedness secured by the Senior Pledge (as defined in the Certificate of Deposit); or

(j)     The commitment to provide the equity investment in the Project expires without having been extended or is terminated; or

(k)     Any change occurs in the operation, prospects or financial condition of Borrower which Lender in its reasonable judgment believes may materially adversely affect the ability of Borrower to repay the Note or the ability of Borrower or any Obligor to perform its respective obligations under this Agreement or the other Loan Documents; or

(l)     A default occurs under any other loans or financing now or in the future provided to Borrower or any Obligor by Lender or under the terms of any instrument or document evidencing or securing, or otherwise executed or delivered in connection with, any other loans or financing now or in the future provided by Lender to Borrower or any Obligor.

**Section 9.2     Remedies Upon Event of Default.** Upon the occurrence of any one or more Events of Default, Lender may exercise all or any of the following rights and remedies:

(a)     Lender may, by written notice to Borrower, declare the indebtedness evidenced by the Note, any and all other amounts payable hereunder and under the other Loan Documents and any and all other indebtedness of Borrower or any Obligor to Lender forthwith to be due and payable, whereupon the indebtedness evidenced by the Note and such other indebtedness shall become immediately due and payable, as to principal, interest and any other amounts payable to Lender.

(b)     Lender may exercise any and all rights and remedies provided in this Agreement and in the other Loan Documents and/or as available at law or in equity.

(c)     Lender may protect and enforce its rights and remedies by appropriate judicial proceedings, including, but not limited to, foreclosure of the Collateral, an award of specific performance, or other legal or equitable remedy in aid of the exercise of the powers granted in or pursuant to this Agreement or the other Loan Documents.

**Section 9.3     Automatic Acceleration.** Upon the occurrence of any Event of Default described in Section 9.1(d), all amounts due under the Note, this Agreement and the other Loan Documents shall immediately be due and payable without presentment, demand, protest or notice

of any kind, all of which are expressly waived by Borrower to the fullest extent permitted by law.

Section 9.4    **Cumulative Rights**. Each right, remedy and power granted to Lender under this Agreement and the other Loan Documents shall be cumulative and in addition to any other right, remedy or power not specifically granted in this Agreement or now or hereafter existing in equity, at law, by virtue of statute or otherwise, may be exercised by Lender from time to time concurrently or independently and as often and in such order as Lender may deem expedient.

## ARTICLE X
## MISCELLANEOUS

Section 10.1    **Indemnification.**

(a)    Borrower shall indemnify and hold Lender harmless against and in respect of:

(i)    Any and all losses, damages or deficiencies of Lender, its employees or its agents, resulting from any material misrepresentation or willful nonfulfillment or breach of any agreement on the part of Borrower under this Agreement or from any material misrepresentation or willful omission from any instrument, agreement or other document furnished or to be furnished to Lender under this Agreement, other than losses, damages or deficiencies in connection with the nonpayment of the Loan, the provisions for which are separately provided for in this Agreement; and

(ii)    Any and all actions, suits, proceedings, demands, assessments, judgments, costs and reasonable legal and other expenses incident to any of the provisions of Section 10.1(a)(i).

(b)    The obligations of this Section 10.1 shall survive the repayment of the Loan.

Section 10.2    **Notices.** All notices, requests, demands, consents, waivers and other communications given under any of the provisions of this Agreement shall be in writing (or by fax, e-mail, or similar electronic transmission confirmed in writing) and shall be deemed to have been duly given or made (i) when delivered by hand, or (ii) if given by mail, three (3) days after deposited in the mails by certified mail, return receipt requested, sufficient postage prepaid, or (iii) if given by fax, e-mail, or similar electronic transmission, when sent and receipt has been confirmed, addressed as stated below, or to such other address as the addressee may have specified in a notice duly given to the other addressees.

To Lender:          Greystone CDE, LLC
                    419 Belle Air Lane
                    Warrenton, Virginia 20186
                    Attention:    Andrew J. Shedlock, III
                    Phone:        540-428-7208

Fax:        540-341-2192
Email:      AShedlock@GreystoneUSA.com

To Borrower:        Santa Fe Pointe, L.P.
c/o Santa Fe Pointe Management, LLC
16416 Oconee Creek Drive
Edmond, Oklahoma 73013
Attention:
Phone:
Fax:
Email:        theo.oliphant@gmail.com

**Section 10.3    Entire Agreement.** This Agreement and the other Loan Documents contain the entire agreement of the parties with respect to the transactions contemplated in this Agreement, and supersedes all prior proposals, negotiations, agreements, and understandings relating to such transactions. Borrower acknowledges that, in entering into this Agreement, it is not relying on any statement, representation, warranty, covenant, or undertaking of any kind made by Lender or any employee or agent of Lender, other than the agreements of Lender set forth in this Agreement.

**Section 10.4    Amendments.** No modification or waiver of any provision of this Agreement shall be valid unless in writing, and signed by Lender and Borrower.

**Section 10.5    No Waiver.** No delay or failure on the part of Lender in exercising any rights under this Agreement or the other Loan Documents and no partial or single exercise of any such rights, shall constitute a waiver of such rights or of any other rights under this Agreement or the other Loan Documents.

**Section 10.6    Liability of Lender.** Borrower agrees that Lender shall have no liability (in contract, in tort, or otherwise) for any lost profits or other consequential damages sustained by Borrower or any Borrower Affiliate as a result of any act or omission to act by Lender or any of its directors, officers, agents, or employees, in connection with the Loan or the Loan Documents, unless caused by the gross negligence or willful misconduct of Lender.

**Section 10.7    No Joint Venture.** Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, Lender, by making the Loan or by any action pursuant to this Agreement or the other Loan Documents, is not and shall not be deemed to be a partner or joint venturer with Borrower.

**Section 10.8    Other Parties.** Nothing in this Agreement shall be construed as giving any person or entity, other than the parties to this Agreement, any right, remedy or claim under or in respect of this Agreement.

**Section 10.9    Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to the principles of conflicts of law).

**Section 10.10  Survival.** All representations, warranties and agreements in this Agreement shall survive the expiration or termination of this Agreement.

**Section 10.11  Severability.** If any provision of this Agreement should, for any reason, be held to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such illegal, invalid or unenforceable provision had never been contained in this Agreement.

**Section 10.12  Successors and Assigns.** This Agreement shall be binding upon and operate for the benefit of the respective successors and assigns of the parties; provided, however, that Borrower shall not have the right to assign any of its rights or delegate the performance of any of its obligations under this Agreement without the prior written consent of Lender.

**Section 10.13  Duplicate Originals.** Two or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument.

**Section 10.14  Titles and Captions.** The titles and captions in this Agreement are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

**Section 10.15  Records.** The outstanding principal balance of the Loan and the unpaid interest accrued thereon shall at all times be ascertained from the records of Lender, which shall be conclusive evidence thereof, absent manifest error.

**Section 10.16  Further Assurances.** At any time upon, and from time to time upon request by Lender, Borrower shall do any acts and execute and deliver any documents as may be reasonably requested by Lender to accomplish the purposes of this Agreement.

**Section 10.17  Assignment of Loan Documents.** The Lender may assign or otherwise transfer its rights under this Agreement at any time or times, in its sole and absolute discretion, without any notice to or approval or consent from Borrower; and any holder or holders of the Note or other Loan Documents shall be deemed an assignee of such rights.

**Section 10.18  Waiver of Jury Trial.** BORROWER AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THE LOAN OR OUT OF THIS AGREEMENT AND/OR THE OTHER LOAN DOCUMENTS THAT IS TRIABLE OF RIGHT BY JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, INTENTIONALLY, KNOWINGLY, AND VOLUNTARILY.

**Section 10.19  Contingency.** The obligations of Lender under this Agreement are contingent upon the execution and delivery by Borrower, the General Partner, the Developer and the Guarantor of the respective Loan Documents to which each is a party and such other documents, instruments, certifications and opinions of counsel as Lender may require.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

GREYSTONE CDE, LLC

By: _____

Name: Leslie F. Danlon

Title: Vice President

SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:     SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company, its general partner

        By: _____
        Name:
        Title:

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

GREYSTONE CDE, LLC

By: _____
Name:
Title:


SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:     SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company, its general partner

        By: _____
        Name:  Theotis F. Oliphant
        Title:    Managing Member

## EXHIBIT A

### FORM OF DISBURSEMENT REQUEST FORM

**BORROWER:**        Santa Fe Pointe, L.P.

**REQUISITION NO.:** _____

**IN THE AMOUNT OF $_____**

TO:    Greystone CDE, LLC
       419 Belle Air Lane
       Warrenton, Virginia 20186

The borrower hereby requests payments in the following amounts, from the following sources and to be made to the following parties, all as set forth on the Invoices attached to this Requisition:

Amount                            Payable to:

                                  [Borrower's account #] [third party
                                  payment/wire instructions must be
                                  attached]

**Requisition – Contents and Attachments**

☐    Borrower's Representations and Warranties

☐    Invoices for Payments

## Exh. *3A*, Page 68

A-1

## Representations and Warranties

1.    Funding of this Disbursement shall be in accordance with the terms and provisions of the Bridge Loan Agreement, dated as of December 20, 2006 (the "Loan Agreement"), and amounts for which disbursement is sought are for payments of predevelopment costs of Borrower described on the attachments hereto which have not been the subject of any previous Requisition.

2.    All moneys requisitioned by Borrower and disbursed by Lender under previously approved Disbursement Request Forms have been expended for the purpose for which they were requisitioned. Attached hereto are invoices (or other evidence, as applicable) of the incurrence of the expenses under previous Disbursement Request Forms, to the extent not previously provided to Lender.

3.    All of the information submitted to Lender in connection with this Disbursement Request Form is true and accurate as of the date of submission.

4.    The representations and warranties set forth in the Loan Agreement and the other Loan Documents are true and correct as of the date hereof with the same effect as if made on this date.

