Eric J. Farber, SBN 169472
eric@farberandco.com
Ann McFarland Draper, SBN 065669
ann.draper@farberandco.com
FARBER & COMPANY ATTORNEYS, P.C.
847 Sansome Street, Ste. LL
San Francisco, California 94111
Telephone 415.434.5320
Facsimile 415.434.5380

Attorneys for Plaintiffs Santa Fe Pointe,
LP, Santa Fe Management, LLC,
Rant, LLC, and Theotis F. Oliphant

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## (SAN FRANCISCO DIVISION)

| | |
|---|---|
| SANTA FE POINTE, LP, et al, <br><br>　　　　　　　　　　Plaintiffs, <br>　　vs. <br><br> GREYSTONE SERVICING CORPORATION, INC., et al, <br><br>　　　　　　　　　　Defendants. | Case No.: C07-05454 JCS <br><br> **DECLARATION OF THEOTIS F. OLIPHANT IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER CASE TO SOUTHERN DISTRICT OF NEW YORK** <br> <u>Hearing</u> <br> Date:　　　February 8, 2008 <br> Time:　　　9:30 a.m. <br> Courtroom: A (15th Floor) <br> Judge:　　　Hon. Joseph C. Spero |

I, THEOTIS F. OLIPHANT, declare as follows:

1.　　I am a resident of the State of California over the age of eighteen (18) years, and I am one of the Plaintiffs herein. I make this declaration based upon my personal knowledge, except where alleged upon information and belief, and, if called to testify, I could and would competently testify to the matters set forth herein.

2.　　I am a resident of the city of El Cerrito, in Contra Costa County, California, where I have lived since 2001. I have never lived or worked in the State of New York.

3.　　Plaintiff RANT, LLC ("Rant") is a Delaware limited liability company qualified to do business in the State of California and having its principal place of business in the County of Contra Costa, State of California. I am now, and have at all times been, the managing member of Plaintiff

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*　　　　　　　　　　- 1
Declaration of Theotis F. Oliphant
Farber & Company Attorneys, P.C.

Santa Fe Management, LLC and the managing member of Plaintiff RANT, LLC. Plaintiff Santa Fe Management, LLC, is the general partner of Plaintiff Santa Fe Pointe, LP.

4. Since August 2006, I have been involved in a project to acquire and rehabilitate a 224-unit apartment building in Oklahoma City (the "Santa Fe Pointe Project") as a tax-credit developer of a Low Income Housing Tax Credit project offered through the FHA's Office of Housing and Urban Development ("HUD"). The Federal Government subsidizes such tax credit projects to encourage private developers to acquire, construct, renovate, and maintain housing stock that will be income restricted for tenants, and maintained by the private developer. Such projects contemplate formation of a single purpose entity (in this case, Plaintiff Santa Fe Pointe LP) to execute the acquisition and rehabilitation of the housing stock and be the borrower on the HUD loan, which is non-recourse. The tax-credit developer is paid a fee equal to 14% of the total allowable project costs.

5. I first learned of this project through Shawn Smith, of Smith Real Estate Development, Inc. Mr. Smith is a real estate professional who focuses his business on tax credit projects and has acted as a consultant for me throughout the project. Mr. Smith is located in Edmond, State of Oklahoma.

6. As a part of the process for developing such a tax-credit project, it was necessary for me to select and retain a HUD-approved underwriter for the FHA's Multifamily Accelerated Processing (MAP) program. It is my understanding that the MAP program establishes national standards for approved lenders to prepare, process and submit their own loan applications. The role of the HUD-approved underwriter is to serve as an intermediary between myself (as developer) and the regional FHA offices, to prepare the HUD application materials, commission any third party reports necessary to support the underwriting analysis, facilitate approval of application and obtain financing within required timeframes. Only the HUD-approved underwriter is allowed to submit the loan application and communicate with HUD; I was neither authorized nor permitted to communicate directly with HUD with respect to the application

7. I selected Greystone Servicing as my HUD-approved underwriter because I was informed that it was one of the nation's leading originators of Federal Housing Administration (FHA) multifamily loans, had the required approvals, and provided long-term, fully amortizing, fixed rate, non-

recourse loans for acquisition and rehabilitation of low-income housing projects such as the Santa Fe Pointe Project. I also understood that Greystone Servicing had regional loan origination offices throughout the United States (including in California), and that the Greystone organization had an extensive team of experienced loan officers, underwriters, analysts and consultants to facilitate the successful acquisition, rehabilitation and financing of projects such as the Santa Fe Pointe Project.

