Mark D. Kemple (State Bar No. 145219)
Erik K. Swanholt (State Bar No. 198042)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone:    (213) 489-3939
Facsimile:    (213) 243-2539
Email: mkemple@jonesday.com
Email: ekswanholt@jonesday.com

Attorneys for Defendants
Greystone Servicing Corporation, Inc., and Greystone CDE, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## (SAN FRANCISCO DIVISION)

| | |
|---|---|
| SANTA FE POINTE, LP, an Oklahoma limited partnership; SANTA FE MANAGEMENT, LLC, an Oklahoma limited liability company; RANT, LLC, a Delaware limited liability company; and THEOTIS F. OLIPHANT, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>GREYSTONE SERVICING CORPORATION, INC., a Georgia corporation; GREYSTONE CDE, LLC, a Delaware limited liability company, and DOES 1 through 100, inclusive,<br><br>Defendants. | CASE NO. C 07-05454 JCS<br><br>Assigned for all purposes to the Honorable Joseph C. Spero<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE; AND DECLARATIONS OF MATTHEW JAMES AND ERIK K. SWANHOLT**<br><br>Date:      February 8, 2008<br>Time:      9:30 a.m.<br>Ctrm:      A (15th Floor) |

LAI-2918839v5

Reply in Supp. of Defs.' Mot. to Transfer
C 07-05454 JCS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 2

    A.    THIS ACTION COULD HAVE BEEN BROUGHT IN THE SOUTHERN
        DISTRICT OF NEW YORK – PLAINTIFFS MISSTATE THE
        PERTINENT TEST .................................................................................... 2

    B.    THE FORUM SELECTION AND CHOICE OF LAW CLAUSES ARE
        ENFORCEABLE, APPLY TO ALL OF PLAINTIFFS' CLAIMS, AND
        THEIR ENFORCEMENT SERVES THE INTERESTS OF JUSTICE ................ 3

        1.    The Bargaining Power Was Equal; No Facts Suggest Duress,
            Adhesion, or Unconscionability ..................................................... 4

            (a)    As Oliphant's Own Law Firm Opined After He Signed
                These Now-Supposed "Contracts of Adhesion," They Are
                "Legal, Valid and Binding"; Oliphant Has Never (Until
                Now) Voiced a Contrary Suggestion ................................ 5

            (b)    Oliphant's Law Firm Got It Right – Indeed, the Bridge Loan
                Was Taken at Oliphant's Insistence .................................. 6

            (c)    Plaintiffs Knew the Material Terms of the Bridge Loan
                Before They Were Presented with the Drafts ................... 8

            2.    The Forum Selection Clauses Are Enforceable and Applicable to
            All of Plaintiffs' Claims for Relief ................................................ 8

            3.    The Interests Of Justice Are Served By Enforcing the Parties'
            Agreements ................................................................................... 10

            (a)    All of Plaintiffs Claims Will Be Governed by New York
                Law ................................................................................. 10

            (b)    Transfer of this Action to the Southern District of New York
                Will Be More Convenient for the Witnesses ................... 11

            (c)    Contrary to Plaintiffs' Statistically Fallacious Argument,
                There Is Not a Significant Difference Between the Districts
                in Terms of Relative Docket Congestion ........................ 12

            (d)    The Presence of the Forum Selection Clauses Is a
                Significant Factor Favoring Transfer .............................. 13

    C.    PLAINTIFFS MAY NOT RELY ON THE FIRST-TO-FILE RULE .................. 14

III.   CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Advanta Corp. v. Dialogic Corp.*,
2006 U.S. Dist. LEXIS 28214 (N.D. Cal. May 2, 2006) ........................................................ 13

*Aspitz v. Witness Sys, Inc.*,
2007 U.S. Dist. LEXIS 61429 (N.D. Cal. Aug. 10, 2007) ...................................................... 9

*Church of Scientology v. United States Dep't of Army*,
611 F.2d 738 (9th Cir. 1979) .......................................................................................... 14, 15

*Coxcom, Inc. v. Hybrid Patents, Inc.*,
2007 U.S. Dist. LEXIS 67168 (N.D. Cal. Aug. 30, 2007) .................................................... 12

*Crawford v. Bell*,
599 F.2d 890 (9th Cir. 1979) ................................................................................................ 14

*Greenwell v. Belkin Corp.*,
2006 U.S. Dist. LEXIS 76231 (N.D. Cal. Oct. 10, 2006) ...................................................... 3

*Hilti Aktiengesellschaft v. Milwaukee Elec. Tool Corp.*,
2004 U.S. Dist. LEXIS 16373 (E.D.N.Y. July 22, 2004) ...................................................... 3

*Hoffman v. Blaski*,
363 U.S. 335 (1960) ............................................................................................................... 3

*Hsu v. Oz Optics Ltd.*,
211 F.R.D. 615 (N.D. Cal. 2002) ......................................................................................... 13

*Hunt Wesson Foods, Inc. v. Supreme Oil Co.*,
817 F.2d 75 (9th Cir. 1987) .................................................................................................. 13

*Inherent.com v. Martindale-Hubbell, Lexis/Nexis, Inc.*,
420 F. Supp. 2d 1093 (N.D. Cal. 2006) ............................................................................... 15

*Jones v. GNC Franchising, Inc.*,
211 F.3d 495 (9th Cir. 2000) ................................................................................................ 13

*Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*,
342 U.S. 180 (1950) .............................................................................................................. 15

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941) .............................................................................................................. 10

*London Homes v. Korn*,
Cal. App. 2d 233 (1965) ......................................................................................................... 8

*Manetti-Farrow, Inc. v. Gucci America, Inc.*,
858 F.2d 509 (9th Cir. 1988) ............................................................................................. 4, 9

*Nagrampa v. MailCoups, Inc.*,
469 F.3d 1257 (9th Cir. 2006) ............................................................................................... 4

*Nedlloyd Lines B.V. v. Superior Court*,
3 Cal. 4th 459 (1992) ............................................................................................................ 11

*Olinick v. BMG Entm't*,
138 Cal. App. 4th 1286 (Ct. App. 2006) .............................................................................. 11

*Orr v. Bank of Am.*,
285 F.3d 764 (9th Cir. 2002) ............................................................................................... 10

**TABLE OF AUTHORITIES**
(continued)

Page

*Pacesetter Sys., Inc. v. Medtronic, Inc.,*
678 F.2d 93 (9th Cir. 1982)..........................................................................................14

