#155243v2
GT Draft 12/17/06

BRIDGE LOAN AGREEMENT

by and between

GREYSTONE CDE, LLC,

and

SANTA FE POINTE, L.P.

Dated as of December __, 2006

## BRIDGE LOAN AGREEMENT

This BRIDGE LOAN AGREEMENT (as amended, modified or supplemented from time to time, this "**Agreement**"), made as of December __, 2006, by and between **GREYSTONE CDE, LLC**, a limited liability company organized and existing under the laws of the State of Delaware, with its principal offices at 419 Belle Air Lane, Warrenton, Virginia 20186 (together with its successors and assigns, "**Lender**"), and **SANTA FE POINTE, L.P.**, a limited partnership organized and existing under the laws of the State of Oklahoma, with its principal offices at 16416 Oconee Creek Drive, Edmond, Oklahoma 73013 (together with its permitted successors and assigns, "**Borrower**"),

### W I T N E S S E T H:

**WHEREAS**, Borrower has requested that Lender make a bridge loan in the maximum principal amount outstanding at any time of $500,000.00 to finance predevelopment expenses of an affordable housing development to be known as the Santa Fe Pointe Apartments located at 125 SW 74th Street in Oklahoma City, Oklahoma, which will be developed and owned by the Borrower, and

**WHEREAS**, subject to the terms and conditions set forth below, and in reliance upon the representations and warranties and the covenants and undertakings of Borrower contained herein, Lender wishes to make such bridge loan to Borrower.

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants and undertakings set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

**Section 1.1    Definitions**.  In addition to terms defined elsewhere in this Agreement, the following terms as used in this Agreement shall have the meanings specified below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Agreement" means this Bridge Loan Agreement, as the same may be amended, modified, or supplemented from time to time.

"Assignment of Project Documents" has the meaning given to that term in Section 3.1(a).

"Assignment of Purchase Contract" has the meaning given to that term in Section 3.1(a).

"Bonds" means those certain $_____ in original aggregate principal amount of _____, the proceeds of which are to be loaned to Borrower to finance a portion of the costs of acquisition and rehabilitation of the Project.

"Bond Documents" means the documents evidencing or securing the Bonds and the loan of the proceeds thereof to Borrower.

"Borrower" means Santa Fe Pointe, L.P., a limited partnership duly organized, validly existing and in good standing under the laws of the State of Oklahoma, together with its successors and permitted assigns.

"Borrower Affiliates" means, collectively, an entity controlled by Borrower or under common control by any person or entity controlling Borrower, together with their respective successors and assigns.

"Business Day" means any day that is not a Saturday, Sunday or public holiday under the laws of the State of New York or the District of Columbia.

"Certificate of Deposit Pledge" has the meaning given to that term in Section 3.1(a).

"Closing" has the meaning given to that term in Section 2.1.

"Closing Date" means the date on which the Closing occurs.

"Collateral" means all property subject to the lien of the Partner Pledge, the Assignment of Project Documents, the Assignment of Purchase Contract, the Developer Fee Pledge and the Certificate of Deposit Pledge.

"Default" means any event which, with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

"Developer" means _____, a _____ duly organized and validly existing under the laws of the State of _____, together with its permitted successors and assigns.

"Developer Fee Pledge" has the meaning given to that term in Section 3.1(a).

"Disbursement" has the meaning given to that term in Section 6.1.

"Disbursement Request Form" shall be the form of request for Disbursements set forth on Exhibit A hereto.

"Event of Default" has the meaning given to that term in Section 9.1.

"Future Project Expenses" has the meaning given to that term in Section 6.2(a).

"General Partner" means Santa Fe Pointe Management, LLC, a limited liability company duly organized and validly existing under the laws of the State of Oklahoma, together with its permitted successors and assigns, in its capacity as a general partner of Borrower.

"Guarantor" means Theotis F. Oliphant, a [married] individual and a resident of the State of California, together with his heirs, executors, legal representatives, personal representatives and permitted successors and assigns.

"Guaranty" has the meaning given to that term in Section 3.1(a).

"LIBOR" means the rate per annum fixed by the British Bankers' Association at 11:00 a.m. (London time) on the last Business Day before the first day of each month, relating to quotations for London Interbank Offered Rates on U.S. dollar deposits for a three (3) month period and as published and reported by the Telerate Service by reference to the screen page currently designated as "Page [3750]" on that service (or such other screen page which may replace such screen page) or if no longer provided by Bloomberg LP or the Telerate Service, such rate as shall be determined in good faith by Lender from such sources as it shall determine to be materially comparable to the Telerate Service.

"Limited Partner" means Theotis F. Oliphant, an individual and a resident of the State of California, together with his heirs, executors, legal representatives, personal representatives, successors and assigns, in his capacity as a limited partner of Borrower.

"Loan" means, the bridge loan to be extended by Lender to Borrower pursuant to the terms of this Agreement.

"Loan Amount" has the meaning given to that term in Section 2.3.

"Loan Documents" means this Agreement, the Note, the Subordinate Mortgage and any other agreements or documents now or in the future executed or delivered to Lender by Borrower in connection with this Agreement and/or the making of the Loan.

"Loan Term" has the meaning given to that term in Section 2.4.

"Note" has the meaning given to that term in Section 2.2.

"Obligors" means, collectively, Borrower, the Guarantor, the Developer, the Limited Partner and the General Partner.

"Origination Period" means the period during which Disbursements may be made by Lender to Borrower, as described in Section 2.7.

"Partner Pledge" has the meaning given to that term in Section 3.1(a).

"Project" means the affordable multi-family housing development to be known as "Santa Fe Pointe Apartments" located at 125 SW 74th Street in Oklahoma City, Oklahoma.

"UCC Filings" has the meaning given to that term in Section 3.1(b).

**Section 1.2    Accounting Terms**.  All accounting terms not specifically defined in this Agreement shall be construed, and all calculations with respect to accounting or financial matters shall be computed, in accordance the generally accepted accounting principles, consistently applied.

