#155250v3

PARTNER GUARANTY, PLEDGE AND SECURITY AGREEMENT

from

SANTA FE POINTE, MANAGEMENT, LLC,

and

THEOTIS F. OLIPHANT

to

GREYSTONE CDE, LLC

Dated as of December 1, 2006

EXHIBIT 2 PAGE 42

# PARTNER GUARANTY,
## PLEDGE AND SECURITY AGREEMENT

This PARTNER GUARANTY, PLEDGE AND SECURITY AGREEMENT (as amended, modified or supplemented from time to time, this **"Agreement"**), dated as of December 20, 2006, is made by SANTA FE POINTE MANAGEMENT, LLC, a limited liability company organized and existing under the laws of the State of Oklahoma, with an address at 16416 Oconee Creek Drive, Edmond, Oklahoma 73013 (together with its permitted successors and assigns, the **"General Partner"**) and THEOTIS F. OLIPHANT, an individual and a resident of the State of California (together with his heirs, executors, personal representatives and permitted successors and assigns, the **"Limited Partner"** and, together with the General Partner, the **"Pledgors"**) with an address at 113 Carmel Avenue, El Cerrito, California 94530, in favor of GREYSTONE CDE, LLC, a limited liability company duly organized and existing under the laws of the State of Delaware (together with its successors and assigns, **"Pledgee"**) with an address at 419 Belle Air, Warrenton, Virginia 20186,

## W I T N E S S E T H :

**WHEREAS,** Pledgors is the general partner and limited partner of Santa Fe Pointe, L.P., a limited partnership duly organized and validly existing under the laws of the State of Oklahoma (together with its permitted successors and assigns, the **"Partnership"**), which is to become owner of certain land located at 125 SW 74th Street in Oklahoma City, Oklahoma, and the site improvements located thereon, known as Santa Fe Pointe Apartments (the **"Project"**);

**WHEREAS,** pursuant to a Bridge Loan Agreement dated as of December 20, 2006 between Pledgee and the Partnership (as the same may be amended, modified or supplemented from time to time, the **"Loan Agreement"**), Pledgee has agreed to make a $500,000.00 loan (the "**Loan**") to the Partnership to fund certain expenses associated with the financing of the Project;

**WHEREAS,** Pledgors will derive substantial economic benefit from the Loan and the financing of the Project; and

**WHEREAS,** the execution and delivery of this Agreement is a condition to Pledgee's making the Loan.

**NOW, THEREFORE,** in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.     Defined Terms**. The following terms, which are defined in the Uniform Commercial Code in effect in the State of New York on the date hereof, are used herein as so defined: Accounts, Chattel Paper, General Intangibles, Instruments and Proceeds; and the following terms shall have the following meanings:

"**Assignment**" has the meaning assigned to it in Section 3 of this Agreement.

"**Collateral**" has the meaning assigned to it in Section 3 of this Agreement.

EXHIBIT ___2___ PAGE _43_

"**Event of Default**" means any "Event of Default" as defined in the Loan Agreement or any of the Loan Documents.

"**Obligations**" has the meaning assigned to it in Section 2 of this Agreement.

"**Partnership Agreement**" means the Agreement of Limited Partnership of Santa Fe Pointe, L.P., dated as of October 16, 2006, as the same may be further amended, modified or supplemented from time to time.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

All other capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Loan Agreement.

**Section 2.    Guaranty.**  The General Partner hereby absolutely, irrevocably and unconditionally guarantees and is surety to Pledgee for, and this Agreement is expressly limited to, the full and punctual payment and performance by the Partnership of any and all payment obligations and other covenants and obligations of the Partnership to Pledgee contained in the Loan Documents and the Limited Partner hereby reaffirms his obligations under the Guaranty (all such obligations hereinafter collectively referred to as the "**Obligations**").

(a)    **Guaranty Absolute.**  The guaranty of General Partner under this Agreement is a guaranty of payment and performance and not merely of collection or enforceability and shall remain in full force and effect until all of the Obligations are indefeasibly paid or performed in full.  The obligations and liabilities of General Partner under this Agreement are the primary, direct and immediate obligations of General Partner and shall in no way be affected, limited, impaired, modified or released by, subject to or conditioned upon, and may be enforced against General Partner irrespective of (i) any attempt, pursuit, enforcement or exhaustion of any rights and remedies Pledgee may at any time have to collect, any or all of the Obligations (whether pursuant to any of the Loan Documents or otherwise) from the Partnership, from any other Obligor, from any other maker, endorser, surety or guarantor of, or pledgor of collateral and security for, all or any part of the Obligations, and/or by any resort or recourse to or against any collateral and security for all or any part of the Obligations, (ii) the invalidity, irregularity, lack of priority or unenforceability in whole or in part of any or all of the Loan Documents, (iii) any counter-claim, recoupment, setoff, reduction or defense based on any claim the Partnership or any other Obligor may now or hereafter have against Pledgee (other than the defense that payment in full of all amounts claimed to be due by Pledgee actually has been made), (iv) the voluntary or involuntary liquidation, dissolution, termination, merger, sale or other disposition of the Partnership or any other Obligor or any of the assets and properties of the Partnership or any other Obligor, (v) any bankruptcy, reorganization, insolvency or similar proceedings for the relief of debtors under any federal or state law by or against the Partnership or any other Obligor, or any discharge, limitation, modification or release of liability of the Partnership or any other Obligor by virtue of any such proceedings, (vi) any event, circumstance or matter to which Pledgor has consented pursuant to the provisions of paragraph 3 hereof, and (vii) any other event or circumstance which might otherwise constitute a legal or equitable discharge, release or defense of guarantor or surety, whether similar or dissimilar to the

2

EXHIBIT    2    PAGE    44

foregoing (other than the defense that payment in full of all amounts claimed to be due by Pledgee actually has been made).

(b)    **Consents.** Without notice to, or further consent of, the General Partner, the General Partner hereby agrees that Pledgee may at any time and from time to time on one or more occasions (i) renew, extend, accelerate, subordinate, change the time or manner of payment or performance of, or otherwise deal with, in any manner satisfactory to Pledgee and in accordance with the applicable Loan Documents, any of the terms and provisions of, all or any part of the Obligations, (ii) waive, excuse, release, change, amend, modify or otherwise deal with in any manner satisfactory to Pledgee any of the provisions of any of, the Loan Documents, (iii) release the Partnership or any or all of the other Obligors, (iv) waive, omit or delay the exercise of any of its powers, rights and remedies against the Partnership or any other Obligors or all or any of the collateral and security for all or any part of the Obligations, (v) release, substitute, subordinate, add, fail to maintain, preserve or perfect any of its liens on, security interests in or rights to, or otherwise deal with in any manner satisfactory to Pledgee, any collateral and security for all or any part of the Obligations, (vi) apply any payments of all or any of the Obligations received from the Partnership or any other Obligors or any other party or source whatsoever first to late charges or other sums due and owing to Pledgee, next to accrued and unpaid interest, and then to amounts due under the Loan Agreement and the other Loan Documents and any excess, after payment of the Obligations and performance of all other Obligations of the Partnership and/or any other obligors to Pledgee, shall be returned to the Partnership, or (vii) take or omit to take any other action, whether similar or dissimilar to the foregoing which may or might in any manner or to any extent vary the risk of the General Partner or otherwise operate as a legal or equitable discharge, release or defense of the General Partner under applicable laws.

(c)    **Waivers.** The General Partner hereby waives (i) notice of the execution and delivery of any of the Loan Documents, (ii) notice of the creation of any of the Obligations, (iii) notice of Pledgee's acceptance of and reliance on this Agreement, (iv) presentment and demand for payment of the Obligations and notice of non-payment and protest of non-payment of the Obligations, (v) any notice from Pledgee of the financial condition of the Partnership regardless of Pledgee's knowledge thereof, (vi) demand for observance, performance or enforcement of, or notice of default under, any of the provisions of this Agreement or any of the Loan Documents (other than such as are expressly provided for therein), and all other demands and notices otherwise required by law which the General Partner may lawfully waive, (vii) any right or claim to cause a marshalling of the assets of the Partnership, and (viii) any defense at law or in equity based on the adequacy or value of the consideration for this Agreement. The General Partner agrees not to institute any action or proceeding based on any rights of subrogation and reimbursement against the Partnership or against any collateral or security for any of the Obligations until the Obligations have been indefeasibly paid and satisfied in full. The foregoing sentence is not intended to limit Pledgor's right to accept payments from the Partnership that are otherwise permitted under the Loan Documents. The General Partner waives any and all other rights and defenses available to Pledgor by reason of any statutory provisions now or hereafter in effect in any other jurisdiction, including, without limitation, any and all rights or defenses the General Partner may have by reason of protection afforded to the Partnership or any other Obligor with respect to the Obligations pursuant to antideficiency or other laws of any state limiting or discharging the Partnership's or any other obligor's

3

EXHIBIT __2__ PAGE __45__

indebtedness (other than the defense that payment in full of all amounts claimed to be due from such parties actually has been made). The General Partner waives all rights and defenses arising out of an election of remedies by Pledgee, even if that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the General Partner's rights of subrogation and reimbursement against the Partnership or any other Obligor.

**Section 3.    Grant of Security Interest by Pledgors.** Each of Pledgers hereby pledge to Pledgee, and grant to Pledgee, a lien on, and continuing priority security interest in, all of the following property now owned or at any time hereafter acquired by Pledgors or in which Pledgors now have or at any time in the future may acquire any right, title or interest (collectively, the "**Collateral**") as security for the prompt and complete payment and performance by the Partnership of the Obligations and by Pledgors of the Obligations:

(a)    its partnership interest in the Partnership and all of its rights as a partner under the Partnership Agreement (including, without limitation, all of its right, title and interest to participate in the operation and management of the Partnership and all of its right, title and interest to property, assets, partnership interest and distributions under the Partnership Agreement);

(b)    all Accounts arising out of its partnership interest in the Partnership and the Partnership Agreement;

(c)    all General Intangibles arising out of its general partnership interest in the Partnership and the Partnership Agreement;

(d)    all present and future rights of Pledgor to receive any payment of money or other distribution or payment arising out of or in connection with its partnership interest in the Partnership and its rights as a partner under the Partnership Agreement;

(e)    any other property of the Partnership to which Pledgor now or in the future may be entitled in its capacity as a partner of the Partnership by way of distribution, return of capital or otherwise;

(f)    any other claim which Pledgor now has or may in the future acquire in its capacity as a partner of the Partnership against the Partnership and its property and of the other partners thereof; and

(g)    to the extent not otherwise included above, all Proceeds of any and all of the foregoing, including, without limitation, whatever is received upon any collection, exchange, sale or other disposition of any of the Collateral, and any property into which any of the Collateral is converted, whether cash or noncash proceeds, and any and all other amounts paid or payable under or in connection with any of the Collateral.

