**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GREYSTONE CDE, LLC,<br><br>　　　　　　*Plaintiff-Counterclaim*<br>　　　　　　*Defendant,*<br>　- against –<br><br>SANTE FE POINTE, L.P.,<br>SANTE FE POINTE MANAGEMENT, LLC<br>RANT LLC, and<br>THEOTIS F. OLIPHANT,<br><br>　　　　　　*Defendants-Counterclaimants*<br>　- against -<br><br>GREYSTONE SERVICING CORPORATION, INC.,<br><br>　　　　　　*Additional Counterclaim*<br>　　　　　　*Defendant.* | Civil Case <u>No</u>:  07-CV.8377 (RPP) |

## DEFENDANTS-COUNTERCLAIMANTS' REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF MOTION TO TRANSFER VENUE

AKERMAN SENTERFITT LLP
*Attorneys for Defendants-Counterclaimants*
335 Madison Avenue, Suite 2600
New York, New York 10017
<u>Telephone</u>:  212.880.3800
<u>Facsimile</u>:   212.880.8965

*Of Counsel:*

Donald N. David (DD 5222)
Brian A. Bloom  (BB 5722)
Jeremy A. Shure (JS 0490)

{NY028846;5}

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT............................................................................................1

STATEMENT OF FACTS AND PROCEDURAL POSTURE .........................................1

ARGUMENT .........................................................................................................................3

| POINT I | A MOTION TO TRANSFER VENUE UNDER 28 U.S.C. §1404 HAS NOT BEEN WAIVED BY THE OLIPHANT PARTIES ....................3 |

| POINT II | GREYSTONE'S ARGUMENT THAT THE COUNTERCLAIM FAILS TO PROPERLY ALLEGE ALTER EGO IS IRRELEVANT FOR PURPOSES OF THIS TRANSFER VENUE MOTION ......................5 |

| POINT III | COUNTERCLAIM DEFENDANT GREYSTONE SERVICING HAS BEEN SERVED WITH A PROPERLY ISSUED SUMMONS AND THEREFORE THIS COURT HAS JURISDICTION OVER IT AND THE COUNTERCLAIMS AGAINST IT ............................................7 |

A.    A Summons Was Properly Issued by the Clerk of Court......................7

B.    Mr. Harnik Refused to Accept Service of the Summons On Behalf of Greystone Servicing ............................................................7

C.    The Summons was Properly Served on an Individual Who Represented Herself as Authorized by Greystone Servicing to Accept Service.................................................................................8

D.    The Summons has Also Been Served on the New York State Secretary of State, who has Been Designated as Greystone Servicing's Registered Agent...............................................................8

| POINT IV | THE OLIPHANT PARTIES WERE NOT REQUIRED TO SEEK LEAVE TO FILE THE COUNTERCLAIM AGAINST GREYSTONE SERVICING.........................................................................9 |

CONCLUSION ....................................................................................................................10

Schofield Declaration - Exhibit C

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.L. Williams & Ass'n, Inc. v D.R. Richardson & Ass'n,*
  98 F.R.D. 748 (N.D. Ga. 1983)..................................................................................... 10

*APA Excelsior III L.P. v. Premiere Technologies,*
  49 F. Supp. 2d 664 (S.D.N.Y. 1999) ............................................................................. 2

*Altman v. Liberty Equities Corp.,*
  322 F. Supp. 377 (S.D.N.Y. 1971) ............................................................................... 4

*Blane v. Am. Inventors Corp.,*
  934 F. Supp. 903 (M.D. Tenn. 1996) ........................................................................... 4

*Fashion Page v. Zurich Ins.,*
  50 N.Y.2d 265 (N.Y. 1980) .......................................................................................... 8

*Ferment-Acid Corp. v. Miles Labs,*
  153 F. Supp. 19 (S.D.N.Y. 1957) ................................................................................. 4

*Garcia v. Maersk, Inc.,*
  2005 WL 1492380 (E.D.N.Y. 2005)............................................................................. 8

*James v. Norfolk & Western Ry. Co.,*
  430 F. Supp. 1317(S.D. Ohio 1976) ............................................................................ 4

*Kolko v. Holiday Inns, Inc.,*
  672 F. Supp. 713 (S.D.N.Y. 1987) ............................................................................... 5

*Lennco Racing v. Arctco, Inc.,*
  953 F. Supp. 69 (W.D.N.Y. 1997) ............................................................................... 4

*M'baye v. World Boxing Ass'n,*
  429 F.Supp.2d 652 (S.D.N.Y. 2006)............................................................................ 8

*Montgomery Ward & Co. v. Anderson Motor Ser., Inc.,*
  399 F. Supp. 713 (W.D. Mo. 1971) ............................................................................. 4

*Mountain States Sports Inc. v. Sharman*
  353 F. Supp. 613 (D. Utah 1972)................................................................................ 10

{NY029004;1}

Schofield Declaration - Exhibit C

*Nat'l Union Fire Ins. v. Turtur,*
    743 F. Supp. 260 (S.D.N.Y. 1990) .................................................................. 2, 5

*Nieves v. Am. Airlines,*
    700 F. Supp 769 (S.D.N.Y. 1988) .................................................................. 2

*Northfield Ins. Co. v. Bender Shipbuilding & Repair Co.,*
    122 F.R.D. 30 (S.D. Ala. 1988) .................................................................. 10

*Old Republic Ins. v. Pacific Financial Services,*
    301 F.3d 54 (2d Cir. 2002) .................................................................. 8

*Pall Corp. v. PTI Technologies,*
    992 F. Supp. 196 (E.D.N.Y. 1998) .................................................................. 2

*Reinhard v. Dow Chem. Co.,*
    No. 07 Civ. 3641(RPP) 2007 WL 2324351 (S.D.N.Y. Aug. 13, 2007) .......... 2

*Silver v. Countrywide Realty, Inc.,*
    39 F.R.D. 596 (S.D.N.Y. 1966) .................................................................. 4

*Tadco Construction Corp. v. Peri Framework Sys., Inc.,*
    460 F.Supp.2d 408 (E.D.N.Y. 2006) .................................................................. 8

*Texwood Ltd. v. Gerber,*
    1985 WL 196 (S.D.N.Y. 1985) .................................................................. 9

*U.S. Banknote Corp. v. E. Bickel & Co. GmbH,*
    No. 92 CIV 6431 (RPP) 1993 WL 8165 (S.D.N.Y. Jan. 5, 1993) ................ 2


**State**

N.D. California Local Rule 7 - 9 .................................................................. 2


**Statutes**

28 U.S.C. § 1404 .................................................................. 1, 10

28 U.S.C. §1404(a) .................................................................. 1, 2, 3, 4, 5

28 U.S.C. §1404(c) .................................................................. 4

Fed.R.Civ.P. Rule 4 (a) .................................................................. 7

iii

Schofield Declaration - Exhibit C

Fed.R.Civ.P. Rule 4(m) ........................................................................................... 8

Fed.R.Civ.P. Rule 12 ........................................................................................... 2, 4

Fed.R.Civ.P. Rule 12(b)(3) ........................................................................................... 4

Fed.R.Civ.P. Rule 12(h) ........................................................................................... 2, 4, 5

Fed.R.Civ.P. Rule 12(h)(1) ........................................................................................... 4

Fed.R.Civ.P. Rule 13(h) ........................................................................................... 9

Fed.R.Civ.P. Rule 19 ........................................................................................... 9

Fed.R.Civ.P. Rule 20 ........................................................................................... 9

**Miscellaneous**

3 Moore's Federal Practice,
    ¶13.39 (2d ed. 1984) ........................................................................................... 9, 10

{NY029004;1}

Schofield Declaration - Exhibit C

## PRELIMINARY STATEMENT

Defendants-Counterclaimants SANTA FE POINTE, L.P. (erroneously sued as SANTE FE POINTE, L.P.), SANTA FE POINTE MANAGEMENT, LLC, RANT LLC (erroneously sued as SANTE FE POINTE MANAGEMENT, LLC), and THEOTIS F. OLIPHANT (collectively, the "Oliphant Parties") respectfully submit this reply memorandum of law in further support of their motion to transfer the within action to the United States District Court in and for the Northern District of California pursuant to 28 U.S.C. §1404 (the "Motion").

In short, there is presently an action pending before Judge Spero in the United States District Court in and for the Northern District of California between the *same parties* related to substantially the *same issues* that are at issue here (the "California Action"). Bringing this Motion has not been waived, service of process to Greystone Servicing, Inc. is not improper and most importantly, judicial economy dictates that the actions be consolidated in one venue. The Oliphant Parties respectfully request this Honorable Court to transfer this action to the Northern District of California for consolidation with the California Action.

## STATEMENT OF FACTS AND PROCEDURAL POSTURE

Strikingly absent from Greystone's opposition to the Motion is any substantive discussion of the spirit and intent of 28 U.S.C. §1404(a), the statute that supports this Motion. In their Memorandum of Points and Authorities, the Oliphant Parties cited extensive authority, including previous decisions from *this* Court, that support the well-recognized principle that a §1404(a) transfer motion is particularly appropriate where, as here, two actions are pending that raise the identical issues.

The "interests of justice" in such a circumstance dictate that to avoid duplicative litigation and expense, to allow the more efficient conduct of discovery, and to avoid inconsistent results, the matter be transferred to the Court that has affirmed it will litigate the matter—here the Northern District of California.[1] Discovery is well underway in the California Action, and the Court in Cali-

---

[1]    Although Greystone will attempt to argue that the California Action should be transferred to New York now that these cases are substantially similar in both fact pattern and claims/counterclaims pled, Greystone has already made that motion in California – and they lost. The California court decided to retain jurisdiction; and the California Action proceeds on its course. In denying Greystone's application to transfer the action to New York, the California Court held that "the forum selection clauses contained in the guaranties do not apply to this action and that [the Oliphant Parties] are entitled to the deference that is generally afforded a plaintiff's choice of forum." *See* Declaration of Donald N. David dated March 24, 2008 ("David Decl."), Exhibit "A", annexing a true and accurate copy of the order denying the

Schofield Declaration - Exhibit C

fornia has ordered Court-sponsored mediation before Mediator Peter W. Sherwood to be completed by the end of May.[2]

Greystone nowhere even attempts to discuss why the interests of justice mandate litigation of the same issues in two fora, nor does it discuss why this Court should allow the waste of money and resources that would result from such duplicative litigation. Indeed, Greystone's opposition papers do not even mention, must less attempt to distinguish, the numerous cases Defendants cite, including this Court's decision in *U.S. Banknote Corp. v. E. Bickel & Co. GmbH*, No. 92 CIV 6431 (RPP) 1993 WL 8165 (S.D.N.Y. Jan. 5, 1993), a case with strikingly similar facts and issues. *See* Motion, at 8-9.[3] Instead, Greystone resorts to confusing, illogical arguments that only divert the focus from the true §1404(a) interests-of-justice analysis.

<u>Waiver under Rule 12</u>. Citing two cases that involve Fed.R.Civ.P. Rule 12 motions to dismiss, Greystone argues the Oliphant Parties waived the right to make the present transfer venue motion because they previously moved the stay the case. The argument is a non-sequitur. The Fed.R.Civ.P. Rule 12 waiver provision, contained in Rule 12(h), is directed to the timing of defenses that must be raised by a Rule 12 motion to dismiss. It has no application to transfer venue motions under section 1404(a), which may be made at any time.

<u>Failure To Adequately Allege Alter Ego</u>. Greystone claims the Counterclaim does not properly allege that the Greystone entities were alter egos of one another. Aside from misreading the intent of the Counterclaim's allegations, Greystone's argument actually demonstrates why the trans-

---

transfer. Greystone blithely asserts that it intends to move for reconsideration of the California Court's prior order. Opp. At 2. Greystone ignores the Northern District of California Local Rule that requires it first to seek leave of the court, and to make an extraordinary showing of changed circumstances, to even lodge such a motion. N.D. Cal. Loc. Rule 7-9.

[2]    The scheduled mediation in California is a global settlement mediation which, if successful, would resolve both actions.

