Mark D. Kemple (State Bar No. 145219)
Erik K. Swanholt (State Bar No. 198042)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone:    (213) 489-3939
Facsimile:    (213) 243-2539
Email: mkemple@jonesday.com
Email: ekswanholt@jonesday.com

Attorneys for Defendants
Greystone Servicing Corporation, Inc., and Greystone
CDE, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (SAN FRANCISCO DIVISION)

| | |
|---|---|
| SANTA FE POINTE, LP, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREYSTONE SERVICING CORPORATION, INC., et al.,<br><br>Defendants. | **CASE NO. C 07-05454 MMC**<br><br>**DECLARATION OF MARK D. KEMPLE** |

## DECLARATION OF MARK D. KEMPLE

I, Mark D. Kemple, declare and state as follows:

1.     I am a partner with the law firm of Jones Day, counsel of record for Defendants Greystone Servicing Corporation, Inc. and Greystone CDE, LLC in the above-entitled matter.  I have personal and first-hand knowledge of the facts set forth in this Declaration, and if called and sworn as a witness, I could and would testify competently to those facts.

2.     Attached hereto as Exhibit A is a true and correct copy of Plaintiff Santa Fe Pointe, LP's Responses to First Set of Interrogatories from Greystone CDE, LLC.

3.     Attached hereto as Exhibit B is a true and correct copy of Plaintiff Santa Fe Management, LLC's Responses to First Set of Interrogatories from Greystone CDE, LLC.

4.     I have reviewed (1) Plaintiff RANT, LLC's Responses to First Set of Interrogatories from Greystone CDE, LLC and (2) Plaintiff Oliphant's Responses to First Set of Interrogatories from Greystone CDE, LLC, and they are largely identical to the Responses of Plaintiffs Santa Fe Pointe, LP and Santa Fe Management, LLC, attached hereto.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed in Los Angeles, California on July 18, 2008.


_/s/ Mark D. Kemple_____
Mark D. Kemple

# EXHIBIT A

3/10

1   Eric J. Farber, SBN 169472
    eric@farberandco.com
2   William W. Schofield, SBN 062674
    william.schofield@farberandco.com
3   FARBER & COMPANY ATTORNEYS, P.C.
    847 Sansome Street, Ste. LL
4   San Francisco, California 94111
    Telephone 415.434.5320
5   Facsimile 415.434.5380

6   Attorneys for Plaintiffs

7

8

9                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
10
                       (SAN FRANCISCO DIVISION)
11
    SANTA FE POINTE, LP, et al.              Case No.: C07-05454 JCS
12
                       Plaintiffs,           PLAINTIFF SANTA FE POINTE,
13                                           LP'S RESPONSES TO FIRST SET
         vs.                                 OF INTERROGATORIES FROM
14                                           GREYSTONE CDE, LLC
    GREYSTONE SERVICING
    CORPORATION, INC., et al.,
15
                       Defendants.
16

17       PROPOUNDING PARTY:    Defendant Greystone CDE, LLC

18       RESPONDING PARTY:     Plaintiff Santa Fe Pointe, L.P.

19       SET NO.:              One

20

21       Plaintiff Santa Fe Pointe, L.P. responds under Federal Rules of Civil Procedure 26 and 33

22  to Defendant Greystone CDE, LLC's First Set of Interrogatories as follows:

23                         **PRELIMINARY STATEMENT**

24       A.    These responses are made solely for purposes of this action and may not be used or

25  disclosed for any other purpose or proceeding.

26       B.    The responses below are made in a good faith effort to supply information after a

27  reasonably diligent search, and are based upon information currently known. Responding Party

28  has not completed investigation of the facts, discovery, or preparation for trial. Responding Party


EXHIBIT _A_ PAGE _2_

1    anticipates that further investigation, discovery, and analysis will supply additional facts or give

2    new or different meaning or significance to known facts. Accordingly, Responding Party may

3    introduce at trial, or at other proceedings, information or documents that became known, available,

4    recalled or determined to be significant to Responding Party after these responses are made.

5        C.    These responses were prepared with counsel's assistance and are based, in part, on

6    information and documents gathered by counsel during investigation and discovery, as to which

7    Responding Party does not have direct knowledge but believes to be true.

8        D.    Each response is subject to all objections as to admissibility and any other objection

9    that would result in the exclusion of any statement at trial.

10        E.    These preliminary statements are incorporated into each response below.

11        F.    The term "Greystone" as used in these responses means Greystone Servicing

12    Corporation, Inc. and Greystone CDE, LLC collectively.

13

14                            **SPECIFIC RESPONSES**

15

16    **Interrogatory No. 1:**

17        State all facts relating to your contention made in paragraph 57 of the Complaint that the

18    "Greystone Defendants and each of them breached their respective duties of due care to Plaintiff

19    and each of them with respect to the Project and the HUD financing."

20    **Response to Interrogatory No. 1:**

21        The facts are stated in some detail in the Second Amended Complaint. Plaintiffs were not

22    privy to most of Greystone's dealings with HUD and will be better able to understand the full

23    extent of Greystone's breach of duty when Greystone responds to Plaintiffs' currently outstanding

24    discovery requests.

25        Greystone agreed to diligently and faithfully process the application for a HUD-insured

26    loan. Under the Engagement Agreement Greystone indicated the initial submittals to HUD would

27    be made in 4-6 weeks. Greystone knew when it entered into the Engagement Agreement and in

28    the weeks afterward that timing in the process was critical to Plaintiffs, yet it did not act with any

EXHIBIT _A_ PAGE _3_

1  sense of urgency. For example, it engaged a Bethesda, Maryland-based firm to do the market

2  survey and property appraisal, rather than a local firm that was familiar with the Oklahoma City

3  market. The market study and appraisal, which was criticized by HUD as inadequate, was not

4  even completed for 10 weeks after the Engagement Agreement. Despite having all materials

5  needed from Plaintiffs, Greystone did not make an initial submittal to HUD until March 2007,

6  more than *six months* after the Engagement Agreement. Under the Engagement Agreement,

7  Greystone was obligated to advise Plaintiffs of any issues raised by HUD relating to Project

8  acceptability and/or proposed project underwriting parameters. Greystone failed to communicate

9  HUD concerns to Plaintiffs and Plaintiffs learned on their own that HUD had rejected the

10 application on July 5, 2007. Plaintiffs also learned that a Greystone representative had sought out

11 an Oklahoma HUD representative at a HUD conference on June 19, 2007 and made unsolicited

12 disparaging remarks about the Project.

13      HUD gave Greystone the opportunity to cure the deficiencies listed in the July 5, 2007

14 HUD rejection letter, but it failed to do so. Instead it unilaterally, and without notice to Plaintiffs,

15 withdrew the HUD application entirely on August 9, 2007 and essentially abandoned Plaintiffs,

16 concerned more with the bridge loan repayment than in seeing that Plaintiffs were successful in

17 obtaining HUD-insured financing. It August 2007 Greystone attempted to oust Mr. Oliphant from

18 participation in the Project entirely in favor of David Henry, while requiring Mr. Oliphant to pay

19 over $200,000 and covenanting not to sue.

