EXHIBIT B

#155239v3

---

ASSIGNMENT OF PURCHASE AGREEMENT

by

SANTA FE POINTE, L.P.,

in favor of

GREYSTONE CDE, LLC

Dated as of December 20, 2006

---

## ASSIGNMENT OF PURCHASE AGREEMENT

This ASSIGNMENT OF PURCHASE AGREEMENT (as the same may be amended, modified or supplemented from time to time, this "**Assignment**"), dated as of December 20, 2006, made by SANTA FE POINTE, L.P., a limited partnership organized and existing under the laws of the State of Oklahoma (together with its permitted successors and assigns, the "**Borrower**"), to GREYSTONE CDE, LLC, a limited liability company organized and existing under the laws of the State of Delaware (together with its successors and assigns, "**Lender**"),

### W I T N E S S E T H :

**WHEREAS,** the Lender has made a loan of $500,000.00 to the Borrower pursuant to a Bridge Loan Agreement dated as of December 20, 2006 between the Lender and the Borrower (as the same may be amended, modified or supplemented from time to time, the "**Loan Agreement**") (all capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Loan Agreement);

**WHEREAS,** the Borrower intends to finance the acquisition, construction and equipping of a 224-unit multifamily residential facility to be known as "Santa Fe Pointe Apartments" located at 125 SW 74th Street in Oklahoma City, Oklahoma (the "**Project**");

**WHEREAS,** the Borrower has entered into a contract for the purchase of the land on which the Project is to be located, which land is more fully described on <u>Exhibit A</u> hereto, pursuant to a Contract for Sale of Real Estate, dated July 12, 2006 as amended by Addendum #1 to Contract for Sale of Real Estate dated December 15, 2006 (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof, the "**Purchase Agreement**"), between Waverly-Walnut Creek Apartments, Inc., as seller (together with its successors and assigns, the "**Seller**"), and RANT, LLC, as buyer, and assigned to the Borrower, as buyer, a copy of which Purchase Agreement is attached hereto as <u>Exhibit B</u>; and

**WHEREAS,** the execution and delivery of this Assignment is a condition to the Lender's making the Loan.

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, and in order to secure the Borrower's performance of its obligations to the Lender under the Loan Documents, including payment of all amounts due or to become due to the Lender under the Loan Agreement and the other Loan Documents, and any extensions, renewals, replacements or modifications of any thereof, the Borrower agrees as follows:

**Section 1    Assignment; Security Interests.** The Borrower hereby assigns and transfers to Lender, and hereby creates in favor of Lender a security interest in and to, all of the Borrower's right, title and interest in, to and under the Purchase Agreement, all accounts and general intangibles arising therefrom and all proceeds of any and all of the foregoing. The security interests created hereby and continued pursuant to this Agreement will, upon filing of UCC financing statements in the appropriate filing offices, constitute perfected security interests in the Purchase Agreement in favor of the Lender and are enforceable as such against all

creditors of and purchasers from the Borrower. All action on the part of the Borrower necessary or desirable to perfect such interests requested by the Lender, including the execution of financing statements for filing in the appropriate filing offices, has been or will be duly taken upon such filing. This Assignment is given as collateral security only. So long as no Event of Default has occurred and is continuing and subject to the express provisions herein to the contrary, the Borrower shall have and may exercise all rights as owner or holder of the Purchase Agreement which are not inconsistent with the provisions of the Loan Documents.

Section 2    **Representations and Warranties.** The Borrower hereby represents and warrants to Lender that (a) the Borrower has not assigned, transferred, mortgaged, pledged or otherwise encumbered any of its right, title and interest in, to and under the Purchase Agreement and no part of such right, title and interest is subject to any lien or other encumbrance, except in favor of the Lender; (b) the Borrower has paid all sums required to be paid by it prior to the date hereof under the terms of the Purchase Agreement and no default exists by any party to the Purchase Agreement; (c) the Borrower's exact legal name is set forth at the beginning of this Agreement and the Borrower does not conduct business under any other name; (d) the Borrower's chief executive offices and chief place of business, and the place where the Borrower keeps its records concerning the Purchase Agreement, is c/o Santa Fe Pointe Management, LLC, 16416 Oconee Creek Drive, Edmond, Oklahoma 73013; and (e) the Borrower's jurisdiction of organization is Oklahoma and its organizational identification number is _____.

Section 3    **Affirmative Covenants.** The Borrower hereby covenants with the Lender that the Borrower shall (a) perform and observe all covenants and agreements to be performed and observed by the Borrower under the Purchase Agreement and provide the Lender with copies of all consents or approvals of the Seller received by the Borrower in the course of its compliance with the Purchase Agreement; (b) enforce, short of termination, the performance and observance of all covenants and agreements to be performed or observed by the Seller under the Purchase Agreement; (c) appear in and defend any action or proceeding arising out of or in connection with any of the Purchase Agreement; (d) promptly give the Lender copies of any reports delivered by the Borrower, any materials provided by the Seller to the Borrower and any notices, including notices of default, given or received by the Borrower under any of the Purchase Agreement; (e) at any time and from time to time, upon the written request of the Lender, and at the sole expense of the Borrower, promptly and duly execute and deliver such further documents and take such further actions as the Lender may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers granted herein; (f) keep and maintain at is own cost and expense satisfactory and complete records of the Purchase Agreement; and (g) furnish to the Lender copies of Purchase Agreement and all amendments thereto and such other statements and schedules further identifying or describing the Purchase Agreement or the status thereof as the Lender may reasonably request.

Section 4    **Negative Covenants.** The Borrower hereby covenants with the Lender that the Borrower shall not (a) assign, transfer, mortgage, pledge or otherwise encumber, or permit to accrue or suffer to exist any lien or other encumbrance on or in, any of the right, title and interest of the Borrower in, to and under the Purchase Agreement except in favor of the Lender; (b) amend or modify any of the terms of the Purchase Agreement, except with the prior written consent of the Lender; (c) terminate or give or join in any material waiver, consent or

approval with respect to the Purchase Agreement, except with the prior written consent of the Lender; (d) settle or compromise any material claim against the Seller; (e) waive any default under or material breach of and the Purchase Agreement without the prior written consent of the Lender (which consent shall not be unreasonably withheld, conditioned or delayed); (f) take any other action in connection with the Purchase Agreement which would materially impair the value of the rights or interests of the Borrower or the Lender thereunder or therein without the prior written consent of the Lender (to be granted or withheld in the Lender's sole discretion); (g) without at least sixty (60) days' prior written notice to the Lender, (i) change the location of its chief executive offices or chief place of business from that specified in Section 2 hereof, or remove its books and records from such location or (ii) change its name, identify, jurisdiction or organization or structure to such an extent that any financing statements filed by the Lender in connection with this Agreement would become misleading.

  **Section 5  Recognition of Lender.** The Borrower hereby irrevocably directs the Seller, upon request of the Lender, to recognize and accept the Lender as the "Buyer" under the Purchase Agreement for any and all purposes. The Borrower does hereby irrevocably constitute and appoint the Lender, for so long as this Assignment remains in effect, as its true and lawful attorney, during the continuance of an Event of Default, to demand and enforce compliance with the terms and conditions of the Purchase Agreement and all benefits thereunder.

  **Section 6  Right of Lender To Cure Borrower Defaults.** If the Borrower shall fail to pay, perform or observe any of its covenants or agreements hereunder or under the Purchase Agreement, the Lender may (but shall have no obligation to) pay, perform or observe the same and collect the cost thereof, together with interest thereon at the Default Rate (as defined in the Note).

