IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTA FE POINTE, LP, et al., | No. C-07-5454 MMC |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART COUNTERCLAIMANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| GREYSTONE SERVICING CORPORATION, INC., et al., | |
| Defendants | |

Before the Court is counterclaimant Greystone CDE, LLC's ("Greystone CDE") Motion for Summary Judgment, filed March 27, 2009. Counter-defendant Theotis F. Oliphant ("Oliphant") has filed opposition, to which Greystone CDE has replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND**

The following facts are undisputed.[2]

On December 20, 2006, Greystone CDE and Santa Fe Pointe, LP ("SFP") entered

---

[1] By order filed May 1, 2009, the Court took the matter under submission.

[2] Each party has submitted various objections to evidence submitted by the opposing party. To the extent the Court has relied on any such evidence herein, the objections thereto are overruled.

into a "Bridge Loan Agreement" ("Loan Agreement") under which the "Lender agree[d] to lend to Borrower such amounts as Borrower may request and Lender may approve . . . up to an aggregate amount at any time outstanding not in excess of the Loan Amount" (see Kemple Decl. Ex. B § 2.1);[3] the Loan Agreement provides that the "Loan Amount" is $500,000 (see id. Ex. B § 2.3).[4]

Also, on December 20, 2006, SFP executed a Bridge Promissory Note ("Note"), in which it promised to repay Greystone CDE, at specified interest rates, the "principal sum" of $500,000 "or so much thereof as shall have been disbursed in accordance with and as shall be then outstanding under the Loan Agreement." (See id. Ex. A at 1.) Further, in the Note, SFP promised to repay the "entire unpaid principal balance and accrued but unpaid interest" no later than July 1, 2007, the date described therein as the "Maturity Date." (See id.)

Additionally, on December 20, 2006, Oliphant executed a "Guaranty and Suretyship Agreement" ("Guaranty"), in which he "unconditionally and irrevocably guarantee[d] to [Greystone CDE] and be[came] surety to [Greystone CDE] for the due, punctual and full payment and performance of, and covenant[ed] with [Greystone CDE] duly, punctually and fully to pay and perform, . . . all indebtness of [SFP] to [Greystone CDE] evidenced by the Loan Agreement and/or incurred under the Loan Documents, both principal and interest." (See id. Ex. C at 1.)

The Loan Agreement initially provided that the term of the loan "shall end on June 15, 2007" (see id. Ex. B § 2.4), and, as noted, the Maturity Date of the Note was July 1, 2007 (see id. Ex. A at 1.) By a "Modification, Consent and Confirmation Agreement," dated June 29, 2007, Greystone CDE, SFP, Oliphant, Santa Fe Pointe Management, LLC

---

[3] The Loan Agreement identifies Greystone CDE as the "Lender" and SFP as the "Borrower." (See id. Ex. B at 1.)

[4] According to the Loan Agreement, SFP sought such funds "to finance predevelopment expenses of an affordable housing development project to be known as the Santa Fe Pointe Apartments located . . . in Oklahoma." (See id. Ex. B at 1.)

("SFM"), and Rant LLC ("Rant")[5] agreed to extend the "ending date" of the Loan Agreement to December 15, 2007, and to extend the Maturity Date of the Note to December 15, 2007. (See id. Ex. G.)

On August 21, 2007, Debi Martin ("Martin"), Vice President of Greystone CDE, advised SFP, Oliphant, SFM, and Rant in writing that Greystone CDE was of the view that SFP was in "default" of certain of its obligations under the Loan Agreement, and stated that Greystone CDE was "reserv[ing] the right to declare the amounts due under the Loan Documents immediately due and payable." (See id. Ex. H.) On September 18, 2007, Martin advised SFP, Oliphant, SFM, and Rant in writing that Greystone CDE was "declar[ing] the indebtedness evidenced by the Note, any and all other amounts payable under the Bridge Loan Agreement and the other Loan Documents and all other indebtedness of [SFP] to [Greystone CDE] to be immediately due and payable," which total amount as of September 18, 2007, according to Martin, was $534,594.51. (See id. Ex. I.)

