IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTA FE POINTE, LP, et al.,<br><br>    Plaintiffs,<br>v.<br><br>GREYSTONE SERVICING CORPORATION, INC., et al.,<br><br>    Defendants<br>_____/ | No. C 07-5454 MMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Before the Court is defendant Greystone Servicing Corporation, Inc. ("Greystone Servicing") and Greystone CDE, LLC's ("Greystone CDE") "Motion for Summary Judgment on Plaintiffs' Claims," filed May 15, 2009. Plaintiffs Santa Fe Pointe, LP ("SFP"), Santa Fe Management, LLC ("SFM"), Rant, LLC ("Rant"), and Theotis F. Oliphant ("Oliphant") have filed opposition, to which defendants have replied. Having read and considered the papers filed in support of and in opposition to the motions, the Court rules as follows.[1]

**BACKGROUND**

The following facts are undisputed, or, if disputed, stated in the light most favorable to plaintiffs.[2]

---

[1] By order filed July 15, 2009, the Court took the matter under submission.

[2] Each party has submitted various objections to evidence submitted by the opposing party. To the extent the Court has relied on any such evidence herein, the objections thereto are overruled.

In July 2006, Rant entered into a contract to purchase a 224-unit apartment building located in Oklahoma City, Oklahoma at a price of $4,256,000; Rant subsequently assigned its interest in the contract to SFP, an entity in which Oliphant is a principal. (See Oliphant Decl., filed May 29, 2009, ¶¶ 5, 14; Kemple Decl., filed May 15, 2009, Exs. HH, LL.) The contract required that SFP close no later than July 31, 2007. (See Kemple Decl. Ex. MM.) Oliphant, on behalf of SFP, intended to finance the purchase by obtaining a mortgage loan insured by the Department of Housing and Urban Development ("HUD") and by selling tax-exempt bonds issued by the Oklahoma County Finance Authority ("OCFA"). (See Oliphant Decl. ¶¶ 6, 7; James Decl., filed May 15, 2009, ¶ 5.)

On September 7, 2006, Oliphant, on behalf of SFP, and Greystone Servicing entered into an agreement titled "Engagement Letter." (See Oliphant Decl. ¶ 14.) Under the terms of the Engagement Letter, Greystone Servicing, in return for a $14,000 fee, agreed as follows:

> Greystone [Servicing] will process an application ("Application") for a mortgage loan ("Loan") on the [Santa Fe Pointe Apartments] project ("Project") for submission to the Department of Housing and Urban Development acting through the Federal Housing Administration ("HUD") under its Multifamily Accelerated Processing ("MAP") for approval of HUD mortgage insurance under Section 221(d)(4) of the National Housing Act.

(See id. Ex. A at 1.)

By "Regulatory Agreement and Declaration of Restrictive Covenants," dated December 1, 2006, the OCFA agreed to issue $7,095,000 in bonds "to provide funds to lend to [SFP] to finance the acquisition and rehabilitation of the Project." (See Kemple Decl. Ex. R at 1 and ¶ 10.) The bonds were subsequently sold to "institutional investors" later in December 2006. (See Oliphant Decl. ¶ 25). In order to obtain funding for the "bond issuance costs," SFP entered into a "Bridge Loan Agreement" with Greystone CDE, under which agreement Greystone CDE agreed to loan SFP up to $500,000 (see Kemple Decl. Ex. B §§ 2.1, 2.3); additionally, SFP executed a "Bridge Promissory Note" ("Note"), in which SFP promised to repay Greystone CDE, at specified interest rates, the sums borrowed under the Bridge Loan Agreement (see id. Ex. A).

1    On March 19, 2007, Greystone Servicing submitted to HUD, on behalf of SFP, a "Firm Application" in which Greystone Servicing "propose[d] an insured mortgage amount of $7,958,500 for the purchase and rehabilitation of the [Santa Fe Pointe Apartments]." (See Tom Decl., filed May 29, 2009, Ex. 3.)

On May 8, 2007, HUD notified Greystone Servicing by letter that a "market study" submitted in support of the application did not "sufficiently identify and analyze the supply of existing multi-family housing in the subject's market area," and afforded Greystone Servicing the opportunity to submit, within twenty days, a "revised market study." (See id. Ex. 4.)  On May 24, 2007, Greystone Servicing submitted to HUD a revised market study, which revised study contained a "survey of all of the properties within a two-mile radius." (See Kemple Decl. Ex. CCC.)