5.    The Borrower represents and warrants that this Disbursement Request Form is in the form of requisition required by Lender and the conditions to Disbursement set forth in Article VI of the Loan Agreement have been satisfied.

6.    The Borrower represents and warrants that (i) all invoices attached hereto and to be paid by this Disbursement have either already been paid by the Borrower or will be paid by the Borrower or directly by Lender on the date this Disbursement is funded and (ii) all anticipated expenses listed on the Schedule attached hereto and intended to be paid by this Disbursement are expected to be incurred in the next 30 (thirty) days and shall be paid as incurred by the Borrower and evidence of such payment shall be supplied by Borrower to Lender in connection with Borrower's next Disbursement Request Form after such payment is made (or otherwise as reasonably requested by Lender).

All capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto under the Loan Agreement.

**Exh. _3A_, Page 69**

A-2

Executed this __ day of _____, 200_.

SANTA FE POINTE, L.P., an Oklahoma limited
partnership

By:    SANTA FE POINTE MANAGEMENT, LLC an
Oklahoma limited liability company, its general
partner

By:  _____
Name:
Title:

**Exh. _3A_, Page 70**

A-3

## Borrower's Invoices for Prior Disbursement Requests

[Attach Invoices]

**Borrower's Invoices for Current Disbursement Request**

**Borrower's Schedule of Anticipated Expenses**
**to be paid from Current Disbursement Request**

3162 15003v3

## MODIFICATION, CONSENT AND CONFIRMATION AGREEMENT

This MODIFICATION, CONSENT AND CONFIRMATION AGREEMENT (the "Agreement") dated as of June 29, 2007 among SANTA FE POINTE, L.P, a limited partnership duly organized, validly existing and in good standing under the laws of the State of Oklahoma (together with its successors and assigns, the "Borrower"), RANT, LLC, a limited liability company duly organized and validly existing under the laws of the State of Delaware (together with its successors and assigns, the "Developer"), SANTA FE POINTE MANAGEMENT, LLC, a limited liability company duly organized and validly existing under the laws of the State of Oklahoma (together with its successors and assigns, the "General Partner"), THEOTIS F. OLIPHANT, an individual and a resident of the State of California (together with his heirs, executors, legal representatives, personal representatives and successors and assigns, the "Guarantor"), and GREYSTONE CDE, LLC, a limited liability company duly organized and validly existing under the laws of the State of Delaware (together with its successors and assigns, the "Lender").

### WITNESSETH:

WHEREAS, the Borrower and the Lender have previously entered into a Bridge Loan Agreement dated as of December 20, 2006 (the "Original Loan Agreement"), pursuant to which the Lender has made a loan (the "Loan") to the Borrower evidenced by a promissory note dated December 20, 2006 (the "Original Note") of the Borrower;

WHEREAS, the Loan Term (as defined in the Loan Agreement) ended on June 15, 2007, subject to extension as set forth in Section 2.4 of the Loan Agreement, and the Maturity Date of the Note is July 1, 2007;

WHEREAS, the parties wish to extend the Loan Term and Maturity Date and to make certain other modifications as more fully described herein;

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises and covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows;

    1.    **Consent to Extension.** Pursuant to the requirements of Section 2.4 of the Original Loan Agreement, the Lender and the Borrower hereby consent to (i) the extension of the ending date of the Loan Term from June 15, 2007 to December 15, 2007 and the Maturity Date of the Original Note from July 1, 2007 to December 15, 2007, and (ii) the execution of an allonge to the Original Note to reflect such extension.

2.      **Receipt of Extension Fee.** The Borrower acknowledges that it has paid and the Lender acknowledges that it has received the Extension Fee (one quarter of one percent (0.25%) of the Loan Amount) required by Section 2.4 of the Original Loan Agreement.

3.      **Confirmation.** As required by and for the purposes of Section 2.4 of the Original Loan Agreement, the Guarantor, the Developer and the General Partner hereby confirm and affirm all of their covenants, agreements, duties and obligations under the Loan Documents to which they are parties and acknowledge that (i) such Loan Documents remain in full force and effect as of the date of this Agreement and (ii) any termination provisions in such Loan Documents shall be extended through the new, extended ending date of the Loan Term of December 15, 2007.

4.      **Amendments to Original Loan Agreement.**

(a)      Section 2.4 of the Original Loan agreement is hereby amended and restated effectively as of June 15, 2007, in its entirety to provided in full as follows:

"The term of the Loan commenced on the Closing Date and shall end on December 15, 2007 (the "**Loan Term**")

(b)      Section 2.6 of the Original Loan agreement is herby amended and restated in its entirety to provide in full as follows:

"A mandatory repayment of the outstanding principal amount of the Loan, plus all accrued and unpaid interest on the Loan, Exit Fee and other sums due and payable on the earliest of: (A) the date on which the FHA – insured 221(d)(4) construction and permanent loan closing occurs in respect of the Project; (B) the date on which the Project level development or financing entitlements expire without having been extended or renewed; or (C) the expiration of the Loan Term."

5.      **Payment of Fees.** The Borrower hereby acknowledges and agrees to reimburse the Lender upon demand for all legal and other out-of-pocket fees and expenses incurred by the Lender in connection herewith.

6.      **Ratification.** Except as expressly amended by this Agreement and by the allonge to the Original Note, all terms and provisions of the Original Loan Agreement and the Original Note shall remain in full force and effect. Except as amended hereby, the parties hereto hereby ratify and reaffirm all of the terms and conditions of the Original Loan Agreement and the Original Note. Any and all waivers set forth herein are limited solely to the events and circumstances referenced herein and the specific rights and duties arising therefrom and do not apply or in any way extend to any other events or circumstances not referenced herein or occurring after the date hereof.

7.      **Severability.** If any provision of this Agreement is held to be in conflict with any applicable statute or rule of law or is otherwise held to be unenforceable for any reason

**Exh. _3A_, Page 75**

whatsoever, such circumstances shall not have the effect of rending the provision in question inoperative or unenforceable in any other case or circumstance, or of rending any other provision of provisions herein contained invalid, inoperative or unenforceable to any extent whatsoever. The invalidity of any one or more phrases, sentences, clauses or sections of this Agreement shall not affect the remaining portions hereof.

8.    **Captions.**  The captions or headings in this Agreement are for convenience only and in no way define, limit or describe the scope or intent of any provisions or sections of this Agreement.

9.    **Counterparts.**  This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one agreement.

10.    **Defined Terms.**  Capitalized terms used herein and not defined shall have the meanings ascribed thereto in the Original Loan Agreement.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute and deliver this Agreement on the date and year first above written.

SANTA FE POINT, L.P., an Oklahoma
limited partnership

By:    SANTA FE POINTE
       MANAGEMENT, LLC, an
       Oklahoma limited liability
       company

       By: _____
       Name: Theotis F. Oliphant
       Title:   Managing Member


GREYSTONE CDE, LLC, a Delaware limited
liability

By: _____
Name:
Title:


SANTA FE POINTE MANAGEMENT,
LLC, an Oklahoma limited liability
company

By: _____
Name: Theotis F. Oliphant
Title:   Managing Member


RANT, LLC, a Delaware limited
liability company

By: _____
Name: Theotis F. Oliphant
Title:   Managing Member


_____
THEOTIS F. OLIPHANT


**Exh. _3A_, Page 77**

**Exhibit 3B**

#155239v3

ASSIGNMENT OF PURCHASE AGREEMENT

by

SANTA FE POINTE, L.P.,

in favor of

GREYSTONE CDE, LLC

Dated as of December 20, 2006

## ASSIGNMENT OF PURCHASE AGREEMENT

This ASSIGNMENT OF PURCHASE AGREEMENT (as the same may be amended, modified or supplemented from time to time, this "**Assignment**"), dated as of December 20, 2006, made by SANTA FE POINTE, L.P., a limited partnership organized and existing under the laws of the State of Oklahoma (together with its permitted successors and assigns, the "**Borrower**"), to GREYSTONE CDE, LLC, a limited liability company organized and existing under the laws of the State of Delaware (together with its successors and assigns, "**Lender**"),

### W I T N E S S E T H :

**WHEREAS**, the Lender has made a loan of $500,000.00 to the Borrower pursuant to a Bridge Loan Agreement dated as of December 20, 2006 between the Lender and the Borrower (as the same may be amended, modified or supplemented from time to time, the "**Loan Agreement**") (all capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Loan Agreement);

**WHEREAS**, the Borrower intends to finance the acquisition, construction and equipping of a 224-unit multifamily residential facility to be known as "Santa Fe Pointe Apartments" located at 125 SW 74th Street in Oklahoma City, Oklahoma (the "**Project**");

**WHEREAS**, the Borrower has entered into a contract for the purchase of the land on which the Project is to be located, which land is more fully described on Exhibit A hereto, pursuant to a Contract for Sale of Real Estate, dated July 12, 2006 as amended by Addendum #1 to Contract for Sale of Real Estate dated December 15, 2006 (as the same may be amended, modified or supplemented form time to time in accordance with the terms hereof, the "**Purchase Agreement**"), between Waverly-Walnut Creek Apartments, Inc., as seller (together with its successors and assigns, the "**Seller**"), and RANT, LLC, as buyer, and assigned to the Borrower, as buyer, a copy of which Purchase Agreement is attached hereto as Exhibit B; and

**WHEREAS**, the execution and delivery of this Assignment is a condition to the Lender's making the Loan.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, and in order to secure the Borrower's performance of its obligations to the Lender under the Loan Documents, including payment of all amounts due or to become due to the Lender under the Loan Agreement and the other Loan Documents, and any extensions, renewals, replacements or modifications of any thereof, the Borrower agrees as follows:

**Section 1**      **Assignment; Security Interests**.  The Borrower hereby assigns and transfers to Lender, and hereby creates in favor of Lender a security interest in and to, all of the Borrower's right, title and interest in, to and under the Purchase Agreement, all accounts and general intangibles arising therefrom and all proceeds of any and all of the foregoing. The security interests created hereby and continued pursuant to this Agreement will, upon filing of UCC financing statements in the appropriate filing offices, constitute perfected security interests in the Purchase Agreement in favor of the Lender and are enforceable as such against all

creditors of and purchasers from the Borrower. All action on the part of the Borrower necessary or desirable to perfect such interests requested by the Lender, including the execution of financing statements for filing in the appropriate filing offices, has been or will be duly taken upon such filing. This Assignment is given as collateral security only. So long as no Event of Default has occurred and is continuing and subject to the express provisions herein to the contrary, the Borrower shall have and may exercise all rights as owner or holder of the Purchase Agreement which are not inconsistent with the provisions of the Loan Documents.