8. On September 7, 2006, I signed a written Engagement Agreement on behalf of the unformed entity that appointed Defendant Greystone Servicing to act as the exclusive agent to process the HUD application for financing the acquisition and rehabilitation of the Santa Fe Pointe Project. A true and correct copy of the Engagement Agreement reflecting that appointment is attached as Exhibit "A" hereto (the "Engagement Agreement"). On the same date, I paid $14,000 in fees to Greystone Servicing as required by the Engagement Agreement. That same day, I also engaged an investment bank underwriter to sell the $7,095,000 of tax-exempt bonds through which the Santa Fe Pointe Project was ultimately to be financed. The bond financing was required to close by December 20, 2006 or the tax-exempt bond allocation awarded for my Project would expire. In order to accomplish timely sale of the tax-exempt bonds, the investment bank underwriter repeatedly impressed upon representatives of Greystone Servicing the importance of completing the HUD application by November 2006.

9. Greystone Servicing's senior underwriter for the Santa Fe Pointe Project was Miriam Simon, who participated in Project meetings and telephone conferences on behalf of Greystone Servicing. Although I dealt with Ms. Simon primarily by telephone and by email, Ms. Simon also traveled to Oklahoma City to meet with members of my team and various HUD personnel regarding the Santa Fe Pointe Project on October 5, 2006.

10. One of the supporting documents required for the HUD application is architectural review by a firm designated by the HUD-approved underwriter. Although I paid additional fees to Greystone Servicing's HUD architect review firm to expedite its review process, delay in the architectural review component nonetheless contributed to delay in filing the HUD application for the Santa Fe Pointe Project. Greystone Servicing selected Mr. Phil Smith of JPS Associates, Inc. as its architectural review firm for the Santa Fe Pointe Project. JPS Associates, Inc. is located in Springfield, Missouri.

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*  - 3
Declaration of Theotis F. Oliphant
Farber & Company Attorneys, P.C.

11. On or about October 16, 2006, I filed the paperwork and expended the funds to form Plaintiff Santa Fe Pointe LP as an Oklahoma limited partnership and Santa Fe Management, LLC as an Oklahoma limited liability company; both have their principal place of business in Edmond, Oklahoma. Santa Fe Pointe LP was the official, single purpose entity formed for the purpose of acquiring and rehabilitating the Santa Fe Pointe Project and be the borrower on the HUD non-recourse loan. Santa Fe Management, LLC was the official, single purpose entity formed to be the general partner of Santa Fe Pointe LP and to manage the Santa Fe Pointe Project.

12. On October 27, 2006, I received an email from Ms. Simon stating that the HUD application process was behind schedule, and I became concerned that this would jeopardize timely acquisition of the project and issuance of the tax-exempt bonds that were an essential part of the financing. I communicated my concerns to Matt James, who was the business development person at Greystone Servicing who had initially convinced me to use its services. To address my concerns, Mr. James told me that Greystone would provide a non-recourse bridge loan to fund the purchase of the Santa Fe Pointe Project and the cost of issuance for the tax-exempt bonds.

13. On November 14, 2006, after Plaintiffs had transmitted all items required to be provided by them, Greystone Servicing representatives informed me, for the first time, that the HUD application would not be submitted in 2006. To ally my concerns and those of my development team and reassure us all that the Santa Fe Pointe Project would ultimately be a success, Mr. James reiterated that Greystone Servicing was committed to funding the acquisition of the Santa Fe Pointe Project and the issuance of the tax-exempt bonds, and he stated that Greystone would issue a non-recourse bridge loan to fund the acquisition and the cost of issuing the bonds.

14. On November 26, 2006 (two days later), Mr. Richard "Ad" Eichner (of Eichner & Norris PLLC, bond counsel for the investment bank) sent an email to confirm that Greystone would fund a bridge loan for the purchase of the Santa Fe Pointe Project and the cost of issuing the tax-exempt bonds. Bond counsel is located in Washington, D.C. Later that day (November 16, 2006), Mr. Matthew James of Greystone Servicing circulated a written term sheet for the bridge loan which specified a non-recourse bridge loan in the amount of $4,348,400, which it stated was for the full

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                                                                                                     - 4
Declaration of Theotis F. Oliphant
Farber & Company Attorneys, P.C.

purchase price of the Santa Fe Pointe Project. A true and correct copy of the written term sheet is attached as Exhibit "B" hereto.