*Pelleport Investors, Inc. v. Budco Quality Theatres, Inc.,*
741 F.2d 273 (9th Cir. 1984)..........................................................................................4

*Softworks Group, Inc. v. IHosting, Inc.,*
2006 U.S. Dist. LEXIS 75989 (N.D. Cal. Oct. 4, 2006)................................................13

*Stewart Org., Inc. v. Ricoh Corp.,*
487 U.S. 22 (1988)..........................................................................................................4

*The Bremen v. Zapata Off-Shore Co.,*
407 U.S. 1 (1972))..........................................................................................................4

*Unisys v. Access Co., Ltd.,*
2005 U.S. Dist. LEXIS 31897 (N.D. Cal. Nov. 23, 2005 ..............................................13

*Van Dusen v. Barrack,*
376 U.S. 612 (1964)......................................................................................................11

*Welsbach Elec. Corp. v. MasTec N. Am., Inc.,*
7 N.Y.3d 624 (Ct. App. 2006)......................................................................................11

*Z-Line Designs, Inc. v. Bell'O Int'l LLC,*
218 F.R.D. 663 (N.D. Cal. 2003) ..................................................................................14

**Statutes**

28 U.S.C. § 1404(a) ...............................................................................................passim

**Other Authorities**

Admin. Office of the United States Courts,
*Federal Court Management Statistics 2006: District Court* ........................................13

**Rules**

Civil L.R. 3-4(e)............................................................................................................13

## I.    **INTRODUCTION**

Plaintiffs' opposition treads great distances to avoid their own agreements, and avoid the law. The wilderness in which they rummage offers them no refuge from an inescapable conclusion: this action belongs in the Southern District of New York, where the parties agreed it could be litigated, and where these same claims, and others arising from the same facts will, *in all events*, be litigated. Plaintiffs do not begin to carry their "heavy burden" to present this Court with a basis to toss out the parties' forum agreement, and force the parties and their witnesses to litigate this same nucleus of facts simultaneously, in two forums, on opposite coasts.

Plaintiffs lead argument is that they were somehow "coerced" into taking $500,000 from Defendants under terms that they now find "adhesive" and "unconscionable." Initially, the signatory of those agreements, Plaintiff Theotis F. Oliphant ("Oliphant"), is a former transactional partner with a large international law firm, who holds himself out as possessing experience in a "sophisticated corporate and private equity practice."[1] Moreover, one week <u>after</u> Oliphant executed those agreements, his law firm, Gibbs & Oliphant LLP, opined and represented to Greystone that: "<u>The Loan Documents are legal, valid and binding obligations of the Borrower</u> <u>enforceable against the Borrower in accordance with the respective terms thereof.</u>" [James Decl., ¶ 25, Ex. 4 at 2 (emph. added).] And though these agreements were modified and re-executed, at no time (prior to now) did this team of legal professionals seek a modified forum selection clause, or complain in any way that the one they executed, and then opined concerning, and based on which they took $500,000 of Greystone's money, was a "contract of adhesion" or economically "unfair."[2]

---

[1] It would be surprising if, in the "broad range of corporate business transactions" he has executed, Oliphant has never encountered or negotiated a forum selection or choice of law provision. [*See* Swanholt Decl. (doc. # 10), ¶ 15, Ex. 6. (*See* Gibbs & Oliphant LLP, Attorney Profile: Theo T. Oliphant, at http://www.gotolawfirm.com/theo_oliphant.php.).] Further, it was Plaintiffs who *insisted* on taking out the $500,000 bridge loan, and who elected to receive the final documents while traveling to Oklahoma for other matters there. [James Decl., ¶¶ 12-15, 20-21.]

[2] Indeed, Plaintiffs' opposition is replete with gaps and mischaracterizations. For example, Plaintiffs argue they were surprised by the terms of the December 17, 2006 draft loan documents providing for a $500,000 full-recourse loan, because the terms were materially different from those of a November 16, 2006 term sheet (the "November Proposal") providing for a non-recourse $4.3 million loan. *See* Opp. (doc. # 16) at 5:24-27. Plaintiffs fail to mention in their opposition, however, that Oliphant rejected the November Proposal and instead received, and signed, a revised term sheet on December 4, 2006, clearly setting forth that the new amount to be loaned, pursuant to Oliphant's request, was $500,000 and that the loan would require Oliphant's personal guarantee. [James Decl., ¶¶ 12-16, Exs. 1 and 2.]

1    Plaintiffs also argue that the Southern District of New York lacks personal jurisdiction over

2    them and therefore 28 U.S.C. § 1404(a) is not satisfied.  Apart from the fact that the Southern

3    District of New York plainly may exercise jurisdiction over them (for example, by virtue of their

4    forum selection clause), this is not the test set forth in section 1404(a).  The test is not whether the

5    transferee district could exercise personal jurisdiction over Plaintiffs in a hypothetical case, but

6    whether it could serve as a proper venue if the plaintiffs chose to file their action there.  Without

7    question it could.

8        The balance of Plaintiffs' argument fares no better.  For example, without question

9    New York law applies to this underlying dispute.  Plaintiffs' response is to argue that questions of

10   adhesion and enforceability of the forum selection clause are governed by California law.  Not only

11   does that avoid the pertinent question of the *substantive* law at issue on the *claims* (New York law),

12   it also misstates the law that governs the enforceability question – *federal* law, *not* state law.

13   Equally misleading is Plaintiffs' discussion of the courts dockets, and the question of first to file.

14       Defendants' motion is supported by a bevy of unambiguous contracts executed by every

15   Plaintiff in this action; and they all call for this case to proceed in New York.  Plaintiffs' bid to

16   force the parties and their witnesses to litigate this same nucleus of facts simultaneously, in two

17   forums, on opposite coasts, fails at every level.  Defendants respectfully request that their motion to

18   transfer this action to the Southern District of New York – where the same issues will be litigated

19   in all events – be granted.

20   **II.    ARGUMENT**

21       **A.    THIS ACTION COULD HAVE BEEN BROUGHT IN THE SOUTHERN
22             DISTRICT OF NEW YORK – PLAINTIFFS MISSTATE THE PERTINENT
             TEST.**

23       "For the convenience of parties and witnesses, in the interest of justice, a district court may

24   transfer any civil action to any other district or division *where it might have been brought*."