**Section 1.3    Incorporation by Reference**. All provisions of the other Loan Documents, as may be amended, modified, or supplemented from time to time, are incorporated by reference in this Agreement with the same effect as though fully set forth in this Agreement. In the event of any inconsistency between the provisions of this Agreement and the provisions of

the other Loan Documents, the provisions of this Agreement or of such other Loan Documents as Lender shall designate in its discretion shall control.

## ARTICLE II
## THE LOAN

**Section 2.1    Agreement to Lend**. Subject to the terms and conditions in this Agreement and the other Loan Documents, Lender agrees to lend to Borrower such amounts as Borrower may request and Lender may approve, to be disbursed in accordance with the terms hereof, up to an aggregate amount at any time outstanding not in excess of the Loan Amount. The closing of the Loan will occur upon satisfaction of the conditions set forth in Sections 5.1 and Section 5.2 (the "**Closing**").

**Section 2.2    Note**. The Loan is evidenced by a Bridge Loan Promissory Note dated December __, 2006 made by Borrower payable to the order of Lender in the principal amount of up to $500,000.00 (together with any extensions, modifications, renewals, replacements or refinancing thereof, the "**Note**").

**Section 2.3    Loan Amount**. The maximum principal amount of the loan at any time outstanding shall be Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "**Loan Amount**").

**Section 2.4    Loan Term**. The term of the Loan commenced on the Closing Date and shall end on June 15, 2007 (the "**Loan Term**"), which may be extended for an additional six (6) months with (i) prior written approval of both Lender and Borrower, and payment to Lender by Borrower of an extension fee equal to one quarter of one percent (0.25%) of the Loan Amount (the "**Extension Fee**") and (ii) execution and delivery by Borrower of an allonge to the Note and confirmation by the Guarantor, the Developer and the General Partner of their obligations under the Loan Documents to which they are parties, all in form and substance acceptable to Lender in its sole discretion.

**Section 2.5    Interest; Exit Fee**.

(a)    The Loan shall bear interest on the full Loan Amount (whether or not disbursed) at a variable rate equal to LIBOR plus two and three-quarters percent (2.75%) per annum, accruing on the full Loan Amount (whether or not disbursed) from the Closing Date. The Note provides for a default rate of interest of the lesser of (i) twelve percent (12.0%) per annum or (ii) the highest rate of interest permitted by applicable law.  Interest on the Loan Amount (whether or not disbursed) shall be due and payable (i) on a quarterly basis, on each March 1, June 1, September 1 and December 1, commencing March 1, 2007 until all amounts due in respect of the Loan shall have been paid in full; (ii) contemporaneously with any payment of the Loan pursuant to Section 2.6 in an amount equal to the accrued and unpaid interest on prepayment of the Loan; and (iii) in full, in the amount of all accrued and unpaid interest, at the end of the Loan Term.  Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  Borrower shall receive a credit against interest due hereunder and under the Note as set forth in Section 6.3 hereof.

4

(b)    In addition to and not in lieu of interest on the Loan, at the end of the Loan Term Borrower shall pay to Lender an exit fee equal to two percent (2%) of the Loan Amount (the "**Exit Fee**").  The Lender shall waive the Exit Fee if the Borrower closes its permanent financing through the Lender or an affiliate of the Lender upon terms and conditions satisfactory to Lender or its affiliate.

Section 2.6    **Mandatory Repayment Schedule**.  A mandatory repayment of the outstanding principal amount of the Loan, plus all accrued and unpaid interest on the Loan Amount and other sums due and payable by Borrower under the Note and the other Loan Documents shall be due and payable on the earlier of: (A) the date on which the FHA-insured 221(d)(4) construction and permanent loan closing occurs in respect of the Project; or (B) the expiration of the Loan Term.

Section 2.7    **Origination Period**. Lender shall make proceeds of the Loan available to Borrower from time to time, up to a maximum amount equal to the Loan Amount, in separate Disbursements, as more fully provided in Article VI.  Disbursements shall be made by Lender, if at all during a period commencing on the Closing Date ending on January 1, 2007, as such date may be extended in accordance with Section 2.4 hereof (the "**Origination Period**"), after which Lender shall no longer have any obligation to disburse funds to Borrower.  Borrower shall have no right to or interest in any portion of the Loan Amount which has not been disbursed to Borrower in accordance with the provisions of Article VI on or before the end of the Origination Period.  Amounts disbursed to Borrower and repaid may not be re-borrowed by Borrower.

## ARTICLE III
## SECURITY

Section 3.1    **Collateral.**

(a)    As security for the due and punctual payment of all liabilities of Borrower with respect to the Loan, including without limitation the payment of all amounts due or to become due under the Note, and as security for the prompt performance of all other obligations of Borrower under the Loan Documents, Borrower shall execute and deliver or cause to be executed and delivered to Lender (i) a guaranty and suretyship agreement dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Guaranty**"), from the Guarantor in favor of Lender, (ii) an assignment of certificate of deposit dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Certificate of Deposit Pledge**"), from the Guarantor in favor of Lender, with the consent of the senior pledgee, (iii) an assignment of project documents dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Assignment of Project Documents**"), from Borrower to Lender, (iv) an assignment of purchase contract dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to time, the "**Assignment of Purchase Contract**"), from Borrower to Lender, with the consent of the seller, (v) a partner limited guaranty, pledge and security agreement dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to time, "**Partner Pledge**") from the General Partner and the Limited Partner to Lender and (vi) a developer limited guaranty, pledge and security agreement dated as of December __, 2006 (as the same may be amended, modified or supplemented from time to

5

time, the **"Developer Fee Pledge"**) from the Developer to the Lender.  All such documents shall be substantially in the form agreed upon by the parties, and shall create a valid second lien on the Project in favor of Lender.  Upon request by Lender, Borrower shall record or file such instruments in the official public records of the State of Oklahoma and/or all state and/or local jurisdictions in which such recording or filing as shall be required to perfect Lender's security interest in the Collateral, and Borrower shall pay all recording costs and other fees in connection with such recording or filing.