This Agreement constitutes a continuing security interest in the Collateral and shall remain in full force and effect until the satisfaction, release or termination of all of the Obligations. In order to further effectuate the intent of this Agreement, Pledgors have executed and delivered assignments of their partnership interests (the "**Assignments**") to Pledgee; Pledgee agrees not to execute such Assignments and deliver them to the Partnership unless and until there shall have

4

EXHIBIT 2 PAGE 46

occurred an Event of Default hereunder. Upon the occurrence of an Event of Default and the execution and delivery by Pledgor to the Partnership of such Assignment or Assignments, the affected Partnership interests shall be deemed transferred to Pledgee or its designee or assignee, as applicable, without any further action whatsoever on the part of Pledgee or the Partnership, for all purposes.

**Section 4.    Rights of Pledgee; Limitations on Pledgee's Obligations.**

(a)    **Pledgors Remain Liable.** Anything herein to the contrary notwithstanding, Pledgors shall remain liable under the Partnership Agreement to observe and perform all the conditions and obligations to be observed and performed by them thereunder, all in accordance with and pursuant to the terms and provisions thereof. Unless Pledgee shall become a general partner and/or a limited partner of the Partnership as a result of its exercise of remedies pursuant to the terms hereof and except as set forth in Section 18 hereof, Pledgee shall not have any obligation or liability by reason of or arising out of this Agreement or the receipt by Pledgee of any payment relating to any Collateral pursuant hereto, nor shall Pledgee be obligated in any manner to perform any of the obligations of Pledgors under or pursuant to the Partnership Agreement or any Account or General Intangible to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any thereof, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been pledged to it or to which it may be entitled at any time or times. Nothing contained in this Agreement shall be construed or interpreted (a) to transfer to Pledgee any of the obligations of a partner of the Partnership or (b) to constitute Pledgee a partner of the Partnership.

(b)    **Proceeds.** Pledgee hereby authorizes Pledgors to collect all Accounts arising out of the Partnership Agreement in respect of their respective partnership interests in the Partnership. If required by Pledgee at any time after the occurrence and during the continuation of an Event of Default, such Accounts and any Proceeds, when collected by Pledgors, shall be forthwith deposited by Pledgors in the exact form received, duly endorsed (without recourse) by Pledgors to Pledgee, in a special bank account maintained by Pledgee, subject to withdrawal by Pledgee as hereinafter provided, and, until so turned over, shall be held by Pledgors in trust for Pledgee, segregated from other funds of Pledgor.

**Section 5.    Representations and Warranties.** Each Pledgor hereby represents and warrants, with respect to himself or itself, as applicable, as follows:

(a)    **Entity Status.** The General Partner is duly formed and validly existing as a limited liability company under the laws of the State of Oklahoma.

(b)    **Loan Documents.** Such Pledgor has or has had an opportunity to examine the Loan Documents.

(c)    **Enforceability.** This Agreement has been duly executed and constitutes a valid and binding obligation of such Pledgor, enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally.

(d)    **Ownership of Collateral; Liens.**  Such Pledgor is the legal and beneficial owner of its Collateral, free and clear of all liens, except for the liens created by this Agreement. Such Pledgor has all requisite power and authority and the legal right to pledge to Pledgee, and to grant to Pledgee, a lien on and continuing security interest in its Collateral.  The execution, delivery and performance by such Pledgor of this Agreement is within such Pledgor's powers, has been duly authorized by all necessary legal action, and does not contravene any agreement applicable to the Partnership or such Pledgor or restriction binding on or affecting the Partnership, such Pledgor or any of their respective assets.  No security agreement, financing statement or other public notice with respect to all or any part of its Collateral is on file or of record in any public office, except such as may have been filed in favor of Pledgee pursuant to this Agreement.

(e)    **Security Interest.**  The security interests granted and continued pursuant to this Agreement will, upon filing of UCC financing statements in the appropriate filing offices, constitute perfected security interests in the Collateral in favor of Pledgee, and are enforceable as such against all creditors of and purchasers from such Pledgor.  All action on the part of such Pledgor necessary or desirable to perfect such security interests in each item of the Collateral requested by Pledgee, including the execution of financing statements for filing in the appropriate filing offices, has been or will be duly taken upon such filing.

(f)    **Legal Name.**  Such Pledgor's exact legal name is set forth at the beginning of this Agreement and such Pledgor does not conduct business under any other name.

(g)    **Power and Authority.**  Such Pledgor has and has duly exercised all requisite power and authority to enter into this Agreement, to pledge its interest in the Collateral and to carry out the transactions contemplated by this Agreement.

(h)    **Place of Business; Jurisdiction of Organization; Organizational Identification Number.**  Such Pledgor's chief executive offices and chief place of business, in the case of the General Partner, or principal residence, in the case of the Limited Partner, and the place where such Pledgor keeps its records concerning the Collateral, is located at such Pledgor's address set forth on page 1 hereof.  The General Partner's jurisdiction of organization is as set forth on page 1 hereof and the General Partner's organizational identification number is 3512119429.

Section 6.    **Covenants.**  Each Pledgor covenants and agrees that, so long as this Agreement remains in effect:

(a)    **Further Documentation; Pledge of Instruments.**  At any time and from time to time, upon the written request of Pledgee, and at the sole expense of such Pledgor, such Pledgor will promptly and duly execute and deliver such further instruments and documents and take such further action as Pledgee may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted. Without limiting the generality of the foregoing, such Pledgor will execute and file such financing or continuation statements, or amendments thereto, and such other instruments, endorsements or notices, as Pledgee may deem necessary or desirable in order to perfect and preserve the liens created or continued or intended to be created or continued hereby.  Such

6

EXHIBIT  2  PAGE  48

Pledgor hereby authorizes Pledgee to file any such financing or continuation statement without the signature of such Pledgor to the extent permitted by applicable Legal Requirements. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, other Instrument or Chattel Paper, such note, Instrument or Chattel Paper shall be immediately delivered to Pledgee, duly endorsed (without recourse) in a manner satisfactory to Pledgee, to be held as Collateral pursuant to this Agreement.

(b)     **Maintenance of Records**. Such Pledgor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral.

(c)     **Limitation on Liens on Collateral**. Such Pledgor will not create, incur or permit to exist, will defend the Collateral and the right, title and interest of Pledgee therein against, and will take such other action as is necessary to remove, any lien, claim, security interest or other encumbrances on or to the Collateral other than the lien created and continued pursuant to this Agreement.

(d)     **Further Identification of Collateral**. Such Pledgor will furnish to Pledgee from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Pledgee may reasonably request, all in reasonable detail.

(e)     **Changes in Locations, Name, Etc**. Such Pledgor will not, unless it shall give sixty (60) days' prior written notice to such effect to Pledgee, (i) change the location of its chief executive office or chief place of business from that specified on page 1 hereof, or remove its books and records from such location or (ii) change its name, identity, structure or jurisdiction of organization to such an extent that any financing statements filed by Pledgee in connection with this Agreement would become misleading or ineffective to perfect the security interests granted hereunder (to the extent the same can be perfected by filing of financing statements).

(f)     **Amendments of Partnership Agreement**. Such Pledgor shall not, without the prior written consent of Pledgee, consent to, vote in favor of or otherwise permit any amendment to or modification of the Partnership Agreement.

(g)     **No Transfer of Interests**. Such Pledgor shall not sell, assign, transfer, pledge or encumber or permit to be sold, assigned, transferred, pledged or encumbered any of its general partnership interest in the Partnership or the other Collateral, nor, in the case of the General Partner, permit the sale, assignment, transfer, pledge or encumbrance any membership interest in the General Partner. Any such sale, assignment, transfer, pledge or encumbrance of Pledgor's partnership interest in the Partnership or of membership interests in the General Partner in violation of the foregoing provisions of this Section 6(g) shall be null and void.

(h)     **Bankruptcy of the Partnership**. Such Pledgor shall not authorize, seek to cause or permit the Partnership to commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property or to consent to any such relief or to the appointment of or taking possession by any such official

7

EXHIBIT _2_ PAGE _49_

in an involuntary case or other proceeding commenced against it, or to make a general assignment for the benefit of the creditors.

(i)    **Maintenance of Existence, Etc.** Such Pledgor shall at all times preserve and maintain in full force and effect its existence under the laws of the state of its organization and its qualification to do business in each jurisdiction where the ownership or leasing of property or the nature of business transacted makes such qualifications necessary.

(j)    **Claims against Collateral.** Such Pledgor shall, within five (5) days of receipt of knowledge by such Pledgor, notify Pledgee in reasonable detail of any lien or claim made or asserted against the Collateral.

(k)    **Notice of Dissolution.** Such Pledgor will forthwith upon learning of the occurrence of any event which would cause termination and/or dissolution of the Partnership, notify Pledgee in writing thereof.

**Section 7.    Pledgee's Appointment as Attorney-in-Fact.**

(a)    **Powers.** Effective immediately, without limiting any rights or powers granted herein to Pledgee while no Event of Default has occurred and is continuing, Pledgors hereby irrevocably constitute and appoint Pledgee and any officer or agent thereof, with full power of substitution, as their true and lawful attorney-in-fact with full irrevocable power and authority, in the place and stead of Pledgors and in the names of Pledgors or in its own name, for the purpose of carrying out the terms of this Agreement, with notice to, but without prior assent by Pledgor, to do the following:

(i)    upon the occurrence of any Event of Default, to exercise all partnership rights and powers to the same extent as a partner of the Partnership;

(ii)    upon the occurrence of any Event of Default, in the name of Pledgors or its own name, or otherwise, to take possession of and endorse (without recourse) and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under the Partnership Agreement or any Account, Instrument or General Intangible arising thereunder or out of Pledgors' partnership interests in the Partnership and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Pledgee for the purpose of collecting any and all such moneys due under the Partnership Agreement or any Account, Instrument or General Intangible arising thereunder or out of Pledgors' partnership interests in the Partnership whenever payable;

(iii)    upon the occurrence of any Event of Default, to pay or discharge taxes and liens levied or placed on the Collateral and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of Section 6(a) hereof; and

(iv)    upon the occurrence of any Event of Default, (A) to direct any party liable for any payment under any of the Collateral to make payment of any

EXHIBIT 2 PAGE 50

and all moneys due or to become due thereunder directly to Pledgee or as Pledgee shall direct, (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral, (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral, (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral, (E) to defend any suit, action or proceeding brought against Pledgors with respect to any Collateral, (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as Pledgee may deem appropriate and (G) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Pledgee were the absolute owner thereof for all purposes, and to do, at Pledgee's option and Pledgors' expense, at any time, or from time to time, all acts and things that Pledgee deems necessary to protect, preserve or realize upon the Collateral and the liens thereon created and continued hereby and to effect the intent of this Agreement, all as fully and effectively as Pledgors might do.

Pledgors hereby ratify all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

(b)     **Other Powers**.  Pledgors also authorize Pledgee, at any time and from time to time, to execute, in connection with any sale provided for in Section 9 hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

**Section 8.     Performance by Pledgee of Pledgors' Obligations; Rights of Pledgors Prior to Event of Default**.  Immediately upon the occurrence of an Event of Default, and without limiting any rights or powers granted herein to Pledgee while no Event of Default has occurred and is continuing, Pledgee, without releasing Pledgors from any obligation, covenant or condition hereof, itself may make any payment or perform, or cause the performance of, any such obligation, covenant or condition or take any other action in such manner and to such extent as Pledgee may deem necessary to protect, perfect or continue the perfection of the liens created or continued or intended to be created or continued pursuant to this Agreement. Unless an Event of Default shall have occurred, Pledgors shall be entitled to receive and retain, dividend or otherwise utilize all distributions made pursuant to the Partnership Agreement or otherwise arising out of the Collateral and exercise all voting, partnership and other rights pertaining to the Collateral and take all action it is authorized to take thereunder; provided that no vote or other action taken shall otherwise result in an Event of Default. All such rights of Pledgors with respect to dividends, distributions and voting shall cease upon the occurrence and during the continuation of an Event of Default.