[3]    Greystone did not even attempt to distinguish the decisions in the within Motion, because to do so would mean that Greystone would be asking this Court to rule in a manner that is inconsistent with the precedent of this District and rule in a contrary manner to many of this Court's own previous decisions. *See U.S. Banknote Corp. v. E. Bickel & Co. GmbH*, No. 92 CIV 6431 (RPP) 1993 WL 8165 (S.D.N.Y. Jan. 5, 1993) (Patterson, J.) [Motion at 8-9]; *Reinhard v. Dow Chemical Co.*, No. 07 Civ. 3641(RPP) 2007 WL 2324351 (S.D.N.Y. Aug. 13, 2007) (Patterson, J.) [Motion, at 7]; *National Union Fire Ins. v. Turtur*, 743 F. Supp. 260 (S.D.N.Y. 1990) [Motion, at 9-10]. *See also APA Excelsior III L.P. v. Premiere Technologies*, 49 F. Supp. 2d 664 (S.D.N.Y. 1999) [Motion, at 10]; *Nieves v. American Airlines*, 700 F. Supp 769 (S.D.N.Y. 1988) [Motion, at 10]; *Pall Corp. v. PTI Technologies*, 992 F. Supp. 196 (E.D.N.Y. 1998) [Motion, at 10].

fer venue motion should be granted. The *California* Court presently has before it the Greystone entities' challenge to various allegations made in the California complaint (which contains the identical claims made in the Counterclaim here). To avoid possible inconsistent results, the interests of justice require that the appropriateness of the pleadings should be decided by that Court.

<u>Improper Service of Process</u>. Demonstrative of Greystone's gamesmanship and wasting of the parties' resources is Greystone's argument that the summons on Greystone Servicing Corporation, Inc. ("Greystone Servicing") was improperly served. It is outrageous that Mr. Harnik can somehow represent to this Court that he could act as principal counsel for Greystone Servicing for purposes of a settlement conference before this Court yet Mr. Harnik *refused* to accept service of the Counterclaim on behalf of Greystone Servicing.[4] Nonetheless, the Counterclaim was served with the Secretary of State within the requisite time frame.[5] As such, and absent a proper motion to quash service, this court has jurisdiction over Greystone Servicing and over the counterclaims asserted against it; Greystone's argument is moot and must fail as such.

<u>Failure To Obtain Leave To File Counterclaim</u> In a fourth quarter Hail Mary, and in contravention of this District's precedent, Greystone claims that the Oliphant Parties were required to obtain leave of the Court to file the Counterclaim. The courts in this District have no rule that requires leave of court in this situation.

## ARGUMENT

### I.
### A MOTION TO TRANSFER VENUE UNDER 28 U.S.C. §1404 HAS NOT BEEN WAIVED BY THE OLIPHANT PARTIES

Greystone's lead argument is that the Oliphant Parties, by their Motion to Stay, waived their right to seek a transfer of venue under 28 U.S.C. §1404(a). Although the argument is not altogether

---

[4]    In fact, Mr. Harnik stated that he "was not authorized to accept service" for Greystone Servicing.

[5]    Due to Mr. Harnik's refusal to accept service, the Oliphant Parties secured a licensed process server to serve the Summons and Counterclaim on Greystone Servicing. As is provided on the Return of Service Form filed with the Court, on March 7, 2008 at 3:23 p.m. in the lobby of 152 West 57th Street, New York, New York, Julius Thompson served the Answer with Affirmative Defenses and Counterclaims (along with other documents) upon Greystone Servicing, which service was accepted by a Ms. Christina Farina, an individual who represented herself to be the managing agent authorized to accept service. Assuming *arguendo* that Ms. Farina was not authorized to accept service on behalf of Greystone Servicing, the Oliphant Parties engaged another process server to serve the Secretary of State with the Summons and the Counterclaims (as well as the other related documents). Service on the New York Secretary of State was accomplished and completed on March 20, 2008 at 10:10 a.m.

Schofield Declaration - Exhibit C

clear, it appears Greystone attempts to invoke Rule 12(h)(1) of the Federal Rules against waiver. Rule 12(h)(1), however, governs Rule 12 motions to dismiss and has nothing to do with Defendants' present motion or with the previous Motion to Stay.

Fed.R.Civ.P. Rule 12(h)(1) states that if certain defenses, including the defense of "improper" venue, are not raised in an early Rule 12 motion to dismiss, they are waived. Here, Defendants are not moving to dismiss under Rule 12 for improper venue; rather, Defendants request the Court transfer venue under 28 U.S.C. §1404(a) -- "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

Regardless of whether a party has waived the right to move under Rule 12 to dismiss for *improper* venue, this does not preclude a motion to transfer venue under section 1404(c), which is not subject to the Rule 12(h) waiver provision. *Blane v. American Inventors Corp.*, 934 F. Supp. 903, 905-906 (M.D. Tenn. 1996)(section 1404(a) motion is not subject to Rule 12(h) waiver rules); *James v. Norfolk & Western Ry. Co.*, 430 F. Supp. 1317, 1319 n.1 (S.D. Ohio 1976) ("[a] motion to transfer venue under §1404(a) is not a Rule 12(b)(3) motion and is not governed by the waiver provisions of Rule 12(h)."); *Montgomery Ward & Co. v. Anderson Motor Service, Inc.*, 399 F. Supp. 713, 718 n.3 (W.D. Mo. 1971)(even if party has waived venue by answering on the merits, case may be transferred under section 1404(a)); *Ferment-Acid Corporation v. Miles Laboratories*, 153 F. Supp. 19, 20 (S.D.N.Y. 1957)(waiver of right to challenge venue does not foreclose section 1404(a) motion to transfer).[6]

As stated in *Lennco Racing v. Arctco, Inc.*, 953 F. Supp. 69, 70 n.1 (W.D.N.Y. 1997), "[a] Rule 12(b)(3) motion to dismiss for improper venue, which must be filed before the answer, is not the same as a motion to transfer venue, pursuant to 28 U.S.C. §1404(a). . . . A motion to transfer

---

[6]    The two cases Greystone cites do not stand for a different proposition. In *Silver v. Countrywide Realty, Inc.*, 39 F.R.D. 596 (S.D.N.Y. 1966), defendant moved under Fed.R.Civ.P. Rule 12 to dismiss on the ground of *forum non conveniens*. The Court held that defendant had waived the right later to move to dismiss for lack of *in personam* jurisdiction because Rule 12(h) required both dismissal motions to be made together. The Oliphant Parties, however, are not moving to dismiss under Rule 12; they are moving to transfer venue under 28 U.S.C. §1404(a). In *Altman v. Liberty Equities Corp.*, 322 F. Supp. 377, 379 (S.D.N.Y. 1971), the Court ruled that a defendant who participated in a §1404(a) motion to transfer could not later file a Rule 12 motion to dismiss for improper venue. Again, however, the Oliphant Parties are not moving to dismiss under Rule 12.

Schofield Declaration - Exhibit C

venue may be made at <u>any time</u>." *(citing, Kolko v. Holiday Inns, Inc.*, 672 F. Supp. 713, 716 (S.D.N.Y. 1987)(emphasis added).

The Oliphant Parties' Motion to Stay was denied, in large part, because the Court considered the complaint in the California Action and the complaint in this case to raise different issues. That changed with the filing of Defendants' Counterclaim here, which raise the precise issues being litigated in the California Action. This motion to transfer venue was filed at the earliest possible opportunity when the identity of issues became evident, and is brought under §1404(a) which is not governed by the waiver rules Greystone cites.

## II.
## GREYSTONE'S ARGUMENT THAT THE COUNTERCLAIM FAILS TO PROPERLY ALLEGE ALTER EGO IS IRRELEVANT FOR PURPOSES OF THIS TRANSFER VENUE MOTION

Greystone next argues that the Counterclaim fails to state a claim because "no effort has been made to differentiate the Greystone counterclaim defendants." Greystone says the Counterclaim does not allege the requisite specific facts to support the theory that the Greystone entities are the alter egos of one another. This argument misses the point of the transfer venue motion entirely. It does underscore why this matter should be litigated in only one forum where questions such as pleading challenges will be decided only once.

As Greystone points out, the allegations of the Oliphant Parties' Second Amended Complaint - which raises the same claims as the Counterclaim here - are being analyzed by the California court through *Greystone's* Rule 12 motion. That motion will be heard by the California court on <u>April 18, 2008</u>. One of the issues raised in that motion is whether the Oliphant Parties have appropriately separated the Greystone entities and identified the claims that are particular to each entity. Greystone now asks *this* Court to perform <u>the same task</u>, <u>duplicate that effort</u>, and possibly <u>render a result that will be at odds</u> with what will be done by the California court. That is precisely why the present motion to transfer should be granted, so as to "avoid[ ] duplicative litigation and inconsistent results, thereby eliminating unnecessary expense to the parties while at the same time serving the public interest." *National Union Fire Ins. v. Turtur*, 743 F. Supp. 260, 262-263 (S.D.N.Y. 1990).

Schofield Declaration - Exhibit C

In any event, Greystone improperly assumes the Counterclaims attempt to assert an "alter ego" theory at all. The Counterclaims here, and the complaint in the California action, both allege that Greystone Servicing entered into an agreement in September 2006 to underwrite and be the HUD interface for Plaintiffs in obtaining a HUD-insured loan. Because of Greystone Servicing's alleged negligence in timely performing that task, the Oliphant Parties faced the prospect of losing the Project and its tax-exempt bonds near the end of 2006. Greystone Servicing therefore offered a bridge loan that would be funded through an affiliate, Greystone CDE, LLC.

The Counterclaims assert, however, that the actions of Greystone Servicing in dealings with the HUD application were influenced and possibly dictated by the financial interests of the affiliated Greystone CDE in obtaining repayment on the bridge loan. When Greystone Servicing unilaterally pulled the HUD application in August 2007, for example, it is entirely unclear whether that was at the instance of Greystone CDE, the lender on the bridge financing, or whether Greystone Servicing was making a decision entirely independent of the financial interests of its affiliate.

One need go no further than the bridge loan default letter to see the problem of attempting to separate the actions of Greystone Servicing and its affiliate Greystone CDE. That letter (Exh. I to Greystone CDE's First Amended Complaint), dated August 21, 2007, purports to declare a default on the Greystone CDE bridge loan. Yet it bears the letterhead of Greystone Servicing, the supposed fiduciary who was contractually obligated to assist the Oliphant Parties in obtaining HUD-insured financing for the Project.

The relationship between the Greystone entities, and their entangled financial interests, is a matter of proof that will be subject to discovery -- and before a trier of fact. But it is not a basis for denying transfer to the Northern District of California. Indeed, Greystone's argument only illustrates why the interests of justice (and judicial economy) requires the transfer to the Northern District of California, where all issues—including the efficacy of the pleadings—should be decided but once.

Schofield Declaration - Exhibit C

## III.
### COUNTERCLAIM DEFENDANT GREYSTONE SERVICING HAS BEEN SERVED WITH A PROPERLY ISSUED SUMMONS AND THEREFORE THIS COURT HAS JURISDICTION OVER IT AND THE COUNTERCLAIMS AGAINST IT

Demonstrative of Greystone's gamesmanship is its argument that service of the Summons and Counterclaim on Greystone Servicing was procedurally defective.  The Counterclaim was served on an individual at Greystone's office who held herself out as agent of Greystone Servicing, and the Summons was served on the Secretary of State within the requisite time frame. As such, this court has jurisdiction over Greystone Servicing and over the counterclaims asserted against it; Greystone's argument is moot and must fail as such.

**A.   A Summons Was Properly Issued by the Clerk of Court.**

Fed.R.Civ.P. Rule 4 (a) provides that "[t]he summons shall be signed by the clerk, bear the seal of the court, identify the court and the parties, be directed to the defendant, and state the name and address of the plaintiff's attorney or, if unrepresented, of the plaintiff."  In this case, the Clerk of the Court properly issued a Summons to Greystone Servicing on March 5, 2008; (i) the Summons identified the Court and the parties, (ii) was directed to Greystone Servicing Corporation, Inc. at its place of business within the judicial district, (iii) identified Defendants-Counterclaimants' attorney, and (iv) stated the time for answering the Counterclaim.

**B.   Mr. Harnik Refused to Accept Service of the Summons On Behalf of Greystone Servicing**

On multiple occasions, by telephone call, email, and letter, counsel for the Oliphant Parties asked Mr. Harnik if he was authorized to accept service on behalf of Greystone Servicing.  This request seems more than reasonable in light of Mr. Harnik's representations to this Court on February 25, 2008 that this Court should allow him to attend the proposed settlement conference *on behalf of both* Greystone CDE and Greystone Servicing. *See* Exh. "B" to David Decl.  Mr. Harnik instead refused to accept multiple overtures from the Oliphant Parties' counsel to accept service. *See* David Decl., Exhs. "C" (March 3, 2008 email request from Jeremy A. Shure, Esq. to Stephen Harnik, to which there was no response); and "D" (March 6, 2008 Letter from Brian A. Bloom, Esq. to Stephen Harnik, to which there was no response).