20 **Interrogatory No. 2:**

21      State all facts relating to your contention made in paragraph 70 of the Complaint that the

22 "the conduct of the Greystone Defendants, and each of them, as described hereinabove was

23 fraudulent, malicious and oppressive, and done for the specific purpose of getting control over

24 Plaintiff's monies for Defendants' own use and benefit."

25 **Response to Interrogatory No. 2:**

26      The facts are stated in some detail in the Second Amended Complaint. Plaintiffs were not

27 privy to most of Greystone's activities and will be better able to understand the full extent of such

28 activities when Greystone responds to Plaintiffs' currently outstanding discovery requests.


EXHIBIT _2_ PAGE _5_

1    Greystone agreed to diligently and faithfully process the application for a HUD-insured

2  loan. Under the Engagement Agreement Greystone indicated the initial submittals to HUD would

3  be made in 4-6 weeks. Greystone knew when it entered into the Engagement Agreement and in

4  the weeks afterward that timing in the process was critical to Plaintiffs, yet it did not act with any

5  sense of urgency. For example, it engaged a Bethesda, Maryland-based firm to do the market

6  survey and property appraisal, rather than a local firm that was familiar with the Oklahoma City

7  market. The market study and appraisal, which was criticized by HUD as inadequate, was not

8  even completed for 10 weeks after the Engagement Agreement. Despite having all materials

9  needed from Plaintiffs, Greystone did not make an initial submittal to HUD until March 2007,

10  more than *six months* after the Engagement Agreement. Under the Engagement Agreement,

11  Greystone was obligated to advise Plaintiffs of any issues raised by HUD relating to Project

12  acceptability and/or proposed project underwriting parameters. Greystone failed to communicate

13  HUD concerns to Plaintiffs and Plaintiffs learned on their own that HUD had rejected the

14  application on July 5, 2007. Plaintiffs also learned that a Greystone representative had sought out

15  an Oklahoma HUD representative at a HUD conference on June 19, 2007 and made unsolicited

16  disparaging remarks about the Project.

17    HUD gave Greystone the opportunity to cure the deficiencies listed in the July 5, 2007

18  HUD rejection letter, but it failed to do so. Instead it unilaterally, and without notice to Plaintiffs,

19  withdrew the HUD application entirely on August 9, 2007 and essentially abandoned Plaintiffs,

20  concerned more with the bridge loan repayment than in seeing that Plaintiffs were successful in

21  obtaining HUD-insured financing. It August 2007 Greystone attempted to oust Mr. Oliphant from

22  participation in the Project entirely in favor of David Henry, while requiring Mr. Oliphant to pay

23  over $200,000 and covenanting not to sue Greystone.

24  **Interrogatory No. 3:**

25    State all facts relating to your contention made in paragraph 71 of the Complaint that the

26  "conduct of the Greystone Defendants was, in and of itself, fraudulent, malicious and oppressive

27  in that said Defendants were guilty of reckless indifference towards Plaintiffs, acted willfully and

28  knowingly in the manner in which they torpedoed the Project and Plaintiffs' HUD application and

EXHIBIT _A_ PAGE _5_

1    the tax-exempt bond issue, and undertook separate negotiations with David Henry to cut out

2    Oliphant and Plaintiffs."

3    **Response to Interrogatory No. 3:**

4        The facts are stated in some detail in the Second Amended Complaint. Plaintiffs were not

5    privy to most of Greystone's activities and will be better able to understand the full extent of such

6    activities when Greystone responds to Plaintiffs' currently outstanding discovery requests.

7        Greystone agreed to diligently and faithfully process the application for a HUD-insured

8    loan. Under the Engagement Agreement Greystone indicated the initial submittals to HUD would

9    be made in 4-6 weeks. Greystone knew when it entered into the Engagement Agreement and in

10    the weeks afterward that timing in the process was critical to Plaintiffs, yet it did not act with any

11    sense of urgency. For example, it engaged a Bethesda, Maryland-based firm to do the market

12    survey and property appraisal, rather than a local firm that was familiar with the Oklahoma City

13    market. The market study and appraisal, which was criticized by HUD as inadequate, was not

14    even completed for 10 weeks after the Engagement Agreement. Despite having all materials

15    needed from Plaintiffs, Greystone did not make an initial submittal to HUD until March 2007,

16    more than *six months* after the Engagement Agreement. Under the Engagement Agreement,

17    Greystone was obligated to advise Plaintiffs of any issues raised by HUD relating to Project

18    acceptability and/or proposed project underwriting parameters. Greystone failed to communicate

19    HUD concerns to Plaintiffs and Plaintiffs learned on their own that HUD had rejected the

20    application on July 5, 2007. Plaintiffs also learned that a Greystone representative had sought out

21    an Oklahoma HUD representative at a HUD conference on June 19, 2007 and made unsolicited

22    disparaging remarks about the Project.

23        HUD gave Greystone the opportunity to cure the deficiencies listed in the July 5, 2007

24    HUD rejection letter, but it failed to do so. Instead it unilaterally, and without notice to Plaintiffs,

25    withdrew the HUD application entirely on August 9, 2007 and essentially abandoned Plaintiffs,

26    concerned more with the bridge loan repayment than in seeing that Plaintiffs were successful in

27    obtaining HUD-insured financing. It August 2007 Greystone attempted to oust Mr. Oliphant from

28


EXHIBIT *A* PAGE *6*

1  participation in the Project entirely in favor of David Henry, while requiring Mr. Oliphant to pay

2  over $200,000 and covenanting not to sue Greystone.

3  **Interrogatory No. 4:**

4      State all facts relating to your contention made in paragraph 76 of the Complaint that the

5  "conduct of the Greystone Defendants in disrupting, delaying and interfering with Plaintiffs'

6  opportunity to complete the Project was wrongful in that said defendants, and each of them,

7  delayed and failed to expedite the HUD application, changed terms of the deal at the last minute,

8  and breached their fiduciary duties to Plaintiffs and each of them."

9  **Response to Interrogatory No. 4:**

10     The facts are stated in some detail in the Second Amended Complaint. Plaintiffs were not

11  privy to most of Greystone's activities and will be better able to understand the full extent of such

12  activities when Greystone responds to Plaintiffs' currently outstanding discovery requests.

13     Greystone agreed to diligently and faithfully process the application for a HUD-insured

14  loan. Under the Engagement Agreement Greystone indicated the initial submittals to HUD would

15  be made in 4-6 weeks. Greystone knew when it entered into the Engagement Agreement and in

16  the weeks afterward that timing in the process was critical to Plaintiffs, yet it did not act with any

17  sense of urgency. For example, it engaged a Bethesda, Maryland-based firm to do the market

18  survey and property appraisal, rather than a local firm that was familiar with the Oklahoma City

19  market. The market study and appraisal, which was criticized by HUD as inadequate, was not

20  even completed for 10 weeks after the Engagement Agreement. Despite having all materials

21  needed from Plaintiffs, Greystone did not make an initial submittal to HUD until March 2007,

22  more than *six months* after the Engagement Agreement. Under the Engagement Agreement,

23  Greystone was obligated to advise Plaintiffs of any issues raised by HUD relating to Project

24  acceptability and/or proposed project underwriting parameters. Greystone failed to communicate

25  HUD concerns to Plaintiffs and Plaintiffs learned on their own that HUD had rejected the

26  application on July 5, 2007. Plaintiffs also learned that a Greystone representative had sought out

27  an Oklahoma HUD representative at a HUD conference on June 19, 2007 and made unsolicited

28  disparaging remarks about the Project.