  **Section 7  Lender Not Liable; Indemnification.** Anything contained herein or in the Purchase Agreement to the contrary notwithstanding, (a) the Borrower shall at all times remain solely liable under the Purchase Agreement to perform all of the obligations of the Borrower thereunder to the same extent as if this Assignment had not been executed; and (b) neither this Assignment nor any action or inaction on the part of the Borrower or the Lender shall release the Borrower from any of its obligations under the Purchase Agreement or constitute an assumption of any such obligation or liability under the Purchase Agreement or otherwise by reason of or arising out of this Assignment, nor shall the Lender be required or obligated in any manner to make any payment or perform any other obligation of the Borrower under or pursuant to the Purchase Agreement except as to exercise by the Lender, as a secured party, against the Borrower's interest in, to and under the Purchase Agreement, or to make any inquiry as to the nature or sufficiency of any payment received by the Lender, or to present or file any claim, or to take any action to collect or enforce the payment of any amounts which have been assigned to the Lender or to which it may be entitled at any time or times. The Borrower shall and does hereby agree to indemnify the Lender and hold the Lender harmless from and against any and all liability, loss or damage which it may or might incur, and from and against any and all claims and demands whatsoever which may be asserted against it, in connection with or with respect to the Purchase Agreement or this Assignment, whether by reason of any alleged obligation or undertaking on its part to perform or discharge any of the covenants or agreements contained in the Purchase Agreement or otherwise, except for any such claims, demands, liabilities, losses or damages determined by a final order of a court of competent jurisdiction to have been the direct

result of the gross negligence or willful misconduct of the Lender. Should Lender incur any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys fees, shall be paid by the Borrower to the Lender immediately upon demand, together with interest thereon at the Default Rate (as defined in the Note) until paid.

**Section 8     Default.** If an Event of Default shall occur and be continuing, the Lender may perform any of the obligations and exercise any of the rights, powers, privileges and remedies of the Borrower, and do any and all acts, matters and other things that the Borrower is entitled to do, under or with respect to the Purchase Agreement, including without limitation the purchase of the Project in accordance with the terms thereof. In addition, if an Event of Default shall have occurred and be continuing, then, in addition to any other rights or remedies provided for herein and in any other Loan Document or that may otherwise be available at law or in equity, the Lender shall have all rights and remedies of a secured party under the Uniform Commercial Code in the State of New York.

**Section 9     Further Assurances.** From time to time upon the request of the Lender, the Borrower shall promptly and duly execute, acknowledge and deliver any and all such further instruments and documents as the Lender may deem reasonably necessary or desirable to carry out the purpose and intent of this Agreement or to enable the Lender to enforce any of its rights hereunder. The Borrower hereby authorizes the Lender to record this Assignment and to file any such financing statements or continuation statements without the signature of the Borrower to the extent permitted by applicable legal requirements.

**Section 10     Amendments, Waivers, Etc.** This Assignment cannot be amended, modified, waived, changed, discharged or terminated except by an instrument in writing signed by the parties hereto.

**Section 11     No Implied Waiver; Cumulative Remedies.** No course of dealing and no delay or failure of the Lender in exercising any right, power or privilege under this Assignment or any other Loan Documents shall affect any other or future exercise thereof or exercise of any other right, power or privilege; nor shall any single or partial exercise of any such right, power or privilege or any abandonment or discontinuance of steps to enforce such a right, power or privilege preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies of the Lender under this Assignment are cumulative and not exclusive of any rights or remedies which the Lender would otherwise have under the other Loan Documents, at law or in equity.

**Section 12     Notices.** All notices, requests, demands, directions and other communications under the provisions of this Assignment shall be sent pursuant to and subject to the provisions of Section 10.2 of the Loan Agreement.

**Section 13     Termination; Survival.** The Lender shall terminate this Agreement and release the security interests granted hereunder upon payment and performance in full by the Borrower of its obligations under the Loan Documents. Notwithstanding the foregoing the indemnities contained herein, including the indemnity set forth in Section 7 hereof, shall survive such termination.

4

**Section 14    Severability.** If any term or provision of this Assignment or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Assignment, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforceable to the fullest extent permitted by law.

**Section 15    Governing Law.** This Assignment shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of laws principles, except as required by mandatory provisions of law and except to the extent that the Uniform Commercial Code of the State of New York provides that the validity or perfection of the security interests hereunder, or remedies hereunder in respect of any particular collateral are governed by the laws of a jurisdiction other than the State of New York. The Borrower hereby irrevocably and unconditionally waives it rights to a trial by jury in any legal action or proceeding relating to or arising out of this Assignment.

**Section 16    Successors and Assigns; Beneficiaries.** This Assignment shall bind the Borrower and its successors and assigns, and shall inure to the benefit of the Lender and its successors and assigns. The Borrower may not assign its rights or obligations without the prior written consent of the Lender. This Assignment is for the purpose of defining the respective rights and obligations of the Borrower and the Lender and is not for the benefit of any creditor or other third party.

5

IN WITNESS WHEREOF, the Borrower has duly executed and delivered this Assignment of Purchase Agreement as of the date first above written.

SANTA FE POINTE, L.P., an Oklahoma limited partnership

By:    SANTA FE POINTE MANAGEMENT, LLC, an Oklahoma limited liability company, its general partner

By: _Sherly F. Oliphant_

Name: Theotis F. Oliphant

Title: Managing Member

STATE OF _Oklahoma_

COUNTY OF _Oklahoma_

On this 20th day of December , 2006, before me, _Rachel Reed-Fight_ personally appeared, _Theotis Oliphant_ proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as the _Managing Member_ of Santa Fe Pointe Management, LLC, the general partner of Santa Fe Pointe, L.P. and that, by his signature on the instrument, the entity on behalf of which he acted executed the instrument.

WITNESS my hand and official seal.

_[signature]_
Notary Public

My Commission expires:
11-13-09
Commission #01018124

Santa Fe/Assignment of Purchase Agreement

Exhibit B-8, Page 51

## CONSENT AND JOINDER OF SELLER

The undersigned, WAVERLY-WALNUT CREEK APARTMENTS, INC. (together with its permitted successors and assigns, the "Seller"), hereby consents to the assignment of the Purchase Agreement as described in the foregoing Assignment of Purchase Agreement. Capitalized terms used herein and not defined shall have the meaning ascribed thereto in said Assignment of Purchase Agreement.

The Seller agrees to perform pursuant to the terms and conditions of the Purchase Agreement with the Borrower notwithstanding the occurrence of any default on the part of the Borrower under the Purchase Agreement or the exercise by the Lender, as a secured party, against the Borrower's interest in, to and under the Purchase Agreement.

The Seller also agrees that, in the event of a breach by the Borrower of any of the terms and conditions of the Purchase Agreement, the Seller shall give prompt written notice to the Lender of such breach. The Lender shall have thirty (30) days from the receipt of such notice of default to remedy, or cure said default or, if such default cannot be cured within such thirty (30) day period with reasonable diligence, and the Lender shall have diligently undertaken to cure such default, then ninety (90) days; provided, however, that nothing herein shall require the Lender to cure said default, but the Lender shall, in its sole discretion, have the option to do so.

The Purchase Agreement is in full force and effect and no default on the part of the Borrower is known to exist by the Seller as of the date hereof.

WAVERLY-WALNUT CREEK APARTMENTS, INC.