Subsequently, on September 26, 2007, Greystone CDE filed, in the Southern District of New York, a civil action against SFP, Oliphant, SFM, and Rant. See Greystone CDE, LLC v. Santa Fe Pointe, L.P., 07-CV-8377 RPP. In its initial complaint, Greystone CDE alleged SFP had breached the terms of the Loan Agreement and Note by failing to repay the amounts loaned to SFP, and that Oliphant, SFM, and Rant had failed to perform the obligations required under their respective guarantees. By order filed May 20, 2008, the Southern District of New York transferred Greystone CDE's action to this district pursuant to 28 U.S.C. § 1404(a), and the matter was subsequently docketed herein as Civil Case No. 08-2756 MMC. At the Case Management Conference conducted August 22, 2008, the Court directed Greystone CDE to file its claims, as alleged in Civil Case No. 08-2756 MMC, as counterclaims to plaintiffs' complaint filed in the above-titled action, Civil Case No. 07-5454 MMC, and Greystone CDE subsequently complied with that order.

---

[5] SFM and Rant are, in addition to Oliphant, guarantors of SFP's performance under the Loan Agreement. (See id. Exs. BB, CC.)

Thereafter, the Court closed Civil Case No. 08-2756 MMC for statistical purposes only.[6]

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." See Celotex, 477 U.S. at 324 (internal quotation and citation omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted). "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted).

## DISCUSSION

In its operative pleading, the First Amended Counterclaim, Greystone CDE alleges SFP has breached the terms of the Loan Agreement and Note by failing to repay the amounts loaned to SFP under the Loan Agreement, and that Oliphant has failed to perform

---

[6]The Court takes judicial notice of the facts set forth in the preceding paragraph, said facts appearing in the Court's files, specifically, Civil Case Nos. 07-5454 MMC and/or 08-2756 MMC.

4

his obligations as required under the Guaranty.[7]  By the instant motion, Greystone CDE seeks summary judgment on its claim against Oliphant only.

**A.  Choice of Law**

In the Loan Agreement, the parties expressly provided that said agreement is to be "governed by and construed in accordance with the laws of New York." (See Kemple Decl. Ex. B § 10.9.)  Additionally, the Note executed by SFP provides that the Note is "governed by, and is to be construed in accordance with the laws of the State of New York." (See id. Ex. A at 3.)  Further, the Guaranty executed by Oliphant provides that the Guaranty is to be "governed by, and construed in accordance with, the laws of the State of New York." (See id. Ex. C at 11.)  Oliphant argues, however, that, irrespective of the unambiguous choice-of-law provisions in each of the above-referenced documents, none of those documents should be governed by New York law.  Rather, Oliphant asserts, California substantive law should govern the parties' contractual relationships at issue herein.

As a threshold matter, the parties disagree as to whether the Court, in determining whether the above-quoted choice-of-law provisions are enforceable, should apply New York or California law.  As discussed above, Greystone CDE's claims were initially filed in the Southern District of New York and were transferred to this district pursuant to § 1404(a).  Where, as here, a diversity action is transferred under § 1404(a), the transferee court is required to apply the substantive law that would have been applied had the matter not been transferred.  See Van Dusen v. Barrack, 376 U.S. 612, 639 (1964) (holding, where action is transferred pursuant to § 1404(a), "transferee district court [is] obligated to apply the state law that would have been applied if there had been no change of venue").  In applying this principle, the Ninth Circuit has held that where, as here, a diversity action is transferred by a New York district court to a California district court, the California court must apply New York law in determining whether a choice-of-law provision in an agreement is enforceable.  See, e.g., International Business Machines Corp. v. Bajorek, 191 F.3d

---

[7]Additionally, Greystone alleges breaches of contract by SFM and Rant.  These claims are not the subject of the instant motion.

5

1033, 1036-37, 1041-42 (9th Cir. 1999) (holding, where district court in New York transferred breach of contract action to district court in California, transferee court erred in failing to enforce contractual choice-of-law provision that was enforceable under New York law).

Under New York law, "[t]he parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars . . . may agree that the law of [New York] state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to [New York] state." See N.Y. Gen. Oblig. Law § 5-1401. As discussed above, the Loan Agreement, Note, and Guaranty each relate to an obligation arising out of a transaction involving more than $250,000.