On July 5, 2007, HUD denied the "Application for Firm Commitment," identifying four reasons therefor:  (1) HUD, having reviewed the "current and anticipated supply and demand conditions in the area," concluded "there [was] not sufficient, sustainable demand in the market area for units restricted [to low income tenants]"; (2) SFP's "occupancy estimates were aggressive and NOT acceptable, since they tend[ed] to overestimate the income accruing from the project"; (3) neither SFP's forecasted occupancy rate of 95% nor the "[a]ppraiser's estimate" of 93% was "acceptable, since the overall market occupancy is 90.5%"; and (4) "[t]he occupancy and income assumptions tend[ed] to be overestimated and not acceptable." (See Tom Decl. Ex. 5.)  In denying the application, HUD stated that the application could be resubmitted. (See id.)

On July 19, 2007, Greystone Servicing sent HUD a letter requesting reconsideration of the denial, noting therein that HUD, earlier on July 19, 2007, had "verbally rescinded the rejection and [was] working toward completing the review of the application." (See Kemple Decl. Ex. RRR.)  In said letter, Greystone Servicing stated it would provide HUD additional documents, such as a "revised mortgage credit analysis." (See id.)

As of July 31, 2007, SFP had not closed on its contract to purchase the subject real property. (See id. Ex. D at 353:22 - 354:5.)  Thereafter, the owner of the property began

3

marketing the property to others.  (See id. Ex. D at 354:6 - 355:1.)

On August 9, 2007, Greystone Servicing notified HUD it was withdrawing SFP's application for the stated reason "there [were] issues with the revised deal structure" that needed to be "resolved" before Greystone Servicing would be able to provide additional information to HUD.  (See id. Ex. UUU.)  The next day, August 10, 2007, Oliphant advised Greystone Servicing that Oliphant no longer had any "ownership interest" in the Project, that SFP had agreed to transfer its interest in the Project to David Henry ("Henry"),[3] that Henry would "handle all negotiations with Greystone on all aspects of the HUD deal," and that Greystone Servicing should "[c]all [Henry] directly."  (See James Decl. Ex. VV.)

On August 21, 2007, Debi Martin ("Martin"), Vice President of Greystone CDE, advised SFP, Oliphant, SFM, and Rant in writing that SFP was in "default" of certain of its obligations under the Bridge Loan Agreement, and stated that Greystone CDE was "reserv[ing] the right to declare the amounts due under the Loan Documents immediately due and payable."  (See Kemple Decl. Ex. H.)  On September 18, 2007, Martin advised SFP, Oliphant, SFM, and Rant in writing that Greystone CDE was "declar[ing] the indebtedness evidenced by the Note, any and all other amounts payable under the Bridge Loan Agreement and the other Loan Documents and all other indebtedness of [SFP] to [Greystone CDE] to be immediately due and payable."  (See id. Ex. I.)

SFP never closed on the subject property.  (See Kemple Decl. Ex. II at 8:2-24.)

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(c).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986),

---

[3]Henry is a "tax credit developer" (see SASC ¶ 32), who was introduced to Oliphant in June 2007 (see Kemple Decl. Ex. D at 391:21-25), and who had considered becoming a 50% partner in SFP (see id. Ex. D at 443:20 - 444:1).

4

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact.  Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  See Celotex, 477 U.S. at 324 (internal quotation and citation omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (citations omitted). "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion."  See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted).

## DISCUSSION

In its operative pleading, the Second Amended and Supplemental Complaint ("SASC"), plaintiffs allege seven causes of action, which the Court addresses in turn.

**A. First Cause of Action ("Negligence, Including Professional Negligence")**

In the First Cause of Action, as limited by the Court's August 1, 2008 order,[4] plaintiffs allege Greystone Servicing breached the "duty of due care" it owed to SFP under the Engagement Letter.  (See SASC ¶ 60.)

Under California law,[5] "[t]he elements of an action for negligence are the existence of duty (the obligation to other persons to conform to a standard of care to avoid unreasonable risk of harm to them); breach of duty (conduct below the standard of care);

---

[4] On August 1, 2008, the Court granted in part defendants' motion to dismiss the SASC, and, in particular, the Court limited the scope of the First, Second, Fourth, Fifth, and Sixth Causes of Action.

[5] The Court has diversity jurisdiction over plaintiffs' claims.  (See Notice of Removal, filed October 25, 2007, ¶¶ 4-18.)

causation (between the defendant's act or omission and the plaintiff's injuries); and damages." See Merrill v. Navegar, Inc., 26 Cal. 4th 465, 500 (2001).

The SASC alleges the following negligent acts by Greystone Servicing: (1) "failing to expedite processing, preparation and submission of the HUD application, causing delay in the processing, preparation and submission of the HUD application," (2) "withdrawing the HUD application without prior notice to or consent by [SFP]," and (3) "making and published unsolicited unprivileged derogatory statements regarding [SFP] and the Project to HUD representatives and others." (See SASC ¶ 63.)

**1. Delay**

As noted, plaintiffs allege Greystone Servicing did not "expedite" its preparation of the application, thus causing a "delay" in its submission to HUD. (See id.)