Section 2    **Representations and Warranties**. The Borrower hereby represents and warrants to Lender that (a) the Borrower has not assigned, transferred, mortgaged, pledged or otherwise encumbered any of its right, title and interest in, to and under the Purchase Agreement and no part of such right, title and interest is subject to any lien or other encumbrance, except in favor of the Lender; (b) the Borrower has paid all sums required to be paid by it prior to the date hereof under the terms of the Purchase Agreement and no default exists by any party to the Purchase Agreement; (c) the Borrower's exact legal name is set forth at the beginning of this Agreement and the Borrower does not conduct business under any other name; (d) the Borrower's chief executive offices and chief place of business, and the place where the Borrower keeps its records concerning the Purchase Agreement, is c/o Santa Fe Pointe Management, LLC, 16416 Oconee Creek Drive, Edmond, Oklahoma 73013; and (e) the Borrower's jurisdiction of organization is Oklahoma and its organizational identification number is _____.

Section 3    **Affirmative Covenants**. The Borrower hereby covenants with the Lender that the Borrower shall (a) perform and observe all covenants and agreements to be performed and observed by the Borrower under the Purchase Agreement and provide the Lender with copies of all consents or approvals of the Seller received by the Borrower in the course of its compliance with the Purchase Agreement; (b) enforce, short of termination, the performance and observance of all covenants and agreements to be performed or observed by the Seller under the Purchase Agreement; (c) appear in and defend any action or proceeding arising out of or in connection with any of the Purchase Agreement; (d) promptly give the Lender copies of any reports delivered by the Borrower, any materials provided by the Seller to the Borrower and any notices, including notices of default, given or received by the Borrower under any of the Purchase Agreement; (e) at any time and from time to time, upon the written request of the Lender, and at the sole expense of the Borrower, promptly and duly execute and deliver such further documents and take such further actions as the Lender may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers granted herein; (f) keep and maintain at is own cost and expense satisfactory and complete records of the Purchase Agreement; and (g) furnish to the Lender copies of Purchase Agreement and all amendments thereto and such other statements and schedules further identifying or describing the Purchase Agreement or the status thereof as the Lender may reasonably request.

Section 4    **Negative Covenants**. The Borrower hereby covenants with the Lender that the Borrower shall not (a) assign, transfer, mortgage, pledge or otherwise encumber, or permit to accrue or suffer to exist any lien or other encumbrance on or in, any of the right, title and interest of the Borrower in, to and under the Purchase Agreement except in favor of the Lender; (b) amend or modify any of the terms of the Purchase Agreement, except with the prior written consent of the Lender; (c) terminate or give or join in any material waiver, consent or

approval with respect to the Purchase Agreement, except with the prior written consent of the Lender; (d) settle or compromise any material claim against the Seller; (e) waive any default under or material breach of and the Purchase Agreement without the prior written consent of the Lender (which consent shall not be unreasonably withheld, conditioned or delayed); (f) take any other action in connection with the Purchase Agreement which would materially impair the value of the rights or interests of the Borrower or the Lender thereunder or therein without the prior written consent of the Lender (to be granted or withheld in the Lender's sole discretion); (g) without at least sixty (60) days' prior written notice to the Lender, (i) change the location of its chief executive offices or chief place of business from that specified in Section 2 hereof, or remove its books and records from such location or (ii) change its name, identify, jurisdiction or organization or structure to such an extent that any financing statements filed by the Lender in connection with this Agreement would become misleading.

**Section 5    Recognition of Lender.** The Borrower hereby irrevocably directs the Seller, upon request of the Lender, to recognize and accept the Lender as the "Buyer" under the Purchase Agreement for any and all purposes. The Borrower does hereby irrevocably constitute and appoint the Lender, for so long as this Assignment remains in effect, as its true and lawful attorney, during the continuance of an Event of Default, to demand and enforce compliance with the terms and conditions of the Purchase Agreement and all benefits thereunder.

**Section 6    Right of Lender To Cure Borrower Defaults.** If the Borrower shall fail to pay, perform or observe any of its covenants or agreements hereunder or under the Purchase Agreement, the Lender may (but shall have no obligation to) pay, perform or observe the same and collect the cost thereof, together with interest thereon at the Default Rate (as defined in the Note).

**Section 7    Lender Not Liable; Indemnification.** Anything contained herein or in the Purchase Agreement to the contrary notwithstanding, (a) the Borrower shall at all times remain solely liable under the Purchase Agreement to perform all of the obligations of the Borrower thereunder to the same extent as if this Assignment had not been executed; and (b) neither this Assignment nor any action or inaction on the part of the Borrower or the Lender shall release the Borrower from any of its obligations under the Purchase Agreement or constitute an assumption of any such obligation or liability under the Purchase Agreement or otherwise by reason of or arising out of this Assignment, nor shall the Lender be required or obligated in any manner to make any payment or perform any other obligation of the Borrower under or pursuant to the Purchase Agreement except as to exercise by the Lender, as a secured party, against the Borrower's interest in, to and under the Purchase Agreement, or to make any inquiry as to the nature or sufficiency of any payment received by the Lender, or to present or file any claim, or to take any action to collect or enforce the payment of any amounts which have been assigned to the Lender or to which it may be entitled at any time or times. The Borrower shall and does hereby agree to indemnify the Lender and hold the Lender harmless from and against any and all liability, loss or damage which it may or might incur, and from and against any and all claims and demands whatsoever which may be asserted against it, in connection with or with respect to the Purchase Agreement or this Assignment, whether by reason of any alleged obligation or undertaking on its part to perform or discharge any of the covenants or agreements contained in the Purchase Agreement or otherwise, except for any such claims, demands, liabilities, losses or damages determined by a final order of a court of competent jurisdiction to have been the direct

result of the gross negligence or willful misconduct of the Lender. Should Lender incur any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys fees, shall be paid by the Borrower to the Lender immediately upon demand, together with interest thereon at the Default Rate (as defined in the Note) until paid. .

**Section 8    Default.** If an Event of Default shall occur and be continuing, the Lender may perform any of the obligations and exercise any of the rights, powers, privileges and remedies of the Borrower, and do any and all acts, matters and other things that the Borrower is entitled to do, under or with respect to the Purchase Agreement, including without limitation the purchase of the Project in accordance with the terms thereof. In addition, if an Event of Default shall have occurred and be continuing, then, in addition to any other rights or remedies provided for herein and in any other Loan Document or that may otherwise be available at law or in equity, the Lender shall have all rights and remedies of a secured party under the Uniform Commercial Code in the State of New York.

**Section 9    Further Assurances.** From time to time upon the request of the Lender, the Borrower shall promptly and duly execute, acknowledge and deliver any and all such further instruments and documents as the Lender may deem reasonably necessary or desirable to carry out the purpose and intent of this Agreement or to enable the Lender to enforce any of its rights hereunder. The Borrower hereby authorizes the Lender to record this Assignment and to file any such financing statements or continuation statements without the signature of the Borrower to the extent permitted by applicable legal requirements.

**Section 10    Amendments, Waivers, Etc.** This Assignment cannot be amended, modified, waived, changed, discharged or terminated except by an instrument in writing signed by the parties hereto.

**Section 11    No Implied Waiver; Cumulative Remedies.** No course of dealing and no delay or failure of the Lender in exercising any right, power or privilege under this Assignment or any other Loan Documents shall affect any other or future exercise thereof or exercise of any other right, power or privilege; nor shall any single or partial exercise of any such right, power or privilege or any abandonment or discontinuance of steps to enforce such a right, power or privilege preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies of the Lender under this Assignment are cumulative and not exclusive of any rights or remedies which the Lender would otherwise have under the other Loan Documents, at law or in equity.

**Section 12    Notices.** All notices, requests, demands, directions and other communications under the provisions of this Assignment shall be sent pursuant to and subject to the provisions of Section 10.2 of the Loan Agreement.

**Section 13    Termination; Survival.** The Lender shall terminate this Agreement and release the security interests granted hereunder upon payment and performance in full by the Borrower of its obligations under the Loan Documents. Notwithstanding the foregoing the indemnities contained herein, including the indemnity set forth in Section 7 hereof, shall survive such termination.

**Section 14     Severability**.  If any term or provision of this Assignment or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Assignment, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforceable to the fullest extent permitted by law.

**Section 15     Governing Law**.  This Assignment shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of laws principles, except as required by mandatory provisions of law and except to the extent that the Uniform Commercial Code of the State of New York provides that the validity or perfection of the security interests hereunder, or remedies hereunder in respect of any particular collateral are governed by the laws of a jurisdiction other than the State of New York.  The Borrower hereby irrevocably and unconditionally waives it rights to a trial by jury in any legal action or proceeding relating to or arising out of this Assignment.

**Section 16     Successors and Assigns; Beneficiaries**.  This Assignment shall bind the Borrower and its successors and assigns, and shall inure to the benefit of the Lender and its successors and assigns.  The Borrower may not assign its rights or obligations without the prior written consent of the Lender.  This Assignment is for the purpose of defining the respective rights and obligations of the Borrower and the Lender and is not for the benefit of any creditor or other third party.