15. Following receipt of this document, all parties proceeded to complete their parts of the arrangements for issuance of the tax-exempt bonds and acquisition of the Santa Fe Pointe Project. The closing of the Project acquisition was scheduled for December 20. I made arrangements for travel to Oklahoma City early on Monday, December 18, so that I would be there for the closing.

16. The tax-exempt bonds were priced on December 13 and 14, 2006, and were sold by the investment bank to institutional investors. At the moment of issue, Plaintiffs incurred approximately $251,000 in bond issuance costs.

17. I did not receive any drafts of the bridge loan documents until Sunday, December 17, 2006, the day before I was scheduled to fly to Oklahoma City for the closing. On the afternoon of Sunday, December 17, I received emails from Diane Fisher (of Greenberg Traurig, outside counsel for Greystone) containing the initial drafts of the bridge loan documents. Ms. Fisher is with the Philadelphia (Pennsylvania) office of Greenberg, Traurig. All of my dealings with Ms. Fisher have been by telephone and email. True and correct copies of the correspondence and draft documents are attached to the Complaint

18. The bridge loan documents received on December 17 varied considerably from the bridge loan described in the Term Sheet. The December 17 bridge loan documents provided for a bridge loan of only $500,000, rather than the promised $4,348,400; this reduced amount would cover the cost of the bond issuance but not acquisition of the Santa Fe Pointe Project. The December 17 bridge loan documents also included a personal guaranty by me, a spousal guaranty (neither of which had ever been previously mentioned); the term sheet stated that the bridge loan would be non-recourse financing. When I received the bridge loan documents on December 17, the $251,000 bond issuance costs had already been incurred because the tax-exempt bonds had been sold. In addition, if Santa Fe Pointe, LP did not close escrow for acquisition of the property by December 20, we were at risk of losing the tax-exempt bond funding because the bonds would expire. The bridge loan documents were presented on a take-it-or-leave-it basis. I had no choice but to travel to Oklahoma on the morning of December 18 and sign the voluminous bridge loan documents as presented.

19. The bridge loan documents that were presented to me for signature in Oklahoma varied in other respects from the drafts provided on December 17. The drafts of three of the documents contained (among other things) language providing for forum selection in the event of litigation and choice of law. These subjects were not included in the written term sheet (Exhibit "B") and had not been discussed, let alone negotiated. Moreover, the December 17 drafts did not specify New York for either forum or choice of law; the identity of the state was left blank in the December 17 drafts.

20. Greystone Servicing did not submit the final HUD application for the Santa Fe Pointe Project until about March 14, 2007. On or about June 14, 2007, my development team and I were introduced to David Henry, an experienced Arkansas tax credit developer who proposed to serve as general contractor, property manager, and co-developer. On or about June 29, 2007, the seller of the Santa Fe Point property agreed to extend the acquisition closing date to July 31, 2007 in order to accommodate additional bridge loan financing being arranged by David Henry. As a part of this agreement, Plaintiffs paid an additional $25,000 earnest money deposit to the seller, which was funded through an additional $25,000 advance on the Greystone bridge loan.

21. On July 5, 2007, I met with HUD personnel in Oklahoma City and learned that the HUD application had been rejected by letter sent out earlier that day. At this meeting, the HUD representative informed me that Miriam Simon (Greystone Servicing's senior underwriter for the project) had gone out of her way to make unsolicited disparaging remarks about the Project to her at a HUD conference in St. Louis on June 19.

22. On July 10, 2007, Matt James (the Greystone Servicing business development person) acknowledged that Greystone had received the HUD rejection letter, but reassured me that Betsy Vartanian, who was "one of the top HUD loan executives at Greystone," was going to step in and help get the application back on track so it could be approved. The following day I received a telephone call from Betsy Vartanian, who informed me that she had spoken with HUD personnel in Oklahoma City, that HUD had agreed to reconsider the application without starting over from the beginning, and that Greystone Servicing would submit written materials responsive to HUD's concerns. This promise was confirmed in a letter dated July 13, 2007 from Greystone to HUD, a copy of which was sent to me.