25   28 U.S.C. § 1404(a) (emph. added).

26       Plaintiffs argue extensively that they are not subject to personal jurisdiction in New York,

27   notwithstanding their plain and indisputable agreement to the contrary in the Bridge Loan

28   documents.  *See* Opp'n (doc. # 16) at 8-14.  Not only are Plaintiffs incorrect regarding the

1  enforceability of the agreements and the clauses by which they have submitted to personal

2  jurisdiction in New York, but they are fundamentally wrong as to the requirements of § 1404(a).

3  The threshold inquiry in considering a motion to transfer pursuant to 28 U.S.C. § 1404(a) is

4  whether venue would be proper in the transferee district. In the words of the statute, the district

5  court must decide whether the transferee district is one "where it [the action] might have been

6  brought." 28 U.S.C. § 1404(a). The test is not, as Plaintiffs believe, whether the transferee district

7  could exercise personal jurisdiction over Plaintiffs in a hypothetical case in which they are the

8  defendants. As one District Court observed:

9          Plaintiffs object that the Northern District of Mississippi lacks
         personal jurisdiction over plaintiff HAG under a constitutional
10        "minimum contacts" analysis, and that transfer to that district is
         therefore improper under § 1404(a) because the lawsuit could not
11        have been brought there. This argument is baseless. The question
         is not whether plaintiffs could be haled into the proposed transferee
12        court as defendants, but whether plaintiffs could have brought the
         same declaratory judgment action in the transferee court.
13

14  *Hilti Aktiengesellschaft v. Milwaukee Elec. Tool Corp.*, 2004 U.S. Dist. LEXIS 16373, at *6-7

15  (E.D.N.Y. July 22, 2004) (emph. added) (citing *Hoffman v. Blaski*, 363 U.S. 335, 344 (1960));

16  *accord Greenwell v. Belkin Corp.*, 2006 U.S. Dist. LEXIS 76231, at *4 (N.D. Cal. Oct. 10, 2006).

17  Accordingly, for the reasons explained in Defendants' motion (doc. # 10) and not challenged by

18  Plaintiffs, this action could have been brought in the Southern District of New York.[3]

19      **B.    THE FORUM SELECTION AND CHOICE OF LAW CLAUSES ARE
            ENFORCEABLE, APPLY TO ALL OF PLAINTIFFS' CLAIMS, AND
20          THEIR ENFORCEMENT SERVES THE INTERESTS OF JUSTICE.**

21      In support of their motion, Defendants put forth fully executed contracts with unambiguous

22  provisions stating that New York is the appropriate venue for this action. Plaintiffs now seek to

23  distance themselves from an agreement signed by their principal – a lawyer – and which their law

24

25  _____
      [3] Further, even were Plaintiffs' misconstruction of the law correct – and without question it
   is not – Judge Patterson has certainly not ruled that that the Southern District of New York lacks
26  jurisdiction over Plaintiffs. Judge Patterson merely resolved a close question of contract
   interpretation as to alternative methods of service pursuant to the parties' agreement. Since the
27  time of that ruling, Plaintiffs have been served pursuant to that court's order. In view of the forum
   selection clauses, the Southern District of New York plainly may exercise personal jurisdiction
28  over the Plaintiffs, who have now been served in that action. Indeed, Judge Patterson has ordered
   that their answer to Greystone's complaint is due December 23, 2007. [Swanholt Decl., ¶ 3.]

1 firm opined was "legal, valid and binding."  Well after the fact, only now, in response to this

2 motion,  Plaintiffs contend for the first time that the underlying agreements were secured under

3 circumstances of "economic duress" and that the forum selection and choice of law provisions are

4 unenforceable because they are "unconscionable" and "adhesive." Plaintiffs' arguments lack merit.

5       Initially, federal law – not state law as Plaintiffs contend – determines whether a District

6 Court should give effect to a forum selection clause and transfer a case to another district pursuant

7 to 28 U.S.C. § 1404(a).  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 32 (1988); *accord Manetti-*

8 *Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 513 (9th Cir. 1988) (holding that in cases based

9 on diversity jurisdiction, "federal law . . . applies to [the] interpretation of forum selection

10 clauses.").  Under federal law, forum selection clauses are presumptively valid and will not be set

11 aside absent a showing that "enforcement would be unreasonable and unjust, or that the clause was

12 invalid for such reason as fraud or overreaching."  *Manetti-Farrow, Inc.*, 858 F.2d at 512 (citing

13 *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).[4]  The party resisting enforcement of a

14 forum selection clause has a "heavy burden" to "show that trial in the contractual forum would be

15 so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in

16 court." *Pelleport Investors, Inc. v. Budco Quality Theatres, Inc.*, 741 F.2d 273, 281 (9th Cir. 1984)

17 (citing *Bremen*, 407 U.S. at 18) (emph. added).

18     **1.**    **The Bargaining Power Was Equal; No Facts Suggest Duress, Adhesion,**

19             **or Unconscionability.**

20       Even under Plaintiffs' truncated presentation, there is no evidence of fraud, undue influence

21 or overweening bargaining power to require this Court to toss out the parties' forum agreement,

22 and force the parties and their witnesses to litigate this same nucleus of facts simultaneously in two

23      [4] For their part, Plaintiffs cannot decide what legal standard should apply.  On page 16 of

24 their opposition (doc. # 16) at lines 20 to 21, Plaintiffs incorrectly declare that in a diversity action *state law* determines whether a forum selection clause is enforceable.  However, in a footnote to an

25 earlier sentence in the same paragraph, *see* Opp'n (doc. # 16) at 16:16, they correctly state that under controlling Supreme Court and Ninth Circuit precedent *federal law* determines the

26 enforceability of a forum selection clause.  *See* Opp'n (doc. # 16) at 21 n.10.  Plaintiffs' reliance on *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006) is misplaced.  There, the Ninth

27 Circuit addressed the appropriateness of a district court's order compelling arbitration, not a transfer order pursuant to § 1404(a).  *See Nagrampa*, 469 F.3d at 1263-67.  Moreover, the court

28 applied California law, without discussion and apparently no argument on the issue of whether under *Manetti-Farrow* it should have applied federal law. *See id.* at 1280-89.

LAI-2918839v5             4         Reply in Supp. of Defs.' Mot. to Transfer

C 07-05454 JCS

1  forums on opposite coasts.