(b)     Borrower hereby authorizes Lender to file UCC-1 financing statements or other documents as Lender may determine necessary to perfect, continue and/or reinstate the perfection of such security interest in the Collateral (the "**UCC Filings**").  Borrower shall pay all filing fees and other costs in connection with such UCC Filings.

**Section 3.2     Application of Collateral**. All amounts received by Lender on account of any other Collateral shall be applied in the following order of priority: (i) first, to the costs of preserving and protecting the Collateral and the costs of collection, if any, including without limitation reasonable attorneys' fees, incurred by Lender in connection with the collection of all or any portion of any amounts due under the Note; (ii) second, to the payment of any amounts other than principal, interest owing or Exit Fee under the Loan Documents; (iii) third, to the payment of accrued and unpaid interest due under the Note; (iv) fourth, to the payment of principal of the Note; (v) fifth, to the payment of unpaid Exit Fee; and (vi) sixth, to Borrower or as a court of competent jurisdiction may direct.

**Section 3.3     Power of Attorney**. Borrower authorizes, and makes, constitutes, and appoints Lender, and any officer or authorized agent of Lender, with full power of substitution, as Borrower's true and lawful attorney-in-fact, with power, in Lender's own name or in Borrower's name, (i) to execute and deliver on Borrower's behalf such documents as Lender may from time to time consider reasonably necessary to create, perfect, or preserve its security interest in the Collateral or to exercise its rights and remedies with respect to the Collateral, and (ii) to endorse any chattel paper, note, draft, instrument, or any other form or obligation relating to or constituting part of the Collateral or any right under the Collateral and, upon the occurrence of an Event of Default, to demand, collect, receipt for, compromise, settle, and sue for monies due in respect of the Collateral; and Borrower ratifies all that said attorney shall lawfully do or cause to be done by virtue thereof. This power of attorney is and shall be deemed coupled with an interest and shall be irrevocable so long as any amounts remain outstanding under the Note and/or the other Loan Documents.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to fund the Disbursements, Borrower represents and warrants to Lender, as of the Closing Date and as of the date of each Disbursement, as follows:

**Section 4.1     Organization**. Borrower is a limited partnership, duly organized, validly existing and in good standing under the laws of the State of Oklahoma, and has paid all taxes and filed all reports, if any, necessary to maintain its status and good standing as an Oklahoma

limited partnership. No proceeding or action is pending or, to the best of Borrower's knowledge, threatened, against Borrower which could affect its organization, existence or status and good standing under the laws of the State of Oklahoma.

      **Section 4.2**    **Power and Authority**. Borrower has the legal and other power and authority to conduct all of the activities which it now conducts or proposes to conduct as contemplated by the Loan Documents to which Borrower is a party, to enter into the Loan Documents to which Borrower is a party, and to make and perform the representations, warranties, covenants and undertakings provided in the Loan Documents to which Borrower is a party.

      **Section 4.3**    **Binding Agreement**. Borrower has taken all legal and other action necessary to authorize the execution and delivery of the Loan Documents to which Borrower is a party and the consummation of transactions contemplated by such Loan Documents, and such Loan Documents are valid and binding obligations of Borrower, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other law and equity principles applied for the relief of debtors generally. Neither the execution and delivery of the Loan Documents to which Borrower is a party nor the consummation of the transactions contemplated by such Loan Documents will constitute a violation or breach of the articles of organization or operating agreement of Borrower, or any provision of any contract or other instrument to which Borrower is a party or by which Borrower or its properties are bound or any order, writ, injunction, decree, statute, rule or regulation of any court or regulatory agency. No consent, order, authorization or other approval of any governmental body or agency is required in order for Borrower to execute or deliver, or perform its obligations under, the Loan Documents to which Borrower is a party.

      **Section 4.4**    **Financial Condition**. The financial statements of Borrower and the other Obligors previously furnished to Lender were prepared in accordance with generally accepted accounting principles, consistently applied, are substantially complete and correct, and present fairly the financial position, the results of operations and the contingent liabilities of Borrower and the other Obligors as of their dates and for the periods then ending. Since the date of the most recent financial statements of Borrower and the other Obligors furnished to Lender, no material adverse change has occurred in the financial condition, operations or prospects of Borrower or the other Obligors.

      **Section 4.5**    **Litigation**. No action, suit or proceeding or no investigation is pending or, to the best of Borrower's knowledge, threatened, against or affecting Borrower and/or the Collateral, at law or in equity, in any court or by any federal, state, municipal or other governmental authority, department, commission, board, agency or other governmental instrumentality which could have a material adverse effect on Borrower's ability to undertake the Project or on the financial condition or operations of Borrower, or which questions, or is likely to materially adversely affect, Borrower's undertakings under, or performance of, the Loan Documents to which Borrower is a party or its financial conditions, operations or prospects.

      **Section 4.6**    **No Defaults**. Borrower is not in default or alleged to be in default with respect to any judgment, order, writ, injunction or decree or in breach or, alleged to be in breach or default under any lease, contract, agreement, commitment, instrument or obligation to which it

is a party or by which it or its properties are bound (including, without limitation, the Collateral); and, no state of facts exists which is likely to create or cause a default or breach under any such lease, contract, agreement, commitment, instrument or obligation.  There are no defaults or events which, with the giving or notice or the passage of time would constitute defaults on the part of Borrower.

**Section 4.7    Compliance with Governmental Requirements**. Borrower has complied with all federal, state and local laws, regulations and orders applicable to the conduct of its operations or the ownership of its properties (including, without limitation, the Collateral).

**Section 4.8    Taxes**. All tax returns (including, but not limited to, information returns) required to be filed by Borrower in any jurisdiction have in fact been filed, and all taxes, assessments, fees and other governmental charges upon Borrower, or upon any of its assets, income or franchises, which are due and payable, have been paid.