**Section 9.     Rights and Remedies.**

9

EXHIBIT 2 PAGE 51

(a)     **Assignments and Collateral.** If an Event of Default shall have occurred, (i) all payments made in respect of the Collateral and received by or on behalf of Pledgee in accordance with the provisions of this Agreement or the Loan Agreement or otherwise, may, in the discretion of Pledgee, (A) be held by or on behalf of Pledgee as Collateral, and/or (B) then or at any time thereafter be applied to the Obligations in such order as Pledgee shall determine, and (ii) all shares or certificates of or evidencing the Collateral shall be registered in the name of Pledgee or its nominee, and (whether or not so registered) Pledgee or its nominee may thereafter exercise (A) all voting, partnership and other rights pertaining to the Collateral and (B) any and all rights of conversion, exchange, subscription and any other rights, privileges or options pertaining to the Collateral as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Collateral upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the partnership structure of the Partnership or upon the exercise by Pledgors or Pledgee of any right, privilege or option pertaining to such shares or certificates of or evidencing the Collateral, and in connection therewith, the right to deposit and deliver any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine), all without liability except to account for property actually received by it, but Pledgee shall have no duty to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing. At Pledgee's option following an Event of Default, Pledgee may execute and deliver to the Partnership one or both of the Assignments, thus effectuating the transfer of the interests in the Partnership to Pledgee.

(b)     **UCC.** If an Event of Default shall have occurred, then, in addition to any other rights and remedies provided for herein and in any other instrument or agreement securing, evidencing or relating to the Obligations, or that may otherwise be available, Pledgee may, without any demand, advertisement or notice (except as expressly provided for below in this Section 9(b) or by applicable legal requirements), exercise all the rights and remedies of a secured party under the UCC, and in addition may sell, lease, assign, give option or options to purchase, or otherwise dispose of the Collateral, or any part thereof, as hereinafter provided. The Collateral may be sold or otherwise disposed of in one or more sales, at public or private sale, conducted by any officer or agent of, or auctioneer or attorney for, Pledgee, at any exchange or broker's board or at Pledgee's place of business or elsewhere, for cash, upon credit or for other property, for immediate or future delivery, and at such price or prices and on such terms as Pledgee shall, in its sole discretion, deem appropriate. Pledgee may be the purchaser of any or all of the Collateral so sold at a sale and thereafter may hold the same, and the Obligations may be applied as a credit against the purchase price. Pledgee may, in its sole discretion, at any such sale restrict the prospective bidders or purchasers as to their number, nature of business and investment intention. Upon any such sale, Pledgee shall have the right to deliver, assign and transfer to the purchaser thereof (including Pledgee) the Collateral so sold. Each purchaser (including Pledgee) at any such sale shall hold the Collateral so sold, absolutely free from any claim or right of whatsoever kind, including any equity or right of redemption, of Pledgors, and Pledgors hereby specifically waive, to the fullest extent they may lawfully do so, all rights of redemption, stay or appraisal that they have or may have under any rule of law or statute now existing or hereafter adopted. Pledgors agree that Pledgee need not give more than 10 days prior notice of the time and place of any public sale or of the time after which a private sale or other intended disposition is to take place and that such notice is reasonable notification of such matters. No notification need be given to Pledgors if they have signed after the occurrence of an

10

EXHIBIT 2 PAGE 52

Event of Default a statement renouncing or modifying any right to notification of sale or other intended disposition. Any such public sale shall be held at such time or times within ordinary business hours as Pledgee shall fix in the notice of such sale. At any such sale, the Collateral may be sold in one lot as an entirety or in separate parcels. Pledgee shall not be obligated to make any sale pursuant to any such notice. Pledgee may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be so adjourned without further notice or publication. In case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by Pledgee until the full selling price is paid by the purchaser thereof, but Pledgee shall not incur any liability in case of the failure of such purchaser to take up and pay for the Collateral so sold, and, in case of any such failure, such Collateral may again be sold pursuant to the provisions hereof.

       (c)    **Proceedings.** If an Event of Default shall have occurred, instead of exercising the power of sale provided in Section 9(b) hereof, Pledgee may proceed by a suit or suits at law or in equity to foreclose the pledge and security interest under this Agreement and sell the Collateral or any portion thereof under a judgment or decree of a court or courts of competent jurisdiction.

       (d)    **Attorney-in-Fact.** Pledgee, as attorney-in-fact pursuant to Section 7 hereof, may, in the name and stead of Pledgors, make and execute all conveyances, assignments and transfers of the Collateral sold pursuant to Section 9(b) or Section 9(c) hereof, and Pledgors hereby ratify and confirm all that Pledgee, as said attorney-in-fact, shall lawfully do by virtue hereof. Nevertheless, Pledgors shall, if so requested by Pledgee, ratify and confirm any sale or sales by executing and delivering to Pledgee, or to such purchaser or purchasers, all such instruments as may, in the judgment of Pledgee, be advisable for the purpose.

       (e)    **Collateral Sold Free and Clear.** The receipt of Pledgee for the purchase money paid at any such sale made by it pursuant to Section 9(b) or 9(c) hereof shall be a sufficient discharge therefor to any purchaser of the Collateral, or any portion thereof, sold as aforesaid; and no such purchaser (or the representatives or assigns of such purchaser), after paying such purchase money and receiving such receipt, shall be bound to see to the application of such purchase money or any part thereof or in any manner whatsoever be answerable for any loss, misapplication or non-application of any such purchase money, or any part thereof, or be bound to inquire as to the authorization, necessity, expediency or regularity of any such sale.

       (f)    **No Pledgee Liability.** Pledgee shall not incur any liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to Section 9(b) hereof conducted in a commercially reasonable manner and in accordance with applicable legal requirements. Pledgors hereby waive, to the fullest extent permitted by legal requirements, all claims, damages and demands against Pledgee arising out of the repossession or retention of the Collateral or the sale of the Collateral pursuant to Section 9(b) or Section 9(c) hereof, including, without limitation, any claims against Pledgee arising by reason of the fact that the price at which the Collateral, or any part thereof, may have been sold at a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if Pledgee accepts the first offer received that Pledgee in good faith deems to

EXHIBIT 2 PAGE 53

be commercially reasonable under the circumstances and does not offer the Collateral to more than one offeree. To the fullest extent permitted by law, Pledgors shall have the burden of proving that any such sale of the Collateral was conducted in a commercially unreasonable manner.

(g)    **Availability of Collateral.** If Pledgee shall demand possession of the Collateral or any part thereof in connection with its rights pursuant to Section 9(b) or Section 9(c) hereof, Pledgors will, at their own expense, forthwith cause such Collateral or any part thereof designated by Pledgee to be assembled and made available and/or delivered to Pledgee at any place reasonably designated by Pledgee.

(h)    **No Release.** No sale or other disposition of all or any part of the Collateral by Pledgee pursuant to this Section 9 shall he deemed to relieve the Partnership or Pledgors of their obligations in respect of the Obligations, except to the extent the proceeds thereof are received by Pledgee.

(i)    **Voting and other Rights.** If an Event of Default shall have occurred and be continuing, Pledgee (i) may (but need not), upon notice to Pledgors, exercise all voting and other rights of Pledgors as partners of the Partnership and exercise all other rights provided under the Partnership Agreement and (ii) shall receive all permitted distributions, if any, made for the account of Pledgor under the Partnership Agreement.

Section 10.    **Waiver.** Pledgors agree that they will not at any time insist upon, claim, plead, or take any benefit or advantage of any appraisement, valuation, stay, extension, moratorium, redemption, or similar law now or hereinafter in force in order to prevent, delay, or hinder the enforcement hereof or the absolute sale of any part of the Collateral. Pledgors, for themselves and all who claim through them, so far as they now or hereafter lawfully may do so, hereby waive the benefit of all such laws, and all right to have the Collateral marshaled upon any foreclosure hereof, and agrees that any court having jurisdiction to foreclose this Agreement may order the sale of the Collateral as an entirety. Without limiting the generality of the foregoing, Pledgors hereby: (a) authorize Pledgee, in its sole discretion and without notice to or demand upon Pledgor and without otherwise affecting the obligations of Pledgors hereunder or in respect of the Obligations, from time to time to take and hold other collateral (in addition to the Collateral) for payment of Obligations or any part thereof and to exchange, enforce or release such other collateral or any part thereof and to accept and hold any endorsement or guarantee of payment of the Obligations or any part thereof and to release or substitute any endorser or pledgor or any other person or entity granting security for or in any other way obligated upon the Obligations or any part thereof; and (b) waives and releases any and all right to require Pledgee to collect any of the Obligations from any specific item or items of the Collateral or from any other party liable as Pledgors or in any other manner in respect of any of the Obligations or from any collateral (other than such Collateral) for any of the Obligations.

Section 11.    **Indemnity.** Pledgors shall indemnify Pledgee from and against any and all claims, losses and liabilities growing out of or resulting from (i) this Agreement (including, without limitation, enforcement of this Agreement), (ii) any refund or adjustment (including any interest thereon) of any amount paid or payable in accordance with the terms hereof to Pledgee, in respect of any Collateral after the occurrence of an Event of Default, or any interest therein,

12

EXHIBIT 2 PAGE 54

that may be ordered or otherwise required by any Governmental Authority, (iii) any delay in paying any and all excise, sales or other similar taxes which may be payable or determined to be payable with respect to any of the Collateral, (iv) any delay in complying with any Legal Requirements applicable to any of the Collateral and (v) the transactions contemplated solely by this Agreement, but, in the case of each of clauses (i) through (v), excluding any such claims, losses or liabilities found by a final order of a court of competent jurisdiction to result from Pledgee's gross negligence or willful misconduct.

Section 12.    **Amendments; Etc.**  No amendment or waiver of any provision of this Agreement or consent to any departure by Pledgors from the terms of this Agreement shall in any event be effective unless the same shall be in writing and signed by Pledgors and Pledgee and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 13.    **Notices.**  All notices, demands and other communications hereunder shall be in writing and sent by United States certified or registered mail, postage prepaid, return receipt requested, or by telecopier or private delivery service, addressed to the parties at the addresses specified on page 1 of this Agreement. Each party may change the address to which notices to it are to be sent by written notice given to the other in accordance with this paragraph. All notices shall, when mailed as aforesaid, be effective on the date indicated on the return receipt, and all notices given by other means shall be effective when received.