{NY028846;5}                              7

**C.    The Summons was Properly Served on an Individual Who Represented Herself as Authorized by Greystone Servicing to Accept Service**

Due to Mr. Harnik's outright refusal to accept service on behalf of Greystone Servicing, the Oliphant Parties secured a licensed process server to serve the Summons and Counterclaim on Greystone Servicing.[7] As is attested to in the sworn statement of service (under penalty of perjury) of Julius Thompson,[8] a licensed process server, Mr. Thompson traveled to 152 West 57th Street, New York, New York to the offices of Greystone Servicing with the intention of serving that entity with the Summons and Counterclaim. Upon his arrival to the building, Mr. Thompson was not allowed to proceed past lobby security. Ms. Christina Farina, an individual who represented that she was authorized to accept service on behalf of Greystone Servicing, came down to the lobby and accepted the papers. Mr. Thompson's belief that Ms. Farina was authorized pursuant to her representation was reasonable. *Fashion Page v. Zurich Ins.*, 50 N.Y.2d 265 (N.Y. 1980).[9, 10]

**D.    The Summons has Also Been Served on the New York State Secretary of State, who has Been Designated as Greystone Servicing's Registered Agent.**

An additional Summons and Counterclaim was served on the New York Secretary of State to insure that service was completed within the timeframe permitted by Fed.R.Civ.P. Rule 4(m). Service on the New York Secretary of State was completed on March 20, 2008. *See*, Affidavit of Service of Daniel Miller dated March 21, 2008, annexed as Exh. "F" to the David Decl. Fed.R.Civ.P. Rule 4(m) provides for one hundred and twenty (120) days for a plaintiff/claimant to

---

[7]    The Summons was served on Greystone Servicing at Greystone's New York Office. According to Mr. Harnick's letter to this Court on February 25, 2008, "[T]his action, as well as the California action, is being supervised and directed by Greystone's New York office to which its CA counsel and I regularly report."

[8]    *See* Exh. "E" to the David Decl. (Returned Summons In A Civil Case, dated March 5, 2008, returned to the Clerk of Court and filed on March 12, 2008.)

[9]    "[W]hen the corporation is regularly doing business in the state, it generally cannot be heard to complain that the summons was delivered to the wrong person when the process server has gone to its offices, made proper inquiry of the defendant's own employees, and delivered the summons according to their directions." *Fashion*, 50 N.Y.2d at 273.

[10]    *Old Republic Ins. v. Pacific Financial Services*, 301 F.3d 54, 57 (2d Cir. 2002) ("As long as the process server's reliance on corporate personnel is reasonable, the defendant may not later complaint that it lacked notice even if the complaint was mistakenly delivered to a person who was not authorized to accept service."); *Tadco Construction Corp. v. Peri Framework Sys., Inc.*, 460 F. Supp. 2d 408, 412 (E.D.N.Y. 2006) ("Courts within the Second Circuit have adopted this broadening approach."); *M'baye v. World Boxing Assn*, 429 F.Supp.2d 652, 659 (S.D.N.Y. 2006) (citing *Fashion* with approval); *Garcia v. Maersk, Inc.*, 2005 WL 1492380, *2 (E.D.N.Y. 2005) (citing *Fashion* with approval and stating, "In tendering service, a process server may rely upon a corporation's employees to identify individuals authorized to accept service.").

Schofield Declaration - Exhibit C

serve a summons on a defendant/counterclaim defendant. Here, the Oliphant Parties have served Greystone Servicing with the Summons and Counterclaim within the requisite time period. As such, this court has jurisdiction over Greystone Servicing and over the counterclaims asserted against Greystone (including Greystone Servicing).

**IV.**

**THE OLIPHANT PARTIES WERE NOT REQUIRED TO SEEK LEAVE
TO FILE THE COUNTERCLAIM AGAINST GREYSTONE SERVICING**

Greystone cites no authority to support its proposition that leave of court is required for the addition of defendants on a counterclaim, and we know of none. There is no rule, either Federal or Local, that *requires* a party seek leave of the court to join a previous non-party as a counterclaim defendant. Further, Greystone cannot cite to a single case in this District to support its proposition a defendant *must* seek leave of the court to join a previous non-party as a counterclaim defendant. *See Texwood Ltd. v. Gerber*, 1985 WL 196, *2 (S.D.N.Y. 1985) (stating that "the additional counter-claim defendants cite no authority supporting the proposition that leave of court is required for the addition of defendants on a counterclaim, *and we know of none.*") (emphasis supplied).

Greystone's assertion that Rule 13(h) does not apply in the current circumstances under Rules 19 and 20 is unsubstantiated or cannot be substantiated. *See* Opposition at 8. Fed.R.Civ.P. Rule 13(h) provides that "[p]ersons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20." *Neither Rule 19 nor Rule 20 requires advance leave of Court for joinder of parties*. Moore correctly states that because "a plaintiff in his original complaint does not require leave of court to name additional parties, it may be implied that the committee intended that leave of court is not necessary [to do so by counterclaim]." 3 Moore's Federal Practice ¶13.39, at 13-239 n.27 (2d ed. 1984).[11]

---

[11]    In his treatise, Professor Moore makes the following observation and argument: "[u]nder the 1966 revision of Rule 13(h), it is not clear whether leave of the court must be obtained before a defendant can bring in new parties as additional defendants to a counterclaim. Former Rule 13(h) inferred that such leave was necessary since it stated 'the court shall order them to be brought in...' However, this language was omitted in favor of the present provision that 'persons . . . may be made parties . . . in accordance with provisions of Rules 19 and 20.' Good arguments can, there-fore, be advanced that leave of court is no longer necessary if the new parties are being brought in on a counterclaim which is raised in the original answer." 3 J. Moore, Moore's Federal Practice, 1 3.39 (2d ed. 1987).

This Court is respectfully referred to *Northfield Insurance Co. v. Bender Shipbuilding & Repair Co.*, 122 F.R.D. 30 (S.D. Ala. 1988), a case on all-fours which held that leave of court is not required to join a previous nonparty as a counterclaim defendant. The two cases cited by Greystone, both of which pre-date and are distinguished by *Northfield*, do not stand for a different proposition. The *Mountain States Sports Inc. v. Sharman* court did not hold that the Federal Rules of Civil Procedure *require* a motion for leave to join; rather, the court merely noted that "the general practice* apparently continues to contemplate an order. 353 F. Supp. 613, 618 (D. Utah 1972). The question for the Court is not to determine the *general practice*, but rather whether the rules *require* such a motion. *See Northfield*, 122 F.R.D. at 32. Similarly, in *A.L. Williams & Assoc., Inc. v D.R. Richardson & Assoc.*, the court simply cited *Mountain States Sports* and the cases cited by *Mountain States Sports*, and without discussion dismissed two would-be counterclaim defendants. 98 F.R.D. 748 (N.D. Ga. 1983); *see also Northfield*, 122 F.R.D. at 32-33. Greystone's attempt to hold the Oliphant Parties to a non-existent rule or precedent is simply to no avail.

## CONCLUSION

For the foregoing reasons and for the reasons detailed in Defendants-Counterclaimants' Motion, the Oliphant Parties respectfully request an order, pursuant to 28 U.S.C. § 1404, transferring the within litigation to the United States District Court for the Northern District of California, declaring Plaintiff's cross motion to dismiss and for summary judgment moot and for such other and further relief as this Honorable Court deems just and proper under the circumstances.

Dated: New York, New York
March 24, 2008

AKERMAN SENTERFITT LLP
*Attorneys for Defendants-Counterclaimants*

By: _____
Donald N. David (DD 5222)
Brian A. Bloom (BB 5722)
Jeremy A. Shure (JS 0490)

TO:    Stephen M. Harnik, Esq.
Harnik Wilker & Finkelstein LLP
*Attorneys for Plaintiff-Counterclaim Defendant and Additional Counterclaim-defendant Greystone CDE, LLC and Greystone Servicing Corporation, Inc.*
645 Fifth Avenue, 7th Floor
New York, New York 10022-5937

{NY028846;5}                    10

Schofield Declaration - Exhibit C

**APPENDIX OF UNREPORTED CASES CITED IN
DEFENDANTS-COUNTERCLAIMANTS' REPLY
MEMORANDUM IN FURTHER SUPPORT OF THE
OLIPHANT PARTIES' MOTION TO TRANSFER**

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1492380 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

C
Garcia v. Maersk, Inc.
E.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Francisco GARCIA, Plaintiff,
v.
MAERSK, INC., Aktieselskabet Dampskibsselska-
bet Svendborg, and Dampskibsselskabet AF 1912,
Aktieselskabet, Defendants
Maersk, Inc., Aktieselskabet Dampskibsselskabet
Svendborg, and Dampskibsselskabet AF 1912, Ak-
tieselskabet, Third-Party Plaintiffs
v.
MTC Transportation Corp. and 716 Corp., d/b/a
MTC Transportation Co., Third-Party Defendants.
No. 03-CV-5697 FB RML.

June 24, 2005.

Stephen B. Roberts, Esq., Tabak, Mellusi & Shisha,
New York, NY, for Plaintiff.
Lawrence J. Kahn, Esq., Freehill Hogan & Mahar,
LLP, New York, NY, for Defendants/Third-Party
Plaintiffs.
Mark L. Levenson, Esq., Cheven Keely & Hatzis,
New York, NY, for Third-Party Defendants.

*MEMORANDUM AND ORDER*

BLOCK, District Judge.
*1 Third-party defendants MTC Transportation
Corporation and 716 Corporation (collectively
"MTC") move to vacate a default judgment entered
against them on August 26, 2004.[FN1] They contend
(1) that personal jurisdiction is lacking because of
improper service of process; alternatively, (2) that
they have a meritorious defense. For the reasons
that follow, the Court denies the motion.

> FN1. The difference between MTC Trans-
> portation Corporation and 716 Corporation
> is not apparent from the record. In their
> moving papers, however, they refer to

themselves collectively as "MTC Corp ."
and draw no distinction between the two
corporations. *See* [MTC's] Aff. Supp.
[Mot.]; Mem. L. [Supp. Mot.]. Further-
more, they share the same corporate of-
fices and at least one corporate officer. *See*
[MTC's] Aff. Supp. [Mot.] at ¶ 12
(referring to one individual, Mike Farino
("Farino"), as "the Vice President of MTC
Corp."). Accordingly, the Court treats the
two corporations as a single entity for pur-
poses of this decision.

I.

Defendants/third-party plaintiffs Maersk, Inc., Ak-
tieselskabet Dampskibsselskabet Svendborg and
Dampskibsselskabet Af 1912, Aktieselskabet
Maersk (collectively "Maersk") are Danish com-
panies engaged in a range of activities worldwide,
including shipping. MTC is a trucking company
that is incorporated in and has its principal place of
business in New York. On March 7, 2003, MTC
took possession of a Maersk shipping container at
the Port of Newark. On March 13, 2003, plaintiff
Francisco Garcia ("Garcia"), an MTC employee,
was allegedly injured by the door of that container.

In October 2003, Garcia commenced a lawsuit
against Maersk in New York Supreme Court, Kings
County, seeking over $1 million in damages for his
alleged injuries. Maersk removed to this Court and,
on May 5, 2004, filed a third-party complaint
against Maersk seeking a declaration that "MTC and
its insurers are contractually obligated to defend,
indemnify and hold [Maersk] harmless for the
costs, disbursements, counsel fees and other ex-
penses incurred in the defense of this action."Third
Party Compl. ¶ 13. Maersk based its claim on a
contract between the parties, pursuant to which MTC
agrees to defend, hold harmless and fully indemnify
[Maersk] against any and all claims, suit, loss, dam-
age, or liability, for bodily injury, death and/or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05454-MMC    Document 56-5    Filed 04/18/2008    Page 18 of 37

Page 3 of 11

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1492380 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

property damage (including reasonable attorneys fees and costs incurred in the enforcement of this agreement) arising out of or relating to [MTC's]: Use or maintenance of the equipment during an interchange period; the performance of this agreement; and/or presence on the facility operator's premises.

Uniform Intermodal Interchange and Facilities Access Agreement ("Agreement") § F. (attached as Ex. 3 to Third Party Compl.). The Agreement also requires MTC to procure liability insurance naming Maersk as an additional insured. *See id.* The Agreement further provides that Maryland law shall govern its "validity, construction, enforcement and interpretation[.]" *See id.* § G.