EXHIBIT _A_ PAGE _7_

1   HUD gave Greystone the opportunity to cure the deficiencies listed in the July 5, 2007

2   HUD rejection letter, but it failed to do so. Instead it unilaterally, and without notice to Plaintiffs,

3   withdrew the HUD application entirely on August 9, 2007 and essentially abandoned Plaintiffs,

4   concerned more with the bridge loan repayment than in seeing that Plaintiffs were successful in

5   obtaining HUD-insured financing. It August 2007 Greystone attempted to oust Mr. Oliphant from

6   participation in the Project entirely in favor of David Henry, while requiring Mr. Oliphant to pay

7   over $200,000 and covenanting not to sue Greystone.

8   Additionally, Greystone in a November 2006 term sheet represented that a bridge loan of

9   $4,385,000 would be extended that would allow for payment of the issuance of the tax-exempt

10   bonds and the purchase of the underlying property. In early December 2006 Greystone indicated

11   that its loan committee had approved $500,000 of that amount and would approve the full amount

12   after it received a property appraisal and market study from Novogradac & Company. The

13   December 4, 2006 term sheet expressly indicated that the size of the loan would be 85% of

14   appraised value. Plaintiffs assumed Greystone had not yet received such an appraisal because

15   Greystone did not indicate to the contrary. The December 4 term sheet said the loan was to be

16   recourse to the borrower, which was Santa Fe Pointe, L.P., not Mr. Oliphant. The collateral for

17   the loan is stated to be a pledge of personal property in the Project, not a guaranty from Mr.

18   Oliphant. The only mention of a guaranty was a "limited recourse guaranty," which (as evidenced

19   by the "Developer Limited Guaranty" ultimately given by Rant LLC) was meant to oblige the

20   guarantor only to the extent of the underlying collateral, i.e., the personal property in the Project.

21   The actual bridge loan documents submitted by Greystone in mid-December 2006 varied

22   these terms. The loan size was only $500,000 and the documents also required Mr. Oliphant's

23   personal guarantee, which was not set out in either earlier term sheet or otherwise discussed before

24   the draft bridge loan documents were submitted.

25   **Interrogatory No. 5:**

26   State all facts relating to your contention made in paragraph 80 of the Complaint that "but

27   for the disruption, delay and interference of the Greystone Defendants, it is reasonably probable

28


EXHIBIT _A_ PAGE _8_

1    that Plaintiffs would have realized the anticipated prospective economic advantage from the

2    Project."

3    **Response to Interrogatory No. 5:**

4        Plaintiffs had a contract to purchase the underlying property, a bond allocation, and an

5    award of tax credits. It had submitted to Greystone all materials necessary to obtain a

6    commitment from HUD to insure the underlying loan on the project. Had Greystone promptly and

7    diligently processed Plaintiffs' application with HUD and followed up to address HUD's

8    concerns, it could have obtained that commitment. If Greystone claims Plaintiffs would not have

9    successfully completed the Project even if Greystone had properly performed its tasks, then

10   Greystone bears the burden of proving that issue as an affirmative defense.

11   **Interrogatory No. 6:**

12       State all facts relating to your contention made in paragraph 97 of the Complaint that the

13   "Greystone Defendants, and each of them, have expressly and unequivocally repudiated those

14   contracts by stating that they will not further perform, by stating that they are "out" of the deal

15   unless Plaintiffs provide proofs and assurances to which the Greystone Defendants are not

16   entitled, by refusing to rescind the August 21 notice of default, and by sending the September 18

17   notice of acceleration."

18   **Response to Interrogatory No. 6:**

19       Greystone claimed Plaintiffs had to have final commitment of a tax credit syndicator

20   before going forward. This was incorrect. First, the HUD documentation called only for evidence

21   of the availability of state or local grants or tax credits. Plaintiffs had presented evidence of both

22   tax-exempt bond allocation and of the availability of $4.1 million of tax credits. Second, tax credit

23   syndication was not a requirement for the Project to go forward. Absent such syndication the

24   Project could have gone forward on a lesser scale, an option that Greystone never presented to or

25   discussed with Plaintiffs.

26       In early August 2007 Oliphant was negotiating with the seller of the project for an

27   extension on the close date for the property purchase. Greystone sabotaged these negotiations by

28   unilaterally withdrawing the HUD application. Greystone then, on August 21, 2007, declared the

EXHIBIT _A_ PAGE _9_

1    bridge loan in default. In it Greystone CDE did not claim the loan was in financial default,

2    because it was not. Instead the letter cited default as being the expiration of the close date for the

3    purchase and sale of the apartment building, without that date having been extended. Of course, it

4    was Greystone's unilateral act of withdrawing the HUD application that had made negotiations to

5    extend the close date difficult in the first place. (The letter also specified a variety of minor

6    supposed "defaults" that were inaccurate, were not defaults, or had previously been waived by

7    Greystone.)

8        Although Greystone's unilateral withdrawal of the HUD application had made negotiations

9    with the seller of the apartment building difficult, Oliphant nonetheless was able to obtain another

10   agreement to extend the close date. Oliphant on September 11, 2007 notified Greystone of this

11   development, showed Greystone the document that verified the extension, and requested that the

12   Greystone default notice be rescinded. Greystone refused to rescind the default notice, claiming

13   the bridge loan was still in default because there was (Greystone representatives claimed) no tax

14   credit syndicator. In fact, however, the bridge loan was not in default for that reason. First of all,

15   Greystone had waived this supposed condition in April 2007 when the initial tax credit syndicator

16   withdrew from the deal. Second, the bridge loan nowhere requires proof of tax credit syndication.

17   Moreover, Oliphant had obtained a commitment from tax credit syndicator Crews & Associates in

18   June 2007 that was still in effect and had not been withdrawn. By letter dated September 21,

19   2007, Greystone CDE notified Oliphant that it was accelerating the bridge loan and declaring all

20   amounts due under the bridge loan note immediately due and payable. The bridge loan, however,

21   was not in default for the reasons stated above.

22   **Interrogatory No. 7:**

23       State all facts relating to your contention made in paragraph 106 of the Complaint that the

24   bridge loan is not in default and has not been accelerated."