By: _____

Name: Wm Forrest White

Title: Officer

Dated: December 19, 2006

## EXHIBIT A

Legal Description of Real Estate

A-1

APPLICATION NO.: 06070929

## EXHIBIT "A"

All of Lot TWO (2), Block SIXTEEN (16), in SOUTHERN OAKS, SECTION THREE, an addition to Oklahoma City, Oklahoma County, Oklahoma, EXCEPT the following described property: COMMENCING at the Northwest corner of the said Lot 2; thence Southeasterly on the Westerly line and on the arc of a curve to the right having a radius of 218.82 feet for the distance of 104.76 feet to the point of beginning; thence South 7°47'00" East on the Westerly line of the said Lot 2, for a distance of 275.00 feet to the point of curve; thence Southerly, Southeasterly and Easterly on the arc of the curve to the left having a radius of 25.00 feet, for a distance of 39.27 feet to a point of tangency on the Southerly line of the said Lot 2; thence North 82°13'00" East on the South line of the said Lot 2, for a distance of 269.42 feet, to a point of curve; thence Northeasterly on the arc of a curve to the right having a radius of 5729.58 feet for a distance of 20.67 feet; thence North 7°47'00" West and parallel to the West line of the said Lot 2, for a distance of 300.04 feet; thence South 82°13'00" West and parallel to the South line of the said Lot 2, for a distance of 315.00 feet to the point or place of beginning as shown on the recorded plat thereof.

TAX ID# 109991200    40/39

AMERICAN GUARANTY TITLE COMPANY
As Agent For:
OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

_____
Authorized Signature

# EXHIBIT B

True, correct and complete copy of Purchase Agreement

155738v1

## ASSIGNMENT AND ASSUMPTION OF
## CONTRACT FOR SALE OF REAL ESTATE

FOR VALUE RECEIVED, RANT, LLC ("**Assignor**") hereby assigns, transfers and sets over to SANTA FE POINTE, L.P., an Oklahoma limited liability company ("**Assignee**"), without recourse or warranty of any kind whatsoever, all right, title and interest of Assignor in and to that certain Contract for Sale of Real Estate, dated July 12, 2006 as amended by Addendum #1 to Contract for Sale of Real Estate between Assignor, as buyer, and Waverly-Walnut Creek Apartments, Inc., as seller (the "**Agreement**"). Assignee hereby acknowledges receipt of a copy of the Agreement and accepts such assignment and agrees to assume all of the responsibilities and obligations of Assignor under the Agreement.

Dated:  December **20**, 2006

RANT, LLC

By: _Theotis F. Oliphant_
Name: _Theotis Oliphant_
Title: _managing member_

SANTA FE POINTE, L.P., an Oklahoma
limited partnership

By:      SANTA FE POINTE
         MANAGEMENT, LLC, an
         Oklahoma limited liability company,
         its general partner

By: _Theotis F. Oliphant_
Name: _Theotis Oliphant_
Title: _Managing member_

# CONTRACT FOR SALE OF REAL ESTATE

**THIS CONTRACT FOR SALE OF REAL ESTATE** is entered into by and between **Waverly-Walnut Creek Apartments, Inc.** ("Seller") and **Rant, LLC And/Or Assigns** ("Buyer") upon approval by both Seller and Buyer, as evidenced by their signatures hereto, and the insertion of the Effective Date per Paragraph 22, a valid and binding contract of sale shall exist and the terms and conditions of which are as follows:

**1. SALE:** Seller agrees to sell and convey to Buyer by warranty deed and Buyer agrees to purchase the following described real estate ("the Property") located in Oklahoma County, Oklahoma:

**The Sante Fe Pointe Apartments – 224 Units**
**125 SW 74ᵗʰ Street**
**Oklahoma City, OK 73139**

Legal Description: Exact legal description to be provided by Seller and to be attached hereto as Exhibit "A".

**2. PURCHASE PRICE:** The total purchase price is **$4,256,000**, payable as follows: **$25,000** on execution of this contract, as earnest money and part payment of the purchase price (the "Earnest Money"), receipt of which is acknowledged by Seller, and which has been delivered to the Broker identified below. The Earnest Money, in immediately available federal funds, evidencing Buyer's obligations under this Agreement, shall be deposited with Old Republic National Title Insurance Company ("Escrow Agent") in an interest bearing escrow account within three (3) days from the Effective Date of this Contract; and the balance of the purchase price in cash, cashier's or certified check upon delivery of the deed (the "Closing"). In the event Buyer fails to timely deposit the earnest money with the Escrow Agent, this Agreement shall be of no force and effect.

**3. CONDITION OF PROPERTY, INSPECTIONS, DISCLAIMER AND CONTINGENCIES:** The Buyer agrees and acknowledges that Seller, Broker(s) and their agents are not experts regarding the condition of the Property. No representations, warranties, or guarantees regarding the condition of the Property, or environmental hazards, are expressed or implied except as may be specified herein by Seller.

**3.1 PROPERTY INFORMATION:** Seller shall make available to Buyer, immediately upon acceptance of this Agreement, to the extent in Seller's possession, copies of, or access to, with the right to copy, the following ("Property Information"):

(a)    The standard form of apartment lease together with any written addenda, modifications, or extensions pertaining to a particular lease, used by Seller for the Property and the right to inspect and copy the existing Leases in the possession of the property manager for the Property;

(b)    A list of all unit types, number of each type, square footage of each type and the current street rate or asking rent for a new resident.

(c)    The most current rent roll of the Property ("Rent Roll") notarized by Seller, showing residents name, original lease date, lease expiration date, rental rate security deposit and unit number or address.

(d)    Year to date and prior full year, if available, operating statements ("Operating Statements");

Buyer _____    Seller _____

(e)    A list of Personal Property, if any. (free standing appliances such as refrigerators, office furnishings and equipment, pool equipment, tools, etc.)

(f)    A list and copies of any management, service or maintenance agreements, if any, relating to the Property ("Service Contracts");

(g)    Any environmental, architectural and engineering reports prepared for Seller and, to Seller's knowledge, in its possession in connection with Seller's purchase, ownership or management of the Property.

(h)    Seller will disclose in writing and attach hereto all other known property faults which may affect the value of the property, including hazardous substances as defined by the EPA.

(i)    The most recent copy of all utility bills paid by Seller including gas, electric, water, sewer, trash, and cable.

Seller represents and warrants, to the best of Sellers knowledge, the accuracy or completeness of the Property Information. If Seller has not provided all necessary information and material requested herein within 30 days from the Effective Date, this contract shall be considered null and void at the Buyers discretion and the Earnest Money shall be considered mutually released by both Buyer and Seller and immediately returned to Buyer. The Property Information and all information furnished to, or obtained through inspection of the property by Buyer, its affiliates, or employees or agents relating to the property (other than matters of public record), will be treated by Buyer, its affiliates, employees and agents as confidential, and will not be disclosed to anyone other than on a need to know basis to Buyer's consultants, and will be returned to Seller by Buyer if Closing does not occur.

3.2 **PHYSICAL INSPECTIONS/DUE DILIGENCE PERIOD:** Within 60 **days** from the Effective Date, Buyer, its agents, and employees shall have the right to enter upon the Property for the purpose of making such non-intrusive inspections as Buyer may deem appropriate at Buyer's sole risk, cost and expense. All of such entries upon the Property shall be at reasonable times during normal business hours and after at least forty-eight (48) hours prior notice to Seller or Seller's agent, and Seller or Seller's agent shall have the right to accompany Buyer during any activities performed by Buyer on the Property. Buyer shall not disturb the tenants on the Property and Buyer's inspection shall be subject to the rights of tenants under their Leases and the law. If any inspection or test disturbs the Property, Buyer will restore the Property to the same condition as existed prior to the inspection or test. Buyer shall defend, indemnify and hold Seller, Seller's tenants, agents, and employees and the Property harmless from and against any and all losses, costs, damages, claims, or liabilities, including but not limited to, mechanic's and materialmen's liens and Seller's attorney fees, arising out of or in connection with Buyer's inspection of the Property as allowed herein.