Accordingly, the Court finds the New York choice-of-law provisions in the Loan Agreement, Note and Guaranty are enforceable. See id.; see, e.g., Sun Forest Corp. v. Shvilis, 152 F. Supp. 2d 367, 388-89 (S.D. N.Y. 2001) (holding New York choice-of-law provision in promissory note enforceable, where note required obligees to repay more than $250,000).

**B.  Liability of Oliphant for SFP's Failure to Repay**

The next issue presented by the instant motion is whether Oliphant can be held liable to Greystone CDE in the event SFP is found to be in breach of its obligation to repay Greystone CDE the amounts SFP borrowed under the Loan Agreement.[8]

The Guaranty unambiguously requires Oliphant to pay Greystone CDE any amounts owed to Greystone CDE in the event SFP fails to repay the amounts due to Greystone

---

[8] Oliphant argues there is no evidence SFP borrowed funds from Greystone CDE. Oliphant is incorrect. Oliphant conceded during his deposition that SFP borrowed $251,000 from Greystone CDE. (See Kemple Decl. Ex. D at 272-73.) Further, plaintiffs themselves allege in the Second Amended Complaint ("SAC") that SFP "funded" an "earnest money deposit to the seller . . . through an additional $25,000 advance on the Greystone bridge loan." (See SAC ¶ 33.) Thus, it is undisputed SFP borrowed at least $276,000 from Greystone CDE.

1  CDE. Oliphant argues, however, that he should not be required to so perform because,
2  according to Oliphant, (1) Oliphant was fraudulently induced to sign the Guaranty,
3  (2) Oliphant's assent was the product of economic duress, (3) consideration is lacking, and
4  (4) Greystone CDE and/or Greystone Servicing, Inc. ("Greystone Servicing") engaged in
5  "undue influence." As discussed below, however, the Court finds Oliphant has failed to
6  offer sufficient evidence to create a triable issue of fact as to any of the above-referenced
7  defenses.

**1. Fraudulent Inducement**

Oliphant argues he was fraudulently induced to sign the Guaranty and, as a result, the Guaranty is unenforceable.

In support of this argument, Oliphant offers his declaration and other evidence that Greystone CDE, on November 16, 2006, proposed in writing to loan to Oliphant, or a "single asset entity" controlled by Oliphant, the sum of $4,348,400 for the purposes of financing said entity's purchase of a specified "housing project" in Oklahoma (see Oliphant Decl. ¶ 24; Ex. C),[9] and that thereafter, on December 4, 2006, Greystone CDE proposed in writing to loan Oliphant, or a "single asset entity" controlled by Oliphant, the lesser sum of $500,000 as a "bridge loan" (see id. Ex. D). According to Oliphant, Matthew James ("James")[10] orally told Oliphant on such latter occasion that Greystone CDE was "committed" to lending SFP "85% of the appraised value of the property" and that Greystone CDE would do so "once the appraisal was in." (See Oliphant Decl. ¶ 26.) Subsequently, on December 17, 2006 or December 18, 2006, James, according to Oliphant, advised Oliphant the "note" would require Oliphant's "personal guaranty," which requirement had "never been discussed" by the parties before that date. (See id. ¶¶ 28, 29.) Further, according to Oliphant, James advised Oliphant orally, before Oliphant signed

---

[9]The cover sheet to the proposal states that the proposal is "for Santa Fe Pointe." (See id. Ex. C.) It thus appears undisputed that the "single asset entity" referenced in the proposal is SFP.

[10]James states he is employed by "Greystone & Co. Inc.," but acknowledges he is "an authorized representative" of Greystone CDE. (See James Decl. ¶ 1.)

7

1  the Guaranty, that Greystone CDE "would provide a bridge loan for the remaining amount
2  after the appraisal came in," and Oliphant "relied" on James's representation when Oliphant
3  signed the Guaranty December 20, 2006.  (See id. ¶ 31; Answer to First Amended
4  Counterclaim ¶ 14.)

5       In sum, Oliphant's evidence, considered in the light most favorable to Oliphant,
6  supports a finding that he signed the Guaranty in reliance on a promise by James that
7  Greystone CDE would later loan SFP an additional sum of money after an appraisal had
8  occurred.  As discussed below, however, such evidence, for two reasons, is insufficient to
9  support a defense of fraudulent inducement.