It is undisputed that SFP and Greystone Servicing entered into the Engagement Letter on September 7, 2006, and that Greystone Servicing submitted a "Firm Application" to HUD on March 19, 2007. Defendants argue plaintiffs lack evidence to support a finding that the submission of the application on March 19, 2007 was negligent. In particular, defendants argue, plaintiffs lack evidence to establish that Greystone Servicing's performance of its duties under the Engagement Letter was negligent, because expert testimony is required to establish the standard of care and any failure to comply therewith, and plaintiffs have not designated an expert.

"If the matter at issue is one within the knowledge of experts only and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert opinion evidence in order to establish a prima facie case." See Miller v. Los Angeles County Flood Control Dist., 8 Cal. 3d 689, 702 (1973) (holding trial court properly entered judgment of nonsuit in favor of defendant construction firm as to negligence claim, where plaintiff failed to offer expert testimony to establish defendant's construction of home fell below standard of care); see also Shad v. Dean Witter Reynolds, Inc., 799 F.2d 525, 529-30 (9th Cir. 1986) (holding district court erred in precluding plaintiffs, who had alleged defendant stockbroker engaged in "churning," from offering expert testimony on issue of "the

appropriateness of the transactions," because trier of fact could not, without expert testimony, determine whether defendant's transactions were appropriate). By contrast, expert testimony is not necessary where the alleged failures on the part of a professional are "so obvious, if not bizarre, that they present no problem in the determination of his negligence." See Miller, 8 Cal. 3d at 702 n.15 (noting expert testimony would not be required to establish negligence if construction firm had engaged in "installation of a fireplace without a chimney or of a second floor without any means of access to it").

Here, plaintiffs argue that no expert testimony is required because, according to plaintiffs, "(1) what was required to be submitted with the HUD application, (2) when and (3) by whom" are "questions that a jury can answer without expert assistance." (See Pls.' Opp., filed May 29, 2009, at 17:1-3.)

At the outset, the Court notes that plaintiffs have failed to identify evidence from which a trier of fact could determine "what was required to be submitted with the HUD application," and have failed to offer any explanation as to how a trier of fact could, based on the "common knowledge of laymen," see Miller, 8 Cal. 3d at 702, determine whether the application submitted to HUD was insufficient under the standard of care owed by Greystone Servicing. Indeed, plaintiffs have not offered the application, let alone pointed to any part of the application that a trier of fact could find to be deficient in light of the common knowledge of laymen.

Turning to plaintiffs' argument that a trier of fact could determine, based on the common knowledge of laymen, "when" the application should have been submitted to HUD,[6] plaintiffs first argue that an exhibit to the Engagement Letter, specifically, Exhibit C thereto, sets forth the timeline in which the application was to be submitted. Plaintiffs argue, in effect, that the standard of care pertaining to when Greystone Servicing was required to submit the application to HUD is set forth in the Engagement Letter, and,

---

[6]There is no dispute as to "who" was required to submit the application. The Engagement Letter, as noted, provides that Greystone Servicing "will process an application . . . for submission to [HUD] for approval of HUD mortgage insurance." (See Oliphant Decl. Ex. A at 1.)

7

consequently, no expert testimony is required to support a negligence claim based on a theory of delay in submission.

Exhibit C, titled "Summary of the Process," sets forth a timeline for submission of a "pre-application" to HUD.  Specifically, Exhibit C provides that "[u]pon completion of processing and underwriting (estimated at 4-6 weeks, depending on timing of third party reports), Greystone [Servicing] will prepare and deliver the pre-application to HUD." (See Oliphant Decl. Ex. A at C-1.)  Exhibit C also states that after Greystone Servicing submits a pre-application to HUD, HUD, according to its "guidelines," first reviews it for completeness and then reviews the pre-application for a period that "should not exceed" 45 days, after which, if HUD issues an "invitation" to submit a "firm application," Greystone Servicing's submission of a firm application is due within 120 days of HUD's invitation.  (See id.) Exhibit C further states, however:  "It is now possible to eliminate the pre-application and submit a firm application.  In that case, the procedure described [in Exhibit C] would be modified."  (See id.)

Here, it is undisputed that Greystone Servicing did not submit a "pre-application." Rather, and as expressly contemplated by the Engagement Letter, Greystone Servicing "eliminate[d] the pre-application and submit[ted] a firm application." (See Tom Decl. Ex. 3 (cover page of application, stating "Greystone Servicing [ ] is pleased to submit the Firm Application for the [P]roject on behalf of the borrower, Santa Fe Pointe, L.P."); id. Ex 1 at 54:3-8 (Oliphant's deposition testimony stating, "[t]he process with Santa Fe was to eliminate the pre-application" and "go to firm").)  Consequently, the timeline pertaining to submission of a "pre-application" is not material, and Exhibit C does not include any timeline for Greystone Servicing's submission of a firm application where, as here, the firm application has not been preceded by a pre-application.  Accordingly, plaintiffs have failed to show that a trier of fact could find, by consideration of Exhibit C to the Engagement Letter and unaided by any expert testimony, that Greystone Servicing's submission of the Firm Application on March 19, 2007 fell below the standard of care owed by Greystone Servicing.