IN WITNESS WHEREOF, the Borrower has duly executed and delivered this Assignment of Purchase Agreement as of the date first above written.

SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:     SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company, its general partner

By: _Shirt F. Oliphant_

Name: Theotis F. Oliphant

Title: Managing member

STATE OF _Oklahoma_

COUNTY OF _Oklahoma_

On this _20th_ day of December , 2006, before me, _Rachel Reed-Light_ personally appeared, _Theotis Oliphant_ proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as the _Managing Member_ of Santa Fe Pointe Management, LLC, the general partner of Santa Fe Pointe, LP. And that, by his signature on the instrument, the entity on behalf of which he acted executed the instrument.

WITNESS my hand and official seal.

Notary Public

My Commission expires:
11-13-09
Commission # 01018124

Exh. _3B_, Page 85

## CONSENT AND JOINDER OF SELLER

The undersigned, WAVERLY-WALNUT CREEK APARTMENTS, INC. (together with its permitted successors and assigns, the "Seller"), hereby consents to the assignment of the Purchase Agreement as described in the foregoing Assignment of Purchase Agreement. Capitalized terms used herein and not defined shall have the meaning ascribed thereto in said Assignment of Purchase Agreement.

The Seller agrees to perform pursuant to the terms and conditions of the Purchase Agreement with the Borrower notwithstanding the occurrence of any default on the part of the Borrower under the Purchase Agreement or the exercise by the Lender, as a secured party, against the Borrower's interest in, to and under the Purchase Agreement.

The Seller also agrees that, in the event of a breach by the Borrower of any of the terms and conditions of the Purchase Agreement, the Seller shall give prompt written notice to the Lender of such breach. The Lender shall have thirty (30) days from the receipt of such notice of default to remedy or cure said default or, if such default cannot be cured within such thirty (30) day period with reasonable diligence, and the Lender shall have diligently undertaken to cure such default, then ninety (90) days; provided, however, that nothing herein shall require the Lender to cure said default, but the Lender shall, in its sole discretion, have the option to do so.

The Purchase Agreement is in full force and effect and no default on the part of the Borrower is known to exist by the Seller as of the date hereof.

WAVERLY-WALNUT CREEK APARTMENTS, INC.

By: _____
Name: Wm Forrest White
Title: officer

Dated: December _A_, 2006

EXHIBIT A

Legal Description of Real Estate

APPLICATION NO.: 06070929

## EXHIBIT "A"

All of Lot TWO (2), Block SIXTEEN (16), in SOUTHERN OAKS, SECTION THREE, an addition to Oklahoma City, Oklahoma County, Oklahoma, EXCEPT the following described property: COMMENCING at the Northwest corner of the said Lot 2; thence Southeasterly on the Westerly line and on the arc of a curve to the right having a radius of 218.82 feet for the distance of 104.76 feet to the point of beginning; thence South 7°47'00" East on the Westerly line of the said Lot 2, for a distance of 275.00 feet to the point of curve; thence Southerly, Southeasterly and Easterly on the arc of the curve to the left having a radius of 25.00 feet, for a distance of 39.27 feet to a point of tangency on the Southerly line of the said Lot 2; thence North 82°13'00" East on the South line of the said Lot 2, for a distance of 269.42 feet, to a point of curve; thence Northeasterly on the arc of a curve to the right having a radius of 5729.58 feet for a distance of 20.67 feet; thence North 7°47'00" West and parallel to the West line of the said Lot 2, for a distance of 300.04 feet; thence South 82°13'00" West and parallel to the South line of the said Lot 2, for a distance of 315.00 feet to the point or place of beginning as shown on the recorded plat thereof.

TAX ID# 109991200    40/39

AMERICAN GUARANTY TITLE COMPANY
As Agent For:
OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

_Authorized Signature_

Exh. _3B_, Page 88

## EXHIBIT B

True, correct and complete copy of Purchase Agreement

155738v1

## ASSIGNMENT AND ASSUMPTION OF
## CONTRACT FOR SALE OF REAL ESTATE

FOR VALUE RECEIVED, RANT, LLC ("**Assignor**") hereby assigns, transfers and sets over to SANTA FE POINTE, L.P., an Oklahoma limited liability company ("**Assignee**"), without recourse or warranty of any kind whatsoever, all right, title and interest of Assignor in and to that certain Contract for Sale of Real Estate, dated July 12, 2006 as amended by Addendum #1 to Contract for Sale of Real Estate between Assignor, as buyer, and Waverly-Walnut Creek Apartments, Inc., as seller (the "**Agreement**"). Assignee hereby acknowledges receipt of a copy of the Agreement and accepts such assignment and agrees to assume all of the responsibilities and obligations of Assignor under the Agreement.

Dated: December **20**, 2006

RANT, LLC

By: _Theotis F. Oliphant_
Name: Theotis Oliphant
Title: Managing Member

SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:    SANTA FE POINTE
       MANAGEMENT, LLC, an
       Oklahoma limited liability company,
       its general partner

By: _Theotis F. Oliphant_
Name: Theotis Oliphant
Title: Managing Member

## CONTRACT FOR SALE OF REAL ESTATE

**THIS CONTRACT FOR SALE OF REAL ESTATE** is entered into by and between **Waverly-Walnut Creek Apartments, Inc.** ("Seller") and **Rant, LLC And/Or Assigns** ("Buyer") upon approval by both Seller and Buyer, as evidenced by their signatures hereto, and the insertion of the Effective Date per Paragraph 22, a valid and binding contract of sale shall exist and the terms and conditions of which are as follows:

**1. SALE:** Seller agrees to sell and convey to Buyer by warranty deed and Buyer agrees to purchase the following described real estate ("the Property") located in Oklahoma County, Oklahoma:

**The Sante Fe Pointe Apartments – 224 Units**
**125 SW 74ᵗʰ Street**
**Oklahoma City, OK 73139**

Legal Description: Exact legal description to be provided by Seller and to be attached hereto as Exhibit "A".

**2. PURCHASE PRICE:** The total purchase price is **$4,256,000**, payable as follows: **$25,000** on execution of this contract, as earnest money and part payment of the purchase price (the "Earnest Money"), receipt of which is acknowledged by Seller, and which has been delivered to the Broker identified below. The Earnest Money, in immediately available federal funds, evidencing Buyer's obligations under this Agreement, shall be deposited with Old Republic National Title Insurance Company ("Escrow Agent") in an interest bearing escrow account within three (3) days from the Effective Date of this Contract; and the balance of the purchase price in cash, cashier's or certified check upon delivery of the deed (the "Closing"). In the event Buyer fails to timely deposit the earnest money with the Escrow Agent, this Agreement shall be of no force and effect.

**3. CONDITION OF PROPERTY, INSPECTIONS, DISCLAIMER AND CONTINGENCIES:** The Buyer agrees and acknowledges that Seller, Broker(s) and their agents are not experts regarding the condition of the Property. No representations, warranties, or guarantees regarding the condition of the Property, or environmental hazards, are expressed or implied except as may be specified herein by Seller.

**3.1 PROPERTY INFORMATION:** Seller shall make available to Buyer, immediately upon acceptance of this Agreement, to the extent in Seller's possession, copies of, or access to, with the right to copy, the following ("Property Information"):

(a)    The standard form of apartment lease together with any written addenda, modifications, or extensions pertaining to a particular lease, used by Seller for the Property and the right to inspect and copy the existing Leases in the possession of the property manager for the Property;

(b)    A list of all unit types, number of each type, square footage of each type and the current street rate or asking rent for a new resident.

(c)    The most current rent roll of the Property ("Rent Roll") notarized by Seller, showing residents name, original lease date, lease expiration date, rental rate security deposit and unit number or address.

(d)    Year to date and prior full year, if available, operating statements ("Operating Statements");

Buyer _____    Seller _____

**Exh. 3B, Page 91**

(e)    A list of Personal Property, if any. (free standing appliances such as refrigerators, office furnishings and equipment, pool equipment, tools, etc.)

(f)    A list and copies of any management, service or maintenance agreements, if any, relating to the Property ("Service Contracts");

(g)    Any environmental, architectural and engineering reports prepared for Seller and, to Seller's knowledge, in its possession in connection with Seller's purchase, ownership or management of the Property.

(h)    Seller will disclose in writing and attach hereto all other known property faults which may affect the value of the property, including hazardous substances as defined by the EPA.

(i)    The most recent copy of all utility bills paid by Seller including gas, electric, water, sewer, trash, and cable.

Seller represents and warrants, to the best of Sellers knowledge, the accuracy or completeness of the Property Information. If Seller has not provided all necessary information and material requested herein within 30 days from the Effective Date, this contract shall be considered null and void at the Buyers discretion and the Earnest Money shall be considered mutually released by both Buyer and Seller and immediately returned to Buyer. The Property Information and all information furnished to, or obtained through inspection of the property by Buyer, its affiliates, or employees or agents relating to the property (other than matters of public record), will be treated by Buyer, its affiliates, employees and agents as confidential, and will not be disclosed to anyone other than on a need to know basis to Buyer's consultants, and will be returned to Seller by Buyer if Closing does not occur.

3.2 PHYSICAL INSPECTIONS/DUE DILIGENCE PERIOD: Within 60 days from the Effective Date, Buyer, its agents, and employees shall have the right to enter upon the Property for the purpose of making such non-intrusive inspections as Buyer may deem appropriate at Buyer's sole risk, cost and expense. All of such entries upon the Property shall be at reasonable times during normal business hours and after at least forty-eight (48) hours prior notice to Seller or Seller's agent, and Seller or Seller's agent shall have the right to accompany Buyer during any activities performed by Buyer on the Property. Buyer shall not disturb the tenants on the Property and Buyer's inspection shall be subject to the rights of tenants under their Leases and the law. If any inspection or test disturbs the Property, Buyer will restore the Property to the same condition as existed prior to the inspection or test. Buyer shall defend, indemnify and hold Seller, Seller's tenants, agents, and employees and the Property harmless from and against any and all losses, costs, damages, claims, or liabilities, including but not limited to, mechanic's and materialmen's liens and Seller's attorney fees, arising out of or in connection with Buyer's inspection of the Property as allowed herein.