23. During this time, I continued to work with David Henry to complete the acquisition of the property. David Henry and I reached an agreement to close the acquisition subject to the existing first mortgage with the seller carrying back a second mortgage in the amount of $500,000. On July 25, 2007, the attorneys for the first mortgage lender sent out drafts of the closing documents. On July 27, 2007, Greystone Servicing threatened to disrupt the acquisition unless the seller agreed to subordinate his carry-back loan to Greystone's pre-development bridge loan. That same day, David Henry and I made arrangements to meet in Oklahoma on July 30th and 31st to make plans for signing the closing documents, taking control of the property, and getting the keys.

24. On July 29, 2007, the eve of my departure for Oklahoma, David Henry emailed that he was having second thoughts about the deal and had concerns about the cost of the bond issuance in December 2006. However, I was unable to reach Mr. Henry to discuss his concerns that entire day.

25. On July 30, 2007, both David Henry and I arrived in Oklahoma City. In a telephone conference call with Greystone, it agreed to rescind its demand that the seller subordinate his carry-back loan. Instead, Greystone requested that David Henry's bank allow it to purchase its loan after closing, so that Greystone could improve its collateral position.

26. On July 31, 2007, David Henry and I met for approximately six hours to discuss his concerns. During this meeting, David Henry proposed taking over the entire Project in exchange for assuming the Greystone CDE bridge loan. However, we did not reach agreement for modifying our prior co-developer arrangement, and David Henry left town without signing the escrow documents. I did sign the closing documents at the title company that day before leaving Oklahoma City.

27. In early August 2007, Greystone was negotiating with David Henry behind my back on ways to complete the Santa Fe Pointe Project without me or my development team. On August 9, 2007, Greystone Servicing unilaterally withdrew the HUD loan application without any prior notice or warning to me or anyone else on my development team. The withdrawal of the HUD application placed at risk the $7,095,000 in tax exempt bond proceeds. It also caused the seller of the property to terminate negotiations with me because the withdrawal of the HUD application made it appear that we could not close the deal in the near future; it would likely take another 10-12 months if the HUD process were started over with a different HUD-approved underwriter.

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                                                             - 7
Declaration of Theotis F. Oliphant
Farber & Company Attorneys, P.C.

28. By email dated August 21, 2007, Greystone representatives requested that Plaintiffs supply additional documentation for submission to the loan committee. While this indicated to me that Greystone intended to go forward with the project, I later learned that Greystone CDE had prepared a letter dated August 21 that declared the bridge loan in default.

29. On August 22, 2007, I received a telephone call from Thom Ruffin of Greystone, who asked if I had received "the letter." I had not. Ruffin then explained that a letter was coming by FedEx declaring the bridge loan in default. Ruffin also told me that it had been talking to David Henry regarding terms upon which Henry would take over Plaintiffs' deal and assume some of the liability on the bridge loan. After the telephone call, I received the August 21, 2007 letter wherein Greystone CDE declared the bridge loan in default. The first alleged default specified in the August 21 letter was "expiration of the contract for purchase and sale of the Project without the same having been extended."

30. Over the next several days, Greystone representatives continued to pressure me to allow David Henry to take over the entire Project (and keep all the profits). As a part of this proposal, Mr. Henry would assume only $275,000 of the bridge loan so Greystone CDE required that I accept responsibility for paying the remaining $215,000. The Greystone Defendants also required that I release them from all liability, and agree not to sue them.

31. On August 27, 2007, I received a letter by email from Greystone Servicing threatening that Greystone CDE intended to pursue all collection remedies unless we agreed to the proposed transaction wherein David Henry would take over the deal. On August 30, 2007, I received an "assignment agreement and covenant not to sue" to this effect from Greystone's counsel, Diane Fisher. Ms. Fisher also demanded that I provide written confirmation of acceptance by August 31 (the Friday before Labor Day).

32. The terms of the proposed "assignment agreement and covenant not to sue" were financially unacceptable to Plaintiffs and I did not sign the documents by the requested deadline. Instead, I contacted counsel and arranged to file suit against Greystone Servicing for their delays, mishandling of their role as HUD-approved underwriter, and egregious breaches of their fiduciary duties and duty of good faith and fair dealing. On September 7, 2007, Plaintiffs herein filed suit in

1  Alameda County Superior Court. In addition to the claims arising out the Greystone Servicing's
2  handling of the entire transaction, the complaint also included a claim for declaratory relief as to the
3  default alleged by Greystone CDE.