2           **(a)**     **As Oliphant's Own Law Firm Opined After He Signed These**
                      **Now-Supposed "Contracts of Adhesion," They Are "Legal,**

3                        **Valid and Binding"; Oliphant Has Never (Until Now) Voiced a**
                      **Contrary Suggestion.**

4

5       Plaintiffs claim that they had no opportunity to negotiate, and that the Bridge Loan

6  documents were contracts of adhesion. Initially, Plaintiff Oliphant, a former transactional partner

7  with a large international law firm, holds himself out as possessing experience in a "sophisticated

8  corporate and private equity practice." [Swanholt Decl. (doc. # 10), ¶ 15, Ex. 6. (*See* Gibbs &

9  Oliphant LLP, Attorney Profile: at http://www.gotolawfirm.com/theo_oliphant.php.)] It would be

10  surprising if, in the "broad range of corporate business transactions" Mr. Oliphant has executed, he

11  has never encountered or negotiated a forum selection or choice of law provision. [*See id.*]

12       Moreover, Plaintiff Oliphant's own law firm rejects his argument. Gibbs & Oliphant LLP,

13  of which Plaintiff Oliphant is a named partner, was retained to represent Oliphant's Santa Fe

14  entities in connection with the transaction. <u>One week after Mr. Oliphant signed this supposed</u>

15  <u>"contract of adhesion," his law firm issued an opinion letter to Greystone endorsing the</u>

16  <u>enforceability of the Bridge Loan documents.</u> Oliphant's Firm opined and represented to

17  Greystone then that: "<u>The Loan Documents are legal, valid and binding obligations of the</u>

18  <u>Borrower enforceable against the Borrower in accordance with the respective terms thereof.</u>" [*Id.*,

19  ¶ 25, Ex. 4 at 2 (emph. added).]

20       Consistent therewith, prior to filing the opposition to this motion, Oliphant <u>never once</u>

21  <u>objected</u> to the forum selection and choice of law provisions. [*Id.*, ¶¶ 19, 23, 30.] Indeed, he failed

22  to ask for a different term when presented with the draft documents or to object at the signing of

23  the final documents.[5] [*Id.*, ¶ 19.] Moreover, when his obligation under the Bridge Loan first came

24  due in June of 2007, and he successfully negotiated for an extension of time in which to repay his

25  debt, Oliphant still <u>did not request different venue or choice of law provisions.</u> [*Id.*, ¶¶ 29-30.]

26  Tellingly, Plaintiffs' first amended complaint, which added a claim seeking declaratory relief with

27       [5] On December 17, 2006, Oliphant was presented with draft documents reflecting the same
material terms set forth in the December 4, 2006 proposal letter that he signed. [*Id.*, ¶ 18.] Having

28  indicated that no further time was needed for his review, the final documents were sent to Oliphant
on December 18, 2006. [*Id.*, ¶ 20.]

1  respect to their obligations under the Bridge Loan documents, <u>does not seek</u> a determination as to

2  the enforceability of the agreements or allege any of the facts asserted in their opposition on that

3  point. *See* Notice (doc. # 1), Ex. A2 ¶¶ 104-10.

4      Equipped with knowledge and experience far beyond that of the ordinary layperson, with

5  the backing of his own law firm, and a demonstrated ability to negotiate material terms such as an

6  extension of time for repayment, Oliphant's yarn about adhesion is wholly without merit, let alone

7  a basis to toss out the parties' choice of forum provision and force the parties and their witnesses to

8  litigate this same nucleus of facts simultaneously and in two forums on opposite coasts.[6]

9          **(b)    Oliphant's Law Firm Got It Right – Indeed, the Bridge Loan
                     Was Taken at *Oliphant's* Insistence.**
10

11     Conveniently omitting their own subsequent opinions and representations, Plaintiffs also

12  offer, in support of their overreaching arguments, that Greystone somehow tricked or coerced them

13  into taking $500,000 from Defendants, and then, for unfathomable reasons, purportedly interfered

14  in such a way as to ensure that it would never be repaid. This hypothesis is preposterous.

15     In early September of 2006, Oliphant had obtained a bond allocation from the Oklahoma

16  Housing Finance Agency ("OHFA") that was set to expire at the end of the calendar year. [James

17  Decl., ¶ 8.] The collateral for the bond issuance was to be ultimately secured by a mortgage loan

18  insured by the Federal Housing Authority ("FHA"), an office of the United States Department of

19  Housing and Urban Development ("HUD") for both its principal and interest payments. [*Id.*, ¶ 13.]

20  Although the development and financing schedule originally contemplated that the HUD loan

21  would close in 2007, many problems impeded the application process, chief among them being

22  Oliphant's failure to submit the required documentation to Greystone in a timely manner, and his

23  inability to locate a party to participate in his project as a tax credit syndicator.[7] [*Id.*, ¶¶ 6, 9.]

24  ───────────────
    [6] We note Oliphant's suggestion that he was somehow forced to travel to Oklahoma to sign
25  these documents, and that this travel somehow renders his signature more flippant and less binding.
    *See* Opp'n (doc. # 16) at 6 ("Oliphant had no choice but to travel to Oklahoma on the morning of
26  December 18 and sign the voluminous bridge loan documents as presented.") In fact, the
    documents were presented to Oliphant in Oklahoma for his convenience, as he was traveling there
27  for other business. [James Decl., ¶ 21.]
    [7] Greystone had provided Oliphant with a detailed summary of the HUD application and
28  approval process, a list of materials that would be required from him in connection with that
    process, and a disclosure of the estimated transaction costs and expenses.

1    In November of 2006, Oliphant approached Greystone to request $4.3 million in bridge

2 financing (approximately 85% of the acquisition price) so he could close on the subject property

3 before the expiration of his purchase contract and bond allocation. [*Id.*, ¶ 10.] On November 16,

4 2006, Greystone supplied Oliphant with a proposal for a non-recourse loan secured by the subject

5 property. [*Id.*, ¶ 11.] Unwilling to contribute any of his own money or produce other financing for

6 the remaining 15% of the purchase price, Oliphant rejected this proposal. [*Id.*, ¶ 12.] Instead,

7 Oliphant asked for a bridge loan to fund the issuance of his OHFA bond allocation into escrow,

8 even though he had not yet purchased the subject property, arranged a viable transaction, or

9 provided documents necessary for submission of the HUD application. [*Id.*, ¶¶ 12-13.] On or

10 about December 4, 2006, Oliphant signed Greystone's predevelopment loan term sheet (the

11 "December Proposal"), which provided for a full recourse $500,000 note backed by Oliphant's

12 personal guaranty. [*Id.*, ¶¶ 15-16, Exs. 1 and 2.]