**Section 4.9    Other Agreements**.  Borrower is not a party to any agreement or instrument, or subject to any restriction, which could materially adversely affect Borrower's properties or assets (including, without limitation, the Collateral), operations, prospects or condition, financial or otherwise.

**Section 4.10   Disclosure**. No representation, warranty or statement of Borrower in this Agreement or the other Loan Documents to which Borrower is a party, or in any document furnished to Lender pursuant to this Agreement or the other Loan Documents, or in connection with the transactions contemplated in this Agreement, contains any untrue statement of a material fact, or omits any material fact, the omission of which would be misleading.  Borrower has disclosed to Lender in writing every fact that affects the financial condition or prospects or its ability to perform its obligations under this Agreement and the other Loan Documents.

**Section 4.11   Judgments**. No judgment, confession of judgment, decree, order, order to show cause, writ, lien, attachment, or injunction, including without limitation those on appeal, has been filed or entered against Borrower and/or the Collateral, in any court or in any arbitration proceeding.

**Section 4.12   Security**. The UCC Filings will be in proper recordable form and, upon recording in the official public records of the State of Oklahoma and all other state and local jurisdictions where required to be filed and will create a valid and binding liens upon the Collateral in favor of Lender, securing payment of the Loan.

**ARTICLE V**
**CONDITIONS TO LENDER'S OBLIGATIONS**

**Section 5.1    General Conditions**. The obligation of Lender under this Agreement fund the Loan is subject to the following conditions precedent, all of which shall be fulfilled to Lender's satisfaction on or prior to the Closing Date, which Closing Date shall occur on or before December __, 2006, and shall be in effect on the Closing Date:

(a)     The representations and warranties made by Borrower in this Agreement and the other Loan Documents shall be true and correct with the same effect as though such representations and warranties had been made on and as of such time.

(b)     No Event of Default shall have occurred and be continuing or shall result from the funding of the Loan.

(c)     No material adverse change, as determined by Lender in its sole discretion, shall have occurred with respect to the Collateral and/or in the financial condition, operations or prospects of any of the Obligors since the dates of the Obligors' financial information most recently provided to Lender.

(d)     The Contract for Sale of Real Estate dated effective July 21, 2006 in respect of the Project shall have been assigned to Borrower and the deadline for closing under such contract shall have been extended to no later than March 31, 2007, with an opportunity to extend again to a date no later than June 30, 2007 for an additional escrow deposit of not more than $75,000.

(e)     Contemporaneously with the closing, Borrower shall have paid Lender's out-of-pocket expenses in connection with the Loan, including, without limitation, the fees and expenses of counsel to Lender.

**Section 5.2    Delivery of Documents**. As conditions precedent to the obligation of Lender to initially fund the Loan, Borrower shall deliver or cause to be delivered to Lender, at or prior to the Closing Date, the following documents, all of which shall be in form and substance acceptable to Lender:

(a)     The original Agreement, duly executed by Lender and Borrower.

(b)     The original Note, duly executed by Borrower.

(c)     The original Guaranty, Certificate of Deposit Pledge, Assignment of Project Documents, Assignment of Purchase Contract, Developer Fee Pledge and Partner Pledge, all duly executed by the parties thereto.

(d)     Closing certificates of Borrower, the General Partner, the Developer and the Guarantor, each substantially in the form provided by Lender to Borrower, with attached exhibits, certified by the Guarantor and the appropriate authorized representatives of Borrower, the General Partner and the Developer.

(e)     Such UCC-1 financing statements as may be requested by Lender.

(f)     Copies of the most recent annual compiled financial statements and quarterly unaudited financial statements of Borrower, the General Partner, the Developer and the Guarantor, each including a schedule of contingent liabilities.

(g)     An opinion of counsel for Borrower, the General Partner, the Developer and the Guarantor, in form and substance reasonably satisfactory to Lender and Lender's counsel.

(h)     Such additional documents and information and such additional certificates and assurances as reasonably requested by Lender under the terms of this Agreement, the other Loan Documents, or otherwise.

## ARTICLE VI
## DISBURSEMENTS

**Section 6.1     Loan Proceeds**. Lender shall disburse to Borrower proceeds of the Loan from time to time in the form of separate disbursements ("**Disbursements**"), in accordance with the procedures and subject to the conditions set forth in Sections 6.2, 6.3 and 6.4.  Except for Disbursements to pay interest on the Loan Amount pursuant to Section 6.3 hereof, the proceeds of each Disbursement shall be made directly to Borrower (or as otherwise directed by Borrower) from time to time to pay development expenses of the Project incurred by Borrower, in each case as pre-approved by Lender.  Prior to disbursement of the proceeds of the Loan in accordance with the terms hereof, neither Borrower nor any creditor of Borrower shall have any right to or interest in any undisbursed portion of the Loan Amount, notwithstanding anything herein to the contrary.

**Section 6.2     Specific Conditions and Procedures for Disbursements**.

(a)     As conditions precedent to the obligation of Lender to make a Disbursement (other than the Disbursement on the Closing Date or pursuant to Section 6.3 hereof), Lender shall have received from Borrower at least ten (10) Business Days before the requested date of the Disbursement, a Disbursement Request Form, substantially in the form attached hereto and made a part hereof as Exhibit A, properly completed and duly executed by Borrower, accompanied by (i) evidence reasonably satisfactory to Lender that the Project development expenses for which the Disbursement is sought are solely related to the Project and have been incurred by Borrower or are reasonably expected to be incurred by Borrower within the next thirty (30) days ("**Future Project Expenses**") and (ii) evidence as to the expenditure of funds for Future Project Expenses which were the subject of previous Disbursements, to the extent not already provided to Lender.  Each Disbursement shall be subject to any other conditions reasonably required by Lender.  Failure to provide Lender with satisfactory evidence of the expenditure of Future Project Expenses previously disbursed to Borrower shall be a condition precedent to any future request for Disbursement.  Borrower may not request Disbursements more frequently then once every thirty (30) calendar days.