Section 14.    **Continuing Pledge and Security Interest.**  This Agreement shall be a continuing one, and all representations, warranties, covenants, undertakings, obligations, consents, waivers and agreements of Pledgors herein shall survive the date of this Agreement and shall continue in full force and effect until final payment in full of all amounts owed under the Loan Documents, at which time, provided there exists no Default or Event of Default under the Loan Documents, Pledgee shall terminate this Agreement and release the security interests granted hereunder. Notwithstanding the foregoing the indemnities contained herein, including the indemnity set forth in Section 11 hereof, shall survive such termination. Promptly after termination, Pledgee shall release this Agreement, return the Assignment to the respective assignors thereunder and make any appropriate filings to reflect such release.

Section 15.    **Governing Law.**  **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAWS PRINCIPLES, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT THE UCC PROVIDES THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTERESTS HEREUNDER, OR REMEDIES HEREUNDER IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

Section 16.    **Headings.**  Headings used in this Agreement are for convenience of reference only and do not constitute part of this Agreement for any purpose.

EXHIBIT 2 PAGE 55

**Section 17.    No Waiver; Cumulative Remedies; Integration.** Pledgee shall not by any act (except by a written instrument pursuant to this Section), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of Pledgee, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Pledgee of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Pledgee would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law.

**Section 18.    Pledgee's Duties.** The powers conferred on Pledgee hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except as provided in the next sentence, Pledgee shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. Pledgee's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Pledgee deals with similar securities and property for its own account. Neither Pledgee nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Pledgors or otherwise.

**Section 19.    Severability.** Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Where provisions of any law or regulation resulting in such prohibition or unenforceability may be waived, they are hereby waived by Pledgors and Pledgee to the full extent permitted by law so that this Agreement shall be deemed a valid and binding agreement, and the liens and security interests created and continued hereby shall constitute continuing liens on and perfected security interests in the Collateral, in each case enforceable in accordance with its terms.

**Section 20.    Specific Performance.** Pledgor hereby irrevocably waive any defense based on the adequacy of a remedy at law that may be asserted as a bar to the remedy of specific performance in any action brought against Pledgors for specific performance of this Agreement by Pledgee or in respect of all or a substantial part of Pledgors' assets under the bankruptcy or insolvency laws of any jurisdiction to which Pledgors or their respective assets are subject.

**Section 21.    Security Interest Absolute.** All rights of Pledgee hereunder, the liens created and continued hereby and all obligations of Pledgors hereunder shall be absolute and unconditional irrespective of: (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any documents delivered in connection with the transactions

14

EXHIBIT  2  PAGE  56

contemplated by the Loan Agreement including, without limitation, the Partnership Agreement; or (b) any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to or departure from any guaranty, for all or any of the Obligations.

Section 22.    **Private Sales.**  Pledgors recognize that Pledgee may be unable to effect a public sale of any or all the Collateral, by reason of certain prohibitions contained in any federal or state law governing the issuance or sale of securities and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire the Collateral for their own account for investment and not with a view to the distribution thereof. Pledgors acknowledge and agree that any such private sale may result in prices and other terms less favorable to Pledgee than if such sale were a public sale and agree that such circumstances shall not, in and of themselves, result in a determination that such sale was not made in a commercially reasonable manner. Pledgee shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit the Partnership to register for public sale under any federal or state law governing the issuance or sale of securities, even if the Partnership would agree to do so.

Section 23.    **Registration of Pledge.**  Concurrently with the execution of this Agreement, Pledgors have given to the Partnership written instructions, and has caused the Partnership to deliver, and the Partnership has, delivered to Pledgee a statement confirming that the Partnership has registered on its books the pledge effected by this Agreement.

Section 24.    **Reinstatement.**  This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by Pledgee upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Pledgors or the Partnership or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Pledgors or the Partnership or any substantial part of their property, or otherwise, all as though such payments had not been made.

Section 25.    **Powers Coupled with an Interest.**  All authorizations, agencies and powers herein contained with respect to the Collateral are irrevocable and are coupled with an interest.

Section 26.    **Submission to Jurisdiction; Waivers.**

(a)    **PLEDGORS HEREBY IRREVOCABLY AND UNCONDITIONALLY:**

(i)    **SUBMIT THEMSELVES AND THEIR RESPECTIVE PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THE LOAN AGREEMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT HEREOF OR**

15

EXHIBIT 2 PAGE 57

THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, THE COURTS OF THE UNITED STATES OF AMERICA FOR THE STATE OF NEW YORK, AND THE APPELLATE COURTS FROM ANY THEREOF;

(ii)    CONSENT THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS, AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREE NOT TO PLEAD OR CLAIM THE SAME;

(iii)    AGREE THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO PLEDGORS AT THE ADDRESSES REFERRED TO ON PAGE 1 OF THIS AGREEMENT; AND

(iv)    AGREE THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT PLEDGEE'S RIGHT TO SUE IN ANY OTHER JURISDICTION.

(b)    PLEDGORS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT.

Section 27.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

16

EXHIBIT 2  PAGE 58

**IN WITNESS WHEREOF,** Pledgors have caused this Partner Guaranty, Pledge and Security Agreement to be duly executed and delivered as of the date first above written.

SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company

By: _Theotis F. Oliphant_

Name: _Theotis F. Oliphant_

Title: _Managing member_

_Theotis F. Oliphant_

THEOTIS F. OLIPHANT

Santa Fe/Partner Pledge

EXHIBIT __2__ PAGE __59__

## ACKNOWLEDGMENT AND CONSENT

Santa Fe Pointe, L.P., a limited partnership duly organized and validly existing under the laws of the State of Oklahoma (the "**Partnership**"), the Partnership referred to in the foregoing Partner Guaranty, Pledge and Security Agreement (the "**Pledge**"), hereby acknowledges receipt of a copy thereof and agrees to be bound thereby and to comply with the terms thereof insofar as such terms are applicable to it.

The Partnership also agrees that, if an Event of Default (as defined in the Pledge) shall occur, to pay to Pledgee all amounts then due and payable and thereafter as they become due and payable to the general partner and/or limited partner of the Partnership, until the Pledge is no longer in force. The Partnership and its general partner and limited partner hereby consent to the admission of Pledgee or its designee or successor or assign as general partner and/or a limited partner, if any such party, upon acquiring the Collateral in the form of partnership interests, desires to become a substitute general partner and/or limited partner, and agree to provide further written evidence of their consent at any later time if necessary or appropriate to allow or evidence the admission of a substitute general partner and/or limited partner pursuant to the applicable provisions of the Partnership Agreement. The Partnership further agrees that Pledgee will not have any of the obligations of a general partner and/or a limited partner of the Partnership unless Pledgee affirmatively elects to undertake such obligations by becoming a general partner and/or limited partner in the Partnership in accordance with the terms of the Pledge.

December 20, 2006

SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:   SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company, its general partner

By: _Theotis F. Oliphant_
Name: Theotis F. Oliphant
Title: Managing Member

Santa Fe/Partner Pledge

EXHIBIT 2   PAGE 60

**Partner Guaranty, Pledge and Security Agreement**

**(Instructions to Partnership)**

December 2̲0̲, 2006

Santa Fe Pointe, L.P.
16416 Oconee Creek Drive
Edmond, Oklahoma 73013

Ladies and Gentlemen:

Santa Fe Pointe Management, LLC, and Theotis F. Oliphant hereby instruct you to register the pledge of their respective partnership interests in the above-captioned partnership in favor of Greystone CDE, LLC, pursuant to the Partner Guaranty, Pledge and Security Agreement dated as of December 2̲0̲ 2006.

Very truly yours,

SANTA FE POINT MANAGEMENT, LLC, an Oklahoma limited liability company

By: _Theotis F. Oliphant_
Name: Theotis Oliphant
Title: managing Member

_Theotis F. Oliphant_
THEOTIS F. OLIPHANT

Santa Fe/Partner Pledge

EXHIBIT _2_ PAGE _61_

## Partner Guaranty, Pledge and Security Agreement

### (Confirmation of Pledge)

December 2<u>0</u>, 2006

Greystone CDE, LLC
418 Bell Air Lane
Warrenton, Virginia 20186

This statement of Santa Fe Pointe, L.P. (the "Partnership") is to advise you that a pledge of the following uncertificated security has been registered in the name Greystone CDE, LLC, as follows:

1.    Uncertificated Securities:  The entire general partnership interest of Santa Fe Pointe Management, LLC, in the Partnership and the entire limited partnership interest of Theotis F. Oliphant in the Partnership.

2.    There are no liens or restrictions on hypothecation of the partnership interests of the undersigned partnership and no adverse claims to which such uncertificated securities are or may be subject known to the undersigned partnership.

3.    The pledge was registered on December 2<u>0</u> 2006.

THIS STATEMENT IS MERELY A RECORD OF THE RIGHTS OF THE ADDRESSEE AS OF THE TIME OF ITS ISSUANCE, DELIVERY OF THIS STATEMENT, OF ITSELF, CONFERS NO RIGHTS ON THE RECIPIENT.  THIS STATEMENT IS NEITHER A NEGOTIABLE INSTRUMENT NOR A SECURITY.

SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:    SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company, its general partner

By: _____
Name: Theotis F. Oliphant
Title: managing member

Santa Fe/Partner Pledge

EXHIBIT 2  PAGE 62

155737v1

## ASSIGNMENT AND ASSUMPTION OF PARTNERSHIP INTEREST

FOR VALUE RECEIVED, SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company ("Assignor"), hereby assigns, transfers and sets over to GREYSTONE CDE, LLC, a Delaware limited liability company ("Assignee"), free and clear of all liens, pledges, claims, assessments, security interests and other encumbrances of any nature, its entire partnership interest in Santa Fe Pointe, L.P., an Oklahoma limited partnership (the "Partnership"), and all right, title and interest of Assignor in and to that certain Agreement of Limited Partnership of Santa Fe Pointe, L.P., dated as of October 16, 2006 (the "Agreement"). Assignee hereby acknowledges receipt of a copy of the Agreement and accepts such assignment and agrees to assume all of the responsibilities and obligations of Assignor under the Agreement.

Dated: _December 20, 2006_

ASSIGNOR:

SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company

By: _Theotis F. Oliphant_
Name: _Theotis F. Oliphant_
Title: _Managing Member_

ASSIGNEE:

GREYSTONE CDE, LLC

By: _____
Name:
Title:

EXHIBIT _2_ PAGE _63_

155739v1

## ASSIGNMENT AND ASSUMPTION OF PARTNERSHIP INTEREST

FOR VALUE RECEIVED, THEOTIS F. OLIPHANT ("Assignor"), hereby assigns, transfers and sets over to GREYSTONE CDE, LLC, a Delaware limited liability company ("Assignee"), free and clear of all liens, pledges, claims, assessments, security interests and other encumbrances of any nature, his entire partnership interest in Santa Fe Pointe, L.P., an Oklahoma limited partnership (the "Partnership"), and all right, title and interest of Assignor in and to that certain Agreement of Limited Partnership of Santa Fe Pointe, L.P., dated as of October 16, 2006 (the "Agreement"). Assignee hereby acknowledges receipt of a copy of the Agreement and accepts such assignment and agrees to assume all of the responsibilities and obligations of Assignor under the Agreement.