Maersk hired a professional process server, United Process Service, Inc. ("United"), to serve its summons and third-party complaint on MTC. On May 28, 2004, Matthew C. Roth ("Roth"), one of United's licensed process servers, went to MTC's corporate offices; in his affidavits of service, Roth noted that the papers were accepted there by an individual who identified himself as Joe.[FN2] The affidavits of service further noted that the "person spoken to refused to state true first and/or last names"; accordingly, he was identified therein as "Joe 'Smith[.]' " Affs. of Serv. (attached as Exhibit B to Maersk's Aff. Opp'n Mot.). In a separate affidavit submitted in opposition to MTC's motion, Roth explained that "[i]n my experience, it is not unusual for a person accepting service of process to refuse to give his full name or his last name" and that in such circumstances, Roth "use[s] common names like 'Smith' and 'Doe' on the affidavit of service." Roth Aff. ¶ 7 (attached as Exhibit C to Maerk's Aff. Opp'n Mot.). The affidavits of service included a description of "Smith" as being approximately 40 years old, 6 feet tall, and 235 pounds. They also described "Smith" as being a "general agent[.]" Affs. of Serv. In his affidavit submitted in opposition to MTC's motion, Roth explained that he

FN2. Roth executed separate affidavits of service for MTC Transportation Corpora-

tion and 716 Corporation.

*2 asked whether the person to whom I was speaking was authorized to receive and accept the papers. As the affidavits [of service] confirm, said person replied in the affirmative, and I thereupon served both sets of Third-Party Summons and Their-Party Complaints on said individual.... It has always been my custom and practice to identify ... a person who states that he or she is authorized to accept service and thereafter accepts the service as a "general agent." For this reason, my affidavit[s] of service identified Joe "Smith" as a "general agent." Roth Aff. ¶ 7-8.

In support of its motion, MTC submitted an affidavit of its vice president, Farino. He attested that "No Joe 'Smith' works at MTC[.]" Farino Aff. ¶ 3 (attached to [MTC's] Aff. Supp. [Mot.] as Ex. H).

Maersk alleges that on June 10, 2004, Maersk's counsel received a telephone call from an individual at MTC, who confirmed that the papers served by Roth were being forwarded to its insurer. MTC does not contest that allegation. Neither MTC nor its insurer timely interposed an answer, which was due on June 19, 2004. On July 14, 2004, Maersk filed an application for a clerk's certificate of default, copies of which application were mailed to MTC's offices.[FN3] The certificate was issued on August 17, 2004. On August 19, 2004, Maersk applied to the Court for a default judgment, again mailing copies to MTC's offices. The application was granted on August 25, 2004. MTC did not take any action in this matter until September 22, 2004, when its attorney advised the Court that he intended to file the motion now before the Court.

FN3. When a party has "failed to plead or otherwise defend" an action, the clerk "shall enter the party's default." Fed.R.Civ.P. 55(a). Local Civ. R. 55.1 allows a party to apply for a certificate of default pursuant to Fed.R.Civ.P. 55(a). Following entry of a clerk's certificate of default, a party may "apply to the court"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

https://findprint.westlaw.com/print/printstream.aspx?rs=IFP2.92&prft=HTMLE&fn=_top...    3/24/2008
Schofield Declaration - Exhibit C

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 1492380 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

for entry of a "judgment by default."
Fed.R.Civ.P. 55(b)(2); *see also* Local Civ.
R. 55.2(b).

## II.

### A. Service of Process

A defendant may move to set aside a default judg-
ment on the ground that the "judgment is void."
Fed.R.Civ.P. 60(b)(4). A judgment is void if
entered against a party over whom the court lacks
personal jurisdiction. *See Peralta v. Heights Med.
Ctr., Inc.,* 485 U.S. 80, 84-87 (1988); *Velez v. Vas-
sallo,* 203 F.Supp .2d 312, 317-18 (S.D.N.Y.2002).
In challenging personal jurisdiction pursuant to
Rule 60(b)(4), a defendant that had notice of the
proceedings bears the burden of establishing that
service was improper. *See CSC Holdings, Inc. v.
Fung,* 349 F.Supp.2d 613, 616 (E.D.N.Y.2004);
*Velez* 203 F.Supp.2d at 324 (S.D.N.Y.2002).

Under the Federal Rules of Civil Procedure, service
upon a corporation "may be effected in any judicial
district of the United States ... pursuant to the law
of the state in which the district court is
located."Fed.R.Civ.P. 4(e)(1), 4(h)(1)."Under the
laws of New York, service on a corporation may be
effected by tendering the summons to, *inter alia,* a
corporate director, officer, or managing or general
agent."*Old Republic Ins. Co. v. Pacific Fin. Servs.,*
301 F.3d 54, 57 (2d Cir.2002) (citing N.Y. C.P.L.R.
§ 311(a)(1)). In tendering service, a process server
may rely upon a corporation's employees to identify
individuals authorized to accept service. *See id .*As
long as the process server's reliance on corporate
personnel is reasonable, "the defendant may not
later complain" that it was not properly served
"even if the complaint was mistakenly delivered to
a person who was not authorized to accept
service."*Id.; see also Fashion Page, Ltd. v Zurich
Ins. Co.,* 406 N.E.2d 747, 752 (N.Y.1980) ("when
the corporation is regularly doing business in the
State, it generally cannot be heard to complain that
the summons was delivered to the wrong person

when the process server has gone to its offices,
made proper inquiry of the defendant's own em-
ployees, and delivered the summons according to
their directions.").

**\*3** A process server's affidavit of service
"establishes a prima facie case of the account of the
method of service, and thus, in the absence of con-
trary facts, [courts] presume that [the defendant]
was properly served with the complaint."*Old Re-
public,* 301 F.3d at 57. A defendant's sworn denial
of receipt of service "rebuts the presumption of
proper service established by the process server's
affidavit    and    necessitates    an    evidentiary
hearing."*Id.* No evidentiary hearing is required,
however, "where the defendant fails to 'swear to
specific facts to rebut the statements in the process
server's affidavits.' " *Id.* at 58 (quoting *Simonds v.
Grobman,* 716 N.Y.S.2d 692, 693 (2000)).

Roth's affidavits of service establish a prima facie
case that MTC was properly served with Maersk's
third-party complaint. As noted, Roth attested that
he inquired of Joe "Smith" whether he was author-
ized to accept service on behalf of MTC and re-
ceived an affirmative response. It was, therefore,
reasonable for him to rely on that response and de-
liver the summons and third-party complaint to
"Smith". In an effort to rebut the presumption of
proper service, MTC offered Farino's Affidavit,
which stated that "No Joe 'Smith' works at MTC."
Farino did not, however, attest that no one by the
name of Joe or meeting the physical description
contained in the affidavits of service works at
MTC. Nor did Farino offer any specific facts to re-
but Roth's statements that such an individual identi-
fied himself as being authorized to accept service
on behalf of MTC. Thus, MTC has failed to rebut
the presumption of valid service created by Roth's
affidavit, no evidentiary hearing is required, and the
Court will not vacate the default judgment as being
void for lack of personal jurisdiction.

### B. Meritorious Defense

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1492380 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

The Second Circuit has established three criteria to be considered in deciding whether to vacate a default judgment: "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented."*Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 96 (2d Cir.1993). As noted, MTC focuses its argument on the last of these criteria. In particular, it argues that it has a meritorious defense because Garcia's injuries were the result of Maersk's negligence and the Agreement's indemnification provision does not express an intent to indemnify Maersk against its own negligence. Whether a defense is meritorious "is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, if proven at trial, would constitute a complete defense."*Enron,* 10 F.3d at 98.

In the recent case of *Lopez v. Louro,* 2002 WL 91273 (S.D.N.Y. Jan. 23, 2002), the Southern District of New York analyzed the precise contractual indemnification language at issue here and held that it obligated a trucking company to indemnify the owner of a container "even for its own negligence." *Id.* at *2. Like the contract at issue here, the contract in *Lopez* was governed by Maryland law. Under Maryland law, "a contract will not be construed to indemnify a party for its own negligence absent an express provision to that effect."*Id.* at *1 (citing *Mass Transit Admin. v. CSX Transportation, Inc.,* 708 A.2d 298 (1998) ("*CSX*")). In *CSX*, the Maryland Supreme Court construed an agreement "to indemnify, save harmless, and defend CSXT from any and all casualty losses, claims, suits, damages or liability of every kind arising out of the Contract Service under this Agreement," and found that "[i]n 'unequivocal terms,' the indemnification in the instant matter includes the liability of CSXT for its own acts or omissions."708 A.2d at 310. Analyzing the contract at issue in *Lopez* in accordance with *CSX*, the Southern District reasoned that *4 there is no reason to believe that the Maryland Supreme Court would reach a different conclusion with respect to the contract at issue here. Among other things, the contract at issue uses the same broad "arising out of" language that was at issue in *CSX*. It also contains a provision obligating the indemnitor to obtain liability insurance, which the court in *CSX* found indicative of an intent to extend the indemnity to cover negligence of the indemnitee.

*Lopez,* 2002 WL 91273, at *1.

As noted, the indemnification provision at issue here required MTC to "defend, hold harmless and fully indemnify" Maersk against "any and all claims, suit, loss, damage, or liability, for bodily injury, death and/or property damage arising out of or relating to" MTC's use or maintenance of the container. Agreement § F. Further, it obligated MTC to obtain liability insurance naming Maersk as an additional insured. Thus, the reasoning of the Maryland Supreme Court compels the conclusion that, under Maryland law, MTC is obligated to indemnify Maersk, even for Maersk's own negligence; therefore, MTC lacks a meritorious defense to Maersk's indemnification action. Because MTC lacks a meritorious defense, the Court need not consider the other two *Enron* criteria. See *Silverman v. RTV Communications Group, Inc.,* 2002 WL 483421, at *4 (S.D.N.Y. Mar. 28, 2002)("Because [defendant] fails to present a meritorious defense, this Court need not consider the remaining two factors governing the analysis"); *see also Sony Corp. v. Elm State Elec.,* 800 F.2d 317 (2d Cir.1986) (affirming denial of motion to vacate default solely on the basis that defendant failed to demonstrate a meritorious defense).

**CONCLUSION**

MTC's motion to vacate the default judgment is denied.

**SO ORDERED.**

E.D.N.Y.,2005.
Garcia v. Maersk, Inc.
Not Reported in F.Supp.2d, 2005 WL 1492380

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1492380 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

(E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                    Page 1
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

C
Reinhard v. Dow Chemical Co.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
J. Pedro REINHARD, Plaintiff,
v.
The DOW CHEMICAL CO., and Andrew N. Liver-
is, Defendants.
No. 07 Civ. 3641(RPP).

Aug. 13, 2007.

Kramer, Levin, Naftalis & Frankel LLP, Attn: Gary
P. Naftalis, New York, NY, for Plaintiff, J. Pedro
Reinhard.
Kirkland & Ellis LLP, Attn: David M. Bernick,
New York, NY, for Defendants, Dow Chemical
Co., and Andrew N. Liveris.

**OPINION and ORDER**

ROBERT P. PATTERSON, JR., U.S.D.J.
**\*1** Defendant The Dow Chemical Company
("Dow") moves to transfer pursuant to 28 U.S.C. §
1404(a). Defendant Andrew N. Liveris ("Liveris")
moves to dismiss pursuant to Fed. R. Civ. P.
12(b)(3), to transfer pursuant to 28 U.S.C. §
1406(a), or in the alternative, to join Defendant
Dow's motion to transfer under 28 U.S.C. § 1404(a).

For the reasons that follow, Dow's and Liveris' mo-
tions to transfer under § 1404(a) are granted. Liver-
is' motion to dismiss under Fed R. Civ. P. 12(b)(3)
or transfer under § 1406(a) is denied. The action is
transferred to the Eastern District of Michigan.

**BACKGROUND**

**A. Factual Background**

**1. The Parties**

Plaintiff, J. Pedro Reinhard ("Reinhard"), was an
employee of Dow for thirty-seven years. Reinhard
became Chief Financial Officer ("CFO") and a
member of the Board of Directors ("the Board") in
1995. Although he retired as CFO and Executive
Vice President in 2005, he remained an employee
director on the Board until his termination in April,
2007. (Compl., dated May 8, 2007, ¶ 14.) Reinhard
is a citizen of Brazil, a lawful permanent resident of
the United States, and is domiciled in Florida. (*Id.* ¶
9.)

Defendant, The Dow Chemical Company, is a
Delaware corporation that has its principal place of
business in Michigan and engages in continuous
activities in New York. (*Id.* ¶ 10.)Defendant, Liver-
is, is the Chairman, CEO, and President of Dow; he
is a citizen of Australia, a lawful permanent resid-
ent of the United States, and is domiciled in
Michigan. (*Id.* ¶ 11.)