25   **Response to Interrogatory No. 7:**

26       In early August 2007 Oliphant was negotiating with the seller of the project for an

27   extension on the close date for the property purchase. Greystone sabotaged these negotiations by

28   unilaterally withdrawing the HUD application. Greystone then, on August 21, 2007, declared the


EXHIBIT _A_ PAGE _10_

1  bridge loan in default. In it Greystone CDE did not claim the loan was in financial default,

2  because it was not. Instead the letter cited default as being the expiration of the close date for the

3  purchase and sale of the apartment building, without that date having been extended. Of course, it

4  was Greystone's unilateral act of withdrawing the HUD application that had made negotiations to

5  extend the close date difficult in the first place. (The letter also specified a variety of minor

6  supposed "defaults" that were inaccurate, were not defaults, or had previously been waived by

7  Greystone.)

8  Although Greystone's unilateral withdrawal of the HUD application had made negotiations

9  with the seller of the apartment building difficult, Oliphant nonetheless was able to obtain another

10  agreement to extend the close date. Oliphant on September 11, 2007 notified Greystone of this

11  development, showed Greystone the document that verified the extension, and requested that the

12  Greystone default notice be rescinded. Greystone refused to rescind the default notice, claiming

13  the bridge loan was still in default because there was (Greystone representatives claimed) no tax

14  credit syndicator. In fact, however, the bridge loan was not in default for that reason. First of all,

15  Greystone had waived this condition in April 2007 when the initial tax credit syndicator withdrew

16  from the deal. Second, the bridge loan nowhere requires proof of tax credit syndication.

17  Moreover, Oliphant had obtained a commitment from tax credit syndicator Crews & Associates in

18  June 2007 that was still in effect and had not been withdrawn. By letter dated September 21,

19  2007, Greystone CDE notified Oliphant that it was accelerating the bridge loan and declaring all

20  amounts due under the bridge loan note immediately due and payable. The bridge loan, however,

21  was not in default for the reasons stated above.

22  **Interrogatory No. 8:**

23  State all facts relating to your contention made on page 13 of your Memorandum of Points

24  and Authorities in Opposition to Defendants' Motion to Transfer Case to the Southern District of

25  New York that you were unaware of the terms, including the amount and the requirement for

26  personal guaranties, of the bridge loan before the "eve of Oliphant's departure for signing in

27  Oklahoma."

28

EXHIBIT _A_ PAGE _11_

1  **Response to Interrogatory No. 8:**

2        Greystone in November 2006 represented that a bridge loan of 85% of the appraised value

3  of the underlying property would be extended. In early December 2006 Greystone indicated that

4  its loan committee had approved a $500,000 bridge loan and would approve the full $4.8 million

5  bridge loan after it received a property appraisal and market study from Novogradac & Company.

6  The December 4, 2006 term sheet expressly indicated that the size of the loan would be 85% of

7  appraised value. Plaintiffs assumed Greystone had not yet received such an appraisal because

8  Greystone did not indicate to the contrary. The December 4 term sheet said the loan was to be

9  recourse to the borrower, which was Santa Fe Pointe, L.P., not Mr. Oliphant. The collateral for

10  the loan is stated to be a pledge of personal property in the Project, not a guaranty from Mr.

11  Oliphant. The only mention of a guaranty was a "limited recourse guaranty," which (as evidenced

12  by the "Developer Limited Guaranty" ultimately given by Rant LLC) was meant to oblige the

13  guarantor only to the extent of the underlying collateral, i.e., the personal property in the Project.

14        The actual bridge loan documents, submitted by Greystone on December 17, 2006 varied

15  these terms. The loan size was only the $500,000 and the documents also required Mr. Oliphant's

16  personal guarantee, which was not set out in the term sheet or otherwise discussed before draft

17  bridge loan documents were received in mid-December 2006.

18  **Interrogatory No. 9:**

19        State all facts relating to your decision to issue the tax-exempt bonds in December 2006

20  rather than allowing that allocation to expire and pursuing another bond allocation for the Project

21  in 2007.

22  **Response to Interrogatory No. 9:**

23        Plaintiffs' pursuit of a tax-exempt bond allocation in 2006 was a competitive, lengthy, and

24  costly process. To begin anew would require reapplying and incurring the full set of approval-

25  related expenses, with no guarantee of success in obtaining an allocation in 2007.

26  **Interrogatory No. 10:**

27        State all facts relating to your contention made in paragraph 56 of the Second Amended

28  Complaint that "Greystone Servicing's October 29 Letter and the accompanying New York

EXHIBIT _A_ PAGE _12_

1   Complaint was designed to, and did, interfere with Plaintiffs' ability to successfully complete the

2   financing, rehabilitation and development of the Project."

3   **Response to Interrogatory No. 10:**

4          By delivering those materials to Standard & Poors, the predominant and highly influential

5   bond-rating institution, Greystone Servicing exposed the tax-exempt bonds issued and sold for the

6   Project to a significant risk of being downgraded or de-rated, even though the bonds were

7   guaranteed and there was no meaningful risk of loss to the bond-holders.  The effect of

8   downgrading or de-rating the bonds would cause the interest rate to increase, thus making it more

9   difficult and more costly, and potentially impossible, to complete the Project.

10         By delivering the materials to the Bank of Oklahoma, N.A., the bond trustee, Greystone

11  Servicing placed the marketability of the bonds at risk.

12         By delivering the materials to the Department of Housing and Urban Development

13  ("HUD"), Greystone Servicing jeopardized completion of the Project because HUD issues the

14  FHA-backed mortgage and could decline to insure the loan in the face of such incomplete and

15  misleading disparaging statements about Plaintiffs.

16  **Interrogatory No. 11:**

17         Supply a computation of any and all categories of damages that you claim you have

18  sustained as a result of any act by the Greystone Defendants addressed in the Complaint,

19  including, without limitation, the amount of each item of damage claimed <u>and how such item was</u>

20  <u>calculated</u>.

21  **Response to Interrogatory No. 11:**

22         Defendants are out-of-pocket approximately $250,000 for project development coats,

23  including but not limited to consulting fees ($12,500), environmental and topo reports ($11,000),

24  earnest money deposits ($75,000), attorneys fees ($30,000), travel expenses ($27,140),

25  architectural fees ($25,300), HUD application fee ($14,000), market study and appraisal

26  ($11,000), tax credit and bond application and reservation fees ($10,700), capital needs assessment

27  ($5,000), and LLC and LP filing fees and assessments ($6,100).

28


EXHIBIT __A__ PAGE _13_

1    Plaintiffs also lost approximately $1.4 million as a project developer fee (calculated as

2  14% of total allowable project costs), approximately $80,000 per year in construction management

3  fees, and the reversionary interest in the value of the underlying property.  Plaintiffs also seek

4  punitive damages and reasonable attorneys' fees subject to proof.

5  **Interrogatory No. 12:**

6    State all facts relating to your efforts to engage a tax credit syndicator to participate in the

7  Project, including but not limited to the identity of each tax credit syndicator you considered for

8  participation in the Project.

9  **Response to Interrogatory No. 12:**

10    Plaintiffs obtained tax syndication commitments from National Equity Fund in December

11  2006, the Richman Group in February or March 2007, and Crews & Associates in June 2007.

12  **Interrogatory No. 13:**

13    State all facts relating to your contention made on page 5 of your Memorandum of Points

14  and Authorities in Opposition to Defendants' Motion to Transfer Case to the Southern District of

15  New York that "[b]y late October, it was apparent that Greystone Servicing was behind schedule

16  and was unable to complete the HUD application in the required time frame."

17  **Response to Interrogatory No. 13:**

18    In the Engagement Letter Greystone indicated that initial submittals to HUD would occur

19  within 4-6 weeks.  By late October, which is outside the six weeks, Greystone had made no HUD

20  submittal.

21  **Interrogatory No. 14:**

22    State all facts relating to your contention made in the Complaint at Prayer for Relief

23  paragraph D that you are entitled to "any statutory damages or penalties available under statute,"

24  including citation(s) to any statute(s) you contend were violated by the Greystone Defendants.