3.3 **FINANCIAL INSPECTIONS/DUE DILLIGENCE PERIOD:** During the Financial Due Diligence Period, which shall be 45 **days** from the receipt of all Property Information from Seller (Paragraph 3.1), Buyer shall have the right to conduct any and all financial due diligence it shall deem necessary. The Seller has agreed to provide all property information required in paragraph 3.1 within ten days from the Effective Date (Paragraph 22). Should Seller fail to provide said property information in the form and substance defined within 30 days from the Effective Date, this contract shall be considered null and void, at the option of the Buyer, and of no further force or effect. In such event, the Title Company is instructed to immediately return the earnest money to Buyer after receiving written notice from Buyer and with no further release requirements from Seller.

Buyer                Seller

**3.4  LEAD-BASED PAINT/ENVIRONMENTAL INSPECTIONS:** During the Physical Due Diligence Period, Buyer, at Buyer's expense, shall have the right to enter upon the Property, together with any other persons, to inspect and conduct such environmental, soil, air, hydrocarbon, chemical, carbon, asbestos, lead-based paint, and other test Buyer deems necessary or appropriate. The inspections may include a non-intrusive Phase I environmental inspection of the Property. If any report discloses a "recognized environmental condition" (as hereinafter defined) affecting the Property, then Seller may terminate this Agreement in its sole and absolute discretion, and the Earnest Money shall be refunded to Buyer. For purposes hereof, a "recognized environmental condition" is defined by American Society for Testing and Material Standard Practice for Environmental Site Assessments: Phase I Site Assessment.

*LEAD BASED PAINT DISCLOSURE* (For Property built before 1978 ONLY); Buyer acknowledges that prior to signing this Contract, Buyer received and read a copy of the EPA "*Protect Your Family From Lead in Your Home*" pamphlet, which explains the hazards of lead-based paint. Seller shall disclose any knowledge of lead-based paint on the property or any results of prior tests for lead-based paint, which have been performed.

**3.5  FLOOD:** Seller represents to the best of Seller's knowledge the Property has not been damaged or affected by flood, storm run off water, or storm sewer backup. During the Physical Due Diligence Period, Buyer, at Buyer's expense, may enter upon the Property to investigate and conduct tests to satisfy himself/herself as to the flood and/or water history and water risk attendant to the Property. If, upon Buyer's investigation, the Buyer is dissatisfied with any of the flood and water history and water risk attendant to the Property, the Buyer may cancel and terminate this Contract and receive a refund of the Earnest Money by delivering written notice to the Seller within twenty-four (24) hours of the expiration of the Due Diligence Period.

**3.6  ENVIRONMENTAL REPRESENTATIONS AND INSPECTIONS: Except as may be specified in Paragraph 14 below,** Seller represents to the best of Seller's knowledge, that there have been no hazardous substances, as defined by the Federal Environmental Protection Agency, stored, released, disposed or used on the Property, including underground storage tanks; that there have been no special use permits, variances, or other land-use authorizations issued concerning waste disposal on the Property; that the Property is neither listed with, nor adjacent to a site listed with, the Environmental Protection Agency as hazardous waste site; and that Seller has received no notice of any legal or administrative proceedings regarding environmental issues affecting the Property.

**3.7  EQUIPMENT:** No fixtures or appliances shall be removed from the Property after the Effective Date herein without notice to Buyer.

During the Physical Due Diligence Period, Buyer, at Buyer's expense, shall have the right to inspect such items.

Notwithstanding anything contained herein, it is understood and agreed by Buyer and Seller that Property is being sold in "AS IS" condition.

**3.8  TERMITE INSPECTION:** After removal of all Buyer contingencies the Seller shall cause to be delivered, in care of the Escrow Agent, at Seller's expense, a current report by a licensed exterminating company addressed to Buyer, reflecting that the buildings on the Property are free and clear of visible infestation or damage caused by any wood destroying organisms (termites, etc,). In the event the report shows

Buyer _____    Seller _____

visible infestation the Seller shall have the property treated by a licensed exterminating company and provide Buyer with a certificate showing that there is no live infestation on the property.

**3.9 TERMINATION DURING PHYSICAL DUE DILIGENCE PERIOD:** In the event Buyer determines before the expiration of the Physical Due Diligence Period that the Property is unacceptable for Buyer's purposes, Buyer shall have the right to terminate this Agreement by giving to Seller written notice of termination before the expiration of the Physical Due Diligence Period. Upon notification by Buyer, both Buyer and Seller hereby agree that this Agreement shall be terminated and of no further force or affect and the Escrow Agent shall immediately refund the Earnest Money to Buyer without any additional release requirements, less any Buyer's costs incurred, pursuant to this contract, and neither party shall have any further rights or liabilities hereunder, except for those provisions which survive the termination of this Agreement.

**3.10 TERMINATION DURING FINANCIAL DUE DILIGENCE PERIOD:** In the event Buyer determines before the expiration of the Financial Due Diligence Period that the Property is unacceptable for Buyer's purposes, Buyer shall have the right to terminate this Agreement by giving to Seller written notice of termination before the expiration of the Financial Due Diligence Period. Upon notification by Buyer, both Buyer and Seller hereby agree that this Agreement shall be terminated and of no further force or affect and the Escrow Agent shall immediately refund the Earnest Money to Buyer without any additional release requirements, less any Buyer's costs incurred, pursuant to this contract, and neither party shall have any further rights or liabilities hereunder, except for those provisions which survive the termination of this Agreement.

**3.11 ACCEPTANCE OF PROPERTY:** If Buyer fails to (i) investigate the water and flood risk, or environmental risk attendant to the Property; (ii) have the equipment inspected; (iii) have the structure and roof inspected; or (iv) deliver such notices in the manner specified, Buyer accepts the flood and water risk, any environmental risk, the structure, and all equipment attendant to the Property and accepts all portions of the Property which are subject to Buyer's right of inspection, in the condition or state which existed at the expiration of the time periods stated in the above paragraphs. Unless otherwise agreed upon, in writing, Buyer, by Closing or taking possession of the Property, shall be deemed to have accepted the Property, in its then condition, including fixtures and equipment. No warranties, express or implied, by Seller, or Seller's agents, with reference to the condition of the Property or any fixtures or equipment shall be deemed to survive the Closing.

**3.12 FINANCING CONTINGENCY/TERMINATION:** Buyer intends to obtain financing from Tax Exempt Multi-family Bonds and Affordable Housing Tax Credits ("AHTC"). Buyer shall have **until February 1, 2007** in which to obtain such financing(s) as Buyer, in its discretion, shall deem advisable with respect to its acquisition of the Property. Buyer shall make application for said financing on or before September 17, 2006. In the event Buyer determines, before the expiration of the Financing Period, that Buyer is unable to obtain such financing(s) as Buyer deems appropriate, Buyer shall have the right to terminate this Agreement by giving to Seller written notice of termination before the expiration of the Financing Period, the Escrow Agent shall immediately refund the Earnest Money to Buyer, without any additional release requirements, less any Buyer costs incurred pursuant to this Agreement, and neither party shall have any further rights or liabilities hereunder except for those provisions which survive the termination of this Agreement.

## 4. TITLE AND SURVEY REVIEW:

**4.1 DELIVERY OF TITLE REPORT:** Within ten (10) days after removal of all contingencies, Seller shall cause to be delivered to Buyer a new or currently re-certified Survey ("Survey") acceptable to the Title

Buyer _____    Seller _____

Company for Survey Coverage and a preliminary report or title commitment issued by the Title Company (the "Title Report"), covering the Property, together with copies of all documents referenced in Title Report. Title Commitment (Binder) shall be shared equally between buyer and seller and Survey shall be paid by Seller.