10      First, although Oliphant argues that at the time James made the above-referenced
11 oral representations to him, "Greystone [CDE] did not intend to loan any more than
12 $500,000" (see Opp. at 10-11), Oliphant fails to offer evidence to support a finding that
13 Greystone CDE, at the time James made the above-referenced oral representations to
14 Oliphant, had decided it would not loan SFP any further funds.  In other words, Oliphant
15 fails to offer evidence to support a finding that James's representations were false when
16 made.  See Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 151 N.E.2d 833, 835 (N.Y.
17 1958) (holding plaintiff seeking rescission of contract on ground of fraudulent inducement
18 must establish "defendant knowingly uttered a falsehood intending to deprive the plaintiff of
19 a benefit and that the plaintiff was thereby deceived and damaged"); see, e.g., Newcourt
20 Small Business Lending Corp. v. Grillers Casual Dining Group Inc., 727 N.Y.S. 2d 699, 701
21 (N.Y. App. Div. 2001) (holding, where defendant argued guarantee was unenforceable by
22 reason of plaintiff's having allegedly falsely told defendant it would loan additional amounts
23 in future, defendant failed to create triable issue of fact to avoid summary judgment on
24 plaintiff's claim for breach of guarantee, where defendant failed to show plaintiff's promise
25 "even if made, was then false, known to be false, or recklessly made").

26      Second, the highest court of the State of New York has held that a party cannot
27 establish a defense of fraudulent inducement based on an oral representation made prior to
28 the execution of a "personal guarantee" of a third party's performance under a loan, where

8

such written guarantee "recites that it is absolute and unconditional irrespective of any lack of validity or enforceability" thereof. See Citibank v. Plapinger, 485 N.E.2d 974, 974, 977 (N.Y. 1985). Here, Oliphant, in the Guarantee, expressly stated his performance thereunder was "continuing, absolute and unconditional, irrespective of any circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a guarantor." (See Kemple Decl. Ex. C at 2.) Such language precludes a defense of fraudulent inducement as a matter of New York law. See Citibank, 485 N.E.2d at 974, 976-77 (holding that although guarantors submitted sufficient evidence to support finding they signed guaranty in reliance on false statement bank was "committed to extend[ing] to the [borrower] an additional line of credit," guarantors' defense was foreclosed by language in guaranty providing that guarantors' obligations were "absolute and unconditional" irrespective of any "circumstance which might otherwise constitute a defense").

**2. Economic Duress**

In his declaration, Oliphant states he was "forced to accept" Greystone CDE's offer that it would loan $500,000 to SFP only if Oliphant personally guaranteed SFP's repayment. (See Oliphant Decl. ¶¶ 29-30.)[11] As Oliphant further explains, he was "forced" because, in his capacity as an agent for SFP, he "already had committed $251,000 to [a] bond sale which was due and payable" and had paid a "non-refundable" deposit of $72,000 to purchase the property at issue. (See id. ¶ 30; see also id. ¶¶ 25, 28-29.) In light of such evidence, Oliphant argues, he is entitled to rescind the Guaranty on the ground of economic duress. The Court disagrees.

At the outset, the Court finds such defense is foreclosed by Oliphant's statement in the Guaranty that his obligations to Greystone CDE were "continuing, absolute and unconditional, <u>irrespective of any circumstance whatsoever</u> which might otherwise constitute a legal or equitable discharge or defense of a guarantor." (See Kemple Decl. Ex. C at 2) (emphasis added).)

---

[11]As noted, Oliphant states that SFP and Greystone CDE, in the course of prior negotiations, had "never discussed" such a requirement. (See id. ¶ 29.)

9

Even assuming, arguendo, such defense is not foreclosed by the above-referenced provision, however, Oliphant has failed to create a triable issue of fact with respect thereto. Under New York law, a party seeking to rescind an agreement on the ground of "economic duress" must prove "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." See Kamerman v. Steinberg, 891 F.2d 424, 431 (2nd Cir. 1989). Here, Oliphant fails to offer any evidence to support a finding that Greystone CDE made any type of unlawful threat, implicit or explicit, to Oliphant or anyone else. Although Oliphant argues the unlawful "threat" was James's alleged fraudulent promise that Greystone CDC would in the future loan SFP a sum in addition to the $500,000 bridge loan (see Opp. at 17-18), Oliphant, as discussed above, has failed to offer evidence to support a finding of any such fraudulent intent on the part of Greystone CDE.