8

1    Plaintiffs also rely on Oliphant's declaration that "[b]y the second week of November 2006, Greystone [Servicing] had all the information and materials it needed from [Oliphant] to submit SFP's HUD Application." (See Oliphant Decl. ¶ 20.)  To the extent plaintiffs, by relying on said declaration, argue that a trier of fact could, based on Oliphant's assertion, determine that Greystone Servicing was negligent in not submitting the application shortly after the second week in November 2006,[7] the Court disagrees.  First, Oliphant's conclusory declaration, which fails to identify any of the referenced "information and materials," is insufficient to create a triable issue of fact.  See Surrell v. California Water Service Co., 518 F.3d 1097, 1103 (9th Cir. 2008) ("Conclusory statements without factual support are insufficient to defeat a motion for summary judgment.").  Second, to the extent Oliphant may be asserting that the "information and materials" he personally was required to provide to Greystone Servicing were provided by November 2006, plaintiffs offer no evidence to support a finding that the other information necessary to support the application was also in the possession of Greystone Servicing in November 2006.  Indeed, as defendants have shown, it is undisputed that the entirety of the necessary information was not in Greystone Servicing's possession until March 2007.  (See, e.g., Kemple Ex. V (email from Oliphant to architect, dated January 5, 2007, stating, "I really need those final plans for Santa Fe Pointe"); id. Ex. PP at 194:24 - 195:25 (deposition testimony of Greystone Servicing's senior underwriter that Greystone Servicing received "final" plans from architect on March 16, 2007).)

Consequently, plaintiffs have failed to show they can establish, without expert testimony, that Greystone Servicing was negligent for having "fail[ed] to expedite processing, preparation and submission of the HUD application, causing delay in the

---

[7] According to plaintiffs' opposition, if the HUD application was not submitted before December 20, 2006, "Oliphant would have to re-start the bond application process in 2007, and risk receiving a less favorable bond allocation from the [OCFA]." (See Pls.' Opp. at 3:27 - 4:7.)  Plaintiffs fail to offer any evidence, expert or otherwise, to support this assertion.  Moreover, it is undisputed that although the HUD application was not submitted until March 2007, the OCFA, in December 2006, did issue over $7 million in bonds to provide funding for SFP's "acquisition and rehabilitation" of the subject property, and that the bonds were sold in December 2006.  (See Kemple Decl. Ex. R; Oliphant Decl. ¶ 25.)

9

processing, preparation and submission of the HUD application." (See SASC ¶ 63.)

Accordingly, to the extent the First Cause of Action is based on such theory, defendants are entitled to summary judgment.

**2. Withdrawal**

As noted, the First Cause of Action is also based on the allegation that Greystone Servicing breached a duty of due care owed to SFP, by "withdrawing the HUD application without prior notice to or consent by [SFP]." (See id.)

Defendants offer evidence, undisputed by plaintiffs, that Miriam Simon ("Simon"), Greystone Servicing's senior underwriter, decided to withdraw the application for the following reasons: (1) SFP's "tax credit syndicator" had withdrawn from the Project in May 2007, SFP had only obtained a "nonbinding" commitment from another syndicator, and Simon did not believe HUD would approve the application without a tax credit syndicator "being in place" (see Kemple Decl. Ex. PP at 165:21-25, 166:11-14; Ex. D at 397:21-25); (2) "SFP had lost [the] contract on the property," i.e., "[t]he purchase contract on the property had expired," and Greystone Servicing could not "continue to maintain an application in front of HUD for a property [as to] which the borrower didn't even have site control" (see id. Ex. PP at 152:21-24, 161:2-11, 167:6-9); and (3) withdrawing the application would allow SFP to later seek mortgage insurance from HUD for the Project, whereas if the application were rejected by HUD a "second time," Greystone Servicing "probably wouldn't be able to get it reopened" (see id. Ex. PP at 147:8-15, 166:22 - 167:5). Defendants also offer evidence, undisputed by plaintiffs, that SFP, through Oliphant, was advised that Greystone Servicing had decided to withdraw the application, and that Oliphant, at that time, stated no objection to the withdrawal. (See id. Ex. BBB (email from Oliphant to Greystone Servicing stating, after noting he had not had an opportunity to "influence the decision": "You've made your decision and that's fine.").

Defendants argue that plaintiffs lack evidence, by way of expert testimony or otherwise, to establish that Greystone Servicing's decision to withdraw the application constituted a breach of duty owed to SFP under the Engagement Letter.