3.3 FINANCIAL INSPECTIONS/DUE DILLIGENCE PERIOD: During the Financial Due Diligence Period, which shall be 45 days from the receipt of all Property Information from Seller (Paragraph 3.1), Buyer shall have the right to conduct any and all financial due diligence it shall deem necessary. The Seller has agreed to provide all property information required in paragraph 3.1 within ten days from the Effective Date (Paragraph 22). Should Seller fail to provide said property information in the form and substance defined within 30 days from the Effective Date, this contract shall be considered null and void, at the option of the Buyer, and of no further force or effect. In such event, the Title Company is instructed to immediately return the earnest money to Buyer after receiving written notice from Buyer and with no further release requirements from Seller.

Buyer _____    Seller _____

**Exh. _3B_, Page 92**

3.4 **LEAD-BASED PAINT/ENVIRONMENTAL INSPECTIONS:** During the Physical Due Diligence Period, Buyer, at Buyer's expense, shall have the right to enter upon the Property, together with any other persons, to inspect and conduct such environmental, soil, air, hydrocarbon, chemical, carbon, asbestos, lead-based paint, and other test Buyer deems necessary or appropriate. The inspections may include a non-intrusive Phase I environmental inspection of the Property. If any report discloses a "recognized environmental condition" (as hereinafter defined) affecting the Property, then Seller may terminate this Agreement in its sole and absolute discretion, and the Earnest Money shall be refunded to Buyer. For purposes hereof, a "recognized environmental condition" is defined by American Society for Testing and Material Standard Practice for Environmental Site Assessments: Phase I Site Assessment.

> ***LEAD BASED PAINT DISCLOSURE*** (For Property built before 1978 ONLY); Buyer acknowledges that prior to signing this Contract, Buyer received and read a copy of the EPA *"Protect Your Family From Lead in Your Home"* pamphlet, which explains the hazards of lead-based paint. Seller shall disclose any knowledge of lead-based paint on the property or any results of prior tests for lead-based paint, which have been performed.

3.5 **FLOOD:** Seller represents to the best of Seller's knowledge the Property has not been damaged or affected by flood, storm run off water, or storm sewer backup. During the Physical Due Diligence Period, Buyer, at Buyer's expense, may enter upon the Property to investigate and conduct tests to satisfy himself/herself as to the flood and/or water history and water risk attendant to the Property. If, upon Buyer's investigation, the Buyer is dissatisfied with any of the flood and water history and water risk attendant to the Property, the Buyer may cancel and terminate this Contract and receive a refund of the Earnest Money by delivering written notice to the Seller within twenty-four (24) hours of the expiration of the Due Diligence Period.

3.6 **ENVIRONMENTAL REPRESENTATIONS AND INSPECTIONS: Except as may be specified in Paragraph 14 below,** Seller represents to the best of Seller's knowledge, that there have been no hazardous substances, as defined by the Federal Environmental Protection Agency, stored, released, disposed or used on the Property, including underground storage tanks; that there have been no special use permits, variances, or other land-use authorizations issued concerning waste disposal on the Property; that the Property is neither listed with, nor adjacent to a site listed with, the Environmental Protection Agency as hazardous waste site; and that Seller has received no notice of any legal or administrative proceedings regarding environmental issues affecting the Property.

3.7 **EQUIPMENT:** No fixtures or appliances shall be removed from the Property after the Effective Date herein without notice to Buyer.

During the Physical Due Diligence Period, Buyer, at Buyer's expense, shall have the right to inspect such items.

Notwithstanding anything contained herein, it is understood and agreed by Buyer and Seller that Property is being sold in "AS IS" condition.

3.8 **TERMITE INSPECTION:** After removal of all Buyer contingencies the Seller shall cause to be delivered, in care of the Escrow Agent, at Seller's expense, a current report by a licensed exterminating company addressed to Buyer, reflecting that the buildings on the Property are free and clear of visible infestation or damage caused by any wood destroying organisms (termites, etc,). In the event the report shows

Buyer _____    Seller _____

visible infestation the Seller shall have the property treated by a licensed exterminating company and provide Buyer with a certificate showing that there is no live infestation on the property.

**3.9 TERMINATION DURING PHYSICAL DUE DILIGENCE PERIOD:** In the event Buyer determines before the expiration of the Physical Due Diligence Period that the Property is unacceptable for Buyer's purposes, Buyer shall have the right to terminate this Agreement by giving to Seller written notice of termination before the expiration of the Physical Due Diligence Period. Upon notification by Buyer, both Buyer and Seller hereby agree that this Agreement shall be terminated and of no further force or affect and the Escrow Agent shall immediately refund the Earnest Money to Buyer without any additional release requirements, less any Buyer's costs incurred, pursuant to this contract, and neither party shall have any further rights or liabilities hereunder, except for those provisions which survive the termination of this Agreement.

**3.10 TERMINATION DURING FINANCIAL DUE DILIGENCE PERIOD:** In the event Buyer determines before the expiration of the Financial Due Diligence Period that the Property is unacceptable for Buyer's purposes, Buyer shall have the right to terminate this Agreement by giving to Seller written notice of termination before the expiration of the Financial Due Diligence Period. Upon notification by Buyer, both Buyer and Seller hereby agree that this Agreement shall be terminated and of no further force or affect and the Escrow Agent shall immediately refund the Earnest Money to Buyer without any additional release requirements, less any Buyer's costs incurred, pursuant to this contract, and neither party shall have any further rights or liabilities hereunder, except for those provisions which survive the termination of this Agreement.

**3.11 ACCEPTANCE OF PROPERTY:** If Buyer fails to **(i)** investigate the water and flood risk, or environmental risk attendant to the Property; **(ii)** have the equipment inspected; **(iii)** have the structure and roof inspected; or **(iv)** deliver such notices in the manner specified, Buyer accepts the flood and water risk, any environmental risk, the structure, and all equipment attendant to the Property and accepts all portions of the Property which are subject to Buyer's right of inspection, in the condition or state which existed at the expiration of the time periods stated in the above paragraphs. Unless otherwise agreed upon, in writing, Buyer, by Closing or taking possession of the Property, shall be deemed to have accepted the Property, in its then condition, including fixtures and equipment. No warranties, express or implied, by Seller, or Seller's agents, with reference to the condition of the Property or any fixtures or equipment shall be deemed to survive the Closing.

**3.12 FINANCING CONTINGENCY/TERMINATION:** Buyer intends to obtain financing from Tax Exempt Multi-family Bonds and Affordable Housing Tax Credits ("AHTC"). Buyer shall have **until February 1, 2007** in which to obtain such financing(s) as Buyer, in its discretion, shall deem advisable with respect to its acquisition of the Property. Buyer shall make application for said financing on or before September 17, 2006. In the event Buyer determines, before the expiration of the Financing Period, that Buyer is unable to obtain such financing(s) as Buyer deems appropriate, Buyer shall have the right to terminate this Agreement by giving to Seller written notice of termination before the expiration of the Financing Period, the Escrow Agent shall immediately refund the Earnest Money to Buyer, without any additional release requirements, less any Buyer costs incurred pursuant to this Agreement, and neither party shall have any further rights or liabilities hereunder except for those provisions which survive the termination of this Agreement.

**4. TITLE AND SURVEY REVIEW:**

**4.1 DELIVERY OF TITLE REPORT:** Within ten (10) days after removal of all contingencies, Seller shall cause to be delivered to Buyer a new or currently re-certified Survey ("Survey") acceptable to the Title

Buyer _____    Seller _____

Company for Survey Coverage and a preliminary report or title commitment issued by the Title Company (the "Title Report"), covering the Property, together with copies of all documents referenced in Title Report. Title Commitment (Binder) shall be shared equally between buyer and seller and Survey shall be paid by Seller.

**4.2 TITLE REVIEW AND CURE:** Buyer shall review title to the Property as disclosed by the Title Report and the Survey. Buyer shall notify Seller in writing of any title or survey objections no later than ten (10) days after Buyer's receipt of the Title Report and Survey. Seller shall have no obligations to cure any title objections except liens of an ascertainable amount created by Seller, which liens Seller shall cause to be released at the Closing. If the Title Company revises the Title Report after the expiration of the Due Diligence Period to add or modify exceptions that materially and adversely affect title to the Property, Buyer may object to such matter by notice to Seller within five (5) days after such revised Title Report is delivered to Buyer. Seller may, but shall not be obligated to, attempt to cure any title objections by the Closing Date. If Seller elects not to cure any title or survey objection, or fails to cure any title or survey objection by the Closing Date, then Buyer shall either terminate this Agreement by written notice to Seller given on or before ten (10) days after receipt of any notice by Seller, that it elects not to cure or cannot cure any title or survey objections, or, if later, the Closing Date, and the Earnest Money shall be immediately refunded to Buyer without any additional release requirements, or waive such title or survey objections, in which event the Closing shall occur as contemplated herein and Buyer shall accept title to the Property subject to such condition. Failure to so terminate shall constitute waiver of such objection(s).

**4.3 TITLE POLICY:** At Closing, as a condition to Buyer's obligation to close and subject to the performance by Buyer of all its obligations in connection therewith, the Title Company shall deliver to Buyer an Owner's Policy of Title Insurance ("Title Policy"), issued by the Title Company dated the date and time of recording of the Deed in the amount of the Purchase Price, insuring Buyer as owner of fee simple title to the Property, in such form permitted by, and subject to such exceptions as set forth in, the most current Title Report as of the expiration of the Due Diligence Period. The Title Policy may be delivered after the Closing if that is customary in the locality. Cost of Owner's Title Policy shall be shared equally between buyer and seller.