4      33.    I also negotiated with the seller for an extension of time to close acquisition of the Santa
5  Fe Pointe property. On September 11, 2007, I notified Thom Ruffin of Greystone Servicing that we
6  had successfully documented an extension of the time to close the deal with the seller; I emailed him
7  copies of the fully executed Addendum effecting the extension agreement. As this cured the principal
8  alleged default specified in the August 21 default letter ("expiration of the contract for purchase and
9  sale of the Project without having been extended"), I also demanded that Greystone rescind its Notice
10 of Default issued August 21, 2007. I received no response from anyone at Greystone, and sent a
11 follow-up email on September 13, 2007. On September 14, 2007, Thom Ruffin telephoned me and set
12 up a telephone conference call for later that day. During that conference call, I attempted to put the
13 deal back on track and again requested that Greystone CDE rescind the August 21 notice of default.
14 Greystone refused to do so, and further stated that "Greystone" was "out" unless we could prove that
15 the Santa Fe Pointe Project was a viable deal.

16     34.    The following week, I received a letter from Greystone CDE dated September 21, 2007,
17 purporting to accelerate the bridge loan and declaring all amounts due under the bridge loan note
18 immediately due and payable.

19     35.    On October 29, 2007, I received a copy of a letter sent by Greystone Servicing to
20 numerous individuals and businesses involved in the project and/or the tax-exempt bond issue,
21 including the Oklahoma County Finance Authority (the government entity who issued the tax-exempt
22 bonds for the Project), their outside counsel, the Bank of Oklahoma (who served as trustee for the tax-
23 exempt bond issue) and their outside counsel, the investment bank who underwrote the bond issue and
24 their outside counsel, Standard & Poors (one of the dominant bond-rating institutions), ImageMaster,
25 Inc. (the printer in Ann Arbor, Michigan who printed the bond paper), and Shawn Smith (my real
26 estate professional in Edmond, Oklahoma). The letter was also accompanied by a copy of the
27 complaint that Greystone CDE had filed in the Southern District of New York for collection on the
28 bridge loan. The letter and accompanying New York Complaint conveyed an inaccurate and

misleading depiction of the Santa Fe Pointe Project and the tax-exempt bonds.  The letter appeared to be designed to cause the credit rating of the bond issue to be downgraded or de-rated (even though the bonds were guaranteed and there was no meaningful risk of loss to the bond-holders), damage the marketability of the bonds, and to interfere with Plaintiffs' ability to successfully complete the financing, rehabilitation and development of the Project.  A true and correct copy of this letter is attached as Exhibit "C" hereto.

36.  The Bridge Loan was not negotiated or executed in New York.  The terms of the bridge loan were negotiated across the United States via telephone and the internet, and the Bridge Loan documents were executed in Oklahoma.  The participants to these negotiations were located in California (Plaintiffs), Oklahoma (Plaintiffs and their consultant Shawn Smith), Florida (Greystone CDE personnel who prepared the loan documentation), Pennsylvania (Greystone's outside counsel Dianne Fisher), Virginia (Greystone Servicing personnel) and Wisconsin (Greystone representation Miriam Simon).  Matt James (of Greystone Servicing as well as Greystone CDE) was in New York.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed this 30th day of November, 2007, at Oakland, State of California.

*Theotis F. Oliphant*
Theotis F. Oliphant

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                                                      - 10
Declaration of Theotis F. Oliphant
Farber & Company Attorneys, P.C.

PROOF OF SERVICE

I, ANN McFARLAND DRAPER, declare:

1. I am an attorney at law over the age of eighteen years of age and not a party to this action. My business address is 847 Sansome St., LL, San Francisco, CA 94111.

2. On November 30, 2007, I served true and correct copies of the foregoing pleading **DECLARATION OF THEOTIS F. OLIPHANT IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER CASE TO SOUTHERN DISTRICT OF NEW YORK** on the interested parties by electronically filing such documents through the CM/ECF system of United States District Court for the Northern District of California, which will send electronic notification of such filing to the following registered users:

> Mark D. Kemple    mdkemple@jonesday.com
>
> Erik K. Swanholt    ekswanholt@jonesday.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed this 30th day of November 2007, at San Francisco, California.

*Ann McFarland Draper*
Ann McFarland Draper

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*    - 11
Declaration of Theotis F. Oliphant
Farber & Company Attorneys, P.C.