13    Although it was possible to fund the bonds into escrow prior to obtaining HUD financing,

14 as Oliphant envisioned, that strategy posed a risk that the deal would evaporate if he could not

15 assemble a viable transaction with a tax credit syndicator in time to complete the HUD process.

16 For this very reason, Greystone and James repeatedly suggested to Oliphant that he not take out the

17 Bridge Loan to fund his OHFA bonds into escrow. Instead, James suggested that Oliphant allow

18 the 2006 bond allocation to expire, and to reapply for a new allocation in 2007, thereby avoiding

19 much undue risk. As James explained to Oliphant, there probably would have been little difficulty

20 for Oliphant to get a new bond allocation in 2007. [*Id.*, ¶¶ 13, 17.]

21    Undeterred, Oliphant insisted on funding his bonds into escrow, and opted to worry later

22 about finding a tax credit syndicator in time to complete his transaction. [*Id.*, ¶ 14.] The Bridge

23 Loan was extended at Oliphant's insistence. To the extent that Oliphant feels that he was placed in

24 circumstances of "economic duress," *see* Opp'n (doc. # 16) at 8:10 – even were this a basis to

25 rescind a contract; and it is not[8] – he has only himself to blame.

─────────────────

26    [8] Plaintiffs have not cited to any federal law suggesting that a forum selection or choice of
law provision, or any provision or contract, may be ignored because the contract was purportedly
27 entered into under circumstances of "economic duress." Moreover, if California law were to apply
in determining the enforceability of those provisions as Plaintiffs sometimes contend – though it
28 does not – even Plaintiffs' carefully selective memory of the negotiations fails to present
circumstances rising to the level of "economic duress." At best, Plaintiffs' incomplete depiction

1            **(c)**     **Plaintiffs Knew the Material Terms of the Bridge Loan Before**
                      **They Were Presented with the Drafts.**

2

3          Further, there was no "undue surprise" to this sophisticated, highly educated, and

4    experienced lawyer when he signed the Bridge Loan documents, let alone such to form a basis to

5    simply toss the parties' agreements in this regard and force dual bi-coastal litigation on these

6    matters.  Plaintiffs claim that they were duped because, when drafts of the Bridge Loan documents

7    were presented to Oliphant on December 17, 2006, the terms supposedly differed from those in a

8    November 16, 2006 proposal letter (the "November Proposal," referred to by Plaintiffs as a "term

9    sheet").  Although the November Proposal would have allowed Oliphant to close on a multi-

10   million dollar property on a non-recourse basis, Oliphant rejected it because he was unwilling to

11   contribute any of his own money (the remaining 15%).  [*Id.*, ¶¶ 11-12.]  Instead, on December 4,

12   2006, Oliphant signed a different proposal letter ("December Proposal") setting out the terms for a

13   $500,000 full recourse loan backed by his personal guaranty.  [*Id.*, ¶¶ 15-16, Exs. 1 and 2.]  Given

14   these unassailable facts, Plaintiffs' claim of having been surprised by the $500,000 loan, and

15   associated terms, on December 17, 2006, is simply false.

16                  **2.**     **The Forum Selection Clauses Are Enforceable and Applicable to All of**
                      **Plaintiffs' Claims for Relief.**

17

18         Conceding, as they must, that this forum selection clause is valid, Plaintiffs next attempt to

19   limit its scope by arguing that they should only apply to the interpretation of the specific contracts

20   within which they appear, and should in no event govern their state law tort claims.  *See* Opp'n

21   (doc. # 16) at 7:24-27, 8:1-8, 10-12.  Plaintiffs are wrong on both counts.

22   _____

     (continued...)

23

    suggests that, upon conclusion of its underwriting, Greystone presented an offer of credit to

24   Plaintiffs for less than the maximum amount contemplated in the nonbinding November proposal
as rejected by Oliphant.  Certainly, being declined for credit on specific terms that one might desire

25   is not such an unusual circumstance in modern society that it leaves one with no economic options.
*Cf. London Homes v. Korn*, Cal. App. 2d 233 (1965) (rejecting developer's assertion that defendant

26   landowner's last moment demand that developer pay 10% above prior contracted sale price under
threat of breach and resultant loss to developer constituted duress to developer, because the

27   developer could *choose* to sue on the first contract or sign the second).  In any event, the facts
demonstrate that Plaintiffs had other options on which they acted, having chosen to fund their bond

28   allocation into escrow, and requested the Bridge Loan from Greystone on the precise terms agreed
to that they and now claim to have found surprising.

LAI-2918839v5                   8               Reply in Supp. of Defs.' Mot. to Transfer
                                                       C 07-05454 JCS

1   Plaintiffs' contention that their claims supposedly arising from their other contracts with

2   Greystone do not relate to the agreements containing forum selection clauses is based on an overly

3   restrictive view of the issues. Plaintiff Oliphant agreed in his individual capacity and on behalf of

4   his Santa Fe entities to forum selection clauses in a guaranty agreement, pledge agreements, and a

5   bridge promissory note. [*See* Swanholt Decl. (doc. # 10), Exs. 3C at 11, 3D at 15-16, 3E at 14, and

6   3G at 3.] These agreements do not exist in a legal vacuum. To that end, the pledge agreements

7   designate New York as an appropriate venue for "any legal action or proceeding relating to this

8   agreement, *or any other document executed in connection with the transactions contemplated by*

9   *the loan agreement . . . .*" [*See, e.g.*, Swanholt Decl. (doc. # 10), Ex. 3D at p. 15-16 (emph.

10  added).] Plaintiffs' attempt to isolate their claims as relating solely to the Engagement Agreement

11  is futile. The Engagement Agreement is simply another document that the parties had executed in

12  connection with the transactions contemplated by the loan agreement. In addition, as explained

13  below, Plaintiffs cannot demonstrate that their state law claims relate more closely to the

14  Engagement Agreement than to the Bridge Loan documents. *Cf. Aspitz v. Witness Sys, Inc.*, 2007

15  U.S. Dist. LEXIS 61429, *4-9 (N.D. Cal. Aug. 10, 2007) (rejecting an argument remarkably

16  similar to that raised by Plaintiffs as showing only "superficial appeal").