(b)     Lender will make good faith efforts to approve each Disbursement, or to advise Borrower of any deficiencies, within ten (10) Business Days of receipt by Lender of the materials described in Section 6.2(a).

(c)     After approval by Lender of the Disbursement Request Form and the accompanying documentation, and subject to all other conditions in this Section 6.2 and in Section 6.4, the Disbursement shall be made by wire transfer or otherwise as directed to

Borrower.  Upon receipt by Borrower of each Disbursement, Borrower shall promptly apply such portion of the proceeds thereof which were drawn for previously incurred expenses to the payment thereof.  Any proceeds drawn by Borrower in anticipation of a Future Project Expense shall be held by Borrower in trust and applied to the payment of such expenses.  Evidence of the application of Disbursement proceeds to the payment of approved expenses shall be sent to Lender along with the next Disbursement Request Form, or otherwise as may reasonably be requested by Lender.

        **Section 6.3**     **Disbursements to Pay Interest.**

        (a)     Unless and until the Loan Amount shall have been fully disbursed in accordance with the terms hereof, on each interest payment date and without submission by Borrower of any Disbursement Request Form or any further authorization by Borrower, Lender shall make a disbursement to itself in an amount equal to the difference between (i) the amount of interest due hereunder and under the Note and (ii) an amount equal to investment earnings received by or credited to the account of Lender, if any, since the preceding interest payment date on an amount equal to the undisbursed portion of the Loan Amount at such interest rate as may be determined from time to time by Lender upon notice to Borrower.  Borrower acknowledges and agrees that Lender may determine the interest rate in its sole and absolute discretion.

        (b)     Notwithstanding any provisions of this Article VI to the contrary, and without further notice to or authorization by Borrower, Lender may, at its option, make a Disbursement to pay such other sums as may be owing from time to time by Borrower in connection with the Loan, upon the failure by Borrower to pay such other sums when and as due, whether or not the proceeds of the Loan were contemplated as the source of payment of interest or such other sums.

        (c)     To the extent any interest or other sum due to Lender is not fully paid by a disbursement of the remaining undisbursed Loan Amount under this Article VI, Borrower shall immediately pay to Lender the balance then due and owing.

        (d)     Any Disbursement pursuant to this Section 6.3 shall be made by Lender to itself, shall be evidenced by the Note and shall be secured by the Collateral as fully as if made to or at the request of Borrower.

        **Section 6.4**     **General Conditions Governing All Disbursements.**

        (a)     No Disbursement shall be made after the end of the Origination Period.

        (b)     No Disbursement shall be made pursuant to Section 6.2 hereof which would cause the total of all Disbursements made pursuant to Section 6.2 to exceed the Loan Amount.

        (c)     No Disbursement shall be made during the continuance of an Event of Default, during the continuance of any event which, with the giving of notice or the passage of time or both, would constitute an Event of Default, or during the continuance of any default

under any other financing now or in the future provided by Lender to Borrower or any other Obligor.

(d)    All representations and warranties made by Borrower in this Agreement and in the other Loan Documents, shall be true and correct in all material respects on the date of the Disbursement with the same effect as though such representations and warranties had been made on and as of such date.

(e)    Lender reserves the right to withhold any Disbursement if, in Lender's reasonable judgment, (i) a material adverse change has occurred in the financial condition, operations or prospects of Borrower or (ii) a material adverse change has occurred in the feasibility or development progress of the Project (including, without limitation, the events described in Section 7.5(d)) and/or the fair market value of the Collateral securing the Loan.

**Section 6.5    No Waiver**. In the event Lender fails to require, or Borrower fails to fulfill, any condition to a Disbursement, such failure shall not constitute a waiver of such condition by Lender, nor shall such failure preclude Lender from requiring fulfillment of such condition by Borrower in order for Borrower to receive a future Disbursement.

**Section 6.6    Continuing Representations and Warranties**. Each request for a Disbursement shall constitute, without the necessity of a written statement to such effect, a confirmation by Borrower to Lender that all representations and warranties made by Borrower in this Agreement and the other Loan Documents are true and correct in all material respects as of the date of such request.

## ARTICLE VII
## AFFIRMATIVE COVENANTS

As long as any portion of the Loan is outstanding or any amounts under the Note remain unpaid, Borrower covenants and agrees that, unless Lender otherwise consents in writing:

**Section 7.1    Reports**. Borrower shall furnish or cause to be furnished to Lender the following financial information and other reports:

(a)    Within one hundred (120) days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender annual financial statements of Borrower certified by an independent certified public accountant as fairly presenting Borrower's financial position at the end of the fiscal year and the results of Borrower's operations for the fiscal year, and as being prepared in accordance with generally accepted accounting principles, consistently applied.

(b)    On the forty-fifth (45th) day after the end of each calendar quarter, commencing March 1, 2007, Borrower shall furnish to Lender: (i) quarterly financial statements of Borrower fairly presenting Borrower's financial position at the end of the quarter and the results of Borrower's operations for the quarter, prepared internally, in accordance with generally accepted accounting principles, consistently applied.

(c)    As promptly and as reasonable practicable after request, Borrower shall furnish to Lender such additional information, reports, statements, and certificates with respect to

the Loan, and/or the operations, prospects or financial condition of Borrower, and/or the development of the Project, as Lender may from time to time reasonably request.

**Section 7.2    Existence**. Borrower shall maintain its existence and good standing under the laws of the State of Oklahoma, and shall comply with all applicable federal, state and local laws and regulations to the extent necessary and required for the continuation of its operations.

**Section 7.3    Taxes and Charges**. Borrower shall promptly pay and discharge all taxes, assessments, and governmental charges, on its income and properties (including, without limitation, the Collateral) prior to the date on which penalties attach thereto, except to the extent such taxes shall be contested in good faith and by appropriate proceedings and as to which adequate reserves in the judgment of Lender shall have been provided.