Dated: December 20, 2006

ASSIGNOR:

THEOTIS F. OLIPHANT

ASSIGNEE:

GREYSTONE CDE, LLC

By:
Name:
Title:

EXHIBIT 2 PAGE 64

#155240v2
GT Draft 12/17/06

DEVELOPER LIMITED GUARANTY
PLEDGE AND SECURITY AGREEMENT

by

[NAME OF DEVELOPER]

in favor of

GREYSTONE CDE, LLC

Dated as of December __, 2006

EXHIBIT 3 PAGE 65

## DEVELOPER LIMITED GUARANTY,
## PLEDGE AND SECURITY AGREEMENT

This **DEVELOPER LIMITED GUARANTY, PLEDGE AND SECURITY AGREEMENT** (as amended, modified or supplemented from time to time, this "**Agreement**"), dated as of December ___, 2006, is made by [NAME OF DEVELOPER] a, _____, duly organized, validly existing and in good standing under the laws of the State of _____, with an address at _____ (together with its permitted successors and assigns, the "**Pledgor**"), in favor of GREYSTONE CDE, LLC, limited liability company organized and existing under the laws of the State of Delaware, with an address at 419 Belle Air Lane, Wanenton, Virginia 20186 (together with its successors and assigns, the "**Pledgee**"),

### W I T N E S S E T H :

WHEREAS, the Pledgor is an affiliate of Santa Fe Pointe, L.P., a limited partnership limited liability company duly organized, validly existing and in good standing under the laws of the State of Oklahoma (together with its permitted successors and assigns, the "**Borrower**"); and

WHEREAS, the Borrower has entered into an Bridge Loan Agreement dated as of December ___, 2006, (as the same may be amended, modified or supplemented from time to time, the "**Loan Agreement**," and together with all documents evidencing or securing the Loan Agreement, collectively, the "**Loan Documents**") with the Pledgee; and

WHEREAS, the Pledgor is or will be entitled to certain development fees under a development agreement to be entered into by and between the Pledgor and Borrower (as the same may be modified, amended or supplemented from time to time, the "**Development Agreement**"); and

WHEREAS, the Pledgor will derive substantial economic benefit from the transactions contemplated by the Loan Agreement; and

WHEREAS, the execution and delivery of this Agreement is a condition to the Pledgee's entering into the Loan Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby and in order to secure the Borrower' performance of its obligations to the Pledgee under the Loan Agreement, including payment of all amounts due or to become due to the Pledgee thereunder, and any extensions, renewals, replacements or modifications of any thereof, the Pledgor hereby agrees as follows:

**Section 1. Defined Terms.** The following terms which are defined in the Uniform Commercial Code in effect in the State of _____ on the date hereof are used herein as so defined: Accounts, Chattel Paper, General Intangibles, Instruments and Proceeds; and the following terms shall have the following meanings:

"**Collateral**" has the meaning assigned to it below in Section 3 of this Agreement.

EXHIBIT _3_ PAGE _66_

"**Event of Default**" means any "Event of Default" as defined in the Loan Agreement.

"**Obligations**" has the meaning assigned to it in Section 2 of this Agreement.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of _____.

All other capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Loan Documents.

**Section 2. Guaranty.** The Pledgor hereby absolutely, irrevocably and unconditionally guarantees and is a surety to the Pledgee for the full and punctual payment and performance by the Borrower of its obligations to the Pledgee under the Loan Documents (collectively, the "**Obligations**").

(a)   **Guaranty Absolute.** The guaranty of the Pledgor under this Agreement is a guaranty of payment and performance and not merely of collection or enforceability and shall remain in full force and effect until all of the Obligations are indefeasibly paid in full. The obligations and liabilities of the Pledgor under this Agreement are the primary, direct and immediate obligations of the Pledgor and shall in no way be affected, limited, impaired, modified or released by, subject to or conditioned upon, and may be enforced against the Pledgor irrespective of (i) any attempt, pursuit, enforcement or exhaustion of any rights and remedies the Pledgee may at any time have to collect any or all of the Obligations (whether pursuant to any of the Loan Documents or otherwise) from the Borrower, from the other Obligors, from any other maker, endorser, surety or guarantor of, or pledgor of collateral and security for, all or any part of the Obligations, and/or by any resort or recourse to or against any collateral and security for all or any part of the Obligations; (ii) the invalidity, irregularity, lack of priority or unenforceability in whole or in part of any or all of the Loan Documents; (iii) any counter-claim, recoupment, setoff, reduction or defense based on any claim the Borrower, any other Obligor, or the Pledgor may now or hereafter have against the Pledgee (other than the defense that payment in full of all amounts claimed to be due by the Pledgee actually has been made); (iv) the voluntary or involuntary liquidation, dissolution, termination or merger of the Borrower or any other Obligor, or the sale or other disposition of the Collateral or any of the assets and properties of the Borrower or any other Obligor; (v) any bankruptcy, reorganization, insolvency or similar proceedings for the relief of debtors under any federal or state law by or against the Borrower or any other obligor, or any discharge, limitation, modification or release of liability of the Borrower or any other Obligor by virtue of any such proceedings; (vi) any event, circumstance or matter to which the Pledgor has consented pursuant to the provisions of clause (b) hereof; and (vii) any other event or circumstance which might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety, whether similar or dissimilar to the foregoing (other than the defense that payment in full of all amounts claimed to be due by the Pledgee actually has been made).

(b)   **Consents.** Without notice to, or further consent of the Pledgor, the Pledgor hereby agrees that the Pledgee may at any time and from time to time on one or more occasions (i) renew, extend, accelerate, subordinate, change the time or manner of payment or

2

EXHIBIT 3  PAGE 67

performance of, or otherwise deal with, in any manner satisfactory to the Pledgee and in accordance with the applicable Loan Documents, any of the terms and provisions of, all or any part of the Obligations; (ii) waive, excuse, release, change, amend, modify or otherwise deal with in any manner satisfactory to the Pledgee any of the provisions of any of the Loan Documents; (iii) release the Borrower or any other Obligor; (iv) waive, omit or delay the exercise of any of its powers, rights and remedies against the Borrower or any other obligor all or any of the collateral and security for all or any part of the Obligations; (v) release, substitute, subordinate, add, fail to maintain, preserve or perfect any of its liens on, security interests in or rights to, or otherwise deal with in any manner satisfactory to the Pledgee, any collateral and security for all or any part of the Obligations; (vi) apply any payments in satisfaction of all or any of the Obligations due under the Loan Documents received from the Borrower or any other Obligor any other party or source whatsoever first to late charges or other sums due and owing to the Pledgee under the Loan Documents, next to accrued and unpaid interest then due and owing under the Loan Documents, and then to any other amounts due under the Loan Documents and any excess, after payment of the Obligations and performance of all other Obligations of the Borrower and any other Obligor to the Pledgee, shall be returned to the Borrower or (vii) take or omit to take any other action, whether similar or dissimilar to the foregoing which may or might in any manner or to any extent vary the risk of the Pledgor or otherwise operate as a legal or equitable discharge, release or defense of the Pledgor under applicable laws.

(c)    **Waivers.** The Pledgor hereby waives (i) notice of the execution and delivery of any of the Loan Documents; (ii) notice of the creation of any of the Obligations; (iii) notice of the Pledgee's acceptance of and reliance on this Agreement; (iv) presentment and demand for payment of the Obligations and notice of non-payment and protest of non-payment of the Obligations; (v) any notice from the Pledgee of the financial condition of the Borrower or any other Obligor regardless of the Pledgee's knowledge thereof; (vi) demand for observance, performance or enforcement of, or notice of default under, any of the provisions of this Agreement or any of the other Loan Documents (other than such as are expressly provided for therein), and all other demands and notices otherwise required by law which the Pledgor may lawfully waive; (vii) any right or claim to cause a marshalling of the assets of the Borrower or any other Obligor; and (viii) any defense at law or in equity based on the adequacy or value of the consideration for this Agreement. The Pledgor agrees not to institute any action or proceeding based on any rights of subrogation and reimbursement against the Borrower or any other Obligor against any collateral or security for any of the Obligations until the Obligations have been indefeasibly paid and satisfied in full. The Pledgor waives any and all other rights and defenses available to the Pledgor by reason of any statutory provisions now or hereafter in effect in any other jurisdiction, including, without limitation, any and all rights or defenses the Pledgor may have by reason of protection afforded to the Borrower or any other Obligor with respect to the Obligations pursuant to antideficiency or other laws of any state limiting or discharging the Borrower's or any other Obligor's indebtedness (other than the defense that payment in full of all amounts claimed to be due from such parties actually has been made). The Pledgor waives all rights and defenses arising out of an election of remedies by the Pledgee, even if that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Pledgor's rights of subrogation and reimbursement against the Borrower or any other Obligor.

3

EXHIBIT 3 PAGE 68

(d) **Non-Recourse.** The obligations of the Pledgor hereunder shall be recoverable solely out of the Collateral pledged pursuant to this Agreement and shall otherwise be without recourse to the Pledgor or any of its other assets or any past, present or future, direct or indirect, partners, members or shareholders in the Pledgor, except that the Pledgee shall have recourse to the assets of any such person or entity if and only to the extent such person or entity has expressly assumed (other than by execution and delivery of this Agreement) or hereafter expressly assumes liability for, or has pledged (other than pursuant to this Agreement) or hereafter pledges any of its other assets as security for the performance of the Obligations or of the Pledgor's obligations hereunder. Notwithstanding the preceding sentence, the Pledgor and its partners, members and shareholders shall be personally liable for and to the extent of any loss suffered by the Pledgee, as a direct result of (a) any act of fraud or willful misconduct by the Pledgor, (b) the application of any Collateral by the Pledgor other than as provided herein, or (c) the failure by the Pledgor to obtain the Pledgee's prior written consent to take any action otherwise proscribed by the terms hereof. In addition, nothing herein contained shall be deemed to limit, vary, modify or amend any obligation owed to the Pledgee, under any other guaranty or indemnification agreement to which the Pledgor is a party.

## Section 3. Grant of Security Interest by Pledgor.

(a) **Grant of Security Interest.** The Pledgor hereby pledges to the Pledgee, and grants to the Pledgee, a lien on, and continuing first priority security interest in, all of the following property (collectively, the **"Collateral"**) as security for the prompt and complete payment and performance by the Borrower of the Obligations and by the Pledgor of its obligations hereunder:

(i) the Pledgor's right to receive payment of the "developer's fee" under the Development Agreement or, if a Development Agreement is never finalized, executed and delivered, the Pledgor's right to receive any amounts in respect of a "developer's fee" or similar fee,, irrespective of the absence of any written agreement with respect thereto;

(ii) all Accounts arising out of its rights to receive such payment under payment of "developer's fee" as aforesaid;

(iii) all General Intangibles arising out of its rights to receive payment of "developer's fee" as aforesaid;

(iv) any such "developer's fee" actually paid; and

(v) to the extent not otherwise included above, all Proceeds of any and all of the foregoing, including, without limitation, whatever is received upon any collection, exchange, sale or other disposition of any of the Collateral, and any property into which any of the Collateral is converted, whether cash or noncash proceeds, and any and all other amounts paid or payable under or in connection with any of the Collateral.

Notwithstanding the foregoing, "collateral" shall not include any "developer fee" already paid in accordance with the terms of the Development Agreement.