**2. Rumors about a Dow Acquisition and Rein-
hard's Termination**

According to Defendants, rumors about a Dow ac-
quisition began with a report in the *Financial Times*
on January 18, 2007, which stated that a group of
private equity firms were "working on a break-up
bid for Dow."(Dow Countercl., dated May 29,
2007, ¶ 10 .) On February 25, 2007, the *Sunday Ex-
press,* a United Kingdom newspaper, reported that a
group of "global investors and American private
equity giants were close to making a bid for
Dow."(Compl.¶ 22.) Reports relating to such a bid
were also published in the *Evening Standard* on
March 12, 2007. (Dow Countercl.¶ 15.) On April
8, 2007, the *Sunday Express* reported that a group
of Middle East investors and a group of private
equity firms were potentially "days away" from a
bid. (*Id.* ¶ 20.)

Dow's response to these early reports rumors was to
make "inquiries with the investment banking and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                         Page 2
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

financial community, to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors."(*Id.* ¶ 11.)[FN1]Additionally, Dow had board meetings to discuss the reports, which were attended by Reinhard, at its headquarters in Midland, Michigan on February 14 and March 16, 2007. (*Id.* at ¶¶ 12, 17.)After the second meeting, the company issued a press release stating that Dow had not had any discussions about a possible leveraged buyout. (*See id.* ¶ 23.)

> FN1. Dow "retained [the law firm] Wachtell, Lipton ... to advise the company concerning potential reactions to a takeover bid."(Transcript of Oral Argument, dated August 2, 2007 ("8/2 Tr .") at 13.)

**\*2** On April 9, 2007, James Dimon ("Dimon") the Chief Executive Officer of J.P. Morgan Chase ("Morgan"),[FN2] is alleged to have told Liveris at a dinner meeting in Michigan that a London affiliate was working on an acquisition of Dow on behalf of Middle East investors. (*Id.* ¶ 24.)Dow contends that on April 10, 2007, Dimon called Liveris and stated that Reinhard and Romeo Kreinberg ("Kreinberg"), another Dow executive, were engaged in discussions about a Dow acquisition. (*Id.* ¶ 25.)[FN3]On the same day, Dow's outside counsel, James Saverese, spoke with Dimon and Liveris on a conference call to confirm the statements Dimon had made to Liveris. (*See* 8/2 Tr. at 14.)

> FN2. Dow refers to its source as the "Bank's CEO," never naming James Dimon. (*See generally* Dow Ans.; Dow Countercl.) Reinhard states, however, that it is "alleged by Mr. Kreinberg in his complaint, and as is undisputed by Dow, the CEO was James Dimon, of Morgan Chase."(Pl.'s Opp'n., dated July 6, 2007 at 4; *see* Affidavit of Duncan Stuart, dated May 29, 2007 ("Stuart Aff.") Ex. C (Kreinberg Compl.) ¶ 2.)

> FN3. Reinhard denies participation in any meetings with respect to takeovers or ac-

quisitions of Dow. (Compl.¶ 35.) He alleges that on July 27, 2006, Dow lowered its earnings estimate for the year, its shares fell by more than ten percent, and "thereafter, rumors began to circulate that Dow might be a target for a buyout or other effort ...." (*Id.* ¶ 21.)

On April 11, 2007, the first day of a previously scheduled board meeting, [FN] Liveris addressed the allegations about Reinhard's and Kreinberg's alleged third party discussions regarding a bid for Dow. The Board discussed the extent of the Dow employees' involvement, the credibility of the witness, and what steps to take. (Dow Countercl. ¶ 27.) The Board unanimously decided that the information was credible and that Reinhard and Kreinberg should be terminated. (*Id.* ¶¶ 27-28.)

> FN4. Reinhard was absent from this meeting, having previously informed Liveris that he would not be able to attend for unrelated reasons. (*See* Dow Countercl. ¶ 29.)

At 7:00 AM, on April 12, 2007, prior to the Board meeting scheduled for that day, Liveris met with Reinhard in his office in Midland, Michigan. (Compl. ¶ 25.) Also present at this meeting were Charles Kalil (General Counsel to Dow), Paul Stern, Arnold Allemang (a Board member), and Martin Lipton of Wachtell, Lipton. (*See* Dow Countercl. ¶ 28.) At the meeting, Liveris told Reinhard that he had "received information" about Reinhard's participation in discussions about an acquisition of Dow. Liveris informed Reinhard that, based on this information, the company had concluded that Reinhard had engaged in grave misconduct and breaches of his fiduciary duty. (Compl.¶ 25.) Reinhard alleges, and Dow denies, that Liveris offered Reinhard his financial benefits if he resigned immediately. (*Id.* ¶ 25; Dow Ans. ¶ 25.) Reinhard denied breaching his fiduciary duties and refused to resign; Dow terminated Reinhard that day. (Compl.¶ 26.)

**3. Reinhard's Termination Becomes Public**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Schofield Declaration - Exhibit C

Slip Copy                                                                                    Page 3
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

That same day, Dow issued a press release, in Michigan, which stated that Reinhard and Kreinberg had been terminated because they "engaged in business activity that was highly inappropriate and a clear violation of Dow's Code of Business Conduct."[FN5](Id. ¶ 29.)Dow also published on its website "An Open Letter to Our Valued Customers" and mailed a "Supplement to Notice of the Annual Meeting and Proxy Statement,"[FN6] addressing both the alleged actions of Reinhard and his termination. (Id. ¶¶ 32, 36.)Reinhard released a statement on April 16, 2007 denying any involvement in a Dow acquisition.(Id. ¶ 35.)

> FN5. The press release was also published on Dow's website. (Compl.¶ 31.)

> FN6. The "Supplement to Notice of the Annual Meeting and Proxy Statement" had the following return address: The Dow Chemical Company, c/o The Bank of New York, PO Box 11002, New York, N.Y. 10286-1002. (Compl.¶ 36.)

Reports of Reinhard's and Kreinberg's termination were published in various news sources, including: *Saginaw News, The Wall Street Journal, The New York Times,* and *The Financial Times.*(Id. ¶¶ 31, 33.)An article in *The Wall Street Journal* quoted Dow spokesperson, Christopher Huntley, stating that Reinhard's alleged third party discussions were conducted during "multiple meetings in multiple months in multiple locations [and] with a number of different parties."(Id. ¶ 33.)

**4. Events Preceding the Instant Action**

*3 Dow and Reinhard engaged in ineffective settlement talks for three weeks after Reinhard's termination. (Declaration of Gary P. Naftalis, dated July 5, 2007 ("Naftalis Decl.") ¶¶ 2-3.) After receiving a settlement proposal from Dow on May 7, 2007, Dow and Reinhard agreed to a conference call on May 8, 2007 at 11 a.m. to further discuss the proposal. (Id. ¶ 3.) On May 8, 2007, Dow cancelled the conference call and filed suit. (Id. ¶ 4.)

On May 8, 2007, at 8:30 a.m., Dow filed an action for breach of contract, breach of fiduciary duty, and declaratory judgment against Reinhard and Kreinberg in the Eastern District of Michigan. Later that day, Reinhard filed this complaint against Dow and Liveris.[FN7](Id. ¶ 3.) On the same day, Kreinberg filed his own action in New York State Supreme Court.[FN8]

> FN7. Reinhard alleges that Dow was aware of his preparation for litigation in early May. He also claims that he did not discover that Dow had filed suit against him in Michigan until he had filed the instant action. (Naftalis Decl. ¶¶ 3-4.)

> FN8. Kreinberg's action was subsequently removed to federal court in this district and then transferred to Michigan by Judge Marrero. *See Kreinberg v. Dow Chemical Co.,* 2007 WL 2141391 (S.D.N.Y. July 23, 2007).

**B. Procedural Background**

The May 8, 2007, complaint filed by Reinhard in this district against Defendants Dow and Liveris alleged claims for (1) libel and (2) breach of contract. On May 29, 2007, Dow filed their Answer and Counterclaim, as well as this Motion to Transfer Pursuant to 28 U.S.C. § 1404(a). On June 19, 2007, Liveris filed a Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(3), to Transfer Pursuant to 28 U.S.C. § 1406(a), or in the Alternative to Join Dow's Motion to Transfer under 1404(a). On July 6, 2007, Reinhard filed a Memorandum in Opposition to Dow's Motion to Transfer and Liveris' Motion to Dismiss or Transfer. Defendants submitted a reply memorandum on July 16, 2007 in further support of their motions. Oral arguments were held on August 2, 2007.

**DISCUSSION**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2324351 (S.D.N.Y.)

**(Cite as: Slip Copy)**

Page 4

### A. Legal Standard

Section 1404(a) states that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a) (1996). District courts have broad discretion to determine convenience and justice on a case-by-case basis. *D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 106 (2d Cir.2006) (citations omitted). Courts should consider factors of private and public interest. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-509 (1947). The following factors are considered in determining convenience and justice: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the ability to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties."*D.H. Blair & Co.,* 462 F.3d at 106-107. The majority of district courts in this circuit also include two additional factors: "[ (8) ] a forum's familiarity with governing law ... [and (9) ] trial efficiency and the interests of justice, based on the totality of the circumstances."*Strougo v. Brantley Capital Corp.,* 2007 WL 1683348, at *5 (S.D.N.Y. June 3, 2007) (citations omitted). The party making the motion to transfer has the burden to show that the transfer is warranted. *D.H. Blair & Co.,* 462 F.3d at 106.

*4 After a consideration of all nine factors, the Court finds that Defendants have met their burden of showing by a preponderance of the evidence that this case should be transferred to the Eastern District of Michigan.

### 1. Plaintiff's Choice of Forum

Normally, a court should "give due deference to the plaintiff's choice of forum which should not be disturbed unless the balance of convenience and justice weigh heavily in favor of defendant's forum ...." *Citigroup Inc. v. City Holding Co.,* 97

F.Supp.2d. 549, 561 (S.D.N.Y.2000) (internal quotations omitted). However, a plaintiff's choice of forum is given less deference when the forum is "neither the [plaintiff's] home nor the place where the operative facts of the action occurred." *Hall v. South Orange,* 89 F.Supp.2d 488, 494 (S.D.N.Y.2000) (internal quotations omitted).

Although Reinhard chose to bring suit in the Southern District of New York, he is domiciled in Florida, and most of the operative facts took place in Michigan.[FN9]Reinhard's assertion that he "travels to New York at least once a month to attend board meetings ... and to transact other business," (Pl.'s Opp'n at 17), is not persuasive. *See Herbert Ltd. Pushup. v. Elec. Arts, Inc.,* 325 F.Supp.2d 282, 291 (S.D.N.Y.2004) ( holding that plaintiff's forum will receive relatively little weight because even though plaintiff alleges that it "conducts all of its business operations" in its chosen forum, it is not plaintiff's home district and the majority of operative facts took place elsewhere).

> FN9.*See infra* § A(5), discussing locus of operative facts.

### 2. The Convenience of Witnesses

The convenience of witnesses weighs in favor of a transfer to Michigan. The convenience of party and non-party witnesses is an important factor: "indeed, certain courts in this district have called it 'probably the single-most important factor in the analysis of whether transfer should be granted.' " *Strougo,* 2007 WL 1683348, at *5 (internal citations omitted). The defendant has the burden of "clearly specify[ing] the key witnesses to be called and must make a general statement of what their testimony will cover." *Peterman v. U.S.,* 2006 WL 2806417, at *2 (N.D.N.Y. Sept. 28, 2006) (citing *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978)).

Dow's Assistant General Counsel, Duncan Stuart, listed the following possible witnesses all located in Michigan both defendants, Dow and Liveris; Dow

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Schofield Declaration - Exhibit C

Slip Copy
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 5

spokesperson, Chris Huntley, the other employee named in the complaint; Dow's public affairs personnel who were involved in releasing statements about Reinhard's termination; Dow's human resources personnel who were involved in Reinhard's compensation plans and the finance and mergers and acquisitions personnel; and Reinhard's assistant who made his international travel plans. (Stuart Aff. ¶¶ 6-12.)

Despite Dow's long list of Michigan witnesses, Reinhard believes that this factor should weigh in favor of maintaining the action in this district because Dimon, "arguably the most important non-party witness [for the libel claim]," and other possible Morgan witnesses reside either in New York or London. (Pl. Opp'n at 13.) [FN10]

> FN10. While Plaintiff's opposition papers refer to "other Morgan witnesses," at oral argument Dow's counsel made the uncontradicted statement that Plaintiff's Rule 26(f) statement listed only Mr. Reinhard, Mr. Kreinberg, Mr. Dimon, and three Dow Employees in Michigan, as the persons known to them to have knowledge of the claims in the Complaint. (See 8/2 Tr. at 20.) Furthermore, counsel for Plaintiff, stated at oral argument that the allegedly false statements were "based solely and exclusively on a conversation ... with Mr. Dimon ...." (Id. at 39.)