25  **Response to Interrogatory No. 14:**

26    Plaintiffs presently are unaware of specific statutory violations by Greystone.  However,

27  Plaintiffs are also not fully aware of the extent of Greystone's malfeasance as Greystone has not


EXHIBIT _A_ PAGE _14_

---

1  yet responded to discovery.  Plaintiffs reserve the right to assert statutory claims in the event

2  discovery reveals such violations.

3

4  Dated:  March 10, 2008                    FARBER & COMPANY ATTORNEYS, P.C.
                                            Attorneys for Plaintiffs
5

6                                          By _____

7                                              William W. Schofield

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              EXHIBIT  A PAGE 15

_Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al._                    - 14

# EXHIBIT B

3/10

1    Eric J. Farber, SBN 169472
     eric@farberandco.com
2    William W. Schofield, SBN 062674
     william.schofield@farberandco.com
3    FARBER & COMPANY ATTORNEYS, P.C.
     847 Sansome Street, Ste. LL
4    San Francisco, California 94111
     Telephone 415.434.5320
5    Facsimile 415.434.5380

6    Attorneys for Plaintiffs

7

8

9                        UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF CALIFORNIA
10
                           (SAN FRANCISCO DIVISION)
11
     SANTA FE POINTE, LP, et al.              **Case No.: C07-05454 JCS**
12
                            Plaintiffs,       **PLAINTIFF SANTA FE**
13                                            **MANAGEMENT, LLC'S**
           vs.                                **RESPONSES TO FIRST SET OF**
14                                            **INTERROGATORIES FROM**
     GREYSTONE SERVICING                      **GREYSTONE CDE, LLC**
     CORPORATION, INC., et al.,
15
                            Defendants.
16

17
           PROPOUNDING PARTY:    Defendant Greystone CDE, LLC
18
           RESPONDING PARTY:     Plaintiff Santa Fe Management, LLC
19
           SET NO.:              One
20

21         Plaintiff Santa Fe Management, LLC responds under Federal Rules of Civil Procedure 26

22   and 33 to Defendant Greystone CDE, LLC's First Set of Interrogatories as follows:

23                          **PRELIMINARY STATEMENT**

24         A.    These responses are made solely for purposes of this action and may not be used or

25   disclosed for any other purpose or proceeding.

26         B.    The responses below are made in a good faith effort to supply information after a

27   reasonably diligent search, and are based upon information currently known. Responding Party

28   has not completed investigation of the facts, discovery, or preparation for trial. Responding Party


EXHIBIT _B_ PAGE _16_

1   anticipates that further investigation, discovery, and analysis will supply additional facts or give

2   new or different meaning or significance to known facts.  Accordingly, Responding Party may

3   introduce at trial, or at other proceedings, information or documents that became known, available,

4   recalled or determined to be significant to Responding Party after these responses are made.

5       C.    These responses were prepared with counsel's assistance and are based, in part, on

6   information and documents gathered by counsel during investigation and discovery, as to which

7   Responding Party does not have direct knowledge but believes to be true.

8       D.    Each response is subject to all objections as to admissibility and any other objection

9   that would result in the exclusion of any statement at trial.

10      E.    These preliminary statements are incorporated into each response below.

11      F.    The term "Greystone" as used in these responses means Greystone Servicing

12  Corporation, Inc. and Greystone CDE, LLC collectively.

13

14                         **SPECIFIC RESPONSES**

15

16  **Interrogatory No. 1:**

17      State all facts relating to your contention made in paragraph 57 of the Complaint that the

18  "Greystone Defendants and each of them breached their respective duties of due care to Plaintiff

19  and each of them with respect to the Project and the HUD financing."

20  **Response to Interrogatory No. 1:**

21      The facts are stated in some detail in the Second Amended Complaint.  Plaintiffs were not

22  privy to most of Greystone's dealings with HUD and will be better able to understand the full

23  extent of Greystone's breach of duty when Greystone responds to Plaintiffs' currently outstanding

24  discovery requests.

25      Greystone agreed to diligently and faithfully process the application for a HUD-insured

26  loan.  Under the Engagement Agreement Greystone indicated the initial submittals to HUD would

27  be made in 4-6 weeks.  Greystone knew when it entered into the Engagement Agreement and in

28  the weeks afterward that timing in the process was critical to Plaintiffs, yet it did not act with any

 EXHIBIT _B_ PAGE _17_

1   sense of urgency. For example, it engaged a Bethesda, Maryland-based firm to do the market

2   survey and property appraisal, rather than a local firm that was familiar with the Oklahoma City

3   market. The market study and appraisal, which was criticized by HUD as inadequate, was not

4   even completed for 10 weeks after the Engagement Agreement. Despite having all materials

5   needed from Plaintiffs, Greystone did not make an initial submittal to HUD until March 2007,

6   more than *six months* after the Engagement Agreement. Under the Engagement Agreement,

7   Greystone was obligated to advise Plaintiffs of any issues raised by HUD relating to Project

8   acceptability and/or proposed project underwriting parameters. Greystone failed to communicate

9   HUD concerns to Plaintiffs and Plaintiffs learned on their own that HUD had rejected the

10  application on July 5, 2007. Plaintiffs also learned that a Greystone representative had sought out

11  an Oklahoma HUD representative at a HUD conference on June 19, 2007 and made unsolicited

12  disparaging remarks about the Project.

13       HUD gave Greystone the opportunity to cure the deficiencies listed in the July 5, 2007

14  HUD rejection letter, but it failed to do so. Instead it unilaterally, and without notice to Plaintiffs,

15  withdrew the HUD application entirely on August 9, 2007 and essentially abandoned Plaintiffs,

16  concerned more with the bridge loan repayment than in seeing that Plaintiffs were successful in

17  obtaining HUD-insured financing. It August 2007 Greystone attempted to oust Mr. Oliphant from

18  participation in the Project entirely in favor of David Henry, while requiring Mr. Oliphant to pay

19  over $200,000 and covenanting not to sue.

20  **Interrogatory No. 2:**

21       State all facts relating to your contention made in paragraph 70 of the Complaint that the

22  "the conduct of the Greystone Defendants, and each of them, as described hereinabove was

23  fraudulent, malicious and oppressive, and done for the specific purpose of getting control over

24  Plaintiff's monies for Defendants' own use and benefit."

25  **Response to Interrogatory No. 2:**

26       The facts are stated in some detail in the Second Amended Complaint. Plaintiffs were not

27  privy to most of Greystone's activities and will be better able to understand the full extent of such

28  activities when Greystone responds to Plaintiffs' currently outstanding discovery requests.