**4.2 TITLE REVIEW AND CURE:** Buyer shall review title to the Property as disclosed by the Title Report and the Survey. Buyer shall notify Seller in writing of any title or survey objections no later than ten (10) days after Buyer's receipt of the Title Report and Survey. Seller shall have no obligations to cure any title objections except liens of an ascertainable amount created by Seller, which liens Seller shall cause to be released at the Closing. If the Title Company revises the Title Report after the expiration of the Due Diligence Period to add or modify exceptions that materially and adversely affect title to the Property, Buyer may object to such matter by notice to Seller within five (5) days after such revised Title Report is delivered to Buyer. Seller may, but shall not be obligated to, attempt to cure any title objections by the Closing Date. If Seller elects not to cure any title or survey objection, or fails to cure any title or survey objection by the Closing Date, then Buyer shall either terminate this Agreement by written notice to Seller given on or before ten (10) days after receipt of any notice by Seller, that it elects not to cure or cannot cure any title or survey objections, or, if later, the Closing Date, and the Earnest Money shall be immediately refunded to Buyer without any additional release requirements, or waive such title or survey objections, in which event the Closing shall occur as contemplated herein and Buyer shall accept title to the Property subject to such condition. Failure to so terminate shall constitute waiver of such objection(s).

**4.3 TITLE POLICY:** At Closing, as a condition to Buyer's obligation to close and subject to the performance by Buyer of all its obligations in connection therewith, the Title Company shall deliver to Buyer an Owner's Policy of Title Insurance ("Title Policy"), issued by the Title Company dated the date and time of recording of the Deed in the amount of the Purchase Price, insuring Buyer as owner of fee simple title to the Property, in such form permitted by, and subject to such exceptions as set forth in, the most current Title Report as of the expiration of the Due Diligence Period. The Title Policy may be delivered after the Closing if that is customary in the locality. Cost of Owner's Title Policy shall be shared equally between buyer and seller.

**5. NON-FOREIGN SELLER:** Seller represents and warrants that at the time of acceptance hereof and at Closing, Seller is not a "foreign person" as such term is defined in Section 1445(f) of the Internal Revenue Code of 1986. At the Closing, and as a condition thereto, Seller shall furnish to Buyer an affidavit, in form and substance acceptable to Buyer, signed under penalty of perjury and containing Seller's United States Social Security and/or Taxpayer Identification Number, to the effect that Seller is not a foreign person within the meaning of Section 1445(f) of the Internal Revenue Code.

**6. OPERATIONS AND RISK OF LOSS:**

**6.1 ONGOING OPERATIONS:** During the pendency of this Agreement, Seller shall carry on its business and activities to the Property substantially in the manner as carried out on the date thereof.

**6.2 PERFORMANCE UNDER LEASES AND SERVICE CONTRACTS:** During the pendency of this Agreement, Seller will perform its material obligations under the Leases and Service Contracts and other agreements that may affect the Property.

**6.3 NEW CONTRACTS:** During the pendency of this Agreement, Seller will not enter into any contract that will be an obligation affecting the Property subsequent to the Closing, except contracts entered into in the ordinary course of business that are terminable without cause on 30 days' notice, without the prior consent

Buyer                    Seller

of the Buyer, which shall not be unreasonably withheld. New tenant leases shall be for a term of no more than six months and at a rate no lower than the stated street rate as provided by Seller per paragraph 3.1 (b).

**6.4 TERMINATION OF SERVICE CONTRACTS:** On the Closing Date, Seller shall terminate those Service Contracts which are terminable without any cost or liability to Seller, unless Buyer notifies Seller during the Due Diligence Period as to which of such Service Contracts should not be canceled and will be assumed by Buyer. All Service Contracts not terminated by Seller shall be assigned to and assumed by Buyer at Closing.

**6.5 RISK OF LOSS:** Risk of loss resulting from any condemnation or eminent domain proceeding which is commenced or has been threatened prior to the Closing, and risk of loss to the Property due to fire, flood or any other cause prior to the Closing, shall remain with Seller. After Closing or transfer of possession such risk shall be upon Buyer.

**7. TAXES AND PRORATIONS:** The Seller shall pay in full: **(i)** all special assessments against the Property upon the date of Closing, whether or not payable in installments; **(ii)** all taxes, other than general ad valorem taxes for the current calendar year, which are a lien on the Property upon the date of Closing, including the cost of documentary stamps to be attached to the Deed; and **(iii)** the cost of any item of workmanship or material furnished on or prior to the date of Closing which is or may become a lien on the Property. Unless otherwise specified in Paragraph 14, the following items shall be prorated between the Seller and the Buyer as of the date of Closing; **(iv)** all collected rents for the current month for every rented unit; **(v)** general ad valorem taxes for the current calendar year, provided that, if the amount of such taxes has not been fixed, the prorations shall be based upon the rate of levy for the previous calendar year; and **(vi)** utilities, including water, sewer, electric and gas, based upon the last reading of meters prior to closing; and **(vii)** fees and charges under Service Contracts as are being assigned to and assumed by Buyer at Closing. Utilities shall be transferred as of the Closing date. Seller shall obtain final readings on the day prior to closing and Buyer shall have new accounts established to become effective as of the Closing date. In the event that final prorations cannot be made at Closing for any item being prorated, then Buyer and Seller agree to allocate such items on a fair and equitable basis as soon as invoices or bills are available, final adjustment to be made as soon as reasonably possible after the Closing. Payments in connection with the final adjustment shall be due within thirty (30) days of written notice. Security deposits shall be delivered and transferred by separate check to Purchaser at closing. Any and all uncollected rent or other amounts due and payable at the time of closing shall be the responsibility and for the benefit of the Buyer. After Closing the Seller shall not contact tenants or make any attempt to collect any monies due as a result of the operation of the property.

**8. CLOSING:** Subject to the provisions contained herein and subject to the fulfillment of any conditions to the Closing specified in Paragraph 14, Closing shall be as agreed between Seller and Buyer, but no later than 30 days after the award of AHTC (**"Closing Date"**). AHTC are scheduled to be awarded on January 31, 2007. Buyer shall have the right to extend the Closing Date for two separate 30 day periods, provided that the following conditions are met: **(i)** Buyer provides written notice to Seller at least 10 days prior to the Closing Date; and **(ii)** Buyer transfers an extension fee to Seller in the amount of $25,000 contemporaneously with the deliver of each such notice. Any such extension fee(s) will be considered earned by seller upon receipt and shall be applicable to the Purchase Price at Closing. If the Buyer has objections to Title, which require correction, the Closing Date shall be extended for the time permitted under Paragraph 4. At or prior to the Closing, the Seller shall deliver to the Escrow Agent a duly executed and acknowledged warranty deed conveying marketable, fee simple title to the Property to the Buyer, assignments of any leases and/or contracts affecting the Property, a Non-foreign Affidavit, a Bill of Sale for any personal property, all keys to the Property,

Buyer _____    Seller _____

and such other documents or materials as are reasonably necessary to convey the Property and rights therein, for delivery to the Buyer upon Payment of the purchase price. Unless otherwise agreed in writing, possession shall be transferred at closing. The Closing/Escrow fees charged at Closing shall be Seller.

**9. POST–CLOSING DELIVERIES:** Immediately after the Closing, Seller shall deliver to Buyer, at the Property; the original Leases; original copies of all contracts, receipt for deposits, and unpaid bills that are Buyer's responsibility for services occurring after closing; all keys, if any, used in the operation of the Property; and, if in Seller's possession or control.

**10. NOTICE TO TENANTS:** Seller and Buyer shall deliver to each tenant immediately after the Closing a notice regarding the sale attached hereto, or such other form as may be required by applicable state law. Within ten (10) days after the Closing Date, Buyer shall send a certificate of Buyer to Seller confirming delivery of the tenant letters.