### 3. Lack of Consideration

Oliphant argues "the entire consideration of the [G]uaranty was to effectuate the purchase of the property," and that because Greystone CDE "refused to loan [ ] Oliphant the purchase price for [the] property," a "total lack of consideration" occurred. (See Opp. at 18:18-23.) In order words, Oliphant contends that because Greystone CDE, after it loaned SFP $500,000, did not later loan SFP an additional sum that SFP would have applied towards the purchase price of the subject property, consideration for the Guarantee was lacking. The Court again disagrees.

First, as discussed above, Oliphant stated in the Guaranty that his obligations to Greystone CDE were "continuing, absolute and unconditional, irrespective of any circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a guarantor." (See Kemple Decl. Ex. C at 2.)

Second, assuming, arguendo, a defense of lack of consideration is not foreclosed by such provision, Oliphant has failed to show said defense is applicable herein. In support of such defense, Oliphant cites the following rule, as stated by the highest court of New York: "Where the consideration fails, either partially or entirely, neither the principle nor the

10

guarantor is accountable for anything which has not been received." See Walcutt v. Clevite Corp., 191 N.E.2d 894, 897-98 (N.Y. 1963). Oliphant's reliance on such rule, however, is unavailing with respect to the instant claim by Greystone CDE. Even assuming some legally cognizable failure of consideration, both SFP and Oliphant are nonetheless "accountable for anything" which has been "received" by SFP from Greystone CDE. See id. Put another way, the fact that Greystone CDE failed to loan SFP funds in an amount greater than $500,000 would not excuse SFP from repaying, and Oliphant from guaranteeing repayment of, any sum actually loaned by Greystone CDE to SFP.

**4. Undue Influence**

Oliphant argues the Guaranty is subject to rescission "based on undue influence." (See Opp. at 20:2-3.) In support of this argument, Oliphant cites the following legal principle: "Where a confidential relationship exists between the parties, and the one in whom confidence is reposed actively participates in a transaction whereby he obtains a gift from, or advantage over, the other, a presumption of undue influence arises and casts on the party who has gained the gift or advantage the burden of rebutting it and showing fairness and good faith." (See id. at 19:16-21.) In that regard, Oliphant further argues, "the facts show" that "Greystone" was SFP's "agent" (see id. at 19:22), and that, under New York law, a guarantor can raise defenses the borrower could raise against the lender.

For the reasons discussed above, the Court finds such defense is foreclosed by the language in the Guaranty. (See Kemple Decl. Ex. C at 2.) Additionally, even assuming, arguendo, Oliphant's ability to raise such defense is not foreclosed, Oliphant nonetheless has failed to show a triable issue of fact exists to support such defense. Specifically, Oliphant fails to identify the "facts" on which he relies to support a finding that Greystone CDE is SFP's "agent," and no such facts are apparent from the record. Moreover, there is no evidence that Greystone CDE received any "gift from" or "advantage over" SFP. Further, to the extent Oliphant's reference to "Greystone" is, in this instance, a reference to

//
//

11

Greystone Servicing,[12] Oliphant fails to offer any evidence to support a finding that Greystone Servicing received any "gift from" or "advantage over" SFP, nor does Oliphant offer any explanation as to how, under New York law or otherwise, any asserted "undue influence" by Greystone Servicing, which is a separate corporation from Greystone CDE, would be attributable to Greystone CDE or serve to relieve SFP and Oliphant of their obligation to repay money advanced to SFP by Greystone CDE.

### 5. Conclusion Re: Oliphant's Liability

Accordingly, Greystone CDE is entitled to summary judgment on the issue of Oliphant's liability to Greystone CDE in the event SFP is found to be in breach of its obligations to repay Greystone CDE the amounts SFP borrowed under the Loan Agreement.

## C. SFP's Failure to Repay

The next issue for the Court's determination is whether it is undisputed that SFP has failed to repay the sums it borrowed from Greystone CDE under the Loan Agreement.