In their opposition, plaintiffs fail to make any argument specific to their claim that the withdrawal was a negligent act, let alone point to any evidence to support a finding that the application, as it existed on the date it was withdrawn, could have been granted by HUD, given the absence at that time of a commitment from a tax credit syndicator and SFP's no longer having a contract to purchase the subject real estate.

Accordingly, defendants are entitled to summary judgment on the First Cause of Action to the extent it is based on the withdrawal of the application.

**3. Derogatory Statements**

The SASC alleges Greystone Servicing acted negligently by making "unsolicited unprivileged derogatory statements regarding [p]laintiffs and the Project to HUD representatives and others." (See SASC ¶ 63.)

With respect to the alleged "derogatory statements" made to "HUD representatives," the SASC alleges that "Greystone [Servicing's] representative had gone out of her way to make unsolicited disparaging remarks about the Project to the HUD representative from Oklahoma City." (See SASC ¶ 34.) Defendants argue that plaintiffs, during discovery, failed to identify any allegedly "disparaging" remark or remarks made to HUD.

In their opposition, plaintiffs rely on the following statement in Oliphant's declaration:

> During my July 5, 2007 visit to HUD's Oklahoma City regional office, Stacia Johnson told me that Miriam Simon, who I knew as Greystone [Servicing's] senior underwriter for SFP's HUD application, had made unsolicited and negative remarks about the SFP project to Ms. Johnson at a conference in St. Louis.

(See Oliphant Decl. ¶ 32.) Plaintiffs have not offered a declaration from Stacia Johnson or any other person who claims to have heard any derogatory or disparaging remarks, nor have plaintiffs offered any other evidence suggesting, let alone identifying, the nature of any disparaging remark.[8]

Accordingly, plaintiffs have failed to create a triable issue of fact with respect to their

---

[8]During her deposition, Simon testified that, during a HUD conference, Stacia Johnson of HUD told Simon "the [P]roject was – that they thought it was harder than they had expected," and that Simon responded "to the effect that it's tough, but it's worth doing." (See Kemper Decl. Ex PP at 119:5 - 120:21.)

11

1  claim that Greystone Servicing made derogatory or disparaging remarks regarding plaintiffs
2  and/or the Project to HUD.
3  　　　With respect to the alleged "derogatory statements" made to "others," the SASC
4  alleges that Greystone Servicing sent a letter, dated October 29, 2007, to the OCFA, and
5  copied to nine other entities, that included "an inaccurate and misleading depiction of the
6  Project and the tax-exempt bonds."  (See SASC ¶¶ 53-54.)  Defendants argue that
7  plaintiffs, during discovery, failed to identify any inaccuracy in the subject letter.
8  　　　The October 29, 2007 letter set forth the basis for Greystone Servicing's opinion that
9  it was "not feasible for [Greystone Servicing] to seek or obtain any form of credit
10 enhancement for the[ ] bonds" issued in December 2006 "or to provide further services for
11 the[ ] borrower."  (See Kemper Decl. Ex. FFF.)  The letter contained the following factual
12 assertions:
13 　　　(1) Greystone Servicing "is no longer pursuing an application for FHA mortgage
14 insurance for the Santa Fe Pointe Apartments [P]roject, nor [is Greystone Servicing]
15 currently involved in any way in seeking or obtaining the credit enhancement for the bond";
16 　　　(2) "on August 9, 2007, [Greystone Servicing] withdrew the [P]roject's application for
17 FHA mortgage insurance due to the insufficiency of information regarding the borrower's
18 other sources of funds for the project (specifically, the lack of a committed tax credit
19 investor)";
20 　　　(3) "[o]n August 1, 2007, [Greystone Servicing] understood that the borrower's
21 contract for the purchase of the Santa Fe Apartments [P]roject expired without being
22 extended; this and other circumstances lead to a default under the bridge loan documents
23 between the borrower and [Greystone CDE]"; and
24 　　　(4) "[l]itigation between [SFP and Greystone CDE] ensued," and a "complaint" was
25 "filed on September 26, 2007 in Federal Court in New York."
26 (See id.)
27 　　　Plaintiffs point to no evidence to support a finding that any of the above statements
28 is inaccurate.  Rather, plaintiffs rely on Oliphant's declaration, in which he asserts: "The

12

letter was artfully drafted to create the impression that I could not successfully finance, rehabilitate, or develop the Project." (See Oliphant Decl. ¶ 36.) Plaintiffs offer no evidence, however, to support a finding that Greystone Servicing "intended [the letter] should be understood as imputing wrongdoing or wrong conduct to plaintiff <u>and that the words were understood in that fashion by those who read [it]</u>." See <u>Palm Springs Tennis Club v. Rangel</u>, 73 Cal. App. 4th 1, 5, 7 (1999) (setting forth elements for claim of "libel per quod," as opposed to claim of "libel per se") (emphasis added).