**5. NON-FOREIGN SELLER:** Seller represents and warrants that at the time of acceptance hereof and at Closing, Seller is not a "foreign person" as such term is defined in Section 1445(f) of the Internal Revenue Code of 1986. At the Closing, and as a condition thereto, Seller shall furnish to Buyer an affidavit, in form and substance acceptable to Buyer, signed under penalty of perjury and containing Seller's United States Social Security and/or Taxpayer Identification Number, to the effect that Seller is not a foreign person within the meaning of Section 1445(f) of the Internal Revenue Code.

**6. OPERATIONS AND RISK OF LOSS:**

**6.1 ONGOING OPERATIONS:** During the pendency of this Agreement, Seller shall carry on its business and activities to the Property substantially in the manner as carried out on the date thereof.

**6.2 PERFORMANCE UNDER LEASES AND SERVICE CONTRACTS:** During the pendency of this Agreement, Seller will perform its material obligations under the Leases and Service Contracts and other agreements that may affect the Property.

**6.3 NEW CONTRACTS:** During the pendency of this Agreement, Seller will not enter into any contract that will be an obligation affecting the Property subsequent to the Closing, except contracts entered into in the ordinary course of business that are terminable without cause on 30 days' notice, without the prior consent

Buyer _____     Seller _____

**Exh. _3B_, Page 95**

of the Buyer, which shall not be unreasonably withheld. New tenant leases shall be for a term of no more than six months and at a rate no lower than the stated street rate as provided by Seller per paragraph 3.1 (b).

**6.4 TERMINATION OF SERVICE CONTRACTS:** On the Closing Date, Seller shall terminate those Service Contracts which are terminable without any cost or liability to Seller, unless Buyer notifies Seller during the Due Diligence Period as to which of such Service Contracts should not be canceled and will be assumed by Buyer. All Service Contracts not terminated by Seller shall be assigned to and assumed by Buyer at Closing.

**6.5 RISK OF LOSS:** Risk of loss resulting from any condemnation or eminent domain proceeding which is commenced or has been threatened prior to the Closing, and risk of loss to the Property due to fire, flood or any other cause prior to the Closing, shall remain with Seller. After Closing or transfer of possession such risk shall be upon Buyer.

**7. TAXES AND PRORATIONS:** The Seller shall pay in full: **(i)** all special assessments against the Property upon the date of Closing, whether or not payable in installments; **(ii)** all taxes, other than general ad valorem taxes for the current calendar year, which are a lien on the Property upon the date of Closing, including the cost of documentary stamps to be attached to the Deed; and **(iii)** the cost of any item of workmanship or material furnished on or prior to the date of Closing which is or may become a lien on the Property. Unless otherwise specified in Paragraph 14, the following items shall be prorated between the Seller and the Buyer as of the date of Closing; **(iv)** all collected rents for the current month for every rented unit; **(v)** general ad valorem taxes for the current calendar year, provided that, if the amount of such taxes has not been fixed, the prorations shall be based upon the rate of levy for the previous calendar year; and **(vi)** utilities, including water, sewer, electric and gas, based upon the last reading of meters prior to closing; and **(vii)** fees and charges under Service Contracts as are being assigned to and assumed by Buyer at Closing. Utilities shall be transferred as of the Closing date. Seller shall obtain final readings on the day prior to closing and Buyer shall have new accounts established to become effective as of the Closing date. In the event that final prorations cannot be made at Closing for any item being prorated, then Buyer and Seller agree to allocate such items on a fair and equitable basis as soon as invoices or bills are available, final adjustment to be made as soon as reasonably possible after the Closing. Payments in connection with the final adjustment shall be due within thirty (30) days of written notice. Security deposits shall be delivered and transferred by separate check to Purchaser at closing. Any and all uncollected rent or other amounts due and payable at the time of closing shall be the responsibility and for the benefit of the Buyer. After Closing the Seller shall not contact tenants or make any attempt to collect any monies due as a result of the operation of the property.

**8. CLOSING:** Subject to the provisions contained herein and subject to the fulfillment of any conditions to the Closing specified in Paragraph 14, Closing shall be as agreed between Seller and Buyer, but no later than 30 days after the award of AHTC (**"Closing Date"**). AHTC are scheduled to be awarded on January 31, 2007. Buyer shall have the right to extend the Closing Date for two separate 30 day periods, provided that the following conditions are met: **(i)** Buyer provides written notice to Seller at least 10 days prior to the Closing Date; and **(ii)** Buyer transfers an extension fee to Seller in the amount of $25,000 contemporaneously with the deliver of each such notice. Any such extension fee(s) will be considered earned by seller upon receipt and shall be applicable to the Purchase Price at Closing. If the Buyer has objections to Title, which require correction, the Closing Date shall be extended for the time permitted under Paragraph 4. At or prior to the Closing, the Seller shall deliver to the Escrow Agent a duly executed and acknowledged warranty deed conveying marketable, fee simple title to the Property to the Buyer, assignments of any leases and/or contracts affecting the Property, a Non-foreign Affidavit, a Bill of Sale for any personal property, all keys to the Property,

Buyer      Seller

and such other documents or materials as are reasonably necessary to convey the Property and rights therein, for delivery to the Buyer upon Payment of the purchase price. Unless otherwise agreed in writing, possession shall be transferred at closing. The Closing/Escrow fees charged at Closing shall be Seller.

**9. POST-CLOSING DELIVERIES:** Immediately after the Closing, Seller shall deliver to Buyer, at the Property; the original Leases; original copies of all contracts, receipt for deposits, and unpaid bills that are Buyer's responsibility for services occurring after closing; all keys, if any, used in the operation of the Property; and, if in Seller's possession or control.

**10. NOTICE TO TENANTS:** Seller and Buyer shall deliver to each tenant immediately after the Closing a notice regarding the sale attached hereto, or such other form as may be required by applicable state law. Within ten (10) days after the Closing Date, Buyer shall send a certificate of Buyer to Seller confirming delivery of the tenant letters.

**11. BREACH OR FAILURE TO CLOSE:** If after the Seller has performed Seller's obligations under this Contract and, if within five (5) days after the date specified above for Closing, the Buyer fails to make payments or to perform any other obligation of the Buyer under this Contract, then the Seller may, at Seller's option, cancel and terminate this Contract and retain all sums paid by the Buyer, but not to exceed 5% of the purchase price, as liquidated damages, or pursue any other legal or equitable remedy for the breach of this Contract by the Buyer. The Seller and the Buyer agree that the undersigned Broker(s) may retain and shall be paid four percent (4%) of such retained funds, not exceeding the agreed upon commission for services in obtaining this Contract. If the Buyer performs all of the obligations of Buyer and Seller breaches this Contract or fails to perform any of Seller's obligations, then Buyer shall be entitled to either cancel and terminate this Contract, return the abstract, if any, to Seller and receive a refund of the Earnest Money, or pursue any other legal or equitable remedy. Should either party employ attorneys to interpret or enforce any of the provisions hereof, the party against whom any final judgment is entered agrees to pay the prevailing party all reasonable costs, charges, and expenses, including attorney's fees, expended or incurred in connection therewith.

**12. EFFECT:** This Contract shall be executed by both Seller and Buyer and shall be binding upon and inure to the benefit of Seller and Buyer, their heirs, legal representatives, successors and assigns. This Contract sets forth the complete understanding of Seller and Buyer and supercedes all previous negotiations, representations and agreements between them and their agents. This Contract can only be amended or modified by a written agreement signed by Seller and Buyer. In executing this Contract, both Seller and Buyer agree to the terms of the Broker(s) Receipt and Agreement contained below.
**13. MISCELLANEOUS:**

**13.1 PARTIES BOUND:** This Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devisees of the parties.

**13.2 CONFIDENTIALITY:** Buyer or Seller shall not record this Agreement or any memorandum of this Agreement.

**13.3 HEADINGS:** The article and paragraph headings of this Agreement are of convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

Buyer _____    Seller _____

**Exh. _3B_, Page 97**

**13.4 INVALIDITY AND WAIVER:** If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

**13.5 GOVERNING LAW:** This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the state in which the Real Property is located.

**13.6 SURVIVAL:** Unless otherwise expressly stated in this Agreement, each of the covenants, obligations, representations, and agreements contained in this Agreement shall survive the Closing.

**13.7 NO THIRD PARTY BENEFICIARY:** This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third party beneficiary, decree, or otherwise.

**13.8 DISCLAIMER:** It is expressly understood by the Seller and Buyer that the Listing Realtor or their Agents and the Selling Realtor or their Agents do not warrant the present or future value, size by square footage, condition, structure or structure systems of any building, nor do they hold themselves out to be experts in quality, design and construction, and further agree to hold the Listing Realtor or their Agents and Selling Realtor or their Agents harmless in any of these events. Agents, however, agree that they will disclose to Buyer any known defects or problems with the property that is the subject of this contract.

**13.9 ENTIRETY AND AMENDMENTS:** This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property except for any confidentiality agreement binding on Buyer, which shall not be superseded by this Agreement. This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

**13.10 TIME:** Time is of the essence in the performance of this Agreement.

**13.11 ATTORNEY'S FEES:** Should either party employ attorneys to interpret or enforce any of the provisions hereof, the party against whom any final judgment is entered agrees to pay the prevailing party all reasonable costs, charges, and expenses, including attorney's fees, expended or incurred in connection therewith.

**13.12 NOTICES:** All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Paragraph 17. Any such notices shall be either (a) sent by certified mail, return receipt requested, in which case notice shall be deemed delivered three business days after deposit, postage prepaid in the U.S. mail, (b) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one business day after deposit with such courier, (c) sent by facsimile, in which case notice shall be deemed delivered upon transmission of such notice, or (d) sent by personal delivery, in which case notice shall be deemed delivered upon receipt. A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.