17  Plaintiffs' argument that their state law claims are beyond the scope of the forum selection

18  clauses simply because they sound in tort is also without merit. Forum selection clauses are

19  applicable to both tort and contractual causes of action. *Manetti-Farrow, Inc.*, 858 F.2d at 514.

20  "Whether a forum selection clause applies to tort claims depends on whether resolution of the

21  claims relates to interpretation of the contract." *Id.* In the present case, every claim for relief

22  asserted by Plaintiffs falls within the scope of the forum selection clauses, because they relate to

23  interpretation of the agreements.[9] This is so because Plaintiffs' state law claims allege the

24  existence of a duty arising not only from the Engagement Agreement, but also from the parties'

25  
26  [9] Plaintiffs assert seven claims for relief: (1) professional negligence; (2) breach of fiduciary duty and constructive fraud; (3) intentional interference with prospective economic advantage; (4) negligent interference with prospective economic advantage; (5) anticipatory
27  breach; (6) breach of the implied covenant of good faith and fair dealing; and (7) declaratory relief with respect to the parties' rights and obligations under the Loan Agreement and related
28  documents. *See* Notice (doc. # 1), Ex. A2 (FAC) ¶¶ 53-110. Plaintiffs do not dispute that the contractual claims in Counts 5, 6, and 7 relate to the Bridge Loan agreements.

1   "business relationship," which includes the relationship created by the Bridge Loan documents, *see*

2   Notice (doc. # 1), Ex. A2 ("FAC") ¶¶ 54 and 61, and allege that this duty was breached, *inter alia*,

3   because Greystone called the Bridge Loan in default and accelerated Plaintiffs' obligations, *see id.*

4   ¶¶ 76 and 90.  Without doubt, resolution of each of Plaintiffs' tort claims relates to the Bridge Loan

5   documents because the Court must determine (1) whether the business relationship established

6   therein created any duty, and (2) whether the Plaintiffs were in default and subject to acceleration

7   of their obligation under the Bridge Loan documents.  Finally, Plaintiffs' tort claims relate to the

8   contracts, because they are all subject to dismissal on account of the exculpatory clauses by which

9   Plaintiffs released Defendants from such liability.  [*See, e.g.*, Swanholt Decl. (doc. #10), Ex. 3A at

10  18 (section 10.6 of Bridge Loan Agreement).]  Accordingly, all of Plaintiffs' claims should be

11  litigated in New York.

12          **3.       The Interests Of Justice Are Served By Enforcing The Parties'**
                       **Agreements.**
13
14          **(a)     All of Plaintiffs Claims Will Be Governed by New York Law.**

15          Plaintiffs argue that this action should not be governed by New York law pursuant to the

16  choice of law provisions because, in their view, (1) the contracts are unenforceable, (2) the Court

17  must apply California choice of law rules in deciding whether to enforce the contractual choice of

18  law provisions, and (3) their state law claims are not necessarily governed by New York law.

19  Opp'n (doc. # 16) at 16-18.  As discussed above, there is no merit to Plaintiffs' bid to toss the

20  parties' agreements on the basis of economic duress, adhesion, and unconscionability.

21          As for Plaintiffs' second argument, it is nothing more than a truism.  It is well established

22  that federal courts sitting in diversity look to the law of the forum state in making choice of law

23  determinations.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Orr v. Bank of*

24  *Am.*, 285 F.3d 764, 772 n.4 (9th Cir. 2002).  Without identifying any conflict of laws issues that

25  presently exist, Plaintiffs surmise that the possibility that the Court may have to apply California

26  choice of law rules to resolve such an issue, if it should arise, outweighs the fact that New York

27  substantive law will apply to the claims in this and the New York action.[10]  Although Plaintiffs

28          [10] Given the complexity of today's interstate and international transactions, choice of law
    issues may arise in any case.  However, it is not necessary for a court to engage in a conflict of

1   recite at length the standard applied in California for determining the validity of a choice of law

2   provision, they cannot explain why under that liberal standard the forum selection clauses in the

3   Bridge Loan documents cannot be enforced. *See* Opp'n (doc. # 16) at 17. If California law will

4   apply in this action, it is only to determine the validity of the choice of law provisions. Plaintiffs

5   do not raise any challenge under that standard and, beyond that, New York substantive law will

6   apply on the merits.[11]

7        Finally, Plaintiffs suggest that California law should apply to their state law tort claims

8   notwithstanding the New York choice of law provision. They are wrong. Under California choice

9   of law rules, New York law will apply not only to Plaintiffs' contract claims, but to Plaintiffs' state

10  tort law claims as well. *See Nedlloyd Lines B.V.*, 3 Cal. 4th at 468-71 (finding that Hong Kong

11  law, as selected in contractual choice-of-law clause, applied to contract claims as well as those for

12  breach of fiduciary duty); *see also Olinick v. BMG Entm't*, 138 Cal. App. 4th 1286, 1297-99 (Ct.

13  App. 2006) (finding that contractual choice-of-law provision selecting New York law applied to

14  contract claims as well as age discrimination claims sounding in tort).

15        **(b)    Transfer of this Action to the Southern District of New York
            Will Be More Convenient for the Witnesses.**

16

17        Plaintiffs surmise that "[t]he witnesses, if called, will have to get on a plane and go

18  somewhere." Opp'n (doc. # 16) at 19. New York is hundreds or even thousands of miles closer to

19  several witnesses than San Francisco. Travel time and costs for those witnesses would be

20  considerably less if they were not forced to travel to San Francisco. Further, Plaintiffs are seeking

21  to amend their complaint to include allegations regarding a correspondence sent by Greystone to 10

22

23  _____

    (continued...)

24  laws analysis unless the proponent demonstrates that there is indeed a conflict of laws, which
    Plaintiffs have not done.

25  [11] As the Court knows, a "transferee district court must . . . apply the state law that would
    have been applied if there had been no change of venue." *Van Dusen v. Barrack*, 376 U.S. 612,

26  639 (1964). The *Van Dusen* policy of preventing forum shopping is not implicated when transfer
    is sought, as here, because a choice of law clause provides that the law of the *transferee* district

27  must apply wherever the case is heard. Moreover, to the limited extent that the New York court
    must apply California law to determine the validity of the choice of law clauses, the laws of both

28  states are the same. *See Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464-65 (1992);
    *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (Ct. App. 2006).