**Section 7.4    Records**. Borrower shall (i) maintain books and records adequate to enable independent certified public accountants to certify the financial statements referred to in Section 7.1, (ii) retain such books and records and copies of the reports and statements referred to in Section 7.1 for a period of at least four (4) years after payment in full of the Note, and (iii) make such books and records available for inspection by Lender and its agents and representatives at all reasonable times.

**Section 7.5    Notices to Lender**. Borrower shall promptly notify Lender of the following:

(a)    The commencement of any action, suit or proceeding before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that seeks recovery from such party in an amount equal to or greater than ten percent (10%) of the Loan Amount;

(b)    Any change in the end of Borrower's fiscal year, which currently is December 31;

(c)    The occurrence of any material adverse change in the financial condition, operations or prospects of Borrower or any other Obligor from the date of the most recent financial statements of the Borrower delivered to Lender;

(d)    Any material adverse change in anticipated course of development of the Project (including, without limitation, the occurrence of any default under the contract for the purchase and sale of the Project, failure to receive any necessary HUD approval, the occurrence of a default under any of the Bond Documents, failure to satisfy any of the conditions to break of escrow under the Bond Documents within the time period specified therein, redemption of the Bonds, failure to satisfy the conditions to the equity investment in the Project or termination of the commitment to provide an equity investment in the Project); and

(e)    The occurrence of any Event of Default or event which, with the giving of notice or the passage of time or both, would constitute an Event of Default.

**Section 7.6    Insurance**. Borrower shall maintain property and general liability insurance in such amounts, on such terms, and covering such risks as is reasonably acceptable to

13

Lender, with Lender to be notified, by the terms thereof, prior to the cancellation or non-renewal of any such policy.

**Section 7.7    Anti-Discrimination Laws**. Borrower, in its use of proceeds of the Loan and in its conduct of the Project, shall comply fully with all applicable federal, state, local, and any other governmental anti-discrimination laws, executive orders, and rules and regulations.

**Section 7.8    Inspections**. Borrower shall allow Lender to inspect Borrower's books and records, and books, records, and contracts relating to the Project, and make copies and extracts therefrom, at all reasonable times. Borrower shall grant Lender and its agents and representatives full rights of entry and free access to the Project.

## ARTICLE VIII
## NEGATIVE COVENANTS

As long as any portion of the Loan is outstanding or any amounts under the Note remain unpaid, Borrower covenants and agrees that, unless Lender otherwise consents in writing:

**Section 8.1    Assignment**. Borrower shall not assign any rights or delegate performance of any duties or obligations of Borrower provided in this Agreement or the other Loan Documents.

**Section 8.2    Material Changes**. Borrower shall not:

(a)    Permit or make any material change in or to the Project; or

(b)    Dissolve, liquidate, consolidate with, merge into, or form a partnership or joint venture with, any corporation or other organization, or otherwise acquire all or substantially all of the assets, capital stock, or properties of any corporation or other organization.

**Section 8.3    Disposal of Assets**. Borrower shall not sell, lease, transfer or otherwise dispose of its properties, assets, rights, licenses to any person or entity, except (i) in the ordinary course of its operations and (ii) in the case of the Collateral, with the prior written approval of Lender.

**Section 8.4    Liens**. Except as otherwise provided in this Agreement, Borrower shall not create, incur, assume or suffer to exist any pledge, lien, charge or other encumbrance of any nature on the Collateral or any portion thereof.

**Section 8.5    Guaranties**. Borrower shall not and shall not permit any Borrower Affiliate to guaranty, become surety for, endorse or otherwise in any way be or become responsible for the liabilities or obligations of any person or entity other than any guaranties in favor of the Lender and the guaranties related to the acquisition or construction of affordable housing developments in which Borrower or any Borrower Affiliate is participating.

**Section 8.6    Indebtedness**. Borrower shall not incur, create, assume or suffer to exist on the part of Borrower, any indebtedness for borrowed money other than (i) the Loan, (ii) the

existing debt due and owing to the Senior Secured Lender and (iii) indebtedness incurred by a Borrower to finance affordable housing projects in which the Borrower is participating.

**Section 8.7    Conduct of Business**.  Borrower shall not cease to engage in its business as currently conducted and shall not engage in any other business.

# ARTICLE IX
# EVENTS OF DEFAULT

**Section 9.1    Events of Default**. The occurrence of any or more of the following events shall constitute an "Event of Default" under this Agreement:

(a)    Borrower or any other Obligor fails to make any payment of principal of or interest when due hereunder and under the Note; or

(b)    Borrower fails to observe or perform any other term, covenant, undertaking or agreement contained in this Agreement or any other Loan Document, and such failure continues unremedied for a period of thirty (30) days after written notice has been given to Borrower by Lender, or, if such failure is not reasonably capable of being remedied within such period of thirty (30) days, Borrower or another Obligor has not commenced remedial action within such thirty-day period and is not proceeding with diligent efforts to remedy such failure; provided, however, that no notice or remedial period shall apply to any event specifically described elsewhere in this Section 9.1, or to a default under Section 8.3 or Section 8.4;

(c)    Any representation or warranty made by Borrower or any other Obligor in this Agreement or the other Loan Documents, or any statement or representation made in any certificate, report or opinion delivered pursuant to this Agreement or the other Loan Documents, proves to have been false, misleading or incorrect when made or deemed made; or

(d)    Any Obligor becomes insolvent, or fails or ceases to pay its debts as they mature or makes an assignment for the benefit of creditors or files a petition in bankruptcy or is adjudicated insolvent or bankrupt or petitions or applies to any tribunal for the appointment of any receiver or any trustee, or commences any proceeding under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or any such proceeding is commenced against any Obligor that is not dismissed within a period of sixty (60) days, or any Obligor, by any act indicates its consent to, approval of, or acquiescence in any such proceeding or the appointment of any receiver of or any trustee for it or any substantial part of its property, or suffers any such receivership or trusteeship to continue undischarged for a period of sixty (60) days; or