EXHIBIT 3 PAGE 69

(b)   **Continuing Interest.**   The security interest granted pursuant to this Agreement constitutes a continuing security interest in the Collateral and shall remain in full force and effect until termination of this Agreement in accordance with Section 15 hereof.

**Section 4. Payments in Respect of Collateral.**   During the continuation of any Event of Default, the Pledgor hereby directs that amounts the Pledgor is entitled to receive representing any portion of the Collateral shall be immediately transferred to the Pledgee.   The Pledgor hereby irrevocably authorizes the Borrower to make such payments directly to the Pledgee by wire transfer in accordance with the following wire transfer instructions, with the same effect as if the same had been paid to the Pledgor in accordance with the Development Agreement:

By execution hereof, the Pledgor acknowledges and agrees to such authorization and agrees to make any such payments to the Pledgee.   The Pledgor hereby agrees that, to the extent it receives any amounts on account of the Collateral during the continuance of an Event of Default, it shall immediately apply such funds as received, to the payment of the Obligations, in such order as the Pledgee may determine in its sole discretion.

**Section 5. Limitations on Pledgee's Obligations.**   Anything herein to the contrary notwithstanding, the Pledgor shall remain liable under the Development Agreement to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof.   The Pledgee shall not have any obligation or liability under this Agreement by reason of or arising out of this Agreement or the receipt by the Pledgee of any payment relating to any Collateral pursuant hereto; nor shall the Pledgee be obligated in any manner to perform any of the obligations of the Pledgor under or pursuant to the Development Agreement or any Account or General Intangible to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any thereof, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been pledged to it or to which it may be entitled at any time or times.   Nothing contained in this Agreement shall be construed or interpreted to transfer to the Pledgee any of the obligations of the Pledgor under the Development Agreement.

**Section 6. Representations and Warranties.**   The Pledgor hereby represents and warrants as follows:

(a)   **Entity Status.**   The Pledgor is a _____ duly formed, validly existing and in good standing under the laws of the State of _____.

(b)   **Loan Documents.**   The Pledgor has examined or has had an opportunity to examine the Loan Agreement.

(c)   **Enforceability.** This Agreement has been duly executed and constitutes the valid and binding obligation of the Pledgor, enforceable against the Pledgor in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally.

(d)   **Ownership of Collateral; Liens.**   The Pledgor is or will be the legal and beneficial owner of the Collateral, free and clear of all liens, except for the liens created by this

5

EXHIBIT ___3___ PAGE 70

Agreement. The Pledgor has all requisite power and authority and the legal right to pledge to the Pledgee, and to grant to the Pledgee, a lien on and continuing security interest in the Collateral. The execution, delivery and performance by the Pledgor of this Agreement is within the Pledgor's powers, has been duly authorized by all necessary legal action, and does not contravene any agreement applicable to the Pledgor or restriction binding on or affecting the Pledgor or any of its assets. No security agreement, financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as may have been filed in favor of the Pledgee pursuant to this Agreement.

(e)    **Security Interest.** The security interests granted and continued pursuant to this Agreement will, upon filing of UCC financing statements in the appropriate filing offices, constitute first priority perfected security interests in the Collateral in favor of the Pledgee and are enforceable as such against all creditors of and purchasers from the Pledgor. All action on the part of the Pledgor necessary or desirable to perfect such security interests in each item of the Collateral requested by the Pledgee, including the execution of financing statements for filing in the appropriate filing offices, has been or will be duly taken upon such filing.

(f)    **Legal Name.** The Pledgor's exact legal name is set forth at the beginning of this Agreement and the Pledgor does not conduct business under any other names.

(g)    **Power and Authority.** The Pledgor has and has duly exercised all requisite power and authority to enter into this Agreement, to pledge its interest in the Collateral and to carry out the transactions contemplated by this Agreement.

(h)    **Place of Business; Organizational Identification Number.** The Pledgor's chief executive office and chief place of business, and the place where the Pledgor keeps its records concerning the Collateral, is located at the Pledgor's address set forth on page 1 hereof, and the Pledgor's jurisdiction of organization is as set forth on page 1 hereof. The Pledgor's organizational identification number is _____.

**Section 7. Covenants.** The Pledgor covenants and agrees that, so long as this Agreement remains in effect:

(a)    **Development Agreement.** The Development Agreement shall be in form and substance satisfactory to Pledgee in all respects. Pledgor shall afford Pledgee a reasonable opportunity to review a draft of the Development Agreement prior to execution and delivery thereof and will provide Pledgee a copy of the executed Development Agreement once it has been executed and delivered.

(b)    **Further Documentation; Pledge of Instruments.** At any time and from time to time, upon the written request of the Pledgee, and at the sole expense of the Pledgor, the Pledgor will promptly and duly execute and deliver such further instruments and documents and take such further action as the Pledgee, as applicable, may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted. Without limiting the generality of the foregoing, the Pledgor will execute and file such financing or continuation statements, or amendments thereto, and such other instruments, endorsements or notices, as the Pledgee may deem necessary or desirable in order to perfect and

EXHIBIT 3 PAGE 71

preserve the liens created or continued or intended to be created or continued hereby. The Pledgor hereby authorizes the Pledgee to file any such financing or continuation statement without the signature of the Pledgor to the extent permitted by applicable legal requirements. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, other Instrument or Chattel Paper, such note, Instrument or Chattel Paper shall be immediately delivered to the Pledgee, duly endorsed (without recourse) in a manner satisfactory to the Pledgee, to be held as Collateral pursuant to this Agreement.

(c)     **Maintenance of Records.** The Pledgor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral.

(d)     **Limitation on Liens on Collateral.** The Pledgor will not create, incur or permit to exist, will defend the Collateral and the right, title and interest of the Pledgee therein against, and will take such other action as is necessary to remove, any lien, claim, security interest or other encumbrances on or to the Collateral other than the lien created and continued pursuant to this Agreement.

(e)     **Further Identification of Collateral.** The Pledgor will furnish to the Pledgee from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Pledgee, as applicable, may reasonably request, all in reasonable detail.

(f)     **Changes in Locations, Name, etc.** The Pledgor will not, without at least sixty (60) days' prior written notice to such effect to the Pledgee, as applicable (i) change the location of its chief executive offices or chief place of business from that specified on page 1 hereof, or remove its books and records from such location or (ii) change its names, identities, jurisdiction of organization or structure to such an extent that any financing statements filed by the Pledgee in connection with this Agreement would become misleading.

(g)     **Amendments to Development Agreement.** The Pledgor shall not, without the prior written consent of the Pledgee, consent to, vote in favor of or otherwise permit any amendment to or modification of the Development Agreement.

(h)     **No Transfer of Interests.** The Pledgor shall not sell, assign, transfer, pledge or encumber or permit to be sold, assigned, transferred, pledged or encumbered any of its interests in, to or under the Development Agreement or the other Collateral, nor permit the sale, assignment, transfer, pledge or encumbrance or any interests in, to or under the Development Agreement. Any sale, assignment, transfer, pledge or encumbrance of the Pledgor's interests under the Development Agreement in violation of the foregoing provisions of this Section 7(h) shall be null and void. Nothing in this Section 7(h) shall be construed to prohibit transfers of membership interests in the Pledgor.

(i)     **Maintenance of Existence, Etc.** The Pledgor shall at all times preserve and maintain in full force and effect its existence under the laws of the state of its organization and its qualification to do business in each jurisdiction where the nature of business transacted makes such qualifications necessary.

7

EXHIBIT ___3___ PAGE _72_

(j)     **Claims against Collateral.** The Pledgor shall, within five (5) days of receipt of knowledge by the Pledgor, notify the Pledgee, in reasonable detail of any lien or claim made or asserted against the Collateral.

(k)     **Notice of Default.** The Pledgor will forthwith upon learning of the occurrence of any event which would cause a default under either of the Development Agreement, notify the Pledgee in writing thereof.

## Section 8. Pledgee's Appointment as Attorney-in-Fact.

(a)     **Powers.** Effective immediately, without limiting any rights or powers granted herein to the Pledgee, the Pledgor hereby irrevocably constitutes and appoints the Pledgee and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority, in the place and stead of the Pledgor and in the name of the Pledgor or in its own name, for the purpose of carrying out the terms of this Agreement, without notice to or assent by the Pledgor, upon the occurrence and continuance of an Event of Default, (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Pledgee; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action or proceeding brought against the Pledgor with respect to any Collateral; (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as the Pledgee, may deem appropriate (provided that Pledgor shall have not less than ten (10) days prior written notice before any such settlement, compromise or adjustment shall become binding and Pledgee shall provide Pledgor with reasonable detail regarding the terms of any such settlement, compromise or adjustment prior to finalization); and (G) upon the occurrence of an Event of Default, generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Pledgee were the absolute owner thereof for all purposes, and to do, at the Pledgee's option, and the Pledgor's expense, at any time, or from time to time, all acts and things that the Pledgee deems necessary to protect, preserve or realize upon the Collateral and the liens thereon created and continued hereby and to effect the intent of this Agreement, all as fully and effectively as the Pledgor might do. The Pledgor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

(b)     **Other Powers.** The Pledgor also authorizes the Pledgee, at any time and from time to time, to execute, in connection with any sale provided for in Section 10 hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

8

EXHIBIT  3   PAGE  73

**Section 9. Performance by Pledgee of Pledgor's Obligations.** Immediately upon the occurrence of an Event of Default, and without limiting any rights or powers granted herein to the Pledgee while no Event of Default has occurred and is continuing, the Pledgee, without releasing the Pledgor from any obligation, covenant or condition hereof, itself may make any payment or perform, or cause the performance of, any such obligation, covenant or condition or take any other action in such manner and to such extent as the Pledgee may deem necessary to protect, perfect or continue the perfection of the liens created or continued or intended to be created or continued pursuant to this Agreement.