*5 At oral argument, however, Dow's counsel, David Bernick, pointed out that although Mr. Dimon had provided information to Dow about the proposed leveraged buyout planned by groups of investors in the United Kingdom and Oman at meetings in the United Kingdom, Dimon was not in attendance at these meetings, nor were the other "Morgan sources," nor was outside counsel, Saverese, who participated in the discussions with Dimon and Liveris. (See 8/2 Tr. at 11-17.) Thus, the potential witnesses residing in New York will not be able to testify as to the truth or falsity of the allegedly defamatory statements made by Dow. The wit-

nesses who might have personal knowledge about the statements are located in the U.K. and Oman.

The most the New York witnesses could testify about would be whether the allegedly libelous statements made by Dow and Liveris about Plaintiff were fair and reasonable in light of the information they had provided to Defendants. Thus, their testimony at trial would only be relevant in so far as it might bear on any bad intent or reckless negligence on the part of Defendants, and, even then, only if the statements of Defendants about Plaintiff contradicted the information supplied by Mr. Dimon and the other alleged Morgan witnesses. On the other hand, Plaintiff is also alleging malice on the part of Defendant Liveris based on prior interactions with Plaintiff. (See Compl. ¶ 49.) The witnesses to such prior statements of Defendant Liveris are most likely all employees of Dow residing in Michigan, or members of Dow's board, a number of whom live in Michigan, while only one lives in New York. (See 8/2 Tr. at 65.)

Furthermore, the witnesses to Plaintiff's breach of contract claim, other than Plaintiff, would appear to be based solely in Michigan, since the contract was formed and all the acts alleged in the Complaint bearing on its breach occurred in Michigan. (See Compl. ¶¶ 53-57.) On balance, the convenience of the witnesses will best be served by a transfer to Michigan.

**3. Location of documents and relative ease of access to sources of proof**

The location of relevant documents and relative ease of access to sources of proof weigh in favor of a transfer to Michigan. Dow's relevant documents are minutes from the Board's meetings involving Reinhard's termination, press release drafts, Reinhard's documents and emails, and the documents and emails of other Dow employees. (Stuart.Aff.¶ 13.) These documents are all located in Michigan. (Id.) Because of technological advancements and the ability to electronically send documents to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 6

site of the litigation, the location of hard copies is given little weight. *See Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. LaFarge N. Am. Inc.,* 474 F.Supp.2d 474 (S.D.N.Y.2007). However, because email discovery is likely and hard drive discovery may be required, this factor favors a transfer to Michigan.

## 4. The Convenience of Parties

The convenience of the parties weighs in favor of Dow's motion to transfer: "[w]here neither party resides in the chosen forum, 'it is only logical that a transfer to the residence of one of them would be more convenient.'" *Dealtime.com v. McNulty,* 123 F.Supp.2d 750, 756 (S.D.N.Y.2000) (quoting *ZPC 2000, Inc. v. SCA Group, Inc.,* 86 F.Supp.2d 274, 279 (S.D.N.Y.2000)). Both defendants, Dow and Liveris, reside in Michigan and Reinhard himself is domiciled in Florida. (Compl.¶¶ 9-11.) Though Reinhard claims that it will be more convenient for him to travel to New York than to Michigan (Pl.'s Opp'n. 17), he must travel regardless of where the case is tried.[FN11] Moreover, though a trip from Florida or New York to Bay City, Michigan, may indeed be inconvenient for parties residing on the East Coast, a trip to New York will be equally inconvenient for those parties residing in Michigan.

> FN11. Plaintiff's counsel, whose offices are located in New York, and who would not have to travel if the action were kept in this district, noted that it took them "14 hours to get home from [a] conference [in Bay City]." (8/2 Tr. at 47.) While the Court empathizes with this inconvenience, it also notes that convenience of counsel is not a factor to be weighed in a motion to transfer.

## 5. Locus of operative facts

*6 The locus of operative facts weighs in favor of Dow's motion to transfer. The claims of libel and breach of contract are based largely on Reinhard's

employment and compensation agreements, Dow's board meetings, Reinhard's termination, and the allegedly defamatory press releases and letters to shareholders issued by Dow. These events all took place in Michigan. (*See* Compl. ¶¶ 24-26, 28-32, 40-42.) The locus of operative facts in a breach of contract case looks at "where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." *Prudential Sec. v. Norcom Dev., Inc.,* 1998 WL 397889, at *4 (S.D.N.Y. July 16, 1998). Reinhard's breach of contract claim is based on multiple contracts and compensation plans, at least one of which was signed by executives in Midland, Michigan. (Compl. ¶ 54; Naftalis Decl. Ex. J.) The Board of Directors and the Dow personnel that interpret and administer the compensation plans, meets in Midland, Michigan. (Dow Countercl. ¶ 35.)

As for the libel claim, Reinhard alleges that he has suffered the greatest harm in New York, since most of the defamatory statements were circulated in New York and because New York is the center of the financial press. (Compl. ¶ 37; Pl.'s Opp'n at 15.) The harm to Reinhard based on the publication of Dow's press release in New York does weigh in favor of a trial in this district, however, it is not a determinative factor when all of the operative facts are considered together. *See Curtis Publ'g Co. v. Birdsong,* 360 F.2d 344, 347 (5th Cir.1966) (holding that in a multi-state publication of libel, it is not enough that the Post was sold in Alabama, as this would create a forum in all other states as well); *see also Barge v. Daily Journal Corp.,* 1996 WL 434561, at * 4-5 (S.D.N.Y. Aug. 2, 1996) (holding that although allegedly defamatory claims were published in Seattle and the plaintiff was harmed in Seattle, the litigation should be situated in California because that was the location where more operative facts took place). Here, even if the circulation of the allegedly defamatory statement did the most harm to Reinhard in New York, the majority of operative facts still took place in Michigan.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 7

**6. Availability of process to compel the attendance of unwilling witnesses**

The availability of process to compel the attendance of unwilling witnesses is a neutral factor. Important elements for this factor are the inability to compel process over a witness, the availability of alternate forms of testimony, and a showing that the witness would be unwilling to testify. *See Citigroup Inc.,* 97 F.Supp.2d at 561-562 (holding that although it may be preferable to have live testimony in the issue at hand, this factor had little weight because defendants failed to show or suggest an unwillingness of the non-party witness to testify).

As Plaintiff notes, Dimon may be beyond Michigan's subpoena power. (Pl.'s Opp'n at 16.) However, there has been no suggestion that Mr. Dimon or any other witness would be unwilling to travel to testify.[FN12]Furthermore, "in light of the option of videotaping testimony of witnesses unwilling to travel,"*Dealtime.com,* 123 F.Supp.2d at 757 (citations omitted), the witnesses' possible unwillingness to appear in Michigan would not be a determinative factor in this case.

> FN12. At oral argument, neither party indicated knowledge about Mr. Dimon's willingness to travel to Michigan (See 8/2 Tr. at 44, 54 .)

**7. Relative means of the parties**

*7 The relative means of the parties weighs against a transfer. If a "disparity exists between the parties, such as an individual suing a large corporation, the relative means of the parties may be considered."*Berman v. Informix Corp.,* 30 F.Supp.2d 653, 659 (S.D.N.Y.1998). However, where "no showing has been made that [a change of forum] would impose an undue hardship on the plaintiff ... this factor weighs neutrally in the overall analysis."*Id.* Reinhard states that litigating in Michigan would "further strain [his] financial resources," (Affidavit of J. Pedro Reinhard, dated July 6, 2007, ¶ 8), but, given the depth of his financial

resources, he has not shown that traveling to Michigan for this litigation will be an undue hardship.[FN13]

> FN13. According to a 2006 SEC filing by Dow, Reinhard's annual compensation in 2005, less long term incentives, was over $2 million. (Declaration of Frank Holozubiec, Ex. B (Dow Form 14A) at 4.)

**8. Forum's familiarity with the governing law**

The forum's familiarity with the governing law is a neutral factor in the analysis. It is likely that Delaware law will govern the breach of contract action and breach of fiduciary duty counterclaim because Dow is incorporated in Delaware.

For the libel claim, it is not certain which state's laws will govern.[FN14] Regardless, as noted by Plaintiff's counsel at oral argument, libel laws are similar enough that a judge will be familiar with the governing law no matter which state's statute ends up applying to the claim in this case.[FN15] Therefore, because the breach of contract and breach of fiduciary duty claim is governed by Delaware law, which is foreign to both jurisdictions, and because a judge in either forum should be familiar with the principles of libel law, this factor is neutral.

> FN14. The following are factors to consider in multi-state libel cases: "(1) the state of the plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where the plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; (6) the state of principal circulation; (7) the state where the libel was first seen; and (9) the law of the forum."*Weinstein v. Friedman,* 1996 WL 137313, *8-9 (S.D.N.Y. Mar. 26, 1996). It is not immediately clear whether Michigan or New York has more connections to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 8
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
**(Cite as: Slip Copy)**

libel claim.

> FN15. (*See* 8/2 Tr. at 42 ("I don't have any
> reason to believe that the general prin-
> ciples of libel law are any different in
> Michigan than they are in New York.").)

**9. Trial efficiency and the interests of justice**

Now that both Dow's action and Kreinberg's action
are located in the Eastern District of Michigan, effi-
ciency and the interests of justice weigh in favor of
transferring this lawsuit to that district. It is logist-
ically practical to have all trial and discovery
scheduling issued from one court given that so
many of the witnesses and document production
will coincide in all three cases.

**B. Liveris' motion to dismiss pursuant to Rule
12(b)(3) or transfer pursuant to § 1406(a) is
denied; his motion to transfer pursuant to §
1404(a) is granted.**

Liveris' motion to dismiss for lack of venue under
Rule 12(b) (3), and his motion to transfer under §
1406(a) are denied.[FN16]Liveris is a citizen of Aus-
tralia and a lawful permanent resident of the United
States.[FN17] (Compl. ¶ ; Dow Ans. ¶ 11.) Under §
1391(d), "an alien may be sued in any dis-
trict."Accordingly, venue is proper in this district or
in the Eastern District of Michigan.

> FN16. A motion to dismiss for improper
> venue   is   made   under   Fed.R.Civ.P.
> 12(b)(3). Section 1406(a) states that "[t]he
> district court of a district in which is filed a
> case laying venue in the wrong division or
> district shall dismiss, or if it be in the in-
> terest of justice, transfer such case to any
> district or division in which it could have
> been brought."28 U.S.C. § 1406(a) (1996).

> FN17. Section 1391(d) applies to all ali-
> ens, resident or non-resident. *See Haaretz
> Daily Newspapers, Ltd. v. Maariv Modiin
> Pub. Co., Ltd.*, 1999 WL 796163, at *1

(S.D.N.Y. Oct. 6, 1999).

Liveris' Motion to Transfer under § 1404(a) is gran-
ted on the same grounds as Dow's motion.

### CONCLUSION

For the aforementioned reasons, it is hereby
ordered that the Clerk of Court is directed to trans-
fer this action to the Eastern District of Michigan.

IT IS SO ORDERED.

S.D.N.Y.,2007.
Reinhard v. Dow Chemical Co.
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1985 WL 196 (S.D.N.Y.), 40 Fed.R.Serv.2d 907, Fed. Sec. L. Rep. P 91,914
**(Cite as: Not Reported in F.Supp.)**

**H**
TEXWOOD LIMITED and TEXWOOD INCOR-
PORATED (U.S.A.), individually and derivatively
on behalf of DRAGER INDUSTRIES, INC.,
Plaintiffs, v. JORDAN GERBER, SCOTT DRAKE,
JOSEPH SCHACHTER & CO., a partnership,
JOSEPH SCHACHTER, LAWRENCE J. KA-
PLAN, RICHARD J. STONE, JAMES K. WAT
and JOSO CONSULTANTS, INC., Defendants.
JORDAN GERBER, Defendant-Counterlclaimant, v.
S.D.N.Y. 1985.