EXHIBIT *B* PAGE *18*

1      Greystone agreed to diligently and faithfully process the application for a HUD-insured

2   loan. Under the Engagement Agreement Greystone indicated the initial submittals to HUD would

3   be made in 4-6 weeks. Greystone knew when it entered into the Engagement Agreement and in

4   the weeks afterward that timing in the process was critical to Plaintiffs, yet it did not act with any

5   sense of urgency. For example, it engaged a Bethesda, Maryland-based firm to do the market

6   survey and property appraisal, rather than a local firm that was familiar with the Oklahoma City

7   market. The market study and appraisal, which was criticized by HUD as inadequate, was not

8   even completed for 10 weeks after the Engagement Agreement. Despite having all materials

9   needed from Plaintiffs, Greystone did not make an initial submittal to HUD until March 2007,

10   more than *six months* after the Engagement Agreement. Under the Engagement Agreement,

11   Greystone was obligated to advise Plaintiffs of any issues raised by HUD relating to Project

12   acceptability and/or proposed project underwriting parameters. Greystone failed to communicate

13   HUD concerns to Plaintiffs and Plaintiffs learned on their own that HUD had rejected the

14   application on July 5, 2007. Plaintiffs also learned that a Greystone representative had sought out

15   an Oklahoma HUD representative at a HUD conference on June 19, 2007 and made unsolicited

16   disparaging remarks about the Project.

17      HUD gave Greystone the opportunity to cure the deficiencies listed in the July 5, 2007

18   HUD rejection letter, but it failed to do so. Instead it unilaterally, and without notice to Plaintiffs,

19   withdrew the HUD application entirely on August 9, 2007 and essentially abandoned Plaintiffs,

20   concerned more with the bridge loan repayment than in seeing that Plaintiffs were successful in

21   obtaining HUD-insured financing. It August 2007 Greystone attempted to oust Mr. Oliphant from

22   participation in the Project entirely in favor of David Henry, while requiring Mr. Oliphant to pay

23   over $200,000 and covenanting not to sue Greystone.

24   **Interrogatory No. 3:**

25      State all facts relating to your contention made in paragraph 71 of the Complaint that the

26   "conduct of the Greystone Defendants was, in and of itself, fraudulent, malicious and oppressive

27   in that said Defendants were guilty of reckless indifference towards Plaintiffs, acted willfully and

28   knowingly in the manner in which they torpedoed the Project and Plaintiffs' HUD application and

EXHIBIT _B_ PAGE _19_

1 | the tax-exempt bond issue, and undertook separate negotiations with David Henry to cut out

2 | Oliphant and Plaintiffs."

3 | **Response to Interrogatory No. 3:**

4 | The facts are stated in some detail in the Second Amended Complaint. Plaintiffs were not

5 | privy to most of Greystone's activities and will be better able to understand the full extent of such

6 | activities when Greystone responds to Plaintiffs' currently outstanding discovery requests.

7 | Greystone agreed to diligently and faithfully process the application for a HUD-insured

8 | loan. Under the Engagement Agreement Greystone indicated the initial submittals to HUD would

9 | be made in 4-6 weeks. Greystone knew when it entered into the Engagement Agreement and in

10 | the weeks afterward that timing in the process was critical to Plaintiffs, yet it did not act with any

11 | sense of urgency. For example, it engaged a Bethesda, Maryland-based firm to do the market

12 | survey and property appraisal, rather than a local firm that was familiar with the Oklahoma City

13 | market. The market study and appraisal, which was criticized by HUD as inadequate, was not

14 | even completed for 10 weeks after the Engagement Agreement. Despite having all materials

15 | needed from Plaintiffs, Greystone did not make an initial submittal to HUD until March 2007,

16 | more than *six months* after the Engagement Agreement. Under the Engagement Agreement,

17 | Greystone was obligated to advise Plaintiffs of any issues raised by HUD relating to Project

18 | acceptability and/or proposed project underwriting parameters. Greystone failed to communicate

19 | HUD concerns to Plaintiffs and Plaintiffs learned on their own that HUD had rejected the

20 | application on July 5, 2007. Plaintiffs also learned that a Greystone representative had sought out

21 | an Oklahoma HUD representative at a HUD conference on June 19, 2007 and made unsolicited

22 | disparaging remarks about the Project.

23 | HUD gave Greystone the opportunity to cure the deficiencies listed in the July 5, 2007

24 | HUD rejection letter, but it failed to do so. Instead it unilaterally, and without notice to Plaintiffs,

25 | withdrew the HUD application entirely on August 9, 2007 and essentially abandoned Plaintiffs,

26 | concerned more with the bridge loan repayment than in seeing that Plaintiffs were successful in

27 | obtaining HUD-insured financing. It August 2007 Greystone attempted to oust Mr. Oliphant from

28 |


EXHIBIT _B_ PAGE _20_

1    participation in the Project entirely in favor of David Henry, while requiring Mr. Oliphant to pay

2    over $200,000 and covenanting not to sue Greystone.

3    **Interrogatory No. 4:**

4        State all facts relating to your contention made in paragraph 76 of the Complaint that the

5    "conduct of the Greystone Defendants in disrupting, delaying and interfering with Plaintiffs'

6    opportunity to complete the Project was wrongful in that said defendants, and each of them,

7    delayed and failed to expedite the HUD application, changed terms of the deal at the last minute,

8    and breached their fiduciary duties to Plaintiffs and each of them."

9    **Response to Interrogatory No. 4:**

10       The facts are stated in some detail in the Second Amended Complaint. Plaintiffs were not

11   privy to most of Greystone's activities and will be better able to understand the full extent of such

12   activities when Greystone responds to Plaintiffs' currently outstanding discovery requests.

13       Greystone agreed to diligently and faithfully process the application for a HUD-insured

14   loan. Under the Engagement Agreement Greystone indicated the initial submittals to HUD would

15   be made in 4-6 weeks. Greystone knew when it entered into the Engagement Agreement and in

16   the weeks afterward that timing in the process was critical to Plaintiffs, yet it did not act with any

17   sense of urgency. For example, it engaged a Bethesda, Maryland-based firm to do the market

18   survey and property appraisal, rather than a local firm that was familiar with the Oklahoma City

19   market. The market study and appraisal, which was criticized by HUD as inadequate, was not

20   even completed for 10 weeks after the Engagement Agreement. Despite having all materials

21   needed from Plaintiffs, Greystone did not make an initial submittal to HUD until March 2007,

22   more than *six months* after the Engagement Agreement. Under the Engagement Agreement,

23   Greystone was obligated to advise Plaintiffs of any issues raised by HUD relating to Project

24   acceptability and/or proposed project underwriting parameters. Greystone failed to communicate

25   HUD concerns to Plaintiffs and Plaintiffs learned on their own that HUD had rejected the

26   application on July 5, 2007. Plaintiffs also learned that a Greystone representative had sought out

27   an Oklahoma HUD representative at a HUD conference on June 19, 2007 and made unsolicited

28   disparaging remarks about the Project.

EXHIBIT 3 PAGE 21

1    HUD gave Greystone the opportunity to cure the deficiencies listed in the July 5, 2007

2    HUD rejection letter, but it failed to do so. Instead it unilaterally, and without notice to Plaintiffs,

3    withdrew the HUD application entirely on August 9, 2007 and essentially abandoned Plaintiffs,

4    concerned more with the bridge loan repayment than in seeing that Plaintiffs were successful in

5    obtaining HUD-insured financing. It August 2007 Greystone attempted to oust Mr. Oliphant from

6    participation in the Project entirely in favor of David Henry, while requiring Mr. Oliphant to pay

7    over $200,000 and covenanting not to sue Greystone.