**11. BREACH OR FAILURE TO CLOSE:** If after the Seller has performed Seller's obligations under this Contract and, if within five (5) days after the date specified above for Closing, the Buyer fails to make payments or to perform any other obligation of the Buyer under this Contract, then the Seller may, at Seller's option, cancel and terminate this Contract and retain all sums paid by the Buyer, but not to exceed 5% of the purchase price, as liquidated damages, or pursue any other legal or equitable remedy for the breach of this Contract by the Buyer. The Seller and the Buyer agree that the undersigned Broker(s) may retain and shall be paid four percent (4%) of such retained funds, not exceeding the agreed upon commission for services in obtaining this Contract. If the Buyer performs all of the obligations of Buyer and Seller breaches this Contract or fails to perform any of Seller's obligations, then Buyer shall be entitled to either cancel and terminate this Contract, return the abstract, if any, to Seller and receive a refund of the Earnest Money, or pursue any other legal or equitable remedy. Should either party employ attorneys to interpret or enforce any of the provisions hereof, the party against whom any final judgment is entered agrees to pay the prevailing party all reasonable costs, charges, and expenses, including attorney's fees, expended or incurred in connection therewith.

**12. EFFECT:** This Contract shall be executed by both Seller and Buyer and shall be binding upon and inure to the benefit of Seller and Buyer, their heirs, legal representatives, successors and assigns. This Contract sets forth the complete understanding of Seller and Buyer and supercedes all previous negotiations, representations and agreements between them and their agents. This Contract can only be amended or modified by a written agreement signed by Seller and Buyer. In executing this Contract, both Seller and Buyer agree to the terms of the Broker(s) Receipt and Agreement contained below.

**13. MISCELLANEOUS:**

    **13.1 PARTIES BOUND:** This Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devisees of the parties.

    **13.2 CONFIDENTIALITY:** Buyer or Seller shall not record this Agreement or any memorandum of this Agreement.

    **13.3 HEADINGS:** The article and paragraph headings of this Agreement are of convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

Buyer _____    Seller _____

**13.4 INVALIDITY AND WAIVER**: If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

**13.5 GOVERNING LAW**: This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the state in which the Real Property is located.

**13.6 SURVIVAL**: Unless otherwise expressly stated in this Agreement, each of the covenants, obligations, representations, and agreements contained in this Agreement shall survive the Closing.

**13.7 NO THIRD PARTY BENEFICIARY**: This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third party beneficiary, decree, or otherwise.

**13.8 DISCLAIMER**: It is expressly understood by the Seller and Buyer that the Listing Realtor or their Agents and the Selling Realtor or their Agents do not warrant the present or future value, size by square footage, condition, structure or structure systems of any building, nor do they hold themselves out to be experts in quality, design and construction, and further agree to hold the Listing Realtor or their Agents and Selling Realtor or their Agents harmless in any of these events. Agents, however, agree that they will disclose to Buyer any known defects or problems with the property that is the subject of this contract.

**13.9 ENTIRETY AND AMENDMENTS**: This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property except for any confidentiality agreement binding on Buyer, which shall not be superseded by this Agreement. This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

**13.10 TIME**: Time is of the essence in the performance of this Agreement.

**13.11 ATTORNEY'S FEES**: Should either party employ attorneys to interpret or enforce any of the provisions hereof, the party against whom any final judgment is entered agrees to pay the prevailing party all reasonable costs, charges, and expenses, including attorney's fees, expended or incurred in connection therewith.

**13.12 NOTICES**: All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Paragraph 17. Any such notices shall be either (a) sent by certified mail, return receipt requested, in which case notice shall be deemed delivered three business days after deposit, postage prepaid in the U.S. mail, (b) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one business day after deposit with such courier, (c) sent by facsimile, in which case notice shall be deemed delivered upon transmission of such notice, or (d) sent by personal delivery, in which case notice shall be deemed delivered upon receipt. A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.

Page 8 of 14

Buyer _____     Seller _____

13.13 CONSTRUCTION: The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and any ambiguities shall not be resolved against the drafting party, both parties being deemed to have drafted this Contract.

13.14 CALCULATION OF TIME PERIODS: Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included at, unless such last day is a Saturday, Sunday or legal holiday for national banks in the location where the Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday. The last day of any period of time described herein shall be deemed to end at 5:00 P.M. local time of the Property described herein.

13.15 EXECUTION IN COUNTERPARTS: This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. To facilitate execution of this Agreement, the parties may execute and exchange by telephone facsimile counterparts of the signature pages and /or any other pages as deemed necessary to reach a final agreement.

14. SPECIAL CONDITIONS:

Notwithstanding anything to the contrary contained herein, the Earnest Money as defined in Para. 2 shall be deemed earned and non-refundable to the Buyer in two phases:

September 5, 2006 – $25,000 Earned and Non-Refundable

October 31, 2006 – additional $25,000 Earned and Non-Refundable

December 31, 2006 –$25,000 Earned and Non-Refundable

15. BROKER RELATIONSHIP DISCLOSURE/COMMISSION: The parties to this transaction hereby acknowledge that, prior to the parties entering into this Contract, the following disclosures were clearly made to each of the parties.

The Listing Broker is acting as a Transaction Broker.

The Selling Broker is acting as a Transaction Broker.

It is further acknowledged and agreed by the parties that the Seller will pay the Broker(s) **4%** of the purchase price at Closing as a commission for services rendered in this real estate transaction.

16. BINDING EFFECT AND ENFORCEABILITY OF CONTRACT: Before this Contract shall be binding and can be enforced by either party, the following acts of execution and deliveries shall be completed:

17. Execution and Delivery of Contract Documents, Counterparts. The parties agree that the Contract between them shall be evidenced by either a single executed Contract upon which each of them shall place their signatures, or by each of them placing their signatures on separate complete (carbon, photo or fax) copies "counterparts" of the Contract documents. The Contract shall be binding only upon the delivery to each party, or their agent, of either (i) a Contract containing the original or copy of the

_____    _____
Buyer                                         Seller

signature of both parties or (ii) a counterpart containing either the original or a copy of the signature of the other party.

**18. NOTICE:** Any notice provided for herein shall be given in writing, sent by (a) personal delivery, (b) United States mail, postage prepaid, (c) overnight mail, prepaid or (d) by FAX, to the Escrow Agent, with copies to the other parties or to such other parties and address as shall hereafter be designated in writing as indicated on Exhibit B attached hereto. Any such notice shall be deemed to have been given upon receipt by the Escrow Agent.

**19. BROKER(S) RECEIPT AND AGREEMENT:** The Buyer and Seller mutually warrant and represent that the undersigned Broker(s) is/are the only Broker(s) involved in this transaction. The Broker(s) and/or Escrow Agent shall be entitled to accept Buyer's personal check for the Earnest Money and endorse it for deposit without recourse. If Seller does not approve the above Contract the Earnest Money shall be returned to Buyer.

**20. SALES COMMISSION:** At Closing, Seller shall pay to the Real Estate Broker(s) identified herein, as compensation 4% of the gross sales price however, the sales commission shall be due and payable if, as and only when, the transaction contemplated hereby is fully consummated. Any cooperating or referring brokerage fees due will be the responsibility of the Brokers (Paragraph 15) and paid only by separate agreement between the Brokers.

**21. ACCEPTANCE:** If this contract is not accepted within five (5) days from the date presented to Seller, this contract shall be considered withdrawn, null and void and of no further force or effect.

**22. SECTION 1031 EXCHANGE:** Seller and/or Buyer may consummate the sale of the Property as part of a so-called like kind exchange (the "Exchange") pursuant to §1031 of the Internal Revenue Code of 1986, as amended (the "Code"), provided that; (i) the Closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of the Exchange to be a condition precedent or condition subsequent to Seller's or Buyer's obligations under this Agreement; (ii) Seller or Buyer shall effect the Exchange through a qualified intermediary, and (iii) Buyer or Seller shall not be required to make an assignment of the purchase agreement for the Exchange property or be required to acquire or hold title to any property for the purposes of consummating the Exchange. Buyer or Seller shall not by this Agreement or acquiescence to the Exchange (1) have its rights under this Agreement affected or diminished in any manner, or (2) be responsible for compliance with or be deemed to have warranted to Seller or Buyer that the Exchange in fact complies with §1031 of the Code.