Greystone CDE argues SFP was required, as of September 18, 2007, to repay the sums it borrowed. In that regard, Greystone CDE offers evidence to support its argument that SFP was in default of its obligations under the Loan Agreement prior to said date, and, consequently, that Greystone CDE had the right to, and did, declare SFP in default on September 18, 2007 and to demand immediate payment on that date. (See, e.g., James Decl. ¶ 19; Kemple Decl. Ex. B at 15-16, Exs. H, I.) Oliphant, by contrast, offers evidence in support of his argument that SFP cured any default existing prior to September 18, 2007, and, as a result, that Greystone CDE had no right to demand repayment on that date (see, e.g., Oliphant Decl. ¶¶ 34-36); consequently, according to Oliphant, the Maturity Date of the Note remained December 15, 2007, as agreed by the parties on June 29, 2007 (see Kemple Decl. Ex. G). Under either theory, however, SFP currently has the obligation to

---

[12] In the SAC, plaintiffs allege "Greystone Servicing" acted as SFP's "agent" for purposes of obtaining insurance from the Department of Housing and Urban Development. (See SAC ¶ 15, Ex. A at 1.)

repay any principle it borrowed from Greystone CDE, as well as any interest due, to the extent SFP has not paid such amounts.[13]

In support of its assertion that SFP has not repaid the funds it borrowed under the Loan Agreement, the only evidence offered by Greystone CDE is James's declaration, specifically, James's statement therein that "[w]hen the extended Maturity Date of the [ ] Note and Bridge Loan Agreement arrived on December 15, 2007, Oliphant and SFP failed to repay the Note." (See James Decl. ¶ 23.) As set forth in James's declaration, such statement is "based on [his] personal knowledge, or upon [his] review of Company records maintained in the ordinary course of business." (See id. ¶ 1.) James fails, however, to offer any factual support for, or elaboration or explanation of, his conclusory statement that he has "personal knowledge" of any failure to repay the Note. Similarly, to the extent he is relying on "records," James fails to identify any such record(s) or describe the basis for his understanding, particularly as someone who admittedly is not employed by Greystone CDE (see id. ¶ 2), that any such record(s) were, in fact, maintained in the ordinary course of Greystone CDE's business. Consequently, Oliphant's objection to ¶ 23 of James's declaration is sustained.[14]

//

---

[13] In an answer to an interrogatory, SFP, without explanation, stated the Maturity Date of the Note had been extended to December 31, 2007. (See Kemple Decl. Ex. II at 7.) In opposition to the instant motion, Oliphant has not offered any evidence to support such assertion by SFP, nor has he argued the Maturity Date was extended. In any event, even if the Maturity Date had been extended to December 31, 2007, that date likewise has passed.

[14] Additionally, even if Greystone CDE had offered admissible evidence to prove a failure to repay by SFP, the evidence offered by Greystone CDE to prove the amount of damages is, as Oliphant argues, inadmissible. The only evidence offered by Greystone CDE as to said issue is James's declaration that SFP, as of March 25, 2009, owed Greystone CDE the total sum of $567,836.42. (See id. ¶ 24.) Although James states such declaration is based on his "review of the Bridge Loan documents, the accounting records maintained in the ordinary course of business with respect to this loan, and the most recently generated payoff statement for the Bridge Loan" (see id.), James again fails to provide any factual support for a finding that the unidentified "accounting records" to which he refers were, in fact, maintained in the ordinary course of Greystone CDE's business and/or that any information contained therein or in the "most recently generated payoff statement" is, in fact, accurate.

13

Accordingly, in light of Greystone CDE's failure to submit admissible evidence to support a finding that SFP has not repaid the sums it borrowed under the Loan Agreement, Greystone CDE has failed to show it is entitled to summary judgment on such issue.

## CONCLUSION

For the reasons stated above, Greystone CDE's motion for summary judgment is hereby GRANTED in part and DENIED in part, as follows:

1. To the extent the motion seeks summary judgment on the issue of Oliphant's liability to Greystone CDE in the event SFP has failed to repay the sums it borrowed under the Loan Agreement, the motion is hereby GRANTED.

2. To the extent the motion seeks summary judgment on the issue of SFP's failure to repay the sums it borrowed from Greystone CDE under the Loan Agreement, the motion is hereby DENIED.

**IT IS SO ORDERED.**

Dated: May 19, 2009

MAXINE M. CHESNEY
United States District Judge