Moreover, plaintiffs' claim is not for defamation, but, rather, for negligence, which, as discussed above, requires a duty of care on the part of the defendant. In this instance, plaintiffs have alleged Greystone Servicing owed SFP a duty of due care arising from the Engagement Letter. (See SASC ¶ 60.) As defendants point out, Oliphant advised Greystone Servicing on August 10, 2007 that he had "zero interest" in the Project as of that date, and plaintiffs have offered no evidence to support a finding that, thereafter, Oliphant or any other plaintiff obtained an interest in the Project. Consequently, plaintiffs have failed to show why, two and a half months after Oliphant advised Greystone Servicing he had "zero interest" in the Project, Greystone Servicing still owed Oliphant duties under the Engagement Letter.

Accordingly, plaintiffs have failed to create a triable issue of fact with respect to their claim that Greystone Servicing made derogatory or disparaging remarks in the October 29, 2007 letter.

**4. Conclusion Re: First Cause of Action**

As set forth above, defendants have shown Greystone Servicing is entitled to summary judgment on the First Cause of Action.

**B. Second Cause of Action ("Breach of Fiduciary Duty/Constructive Fraud")**

In the Second Cause of Action, as limited by the Court's August 1, 2008 order, plaintiffs allege Greystone Servicing owed a fiduciary duty to SFP arising from the Engagement Letter, and breached such duty by engaging in the acts identified above, as well as the following additional acts: by "changing the terms of the bridge financing," by

13

"demanding priority for the bridge loan to which they were not entitled," by "negotiating directly with [ ] Henry under terms that cut out [SFP] from the deal," and by "attempting to force [SFP] to transfer [its] prospective financial and non-economic gain in the Project to [ ] Henry." (See SASC ¶ 69.)

"The elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) its breach, and (3) damage proximately caused by that breach." See Mendoza v. Rast Produce Co., 140 Cal. App. 4th 1395, 1405 (2006). Here, defendants argue, plaintiffs lack evidence to establish a breach of any fiduciary duty and/or any damages caused by any breach.[9]

To the extent the Second Cause of Action is based on the same allegations as made in support of the First Cause of Action, the Court, for several of the reasons set forth above, finds plaintiffs have failed to create a triable issue of fact. In particular, with respect to plaintiffs' claim that Greystone Servicing breached a duty with respect to the content of the application, the timing of its submission, or the withdrawal thereof, plaintiffs have not shown that a jury could, using the common knowledge of laymen, find Greystone Servicing's actions constituted a breach of duty owed to SFP, and, with respect to plaintiffs' claim that Greystone Servicing made disparaging remarks, plaintiffs have failed to offer evidence to support a finding that any disparaging remarks were made.

To the extent the Second Cause of Action is based on the allegation that Greystone Servicing breached a fiduciary duty by "changing the terms of the bridge financing," the Court, again for several reasons, finds plaintiffs have failed to create a triable issue. First, it is undisputed the bridge financing was provided by Greystone CDE, not Greystone Servicing, (see Kemple Decl. Ex. B), and plaintiffs' claim for breach of fiduciary duty, to the

---

[9] Defendants, in their moving papers, do not address plaintiffs' ability to establish a fiduciary duty of some type existed. In their opposition, plaintiffs, in support of their argument that a fiduciary duty does exist, rely on state law providing that "[a[ fiduciary duty is undertaken by agreement when one person enters into a confidential relationship with another." See GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc., 83 Cal. App. 4th 409, 417 (2000). Although plaintiffs fail to identify what "confidential relationship" was created by the Engagement Letter, the Court assumes, for purposes of the instant motion, that such a relationship was created by the Engagement Letter.

extent brought against Greystone CDE, has been dismissed. (See Order, filed August 1, 2008, at 2:12-19.) Second, to the extent plaintiffs are proceeding on a theory that Greystone Servicing is liable for the actions of Greystone CDE under an alter ego theory, plaintiffs have not offered any evidence to support a finding that Greystone Servicing and Greystone CDE are, in fact, alter egos. Third, even assuming, arguendo, plaintiffs could demonstrate Greystone CDE and Greystone Servicing are alter egos, the Court, by order filed May 19, 2009, found Oliphant lacks evidence to establish Greystone CDE engaged in wrongdoing with respect to Greystone CDE's provision of bridge financing to SFP. (See Order, filed May 19, 2009, at 7-12 (finding Oliphant failed to offer any evidence to support claims of fraudulent inducement, economic duress, lack of consideration, or undue influence).)