Buyer _____     Seller _____

**Exh. *3B*, Page 98**

**13.13 CONSTRUCTION:** The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and any ambiguities shall not be resolved against the drafting party, both parties being deemed to have drafted this Contract.

**13.14 CALCULATION OF TIME PERIODS:** Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included at, unless such last day is a Saturday, Sunday or legal holiday for national banks in the location where the Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday. The last day of any period of time described herein shall be deemed to end at 5:00 P.M. local time of the Property described herein.

**13.15 EXECUTION IN COUNTERPARTS:** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. To facilitate execution of this Agreement, the parties may execute and exchange by telephone facsimile counterparts of the signature pages and /or any other pages as deemed necessary to reach a final agreement.

## 14. SPECIAL CONDITIONS:

Notwithstanding anything to the contrary contained herein, the Earnest Money as defined in Para. 2 shall be deemed earned and non-refundable to the Buyer in two phases:

September 5, 2006 – $25,000 Earned and Non-Refundable

October 31, 2006 – additional $25,000 Earned and Non-Refundable

December 31, 2006 –$25,000 Earned and Non-Refundable

## 15. BROKER RELATIONSHIP DISCLOSURE/COMMISSION: The parties to this transaction hereby acknowledge that, prior to the parties entering into this Contract, the following disclosures were clearly made to each of the parties.

The Listing Broker is acting as a Transaction Broker.

The Selling Broker is acting as a Transaction Broker.

It is further acknowledged and agreed by the parties that the Seller will pay the Broker(s) 4% of the purchase price at Closing as a commission for services rendered in this real estate transaction.

## 16. BINDING EFFECT AND ENFORCEABILITY OF CONTRACT: Before this Contract shall be binding and can be enforced by either party, the following acts of execution and deliveries shall be completed:

## 17. Execution and Delivery of Contract Documents, Counterparts. The parties agree that the Contract between them shall be evidenced by either a single executed Contract upon which each of them shall place their signatures, or by each of them placing their signatures on separate complete (carbon, photo or fax) copies "counterparts" of the Contract documents. The Contract shall be binding only upon the delivery to each party, or their agent, of either (i) a Contract containing the original or copy of the

Buyer                    Seller

**Exh. _3B_, Page 99**

signature of both parties or (ii) a counterpart containing either the original or a copy of the signature of the other party.

**18. NOTICE:** Any notice provided for herein shall be given in writing, sent by (a) personal delivery, (b) United States mail, postage prepaid, (c) overnight mail, prepaid or (d) by FAX, to the Escrow Agent, with copies to the other parties or to such other parties and address as shall hereafter be designated in writing as indicated on Exhibit B attached hereto. Any such notice shall be deemed to have been given upon receipt by the Escrow Agent.

**19. BROKER(S) RECEIPT AND AGREEMENT:** The Buyer and Seller mutually warrant and represent that the undersigned Broker(s) is/are the only Broker(s) involved in this transaction. The Broker(s) and/or Escrow Agent shall be entitled to accept Buyer's personal check for the Earnest Money and endorse it for deposit without recourse. If Seller does not approve the above Contract the Earnest Money shall be returned to Buyer.

**20. SALES COMMISSION:** At Closing, Seller shall pay to the Real Estate Broker(s) identified herein, as compensation 4% of the gross sales price however, the sales commission shall be due and payable if, as and only when, the transaction contemplated hereby is fully consummated. Any cooperating or referring brokerage fees due will be the responsibility of the Brokers (Paragraph 15) and paid only by separate agreement between the Brokers.

**21. ACCEPTANCE:** If this contract is not accepted within five (5) days from the date presented to Seller, this contract shall be considered withdrawn, null and void and of no further force or effect.

**22. SECTION 1031 EXCHANGE:** Seller and/or Buyer may consummate the sale of the Property as part of a so-called like kind exchange (the "Exchange") pursuant to §1031 of the Internal Revenue Code of 1986, as amended (the "Code"), provided that; (i) the Closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of the Exchange to be a condition precedent or condition subsequent to Seller's or Buyer's obligations under this Agreement; (ii) Seller or Buyer shall effect the Exchange through a qualified intermediary, and (iii) Buyer or Seller shall not be required to make an assignment of the purchase agreement for the Exchange property or be required to acquire or hold title to any property for the purposes of consummating the Exchange. Buyer or Seller shall not by this Agreement or acquiescence to the Exchange (1) have its rights under this Agreement affected or diminished in any manner, or (2) be responsible for compliance with or be deemed to have warranted to Seller or Buyer that the Exchange in fact complies with §1031 of the Code.

Buyer _____     Seller _____

**Exh. _3B_, Page 100**

**23. EFFECTIVE DATE:** The Effective Date of this agreement shall be inserted after complete acceptance of this agreement by both Buyer and Seller and receipt has been acknowledged by the Escrow Agent herein.


**EFFECTIVE DATE:** _____


**APPROVED AND AGREED TO BY BUYER(S):**

This _____ day of _____, 2006

_____

_____

_____


**APPROVED AND AGREED TO BY SELLER(S):**

This _____ day of _____, 2006

_____

_____    _____
Buyer            Seller

**Exh. _3B_, Page 101**

## ACKNOWLEDGEMENT BY ESCROW HOLDER

### ACKNOWLEDGEMENT OF CONTRACT

The Escrow Holder hereby agrees to perform its obligations under this Agreement and acknowledges receipt of the fully executed counterpart of this Agreement. If Buyer's earnest money is not received by Escrow Holder within three (3) days from the Effective Date herein, and without written extension signed by Seller, this contract shall be considered null and void.

The parties hereto agree to execute such other escrow instructions as may reasonably be requested by escrow holder.

BY: _____    DATE: _____
    Old Republic National Title Insurance Company

### ACKNOWLEDGEMENT OF EARNEST MONEY

The Escrow Holder hereby agrees to perform its obligations under this Agreement and acknowledges receipt of the Earnest Money in the amount of **$25,000**  If Buyer's earnest money is not received by Escrow Holder within three (3) days from the Effective Date herein, and without written extension signed by Seller, this contract shall be considered null and void.

The parties hereto agree to execute such other escrow instructions as may reasonably be requested by escrow holder.

BY: _____    DATE: _____
    Old Republic National Title Insurance Company

### ALWAYS HAVE YOUR TITLE EXAMINED BY AN EXPERIENCED ATTORNEY.

Buyer      Seller

**Exh. _3B_, Page 102**

# Exhibit A

# Legal Description

Buyer                    Seller

**Exh.** *3B*, **Page 103**

# Exhibit B

## Notices

| | | | |
|---|---|---|---|
| Escrow Agent: | Old Republic National Title Insurance Company | Title Company: | Old Republic National Title Insurance Company |

Buyer(s):    **Rant, LLC**

Seller(s):    **Waverly – Walnut Creek Apartments, Inc.**

Selling Broker:    **Compass Property Advisors LLC**

**Mark F. White**
**909 S. Meridian Ave., Suite 500**
**Oklahoma City, OK 731089 (405)**
**605-5885 phone**
**(405) 605-7525**

Listing Broker:

Attorney:

Attorney:

1031 Co.:

1031 Co.:

Page 14 of 14

Buyer _____    Seller _____

**Exh. *3B*, Page 104**

SAMPLE

# RENTAL APPLICATION

The information collected below will be used to determine whether you qualify as a tenant. It will not be disclosed without your consent except to your employer's for verification of income and employment and to financial institutions for verification of assets, and as required and permitted by law. You do not have to provide the information, but if you do not your application may be delayed or denied.

| 1. Applicants Name | | Social Security No. | | Home phone ( ) | |
|---|---|---|---|---|---|
| 2. Present Street Address | City | State | Zip Code | # of Years at Present Address | |
| 3. Former Street Address (If at address for less than 2 yrs.) | City | State | Zip Code | # of Years at Former Address | |

4. Names of other persons in household

| 5. Name and address of employer | Type of Business | Self Employed? __ yes __ no |
|---|---|---|
| Business phone number ( ) | Position/Title | No. of Yrs on Job |
| 6. Name and address of previous employer (If employed at present position less than 2 yrs) | No. of Yrs with Previous Employer | Business phone ( ) |

| 1. Co-Applicants Name | | Social Security No. | | Home phone ( ) | |
|---|---|---|---|---|---|
| 2. Present Street Address | City | State | Zip Code | # of Years at Present Address | |
| 3. Former Street Address (If at address for less than 2 yrs.) | City | State | Zip Code | # of Years at Former Address | |
| 4. Name and address of employer | | Type of Business | | Self Employed? __ yes __ no | |
| Business phone number ( ) | | Position/Title | | No. of Yrs on Job | |
| 5. Name and address of previous employer (If employed at present position less than 2 yrs) | | No. of Yrs with Previous Employer | | Business phone ( ) | |

Exh. 3B, Page 105

Application
Page 2

ANNUAL INCOME

| Source | Applicant | Co-Applicant | Other Household Members 18 or Older | Total |
|---|---|---|---|---|
| Salary | | | | |
| Overtime Pay | | | | |
| Commissions | | | | |
| Fees | | | | |
| Tips | | | | |
| Bonuses | | | | |
| Interest and/or Dividends | | | | |
| Net Income from Business | | | | |
| Net Rental Income | | | | |
| Social Security, Pensions, Retirement Funds etc., received periodically | | | | |
| Unemployment Benefits | | | | |
| Workers Compensation | | | | |
| Alimony, Child Support | | | | |
| Other: | | | | |
| | | | TOTAL: | |

| Assets | Cash Value | Income from Assets | Bank Name | Account Number |
|---|---|---|---|---|
| Cash on Hand | $ | NA | NA | NA |
| | $ | NA | NA | NA |
| Checking Account | $ | $ | | |
| | $ | $ | | |
| Savings Account | $ | $ | | |
| | $ | $ | | |
| Credit Union | $ | $ | | |
| | $ | $ | | |

**Have you disposed of any assets for less than fair market value in the past 2 years?  YES  or  NO**

Revised October 2005                Appendix C                Rental App

**Exh. _3B_, Page 106**

Household Composition

List the head of your household and all members who live in your home.  Give the relationship of each family member to the head.

| Member No. | Full Name | Relationship | Date Of Birth | Social Sec. # | Full-Time Student (Yes or No) |
|---|---|---|---|---|---|
| H.O.H. | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |

Does anyone live with you now who is not listed above? _____ Yes _____ No
Does anyone plan to live with you in the future who not listed above? _____ Yes _____ No
Please explain if you answer "Yes" to either question above.