1    entities – additional witnesses, each of which is closer to New York than California.  Specifically,

2    they are in (1) New York (three entities), (2) Washington, D.C., (3) Michigan, and (4) Oklahoma

3    (five entities).  [*See* Swanholt Decl., ¶ 2, Ex. 1 ¶ 55.][12]

4    But moreover, as explained in Defendants' motion (doc. # 10), all of the witnesses will be

5    called to testify in the New York Action.  Other than Oliphant's expectation that the witnesses

6    "will have to get on a plane" and come to him, Plaintiffs have no sensible explanation as to why the

7    witnesses should be burdened with duplicative demands on their time for travel and testimony

8    simply for Oliphant to maintain suit in his home district.  *See Coxcom, Inc. v. Hybrid Patents, Inc.*,

9    2007 U.S. Dist. LEXIS 67168, at *7 (N.D. Cal. Aug. 30, 2007) (finding that transfer of action to

10    the Eastern District of Texas where a related matter was pending would be more convenient for

11    non-party witnesses located in *California*, because it would eliminate the need to engage in

12    duplicative litigation and travel).  Again, either way, these witnesses will have to travel and testify

13    in New York.  Common sense dictates that they should not also be required to fly to the opposite

14    coast to testify again about these same issues simultaneously in another forum.

15            **(c)    Contrary to Plaintiffs' Statistically Fallacious Argument, There**
                        **Is Not a Significant Difference Between the Districts in Terms**
16                      **of Relative Docket Congestion.**

17    In the underlying motion, Defendants explain how the transfer of this action and its

18    consolidation with the New York Action will advance judicial efficiency and reduce the costs of

19    litigation for the parties.  *See* Mot. (doc. # 10) at 8-9.  Lacking any principled basis by which to

20    deny that transfer would considerably promote the interests of justice, Plaintiffs aver, on

21    statistically flawed premises, that the civil docket of the Southern District of New York is more

22    congested than that of the Northern District of California.  *See* Opp'n (doc. # 16) at 23-24.

23    Plaintiffs surmise that civil cases take much longer to process in the Southern District of New

24    York, because there are more three-year cases pending there than in the Northern District of

25    California.  *Id.* at 24 ("2 ½ times as many cases are still pending after three years").  It is not

26    difficult to see through Plaintiffs' data dredging and manipulation, however, and realize that the

27    _____

[12] Plaintiffs identify other witnesses located in Oklahoma City, Oklahoma; Springfield,
Missouri; Washington, D.C.; Philadelphia, Pennsylvania; and Arkansas.  [Draper Decl. (doc. # 20),

28    ¶ 10.]  The fact that these witnesses are also located nearer to New York than to California also
favors transfer.

1    Southern District of New York has a correspondingly greater number of judges to manage its larger

2    overall caseload.[13] This factor neither strongly favors nor in any way disfavors transfer.

3               **(d)    The Presence of the Forum Selection Clauses Is a Significant**
                      **Factor Favoring Transfer.**

4

5          The existence of a forum selection clause is a "significant factor in the court's § 1404(a)

6    analysis." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000). Although the

7    parties clearly contemplated venue in New York, Plaintiffs contend that their agreements should be

8    ignored because the forum selection clauses are permissive and not mandatory. *See* Opp'n (doc. #

9    16) at 21-23. Defendants have already explained that the issue is not whether Plaintiffs were

10   obligated to bring suit in New York, but whether New York is the superior forum now in light of

11   the parties agreements' and the judicial efficiency that would result from the transfer and

12   consolidation of this action with the New York action. *See Unisys v. Access Co., Ltd.*, 2005 U.S.

13   Dist. LEXIS 31897, at *13 (N.D. Cal. Nov. 23, 2005) (transferring action pursuant to § 1404(a)

14   based on the presence of a permissive forum selection clause). Moreover, the cases relied upon by

15   Plaintiffs are easily distinguished because, unlike a convenience transfer, those cases sought either

16   *dismissal* or *remand*, which would naturally require a mandatory forum selection clause.[14]

17   Therefore, to the extent that those cases declare that the *Bremen* doctrine does not apply, it only

18               _____

19   [13] For instance, processing time for civil cases is not significantly longer in New York, as Plaintiffs suggest. *See* Opp'n (doc. # 16) at 24. During the 12-month period ending September 30, 2006, the median time from the filing of a civil case until disposition was 7.4 months in the

20   Northern District of California and 8.3 months in the Southern District of New York. More importantly, during the same time period, there were 558 new civil filings and 621 weighted filings

21   per judgeship in the Northern District of California as compared with only 385 new civil filings and 501 weighted filings per judgeship in the Southern District of New York. [*See* Draper Decl.

22   (doc. # 20), Exs. H & I]; *accord* Admin. Office of the United States Courts, *Federal Court Management Statistics 2006: District Court*, at www.uscourts.gov/cgi-bin/cmsd2006.pl.

23   [14] *See Hsu v. Oz Optics Ltd.*, 211 F.R.D. 615, 617 (N.D. Cal. 2002) (seeking dismissal under Fed. R. Civ. P. 12(b)(3) or *forum non conveniens*); *Hunt Wesson Foods, Inc. v. Supreme Oil*

24   *Co.*, 817 F.2d 75, 76 (9th Cir. 1987) (reversing district court's remand order because forum selection clause was permissive and did not require jurisdiction in state court); *Advanta Corp. v.*

25   *Dialogic Corp.*, 2006 U.S. Dist. LEXIS 28214, at *1, *9, *16-19 (N.D. Cal. May 2, 2006) (dismissing action on grounds of *forum non conviens*, notwithstanding permissive forum selection

26   clause that would have made venue proper in the Northern District of California); *but cf. Softworks Group, Inc. v. IHosting, Inc.*, 2006 U.S. Dist. LEXIS 75989, at *1-4 (N.D. Cal. Oct. 4, 2006) (party

27   seeking § 1404(a) transfer pursuant to permissive forum selection clause did not have a related action pending in the transferee district with which the case, if transferred, could be consolidated).

28   The *Advanta* case, which does not aid Plaintiffs' position, is also designated "not for publication" and should therefore not have been cited by Plaintiffs in the first instance. *See* Civil L.R. 3-4(e).