(e)    One or more judgments or decrees are entered against any Obligor involving in the aggregate a liability of an Obligor (not paid or fully covered by insurance) which in the judgment of Lender is determined to materially and adversely affect the financial condition of such Obligor, and all such judgments or decrees are not vacated, discharged, stayed or bonded pending appeal within sixty (60) days after receiving notice from Lender of its determination under this Section 9.1(e); or

(f)    The organizational documents of Borrower are amended without the prior written consent of Lender; or

(g)    The contract for the purchase and sale of the Project expires without having been extended or a default occurs thereunder which extends beyond any applicable notice, grace or cure period;

(h)    There occurs and is continuing beyond any applicable notice, grace or cure period, an event of default under the Bond Documents or the Bonds are redeemed; or

(i)    There occurs and is continuing beyond any applicable notice, grace or cure period, an event of default in respect of the indebtedness secured by the Senior Pledge (as defined in the Certificate of Deposit); or

(j)    The commitment to provide the equity investment in the Project expires without having been extended or is terminated; or

(k)    Any change occurs in the operation, prospects or financial condition of Borrower which Lender in its reasonable judgment believes may materially adversely affect the ability of Borrower to repay the Note or the ability of Borrower or any Obligor to perform its respective obligations under this Agreement or the other Loan Documents; or

(l)    A default occurs under any other loans or financing now or in the future provided to Borrower or any Obligor by Lender or under the terms of any instrument or document evidencing or securing, or otherwise executed or delivered in connection with, any other loans or financing now or in the future provided by Lender to Borrower or any Obligor.

**Section 9.2    Remedies Upon Event of Default**. Upon the occurrence of any one or more Events of Default, Lender may exercise all or any of the following rights and remedies:

(a)    Lender may, by written notice to Borrower, declare the indebtedness evidenced by the Note, any and all other amounts payable hereunder and under the other Loan Documents and any and all other indebtedness of Borrower or any Obligor to Lender forthwith to be due and payable, whereupon the indebtedness evidenced by the Note and such other indebtedness shall become immediately due and payable, as to principal, interest and any other amounts payable to Lender.

(b)    Lender may exercise any and all rights and remedies provided in this Agreement and in the other Loan Documents and/or as available at law or in equity.

(c)    Lender may protect and enforce its rights and remedies by appropriate judicial proceedings, including, but not limited to, foreclosure of the Collateral, an award of specific performance, or other legal or equitable remedy in aid of the exercise of the powers granted in or pursuant to this Agreement or the other Loan Documents.

**Section 9.3    Automatic Acceleration**. Upon the occurrence of any Event of Default described in Section 9.1(d), all amounts due under the Note, this Agreement and the other Loan Documents shall immediately be due and payable without presentment, demand, protest or notice

of any kind, all of which are expressly waived by Borrower to the fullest extent permitted by law.

Section 9.4    **Cumulative Rights**. Each right, remedy and power granted to Lender under this Agreement and the other Loan Documents shall be cumulative and in addition to any other right, remedy or power not specifically granted in this Agreement or now or hereafter existing in equity, at law, by virtue of statute or otherwise, may be exercised by Lender from time to time concurrently or independently and as often and in such order as Lender may deem expedient.

**ARTICLE X**
**MISCELLANEOUS**

Section 10.1   **Indemnification.**

(a)    Borrower shall indemnify and hold Lender harmless against and in respect of:

(i)    Any and all losses, damages or deficiencies of Lender, its employees or its agents, resulting from any material misrepresentation or willful nonfulfillment or breach of any agreement on the part of Borrower under this Agreement or from any material misrepresentation or willful omission from any instrument, agreement or other document furnished or to be furnished to Lender under this Agreement, other than losses, damages or deficiencies in connection with the nonpayment of the Loan, the provisions for which are separately provided for in this Agreement; and

(ii)    Any and all actions, suits, proceedings, demands, assessments, judgments, costs and reasonable legal and other expenses incident to any of the provisions of Section 10.1(a)(i).

(b)    The obligations of this Section 10.1 shall survive the repayment of the Loan.

Section 10.2   **Notices**. All notices, requests, demands, consents, waivers and other communications given under any of the provisions of this Agreement shall be in writing (or by fax, e-mail, or similar electronic transmission confirmed in writing) and shall be deemed to have been duly given or made (i) when delivered by hand, or (ii) if given by mail, three (3) days after deposited in the mails by certified mail, return receipt requested, sufficient postage prepaid, or (iii) if given by fax, e-mail, or similar electronic transmission, when sent and receipt has been confirmed, addressed as stated below, or to such other address as the addressee may have specified in a notice duly given to the other addressees.

To Lender:      Greystone CDE, LLC
                419 Belle Air Lane
                Warrenton, Virginia 20186
                Attention:    Andrew J. Shedlock, III
                Phone:        540-428-7208

|                      |                                        |
|----------------------|----------------------------------------|
|                      | Fax:          540-341-2192             |
|                      | Email:        AShedlock@GreystoneUSA.com |
| To Borrower:         | Santa Fe Pointe, L.P.                  |
|                      | c/o Santa Fe Pointe Management, LLC    |
|                      | 16416 Oconee Creek Drive               |
|                      | Edmond, Oklahoma 73013                 |
|                      | Attention:                             |
|                      | Phone:                                 |
|                      | Fax:                                   |
|                      | Email:                                 |

**Section 10.3    Entire Agreement**. This Agreement and the other Loan Documents contain the entire agreement of the parties with respect to the transactions contemplated in this Agreement, and supersedes all prior proposals, negotiations, agreements, and understandings relating to such transactions. Borrower acknowledges that, in entering into this Agreement, it is not relying on any statement, representation, warranty, covenant, or undertaking of any kind made by Lender or any employee or agent of Lender, other than the agreements of Lender set forth in this Agreement.

**Section 10.4    Amendments**. No modification or waiver of any provision of this Agreement shall be valid unless in writing, and signed by Lender and Borrower.

**Section 10.5    No Waiver**. No delay or failure on the part of Lender in exercising any rights under this Agreement or the other Loan Documents and no partial or single exercise of any such rights, shall constitute a waiver of such rights or of any other rights under this Agreement or the other Loan Documents.