**Section 10. Rights and Remedies.**

(a)     **Collateral.** If an Event of Default shall have occurred, all payments made in respect of the Collateral and received by or on behalf of the Pledgee in accordance with the provisions of this Agreement or the Loan Agreement or otherwise shall be applied in accordance with the Loan Agreement, which may result in the Collateral, in the discretion of the Pledgee, (A) being held by or on behalf of the Pledgee as Collateral, and/or (B) then or at any time thereafter being applied to the Obligations in such order as the Pledgee shall determine,

(b)     **UCC.** If an Event of Default shall have occurred, then, in addition to any other rights and remedies provided for herein and in any other instrument or agreement securing, evidencing or relating to the Obligations, or that may otherwise be available, the Pledgee may, without any demand, advertisement or notice (except as expressly provided for below in this Section 10(b) or by applicable legal requirements), exercise all the rights and remedies of a secured party under the UCC, and in addition may sell, lease, assign, give option or options to purchase, or otherwise dispose of the Collateral, or any part thereof, as hereinafter provided. The Collateral may be sold or otherwise disposed of in one or more sales, at public or private sale, conducted by any officer or agent of, or auctioneer or attorney for, the Pledgee, at any exchange or broker's board or at the Pledgee's place of business or elsewhere, for cash, upon credit or for other property, for immediate or future delivery, and at such price or prices and on such terms as the Pledgee shall, in its sole discretion, deem appropriate. The Pledgee may be the purchaser of any or all of the Collateral so sold at a sale and thereafter may hold the same, and the Obligations may be applied as a credit against the purchase price. The Pledgee may, in its commercially reasonable discretion, at any such sale restrict the prospective bidders or purchasers as to their number, nature of business, financial capability and investment intention, so long as prospective bidders or purchasers are not limited to the Pledgee and its affiliates (unless no commercially reasonable alternative is available). Upon any such sale, the Pledgee shall have the right to deliver, assign and transfer to the purchaser thereof (including the Pledgee) the Collateral so sold. Each purchaser (including the Pledgee) at any such sale shall hold the Collateral so sold, absolutely free from any claim or right of whatsoever kind, including any equity or right of redemption, of the Pledgor, and the Pledgor hereby specifically waives, to the fullest extent they may lawfully do so, all rights of redemption, stay or appraisal that they have or may have under any rule of law or statute now existing or hereafter adopted. The Pledgor agrees that the Pledgee need not give more than ten (10) days prior notice of the time and place of any public sale or of the time after which a private sale or other intended disposition is to take place and that such notice is reasonable notification of such matters. No notification need be given to the Pledgor if it has signed after the occurrence of an Event of Default a statement renouncing or modifying any right to notification of sale or other intended disposition. Any such public sale shall be held

9

EXHIBIT 3  PAGE 74

at such time or times within ordinary business hours as the Pledgee shall fix in the notice of such sale. At any such sale, the Collateral may be sold in one lot as an entirety or in separate parcels. The Pledgee shall not be obligated to make any sale pursuant to any such notice. The Pledgee may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be so adjourned without further notice or publication. In case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by the Pledgee until the full selling price is paid by the purchaser thereof, but the Pledgee shall not incur any liability in case of the failure of such purchaser to take up and pay for the provisions hereof.

(c)    **Proceedings.** If an Event of Default shall have occurred and is continuing, instead of exercising the power of sale provided in Section 10(b) hereof, the Pledgee may proceed by a suit or suits at law or in equity to foreclose the pledge and security interest under this Agreement and sell the Collateral or any portion thereof under a judgment or decree of a court or courts of competent jurisdiction.

(d)    **Attorney-in-Fact.** The Pledgee, as attorney-in-fact pursuant to Section 8 hereof, may, in the name and stead of the Pledgor, make and execute all conveyances, assignments and transfers of the Collateral sold pursuant to Section 10(b) or Section 10(c) hereof, and the Pledgor hereby ratifies and confirms all that the Pledgee, as said attorney-in-fact, shall lawfully do by virtue hereof. Nevertheless, the Pledgor shall, if so requested by the Pledgee, ratify and confirm any sale or sales by executing and delivering to the Pledgee, or to such purchaser or purchasers, all such instruments as may, in the judgment of the Pledgee, be advisable for the purpose.

(e)    **Collateral Sold Free and Clear.** The receipt of the Pledgee for the purchase money paid at any such sale made by it pursuant to Section 10(b) or 10(c) hereof shall be a sufficient discharge therefor to any purchaser of the Collateral, or any portion thereof, sold as aforesaid; and no such purchaser (or the representatives or assigns of such purchaser), after paying such purchase money and receiving such receipt, shall be bound to see to the application of such purchase money or any part thereof or in any manner whatsoever be answerable for any loss, misapplication or non-application of any such purchase money, or any part thereof, or be bound to inquire as to the authorization, necessity, expediency or regularity of any such sale.

(f)    **No Pledgee Liability.** The Pledgee shall not incur any liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to and in accordance with Section 10(b) hereof conducted in a commercially reasonable manner and in accordance with applicable legal requirements. The Pledgor hereby waives to the fullest extent permitted by legal requirements, all claims, damages and demands against the Pledgee arising out of the repossession or retention of the Collateral or the sale of the Collateral pursuant to and in accordance with Section 10(b) or Section 10(c) hereof, including, without limitation, any claims against the Pledgee arising by reason of the fact that the price at which the Collateral, or any part thereof, may have been sold at a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Pledgee accepts the first offer received that the Pledgee in good faith deems to be commercially reasonable under the circumstances and for commercially reasonable reasons does not offer the

EXHIBIT   3   PAGE  75

Collateral to more than one offeree (so long as the offerees are not limited to the Pledgee and its affiliates, unless no commercially reasonable alternative was available). To the fullest extent permitted by law, the Pledgor shall have the burden of proving that any such sale of the Collateral was conducted in a commercially unreasonable manner.

(g)    **Availability of Collateral**. If the Pledgee shall demand possession of the Collateral or any part thereof in connection with its rights pursuant to Section 10(b) or Section 10(c) hereof, the Pledgor will, at its own expense, forthwith cause such Collateral or any part thereof designated by the Pledgee to be assembled and made available and/or delivered to the Pledgee at any place reasonably designated by the Pledgee.

(h)    **No Release**. No sale or other disposition of all or any part of the Collateral by the Pledgee pursuant to this Section 10 shall be deemed to relieve the Borrower or the Pledgor of their obligations in respect of the Obligations, except to the extent the proceeds thereof are received by the Pledgee.

**Section 11. Waiver**. The Pledgor agrees that it will not at any time insist upon, claim, plead, or take any benefit or advantage of any appraisement, valuation, stay, extension, moratorium, redemption, or similar law now or hereinafter in force in order to prevent, delay, or hinder the enforcement hereof or the absolute sale of any part of the Collateral. The Pledgor, for itself and all who claim through it, so far as it now or hereafter lawfully may do so, hereby waives the benefit of all such laws, and all right to have the Collateral marshaled upon any foreclosure hereof, and agrees that any court having jurisdiction to foreclose this Agreement may order the sale of the Collateral as an entirety. Without limiting the generality of the foregoing, the Pledgor hereby: (a) authorizes the Pledgee, in its sole discretion and without notice to or demand upon the Pledgor and without otherwise affecting the obligations of the Pledgor hereunder or in respect of the Obligations, from time to time to take and hold other collateral (in addition to the Collateral) for payment of Obligations or any part thereof and to exchange, enforce or release such other collateral or any part thereof and to accept and hold any endorsement or guarantee of payment of the Obligations or any part thereof and to release or substitute any endorser or pledgor or any other person or entity granting security for or in any other way obligated upon the Obligations or any part thereof and (b) waives and releases any and all right to require the Pledgee to collect any of the Obligations from any specific item or items of the Collateral or from any other party liable as the Pledgor or in any other manner in respect of any of the Obligations or from any collateral (other than such Collateral) for any of the Obligations.

**Section 12. Indemnity**. The Pledgor shall indemnify the Pledgee from and against any and all claims, losses and liabilities growing out of or resulting from (i) this Agreement (including, without limitation, enforcement of this Agreement), (ii) any refund or adjustment (including any interest thereon) of any amount paid or payable in accordance with the terms hereof to the Pledgee in respect of any Collateral after the occurrence of an Event of Default, that may be ordered or otherwise required by any governmental authority, (iii) any delay in paying any and all excise, sales or other similar taxes which may be payable or determined to be payable with respect to any of the Collateral, (iv) any delay in complying with any legal requirements applicable to any of the Collateral and (v) the transactions contemplated solely by this Agreement, but, in the case of each of clauses (i) through (v), excluding any such claims, losses

11

EXHIBIT 3   PAGE 76

or liabilities found by a final order of a court of competent jurisdiction to result from the gross negligence or willful misconduct of the Pledgee.

**Section 13. Amendments; Etc.** No amendment or waiver of any provision of this Agreement or consent to any departure by the Pledgor from the terms of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Pledgor and the Pledgee, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**Section 14. Notices.** All notices, demands and other communications hereunder shall be in writing and sent by United States certified or registered mail, postage prepaid, return receipt requested, or by telecopier or private delivery service, addressed to the parties at the addresses specified in Section 10.2 of the Loan Agreement. Each party may change the address to which notices to it are to be sent by written notice given to the other in accordance with this paragraph. All notices shall, when mailed as aforesaid, be effective on the date indicated on the return receipt, and all notices given by other means shall be effective when received.

**Section 15. Termination.** This Agreement shall be a continuing one, and all representations, warranties, covenants, undertakings, obligations, consents, waivers and agreements of Pledgor herein shall survive the date of this Agreement and shall continue in full force and effect until the payment and performance in full of all obligations of the Borrower under the Loan Agreement. Notwithstanding the foregoing the indemnities contained herein, including the indemnity set forth in Section 12 hereof, shall survive such termination. Promptly after termination, Pledgee shall release this Agreement and make any appropriate filings to reflect such release.

**Section 16. GOVERNING LAW.** THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF _____, WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAWS PRINCIPLES, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT THE UCC PROVIDES THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTERESTS HEREUNDER, OR REMEDIES HEREUNDER IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF _____.

**Section 17. Headings.** Headings used in this Agreement are for convenience of reference only and do not constitute part of this Agreement for any purpose.

**Section 18. No Waiver; Cumulative Remedies; Integration.** The Pledgee shall not by any act (except by a written instrument pursuant to this Section), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of the Pledgee, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Pledgee of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which would otherwise have

12

EXHIBIT 3 PAGE 77

on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law.

Section 19. Pledgee's Duties.  The powers conferred on the Pledgee hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except as provided in the next sentence, the Pledgee shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.  The Pledgee's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Pledgee deals with similar securities and property for its own account. Neither the Pledgee nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Pledgor or otherwise.

Section 20. Severability.   Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Where provisions of any law or regulation resulting in such prohibition or unenforceability may be waived, they are hereby waived by the Pledgor and the Pledgee to the full extent permitted by law so that this Agreement shall be deemed a valid and binding agreement, and the liens and security interests created and continued hereby shall constitute continuing liens on and perfected security interests in the Collateral, in each case enforceable in accordance with its terms.

Section 21. Specific Performance.  The Pledgor hereby irrevocably waives any defense based on the adequacy of a remedy at law that may be asserted as a bar to the remedy of specific performance in any action brought against the Pledgor for specific performance of this Agreement by the Pledgee or in respect of all or a substantial part of the Pledgor's assets under the bankruptcy or insolvency laws of any jurisdiction to which the Pledgor or its respective assets are subject.

Section 22. Security Interest Absolute.  All rights of the Pledgee hereunder, the liens created and continued hereby and all obligations of the Pledgor hereunder shall be absolute and unconditional irrespective of: (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any documents delivered in connection with the transactions contemplated by the Loan Agreement; or (b) any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to or departure from any guaranty, for all or any of the Obligations.

Section 23. Private Sales.  The Pledgor recognizes that the Pledgee may be unable to effect a public sale of any or all the Collateral, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire the Collateral for their own account for investment and not with a view to the distribution thereof.  The Pledgor acknowledges and agrees that, subject to compliance with

13

EXHIBIT 3 PAGE 78

Section 10(b) hereof, any such private sale may result in prices and other terms less favorable to the Pledgee than if such sale were a public sale and agrees that such circumstances shall not, in and of themselves, result in a determination that such sale was not made in a commercially reasonable manner.