United States District Court; S.D. New York.
TEXWOOD LIMITED and TEXWOOD INCOR-
PORATED (U.S.A.), individually and derivatively
on behalf of DRAGER INDUSTRIES, INC.,
Plaintiffs,
v.
JORDAN GERBER, SCOTT DRAKE, JOSEPH
SCHACHTER & CO., a partnership, JOSEPH
SCHACHTER, LAWRENCE J. KAPLAN,
RICHARD J. STONE, JAMES K. WAT and JOSO
CONSULTANTS, INC., Defendants.
JORDAN GERBER, Defendant-Counterlclaimant,
v.
TEXWOOD LIMITED, TEXWOOD INCORPOR-
ATED (U.S.A.), Plaintiffs-Defendants to Counter-
claims, and WILLIAM WONG, K. W. CHUNG
and SHIU TAM, Additional Defendants to Counter-
claims.
**No. 83 Civ. 304 (WCC).**

January 16, 1985.

KRAVER & MARTIN, ESQS. 919 Third Avenue
New York, New York 10022, for plaintiffs-de-
fendants to Counterclaims TEXWOOD LIMITED,
TEXWOOD INCORPORATED (U.S.A.) and WIL-
LIAM WONG, K. W. CHUNG and SHIU TAM,
Additional      Defendants      to      Counterclaims;
RICHARD M. KRAVER, ESQ., of counsel.
SUZANNE ANTIPPAS, ESQ., 681 Fifth Avenue
New York, New York 10022, for defendant and

counterclaimant Jordan Gerber and defendant Joso
Consultants, Inc.
SPENGLER CARLSON GUBAR BRODSKY &
FRISCHLING, ESQS. 280 Park Avenue New York,
New York 10017, for defendants Joseph Schachter
& Co. and Joseph Schachter; ROBERT KNUTS,
ESQ., of counsel.
WOHL LOEWE STETTNER KRIM & FABRIC-
ANT, ESQS. 10 East 40th Street New York, New
York 10016, for defendant Scott Drake; LE-
ONARD HOLLAND, ESQ., of counsel.
EDWARD RUBIN, ESQ. 477 Madison Avenue
New York, New York 10022, for defendant Richard
J. Stone.
SCHNEIDER HARRIS & HARRIS, ESQS. 1015
Broadway Woodmere, New York 11598, for De-
fendant Lawrence J. Kaplan; SONDRA I. HARRIS,
ESQ., of counsel.
HALL McNICOL HAMILTON & CLARK, ESQS.
220 East 42nd Street New York, New York 10017,
for defendant James K. Wat; KENNETH V. HAN-
DAL, ESQ., of counsel.

OPINION AND ORDER

CONNER, District Judge:
**\*1** This is an action under the federal securities
laws, the New York State General Business Law
and common law charging defendants with, inter
alia, (1) inducing plaintiff Texwood, Limited, to
purchase the capital stock of Drager, Inc. ('Drager')
by false and fraudulent misrepresentations and con-
cealment of material facts respecting Drager's fin-
ancial condition and business prospects; (2) breach
of warranties made in the stock purchase agree-
ment; (3) negligence in the preparation of financial
statements; (4) conversion of Drager's assets; and
(5) violation of fiduciary duties in the management
of Drager.

Defendants' Amended Answer to the Second
Amended Complaint contains two counterclaims
under Rule 10b-5 promulgated by the Securities &
Exchange Commission under the authority of §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Schofield Declaration - Exhibit C

Not Reported in F.Supp.                                                                                 Page 2
Not Reported in F.Supp., 1985 WL 196 (S.D.N.Y.), 40 Fed.R.Serv.2d 907, Fed. Sec. L. Rep. P 91,914
**(Cite as: Not Reported in F.Supp.)**

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) on behalf of defendant Gerber against plaintiffs Texwood Limited, Texwood (U.S.A.) and three additional defendants on the counterclaims, William Wong, K. W. Chung and Shiu Tam. The first counterclaim alleges that the counterclaim defendants induced Gerber, Drake and Drager to sell to Texwood (U.S.A.) a total of one-third of the capital stock of Drager for $496,633 by falsely representing (1) that Texwood Limited, as Drager's exclusive supplier of jeans, would supply to Drager jeans made by it in Hong Kong of such quality and at such prices that Drager could resell them at a profit; and (2) that Gerber and Drake would continue to be in charge of the operation of Drager and would receive compensation and expense allowances comparable to those they had been receiving. The first counterclaim further alleges that these representations were false and were wilfully and fraudulently made with the intention of terminating the employment of Gerber and Drake and taking over control of Drager so that Texwood Limited could 'dump' into the United States large quantities of inferior merchandise at inflated prices.

The second counterclaim alleges that in about August 1981, after Drager had sustained large financial losses as a result of the inferior, over-priced jeans supplied to it by Texwood Limited, and had thus become insolvent, Wong and Chung, acting on behalf of themselves and the other counterclaim defendants, induced Gerber to terminate his employment by Drager, forgive Drager's obligations to him and his counselling firm Joso Consultants, Inc., and to transfer his remaining Drager stock to Texwood (U.S.A.) by falsely and fraudulently representing that plaintiffs would release Gerber from all claims of whatever nature which they had against him. Although this agreement was consummated by the execution and delivery of general releases by Texwood (U.S.A.) and Drager in favor of Gerber, it is alleged that the counterclaim defendants never intended to honor the releases given to Gerber but were planning to and did institute the present action notwithstanding such releases.

The additional counterclaim defendants have moved to dismiss both counterclaims on the grounds: (1) that leave of Court was not obtained for adding defendants on the counterclaims; (2) that the Court lacks personal jurisdiction over the counterclaim defendants Tam and Chung; and (3) that the counterclaims fail to state a claim on which relief can be granted and fail to plead fraud with the particularity required by Rule 9(b), F.R.Civ.P.

### 1. Addition of counterclaim defendants without leave of Court

**\*2** The additional counterclaim defendants cite no authority supporting the proposition that leave of court is required for the addition of defendants on a counterclaim, and we know of none. Rule 13(h), F.R.Civ.P., provides that
Persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20.

Rule 19 relates to joinder of necessary or indispensable parties, while Rule 20 relates to permissive joinder. Neither rule requires advance leave of Court for joinder of parties. Moore thus states that because 'a plaintiff in his original complaint does not require leave of court to name additional parties, it may be implied that the committee intended that leave of court is not necessary [to do so by counterclaim].' 3 Moore's Federal Practice ¶13.39, at 13-239 n.27 (2d ed. 1984).

### 2. Personal jurisdiction of Tam and Chung

Defendant Gerber asserts that the Court has personal jurisdiction of counterclaim defendants Tam and Chung by virtue of § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, which provides for suit in any district 'wherein the defendant is found or is an inhabitant or transacts business.'

In <u>Leasco Data Processing Equipment Corp. v. Maxwell</u>, 468 F.2d 1326, 1339 (2d Cir. 1974),

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                    Page 3
Not Reported in F.Supp., 1985 WL 196 (S.D.N.Y.), 40 Fed.R.Serv.2d 907, Fed. Sec. L. Rep. P 91,914
**(Cite as: Not Reported in F.Supp.)**

Judge Friendly stated:
We hold that Congress meant § 27 [of the Securities Exchange Act] to extend personal jurisdiction to the full reach permitted by the due process clause . . ..

This requires only the existence of 'minimum contacts' between the defendant and the forum 'such that the maintenance of the suit does not offend 'traditional nations of fair play and substantial justice.'International Sh oe Co. v. W ashington, 326 U.S. 310, 316 (1945)quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940). This determination involves an inquiry into the nature and extent of the defendant's contacts with the forum. Kulko v. Superior Court of California, 436 U.S. 84 (1978). The defendant must have purposely availed himself of the privilege of conducting business within the forum state. Hanson v. Denckla, 357 U.S. 235, 253 (1958), and his contacts with the forum must have been related to the subject of the claim.Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 104 S.Ct. 1868 (1984). In Leasco, supra, the Court ruled that a single meeting of a foreign national in the United States for the purpose of inducing the purchase or sale of a security in violation of Rule 10b-5 is sufficient to confer personal jurisdiction under § 27 of the 1934 Act.

As established by uncontroverted affidavits filed in support of the motion, both Tam and Chung are citizens and residents of the British Colony of Hong Kong, and both are employed there. Except for Tam's stock ownership in Texwood Limited, which in turn owns Texwood (U.S.A.), neither Tam nor Chung has any property in New York State nor derives any income from any source here. Neither participated in any negotiations in New York leading to execution of the contract which is the subject of the first counterclaim, although they did meet with Gerber in Hong Kong in December 1979 for that purpose. It is conceded that Wong and Chung came to New York in 1981 to meet with Gerber to discuss the releases which are the subject of the second counterclaim. However, those negotiations

were obviously conducted on behalf of Texwood (U.S.A.) and Drager, who executed the releases in question, and not on behalf of Wong and Chung personally.

**\*3** Under the 'fiduciary shield' doctrine recognized in this and a number of other circuits, Wong and Chung are not subject to personal jurisdiction here because their acts here were committed in the course of their employment by and for the benefit of their corporate employer. As the Court of Appeals stated in Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 902 (2d Cir. 1981):
The teaching of the courts of this Circuit and of New York is that there is a dichotomy between the principles governing the personal liability of corporate agents for torts committed in their corporate roles and the principles governing the amenability of such agents to personal jurisdiction solely on the basis of those acts . . .. These cases have recognized that if an individual has contact with a particular state only by virtue of his acts as a fiduciary of the corporation, he may be shielded from the exercise, by that state, of jurisdiction over him personally on the basis of that conduct. Thus, his conduct, although it may subject him to personal liability, may not form the predicate for the exercise of jurisdiction over him as an individual. The underpinning of this fiduciary shield doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.

This rule has been repeatedly applied in this Court. Trafalgar Capital Corp. v. Oil Producers Equipment Corp., 555 F. Supp. 305, 309-10 (S.D.N.Y. 1983); Louis Marx & Co., Inc. v. Fuji Seiko Co., Ltd., 453 F. Supp. 385, 389 (S.D.N.Y. 1978).

It follows that neither Tam nor Chung is personally suable here on either counterclaim and both counterclaims will be dismissed as to them.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1985 WL 196 (S.D.N.Y.), 40 Fed.R.Serv.2d 907, Fed. Sec. L. Rep. P 91,914
**(Cite as: Not Reported in F.Supp.)**

### 3. Alleged failure to state a claim

The counterclaim defendants urge that both the first and second counterclaims are deficient in that, although both counterclaims allege that defendants were induced to transfer their stock in Drager to Texwood (U.S.A.) by certain false and fraudulent representations, 'no objective facts are alleged from which an inference could be drawn that the statements were false when made.' The first counterclaim is also attacked on the ground that it does not specify which of the counterclaim defendants made which misrepresentations nor when they were made nor whether they were made in person or by telephone.

However a careful reading of the counterclaim convinces the Court that their allegations state a claim under Rule 10b-5 and satisfy at least the minimum requirements of Rule 9(b), F.R.Civ.P. All five of the counterclaim defendants are alleged to have made in or about December 1979 each of the false representations set forth in Paragraphs 88(a), (b) and (c) and 89. In Paragraph 89 it is alleged that Gerber, Drake and Drager relied on these misrepresentations and were thereby induced to transfer certain of their Drager shares to Texwood (U.S.A.), and in Paragraph 96 it is alleged that they were thereby injured in specified respects.

*4 Although there is no detailed specification as to where and how the alleged misrepresentations were made, this information is obtainable by interrogatories or depositions. No purpose would be served by requiring these details to be set forth in the pleadings, which are already sufficiently specific to apprise the counterclaim defendants of the nature of the claim and to permit them to prepare their defense. Whether the allegations can be proven, of course, remains to be seen.

The same is true of the second counterclaim. The counterclaim defendants attack it on the further ground that it alleges that Drager and Berger were induced by fraudulent misrepresentations made by the counterclaim defendants to transfer their re-

maining Drager stock to Texwood (U.S.A.) and drop their claims against Texwood (U.S.A.) in exchange for general releases from Texwood (U.S.A.) and Drager. This allegation is asserted to be inconsistent with defendants' reliance on the releases as an affirmative defense to the main action against them. But inconsistent pleadings are not only permitted but are so common as not to require a citation of supporting authority. Indeed, plaintiffs' main action itself is inconsistent with the general releases, since the releases, if effective, would appear to constitute an absolute defense to plaintiffs' claims against Gerber.

### SUMMARY

The first and second counterclaims are dismissed as to Tam and Chung. The motion of the counterclaim defendants is in all other respects denied.

SO ORDERED.