8    Additionally, Greystone in a November 2006 term sheet represented that a bridge loan of

9    $4,385,000 would be extended that would allow for payment of the issuance of the tax-exempt

10   bonds and the purchase of the underlying property. In early December 2006 Greystone indicated

11   that its loan committee had approved $500,000 of that amount and would approve the full amount

12   after it received a property appraisal and market study from Novogradac & Company. The

13   December 4, 2006 term sheet expressly indicated that the size of the loan would be 85% of

14   appraised value. Plaintiffs assumed Greystone had not yet received such an appraisal because

15   Greystone did not indicate to the contrary. The December 4 term sheet said the loan was to be

16   recourse to the borrower, which was Santa Fe Pointe, L.P., not Mr. Oliphant. The collateral for

17   the loan is stated to be a pledge of personal property in the Project, not a guaranty from Mr.

18   Oliphant. The only mention of a guaranty was a "limited recourse guaranty," which (as evidenced

19   by the "Developer Limited Guaranty" ultimately given by Rant LLC) was meant to oblige the

20   guarantor only to the extent of the underlying collateral, i.e., the personal property in the Project.

21   The actual bridge loan documents submitted by Greystone in mid-December 2006 varied

22   these terms. The loan size was only $500,000 and the documents also required Mr. Oliphant's

23   personal guarantee, which was not set out in either earlier term sheet or otherwise discussed before

24   the draft bridge loan documents were submitted.

25   **Interrogatory No. 5:**

26   State all facts relating to your contention made in paragraph 80 of the Complaint that "but

27   for the disruption, delay and interference of the Greystone Defendants, it is reasonably probable

28



EXHIBIT _B_ PAGE _22_

1   that Plaintiffs would have realized the anticipated prospective economic advantage from the

2   Project."

3   **Response to Interrogatory No. 5:**

4       Plaintiffs had a contract to purchase the underlying property, a bond allocation, and an

5   award of tax credits. It had submitted to Greystone all materials necessary to obtain a

6   commitment from HUD to insure the underlying loan on the project. Had Greystone promptly and

7   diligently processed Plaintiffs' application with HUD and followed up to address HUD's

8   concerns, it could have obtained that commitment. If Greystone claims Plaintiffs would not have

9   successfully completed the Project even if Greystone had properly performed its tasks, then

10  Greystone bears the burden of proving that issue as an affirmative defense.

11  **Interrogatory No. 6:**

12      State all facts relating to your contention made in paragraph 97 of the Complaint that the

13  "Greystone Defendants, and each of them, have expressly and unequivocally repudiated those

14  contracts by stating that they will not further perform, by stating that they are "out" of the deal

15  unless Plaintiffs provide proofs and assurances to which the Greystone Defendants are not

16  entitled, by refusing to rescind the August 21 notice of default, and by sending the September 18

17  notice of acceleration."

18  **Response to Interrogatory No. 6:**

19      Greystone claimed Plaintiffs had to have final commitment of a tax credit syndicator

20  before going forward. This was incorrect. First, the HUD documentation called only for evidence

21  of the availability of state or local grants or tax credits. Plaintiffs had presented evidence of both

22  tax-exempt bond allocation and of the availability of $4.1 million of tax credits. Second, tax credit

23  syndication was not a requirement for the Project to go forward. Absent such syndication the

24  Project could have gone forward on a lesser scale, an option that Greystone never presented to or

25  discussed with Plaintiffs.

26      In early August 2007 Oliphant was negotiating with the seller of the project for an

27  extension on the close date for the property purchase. Greystone sabotaged these negotiations by

28  unilaterally withdrawing the HUD application. Greystone then, on August 21, 2007, declared the

EXHIBIT _B_ PAGE _23_

1    bridge loan in default. In it Greystone CDE did not claim the loan was in financial default,

2    because it was not. Instead the letter cited default as being the expiration of the close date for the

3    purchase and sale of the apartment building, without that date having been extended. Of course, it

4    was Greystone's unilateral act of withdrawing the HUD application that had made negotiations to

5    extend the close date difficult in the first place. (The letter also specified a variety of minor

6    supposed "defaults" that were inaccurate, were not defaults, or had previously been waived by

7    Greystone.)

8        Although Greystone's unilateral withdrawal of the HUD application had made negotiations

9    with the seller of the apartment building difficult, Oliphant nonetheless was able to obtain another

10   agreement to extend the close date. Oliphant on September 11, 2007 notified Greystone of this

11   development, showed Greystone the document that verified the extension, and requested that the

12   Greystone default notice be rescinded. Greystone refused to rescind the default notice, claiming

13   the bridge loan was still in default because there was (Greystone representatives claimed) no tax

14   credit syndicator. In fact, however, the bridge loan was not in default for that reason. First of all,

15   Greystone had waived this supposed condition in April 2007 when the initial tax credit syndicator

16   withdrew from the deal. Second, the bridge loan nowhere requires proof of tax credit syndication.

17   Moreover, Oliphant had obtained a commitment from tax credit syndicator Crews & Associates in

18   June 2007 that was still in effect and had not been withdrawn. By letter dated September 21,

19   2007, Greystone CDE notified Oliphant that it was accelerating the bridge loan and declaring all

20   amounts due under the bridge loan note immediately due and payable. The bridge loan, however,

21   was not in default for the reasons stated above.

22   **Interrogatory No. 7:**

23       State all facts relating to your contention made in paragraph 106 of the Complaint that the

24   bridge loan is not in default and has not been accelerated."

25   **Response to Interrogatory No. 7:**

26       In early August 2007 Oliphant was negotiating with the seller of the project for an

27   extension on the close date for the property purchase. Greystone sabotaged these negotiations by

28   unilaterally withdrawing the HUD application. Greystone then, on August 21, 2007, declared the

EXHIBIT _B_ PAGE _29_

1    bridge loan in default. In it Greystone CDE did not claim the loan was in financial default,

2    because it was not. Instead the letter cited default as being the expiration of the close date for the

3    purchase and sale of the apartment building, without that date having been extended. Of course, it

4    was Greystone's unilateral act of withdrawing the HUD application that had made negotiations to

5    extend the close date difficult in the first place. (The letter also specified a variety of minor

6    supposed "defaults" that were inaccurate, were not defaults, or had previously been waived by

7    Greystone.)

8        Although Greystone's unilateral withdrawal of the HUD application had made negotiations

9    with the seller of the apartment building difficult, Oliphant nonetheless was able to obtain another

10   agreement to extend the close date. Oliphant on September 11, 2007 notified Greystone of this

11   development, showed Greystone the document that verified the extension, and requested that the

12   Greystone default notice be rescinded. Greystone refused to rescind the default notice, claiming

13   the bridge loan was still in default because there was (Greystone representatives claimed) no tax

14   credit syndicator. In fact, however, the bridge loan was not in default for that reason. First of all,

15   Greystone had waived this condition in April 2007 when the initial tax credit syndicator withdrew

16   from the deal. Second, the bridge loan nowhere requires proof of tax credit syndication.