Buyer                    Seller

23. **EFFECTIVE DATE:** The Effective Date of this agreement shall be inserted after complete acceptance of this agreement by both Buyer and Seller and receipt has been acknowledged by the Escrow Agent herein.


**EFFECTIVE DATE:** _____


**APPROVED AND AGREED TO BY BUYER(S):**

This ____ day of _____, 2006

_____

_____

_____

**APPROVED AND AGREED TO BY SELLER(S):**

This _____ day of _____, 2006

_____

Buyer _____   Seller _____

## ACKNOWLEDGEMENT BY ESCROW HOLDER

### ACKNOWLEDGEMENT OF CONTRACT

The Escrow Holder hereby agrees to perform its obligations under this Agreement and acknowledges receipt of the fully executed counterpart of this Agreement. If Buyer's earnest money is not received by Escrow Holder within three (3) days from the Effective Date herein, and without written extension signed by Seller, this contract shall be considered null and void.

The parties hereto agree to execute such other escrow instructions as may reasonably be requested by escrow holder.

BY: _____        DATE: _____
      Old Republic National Title Insurance Company

### ACKNOWLEDGEMENT OF EARNEST MONEY

The Escrow Holder hereby agrees to perform its obligations under this Agreement and acknowledges receipt of the Earnest Money in the amount of $25,000  If Buyer's earnest money is not received by Escrow Holder within three (3) days from the Effective Date herein, and without written extension signed by Seller, this contract shall be considered null and void.

The parties hereto agree to execute such other escrow instructions as may reasonably be requested by escrow holder.

BY: _____        DATE: _____
      Old Republic National Title Insurance Company

## ALWAYS HAVE YOUR TITLE EXAMINED BY AN EXPERIENCED ATTORNEY.

Buyer       Seller

**Exhibit B-25, Page 68**

# Exhibit A

# Legal Description

Buyer _____    Seller _____

# Exhibit B

## Notices

| | | | |
|---|---|---|---|
| Escrow Agent: | Old Republic National Title Insurance Company | Title Company: | Old Republic National Title Insurance Company |

Buyer(s):     **Rant, LLC**              Seller(s):     **Waverly – Walnut Creek Apartments, Inc.**

Selling Broker:     **Compass Property Advisors LLC**       Listing Broker:

**Mark F. White.**
**909 S. Meridian Ave., Suite 500**
**Oklahoma City, OK 731089 (405)**
**605-5885 phone**
**(405) 605-7525**

Attorney:                                      Attorney:

1031 Co.:                                      1031 Co.:

_____   _____
Buyer                    Seller

Exhibit B-27, Page 70

# SAMPLE
## RENTAL APPLICATION

The information collected below will be used to determine whether you qualify as a tenant. It will not be disclosed without your consent except to your employer's for verification of income and employment and to financial institutions for verification of assets, and as required and permitted by law. You do not have to provide the information, but if you do not your application may be delayed or denied.

| 1. Applicants Name | | Social Security No. | | Home phone ( ) |
|---|---|---|---|---|
| 2. Present Street Address | City | State | Zip Code | # of Years at Present Address |
| 3. Former Street Address (If at address for less than 2 yrs.) | City | State | Zip Code | # of Years at Former Address |
| 4. Names of other persons in household | | | | |

| 5. Name and address of employer | Type of Business | Self Employed? __ yes __ no |
|---|---|---|
| Business phone number ( ) | Position/Title | No. of Yrs on Job |
| 6. Name and address of previous employer (If employed at present position less than 2 yrs) | No. of Yrs with Previous Employer | Business phone ( ) |

| 1. Co-Applicants Name | | Social Security No. | | Home phone ( ) |
|---|---|---|---|---|
| 2. Present Street Address | City | State | Zip Code | # of Years at Present Address |
| 3. Former Street Address (If at address for less than 2 yrs.) | City | State | Zip Code | # of Years at Former Address |

| 4. Name and address of employer | Type of Business | Self Employed? __ yes __ no |
|---|---|---|
| Business phone number ( ) | Position/Title | No. of Yrs on Job |
| 5. Name and address of previous employer (If employed at present position less than 2 yrs) | No. of Yrs with Previous Employer | Business phone ( ) |

**Exhibit B-28, Page 71**

Application
Page 2

ANNUAL INCOME

| Source | Applicant | Co-Applicant | Other Household Members 18 or Older | Total |
|---|---|---|---|---|
| Salary | | | | |
| Overtime Pay | | | | |
| Commissions | | | | |
| Fees | | | | |
| Tips | | | | |
| Bonuses | | | | |
| Interest and/or Dividends | | | | |
| Net Income from Business | | | | |
| Net Rental Income | | | | |
| Social Security, Pensions, Retirement Funds etc., received periodically | | | | |
| Unemployment Benefits | | | | |
| Workers Compensation | | | | |
| Alimony, Child Support | | | | |
| Other: | | | | |
| | | | TOTAL: | |

| Assets | Cash Value | Income from Assets | Bank Name | Account Number |
|---|---|---|---|---|
| Cash on Hand | $ | NA | NA | NA |
| | $ | NA | NA | NA |
| Checking Account | $ | $ | | |
| | $ | $ | | |
| Savings Account | $ | $ | | |
| | $ | $ | | |
| Credit Union | $ | $ | | |
| | $ | $ | | |

**Have you disposed of any assets for less than fair market value in the past 2 years?  YES  or  NO**

Revised October 2005                    Appendix C                    Rental App

**Exhibit B-29, Page 72**

Application
Page 3

Household Composition

List the head of your household and all members who live in your home. Give the relationship of each family member to the head.

| Member No. | Full Name | Relationship | Date Of Birth | Social Sec. # | Full-Time Student (Yes or No) |
|---|---|---|---|---|---|
| H.O.H. | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |

Does anyone live with you now who is not listed above? _____ Yes _____ No

Does anyone plan to live with you in the future who not listed above? _____ Yes _____ No

Please explain if you answer "Yes" to either question above.

_____

_____

_____

Have any of your household members ever been convicted of a felony? _____ Yes _____ No

Are all household members full-time students? _____ Yes _____ No

If you answered Yes to the above question does the household qualify for one of the following exceptions.

_____ 1.    Married and filing a joint tax return.

_____ 2.    Single parent(s) with minor child(ren) and both the parent(s) and child(ren) are not a dependent of a third party.

_____ 3.    At least one member of the household receives assistance under Title IV of the Social Security Act (i.e., AFDC assistance)

_____ 4.    At least one member of the household is enrolled in a job training program receiving assistance under the Job Training Partnership Act, or similar federal, state, or local laws.

Revised October 2005                          Appendix C                          Rental App

**Exhibit B-30, Page 73**

The information provided on Pages 1 through 3 are true and complete to the best of my knowledge and belief. I/We consent to the disclosure of income and financial information from my/our employer and financial references for purposes of income and aset verification related to my/our application for tenancy.

_____        _____
Applicant                                Date

_____        _____
Co-Applicant                             Date

# Counter Offer

Seller:     Waverly-Walnut Creek Apartments, Inc.

Buyer:      Rant LLC and/or Assigns

Property:   Santa Fe Apartments – 224 Units
            125 SW 74th Street
            Oklahoma City, OK 73139

The following shall serve as a Counter Offer to the Contract for Sale of Real Estate
dated July 19th, 2005 by and between Seller and Buyer named above.