Finally, to the extent the Second Cause of Action is based on the allegation that Greystone Servicing by "negotiating directly with [ ] Henry under terms that cut out [SFP] from the deal, and by attempting to force [SFP] to transfer [its] prospective financial and non-economic gain in the Project to [ ] Henry" (see SASC ¶ 69), the Court finds plaintiffs again have failed to create a triable issue of fact. Defendants have offered evidence that Oliphant, in June 2007, was introduced to Henry (see Kemple Decl. Ex. D at 391:21-25), that Oliphant, "at some point" after his initial meeting with Henry, discussed with Henry whether Henry would "take a 50 percent interest in [SFP]" (see id. Ex. D at 443:20 - 444:1), and that, on August 10, 2007, Oliphant advised Greystone Servicing that Oliphant and SFP no longer had any "ownership interest" in the Project and that Henry would henceforth "handle all negotiations with Greystone on all aspects of the HUD deal" (see James Decl. Ex. VV). In their opposition, plaintiffs offer no contrary evidence, and, more importantly, fail to point to any additional evidence that could support a finding that Greystone Servicing engaged in negotiations with Henry to "cut out [SFP]" from the Project or that Greystone Servicing attempted to force SFP to engage in transactions with Henry.

Accordingly, defendants have shown Greystone Servicing is entitled to summary judgment on Second Cause of Action.

**C. Third Cause of Action ("Intentional Interference With Prospective Economic Advantage")**

In the Third Cause of Action, as limited by the Court's May 8, 2009 order,[10] plaintiffs allege that SFP had an "existing business relationship" with the seller of the subject Oklahoma property and with HUD (see SASC ¶ 79), that SFP had a "probability of future economic benefit" from such relationships (see SASC ¶ 80), that defendants "disrupted, delayed and interfered with [SFP's] prospective economic advantage" by "delay[ing] and fail[ing] to expedite the HUD application, chang[ing] terms of the deal at the last minute, and breach[ing] [ ] fiduciary duties" (see SASC ¶¶ 81-82), and that defendants intended the disruption (see SASC ¶ 84).

"In order to prove a claim for intentional interference with prospective economic advantage, a plaintiff has the burden of proving five elements: (1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) an intentional act by the defendant, designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful act, including an intentional act by the d efendant that is designed to disrupt the relationship between the plaintiff and a third party." Edwards v. Arthur Andersen LLP, 44 Cal. 4th 937, 944 (2008). "The plaintiff must also prove that the interference was wrongful, independent of its interfering character." Id. "An act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." Id. (internal quotation, citation, and alteration omitted).

Here, the "independently wrongful" acts alleged in the SASC, in support of the Third Cause of Action, consist entirely of acts identified by plaintiffs as supporting their claims for negligence and/or for breach of fiduciary duty. As discussed above, however, plaintiffs

---

[10]On May 8, 2009, the Court granted in part defendants' motion for judgment, and, in particular, limited the scope of the Third and Seventh Causes of Action and further limited the scope of the Fifth and Sixth Causes of Action.

have failed to create a triable issue of fact with respect to either their claims for negligence or for breach of fiduciary duty. Consequently, plaintiffs have failed to show they can establish either defendant engaged in an "independently wrongful" act.

Accordingly, defendants have shown they are entitled to summary judgment on the Third Cause of Action.

**D. Fourth Cause of Action ("Negligent Interference With Prospective Economic Advantage")**

In the Fourth Cause of Action, as limited by the Court's August 1, 2008 order, plaintiffs allege that defendants negligently interfered with SFP's business relationship with the seller of the Oklahoma property and with HUD; plaintiffs' claim is based on the allegation that defendants "disrupt[ed[, delay[ed] and interfere[d] with [SFP's] prospective economic advantage" by "delaying and failing to expedite the HUD application, changing terms of the deal at the last minute, breaching their fiduciary duties to [SFP], and maligning [SPF] and the Project to the Oklahoma County Finance Authority and others." (See SASC ¶¶ 97.)

"The tort of negligent interference with prospective economic advantage is established where a plaintiff demonstrates that (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship." North American Chemical Co. v. Superior Court, 59 Cal. App. 4th 764, 786 (1997).

Here, as discussed above with respect to the First Cause of Action, plaintiffs have failed to create a triable issue as to their claim of negligence against Greystone Servicing,