_____

_____

Have any of your household members ever been convicted of a felony? _____ Yes _____ No
Are all household members full-time students? _____ Yes _____ No
If you answered Yes to the above question does the household qualify for one of the following exceptions.

_____ 1.  Married and filing a joint tax return.

_____ 2.  Single parent(s) with minor child(ren) and both the parent(s) and child(ren) are not a dependent of a third party.

_____ 3.  At least one member of the household receives assistance under Title IV of the Social Security Act (i.e., AFDC assistance)

_____ 4.  At least one member of the household is enrolled in a job training program receiving assistance under the Job Training Partnership Act, or similar federal, state, or local laws.

Exh. *3D*, Page 107

Application
Page 4

The information provided on Pages 1 through 3 are true and complete to the best of my knowledge and belief. I/We consent to the disclosure of income and financial information from my/our employer and financial references for purposes of income and aset verification related to my/our application for tenancy.

_____          _____
Applicant                                 Date


_____          _____
Co-Applicant                              Date

Exh. _3B_, Page 108

# Counter Offer

Seller:    Waverly-Walnut Creek Apartments, Inc.

Buyer:    Rant LLC and/or Assigns

Property:    Santa Fe Apartments – 224 Units
125 SW 74th Street
Oklahoma City, OK 73139

The following shall serve as a Counter Offer to the Contract for Sale of Real Estate, dated July 19th 2005 by and between Seller and Buyer named above.

Para 2.    TERMS: The total purchase price to be $4,916,000.00
4,704,000.

Para 4.3    Title Policy: Cost of Owner's Title Policy shall be at Buyer's expense.

Para 15    Broker Relationship Disclosure/Commission: Seller will pay the Broker(s) 5% of price at Closing

All other provisions of the contract not amended herein shall remain in full force and effect.

APPROVAL OF SELLER THIS
20th DAY OF July ,2006

Waverly-Walnut Creek Apartments, Inc.

APPROVAL OF BUYER THIS
21st DAY OF July ,2006

Rant LLC and/or Assigns

Exh. 3B , Page 109

Addendum # 1 –
CONTRACT FOR SALE OF REAL ESTATE
Sante Fe Pointe Apartments

THIS ADDENDUM #1 ("Addendum") modifies and amends the CONTRACT FOR SALE OF REAL ESTATE (the "Contract") dated July 12, 2006 (collectively, the "Contract"), entered into by and between Waverly-Walnut Creek Apartments, Inc. (the "Seller") and RANT, LLC (the "Buyer"). Capitalized terms not defined herein shall have the meaning set forth in the Contract.

Seller and Buyer, respectively, each agree to modify and amend the Contract as follows:

1.      Section 14 of the Contract is hereby amended and restated in its entirety to read as follows:

The purchase and sale of the Property ("Closing") shall be consummated through the Escrow Holder and closing shall take place at the Escrow Holder's Office on a date mutually agreeable to the parties, but not later than March 31, 2007 (the "Closing Date"); provided, however that Buyer shall have the right to extend the Closing Date for three (3) separate 30 day periods, provided that the following conditions are met: (i) Buyer provides written notice to Seller at least 10 days prior to the Closing Date, and (ii) Buyer transfers an extension fee to Seller in the amount of $25,000 contemporaneously with the delivery of each such notice. Any such extension fee(s) will be considered earned by Seller upon receipt, non-refundable and shall be applied to the Purchase Price at Closing.

2.      Buyer to pay an additional $50,000 to Seller upon the execution of this Addendum.

3.      Seller hereby agrees and consents to the assignment of Buyer's rights, title and interest under the Contract to Santa Fe Pointe, L.P. ("Assignee"), a newly created Oklahoma limited partnership of which Buyer is the General Partner. Assignee agrees to assume and perform all obligations of Buyer under the Contract and this Addendum.

4.      Except as expressly set forth herein, the terms and conditions of the Contract remain in full force and effect.

1 of 2

Exh. *3B*, Page 110

3.      This Addendum #1 may be executed in one or more counterparts, each of which shall be an original and all of which together shall be one and the same instrument.

IN WITNESS WHEREOF, Seller and Buyer have entered into this Addendum to the Contract as of December 19, 2006.

Waverly-Walnut Creek Apartments, Inc.

By: _____
Name: Wm. Forrest White
Title:  Officer

Buyer: RANT, LLC

By: _____
Name: Theo F. Oliphant
Title:   Managing Member

Assignee: Santa Fe Pointe, L.P.

By: _____
Name: Theo F. Oliphant
Title:   Managing Member of
          General Partner

2 of 2

Exh. _3B_, Page 111

SANTA FE POINTE, LP
16416 Oconee Creek Drive
Edmond, OK 73013

June 22, 2007

VIA FACSIMILE and E-MAIL
Waverly-Walnut Creek Apartments, Inc.
c/o Compass Properties

Dear Mark,

This letter shall serve as confirmation that Santa Fe Pointe, LP ("Buyer"), hereby elects to extend the Closing Date until July 31, 2007 for the purchase of the Santa Fe Pointe Apartments located in Oklahoma City, Oklahoma. Pursuant to Section 14 of the Contract for Sale of Real Estate between Buyer and your client, Waverly-Walnut Creek Apartments, Inc. ("Seller"), Buyer will deliver $25,000 on or before June 29, 2007 as consideration to be applied to the purchase price for the property.

Thank you for all of your efforts in coordinating the due diligence and closing of the purchase transaction.

Very truly yours,

Santa Fe Pointe Management, LLC

Theo F. Oliphant,
Managing Member of the
General Partner

ACCEPTED AND AGREED TO:

Waverly-Walnut Creek Apartments, Inc.

By:
Name: Wm Forrest White
Title: Corp. Officer

**Exh. _3B_, Page 112**

JUN-29-2007 FRI 12:34 PM GREAT-WEST          FAX NO. 405 634 7331          P. 01

# Great-West Management Corporation

Phone:     405-634-8888
FAX:       405-634-7331

# FAX

DATE: _6 - 29 - 07_

TO: _Theo F. Oliphant_

FAX: _570-289-7371_     FROM: _Forrest White_

RE: _Santa Fe Pointe_

Number of pages with cover sheet: _2_

Urgent     For review     Please comment     Please reply

_Mark -- Fax 405 605-7525_

6619 So. Western, Oklahoma City, OK  73139

**Exh. _38_ , Page 113**

Addendum # 3
CONTRACT FOR SALE OF REAL ESTATE
Santa Fe Pointe Apartments

THIS ADDENDUM #3 ("Addendum") modifies and amends the CONTRACT FOR SALE OF REAL ESTATE ( the "Contract") dated July 12, 2006 (collectively, the "Contract"), including Addendum #1 signed and dated December 19, 2006 entered into by and between Waverly-Walnut Creek Apartments , Inc. (the "Seller") and Santa Fe Pointe, L.P., (the "Buyer"), Assignee of RANT, LLC and including Addendum #2 signed and dated July 20, 2007 entered into by and between the Seller and the Buyer. Capitalized terms not defined herein shall have the meaning set forth in the Contract.

Seller and Buyer, respectively, each agree to modify and amend the Contract as follows:

1.  Closing shall take place at the Escrow Holder's Office on a date mutually agreeable to the parties, but not later than the close of business on October 15, 2007 (the "Closing Date").

2.  Upon full execution of this Addendum #3, Buyer shall cause Escrow Holder to release the remaining $50,000 in earnest money to Seller and to be applied toward the Purchase Price by signing the included release from Escrow Holder.

3.  Seller may continue to solicit and accept third party back-up purchase offers for the Property prior to the Closing Date.  Provided, however, Seller shall notify such third party ("3rd Party Offeror") in writing that: (a) Buyer is scheduled to close on or before October 15, 2007, (b) such 3rd Party Offeror may tender earnest money deposit to Seller's attorney and thereafter commence due diligence review of the Property and its historical operating results, and (c) such 3rd Party Offer and Seller may close on the purchase and sale transaction on any date after expiration of Buyer's Closing Date.

4.  In the event Buyer requests additional time beyond the Closing Date named herein, any extensions may be granted at Seller's option at a price of $10,000.00 per week.

5.  Seller agrees to provide Buyer with Seller Financing in an amount not to exceed $500,000.00 on a short term basis to complete the sale.  Terms and conditions of Seller Financing are outlined in a separate note and second mortgage agreement between Buyer and Seller.

This Addendum #3 may be executed in one or more counterparts, each of which shall be an original and all of which together shall be one and the same instrument.

*[Remainder of this Page Intentionally Left Blank.  Signature Page Follows.]*

IN WITNESS WHEREOF, Seller and Buyer have entered into this Addendum #3 to the Contract effective as of September 10, 2007.

Waverly-Walnut Creek Apartments, Inc.

By:_____
    Name: William Forrest White
    Title: Authorized Agent


Buyer: RANT, LLC


By: _____
    Name: Theo F. Oliphant
    Title: Managing Member


Assignee: Santa Fe Pointe, L.P


By:_____
    Name: Theo F. Oliphant
    Title:   Managing Member of
            General Partner