1  means that a permissive forum selection clause cannot compel *dismissal for improper venue*, an

2  issue not relevant to this motion. The cases cannot reasonably be read to mean that federal law for

3  determining the enforceability of forum selection clauses in general ceases to apply.

4  ### C.    PLAINTIFFS MAY NOT RELY ON THE FIRST-TO-FILE RULE.

5  The doctrine of federal comity, sometimes referred to as the "first-to-file" rule, allows a

6  District Court "to decline jurisdiction over an action when a complaint involving the same parties

7  and issues has already been filed in another district." *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678

8  F.2d 93, 94-5 (9th Cir. 1982). Commenting on the doctrine's value in promoting efficiency, the

9  Ninth Circuit stated in 1979 that:

10
11
12
13
> " . . . increasing calendar congestion in the federal courts makes it imperative to avoid concurrent litigation in more than one forum whenever consistent with the rights of the parties. A court may choose not to exercise its jurisdiction when another court having jurisdiction over the same matter has entertained it and can achieve the same result."

14  *Church of Scientology v. United States Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979) (quoting

15  *Crawford v. Bell*, 599 F.2d 890, 893 (9th Cir. 1979)).

16  In the instant case, the Court should decline jurisdiction over this matter, and allow these

17  issues to be litigated in the Southern District of New York where the substantive claims concerning

18  Plaintiffs' default under the Bridge Loan documents are pending. Although Plaintiffs' action was

19  filed first, Defendants did not receive any notice of it until September 25, 2007 when they were

20  served with Plaintiffs' *first amended* complaint, which occurred only one day before the filing of

21  Greystone's New York action. In light of the relatively short time period between these filings,

22  Plaintiffs' earlier filing date should be accorded little weight. *See Z-Line Designs, Inc. v. Bell'O*

23  *Int'l LLC*, 218 F.R.D. 663, 667 (N.D. Cal. 2003).

24  More importantly, the facts demonstrate that Plaintiffs filed their declaratory action in their

25  home district only when they were confronted with "specific, concrete indications that a suit by

26  defendant[s] was imminent." *Id.* at 665. In particular, on August 21, 2007, Greystone sent via

27  Federal Express a detailed, three-page letter entitled "Notice of Default," advising Plaintiffs at

28  length of the numerous events of default that had occurred under the Bridge Loan Agreement.

1  Oliphant acknowledged receipt of a letter dated August 27, 2007 expressing Greystone's intention

2  to pursue all collection remedies.  [Oliphant Decl. (doc. # 18), ¶ 31.]  Plaintiffs were well aware of

3  the likelihood of litigation.  [*See* Swanholt Decl. (doc. # 10), ¶ 11, Ex. 3J.]; *see also Inherent.com*

4  *v. Martindale-Hubbell, Lexis/Nexis, Inc.*, 420 F. Supp. 2d 1093, 1099-1100 (N.D. Cal. 2006).[15]

5  Having signed numerous agreements governed by New York law and containing New York forum

6  selection clauses, Plaintiffs cannot deny that they anticipated that any litigation would commence

7  in New York.  On September 18, 2007— still one week before Defendants were first notified of

8  this action through service of Plaintiffs' *first amended* complaint— Greystone sent via overnight

9  delivery another detailed letter entitled "Notice of Acceleration," explaining its decision to

10  accelerate and bring due the entire balance of the Bridge Loan.  [Swanholt Decl. (doc. # 10), ¶ 11,

11  Ex. 3J.]  Aware from the specific and concrete indications received from Greystone that suit was

12  impending, Plaintiffs filed an anticipatory suit in their home district for declaratory relief.

13         In view of the anticipatory nature of Plaintiffs' action, the parties' executed agreements, the

14  conveniences favoring venue in the Southern District of New York, and the balance of the equities,

15  Plaintiffs cannot rely on the "first-to-file" rule to avoid transfer and consolidation of this matter

16  with the New York action.  Allowing these issues to be resolved in the Southern District of New

17  York will best promote the policy of judicial efficiency, which is the underpinning of the broader

18  doctrine of federal comity from which the "first-to-file" rule arises.  *See Kerotest Mfg. Co. v. C-O-*

19  *Two Fire Equip. Co.*, 342 U.S. 180, 183 (1950); *Church of Scientology*, 611 F.2d at 750.

20  **III.    CONCLUSION**

21         Defendants respectfully request that this Court grant Defendants' motion to transfer this

22  action to the Southern District of New York.

23  Dated:  December 14, 2007                 JONES DAY

24                                            By: _____

25                                                Mark D. Kemple
                                                  Erik K. Swanholt
26                                                Attorneys for Defendants Greystone Servicing
                                                  Corporation, Inc. and Greystone CDE, LLC
27  _____

28  [15] Consistent with this knowledge, at around the same time in early to mid August, Plaintiff
Oliphant had intimated to David Henry that he thought he would end up in litigation with
Greystone over his dealings.  [James Decl., ¶ 41.]

1

**CERTIFICATE OF SERVICE**

2

I, Jean E. Asuncion, declare:

3

I am a citizen of the United States and employed in Los Angeles County, California.  I am

4

over the age of eighteen years and not a party to the within-entitled action.  My business address

5

is 555 South Flower Street, Fiftieth Floor, Los Angeles, California  90071-2300.  On December

6

14, 2007, I served a copy of the within document(s):

7

8

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE;
AND DECLARATIONS OF MATTHEW JAMES AND ERIK K. SWANHOLT**

9

10

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

11

12

☐    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

13

14

☐    by placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

15

16

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

17

☐    by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

18

☒    by electronically filing such document(s) through the United States District Court for the Northern District of California CM/ECF which will send electronic notification of such filing to the following registered users:

19

20

Eric J. Farber, Esq.                      *Attorneys for Plaintiffs*

21

Ann McFarland Draper, Esq.
FARBER & COMPANY

22

ATTORNEYS, LLP
847 Sansome St., Suite LL

23

San Francisco, CA  94111
Phone: (415) 434-5320

24

Fax: (415) 434-5380

25

I am readily familiar with the firm's practice of collection and processing correspondence

26

for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same

27

day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on

28

motion of the party served, service is presumed invalid if postal cancellation date or postage

meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on December 14, 2007, at Los Angeles, California.

_____
Jean E. Asuncion