**Section 10.6    Liability of Lender**. Borrower agrees that Lender shall have no liability (in contract, in tort, or otherwise) for any lost profits or other consequential damages sustained by Borrower or any Borrower Affiliate as a result of any act or omission to act by Lender or any of its directors, officers, agents, or employees, in connection with the Loan or the Loan Documents, unless caused by the gross negligence or willful misconduct of Lender.

**Section 10.7    No Joint Venture**. Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, Lender, by making the Loan or by any action pursuant to this Agreement or the other Loan Documents, is not and shall not be deemed to be a partner or joint venturer with Borrower.

**Section 10.8    Other Parties**. Nothing in this Agreement shall be construed as giving any person or entity, other than the parties to this Agreement, any right, remedy or claim under or in respect of this Agreement.

**Section 10.9    Applicable Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of _____ (without regard to the principles of conflicts of law).

**Section 10.10  Survival**. All representations, warranties and agreements in this Agreement shall survive the expiration or termination of this Agreement.

**Section 10.11  Severability**. If any provision of this Agreement should, for any reason, be held to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such illegal, invalid or unenforceable provision had never been contained in this Agreement.

**Section 10.12  Successors and Assigns**. This Agreement shall be binding upon and operate for the benefit of the respective successors and assigns of the parties; provided, however, that Borrower shall not have the right to assign any of its rights or delegate the performance of any of its obligations under this Agreement without the prior written consent of Lender.

**Section 10.13  Duplicate Originals**. Two or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument.

**Section 10.14  Titles and Captions**. The titles and captions in this Agreement are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

**Section 10.15  Records**. The outstanding principal balance of the Loan and the unpaid interest accrued thereon shall at all times be ascertained from the records of Lender, which shall be conclusive evidence thereof, absent manifest error.

**Section 10.16  Further Assurances**. At any time upon, and from time to time upon request by Lender, Borrower shall do any acts and execute and deliver any documents as may be reasonably requested by Lender to accomplish the purposes of this Agreement.

**Section 10.17  Assignment of Loan Documents**. The Lender may assign or otherwise transfer its rights under this Agreement at any time or times, in its sole and absolute discretion, without any notice to or approval or consent from Borrower; and any holder or holders of the Note or other Loan Documents shall be deemed an assignee of such rights.

**Section 10.18  Waiver of Jury Trial**. BORROWER AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THE LOAN OR OUT OF THIS AGREEMENT AND/OR THE OTHER LOAN DOCUMENTS THAT IS TRIABLE OF RIGHT BY JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, INTENTIONALLY, KNOWINGLY, AND VOLUNTARILY.

**Section 10.19  Contingency**. The obligations of Lender under this Agreement are contingent upon the execution and delivery by Borrower, the General Partner, the Developer and the Guarantor of the respective Loan Documents to which each is a party and such other documents, instruments, certifications and opinions of counsel as Lender may require.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

GREYSTONE CDE, LLC

By: _____
Name:
Title:


SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:    SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company, its general partner


By: _____
Name:
Title:

## <u>EXHIBIT A</u>

**FORM OF DISBURSEMENT REQUEST FORM**

**BORROWER:**      Santa Fe Pointe, L.P.

**REQUISITION NO.:  _____**

**IN THE AMOUNT OF $_____**

TO:    Greystone CDE, LLC
       419 Belle Air Lane
       Warrenton, Virginia 20186

The borrower hereby requests payments in the following amounts, from the following sources and to be made to the following parties, all as set forth on the Invoices attached to this Requisition:

    Amount                          Payable to:

                                    [Borrower's account #] [third party
                                    payment/wire instructions must be
                                    attached]

**Requisition – Contents and Attachments**

    ☐     Borrower's Representations and Warranties

    ☐     Invoices for Payments

A-1

<u>**Representations and Warranties**</u>

1.      Funding of this Disbursement shall be in accordance with the terms and provisions of the Bridge Loan Agreement, dated as of December __, 2006 (the "Loan Agreement"), and amounts for which disbursement is sought are for payments of predevelopment costs of Borrower described on the attachments hereto which have not been the subject of any previous Requisition.

2.      All moneys requisitioned by Borrower and disbursed by Lender under previously approved Disbursement Request Forms have been expended for the purpose for which they were requisitioned. Attached hereto are invoices (or other evidence, as applicable) of the incurrence of the expenses under previous Disbursement Request Forms, to the extent not previously provided to Lender.

3.      All of the information submitted to Lender in connection with this Disbursement Request Form is true and accurate as of the date of submission.

4.      The representations and warranties set forth in the Loan Agreement and the other Loan Documents are true and correct as of the date hereof with the same effect as if made on this date.

5.      The Borrower represents and warrants that this Disbursement Request Form is in the form of requisition required by Lender and the conditions to Disbursement set forth in Article VI of the Loan Agreement have been satisfied.

6.      The Borrower represents and warrants that (i) all invoices attached hereto and to be paid by this Disbursement have either already been paid by the Borrower or will be paid by the Borrower or directly by Lender on the date this Disbursement is funded and (ii) all anticipated expenses listed on the Schedule attached hereto and intended to be paid by this Disbursement are expected to be incurred in the next 30 (thirty) days and shall be paid as incurred by the Borrower and evidence of such payment shall be supplied by Borrower to Lender in connection with Borrower's next Disbursement Request Form after such payment is made (or otherwise as reasonably requested by Lender).

All capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto under the Loan Agreement.

A-2

Executed this __ day of _____, 200_.

SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:    SANTA FE POINTE MANAGEMENT, LLC an Oklahoma limited liability company, its general partner

By:    _____
Name:
Title:

**<u>Borrower's Invoices for Prior Disbursement Requests</u>**

[Attach Invoices]

**<u>Borrower's Invoices for Current Disbursement Request</u>**

**<u>Borrower's Schedule of Anticipated Expenses</u>**
**<u>to be paid from Current Disbursement Request</u>**