**Section 24. Reinstatement.** This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations paid prior to the termination hereof in accordance with Section 15 is rescinded or must otherwise be restored or returned by the Pledgee upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Pledgor or the Borrower or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Pledgor or the Borrower or any substantial part of their property, or otherwise, all as though such payments had not been made.

**Section 25. Powers Coupled with an Interest.** All authorizations, agencies and powers herein contained with respect to the Collateral are irrevocable and are coupled with an interest.

**Section 26. SUBMISSION TO JURISDICTION; WAIVERS.**

   (a)    PLEDGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY:

   (i)    SUBMITS ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THE LOAN AGREEMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT HEREOF OR THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF _____, THE COURTS OF THE UNITED STATES OF AMERICA FOR THE STATE OF _____, AND THE APPELLATE COURTS FROM ANY THEREOF;

   (ii)    CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS, AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREE NOT TO PLEAD OR CLAIM THE SAME;

   (iii)    AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO THE PLEDGOR AT THE ADDRESS REFERRED TO ON PAGE 1 OF THIS AGREEMENT; AND

14

EXHIBIT  3   PAGE  79

AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT PLEDGEE'S RIGHT TO SUE IN ANY OTHER JURISDICTION.

(b)    PLEDGOR HEREBY SUBMITS AND CONSENTS TO VENUE IN ANY COURT IN THE COUNTY WHERE THE PROJECT TO WHICH THE COLLATERAL RELATES IS LOCATED WITH RESPECT TO ANY ACTIONS ARISING OUT OF THIS AGREEMENT.

(c)    PLEDGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT.

Section 27. Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

Section 28. Successors and Assigns; Beneficiaries.  This Agreement shall be binding upon the Pledgor, the Borrower and their respective successors and assigns and shall inure to the benefit of the Pledgee and its respective successors and assigns.  The Pledgor shall not assign its obligations hereunder without the prior written consent of the Pledgee.  This Agreement is for the purpose of defining the respective rights and obligations of the Pledgor, the Borrower and the Pledgee and is not for the benefit of any creditor or other third party.

15

EXHIBIT 3 PAGE 80

**IN WITNESS WHEREOF,** the Pledgor has caused this Developer Limited Guaranty, Pledge and Security Agreement to be duly executed and delivered as of the date first above written.

[NAME OF DEVELOPER], a _____

By: _____

Name:

Title:


Acknowledged and Agreed to by:

SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:    SANTA FE POINTE
       MANAGEMENT, LLC, an Oklahoma
       limited liability company, its general
       partner

       By: _____
       Name:
       Title:


EXHIBIT 3 PAGE 81

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GREYSTONE CDE, LLC,

                              Plaintiff,

                                                    07 CV. 8377 (RPP)

        - against -
                                                    **OPINION AND ORDER**

SANTE FE POINTE L.P.,
SANTE FE POINTE MANAGEMENT, LLC,
RANT LLC, and
THEOTIS F. OLIPHANT,

                              Defendants.
-----------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

        On January 7, 2008, Defendants Santa Fe Pointe, L.P., Santa Fe Pointe

Management LLC, Rant LLC, and Theotis F. Oliphant ("Defendants") moved pursuant to

the requirements of Rule 7 of the Federal Rules of Civil Procedure, Fed. R. Civ. P. Rule

83(b), and the inherent power of the Court to stay all proceedings in this case pending a

ruling by the United States Court for the Northern District of California on a venue

transfer motion brought by Greystone Servicing Corp. and Greystone CDE, LLC

("Greystone CDE" or "Plaintiff"), the latter of which is the plaintiff in this case.

Alternatively, if the motion to transfer venue is denied, Defendants moved to stay this

proceeding pending final resolution of the action in California (the "California action").

Defendants sought to reserve their right to challenge the Court's personal jurisdiction

over the Defendants at the time of Defendants' answer or other response to Plaintiff's

complaint.

EXHIBIT 4 PAGE 82

On January 22, 2008, Plaintiff cross moved for default judgment against Defendants based on Defendants' failure to answer the amended complaint and engage in discovery as ordered by the Court on December 11, 2007. Alternatively, Plaintiff moved to strike Defendants' personal jurisdiction defense.

On February 8, 2008, before the motions were fully submitted in this case, the Northern District of California denied the motion to transfer the California action to New York. Accordingly, Defendants' motion before this Court is to stay the proceedings pending final resolution of the California action. For the foregoing reasons, Defendants' motion to stay (Doc. No. 24) is denied, and Plaintiff's cross-motion for entry of default judgment (Doc. No. 30) is denied.

**DISCUSSION**

A district court may stay an action pursuant to "the power inherent in every court to control the disposition of the causes on its own docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. North Am. Co., 299 U.S. 248, 254 (1936). As the party moving for the stay, Defendants "bear[] the burden of establishing its need." Clinton v. Jones, 520 U.S. 681, 708 (1997).

In deciding whether or not to grant a stay, courts consider five factors:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

Kappel v. Comfort, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996) (quoting Volmar Distributors v. New York Post Co., 152 F.R.D. 36, 39 (S.D.N.Y. 1993)). In weighing the

EXHIBIT 4 PAGE 83

Kappel factors in a case-by-case determination, the "basic goal [is] to avoid prejudice." Id.

Defendants fail to establish a basis for a stay in this case. They argue that a stay is warranted because there is a concurrently pending federal action that "arises from the same nucleus of facts," citing SST Global Technology, LLC v. Chapman, 270 F. Supp. 2d 444, 455 (S.D.N.Y. 2003). The action in this Court arises out of a bridge loan agreement between Greystone CDE and Defendant Santa Fe Pointe, L.P., and the agreements executed by the remaining Defendants to guarantee that loan. Greystone CDE seeks to recover damages for breach of the loan and guaranty agreements in this action. The claims in the California action, on the other hand, "are not based on the guaranties with Greystone CDE," as Defendants argued and the Northern District of California agreed in denying the motion to transfer venue. Santa Fe Pointe, LP v. Greystone Servicing Corp. Inc., No. 07-cv-5454, slip op. at 8, 9 (N.D. Ca. Feb. 4, 2008). Defendants' claims in the California action arise out of related claims sounding in tort, which principally involve the actions of Greystone Servicing, a separate corporation, to assist Defendants with a HUD application to acquire and rehabilitate a housing development in Oklahoma and do not directly involve the loan agreement in question in this action. The substantial differences between these actions weigh against a stay in this case.

Furthermore, granting a stay would prejudice Plaintiff more than allowing the case to proceed would prejudice Defendants. See Lasala v. Needham & Co., 399 F. Supp. 2d 421, 428 (2005) ("Courts are generally reluctant to stay proceedings because they are concerned with vindicating the *plaintiff*'s right to proceed with its case."); see

3

EXHIBIT 4 PAGE 84

also An Giang Agric. & Food Import Export Co. v. United States, 350 F. Supp. 2d 1162.

1164 n.3 (2004) (stating that "underpinning much of the case law – implicitly, if not

explicitly – is a concern for the rights of assertedly aggrieved plaintiffs to seek redress in

the courts" while noting a lack of "comparable concern for the rights of defendants").

Plaintiff, which opposes the stay, should be able to proceed in this forum with its claim

against Defendants for default and failure as guarantors to make payment when due.

        More importantly, Plaintiff selected this forum based on the forum selection

clauses of the loan guaranties, which each Defendant executed in favor of Greystone

CDE. By signing the Guaranty and Suretyship Agreement, Defendant Theotis Oliphant

irrevocably agreed that Greystone CDE may bring an action arising out of the guaranty in

any state or federal court located in New York, consented to the jurisdiction of such court

in any action, and waived any objection to the laying of venue of any such action.

(Compl., Ex. C at 11.) Defendants Santa Fe Pointe Management LLC, Theotis Oliphant,

and Rant LLC also signed pledge agreements by which they irrevocably and

unconditionally submitted themselves and their property in any legal action relating to

those agreements to the non-exclusive general jurisdiction of the state, federal, and

appellate courts of the State of New York. (Compl., Ex. D at 15-16; Ex. E at 14.)

Subsequent to signing the loan and guaranty agreements, Defendant Oliphant's law office

rendered a legal opinion as to the validity and enforceability of the bridge loan agreement

and the partners' guaranties thereof. (Harnik Decl., Ex. G, ¶ 3.) Having previously

agreed to litigate this case in New York should Plaintiff institute an action here.

Defendants cannot now claim that their burden in doing so outweighs the interest of

Plaintiff in proceeding with its action.

EXHIBIT 4 PAGE 85

The interests of the courts, non-parties, and the public do not weigh strongly in favor of granting a stay. In view of the claims raised by the California action, a stay of this action is not likely to lead to a more expeditious resolution of this case but rather would enable Defendants to utilize the bridge loan to finance the California action.

Defendants urge the Court to decide the motion to stay on the first-to-file rule. Embracing the advice of the U.S. Supreme Court that wise judicial administration "does not counsel rigid mechanical solution of such problems," Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183 (1950), the Court declines to grant a stay based on Defendants' technical first filing. Although it is true that Defendants filed an action in California state court prior to Plaintiff's filing of this action, they did not serve process until the day before Plaintiff filed its action here in New York, nor did they disclose the filing of their action while they negotiated with Plaintiff. Moreover, as Plaintiff points out, the California action was filed well after Defendants received a notice of default and of Greystone CDE's intent to pursue collection remedies. This sequence weighs against an application of the first to file rule. See Capital Records, Inc. v. Optical Recording Corp., 810 F. Supp. 1350, 1355 (S.D.N.Y. 1992) ("Another factor that weighs against application of the first-filed rule is that this action was essentially a victory in a race to the courthouse triggered by ORC's letter. ORC's letter served the dual purpose of proposing further settlement discussion and putting Capitol on notice that failure of the negotiations would lead to legal action.").

5

EXHIBIT 4 PAGE 86

**CONCLUSION**

Whether there is any merit to Defendants' claims in California can be determined by the California court, but Defendants here should not be in the position of spending the remaining proceeds of the bridge loan pursuing the action. Defendants' motion for a stay (Doc. No. 24) is denied. Plaintiff's motion to enter a default judgment (Doc. No. 30) is denied, and Plaintiff's motion to strike Defendants' personal jurisdiction defense (Doc. No. 30) is denied since such a defense has not been raised. Defendants are to answer the complaint or otherwise respond in ten (10) days of this opinion.

The parties and their principal counsel are to appear in court on Thursday, February 28, 2008, at 9:30 AM to discuss settlement so the legal fees in this case and the California case will not result in further injury to both parties.

IT IS SO ORDERED.

Dated: New York, New York
       February 20, 2008

_____
Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this Opinion and Order sent to:**

*Attorneys for Plaintiff*
Harnik Wilker & Finkelstein LLP
ATTN: Stephen M. Harnik
645 Fifth Avenue, 7th Floor
New York, NY 10022-5937
Tel: 212-599-7575
Fax: 212-867-8120

*Attorneys for Defendants*
Akerman Senterfitt LLP
ATTN: Donald N. David, Brian A. Bloom, Jeremy A. Shure
335 Madison Avenue, Suite 2600
New York, NY 10017
Tel: 212-880-3800
Fax: 212-880-8965

EXHIBIT 4 PAGE 87