S.D.N.Y. 1985.
Texwood Ltd. v. Gerber
Not Reported in F.Supp., 1985 WL 196 (S.D.N.Y.), 40 Fed.R.Serv.2d 907, Fed. Sec. L. Rep. P 91,914

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

C
U.S. Banknote Corp. v. E. Bickel & Co. GmbH
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
UNITED STATES BANKNOTE CORPORATION
and American Bank Note Company, Plaintiffs,
v.
E. BICKEL & CO. GMBH and Bickel USA, De-
fendants.
No. 92 CIV 6431 (RPP).

Jan. 5, 1993.

Law Office of Charles B. Manuel, Jr. by Charles B.
Manuel, Jr., New York City, for plaintiffs.
Cournoyer & Cournoyer, P.C. by Donald Cournoy-
er, Jr., Southbridge, Mass., Albert A. Natoli, New
York City, for defendant Bickel USA.

OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.
*1 Plaintiffs bring this action for compensatory and
punitive damages based upon allegations of breach of
contract, breach of warranty, and breach of im-
plied covenant of good faith and fair dealing arising
out of Plaintiffs' agreement to purchase machinery
from Defendants. Defendant Bickel USA moves for
(1) reinstatement of this Court's previous order of
dismissal, or, alternatively, (2) an order transferring
this action to the United States District Court for
the Western District of Massachusetts or, alternat-
ively, (3) a stay of this action pending determina-
tion of a parallel action currently pending in the
Western District of Massachusetts. For the reasons
set forth below, Defendant's motion to transfer this
action to the Western District of Massachusetts is
granted.

BACKGROUND

Plaintiff United States Banknote Corporation
("USBN") is a New York corporation having its

principal place of business in New York. Compl. at
¶ 2. Plaintiff American Bank Note Company
("ABN"), a subsidiary of USBN, is a New York
corporation with a principal place of business in
Pennsylvania and offices in New York and Califor-
nia. *Id.* at ¶ 3.

Defendant E. Bickel & Co. GmbH ("Bickel Ger-
many") is a German company allegedly doing busi-
ness in the United States through its sales agent,
Defendant Bickel USA. *Id.* at ¶ 4. Bickel USA is an
organization having a principal place of business in
Wilbraham, Massachusetts, and a mailing address
in East Longmeadow, Massachusetts. Defendant's
Notice of Motion, dated Nov. 17, 1992, ("Notice of
Motion"), Exh. B.

In December 1990, Mr. John M. Shank, President
of Bickel USA, offered ABN an option to purchase
a set of machines manufactured by Bickel Ger-
many. Affidavit of John A. Murphy, dated Oct. 19,
1992, ("Murphy Aff.") at ¶ 2. In January of 1991,
ABN paid the defendants $15,000 to secure the op-
tion to purchase this first set of machines. *Id.* at ¶ 4.
ABN soon exercised its option by ordering the first
set of machines, then ordered a second set of ma-
chines. *Id.* ABN intended to use these machines to
punch perforations in the postage stamps that it
manufactures. *Id.* at ¶ 3.

Plaintiffs allege that Defendants failed to deliver
the machines in a timely manner and made repeated
false assurances that delays would be short term.
Affidavit of Harvey J. Kesner, dated Oct. 19, 1992,
("Kesner Aff.") at ¶ 5. They also allege that the ma-
chines, when eventually delivered, did not perform
as promised. *Id.* at ¶ 6. Defendant Bickel USA
maintains that it has completely performed its con-
tract with the plaintiffs and is therefore entitled to
the balance of $425,598 owed to it by the plaintiffs
under the contract. Notice of Motion, Exh. B.

ABN and Bickel USA attempted to negotiate a set-
tlement to this dispute before taking court action.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 2

The plaintiffs assert that during the course of the settlement discussions, "ABN informed Bickel that if some agreement could not be reached, ABN was prepared to file in New York an already drafted complaint seeking relief for injuries suffered by ABN as a result of the delays, defects and subsequent malfunctions." Kesner Aff. at ¶ 11.

*2 On August 19, 1992, Bickel USA filed an action arising out of this contract dispute against ABN and USBN in the Western District of Massachusetts. The Complaint in that action alleges breach of contract and unjust enrichment and seeks judgment in the amount of the balance remaining under the contract plus interest. Notice of Motion, Exh. B. The Complaint also states Bickel USA's intent to request an injunction prohibiting the defendants from using the machines during the pendency of the suit, but indicates that "said injunction request [is] to be made formally by separate Motion." *Id.* The summons in the Massachusetts action was issued on September 9, 1992, and ABN was served on September 23, 1992. Kesner Aff. at ¶ 15.

On August 23, 1992, USBN and ABN filed this action in the Southern District of New York. *Id.* at ¶ 12. The summons was issued on the same day, and summons and complaint were served "immediately" upon Bickel USA in Massachusetts. *Id.* at ¶ 13. Bickel Germany was served "through service upon its agent Bickel USA." *Id.* Bickel Germany has not appeared in this action or challenged the Court's jurisdiction or venue.

In a previous motion, dated September 24, 1992, Bickel USA asked this Court to dismiss this action on the ground that "this case had previously been filed in the United States District Court in the Western District of Massachusetts." Affidavit of Charles B. Manuel, Jr., dated November 25, 1992, ("Manuel Aff."), Exh. A. This Court granted Defendant's motion to dismiss, but subsequently vacated its order of dismissal after receiving a letter, dated October 22, 1992, from Charles B. Manuel, attorney to the plaintiffs, stating:

Contrary to Bickel-USA's unsworn assertions, the

same action is not pending in another court. A related but not identical action brought by Bickel-USA against USBN and ABN is pending in the United States District Court for the District of Massachusetts. The action does not include E. Bickel GmbH, a defendant here, nor does it address USBN and ABN's claims in this action.

*Id.*, Exh. B at 3.

Defendant Bickel USA now moves this Court to take one of the following courses of action: (1) reinstate its previously vacated order of dismissal and sanction Plaintiffs' counsel for alleged misrepresentations in its October 22, 1992, letter, (2) transfer this action to the Western District of Massachusetts, or (3) stay this action pending a determination of the parallel action in the Western District of Massachusetts.

## DISCUSSION

### I. REINSTATEMENT AND SANCTIONS

Defendant Bickel USA seeks reinstatement of this Court's prior order of dismissal and Rule 11 sanctions against Plaintiffs' attorney on the ground that the attorney, Charles B. Manuel, intentionally misrepresented to the Court in his letter of October 22, 1992, that "the same action is not pending in another court." The Court finds that this statement by Mr. Manuel, when taken in the context of his entire letter, as quoted above, does not misrepresent the relationship between this action and the one pending in Massachusetts. Accordingly, Defendant's motion for reinstatement of this Court's prior order of dismissal and Rule 11 sanctions is denied.

### II. TRANSFER

*3 Defendant Bickel USA asks this Court to transfer this action to the Western District of Massachusetts, where a parallel action is currently pending. Defendant's argument for transfer rests primarily

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Schofield Declaration - Exhibit C

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 3

upon the "first filed rule." This "well-settled" rule provides that "where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience in favor of the second action, or unless there are special circumstances which justify giving priority to the second." *Motion Picture Lab. Technicians Local 780 v. McGregor & Werner, Inc.,* 804 F.2d 16, 19 (2d Cir.1986) (quoting *Fort Howard Paper Co. v. William D. Witter, Inc.,* 787 F.2d 784, 790 (2d Cir.1986)).

"The first filed rule is not to be applied in a mechanical way." *Cooperative Centrale Raiffeisen-Boerenleen Bank v. Northwestern Nat'l Ins. Co.,* 778 F.Supp. 1274, 1278 (S.D.N.Y.1991); *accord Gibbs & Hill, Inc. v. Harbert Int'l, Inc.,* 745 F.Supp. 993, 996 (S.D.N.Y.1990). "[W]here each side, after a breakdown in settlement negotiations, engages in a race to the courthouse to achieve 'first filed' status, the courts should be concerned with what the interests of justice require and not with who won the race." *National Patent Dev. Corp. v. American Hosp. Supply Corp.,* 616 F.Supp. 114, 118 (S.D.N.Y.1984).

Bickel USA filed its action in Massachusetts four days before the plaintiffs filed this action here. However, ABN was not served in the Massachusetts action until approximately one month after ABN and USBN had served Bickel USA in this action. The courts in this Circuit have not definitively decided "whether the 'first filed' action is determined by the date of filing of the complaint or by the date of actual service of process." *Id.* at 118 & n. 7. "Courts also pay little regard to the date of filing when the competing suits were commenced within days of each other." *Gibbs & Hill, Inc.,* 745 F.Supp. at 996. Given that Bickel USA commenced the Massachusetts action following a breakdown in settlement negotiations during which it had learned that the plaintiffs intended to commence this action in New York, and that Bickel USA filed the Massachusetts action only four days before the plaintiffs filed this action and served the plaintiffs

one month after receiving service of the plaintiffs' complaint, the "first filed" rule merits little weight in the context of this motion to transfer.

The Court must therefore decide Defendant's motion to transfer under 28 U.S.C. § 1404(a) by balancing the significant factors. Section 1404(a) gives the district court discretion to transfer a civil action to any other district in which it might have been brought "for the convenience of parties and witnesses and in the interest of justice." Factors to consider in deciding a motion to transfer include: "the place wherever the operative facts occurred; the convenience of parties and witnesses; the principal places of business and operations of the parties to the action; the location of documents, the relative ease of access to the sources of proof, and the availability of process to compel attendance of unwilling witnesses; the plaintiff's choice of forum; a forum's familiarity with the governing law; trial efficiency and the interest of justice." *Gibbs & Hill, Inc.,* 745 F.Supp. at 996.

\*4 In this case, the balance of the conveniences tips in favor of transfer to the Western District of Massachusetts. The dispute revolves around a contract negotiated mainly by means of telephone and written correspondence between Defendant Bickel USA's office in Massachusetts and Plaintiff ABN's office in Pennsylvania. Murphy Aff. at ¶ 5. Additional negotiations took place via correspondence between Bickel Germany and ABN's facility in California. *Id.* The machines at issue were manufactured in Germany and delivered to California. The contract between the parties had no contact with New York until disputes arose regarding the timeliness of delivery and ABN's counsel in New York became involved in negotiating solutions. *See id.* at ¶ 7.

Although the convenience of the parties and witnesses appears to favor neither forum, consideration of the parties' principal places of business and operations favors Massachusetts. Bickel USA is a one- or two-person organization with only one office, which is in western Massachusetts. ABN has its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Schofield Declaration - Exhibit C

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 4

principal place of business in Pennsylvania and offices in New York and California. ABN, as a larger corporation with offices nationwide, is more likely than a local corporation such as Bickel USA to possess the resources to engage in litigation outside of its home jurisdiction.

Relative ease of access to sources of proof does not appear to weigh in favor either forum. Because none of the parties has given the Court any indication that it intends to call non-party witnesses, the Court does not anticipate any problems with compelling witnesses to attend trial. In addition, the parties have not indicated that documentary evidence relevant to this action is sufficiently voluminous as to present difficulties of production in either forum.

Considerations of trial efficiency tip the balance towards transfer to Massachusetts. A parallel action, arising out of the same transaction or series of transactions, is currently pending in the Western District of Massachusetts. Even while opposing the transfer, the plaintiffs in this action concede that "[t]he two suits are clearly related, and the transfer or stay of one action certainly is warranted." Manuel Aff. at ¶ 8. Transfer of this action to Massachusetts would permit consolidation of the two actions and thereby promote the efficient use of judicial resources.

Plaintiffs argue that transfer to Massachusetts would prevent them from obtaining complete relief because Bickel Germany is not a party to the Massachusetts action. Neither Plaintiffs nor Defendants have suggested any reason why Bickel Germany is less likely to be amenable to the jurisdiction of the District Court for the Western District of Massachusetts than to the jurisdiction of this Court. If this action is transferred to that district, all the parties, including Bickel Germany, will go with it.

Although Plaintiffs' choice of forum weighs against transfer, it does not outweigh the other factors indicating that the Western District of Massachusetts is the more convenient forum. Accordingly, De-

fendant Bickel USA's motion to transfer this action to the Western District of Massachusetts is granted.

III. STAY

*5 This Court's decision to grant Defendant Bickel USA's motion to transfer moots that defendant's motion for a stay of proceedings.

CONCLUSION

For the reasons set forth above, Defendant Bickel USA's motion to transfer this action to the United States District Court for the Western District of Massachusetts is granted. Its motion to reinstate this Court's prior order of dismissal and order Rule 11 sanctions is denied.

IT IS SO ORDERED.

S.D.N.Y.,1993.
U.S. Banknote Corp. v. E. Bickel & Co. GmbH
Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Schofield Declaration - Exhibit C