17   Moreover, Oliphant had obtained a commitment from tax credit syndicator Crews & Associates in

18   June 2007 that was still in effect and had not been withdrawn. By letter dated September 21,

19   2007, Greystone CDE notified Oliphant that it was accelerating the bridge loan and declaring all

20   amounts due under the bridge loan note immediately due and payable. The bridge loan, however,

21   was not in default for the reasons stated above.

22   **Interrogatory No. 8:**

23       State all facts relating to your contention made on page 13 of your Memorandum of Points

24   and Authorities in Opposition to Defendants' Motion to Transfer Case to the Southern District of

25   New York that you were unaware of the terms, including the amount and the requirement for

26   personal guaranties, of the bridge loan before the "eve of Oliphant's departure for signing in

27   Oklahoma."

28


EXHIBIT _B_ PAGE _25_

1    **Response to Interrogatory No. 8:**

2    Greystone in November 2006 represented that a bridge loan of 85% of the appraised value

3    of the underlying property would be extended. In early December 2006 Greystone indicated that

4    its loan committee had approved a $500,000 bridge loan and would approve the full $4.8 million

5    bridge loan after it received a property appraisal and market study from Novogradac & Company.

6    The December 4, 2006 term sheet expressly indicated that the size of the loan would be 85% of

7    appraised value. Plaintiffs assumed Greystone had not yet received such an appraisal because

8    Greystone did not indicate to the contrary. The December 4 term sheet said the loan was to be

9    recourse to the borrower, which was Santa Fe Pointe, L.P., not Mr. Oliphant. The collateral for

10   the loan is stated to be a pledge of personal property in the Project, not a guaranty from Mr.

11   Oliphant. The only mention of a guaranty was a "limited recourse guaranty," which (as evidenced

12   by the "Developer Limited Guaranty" ultimately given by Rant LLC) was meant to oblige the

13   guarantor only to the extent of the underlying collateral, i.e., the personal property in the Project.

14   The actual bridge loan documents, submitted by Greystone on December 17, 2006 varied

15   these terms. The loan size was only the $500,000 and the documents also required Mr. Oliphant's

16   personal guarantee, which was not set out in the term sheet or otherwise discussed before draft

17   bridge loan documents were received in mid-December 2006.

18   **Interrogatory No. 9:**

19   State all facts relating to your decision to issue the tax-exempt bonds in December 2006

20   rather than allowing that allocation to expire and pursuing another bond allocation for the Project

21   in 2007.

22   **Response to Interrogatory No. 9:**

23   Plaintiffs' pursuit of a tax-exempt bond allocation in 2006 was a competitive, lengthy, and

24   costly process. To begin anew would require reapplying and incurring the full set of approval-

25   related expenses, with no guarantee of success in obtaining an allocation in 2007.

26   **Interrogatory No. 10:**

27   State all facts relating to your contention made in paragraph 56 of the Second Amended

28   Complaint that "Greystone Servicing's October 29 Letter and the accompanying New York

EXHIBIT _B_ PAGE _26_

1 | Complaint was designed to, and did, interfere with Plaintiffs' ability to successfully complete the

2 | financing, rehabilitation and development of the Project."

3 | **Response to Interrogatory No. 10:**

4 | By delivering those materials to Standard & Poors, the predominant and highly influential

5 | bond-rating institution, Greystone Servicing exposed the tax-exempt bonds issued and sold for the

6 | Project to a significant risk of being downgraded or de-rated, even though the bonds were

7 | guaranteed and there was no meaningful risk of loss to the bond-holders. The effect of

8 | downgrading or de-rating the bonds would cause the interest rate to increase, thus making it more

9 | difficult and more costly, and potentially impossible, to complete the Project.

10 | By delivering the materials to the Bank of Oklahoma, N.A., the bond trustee, Greystone

11 | Servicing placed the marketability of the bonds at risk.

12 | By delivering the materials to the Department of Housing and Urban Development

13 | ("HUD"), Greystone Servicing jeopardized completion of the Project because HUD issues the

14 | FHA-backed mortgage and could decline to insure the loan in the face of such incomplete and

15 | misleading disparaging statements about Plaintiffs.

16 | **Interrogatory No. 11:**

17 | Supply a computation of any and all categories of damages that you claim you have

18 | sustained as a result of any act by the Greystone Defendants addressed in the Complaint,

19 | including, without limitation, the amount of each item of damage claimed <u>and how such item was</u>

20 | <u>calculated</u>.

21 | **Response to Interrogatory No. 11:**

22 | Defendants are out-of-pocket approximately $250,000 for project development coats,

23 | including but not limited to consulting fees ($12,500), environmental and topo reports ($11,000),

24 | earnest money deposits ($75,000), attorneys fees ($30,000), travel expenses ($27,140),

25 | architectural fees ($25,300), HUD application fee ($14,000), market study and appraisal

26 | ($11,000), tax credit and bond application and reservation fees ($10,700), capital needs assessment

27 | ($5,000), and LLC and LP filing fees and assessments ($6,100).

28 |


EXHIBIT *B* PAGE *22*

---

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                    - 12

1    Plaintiffs also lost approximately $1.4 million as a project developer fee (calculated as

2    14% of total allowable project costs), approximately $80,000 per year in construction management

3    fees, and the reversionary interest in the value of the underlying property.  Plaintiffs also seek

4    punitive damages and reasonable attorneys' fees subject to proof.

5    **Interrogatory No. 12:**

6    State all facts relating to your efforts to engage a tax credit syndicator to participate in the

7    Project, including but not limited to the identity of each tax credit syndicator you considered for

8    participation in the Project.

9    **Response to Interrogatory No. 12:**

10   Plaintiffs obtained tax syndication commitments from National Equity Fund in December

11   2006, the Richman Group in February or March 2007, and Crews & Associates in June 2007.

12   **Interrogatory No. 13:**

13   State all facts relating to your contention made on page 5 of your Memorandum of Points

14   and Authorities in Opposition to Defendants' Motion to Transfer Case to the Southern District of

15   New York that "[b]y late October, it was apparent that Greystone Servicing was behind schedule

16   and was unable to complete the HUD application in the required time frame."

17   **Response to Interrogatory No. 13:**

18   In the Engagement Letter Greystone indicated that initial submittals to HUD would occur

19   within 4-6 weeks.  By late October, which is outside the six weeks, Greystone had made no HUD

20   submittal.

21   **Interrogatory No. 14:**

22   State all facts relating to your contention made in the Complaint at Prayer for Relief

23   paragraph D that you are entitled to "any statutory damages or penalties available under statute,"

24   including citation(s) to any statute(s) you contend were violated by the Greystone Defendants.

25   **Response to Interrogatory No. 14:**

26   Plaintiffs presently are unaware of specific statutory violations by Greystone.  However,

27   Plaintiffs are also not fully aware of the extent of Greystone's malfeasance as Greystone has not

28

EXHIBIT _B_ PAGE _28_

1   yet responded to discovery.  Plaintiffs reserve the right to assert statutory claims in the event

2   discovery reveals such violations.

3

4   Dated: March 10, 2008                    FARBER & COMPANY ATTORNEYS, P.C.
                                             Attorneys for Plaintiffs

5

6                                            By _William W. Schofield_

7                                               William W. Schofield

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B PAGE 29

*Santa Fe Pointe, LP, et al v. Greystone Servicing Corporation, Inc., et al.*                    - 14