Para 2.     TERMS:  The total purchase price to be $4,815,000.00
            4,704,000.

Para 4.3    Title Policy:  Cost of Owner's Title Policy shall be at Buyer's expense.

Para 15     Broker Relationship Disclosure/Commission:  Seller will pay the Broker(s)
            5% of price at Closing

All other provisions of the contract not amended herein shall remain in full force and effect.

APPROVAL OF SELLER THIS                 APPROVAL OF BUYER THIS
22nd DAY OF  July    2006               21st DAY OF  July    2006

Waverly-Walnut Creek Apartments, Inc.   Rant LLC and/or Assigns

**Exhibit B-32, Page 75**

Addendum # 1 –
CONTRACT FOR SALE OF REAL ESTATE
Sante Fe Pointe Apartments

THIS ADDENDUM #1 ("Addendum") modifies and amends the CONTRACT FOR SALE OF REAL ESTATE (the "Contract") dated July 12, 2006 (collectively, the "Contract"), entered into by and between Waverly-Walnut Creek Apartments, Inc. (the "Seller") and RANT, LLC (the "Buyer"). Capitalized terms not defined herein shall have the meaning set forth in the Contract.

Seller and Buyer, respectively, each agree to modify and amend the Contract as follows:

1.    Section 14 of the Contract is hereby amended and restated in its entirety to read as follows:

The purchase and sale of the Property ("Closing") shall be consummated through the Escrow Holder and closing shall take place at the Escrow Holder's Office on a date mutually agreeable to the parties, but not later than March 31, 2007 (the "Closing Date"); provided, however that Buyer shall have the right to extend the Closing Date for three (3) separate 30 day periods, provided that the following conditions are met: (i) Buyer provides written notice to Seller at least 10 days prior to the Closing Date, and (ii) Buyer transfers an extension fee to Seller in the amount of $25,000 contemporaneously with the delivery of each such notice. Any such extension fee(s) will be considered earned by Seller upon receipt, non-refundable and shall be applied to the Purchase Price at Closing.

2.    Buyer to pay an additional $50,000 to Seller upon the execution of this Addendum.

3.    Seller hereby agrees and consents to the assignment of Buyer's rights, title and interest under the Contract to Santa Fe Pointe, L.P. ("Assignee"), a newly created Oklahoma limited partnership of which Buyer is the General Partner. Assignee agrees to assume and perform all obligations of Buyer under the Contract and this Addendum.

4.    Except as expressly set forth herein, the terms and conditions of the Contract remain in full force and effect.

1 of 2

3.    This Addendum #1 may be executed in one or more counterparts, each of which shall be an original and all of which together shall be one and the same instrument.

IN WITNESS WHEREOF, Seller and Buyer have entered into this Addendum to the Contract as of December 19, 2006.

Waverly-Walnut Creek Apartments, Inc.

By: _____
Name: Wm. Forrest White
Title: Officer

Buyer: RANT, LLC

By: _____
Name: Theo F. Oliphant
Title: Managing Member

Assignee: Santa Fe Pointe, L.P.

By: _____
Name: Theo F. Oliphant
Title: Managing Member of
General Partner

2 of 2

JUN-29-2007 FRI 12:34 PM GR_...-WEST          FAX NO. 40_ _34 7331          P. 02

SANTA FE POINTE, LP
16416 Oconee Creek Drive
Edmond, OK 73013

June 22, 2007

VIA FACSIMILE and E-MAIL
Waverly-Walnut Creek Apartments, Inc.
c/o Compass Properties

Dear Mark,

    This letter shall serve as confirmation that Santa Fe Pointe, LP ("Buyer"), hereby elects to extend the Closing Date until July 31, 2007 for the purchase of the Santa Fe Pointe Apartments located in Oklahoma City, Oklahoma. Pursuant to Section 14 of the Contract for Sale of Real Estate between Buyer and your client, Waverly-Walnut Creek Apartments, Inc. ("Seller"), Buyer will deliver $25,000 on or before June 29, 2007 as consideration to be applied to the purchase price for the property.

    Thank you for all of your efforts in coordinating the due diligence and closing of the purchase transaction.

Very truly yours,

Santa Fe Pointe Management, LLC

Theo F. Oliphant,
Managing Member of the
General Partner

ACCEPTED AND AGREED TO:

Waverly-Walnut Creek Apartments, Inc.

By:
    Name: Wm Forrest White
    Title: Corp. Officer

**Exhibit B-35, Page 78**

JUN-29-2007 FRI 12:34 PM GREAT-WEST          FAX NO. 405 634 7331          P. 01

# Great-West Management Corporation

Phone:    405-634-8888
FAX:       405-634-7331

# FAX

DATE: 6-29-07

TO: Theo P. Oliphant

FAX: 570-288-1371          FROM: Forrest White

RE: Santa Fe Pointe

Number of pages with cover sheet: 2

**Urgent      For review      Please comment      Please reply**

Mark -- Fax 405 605-7525

6619 So. Western, Oklahoma City, OK  73139

**Exhibit B-36, Page 79**

Addendum # 3
CONTRACT FOR SALE OF REAL ESTATE
Santa Fe Pointe Apartments

THIS ADDENDUM #3 ("Addendum") modifies and amends the CONTRACT FOR SALE OF REAL ESTATE ( the "Contract") dated July 12, 2006 (collectively, the "Contract"), including Addendum #1 signed and dated December 19, 2006 entered into by and between Waverly-Walnut Creek Apartments , Inc. (the "Seller") and Santa Fe Pointe, L.P., (the "Buyer"), Assignee of RANT, LLC and including Addendum #2 signed and dated July 20, 2007 entered into by and between the Seller and the Buyer. Capitalized terms not defined herein shall have the meaning set forth in the Contract.

Seller and Buyer, respectively, each agree to modify and amend the Contract as follows:

1.  Closing shall take place at the Escrow Holder's Office on a date mutually agreeable to the parties, but not later than the close of business on October 15, 2007 (the "Closing Date").

2.  Upon full execution of this Addendum #3, Buyer shall cause Escrow Holder to release the remaining $50,000 in earnest money to Seller and to be applied toward the Purchase Price by signing the included release from Escrow Holder.

3.  Seller may continue to solicit and accept third party back-up purchase offers for the Property prior to the Closing Date. Provided, however, Seller shall notify such third party ("3rd Party Offeror") in writing that: (a) Buyer is scheduled to close on or before October 15, 2007, (b) such 3rd Party Offeror may tender earnest money deposit to Seller's attorney and thereafter commence due diligence review of the Property and its historical operating results, and (c) such 3rd Party Offer and Seller may close on the purchase and sale transaction on any date after expiration of Buyer's Closing Date.

4.  In the event Buyer requests additional time beyond the Closing Date named herein, any extensions may be granted at Seller's option at a price of $10,000.00 per week.

5.  Seller agrees to provide Buyer with Seller Financing in an amount not to exceed $500,000.00 on a short term basis to complete the sale. Terms and conditions of Seller Financing are outlined in a separate note and second mortgage agreement between Buyer and Seller.

This Addendum #3 may be executed in one or more counterparts, each of which shall be an original and all of which together shall be one and the same instrument.

*[Remainder of this Page Intentionally Left Blank. Signature Page Follows.]*

IN WITNESS WHEREOF, Seller and Buyer have entered into this Addendum #3 to the Contract effective as of September 10, 2007.

Waverly-Walnut Creek Apartments, Inc.

By:_____
    Name: William Forrest White
    Title: Authorized Agent

Buyer: RANT, LLC

By: _____
    Name: Theo F. Oliphant
    Title: Managing Member

Assignee: Santa Fe Pointe, L.P

By:_____
    Name: Theo F. Oliphant
    Title:   Managing Member of
           General Partner