17

1  and, as discussed above with respect to the Second Cause of Action, plaintiffs have failed
2  to show Greystone CDE engaged in any wrongdoing with respect to the bridge loan.
3      Accordingly, defendants have shown they are entitled to summary judgment on the
4  Fourth Cause of Action.
5  **E. Fifth Cause of Action ("Anticipatory Breach")**
6      In the Fifth Cause of Action, as limited by the Court's August 1, 2008 and May 8,
7  2009 orders, plaintiffs allege Greystone Servicing breached the Engagement Letter by
8  stating Greystone Servicing "will not further perform" and by stating that Greystone
9  Servicing was "'out' of the deal unless [SFP] provide[d] proofs and assurances" to which,
10 according to plaintiffs, Greystone Servicing was "not entitled." (See SASC ¶ 104.)
11     Under California law, "[a]nticipatory breach occurs when one of the parties to a
12 bilateral contract repudiates the contract." Taylor v. Johnston, 15 Cal. 3d 130, 137 (1975).
13 "The repudiation may be express or implied." Id. "An express repudiation is a clear,
14 positive, unequivocal refusal to perform; an implied repudiation results from conduct where
15 the promisor puts it out of his power to perform so as to make substantial performance of
16 his promise impossible." Id. (internal citations omitted).
17     In their opposition to defendants' motion to dismiss the SASC, plaintiffs clarify that
18 the factual basis for their claim of anticipatory breach against Greystone Servicing is that
19 Greystone Servicing had withdrawn the HUD application. (See Pls.' Opp., filed July 11,
20 2008, at 7:3-7.) As discussed above with respect to the First Cause of Action, plaintiffs
21 have failed to show the withdrawal of the application was wrongful. Further, plaintiffs point
22 to no provision in the Engagement Letter precluding Greystone Servicing from withdrawing
23 the application where Greystone Servicing believed it would not be granted by HUD.
24 Moreover, as discussed above, defendants have offered evidence, undisputed by plaintiffs,
25 that the withdrawal of the application would assist SFP in resubmitting it in the future under
26 more favorable circumstances. Finally, also as discussed above, the day after Greystone
27 Servicing withdrew the HUD application, Oliphant advised Greystone Servicing he no
28 longer would have an "ownership interest" in the Project, that Henry would be "handl[ing] all

1 negotiations with Greystone on all aspects of the HUD deal," and that Greystone Servicing
2 should "call [Henry] directly." (See James Decl. Ex. VV.)
3     In sum, plaintiffs fail to show that a trier of fact could find the withdrawal of the
4 application constituted an anticipatory repudiation of the Engagement Letter.
5     Accordingly, defendants have shown Greystone Servicing is entitled to summary
6 judgment on the Fifth Cause of Action.
7 **F. Sixth Cause of Action ("Breach of the Implied Covenant of Good Faith and Fair**
8 **Dealing")**
9     In the Sixth Cause of Action, as limited by the Court's August 1, 2008 and May 8,
10 2009 orders, plaintiffs allege that the Engagement Letter includes an "implied covenant of
11 good faith and fair dealing," which covenant Greystone Servicing breached by "interfering
12 as alleged [in plaintiffs' other claims] and by failing to cooperate with [SFP] in the
13 performance of the [Engagement Letter]." (See SASC ¶ 109.)
14     As pleaded, the Sixth Cause of Action is derivative of plaintiffs' other claims. As
15 discussed above, defendants have shown plaintiffs lack evidence to establish that
16 Greystone Servicing negligently performed the duties required under the Engagement
17 Letter, that Greystone Servicing breached any fiduciary duty that arose from the
18 Engagement Letter, that defendants intentionally or negligently interfered with SFP's
19 prospective economic relationships with HUD and the seller of the subject real property, or
20 that Greystone Servicing's withdrawal of the application constituted an anticipatory
21 repudiation of the Engagement Letter.
22     Accordingly, defendants have shown Greystone Servicing is entitled to summary
23 judgment on the Sixth Cause of Action.
24 **G. Seventh Cause of Action ("Declaratory Relief")**
25     In the Seventh Cause of Action, as limited by the Court's May 8, 2009 order,
26 plaintiffs allege they are entitled to a declaration as to whether the Bridge Loan Agreement
27 is in "default," whether the "maturity of the [B]ridge [L]oan [Agreement] has been
28 accelerated," and whether "any payment is currently due and payable from Oliphant" to

19

Greystone CDE.  (See SASC ¶ 114.)  In their motion for summary judgment, defendants argue that the Seventh Cause of Action should be dismissed on its merits.

Subsequent to the filing of the motion for summary judgment, the Court, by order filed June 17, 2009, entered upon stipulation between the parties, found that "SFP, Oliphant, and Rant [ ] owe, jointly and severally, Greystone CDE $601,290.83 on the bridge loan in unpaid principal, interest, and loan-related fees."  (See Order, filed June 17, 2009, at 3:4-5.)  In light of such order, the parties' dispute regarding their respective duties under the Bridge Loan Agreement has been resolved.

Accordingly, the Seventh Cause of Action will be dismissed as moot.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is hereby GRANTED, as follows:

1. Defendants are entitled to summary judgment in their favor and against SFP on the First through Sixth Causes of Action.

2. The Seventh Cause of Action is dismissed as moot.

**IT IS SO ORDERED**.

Dated:  July 29, 2009

_____
MAXINE M. CHESNEY
United States District Judge